John Houston Scott,  SBN 72578
Lizabeth N. de Vries, SBN 227215
**SCOTT LAW FIRM**
1375 Sutter Street, Suite 222
San Francisco, CA 94109
Telephone: (415) 561-9600
Facsimile: (415) 561-9609

Eric Safire, SBN 98706
**LAW OFFICES OF ERIC SAFIRE**
2431 Fillmore Street
San Francisco, CA 94115
Telephone: (415) 292-1940
Facsimile: (415) 292-1946

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA DESANTIS, individually and as Successor in Interest for RICHARD DESANTIS, deceased, and as Guardian Ad Litem for DANI DESANTIS,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SANTA ROSA, JERRY SOARES, RICH CELLI, TRAVIS MENKE, PATRICIA MANN and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.: C 07 3386 JSW<br><br>Case No.:  C 07 3386 JSW<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY ADJUDICATION**<br><br>[Fed. R. Civ. P. 56(c), 56(d)]<br><br>Date:   October 17, 2008<br>Time:   9:00 a.m<br>Place:  Courtroom 2, 17th floor<br>Judge:  Hon. Jeffrey S. White |

# TABLE OF CONTENTS

| | PAGE |
|---|---|
| I. ISSUES PRESENTED | 1 |
| II. INTRODUCTION | 1 |
| III. STATEMENT OF FACTS | 1 |
|     A. Plaintiff called 911 because her husband was in crisis | 1 |
|     B. When officers arrived at the scene, Mr. DeSantis was on his porch, in plain view, and was not armed | 2 |
|     C. Sgt. Celli Shot Mr. DeSantis with Lethal Force – A Rifle | 5 |
|     D. Sgt. Celli's Justification for the Lethal Force is not Reasonable Given His Training and Experience | 6 |
|     E. Sgt. Celli Was Involved in Another Fatal Shooting Incident Two Months Prior | 6 |
| IV. ARGUMENT | 7 |
|     A. This court may make a legal determination on this summary adjudication motion that defendant Sgt. Celli is liable for violating Plaintiffs' civil rights | 7 |
|     B. Officer Celli's Fatal Shooting of Mr. DeSantis Constituted Excessive Force in Violation of His Constitutional Rights as a Matter of Law | 8 |
|     1) Sgt. Celli's Use of Deadly Force Was Not Objectively Reasonable Under the Facts and Circumstances Presented | 8 |
|     C. Qualified Immunity Fails Because a Constitutional Right Was Violated and this Right Was Clearly Established | 12 |
| V. CONCLUSION | 14 |

# TABLE OF AUTHORITIES

PAGE

**CASES**

*Acosta v. City and County of San Francisco*, 83 F.3d 1143 (9th Cir. 1996) ..................................9

*Acosta v. Hill*, 504 F.3d 1323 (9th Cir. 2007) ..................................................................................8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..............................................................7, 8

*Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005) ...................................................9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................................7

*Conklin Bros. of Santa Rosa, Inc. v. U.S.*, 986 F.2d 315 (9th Cir. 1993) .......................................7

*Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) ...................................................12

*Graham v. Connor*, 490 U.S. 386 (1989) ..................................................................................8, 14

*Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir. 2001) ......................................................10

*Saucier v. Katz*, 533 U.S. 194 (2001) ...........................................................................................12

*Scott v. Harris*, ___U.S. ___, 127 S.Ct. 1769 (2007) .............................................................12, 13

*Tennessee v. Garner*, 461 U.S. 1 (1985) ........................................................................8, 9, 13, 14

**STATUTES**

Federal Rule of Civil Procedure 56 ............................................................................................7, 8

## I. ISSUES PRESENTED

Should the court grant partial summary judgment on the issue of liability against Sgt. Celli for excessive force for fatally shooting Mr. DeSantis where (1) no disputed facts exist that the victim was unarmed, shirtless, barefoot and suffering from a mental disorder from the time officers contacted him until the time he was shot by Sgt. Celli, and (2) no disputed facts exist that Sgt. Celli unreasonably resorted to lethal force when he shot Mr. DeSantis with a rifle?

## II. INTRODUCTION

Plaintiff Patricia DeSantis submits this motion for partial summary adjudication against Sergeant Richard Celli individually, and as Successor in Interest for Richard DeSantis, and as Guardian Ad Litem for Dani DeSantis on the issue of liability, only.

Plaintiff is not requesting that this Court decide issues of causation and damages on any of the claims. In conjunction with this Memorandum, Plaintiff has also filed the Declaration of John H. Scott ("Scott Declaration"), which authenticates the deposition testimony of defendant Celli and other officers who witnessed the events leading up to the shooting.

Plaintiffs also intend to file a separate motion for partial summary judgment as to the City of Santa Rosa on the issue of liability only.

## III. STATEMENT OF FACTS

**A. Plaintiff called 911 because her husband was in crisis.**

On Monday, April 9, 2007, at approximately 1:00 a.m., plaintiff Patricia DeSantis called 911 and advised that her husband, Richard DeSantis, was firing shots into the ceiling of their home. (911 Call Log attached to the Declaration of John Scott as **Exhibit A**) She advised the dispatcher that he was in a **"manic phase"** of a **bipolar episode** and having **"paranoid delusions"** that there were people in the attic. *Id.* She also advised the dispatcher that she was in the home with her two minor children aged 2 and 10. *Id.*

1   Officer Mann heard over dispatch that Mr. DeSantis "had a mental disorder."[1] (Mann Depo, 102:13-20)[2]

Sergeant Richard Celli was one of several Santa Rosa police officers who promptly responded to the scene. (Celli Depo, 5:10-14)   Sgt. Jerry Soares and Santa Rosa Police Officers Travis Menke, Patricia Mann, Daniel Jones, and Jerry Ellsworth also responded to the scene. Dispatch informed the Officers that DeSantis "was firing a weapon inside the residence." (Celli Depo, 205:3-4) Sgt. Celli knew "there was a wife and two children" inside as well. (Celli Depo, 206:1-13) During the communications back and forth between dispatch, Celli learned DeSantis was "still shooting while [Celli] was responding." (Celli Depo, 70:3-70:12)

**B.   When officers arrived at the scene, Mr. DeSantis was on his porch, in plain view, and was not armed.**

Celli parked his patrol vehicle southeast of the driveway.  Officer Jones was parked immediately in front of his vehicle, and Sergeant Soares pulled in directly behind him. (Celli Depo, 69:20-70:4) Sgt. Celli's first communication with on-scene officers was with Officer Jones and Officer Soares at their patrol cars. (Celli Depo, 211:17-21) Sgt. Celli removed his rifle from his trunk, and they briefly met at their vehicles. (Celli Depo, 73:6-10) This meeting lasted approximately "ten seconds." (Celli Depo, 77:11) Sgt. Soares advised Sgt. Celli that he **had the Sage.**[3] (Celli Depo, 77:13-15)

When Sgt. Celli arrived at the scene, he first observed Mr. DeSantis "standing just off of the steps to his residence." (Celli Depo, 213:18-25) Celli had no prior contact with, or

---

[1] Sgt. Celli obtained information from "radio traffic" (the dispatcher) as he responded to the scene in his police vehicle. He was aware that Mrs. DeSantis was on the phone with the dispatcher and that she had reported shots had been fired inside the residence. (Celli Depo., 70:5-71:3). Sgt. Celli remembers being told by Mrs. DeSantis that her husband was bipolar after he was shot. Sgt. Celli does not remember whether he heard, before he fired, that Richard DeSantis had a mental disorder. (Celli Depo., 106:10-108:2)

[2] All deposition transcripts are attached to the Declaration of John Scott as follows: Celli Depo. attached as **Exhibit B**; Mann Depo. attached as **Exhibit C**; Menke Depo. attached as **Exhibit D**; Soares Depo. attached as **Exhibit E**; and Jones Depo. attached as **Exhibit F**.

[3] A Sage is a "less lethal" weapon system that fires a 37-millimeter projectile polyurethane grommet. (Soares Depo, 34:3-35:2) Sgt. Soares is trained to aim "below center mass," at the waistline, which is the "ideal target." (Soares Depo, 36:12-17)

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT 2

knowledge of, Mr. DeSantis. (Celli Depo, 202:20-25) Patricia DeSantis was standing on the steps with their two-year old child in her arms. (Celli Depo, 214:13-16) Officer Menke, Officer Mann, Officer Ellsworth were in the "proximity" of the residence. (Celli Depo, 69:12-20) Sgt.

Next, Sgt. Celli observed Officers Menke, Mann and Elsworth approaching the southwest corner of the driveway. (Celli Depo, 79:1-2) Officer Menke signaled to Sgt. Celli with his flashlight. (Celli Depo, 79:7-8) Although it was dark, Sgt. Celli "could see the scene, and Mr. DeSantis could see me." (Celli Depo, 81:7-8) Officer Jones testified the **"lighting was good."** (Jones Depo, 102:1) "There was a street light somewhere in the vicinity of the driveway and there was light emitting from the DeSantis residence." (Celli Depo, 81:18-21) Mr. DeSantis "could see [Sgt. Celli]" as well as Officer Menke, Officer Mann and Officer Ellsworth. (Celli Depo, 117:18-25)

Mr. DeSantis moved "off the steps a couple of yards" towards Sgt. Celli. (Celli Depo, 82:18-20) DeSantis appeared **shirtless**, with jeans, and **no shoes**. (Celli Depo, 83:1-22) There were **no weapons** "sticking out the top" of DeSantis' waistband. (Celli Depo, 217: 10-13) At this time, Officer Menke was "15 to 20 feet" to the left of Celli. Officer Jones was just left of Celli. Officer Mann and Officer Ellsworth were "to the right of Officer Menke." (Celli Depo, 85:18) The officers were in a "straight line," but on opposite sides of the driveway. There were approximately "15 to 20" feet between the two groups of three. (Celli Depo, 86:1-25)(*See also*, Mann Depo, 60:25-76:25, Exh. 1 Diagram; Menke Depo, 73:23-82:25, Exh. 2 Diagram)

When DeSantis moved "from the area of the porch and walked southwest approximately three to four steps towards Officer Menke's direction," Officer Menke ordered him to put his knees on the ground. (Celli Depo, 118:6-9; 118:15-17) Mr. DeSantis **complied** and "eventually [put] both knees" on the ground. (Celli Depo, 119:2-6) This took "several seconds." (Celli Depo, 119:10-11) Mrs. DeSantis remained on the porch, yelling to the officers that Mr. DeSantis **"had a mental illness and was 'in crisis.'"** (Jones Depo, 36:16-24; 52:6-8)

Celli was in command of the scene. (Celli Depo, 226:14-22) Sgt. Celli ordered Officer Menke to start speaking with DeSantis. Officer Menke made all the commands. (Celli Depo, 87:21; 120:21-22) DeSantis was "told to keep his hands in the air and then to put his hands out

on the ground in front of him," which he did "after repeated commands." (Celli Depo, 119:25-120:3-6)

Sgt. Celli had authority to give the order for Officer Ellsworth to release the canine unit upon Mr. DeSantis. (Celli Depo, 102:23-103:9) Sgt. Celli stated, however, that it was not appropriate to have the dog go after DeSantis because, at that point, "he was hesitantly complying, **he was complying**" with the commands.[4] (Celli Depo, 122:4-9) When the officers "gained his compliance and he was on the ground." The Taser was also not an option because **DeSantis was "too far away" at approximately "16 to 18 yards".** (Celli Depo, 123:4-15)

Mr. DeSantis "bent forward, rolled his hips towards the ground, [and] immediately came back up to his kneeling position." (Celli Depo, 124:2-5) At the time "there was [still] no reason to send the dog . . . nor did I order it." (Celli Depo, 125:18-20; 252:17-25) Also, DeSantis had not "displayed characteristics, or a reason to deploy the Taser up to that point." (Celli Depo, 227:6-11)

Next, DeSantis "looked at [Sgt. Celli] . . . looked towards his wife's direction, and looked at [Officer Menke] and ran." (Celli Depo, 125:24-126:20) He ran "directly at [Officer Menke] and Officer Mann." (Celli Depo, 127:23-25) **None** of the officers reported seeing anything in Mr. DeSantis's hands. (Celli Depo, 128:8-12; Menke Depo, 63:17-23; Mann Depo, 87:8-9; Jones Depo, 38:19-20; Soares Depo, 123:15-17) "After several steps" Sergeant Soares "stepped forward to my left and fired the less lethal Sage." (Celli Depo, 128:14-17) DeSantis sprinted approximately "7 to 10 yards." (Celli Depo, 130: 5-10) As Sgt. Soares fired the Sage, Sgt. Celli had his rifle pointed in the direction of Mr. DeSantis. He was aiming at "his upper body." (Celli Depo, 130: 11-17)

When Sgt. Soares shot Mr. DeSantis with the Sage, DeSantis was approximately "10 to 12 yards" (Celli Depo, 129:1-25) from Sergeant Soares and approximately "30 to 45 feet" from Officer Menke. DeSantis was "a little closer" to Sgt. Soares. (Celli Depo, 130:5)

---

[4] Both Sgt. Celli and Sgt. Soares had authority to order Officer Elsworth to release the dog. (Soares Depo, 110:4-16)

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT 4

Sgt. Celli heard Sgt. Soares fire the Sage. "[I]t appeared that the Sage round hit Mr. DeSantis, he titled his body right, briefly, and proceeded towards Officers Menke and Mann." (Celli Depo, 133:19-21) Sgt. Celli "immediately" assessed Mr. DeSantis for "a second or two," saw DeSantis "continue towards Officer Menke and Mann" with **nothing in his hands**.[5] (Celli Depo, 134:22-135:14) DeSantis moved "a couple of steps" when the Sage round shot him, and traveled a distance of "approximately three to four yards" in those steps.[6] (Celli Depo, 136:6-8)

### C. Sgt. Celli Shot Mr. DeSantis with Lethal Force – A Rifle

DeSantis was "approximately 6 to 8 yards" from Officer Menke when Celli stepped into Sgt. Soares' field of view. This caused Soares to hesitate firing a second Sage shot. (Soares Depo, 39:17-40:7) If Celli had not come into view, **Soares would have fired the second Sage round**. (Soares Depo, 40:5-10) Celli fired his rifle and shot Mr. DeSantis. (Celli Depo, 135:23) At the time, DeSantis was "approximately 7 to 9 yards" from Celli. (Celli Depo, 136:9-18) Upon firing his rifle, Celli observed "DeSantis's body starting to turn," and that DeSantis took "one to two more steps" when "two more shots were fired"[7] by Menke and Mann.[8] (Celli Depo, 137:1-13) "A minute" to "a minute and a half" passed from the time that Sgt. Celli arrived to the time that Mr. DeSantis was shot dead. (Celli Depo, 216:5-8)

//

---

[5] As Mr. DeSantis ran towards the Officers with his hands pumping, they could see there was nothing in his hands. (Celli Depo, 127:18-128:5; Soares Depo, 122:12-123:16; Menke Depo, 63:17-64:7; Mann Depo, 91:5-92:2; Jones Depo, 84:13-23)

[6] The first Sage shot "momentarily" slowed DeSantis, as "he looked down towards his hands and the left side of his body." (Soares Depo, 37:22-25)

[7] Sympathetic gunfire is when a person hears a gun shot fired and reacts by shooting. These Officers were trained in avoiding sympathetic gunfire by *individually assessing* danger or threats based on *individual thoughts*. (Celli Depo, 97:6-21; Jones Depo, 72:25-73:25; Mann Depo, 115:17-166:10; Soares Depo, 53:12-55:3). Here, a triable issue of fact exists as to whether Officers Menke and Mann reacted with sympathetic gunfire. However, the issue of whether it was reasonable for Officer Menke and Officer Mann to fire shots is not raised in this motion.

[8] Officer Menke and Officer Mann are rookies. Officer Menke's hire date with the Santa Rosa Police Dept. was March 2006, and Officer Mann's hire date was April 2006. (Menke Depo, 9:12-23; Mann Depo, 13:14-16).

### D. Sgt. Celli's Justification for the Lethal Force is not Reasonable Given His Training and Experience

Based on Sgt. Celli's own testimony, the force used was excessive. His **only** justification for the use of lethal force was his subjective belief that DeSantis would attack Officers Menke, Mann, Ellsworth, and a police dog, and immediately create a life threatening situation by "either pulling out a weapon or taking theirs." (Celli Depo, 135:13-23)

Sgt. Celli is trained in the continuum of levels of force. (Celli Depo, 42:23-43:24) This begins with verbal presence, light touch, control holds, and personal body weapons, such as hands and feet. It progresses to impact weapons, such as baton or flashlight, bean bag rounds, and then long-range projectiles (such as a Sage). (Celli Depo, 45:1-46:25) Next is pepper spray, then the carotid restraint, followed by the Taser. (Celli Depo, 50:1-5; 50:6-25) The Taser can be used from "close proximity" to up to "approximately 20 feet" effectively. (Celli Depo, 51:1-13) After the Taser, the next level is canines. (Celli Depo, 52: 4-7)

Sgt. Celli was trained in dealing with emotionally disturbed persons. (Celli Depo, 185:1-185:25) He has "been involved in . . . hundreds" of 5150's. (Celli Depo, 188:9-11) Sgt. Celli was a Field Training Officer from "January of '02 up until September of '06." (Celli Depo, 182:18-183:1) From his SWAT background, he also had "training in tactics" and **he was "in command of the scene" at the DeSantis residence.** [9] (Celli Depo, 226:14-22) Celli did not put a Sage in his vehicle on the night of the shooting, because it was not part of his standard practice to do so. (Celli Depo, 55:18) He had pepper spray available, as well as a Taser. (Celli Depo, 57:18-58:5)

### E. Sgt. Celli Was Involved in Another Fatal Shooting Incident Two Months Prior

From 2002 to 2007, the Santa Rosa Police Department reported four incidents where a gun was discharged by an officer. Two were fatal. (*See*, Defendant's Response to Interrogatory No.

---

[9] Celli stated in a police interview that he was **"mad at Mr. DeSantis"** when he fired. (Celli Depo, 255:11-14)

6, Set Two; attached to the Scott Declaration as **Exhibit F**.) Sgt. Celli was also involved in the fatal shooting of an unarmed man on February 23, 2007. (Celli Depo, 18:23; 152:2-3)

The victim was a "black male" in his "early 20's." (Celli Depo, 164:12-13) He was fleeing the police and trying to scale a fence. (Celli Depo, 167:7-13) As he was trying to pull a leg over the fence, "he was shot." (Celli Depo, 168:1-3) Celli reports both the victim's hands were "in his waistband" when he fired. (Celli Depo, 174:13-17) Celli fired "two to three" shots in "rapid succession," but doesn't know if his shots hit the suspect. (Celli Depo, 168:20-169:8; 175:6-8) The next day, Celli learned that the victim was not armed at the time of the shooting.[10] (Celli Depo, 176:4-7)

## IV.   ARGUMENT

### A.   THIS COURT MAY MAKE A LEGAL DETERMINATION ON THIS SUMMARY ADJUDICATION MOTION THAT DEFENDANT SGT. CELLI IS LIABLE FOR VIOLATING PLAINTIFFS' CIVIL RIGHTS

Under Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted "if there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Conklin Bros. of Santa Rosa, Inc. v. U.S.*, 986 F.2d 315, 316 (9th Cir. 1993). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses which demonstrate that absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its initial burden, the opposing party must then

---

[10] Plaintiff recognizes that the February 23, 2007 constitutes a "prior bad act." However, under FRE 404(b), evidence of prior bad acts is admissible to prove motive, opportunity, preparation, plan, knowledge, identity, or absence of mistake or accident. Here, Officer's Celli's prior fatal shooting of an unarmed suspect occurred just two months prior to the fatal shooting of Richard DeSantis. This would be relevant if Sgt. Celli claims there is a subjective component to his liability, as well as to the issue of punitive damages.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT 7

"set forth specific facts showing that there is a genuine issue for trial" in order to defeat the motion. Fed. R. Civ. P. 56(e); *Anderson, supra*, 477 U.S. at 250.

In addition, judgment as a matter of law may be rendered as to a particular issue, which may be "the issue of liability alone though there is a genuine issue as to the amount of damages." FRCP 56(c), 56(d).

Here, there can be no genuine issue as to any material fact on the issue of liability, because based on Sgt. Celli's own testimony the force used was excessive. His only "justification" for shooting is his subjective belief that Mr. DeSantis would somehow overcome a group of police officers, and a police dog, and wrestle a gun away from them with his barehands and seriously harm or kill them. This belief is simply not objectively reasonable given the facts presented. Otherwise, police officers would have license to shoot and kill any unarmed suspect who was disobeying commands and running toward a group of officers. Several non-lethal use of force options exist to restrain and control unarmed suspects in this type of situation.

### B. OFFICER CELLI'S FATAL SHOOTING OF MR. DESANTIS CONSTITUTED EXCESSIVE FORCE IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS AS A MATTER OF LAW

#### 1) Sgt. Celli's Use of Deadly Force Was Not Objectively Reasonable Under the Facts and sCircumstances Presented

All claims of excessive force in making an arrest or other "seizure" of the person are properly analyzed under the objective reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 397 (1989), *Tennessee v. Garner*, 471 U.S. 1 (1985); *Scott v. Harris*, ___U.S.___, 127 S.Ct. 1769, 1777-1778 (2007). The issue is "whether [the police officer's] actions were *reasonable*." *Acosta v. Hill*, 504 F.3d 1323 (9th Cir. 2007).

A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. *Garner, supra*, 490 U.S. at 11. In *Garner*, an officer responding to a night "prowler" call from dispatch arrived on scene to see someone run across a backyard nearby. The officer could see the suspect's face and hands and saw no sign of a weapon. After the officer called out "police, halt," the suspect continued to scale the fence. Convinced that the suspect would otherwise elude capture, the officer fatally shot the suspect in the back of the head. *Garner, supra*, 471 U.S. at 3-

4. In a three-day bench trial, the district court found, *inter alia*, that the officer's force used was not excessive. *Id.* at 5. The 6th Circuit Court of Appeals affirmed as to the officer's liability, as good faith reliance on the statute entitled him to qualified immunity. *Id.* It remanded for reconsideration of possible city liability under the recent *Monell* decision. *Id.* On remand, the district court found, *inter alia*, the use of deadly force was constitutional. *Id.* at 6. The Court of Appeals reversed and remanded, reasoning that the killing of a fleeing suspect was a "seizure" under the Fourth Amendment. The State of Tennessee intervened to defend the statute. *Id.* at 7. On review, the Supreme Court held that the Tennessee statute giving the officer such authority was unconstitutional. It held that the use of deadly force to prevent the escape of an apparently unarmed suspected felon could not be used unless it was necessary to prevent the escape and the officer had probable cause to believe that the suspect posed a significant threat of death or serious physical injury to the officer or others.

In *Acosta v. City and County of San Francisco*, 83 F.3d 1143 (9th Cir. 1996), an officer chased two male purse-snatching suspects (Pescon and Silva) down a street. They got into a waiting car. *Id.* at 1144. The officer fired two shots into the car, killing the driver (Acosta) instantly. *Id.* The jury found that the officer used **excessive force** in shooting Acosta and returned a verdict for plaintiffs. *Id.* at 1144-1145. Following the jury's award of damages, the district court granted the officer's motions for judgment on the merits as a matter of law and on the ground of qualified immunity. *Id.* at 1145. On review, the 9th Circuit held that the grant of judgment for the officer as a matter of law was improper. *Id.* at 1147. It reversed the district court's grant of qualified immunity and judgment as a matter of law and denied the officer's new trial motion, and reinstated the jury's verdict against the officer. *Id.* at 1149.

In *Blanford v. Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005), the Ninth Circuit described the reasonableness standard as requiring a balance between the nature and quality of the individual's Fourth Amendment interests against the countervailing governmental interests at stake. The balancing test examines the totality of the facts and circumstances in each particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat

to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir. 2001).

A seizure of a person is unreasonable under the Fourth Amendment if a police officer uses excessive force in defending himself or others. Thus, in order to prove an unreasonable seizure in this case, here, plaintiff must prove **by a preponderance of the evidence** that the Officer Celli used excessive force when firing upon Mr. DeSantis.[11] Under the Fourth Amendment, a police officer may use such force as is "objectively reasonable" under all of the circumstances. In other words, the court must judge the reasonableness of a particular use of force **from the perspective of a reasonable officer at the scene** and not with the 20/20 vision of hindsight. In determining whether officer Celli used excessive force in this case, the court should consider all of the circumstances known to the officer on the scene, including:

1. The **severity** of the crime or other circumstances to which Sgt. Celli was responding;

2. Whether Mr. DeSantis posed an **immediate threat** to the safety of Sgt. Celli or to others;

3. Whether Mr. DeSantis was **actively resisting** arrest or attempting to evade arrest by flight;

4. The **amount of time** and any changing circumstances during which Sgt. Celli had to determine the type and amount of force that appeared to be necessary;

5. The **type and amount of force** used;

6. The availability of **alternative methods** to take Mr. DeSantis into custody or to subdue him;

7. **Other** factors particular to the case.

(9th Circuit Model Civil Jury Instruction No. 9.22; attached to the Scott Declaration as Exhibit H.)

In light of these factors, Sgt. Celli's use of deadly force was not reasonable as a matter of law.

---

[11] This is a civil case, not a criminal one. Plaintiff's burden of proof is by a "preponderance of the evidence," which means that the jury must be persuaded by the evidence that the claim is more probably true than not true. See, Ninth Circuit Model Civil Jury Instruction 1.3

**First**, when the officers arrived at the scene there was a crime in progress with potentially deadly results. An act of shooting was in progress and the subject (DeSantis) was potentially homicidal and suicidal.

**Second**, DeSantis posed an immediate threat to the safety of Sgt. Celli and others (particularly DeSantis's wife and two children) when the officers first arrived at the scene.

**Third**, DeSantis was "in and out" of resistance. When the officers initially arrived they took control of the situation. DeSantis became compliant. He left the home, was physically removed from his wife and two children, and followed the orders by Officer Menke to get on his knees and take a prone position. At this point the severity of the circumstances, and potential threat, were significantly diminished. The officers could see his hands and they did not see a weapon. DeSantis continued to be a potential threat (if he was hiding a weapon). However, there was no longer an immediate threat.

When DeSantis got up and started running toward Officers Menke, Mann and Elsworth he was now actively resisting arrest with the apparent intent to assault the officers. However, DeSantis was **not** a deadly threat simply because he was running at the officers so long as the officers could see his hands **and** did not see a weapon. **DeSantis did not pose a deadly threat to the officers or others at that time.**

**Fourth**, when DeSantis got up from a prone position and started running toward the officers he was approximately 16 to 18 yards away. There was sufficient time for the officers present to take action with six types of (less than lethal) force that was available. There was time and opportunity to use the following less than lethal levels of force: (1) defensive tactics; (2) chemical agents/ pepper spray; (3) impact weapons/ baton; (4) Taser; (5) the Sage; and (6) a K-9. **There was time and the opportunity for Sergeant Celli, who was in command of the scene, to employ any one or a combination of these levels of force to restrain and subdue DeSantis.**

**Fifth**, Sergeant Celli resorted to deadly force and shot DeSantis with his rifle.

**Sixth**, there were six alternative methods available to take DeSantis into custody and restrain him: (1) defensive tactics; (2) chemical agents/ pepper spray; (3) impact weapons/ baton; (4) Taser; (5) the Sage; and (6) a K-9- Canine.

**Seventh**, this was a unique situation in that there were **six** officers at the scene **and** a K-9. In addition, the officers had available batons, pepper spray, Tasers, and a Sage. These options were all capable of restraining and subduing DeSantis without resorting to deadly force.

In addition, if it is or should be apparent to the officers that the individual involved is emotionally disturbed that factor that must be considered in determining the reasonableness of the force used. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003). The *Drummond* court held that "a detainee's **mental illness must be reflected in any assessment of the government's interest in the use of force**." Although it stopped short of enacting a *per se* rule establishing two different classifications of suspects, it did emphasize the differing roles force plays in the treatment of mentally disabled persons versus "serious" criminals.

Here, Mr. DeSantis's emotional crisis figured prominently into the facts and circumstances. Mr. DeSantis' wife called 911 and explained that she was not in danger, but that Mr. DeSantis was suffering a bipolar episode. Officer Jones confirmed that Mrs. DeSantis yelled at the officers from the front porch that Mr. DeSantis had a mental illness and was in crisis. According to the officers' own testimony, none of the officers saw anything in his hands, much less a weapon that could endanger their safety to the extent that deadly force was necessary.

### C. QUALIFIED IMMUNITY FAILS BECAUSE A CONSTITUTIONAL RIGHT WAS VIOLATED AND THIS RIGHT WAS CLEARLY ESTABLISHED

In *Scott v Harris*, the Supreme Court reaffirmed the two step analysis announced in *Saucier v. Katz*. The threshold question is: Taken in the light most favorable to the non-moving party, do the facts alleged show the officer's conduct violated a constitutional right? *Scott v Harris, supra*, 127 S.Ct. at 1774. In *Saucier* the court found, as a matter of law, a shove to a protester did not constitute a violation of the Fourth Amendment, i.e., excessive force. *Saucier v. Katz*, 533 U.S. 194 (2001). There was not a factual dispute as to the amount of force used or the circumstances in which it was used.

In *Scott*, the court found that the videotape of a car chase "clearly contradicts the version of the story" told by the plaintiff/respondent. The Plaintiff's story was "utterly discredited" by the record (videotape) so that no reasonable jury could believe him. Accordingly, there being no

genuine issue of material fact in dispute, the court could decide the issue of excessive force as a matter of law. *Id.* at 1776.

In *Scott*, the court then went on to distinguish the facts (a car chase where a police vehicle bumped a fleeing car causing it to go off the road, overturning, and crashing) from *Tennessee v. Garner*, 461 U.S. 1 (1985). *Garner* held that it was unreasonable, as a matter of law, to kill an unarmed burglary suspect by shooting him in the back of the head while he was running away on foot. The officer could not reasonably believe that the suspect posed any threat and never attempted to justify his actions on any basis other than the need to prevent an escape. *Id.* at 21.

Here, for purposes of this motion, the Plaintiff is asking the court to find that the amount of force used by the defendant (Sgt. Celli) was excessive based on his own testimony. Here, there is not a videotape. Rather, the plaintiff is asking the court to consider the defendant's version of the facts, i.e., his own testimony.

In *Garner*, the court prescribed certain preconditions that must be met before the officer's actions can survive Fourth Amendment scrutiny: (1) The suspect must have posed an immediate threat of serious physical harm to the officer or others; (2) deadly force must have been necessary to prevent the escape; and (3) where feasible the officer must have given the suspect some warning. *Scott v Harris, supra,* 127 S.Ct. at 1777. In *Scott*, the court noted that this test did not apply to car chases for obvious reasons. Id. However, the *Garner* test does apply to this case.

**First**, the undisputed facts show a constitutional right was violated because Sgt. Celli used excessive force to shoot an unarmed, mentally-ill man. None of the officers saw anything in his hands, much less a weapon that could endanger safety to the extent that deadly force was necessary. At the time Sgt. Celli fired, Mr. DeSantis did not pose a serious risk of serious injury, much less a risk of fatal injury. Mr. DeSantis had just arisen from a prone position on the ground and began running at the group of officers. He was largely outnumbered. There was a trained police dog on hand. Mr. DeSantis was amidst a mental crisis, shirtless, barefoot, and had nothing in his hands, much less a weapon. Sgt. Soares had just fired the non-lethal Sage and was about to fire a second round. It was not reasonable that Sgt. Celli chose to dramatically escalate the situation by resorting to deadly force.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT 13

Moreover, Officer Jones is an experienced, reasonable officer who did not fire a lethal weapon at the scene.[12] (Jones Depo, 7:7-20) Jones was shoulder to shoulder with Sgt. Celli, "no more than two feet apart," and Jones did not shoot his weapon. (Jones Depo, 87:24-88:5; 88:6-9). Jones wanted to assess whether the first Sage projectile hit Mr. DeSantis. (71:25-72:3; 90:7-10) Soares intended to fire a second Sage round. (58:11-16)

**Second**, the Fourth Amendment right to be free from excessive force is clearly established. If a law enforcement official uses deadly force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen which is objectively unreasonable, this violates the clearly established right to be free from unreasonable search and seizure under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386 (1989). See, *Tennessee v. Garner*, 471 U.S. 1, 17-22 (1985)(claims of excessive force to effect arrest analyzed under a Fourth Amendment standard); see also, *Scott v. Harris*, ___U.S. ___, 127 S.Ct. 1769, 1777-1778 (2007) (applying the Fourth Amendment objective reasonableness standard to unconstitutional deadly force).

The Fourth Amendment objective reasonableness standard was clearly established at the time Sgt. Celli shot the unarmed Richard DeSantis with his rifle.

## V. CONCLUSION

For the foregoing reasons, plaintiff is entitled to partial summary adjudication.

DATED: August 8, 2008

Respectfully submitted,

**SCOTT LAW FIRM**

By: _____
JOHN HOUSTON SCOTT

F:\Cases\Cases - Active\DeSantis\Pleadings\Partial MSJ.8.08.08.doc

---

[12] Officer Jones began his career at the Twin Cities Police Department (Marin County), where he worked for "over seven years," before joining the Santa Rosa Police Department, where he worked for "just over 3 years." (Jones Depo, 7:7-7:20)