# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICIA DESANTIS, individually and as Successor in Interest for RICHARD DESANTIS, deceased, and as Guardian Ad Litem for DANI DESANTIS, a minor and TIMOTHY FARRELL, a minor,

Plaintiffs,

CERTIFIED COPY

vs.

CASE NO. C 07 3386 JSW

CITY OF SANTA ROSA, JERRY SOARES, RICH CELLI, TRAVIS MENKE, PATRICIA MANN and DOES 1 through 25, inclusive,

Defendants.

_____________________________/

DEPOSITION OF

RICHARD CELLI - VOLUME I

November 14, 2007

Reported by:
JUDY A. MANFRED
CSR No. 4748

HANNAH KAUFMAN & ASSOCIATES, INC.
Certified Shorthand Reporters
472 Pacheco Street
San Francisco, California 94116
(415) 664-4269

INDEX

PAGE
DEPOSITION OF RICHARD CELLI - VOLUME I
EXAMINATION BY MR. SCOTT 5

EXHIBITS
(No Exhibits Marked.)

BE IT REMEMBERED that pursuant to Notice of Taking Deposition, and on Wednesday, the 14th day of November, 2007, commencing at the hour of 1:39 p.m. thereof, at the offices of The Scott Law Firm, 1375 Sutter Street, Suite 222, San Francisco, California, before me JUDY A. MANFRED, a Certified Shorthand Reporter in the State of California, personally appeared,

RICHARD CELLI,

called as a witness herein; and the said witness, being by me first duly sworn, was thereupon examined and testified as is hereinafter set forth.

APPEARANCES

THE SCOTT LAW FIRM, 1375 Sutter Street, Suite 222, San Francisco, California 94109, represented by JOHN H. SCOTT, Attorney at Law, appeared on behalf of the Plaintiffs.

LAW OFFICES OF ERIC SAFIRE, 2431 Fillmore Street, San Francisco, California 94115, represented by ERIC SAFIRE, Attorney at Law, appeared on behalf of the Plaintiffs.

OFFICE OF THE CITY ATTORNEY, 100 Santa Rosa Avenue, Santa Rosa, California 95402-1678, represented by CAROLINE L. FOWLER, Assistant City Attorney, appeared on behalf of the Defendants.

RICHARD CELLI,
sworn as a witness by the Certified
Shorthand Reporter, testified as follows:
-oOo-

THE VIDEOGRAPHER: Good afternoon. This marks the beginning of volume 1, videotape 1 in the deposition of Richard Celli in the matter of Patricia Desantis, et al. versus City of Santa Rosa, et al. in the United States District Court, Northern District of California, Court case number C 07-3386 JSW. Today's date is November 14th, 2007 and the time it 1:39. The location of this deposition is 1375 Sutter Street, Suite 222, San Francisco, California. The deposition was noticed by John Scott of The Scott Law Firm and the videotape is being produced on behalf of the plaintiff. The video operator is James Taylor, a California Notary Public for the County of San Francisco, employed by Dan Mottaz Video Productions, LLC, 182 Second Street, Suite 202, San Francisco, California 94105, 415-624-1300. The Court Reporter is Judy Manfred.

Would counsel please identify themselves and state whom they represent.

MR. SCOTT: John Scott appearing for the plaintiffs.

MR. SAFIRE: Eric Safire appearing for plaintiff.

MS. FOWLER: Caroline Fowler, Assistant City Attorney appearing for all of the defendants.

THE VIDEOGRAPHER: If there are no stipulations the Court Reporter may administer the oath.

(The oath was administered by the Court Reporter.)

EXAMINATION BY MR. SCOTT

MR. SCOTT: Q. Would you state your full name for the record, please?

**A. Richard Todd Celli.**

Q. Have you ever been known by any other names?

**A. No.**

Q. You are a sergeant with the Santa Rosa Police Department; is that correct?

**A. Yes.**

Q. And do you have a preference whether I refer to you as Mr. Celli or Sergeant Celli?

**A. Mister is fine.**

Q. Mr. Celli, my name is John Scott. I'm one of the attorneys who represents the plaintiffs in this case. That would be Richard Desantis, wife, and his two-year-old daughter in a lawsuit that's been brought against the City of Santa Rosa, you and others, relating to a shooting death that occurred earlier this year in April.

First of all, just so we have it clear that

firing of weapons he's doing recreationally --
MR. SCOTT: Anything. Either on duty or off duty.
Q. I mean in the last, say, five years how often have you fired weapons, other than when you were just at the range?
**A. I hunt on occasion.**
Q. Okay. How often, an average, in a year?
**A. Maybe once every other year.**
Q. And what kind of hunting?
**A. Elk, deer, small game.**
Q. Is that with a rifle, a shotgun or both?
**A. Both.**
Q. Do you use a rifle for elk and deer and the shotgun for smaller game?
**A. A rifle for elk and deer and a rifle or shotgun for small game.**
Q. And other than the incident that we're here about that occurred in April of this year, have you ever fired your weapon on duty, other than at the range?
**A. Once.**
Q. And when was that?
**A. February 23rd, 2007.**
Q. And where did that occur?
MS. FOWLER: I'm going to object for the record.

This is an open criminal investigation and the investigation is still pending. I will allow you to ask him a limited number of questions about that if you stipulate that this portion of the deposition would be subject to the protective order.
MR. SCOTT: I will. And let's do it near the end, so we can just have it all on one spot. It makes it easier for me and the Court Reporter. So hopefully Mr. Safire or somebody will remind me to come back to it later.
MR. SAFIRE: I wrote down later.
MR. SCOTT: Okay. We'll save that for the end of the deposition.
Q. Have you ever been shot?
**A. No.**
Q. Have you ever been shot at?
**A. No.**
Q. Have you ever been injured in the line of duty?
**A. Yes.**
Q. On how many occasions? I'm not talking about, you know, a little bruise, but where you missed time from work where you had to go to the hospital?
**A. Twice.**
Q. And what type of injuries were those?
MS. FOWLER: Well, I'm going to object that that

invades his right to privacy as to his medical conditions. Let me talk to him.
MR. SCOTT: Okay. Off the record.
THE VIDEOGRAPHER: The time now is 2:01 and we are off the record.
(Off the record from 2:01 p.m. to 2:02 p.m.)
MS. FOWLER: Let's go back on the record. I've spoken to Sergeant Celli and he --
THE VIDEOGRAPHER: Wait. Hold on one second. The time now is 2:02. We are on the record.
MS. FOWLER: I spoke with Sergeant Celli and he does not have a concern about telling you that information so you can go ahead and answer the question.
MR. SCOTT: Thank you. And I'll stipulate right now, I'm not going to stipulate -- I'm not going to attempt to subpoena any of those medical records. I really don't care.
MR. SCOTT: Q. So what kind of injuries did you receive on those two occasions?
**A. I believe it was either 2001 or 2002, I broke my left elbow in a training accident.**
Q. And how did the -- how did it occur that you broke your elbow in a training accident?
**A. I fell into a basement.**
Q. What was the other injury?

**A. I don't know the year. I would say approximately 2003 I was involved in a physical altercation with an arrestee and hurt my right quadricep, right hamstring, dislocated my right hip, injured my L5 and S1 disks in my back.**
Q. Sounds like it was quite a tussle. Were there any other officers present at the time or was it just a one-on-one situation?
**A. There was one other officer.**
Q. And can you just generally describe the suspect? I mean, man, woman, young, old, white, African-American?
**A. Middle-aged white male.**
Q. Was he under the influence of PCP or something, if you know?
**A. I don't know.**
Q. Was he a big guy?
**A. No.**
Q. Did you draw your weapon at any time in that incident?
**A. Give me a second. No.**
Q. Did you use any weapons in that incident other than your hands, your arms, your legs, fists, whatever?
**A. No.**
Q. Did you have any other weapons with you at the time?

with Officer Ellsworth as a canine officer before the shooting that we're here about?

**A. Yes.**

Q. And what had you seen that dog do in the line of duty prior to April of 2007?

**A. Very limited training, the vehicle searches at high risk vehicle stops, a handful of building searches.**

Q. Okay. Had you ever observed Officer Ellsworth's canine locate a suspect as part of a search?

**A. Not that I recall.**

Q. Okay. Do you know if Officer Ellsworth's dog was trained to search for suspects?

**A. I don't know the specific training for the dog, but it's my belief that all of our dogs are trained to search.**

Q. I'm talking about people, not drugs?

**A. Correct.**

Q. Okay. Do you know if the Santa Rosa Police Department has any canines that are just used for sniffing, in other words, not searching for people, but just sniffing around for drugs?

**A. No, we don't.**

Q. Have you received training in use of force options?

**A. Yes.**

42

Q. Okay. And when did you first receive training in that regard?

**A. The police academy.**

Q. So from 1990 up until the present?

**A. Yes.**

Q. And has that training changed over the last 17 years?

MS. FOWLER: The training at the academy?

MR. SCOTT: Q. No, the training that he's received in use of force options?

**A. Some tactics have changed but, generally, it's the same training.**

Q. What tactics have changed?

**A. Control holds, the type of restraints, physical restraints that are placed on the person, meaning what we call as now maximum restraints, the tactics we use to approach people, or I guess to put control holds on.**

Q. Anything else changed?

**A. I want to say not significantly.**

Q. Okay. And do you have to receive training periodically to meet any requirements to continue employment at the Santa Rosa Police Department?

**A. We're required to show competency in defensive tactics in firearms.**

Q. And have you ever heard the term perishable

43

skills?

**A. Yes.**

Q. What does that term mean to you?

**A. Some skills that are taught or learned by officers, unless they are repeated and kept up to date, can perish and your skills in that won't be the same as maybe they had been.**

Q. Do you believe that you had been taught some skills that you have lost because you just haven't had occasion to use it?

MS. FOWLER: Well, I'm going to object. I think that calls for speculation.

MR. SCOTT: I don't need him to speculate.

Q. If you don't know, say you don't know.

**A. I don't think I've lost any skills.**

Q. Okay. Now, are you also familiar with the term either escalation of force or continuum of force?

**A. Yes.**

Q. Which term are you more familiar with, escalation or continuum?

**A. Continuum.**

Q. What does that term continuum of force mean to you?

**A. Means the level of force that is used varies based upon the dynamics or the situation, and that the**

44

**amount of force used in those situations can change or may need to be modified.**

Q. What levels of force have you been trained to use as a Santa Rosa police officer, starting with hands-on -- or I guess your verbal command would be the beginning, but after verbal command, between that and deadly force, what are all the options you're aware of?

**A. Well, there's a verbal. Well, there's presence even before verbal.**

Q. Okay.

**A. Light touch, control holds, personal body weapons.**

Q. And what would those be?

**A. Hands and feet.**

Q. Okay.

**A. Impact weapons.**

Q. What would those be?

**A. Baton.**

Q. Anything else?

**A. Bean bag rounds, long-range projectiles.**

Q. What about flashlight?

**A. Yes.**

Q. Did you receive training in using a flashlight as an impact weapon?

**A. Not specifically. However, it is not -- how do I**

45

**phrase this? It can be used.**
Q. On impact weapons you mentioned baton, bean bag and projectiles. Anything else you can think of?
MS. FOWLER: With respect to non-lethal or do you want him to move on to the other...
MR. SCOTT: No, I think we're still on non-lethal impact weapons.
THE WITNESS: I don't think as far as impact weapons go.
MR. SCOTT: Q. You mentioned the bean bag. What is that?
**A. Bean bag is a shot out of a 12-gauge shotgun.**
Q. And is that something you've been trained to use?
**A. Yes.**
Q. Do they have any other name for it or is it still called a bean bag?
**A. I'm going to try to recall the specific name. I can't recall the specific name.**
Q. Fair enough. You mentioned projectiles. What are those?
**A. They're long-range impact weapons. For instance, a Sage is a multi-round impact weapon, shoots a hard projectile.**
Q. And are you trained to use the Sage?
**A. Yes.**

46

Q. Did you have training on when it would be appropriate to use the Sage instead of the shotgun or the shotgun instead of the Sage?
**A. Yes.**
Q. And what was that training?
**A. We're trained to use that level of force to effect the arrest or stop the activities of the suspect or the intended target of that weapon. Again it's in our continuum.**
Q. Were you given training on when it would be appropriate to use a shotgun instead of a Sage or a Sage instead of a shotgun? In other words, did they give you examples?
**A. No.**
Q. So based on your training, do you have an understanding when it would be appropriate to use a Sage instead of a shotgun or a shotgun instead of a Sage?
**A. It would depend on the type of circumstance incident.**
Q. Can you give me an example of a situation where it would be appropriate to use a shotgun instead of a Sage or a Sage instead of a shotgun?
**A. It would depend on a multitude of things.**
Q. Can you give me some examples?
**A. Distance.**

47

Q. Sage for a longer distance?
**A. Correct.**
Q. And have you been given training on what would be the appropriate range to use the shotgun instead of the Sage?
MS. FOWLER: I'm going to object as an incomplete hypothetical. He's already told you it depends on the circumstances.
MR. SCOTT: I understand that. I'm just talking about range.
Q. I understand it can be depend on circumstances, but as far as range goes.
**A. In general, general ideas on range, but no set specifics for distance of -- as far as the further distance.**
Q. When you trained with the bean bag round of a shotgun, what's the distance you train at?
**A. Approximately 10 yards. I'm going to say approximate because I'm not sure on it.**
Q. I just want your best estimate.
**A. To up to 25 yards.**
Q. Okay. So you trained at approximately 10 to 25 yards with the shotgun bean bag round?
**A. Right.**
Q. These were estimates?

48

**A. Estimates only.**
Q. And what about the Sage, what distance do you train with the Sage projectiles?
**A. That approximate short distance to -- I couldn't give a specific as far as how far out. Maybe because --**
Q. For training?
**A. Well, it depends on your comfort level with a -- with each weapon such as a Sage on your -- comfortable with your abilities. I would probably put it no more than 30 yards, 40 yards.**
Q. Are you more comfortable with a Sage or the shotgun -- with a bean bag?
**A. I'm comfortable with them both.**
Q. Do you prefer one over the other?
MS. FOWLER: And I'd object as incomplete hypothetical. If you can answer it, go ahead and answer it.
THE WITNESS: No.
MR. SCOTT: Q. Have you ever used the shotgun with the bean bag round in the line of duty?
**A. No.**
Q. Have you ever used the Sage with the projectile in the line of duty?
**A. No.**
Q. Okay. Now, you mentioned the low -- the

49

non-lethal impact rounds. What would come next in the continuum of force?
**A. OC sprays.**
Q. Also known as pepper spray?
**A. Yes.**
Q. And what type of situations are you trained to use the OC spray?
**A. A multitude of situations. Combative suspects, crowd control.**
Q. How many times have you used OC spray in the line of duty, approximately?
**A. Approximately two dozen times.**
Q. What would come next in the continuum of force?
**A. The carotid restraint.**
Q. That would be applying force to the carotid arteries to cause someone to become unconscious?
**A. Yes.**
Q. What would come next?
**A. Taser.**
Q. By the way, let me backtrack a little bit. Have you ever used a carotid restraint in the line of duty?
**A. Yes.**
Q. How many times?
**A. Approximately two to three.**
Q. Now, you mentioned the Taser being next. Are you

50

train to use the Taser?
**A. Yes.**
Q. And now do you know if it's the M26 or the X26?
**A. X26.**
Q. And do you know what the distance is for using the X26 Taser?
**A. Depends on how it's used.**
Q. Explain what you mean by that.
**A. It can be used at close contact with -- without firing it. You're just using contact probes. It can be used from there with the probes from close proximity up to approximately 20 feet effectively.**
Q. Have you been trained to use it up to 20 feet?
**A. Yes.**
Q. And have you ever used the Taser on duty?
**A. Yes.**
Q. How many times?
**A. Approximately five to seven.**
Q. And was it successful -- successfully implemented when you used it?
MS. FOWLER: I'm going to object. That's vague and ambiguous as to what you mean by successful.
MR. SCOTT: Q. Did it accomplish the goal you were trying to achieve when you used the Taser?
**A. Not every time.**

51

Q. Okay. What kind of cartridge is in the X26, do you know?
**A. I don't know.**
Q. What would come after the Taser in the continuum of force?
**A. The canines.**
Q. And were you trained when it was appropriate to use canines?
**A. Yes.**
Q. And what was that training?
**A. Talks about how they're to be deployed, in what circumstances, in general.**
Q. What do you recall about that training?
**A. No specifics, but it gives generalities on types of crime of violent offenders. Building searches.**
Q. When you say violent offenders, what do you mean by that?
**A. Noncompliant or hostile subjects.**
Q. What does noncompliant mean?
**A. Could be fleeing subjects, but that depends on several circumstances.**
Q. Okay. What do you mean by hostile?
**A. Physically fighting, threatening assault.**
Q. In the continuum of force what would come after the canines?

52

**A. I don't know if I've missed anything there. Lethal force.**
Q. And what types of lethal force were you trained to use?
**A. Firearms.**
Q. What kind of firearms?
**A. Pistol.**
Q. Anything else?
**A. Shotgun.**
Q. Anything else?
**A. Rifle.**
Q. Now, in April of 2007, the night of the shooting incident, did you have a baton available?
**A. Yes.**
Q. Did you have a shotgun available?
**A. Yes.**
Q. With bean bag rounds; is that available to you?
**A. I didn't have it in my car.**
Q. Okay. What did you have in your car that you could use with a shotgun?
**A. I had a shotgun.**
Q. What type of ammunition did you have for the shotgun?
**A. Double 00 buck and slug.**
Q. What's slug, what's that?

53

**A. It's a single round.**
Q. Is that lethal?
**A. Yes.**
Q. And why didn't you have any non-lethal shotgun rounds with you?
**A. I didn't take a shot -- you don't change those -- you wouldn't put a non-lethal round into a standard shotgun.**
Q. You'd need a special shotgun?
**A. Yes.**
Q. How do you get that special shotgun?
**A. They're available to take out by the officers who have been qualified and trained to use them.**
Q. And were you one of those officers?
**A. Yes.**
Q. And did you have it available on the night of the shooting?
**A. It was not with me.**
Q. Why not?
**A. I didn't take it out with me.**
Q. Why not?
**A. I just didn't take it out.**
Q. Any reason why?
**A. I didn't put it in my car.**
Q. Was that your custom or habit that you didn't put

it in your car, or was there something special about this night?
**A. No, there's nothing special about that night.**
Q. Was it your habit or custom not to have it in your car?
**A. Yes.**
Q. Okay. Why was that?
**A. I just don't carry it.**
Q. No reason?
**A. No.**
Q. Did you have the Sage with you the night of the shooting?
**A. I did not.**
Q. Why not?
**A. I didn't put it in my car.**
Q. Any reason?
**A. I standard -- I don't put it in my car on a standard practice.**
Q. Any reason why you don't do that as a standard practice?
**A. I just don't.**
Q. Okay. Is that -- did you understand that it was your option or decision to make whether to put the shotgun with the bean bag round or the Sage with the projectile round in your car or not?

**A. Yes.**
Q. And that wasn't anything you had to clear with the lieutenant or anyone in your chain of command?
**A. No.**
Q. Were you aware of other sergeants who carried the Sage and the shotgun with the bean bag rounds in their cars?
**A. Some do.**
Q. Do you know why they do?
MS. FOWLER: Object. Calls for speculation.
MR. SCOTT: Q. Just say you don't know if you don't know. I just said do you know why they do?
**A. Personal trust.**
Q. Okay. Was there -- if you'd wanted to put the shotgun with the bean bag rounds in your car the night the shooting occurred, could you have? Was one available?
**A. Yes.**
Q. And was the Sage round available, if you'd wanted to take one?
**A. I don't know.**
Q. Why is that, because they might have been out of them?
**A. Correct.**
Q. And if you wanted to find out who would you ask, whether there was one available that night?

**A. It would be whether one of the officers or one of the sergeants had one, had them.**
Q. How many are there, to your knowledge?
**A. I believe two.**
Q. And if you take it with you I guess that means, then, the other sergeants can't. So there's only two, right? Is that two per shift and you take it at the beginning of the shift and you return it at the end?
**A. Correct.**
Q. How many shotguns with bean bags were available in April of this year?
**A. I don't know.**
Q. Do you know approximately how many?
**A. No.**
Q. But you know there were only two Sage rifles?
**A. That's my belief.**
Q. Okay. Why do you believe that?
**A. I think I've only seen two.**
Q. Okay. Did you have OC spray available on the night of the shooting?
**A. Yes.**
Q. Did you have a Taser available on the night of the shooting?
**A. Yes.**
Q. And did you have a Taser on your person?

A. **No.**
Q. Where was it?
A. **In my car.**
Q. Where was it located in your car?
A. **In the trunk.**
Q. Did you have any other weapons in the trunk that night, that is, the night of the shooting?
A. **No.**
Q. And was a canine at the scene at the time of the shooting?
A. **Yes.**
Q. And as far as lethal force went you had your pistol with you on your duty belt at the time of the shooting?
A. **Yes.**
Q. And is that a revolver or an automatic?
A. **Semi-automatic.**
Q. Do you know how many -- does it have a clip?
A. **Yes.**
Q. Do you know how many rounds it holds?
A. **13.**
Q. And did you have a shotgun available to you that night, the lethal force?
A. **Yes.**
Q. And where was that shotgun located in your vehicle?

58

A. **In a shotgun rack next to the driver and passenger seat.**
Q. What kind of shotgun was that?
A. **12 gauge.**
Q. Do you know what type of load it had that night?
A. **Double 00 buck.**
Q. Was that your choice?
A. **Yes.**
Q. Why did you choose the double 00 bulk?
A. **That's standard.**
Q. And did you also have a rifle available to you that night?
A. **Yes.**
Q. Lethal force rifle? That's a yes. What kind of rifle was that?
A. **NAR 15.**
Q. What's an NAR 15?
A. **AR.**
Q. Oh, I'm sorry. AR 15. What's that?
A. **It's a 223 caliber semi-automatic rifle.**
Q. And when did you first receive training in the AR 15?
A. **I believe it was year 2000.**
Q. Is that when you joined the SWAT team?

59

A. **Yes.**
Q. If you had not been a member of the SWAT team, would you have had an AR 15 with you?
A. **I very well could have.**
Q. So in other words -- well, before 2000 had you ever had an AR 15 with you in patrol duties?
A. **No.**
Q. To your knowledge, did other patrol officers have AR 15s assigned to them for patrol duties?
A. **When?**
Q. At any time. Was there some period of time when it started?
A. **I don't know the specific year, but we started training officers to qualify with the AR 15 or M16 rifles, I would say, in approximately 2002, 2003.**
Q. Do you know who made that decision?
A. **Command staff.**
Q. Do you know who the chief was at the time?
A. **Mike Dunbagh.**
Q. I'm sorry. Mike who?
A. **Dunbagh.**
Q. Dunbagh. How do you spell that?
A. **D-u-n-b-o-u-g-h.**
MS. FOWLER: -b-a-g-h, I think.
MR. SCOTT: Q. Was he the chief at the time of the shooting in this case?

60

A. **No.**
Q. Who was the chief in April of this year?
A. **Ed Flint.**
Q. Is he still the chief?
A. **Yes.**
Q. When did Ed Flint become chief?
A. **I don't know. I think he's been there three years and that's an approximate.**
Q. Okay. Were you trained to use the AR 15 in particular types of situations?
A. **Yes.**
Q. What type of situations?
A. **Situations that would necessitate the use of a rifle.**
Q. And can you give me examples of what you're training was in that regard?
A. **Incidents that involved possible harm or injury to the victims, officers, the community.**
Q. Was the training any different from a handgun or was it just optional, you could use a rifle or handgun, take your pick, it's up to you?
A. **It's where the officer individually deems that situation to be appropriate under the circumstances given at the time.**

61

Q. And as part of your training were you given examples of types of problems that can occur if the team work is not coordinated?

**A. Yes.**

Q. And what examples were you taught?

**A. Entering rooms without a partner, for instance, is more hazardous than any tactically or multiple partners.**

Q. And as part of your training as a member of the SWAT team were you taught that communication is critical?

MS. FOWLER: I'm going to object that's an incomplete hypothetical, but if you can answer it as phrased.

THE WITNESS: I can't answer it as phrased. There are...

MR. SCOTT: Q. Did you get any training in communication in relation to being a member of the SWAT team?

MS. FOWLER: I think that's vague and ambiguous as to what you mean by communication. It's overly broad.

MR. SCOTT: Q. If you don't understand what I'm asking, then just say you don't understand.

**A. There are many types of communication or times to communicate and times not to.**

Q. What types of -- were you told why it can be

important to communicate?

**A. Yes.**

Q. And what were you taught in that regard?

**A. Understanding scenes or surroundings.**

Q. When you say understanding scenes, what do you mean by that?

**A. Maybe the dynamics of the call or incident.**

Q. And as of a member of the SWAT team were you trained to take the initiative in certain situations?

**A. Yes.**

Q. And at the scene where Mr. Desantis was shot and killed in April of this year were you the most trained officer at the scene?

**A. I don't know.**

Q. Were there any other members of the SWAT team there?

**A. No.**

Q. So to your knowledge, was there anyone there who had more training than you, in terms of handling this type of a situation?

MS. FOWLER: Well, I'm going to object that calls for him to speculate. He doesn't know specifically about the training of the other officers involved and whether one type of training makes you better able to deal with a situation than another.

MR. SCOTT: He can say he doesn't know.

THE WITNESS: I don't know about the rest of the other officers training specifically.

MR. SCOTT: Q. But you were the only SWAT team member there, correct.

**A. Yes.**

Q. Who was in charge of the scene when you arrived at the Desantis -- the area of the Desantis house, then?

**A. I can't say anybody was until I got there.**

Q. Do you know if anyone was before you got there?

**A. When you're describing -- are you asking which officers were in charge?**

Q. Yes, if anyone.

**A. I don't think anyone was in charge of that scene before I got there.**

Q. And why do you believe that?

**A. Based upon the circumstances at the time.**

Q. And what was it about the circumstances that led you to believe that no one was in charge?

**A. Officers were approaching and had not made contact at that point at the residence or at the location.**

Q. What do you mean by that?

**A. They had not made contact at the location and were still approaching the location.**

Q. And by the location, you mean the area where the

shooting occurred?

**A. Yes.**

Q. So you were there first?

**A. No.**

Q. Who was there when you arrived?

MS. FOWLER: I think it's vague and ambiguous as to where there is. You mean actually at the Desantis residence?

MR. SCOTT: At the vicinity. At the vicinity, at the residence.

Q. Who could you see?

**A. Officer Menke, Officer Mann, Officer Ellsworth were not at the residence but were approaching.**

Q. When you say at the residence, what do you mean by that? Are you talking about inside the house as opposed to in the driveway?

**A. They were not to the residence yet.**

Q. And by residence you mean in the house or do you mean --

**A. Well, in the proximity of the house.**

Q. When you arrived what did you -- where did you park your car in relation to the house and the driveway?

**A. Southeast.**

Q. Okay. Did you see other police cars there when you arrived?

**A. Yes.**
Q. How many?
**A. One was parking in front of me and one pulled in behind me.**
Q. What information did you have when you arrived and before you got out of your car?
**A. Regarding?**
Q. What you were approaching.
**A. That a subject was shooting inside the residence, that his wife had called, that there were two children in the house with him, and that the subject was still shooting while I was responding. I mean, there's a lot.**
Q. Well, keep going.
**A. That officers were on scene when the subject was still shooting, that the caller was either unable or unwilling to leave the residence.**
Q. Anything else?
**A. No.**
Q. And did you pick this up by listening to radio traffic or from some other source?
**A. Radio traffic.**
Q. Did you understand that there was someone in the house who was giving information to someone outside the house, in other words, that whatever radio traffic you were getting was from a dispatcher or somebody who was

70

talking to somebody inside the house?
**A. I was aware that a dispatcher was on the phone with Mrs. Desantis.**
Q. Okay. Did you have an opportunity to talk to Ms. Desantis if you wanted to?
**A. No.**
Q. Okay. Did you talk to the dispatcher who was talking to Mrs. Desantis?
**A. No.**
Q. Did you have any information about who was firing the weapon inside the house?
**A. Mr. Desantis.**
Q. Okay. Did you have any other information about him?
**A. His name. I don't know if there was a date of birth. That's about it.**
Q. Okay. Did you have information that anyone had been shot?
**A. No.**
Q. Was your understanding no one had been shot?
**A. No one had been reported to have been shot yet.**
Q. And did you understand it was a hostage situation?
**A. No, not necessarily. There was no hostage or the use of the word hostage.**

71

Q. And when you arrived at the -- if I use the term scene, do you understand I'm just talking about the area around the house?
**A. Yes.**
Q. Okay. The general area, the driveway and the vicinity of the house, if I say scene, we're on the same page?
**A. Yes.**
Q. Okay. So you arrived at the scene and what's the first thing you did when you arrived?
**A. I retrieved my rifle from the trunk.**
Q. From where?
**A. From the trunk of the car.**
Q. And was the Taser also available at that time?
**A. Yes.**
Q. Could you have taken the Taser and the rifle?
**A. Yes.**
Q. And are you trained to sling a rifle and use a Taser?
**A. At times, depending on the circumstances.**
Q. And you decided -- why did you decide to take the rifle?
**A. Mr. Desantis was shooting inside the residence.**
Q. Okay. And that's the reason you took the rifle?
**A. Yes.**

72

Q. And why did you not take the Taser?
**A. Because Mr. Desantis was shooting in the residence.**
Q. And when you got the rifle from your trunk, what's the next thing you did?
**A. Met up with Officer Jones and Sergeant Soares at our vehicles.**
Q. Where were their vehicles in relation to yours?
**A. Officer Jones was parked right in front of me to the west of me, Sergeant Soares to the east of me behind me.**
Q. Did you arrive at approximately the same time with Jones and Soares?
**A. Yes.**
Q. Did you essentially all drive there together?
**A. Sergeant Soares and I did.**
Q. Where were you and Sergeant Soares when you got the call?
**A. Inside the police department.**
Q. What were you doing?
**A. Approving reports.**
Q. And what shift were you on that night?
**A. Graveyard.**
Q. And what time did you come on duty?
**A. 7:00 p.m.**

73

Q. Okay. And when did your shift end?
**A. Normally at 8:00 a.m.**
Q. Were you on a 4/10?
**A. No 3/12.**
Q. 3/12. And what three days of the week did you work at that time?
**A. Friday, Saturday, Sunday.**
Q. Did you choose to work those three nights?
**A. No.**
Q. Were there other nights that you wanted to choose but because you didn't have seniority you got Friday, Saturday, Sunday?
**A. Correct.**
Q. How many officers were you supervising that night?
**A. I don't know.**
Q. Do you know approximately how many?
**A. Approximately 8 to 10.**
Q. And were you responsible for a particular part of Santa Rosa that night, or did you and another sergeant kind of jointly have responsibilities for the whole city, or were there sectors, or anything like that?
**A. We were responsible for the whole city.**
Q. And who were the other sergeants on duty that night with you?

74

**A. Sergeant Soares, Sergeant Nick Sensley.**
Q. Anything else?
**A. No, that's it.**
Q. Okay. Three of them. Was there a lineup at the beginning of that shift?
**A. Briefing?**
Q. Yeah, briefing.
**A. Yes.**
Q. Did you count the officers that were at the briefing?
**A. I don't know.**
Q. Was Officer Mann at the briefing?
**A. Yes.**
Q. Officer Jones at the briefing?
**A. No.**
Q. Was officer -- was that because he came on duty later?
**A. Before.**
Q. Okay. What about officer Ellsworth, was he at the briefing?
**A. No.**
Q. And why is that?
**A. Before. Came on before.**
Q. All right. And what about Officer -- is it Menke?

75

**A. Menke, yes.**
Q. He was at the briefing?
**A. Yes.**
Q. All right. Was Sergeant Soares at the briefing?
**A. No.**
Q. Why is that?
**A. It wasn't his shift.**
Q. When was his shift over, do you know?
**A. 2:00 a.m. Wait. No. Sorry. 2:30 a.m.**
Q. Now, this was a Sunday night, right?
**A. Yes.**
Q. Or early Monday morning? Had it been a quiet night?
MS. FOWLER: Vague and ambiguous as to what you mean by quiet, but if you can answer, go ahead.
THE WITNESS: Recall it being busy.
MR. SCOTT: Q. Okay. It was Easter Sunday, right?
**A. Yes.**
Q. What do you mean by busy, a lot of calls?
**A. Yes.**
Q. And you responded to a number of calls prior to going to the Desantis residence?
**A. I don't know.**
Q. Do you recall any calls you responded to that

76

night before Desantis?
**A. No.**
Q. Now, you get to the scene you get out of your car. You go to the trunk, you get your rifle, and then you meet with Sergeant Soares and Officer Jones, correct?
**A. Yes.**
Q. And where did that meeting take place?
**A. To the right or in the middle of the street from my patrol car.**
Q. How long did that meeting last?
**A. Approximately ten seconds.**
Q. And what was said?
**A. Sergeant Soares advised me that he had the Sage less lethal and I described where I wanted to approach the residence.**
Q. What did you say?
**A. I pointed out the southeast corner of the driveway.**
Q. Was this your attempt to establish a plan, a tactical plan?
**A. The start of one, yes.**
Q. Okay. And so at this point your plan was to do what exactly?
**A. Get on scene, locate where the residence and the subjects involved were, and resolve the situation.**

77

Q. What do you mean by resolve?
**A. To stop the shooting, protect the family, protect the citizens, protect the neighborhood.**
Q. When you say protect the family, what do you mean by that? Did that include Mr. Desantis or not?
**A. Yes.**
Q. Okay. Did you understand if there were any children in the house?
**A. Two.**
Q. Do you know how old they were?
**A. I believe 10 and 2.**
Q. When you talked initially to Sergeant Soares and Officer Jones did they provide you any new information that you did not already have?
**A. No.**
Q. And did you tell them what the plan was?
**A. The basic plan of approach, where the approach should come from, yes.**
Q. Was the idea that the three of you would approach together from the same general direction?
**A. Yes.**
Q. And what's the next thing you did after this conversation with Sergeant Soares and Officer Jones?
MS. FOWLER: Soares.
MR. SCOTT: Q. Soares.

78

**A. Observed Officers Menke, Mann and Ellsworth approaching the southwest corner of the driveway.**
Q. When you say approaching, you mean they were walking toward it?
**A. Yes.**
Q. And what's the next thing you did?
**A. Observed Officer Menke flashing his flashlight at me to get my attention of where his location was.**
Q. What was the lighting conditions at the time, speaking of flashlights?
**A. Dark. I think there was one street light and I don't know which side of the street.**
Q. And were any of the police cars positioned so as to shine lights from their cars into the -- towards the house or the driveway?
**A. No.**
Q. Okay. Tactically did you consider doing that?
**A. Yes.**
Q. And tactically did you think it was a good idea?
**A. No.**
Q. Why not?
**A. I didn't want to give up my position.**
Q. What do you mean by that?
**A. I didn't want to be seen.**
Q. All right. So you were using the dark for

79

concealment purposes; is that the idea?
**A. Yes.**
Q. And that was a tactical decision you made, to use the dark as concealment?
**A. Initially.**
Q. Did that change at some point?
**A. Yes.**
Q. When did it change?
**A. When I exposed myself to Mr. Desantis.**
Q. Why did you do that?
**A. So he could identify who I was as the police.**
Q. And at that point did you feel it would have been better to have more lighting?
MS. FOWLER: Object as vague and ambiguous as to better. Calls for speculation.
MR. SCOTT: Q. I thought I understood you to say you thought the dark was good for concealment purposes up to a certain point. And then you thought that being dark was not of benefit to you. Did I misunderstand you?
MS. FOWLER: It misstates his testimony. He said being under cover -- or being in a position of cover was initially beneficial and that was what changed, not the lighting conditions.
MR. SCOTT: Q. Well, I'm just asking questions. I'm just trying to understand what you're saying. So I'm

80

just trying to understand if at some point you thought tactically it would have been better to have more light instead of darkness?
**A. I don't know if any more light was needed in the driveway.**
Q. Why do you say that?
**A. I could see the scene and Mr. Desantis could see me.**
Q. How do you know he could see you?
**A. He turned and looked at me.**
Q. But how do you know he could see you, just because he looked in your direction? You mean it was light enough for him to see you?
**A. Yes.**
Q. And it was light enough for you to see him?
**A. Yes.**
Q. Where was the light coming from?
**A. There was a street light somewhere in the vicinity of the driveway and there was light emitting from the Desantis residence.**
Q. Now, when you first saw Mr. Desantis, were you in the vicinity of the driveway?
**A. Yes.**
Q. In the southeast corner of the driveway?
**A. Yes.**

81

Q. Approximately how far were you from the front door of his house where you saw the light emanating from?
**A. Approximately 18 to 20 yards.**
Q. And did you see anyone else in the vicinity of the house?
**A. Yes.**
Q. Who did you see?
**A. A female holding, approximately, a two-year-old.**
Q. Where was she in relation to the house?
**A. Standing on the steps.**
Q. Did you hear her say anything?
**A. No.**
Q. Did you ever hear her say anything before the shots were fired?
**A. Not that I recall.**
Q. Now, when you first saw Mr. Desantis, where was he in relation to his wife and child?
**A. Off the steps a couple of yards south towards my direction.**
Q. And was he walking toward you?
**A. No.**
Q. Was he walking?
**A. No.**
Q. What was he doing?
**A. Standing.**

82

Q. And what was he wearing?
**A. Baggy jeans, no shirt.**
Q. No shirt?
**A. No shirt.**
Q. You're sure about that?
**A. Yes.**
Q. When you say baggy jeans, what do you mean by that? How baggy?
**A. Loose fitting.**
Q. Were they kind of hanging down towards his hips?
**A. They were not hanging off his hips.**
Q. Oh. Not like the young kids we see these days, he didn't have to hold his pants up with a hand?
**A. No.**
Q. Not that baggy?
**A. No.**
Q. All right. And it appeared to be blue jeans?
**A. Yes.**
Q. And was he wearing a hat?
**A. No.**
Q. Was he wearing shoes or anything on his feet?
**A. I don't think so.**
Q. Did he have anything in his hands, either one of his hands?
**A. No.**

83

Q. You could see his hands?
**A. Yes.**
Q. When he was standing, I guess, a few feet from his wife; is that correct?
**A. Yes.**
Q. And was he facing towards her?
**A. No, he was looking towards the direction of Officer Menke.**
Q. Officer Menke was to your left?
**A. Yes.**
Q. Approximately how many feet?
**A. From me?**
Q. Yes.
**A. 15 to 20 feet.**
Q. And where was Sergeant Soares at this time?
**A. To my left.**
Q. Approximately how far?
**A. On my shoulder.**
Q. And where was Officer Jones at this time?
**A. On my left.**
Q. To the left of Sergeant Soares?
**A. That or the two were switched, but they were both in close proximity to my left.**
Q. How much distance was there -- well, let me say it another way. Immediately to your left was Sergeant

84

Soares and Officer Jones. One -- you forget which one was closest to you, but they were close to you to your left, correct?
**A. Yes.**
Q. And then there was some distance, some space, and then there was Officer Menke?
**A. Yes.**
Q. And were there any other officers there at the time that you could see?
MS. FOWLER: At what time? When he first saw --
MR. SCOTT: Yes.
MS. FOWLER: -- Mr. Desantis?
MR. SCOTT: Q. Now, he's there and you see Mr. Desantis standing not far from his wife near the front door of the house?
**A. Yes, Officer Mann and Officer Ellsworth.**
Q. And where were they in relation to you?
**A. To the right of Officer Menke.**
Q. So Officer Menke would have been the furthest to the left or to the west, and you were the furthest to the east?
**A. No.**
MS. FOWLER: That misstates his testimony.
MR. SCOTT: Q. Okay. So you're facing Mr. Desantis and you're in the southeast corner?

85

**A. Yes.**
Q. Okay. And everyone else is to your left or to the west?
**A. Yes.**
Q. Okay. And the order would have been either -- next to you would have been either Soares or Jones?
**A. Yes.**
Q. Correct? And then it would have been Ellsworth, Mann and Menke or Mann, Ellsworth and Menke?
**A. Ellsworth was south of Menke, Mann was south of Menke, Mann was in between Ellsworth and Menke.**
Q. So in other words, when you say south, you mean behind?
**A. No, in a straight line.**
Q. Okay. So basically there's six officers who are kind of in a line?
**A. On opposite sides.**
Q. When you say opposite sides, what do you mean?
**A. Of the driveway. There's three on one side, three on the other.**
Q. And a gap between the two groups of three?
**A. Yes.**
Q. And how much space between the two groups of three?
**A. Approximately 15 to 20 feet.**

86

Q. Okay. Was this part of a plan?
**A. No.**
Q. Now at this point, for tactical reasons, did you need a rifle?
**A. Yes.**
Q. Why?
**A. Mr. Desantis had been shooting and I didn't know if Mr. Desantis was still armed or --**
Q. Okay. Go ahead.
**A. Or what continued threat was going on.**
Q. All right. And at this point did -- who was in charge of the scene?
**A. I was.**
Q. So you took command?
**A. Yes.**
Q. And what orders did you give the other officers?
MS. FOWLER: At what point in time?
MR. SCOTT: Q. This point. The six of you are there, Mr. Desantis is down by the house in the vicinity of his wife, standing there.
**A. I ordered Officer Menke to start speaking to him.**
Q. And did you tell Officer Menke what to say?
**A. I don't know my specific words, but I believe they were to call him out.**
Q. Why did you order Officer Menke to do that?

87

**A. Mr. Desantis was facing his direction and Officer Menke had a better view of the driveway and residence.**
Q. And why do you believe that?
**A. Based upon where Officer Menke was as opposed to myself.**
Q. And why do you believe he had a better view? Because you had an obstructed view, or he was closer? Why was it better?
**A. Officer Menke was facing the right side of the four-plex toward the Desantis home, as opposed to where I was. I was facing the left side of the buildings.**
Q. Okay. So at this point were you in a position of cover?
**A. Concealment.**
Q. What was concealing you?
**A. A green garbage can.**
Q. Okay. Why didn't you take a position of cover?
**A. I wouldn't have been able to see the scene.**
Q. Have you ever used your vehicle as cover?
**A. Yes.**
Q. Why didn't you use your vehicle as cover in this situation?
**A. I didn't feel it was appropriate to take a vehicle into the scene, not knowing the circumstances.**
Q. Okay. What were you afraid was going to happen

88

to the vehicle?
MS. FOWLER: Objection. Assumes facts not in evidence. He didn't say he was afraid anything would happen to the vehicle.
MR. SCOTT: Q. Okay. Were you afraid something would happen to the vehicle?
**A. For safety reasons I wasn't about to drive into a scene where a subject was shooting.**
Q. Okay. For safety reasons you didn't think you needed cover?
**A. I made the choice of being able to see, as opposed to not being able to see.**
Q. Okay. And did you tell any of the other officers there to take a position of cover?
**A. No.**
Q. Why not?
**A. They were taking their own precautions. Officer Menke was at the corner of the -- southwest corner of the building using that as cover.**
Q. So Officer Menke was using a building for cover?
**A. Yes.**
Q. Were any of the other officers there using anything for cover?
**A. I can't speak to what their views were from that side, so I don't know if they were viewing from a point of**

89

you feel like doing?
**A. No.**
Q. Okay. So have you been trained in certain situations where it might be more appropriate to negotiate?
**A. Under certain circumstances.**
Q. And would that include a 5150 situation?
**A. Depending on the circumstances.**
Q. What other situations have you been trained to try to negotiate instead of make commands?
**A. It depends on the situation. There are numerous.**
Q. Well, you've been trained to handle dozens of situations, right?
**A. Yes.**
Q. Of those dozens of situations tell me three or four situations where you've been trained to negotiate.
MS. FOWLER: Object. Vague and ambiguous. It's an incomplete hypothetical. There is no set situation. Everything is an evolving situation and circumstances change.
MR. SCOTT: Q. So that's your training, everything is evolving, situations change, so do whatever you want to do, or are you trained to handle particular types of situations?
MS. FOWLER: I'm going to object to that. Don't

94

answer it.
MR. SCOTT: Q. Are you trained based on scenarios?
**A. Sometimes.**
Q. And you've received training in scenarios regarding negotiating as opposed to using commands?
**A. Yes.**
Q. What -- give me example of scenarios you've been trained in to negotiate instead of using commands?
**A. There are numerous.**
Q. Okay. Tell me about -- of the numerous, tell me four or five.
**A. There are all types of situations which speaking to somebody under certain circumstances, you can negotiate or not, depending on the dynamics of that situation.**
Q. And what scenarios have you been taught?
**A. Getting somebody to comply with commands, suicidal subjects. The list goes on.**
Q. Okay. Now, you say suicidal subjects. Do you have training in dealing with suicidal subjects?
**A. Yes.**
Q. Do you have training in dealing with situations referred to as suicide by cop?
**A. Yes.**
Q. What is suicide by cop?

95

**A. I don't know the legal term of suicide by cop.**
Q. What training have you received about it?
**A. It's when the subject uses his actions to get a specific response or actions by police in an attempt to take his or her life.**
Q. Do you think this case was suicide by cop?
**A. I don't know.**
Q. Have you been trained on how to deal with those types of situations referred to as suicide by cop?
**A. Yes.**
Q. And how are you trained to respond to those types of situations?
**A. It's based upon the dynamic of those situations.**
Q. Okay. Do you have training regarding any specific types of situations or scenarios?
**A. It would depend on where you were, the actions of the subject, your surrounding, a multitude of things. It all changes.**
Q. Have you received training about any particular scenarios?
**A. Regarding?**
Q. Suicide by cop.
**A. Yes.**
Q. And what scenarios have you had training in?
**A. Subjects feigning assault or demanding that you shoot them.**

96

Q. How are you trained to respond to those situations?
**A. To deal with it based upon the situation at the time, based upon the dynamics around you.**
Q. Have you ever heard the term sympathetic gunfire?
**A. Yes.**
Q. Have you heard that in training?
**A. Yes.**
Q. What do you understand that term means?
**A. When gunfire is fired after an initial shot based upon the initial shot.**
Q. And what do you mean by that? You mean somebody hears a shot fired and they just react by shooting?
**A. Yes.**
Q. And did you have training in -- to avoid doing that?
**A. Yes.**
Q. And how are you trained to avoid doing that?
**A. We are trained to individually assess danger or threats based upon our individual thoughts.**
Q. And have you --
**A. And observations.**
Q. And have you heard the term shoot and assess?
**A. Yes.**

97

sock rounds available or another Sage available, you just don't know, correct?

MS. FOWLER: He doesn't know whether he checked or whether there were ones available?

MR. SCOTT: Q. Well, you didn't check, right?

**A. Correct.**

Q. Did you know Sergeant Soares was bringing the Sage to the scene before you got there, or did you discover that when you got there?

**A. When I got there.**

Q. And I take it when you -- that first conversation you had with him and Officer Jones at the scene, you didn't ask either one of them if they had a shotgun with the sock rounds available; is that correct?

**A. Correct.**

Q. And as part of the plan did you ask any one of the officers present to have a Taser available?

**A. No.**

Q. And before shots were fired in this case did you have a plan with Officer Ellsworth, in terms when and if the dog would be used?

**A. No.**

Q. Could you have ordered Officer Ellsworth to put the dog on Mr. Desantis when you first got there?

**A. No.**

102

Q. Why not?

**A. It's not my call.**

Q. Whose call is it?

**A. Officer Ellsworth.**

Q. Okay. And so if I understand you correctly, as the supervisor in command at the scene, you did not have the authority to order Officer Ellsworth to put the dog on Mr. Desantis; is that correct?

**A. I could have given that order. Whether that order would be right or wrong would be in question.**

Q. What do you mean by that?

**A. I can order officers to do things; take a report, send their dog, to drive slower, a multitude of things.**

Q. Right. And if they don't follow your order --

MS. FOWLER: He didn't finish his answer.

MR. SCOTT: Q. I'm sorry.

**A. Officers have to respond and do things that are lawful and they have to use their own beliefs on what is reasonable at the time to conduct themselves.**

Q. Okay. Do you think it would have been an unlawful order for you to order Officer Ellsworth to put the dog on Mr. Desantis?

MS. FOWLER: When they first arrived on the scene?

MR. SCOTT: Q. Yes.

103

**A. I don't know.**

Q. Well, what would you need to know in order to answer the question?

**A. More about the scene.**

Q. Would you need -- would it depend on whether Mr. Desantis had a gun or not?

**A. It would depend on a multitude of things at the scene, the dynamics, who was where.**

Q. Well, in the situation you described when you got there, and you said you saw Mr. Desantis standing, I guess, from where you were positioned in the vicinity -- in front of his wife and his child, not far from the front of the house or the front door of the house, now -- and you didn't know if he had a gun, correct?

**A. I assumed he did.**

Q. You assumed he had a gun. And you knew that shots had recently been fired, right?

**A. Yes.**

Q. And, now, at that point, do you think it would have been a lawful order to have Officer Ellsworth put the dog on Mr. Desantis?

**A. It's -- I -- go ahead.**

MS. FOWLER: Let me just -- I would object to the extent that the term lawful is vague and ambiguous and calls for a legal conclusion. If you can answer the

104

question, go ahead and answer it.

MR. SCOTT: Q. It was your term. I'll take the lawful out of it. Do you think it would have been appropriate?

**A. No.**

Q. Why not?

**A. Because Patricia Desantis -- or the female. I didn't know it was Patricia -- and the child were in close proximity to Mr. Desantis.**

Q. And, what, you were afraid the dog might attack them?

**A. Yes.**

Q. So getting back to where we were, and you have ordered Officer Menke to make commands, do you know what commands he made?

**A. I don't know his specific words.**

Q. Do you recall anything about what he said?

**A. He ordered Mr. Desantis towards him, towards Officer Menke.**

Q. Is that tactically something you wanted him to do?

**A. Yes.**

Q. Why?

**A. I wanted him to gain compliance of Mr. Desantis.**

Q. What do you mean by that?

105

Q. And how did they do it?
**A. By creating a dialogue and having that person talk back to them.**
Q. And would it be fair to say these were 5150 situations?
**A. The ones that I've described for you just --**
Q. Yes, the ones that you've described for me.
**A. Yes.**
Q. And, now, based on your training of suicide by cop -- have you heard it referred to as SBC, by the way?
**A. No.**
Q. Have you gotten any training on the dynamics of -- what the dynamics would be in a suicide by cop situation?
**A. Describe dynamics.**
Q. Have you heard that term used in -- as part of your training in relation to suicide by cop?
**A. No.**
Q. Have you received any training in developing a plan to deal with situations to take into account a possible suicide by cop situation?
**A. Yes.**
Q. And what training have you received in that regard?
**A. To use tactics to determine what the threat is,**

114

**how to assess the threat, and stop the threat.**
Q. Okay. Without someone dying?
**A. If at all possible.**
Q. Is that the goal?
**A. Yes.**
Q. Now, is it your understanding one of the dynamics of suicide by cops is having an audience present?
MS. FOWLER: I object. He's already told you he hasn't heard the term used in his training.
MR. SCOTT: Q. Okay. Well, one of the elements of suicide by cops, is that having an audience present?
**A. No. I don't know.**
Q. Have you had any training regarding the idea of someone posturing in a suicide by cop situation?
**A. Not specifically suicide by cop.**
Q. But you're familiar with the term posturing?
**A. Yes.**
Q. What does that term mean to you, based on your training?
**A. Acting out to get a response.**
Q. Okay. And has it been your experience that sometimes people who are maybe intoxicated or psychotic, crazy, may act out to get a response?
**A. Yes.**
Q. And have you been trained that the response that

115

intoxicated or psychotic people are doing is to -- maybe for the purpose of being shot or harmed?
**A. I don't know.**
Q. Okay. And you don't -- haven't had any training in that regard? In other words, why would an unarmed person act out to cause him or herself to get seriously injured or killed; you don't have any training about that?
**A. We train on all types of scenarios.**
Q. Including this?
**A. Yes.**
Q. Okay. Now, I think we were at this situation where Mr. Desantis was going in the direction of Officer Menke; is that correct?
**A. Away.**
Q. When you started giving the commands, at some point, reluctantly, Mr. Desantis started going in his direction?
**A. Yes.**
Q. And at that point were the officers that you mentioned still in the same positions or had people moved or changed their positions?
**A. The same position.**
Q. Was everybody standing?
**A. Yes.**
Q. And were you aiming your rifle in the direction

116

of Mr. Desantis?
**A. Yes.**
Q. Why?
**A. He was a threat.**
Q. Okay. And to your knowledge, was Sergeant Soares aiming his -- what's it called, Sage? Was he aiming his Sage in the direction of Mr. Desantis?
**A. Yes.**
Q. And did you observe the other officers at the scene -- did they have their weapons drawn?
**A. Officer Mann and Officer Menke did.**
Q. What about Officer Ellsworth?
**A. I don't know.**
Q. What about Officer Jones?
**A. I don't know.**
Q. And you believe Mr. Desantis could have seen you?
**A. Yes.**
Q. So at this point Mr. Desantis should have been able to see at least four officers pointing rifles or handguns at him and two other officers, including a police dog, all standing kind of in front of him, right?
**A. I know Mr. Desantis could see myself, or looking at me, as well as looking in the direction of Officer Menke, Officer Mann and Officer Ellsworth.**
Q. Okay. I mean, you don't know what he saw, but he

117

certainly had an opportunity to see all the officers there and see what you saw?
**A. Yes.**
Q. Can you describe how Mr. Desantis moved in the direction of Officer Menke?
**A. He stepped from the area of the porch and walked southwest approximately three to four steps towards Officer Menke's direction.**
Q. You say he walked. Was it a slow pace, a normal pace, how would you describe it?
**A. I can't. I don't know.**
Q. So he took about three or four steps?
**A. Yes.**
Q. And then what did he do?
**A. Officer Menke ordered him to put his knees on the ground.**
Q. Is this something you wanted Officer Menke to order him to do?
**A. Yes.**
Q. Did you tell Officer Menke to order him to do that?
**A. No.**
Q. Did Officer Menke order him to stop after he took three or four steps and to get on the ground, or did he do it without being ordered to do it?

118

**A. I don't know.**
Q. So Mr. Desantis, after he took three or four steps in the direction of Officer Menke, stopped and put one or more knees on the ground?
**A. Eventually both knees.**
Q. And how long was he standing there before both knees were on the ground?
**A. There were several commands to do so. It took a while for him to get on his knees.**
Q. Several seconds?
**A. Yes.**
Q. During this period of time was his wife still in the vicinity of the front door of the house?
**A. Yes.**
Q. You could see her?
**A. No.**
Q. Did you -- before the shots were fired, did you hear her say anything about a leg injury that he had?
**A. No.**
Q. And did you hear over the radio traffic any information about a leg injury?
**A. No.**
Q. Now, what happened after Mr. Desantis put two knees on the ground?
**A. He was told to keep his hands in the air and then to put his hands out on the ground in front of him.**

119

Q. Did he do that?
**A. After repeated commands.**
Q. And so at some point you saw his hands in the air?
**A. Yes.**
Q. Did you see anything in his hands?
**A. No.**
Q. And could you see his feet?
**A. Yes.**
Q. And was he barefoot?
**A. I believe so. I don't know.**
Q. And then -- well, did you ever see a weapon anywhere on his person or near his person before he was shot?
**A. No.**
Q. Now, did he then put his hands on the ground?
**A. Eventually.**
Q. And how long did that take? Several commands?
**A. Yes.**
Q. Was Officer Menke making all the commands?
**A. Yes.**
Q. Did anyone else -- any other officers say anything during this period of time when Officer Menke is making commands?

120

MS. FOWLER: Other than what he's already testified to?
MR. SCOTT: Yes.
THE WITNESS: No.
MR. SCOTT: Q. And how would you describe Officer Menke's tone of voice?
**A. Assertive.**
Q. Loud?
**A. Yes.**
Q. Was he screaming?
**A. No.**
Q. Did Mr. Desantis ever say anything to Officer Menke?
**A. No.**
Q. When Mr. Desantis put his hands on the ground was he in a prone position?
**A. No.**
Q. What position was he in?
**A. Kneeling.**
Q. He was kneeling and he had his hands facing down on the ground?
**A. Briefly.**
Q. For how long?
**A. He would pick them up, take them off the ground, and then put them back down.**

121

Q. How many times did he do that?
**A. I would es- -- excuse me. I would estimate one or two times.**
Q. At that time would it have been appropriate to have the dog go after Mr. Desantis?
**A. No.**
Q. Why not?
**A. Because, although he was hesitantly complying, he was complying.**
Q. Okay. Now, at that point were you going to go over or have someone go over to Mr. Desantis and handcuff him?
**A. Once he was proned out.**
Q. What does that mean, proned out?
**A. Once we gained his compliance and he was on the ground.**
Q. When you say on the ground, what do you mean by that? Fully on the ground, not just on his hands and knees?
**A. Correct.**
Q. So the idea was once he got fully on the ground, not just on his hands and knees, someone would -- one or more persons would approach him to handcuff him?
**A. Yes.**
Q. And if he didn't do that was putting the dog on

122

him ever an option?
MS. FOWLER: I object. Incomplete hypothetical.
THE WITNESS: No.
MR. SCOTT: Q. Okay. Was using a Taser ever an option?
MS. FOWLER: Again, I'm going to object. Incomplete hypothetical. Also, vague and ambiguous as to time.
MR. SCOTT: Q. At this point. He's on the ground. Hands and knees are on the ground.
**A. No.**
Q. Okay. And why not?
**A. It's too far away.**
Q. How far away was he?
**A. 16 to 18 yards, approximately.**
Q. Okay. Was that for tactical reasons to have him go on the ground that far away?
**A. Yes.**
Q. Was there tactical reasons you wanted to stay that far away from him before you -- that you were going to stay 16 or 18 yards from him before he was fully prone?
**A. Yes.**
Q. Okay. Is that part of your training?
**A. Yes.**
Q. So at this point what's the next thing

123

Mr. Desantis did?
**A. Mr. Desantis was ordered to lay down prone. He bent forward, rolled his hips towards the ground, immediately came back up to his kneeling position.**
Q. When you say rolled his hips to the ground, what do you mean by that?
**A. He went from having his hands and knees on the ground to moving forward, placing his hips on the ground.**
Q. The side of his hips or...
**A. No, like he was going to lie down.**
Q. Okay. On his back or on his stomach?
**A. On his stomach.**
Q. So did he do that by kind of going forward or sideways on his hands -- he's on his hands and knees. And what did he do to make it appear like he was going to go on the ground on his stomach?
**A. He pushed his hips forward.**
Q. And what were his hands doing at that point?
**A. Staying in the same spot.**
Q. Did his face hit the ground?
**A. I don't think so.**
Q. Did any of his upper body touch the ground?
**A. No.**
Q. Okay. And then what happened? How long was he in that position where he was kind of leaned forward but

124

hadn't touched the ground yet?
**A. Approximately a second.**
Q. And then what happened?
**A. He was back at the kneeling position.**
Q. For how long?
**A. A couple seconds.**
Q. And were commands still being made?
**A. Yes.**
Q. Did it appear that the commands were not being followed?
**A. Yes.**
Q. Did -- what were your options at that point if he wasn't going to follow commands?
**A. To continue to try to gain his compliance.**
Q. And was negotiating with him an option at that time?
**A. Had he been responsive.**
Q. And was putting a dog on him an option at that time?
**A. No.**
Q. Okay. And what's the next thing you saw him do after he was on his hands and knees again for about a second?
**A. He looked at me, looked towards me, looked towards his wife's direction, and looked at Travis and**

125

**ran.**
Q. And did what?
**A. Ran.**
Q. Ran. On his hands and knees or did he get up?
**A. He got up.**
Q. And did he look at you and his wife and Officer Menke before he got up or after he got up?
**A. Before he got up.**
Q. And how long did he look in your direction?
**A. Momentarily.**
Q. And then how long did he look at his wife?
**A. Momentarily.**
Q. And did he look at you first?
**A. I don't know.**
Q. Did he look at his wife before or after he looked at you?
**A. I don't know.**
Q. And describe how he got up.
**A. He took off like he left the sprinter blocks, if you know what sprinter blocks are.**
Q. I ran track, so I know what they are very well. So he came -- got up and like he was coming out of sprinter blocks?
**A. Yes.**
Q. Without track shoes? All right. And was he

126

sprinting?
**A. Yes.**
Q. Have you ever sprinted?
**A. Yes.**
Q. Did you run the hundred, 220, 240, or you just sprinted for fun?
**A. I've run track.**
Q. What events?
**A. All types. Short distance, long distance.**
Q. What was your best time in a hundred?
**A. I have no idea.**
Q. Okay. So -- but you've run out of blocks?
**A. Yes.**
Q. On tracks?
**A. Yes.**
Q. In high school or in college?
**A. High school.**
Q. And you know what it looks like to sprint, right?
**A. Yes.**
Q. And was Mr. Desantis sprinting?
**A. Yes.**
Q. And what direction was he sprinting?
**A. Directly at Travis and Officer Mann.**
Q. And his legs were pumping?
**A. Yes.**

127

Q. His arms were pumping?
**A. Yes.**
Q. Okay. And you could see his arms moving like a sprinter?
**A. Yes.**
Q. And his legs were moving like a sprinter?
**A. Yes.**
Q. And there was nothing in his hands?
**A. No.**
Q. Correct? Correct, there was nothing in his hands?
**A. Correct.**
Q. And then what happened?
**A. After several steps when Mr. Desantis -- Officer -- Sergeant Soares stepped forward to my left and fired the less lethal Sage.**
Q. When he stepped in front of you -- when you say he stepped, was that kind of in front of you between you and Mr. Desantis?
**A. He just stepped to my left.**
Q. So he didn't get in your -- what would be your line of fire?
**A. Correct.**
Q. And how far away was -- well, did you order him to shoot?

128

**A. No.**
Q. Were you surprised that he shot?
**A. No.**
Q. Why didn't you shoot?
**A. Before that?**
Q. Yeah, or at the same time. What were you waiting for?
**A. Compliance, which wasn't happening.**
Q. Okay. So why didn't you shoot before Sergeant Soares shot?
**A. I just hadn't.**
Q. Were you waiting for him to shoot?
**A. No.**
Q. And approximately how far was Mr. Desantis from Sergeant Soares when Sergeant Soares shot?
**A. I would estimate approximately 10 to 12 yards.**
Q. 30 to 35 feet?
**A. Yes.**
Q. And approximately how far was Mr. Desantis from Officer Menke when the first shot was fired?
**A. 10 to 15 feet -- yards.**
Q. Yards?
**A. Yards.**
Q. So 30 to 45 feet?
**A. Yes.**

129

Q. About the same distance -- Desantis at this point was about the same distance from Sergeant Soares as he was from Officer Menke, or maybe he was a little closer to Soares?
**A. A little closer to Soares.**
Q. Okay. And how far had Desantis sprinted before the first shot was fired?
**A. 7 to 10 yards, approximately.**
Q. 20 to 30 feet?
**A. Yes, approximately.**
Q. And at this point when Sergeant Soares fired the Sage, was your rifle pointed in the direction of Mr. Desantis?
**A. Yes.**
Q. Were you aiming for any particular thing in his body?
**A. His upper body.**
Q. Center mass?
**A. Yes.**
Q. Were you trying to kill him?
**A. When I was aiming at him?**
Q. Yeah.
**A. I was aiming at him.**
Q. Did you understand that center mass would be a kill shot?

130

**A. No.**
Q. Did you have an option of shooting at his legs?
**A. No.**
Q. Why not?
**A. I'm trained to use the force necessary to stop him, and center mass would have more ability to stop him.**
Q. Are you trained to shoot at moving targets?
**A. Yes.**
Q. Where did you receive that training?
**A. At the police department.**
Q. Is that part of everybody's training or just SWAT team?
**A. Everyone's training.**
Q. Is to shoot at moving targets?
**A. Yes.**
Q. And are you trained to shoot in both daytime and night time situations?
**A. Yes.**
Q. And is everyone at the police department trained to shoot in daytime and night time situations?
**A. The officers are, yes.**
Q. And did you think that a shot from your A 15 to his leg would have stopped him?
MS. FOWLER: Object. Calls for speculation.
MR. SCOTT: Q. Well, if you don't know, just say

131

you don't know.
**A. I don't know.**
Q. When you have training with the -- I'm sorry, the AR 15, is that what it's called?
**A. Correct.**
Q. When you have training with the AR 15 do you shoot into various types of objects, meaning cars and wood and houses and things like that?
**A. Yes.**
Q. So you know what that round is capable of doing?
**A. Generally.**
Q. It can go through walls?
**A. Sometimes.**
Q. Could go through a car door?
**A. Sometimes.**
Q. Okay. Do you have any training on what it does to a human body?
**A. No.**
MR. SCOTT: I think we're running out of tape so I'm going to take a recess so we can change the tape and take a short recess.
THE VIDEOGRAPHER: This marks the end of volume 1, videotape number 2, in the deposition of Richard Celli on November 14th, 2007. The time now is 5:39. We are off the record.

132

(Brief recess taken from 5:39 p.m. to 5:48 p.m.)
THE VIDEOGRAPHER: This marks the beginning of volume 1, videotape number 3 in the deposition of Richard Celli in the matter of Patricia Desantis, et al. versus City of Santa Rosa in the United States District Court, Northern District of California, case number C 07-3386 JSW. Today's date is November 14th, 2007, and the time now is 5:48 on the record.
MR. SCOTT: Back on the record.
Q. Mr. Celli, we left off and I think where we left off Mr. Desantis was sprinting in the direction of Officer Menke and you observed Sergeant Soares take a position, aim his Sage -- and how is that spelled, s-a-g or s-a-g-e?
**A. S-a-g-e.**
Q. And did you see Sergeant Soares fire the Sage?
**A. I heard it.**
Q. And did you -- what's the next thing you saw after you heard the Sage being fired?
**A. It appeared that the Sage round hit Mr. Desantis, he tilted his body right, briefly, and proceeded towards Officers Menke and Mann.**
Q. Was he still sprinting?
**A. Yes.**
Q. At any time did he stop sprinting?
**A. No.**

133

Q. So he kept sprinting, but he just tilted slightly?
**A. Yes.**
Q. And it appeared that he had been shot?
**A. Yes.**
Q. And did it appear that he'd been shot in his right arm?
**A. I couldn't tell.**
Q. But it appeared -- at least there appeared to be an impact in his body that you observed?
**A. Yes.**
Q. Okay. And you saw his body tilt, I think you said?
**A. Yes.**
Q. And you associated that tilt with him being hit?
**A. Yes.**
Q. And at this point is this a shoot and assess situation?
**A. For me?**
Q. Yes.
**A. Yes.**
Q. And how long did you assess Mr. Desantis after it appeared that he was shot by the Sage?
**A. Immediately.**
Q. What period of time?

134

**A. A second.**
Q. One second?
**A. Maybe -- I would say a second to two, approximately.**
Q. And in those one or two seconds what did you observe Mr. Desantis do?
**A. Continue towards Officer Menke and Mann.**
Q. And was he still continuing as a sprinter?
**A. Yes.**
Q. And his legs were -- and his arms were moving like a sprinter?
**A. Yes.**
Q. And there was nothing in his hands, correct?
**A. Correct.**
Q. What were you afraid he was going to do, tackle them or run by them, what were you thinking?
**A. He was attacking them.**
Q. And were you afraid he was going to kill them?
**A. Yes.**
Q. And how did you think he was going to kill them?
**A. By either pulling out a weapon or taking theirs.**
Q. And what did you do?
**A. I shot him.**
Q. And where -- how far had he moved from when the Sage round hit him to when you pulled -- squeezed the

135

trigger?
**A. A couple of steps.**
Q. Okay. Are you sure it was a couple of steps, not more?
**A. Two to four steps.**
Q. And approximately how many feet had he moved in those two to four steps?
**A. Approximately three to four yards.**
Q. And how far away was he from Officer Menke when you fired?
**A. Approximately six to eight yards.**
Q. And how far away was he from you when you fired?
**A. A little further, approximately, I'd say, seven to nine yards.**
Q. 20, 25 feet?
**A. Approximately.**
Q. It would have been maybe 15 or 20 feet from Officer Menke?
**A. Approximately.**
Q. And did it appear to you that he was heading directly towards Officer Menke?
**A. Yes.**
Q. How big is Officer Menke?
**A. Approximately five-six to five-nine, 150 to 175 pounds, approximately.**

136

Q. Okay. Well, what happened, what did you observe after you fired your shot?
**A. Mr. Desantis's body starting to turn.**
Q. Was he still sprinting?
**A. Yes.**
Q. And why didn't you shoot again if he was still sprinting?
**A. I was assessing.**
Q. And how many steps did he take while you were assessing?
**A. Maybe one to two.**
Q. And then what happened?
**A. Two more shots were fired.**
Q. And why didn't you shoot again?
**A. Mr. Desantis stopped.**
Q. After the other two shots were fired?
**A. Yes.**
Q. Do you know who fired the other two shots?
MS. FOWLER: Now, or did he know then?
MR. SCOTT: Q. Did you know then?
**A. I did not know then.**
Q. This is a good place to stop, so let's stop here for today. This deposition will be reconvened at a time that is mutually convenient for the witness and for opposing counsel but, hopefully, sometime before we get to

137

the ENE, so sometime between now and January 7th we'll try to finish this at a mutually convenient time.

MS. FOWLER: The only potential issue is that I may be sent out to trial so we'll just have to work around that.

MR. SCOTT: Fine. I'm happen to accommodate everybody's schedule. Okay.

THE VIDEOGRAPHER: This is the end of volume 1, tape number 3. This concludes the deposition of Richard Celli. The original videotapes will be retained by Dan Mottaz Video Productions, LLC, 182 Second Street, Suite 202, San Francisco, California 94105. 415-624-1300. The time is now 5:56 and we are off the record.

(Whereupon the deposition was recessed at 5:56 p.m.)

____________________________

RICHARD CELLI

138

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the 26th day of November, 2007.

Judy G. Manfred

Certified Shorthand Reporter

CSR No. 4748

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

PATRICIA DeSANTIS, individually, and as Successor in Interest for RICHARD DeSANTIS, deceased, and as Guardian Ad Litem for DANI DeSANTIS, a minor,

Plaintiffs,

vs.

CITY OF SANTA ROSA, JERRY SOARES, RICH CELLI, TRAVIS MENKE, PATRICIA MANN, and DOES 1 through 25, inclusive,

Defendants.

No. C-07 3386 JSW

DEPOSITION OF RICHARD CELLI

VOLUME II - PAGES 140 - 261

June 11, 2008

REPORTED BY: A. MAGGI SAUNDERS,

C.S.R. No. 2755

**A. Maggi Saunders & Associates**
**Certified Shorthand Reporters**
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755
(415) 383-6281

Case 3:07-cv-03386-JSW Document 47-3 Filed 08/08/2008 Page 27 of 42

session of your deposition, you mentioned that in, I believe February of 2007, you were involved in another shooting, correct?

A. **Yes.**

Q. Okay. And we were going to delay until a later time, and that is right now, asking questions about that other shooting.

Now, my understanding is that the District Attorney has also announced that it's not prosecuting you or anyone else relating to that the shooting, correct?

A. **Correct.**

Q. And, to your knowledge, did the Santa Rosa Police Department do an independent review of that shooting --

A. **Correct.**

Q. -- other than relying on the District Attorney and the Sheriff's Department?

A. **I don't know.**

Q. Okay. And in that shooting incident do you know how many Officers fired weapons?

A. **Four.**

Q. And you were one of those four?

A. **Yes.**

Q. Okay. And who were the other three

Page 152

Officers who fired weapons.

A. **Officer -- or Sergeant Craig Schwartz; Officer Brian Boettger, B-o-e-t-t-g-e-r; Officer John Barr, B-a-r-r.**

Q. Were these other Officers part of the SWAT team?

A. **Yes.**

Q. And was this other shooting incident a situation where a -- the SWAT team was called to respond to an incident?

A. **Yes.**

Q. And can you summarize for me what the incident was that you responded to?

A. **It was a request for a mutual aid from the Oakland Police Department regarding a -- the location of a homicide suspect.**

Q. And was this homicide suspect known to you, or someone you had had prior contact with?

A. **No.**

Q. And was this homicide suspect believed to have been armed and dangerous?

A. **Yes.**

Q. Okay. And that was the information you had, that he was armed and dangerous?

A. **Yes.**

Page 153

Q. And can you summarize for me briefly the events leading up to the shooting, as you observed them?

A. **Yes.**

Q. Okay. What happened? At least, what did you see?

A. **How far do we want to go back?**

Q. To when you arrived at the scene.

A. **Okay.**

**I arrived at the scene just north of the location with the other Officers; there was actually five of us there. We were what we call a "React Team". The rest of the team was on their way to the scene.**

**We got there, contacted the Oakland Police Department Sergeant in charge of his scene, as well as one of our Commanding Officers, Lieutenant Briggs.**

Q. Do you recall who that Sergeant was?

A. **No, I don't.**

Q. Thank you. Go ahead.

A. **Briefly obtained photographs of the suspect and his girlfriend;**

**And then, we were advised that the suspects were leaving the hotel room in maybe an attempt to flee.**

Page 154

**We were unable to establish a further Plan of Action, other than that we were going to try to contain the subjects at the hotel, and avoid any hostage scenarios.**

Q. Was there a perimeter established?

A. **Yes.**

Q. When you say a "React Team," what is a React Team?

A. **It's a team that first arrives on the scene, in case a major type of incident is evolving.**

**It's essentially trying to just get persons out to the location before the main part -- body of the team arrives.**

Q. And were you a member of the React Team at that time?

A. **It -- Yeah, there is no set React Team for the Department. It was basically myself and Sergeant Schwartz who pulled three of the first responding Officers together to go out.**

Q. So, if I understand you correctly, based on availability, whichever members of the SWAT team are able to respond to a scene the most rapidly will be the React Team?

A. **Yes.**

Q. All right. And I take it, you received

Page 155

officer first in line would be giving cover to the officers behind him?

In other words, you were exposing fewer officers to a risk of being shot, if you are lined up one behind the other, or why did you do it that way?

A. **We were just heading to the location. There wasn't a -- at that point a determination who was going to take cover, or positions of cover for the others. We were just trying to get to the location.**

Q. All right. And can you describe the suspect for me, what he looked like?

A. **Black male, early 20s. I think he had a beanie cap at the time.**

Q. Do you recall what he was wearing?

A. **A jacket and jeans.**

Q. And was he with someone else, or alone?

MS. FOWLER: At that point in time?

MR. SCOTT: Q. At that point in time.

A. **Alone.**

Q. And at the time he turned and started running toward you, had you heard anyone identify themselves as "Police"? Did anybody say, you know, "Stop. Police. Hands up," anything like that?

A. **Not that I was aware of.**

Q. Okay. And as he turned and started

running in your direction, what happened next?

A. **He turned, saw us, and began running still towards our direction, but had changed directions heading due east, now I would say past us, but away from us.**

Q. Would that have been, if you are looking at him, to your right or your left?

A. **Heading left.**

Q. Heading left.

Okay. And heading at a diagonal, or somewhat toward you, or away from you while going to your left.

A. **He actually ran by us -- I wouldn't call it diagonal, but he didn't -- he didn't close distance towards us at that point. And basically he ran probably 15 yards away from us as he passed us all the way.**

Q. What was the closest he ever got to you?

A. **About 15 -- Well, [Thinking] 12, 14 yards.**

Q. Okay. And as he was running, did he start -- come closer to you and then turn and start going more away from you; is that how it worked?

A. **Um. . .**

Q. In other words, there was a period he was closing, getting closer to you, and then he kind of

went to your left --

A. **Yes.**

Q. -- and he was going away from you as he was going to your left?

A. **Correct.**

Q. Okay. And was he running?

A. **Yes.**

Q. And what happened next?

A. **He began running away from us. As he did so, I was identifying myself as a Police Officer, yelling at him to "get down," as were several other Officers.**

**He immediately reached into the right side of his waistband with both his right and left hand.**

Q. Okay. And then what happened?

A. **He continued to run towards the freeway, which is east, just due east of us, with a three to four-foot-high chain-link fence there.**

Q. And so, would this be an entrance or exit to 101?

A. **No entrance. It was just a chain link fence that borders 101.**

Q. Okay. And which side of 101 is it, east or the west side?

A. **The west side.**

Q. All right. And between which exits?

A. **Between the Steele Lane exit and the Bicentennial exit.**

Q. All right. Do you recall the name of the hotel?

A. **The Comfort Inn.**

Q. And as he was running towards that fence, what happened next?

A. **He got towards the fence. He was still reaching into his waistband, and began to turn towards us. And I actually think he was -- I think he had gotten one leg up on the fence as he was turning back at us.**

Q. Okay. Do you recall which leg it was?

A. **I believe it was the left leg.**

Q. All right. And did you see him --

Was he kind of jumping over the fence, or using his hands to get over the fence?

A. **He was just trying to hop over it, kind of like you would -- not that you would hurdle it, cuz it wasn't a hurdle, but maybe try to roll over the top of the fence.**

Q. Okay. And as he was trying to put one of his legs over the fence, what was he doing with his arms?

**A. He still was reaching into his waistband.**
Q. Okay. As he was trying to put a leg over the fence?
**A. Yes.**
Q. Okay. And then what happened?
**A. He was shot.**
Q. Approximately what distance was he from you when he was shot?
**A. 15 to 18 yards, approximately.**
Q. And of the four Officers who shot, was it all simultaneous, or was there some order you could determine?
**A. I couldn't determine. I knew at the time I was shooting there were other -- had other shots at the time I was.**
Q. Okay. Do you know if, of the four Officers who fired, who fired the first shot?
**A. I don't know.**
Q. How many shots did you fire?
**A. I believe two to three.**
Q. Okay. And was it in rapid succession, or some space between those shots?
**A. Rapid succession.**
Q. And did you know if any of your shots hit the suspect?

Page 168

**A. I don't know.**
Q. Do you know how many shots hit the suspect?
**A. I don't recall.**
Q. To your knowledge, did anyone in the Santa Rosa Police Department try to determine if any of your shots hit the suspect?
**A. I don't know.**
Q. All right. To your knowledge, was there any kind of debriefing done of the SWAT team in relation to that incident?
MS. FOWLER: To the extent that that may call for privileged attorney-client communications, or privileged psychotherapist/patient communications, I would instruct you not to reveal any conversations or debriefings in which either an attorney, or some type of psychotherapist was present.
MR. SCOTT: Q. Right.
No, other than what may have been for -- with attorneys for possible litigation purposes, or psychotherapists, I want to know, just for business purposes, for purposes of just doing an analysis of this, for purposes of doing your job, was there a debriefing done by or with the SWAT team of this incident?

Page 169

**A. We talked about it as a team.**
Q. All right. And when did that occur?
**A. (No audible response).**
Q. Was this formal or informal?
**A. Informal.**
Q. Okay. Was there a formal --
**A. Well, it was at training, but -- so I guess you would call it -- Well, I don't know how would you call that, formal or informal.**
Q. Okay. Let me ask you --
MS. FOWLER: Vague and ambiguous as to what you mean by formal.
MR. SCOTT: Q. Have you ever participated in any formal debriefing regarding an incident?
MS. FOWLER: And, again, to the extent that that involves privileged communications, I would instruct you not to answer.
THE WITNESS: Yes.
MR. SCOTT: Q. Yeah, okay, no, I'm not talking about with lawyers. I'm talking about without lawyers: Have you ever participated in a formal debriefing?
**A. All the time.**
Q. When you say all the time, what do you mean by that?

Page 170

**A. At my briefing training, roll-call training -- or roll call, we may discuss the night's prior incidents, responses, tactics.**
Q. Okay. And what do you understand to be the purpose of a formal debriefing of an incident?
**A. There are many purposes, but one would be tactics;**
**Another one would be deployment: How we obtain information, how everybody feels about it, their job, how they did.**
Q. Okay. And is it your understanding one of the purposes for debriefing would be to both identify things you did right and things that you may have done wrong, for purposes of, you know, not making mistakes in the future?
**A. Absolutely.**
Q. All right.
And approximately how many debriefings have you participated in as a member of the SWAT team? I'm talking about formal debriefings .
MS. FOWLER: Again, I'm going to object that the term "formal" is vague and ambiguous, but you can answer the question.
THE WITNESS: I don't know the number, but we try to debrief every mission that we go on.

Page 171

A. MAGGI SAUNDERS & ASSOCIATES (415) 383-6281
57 Plymouth Avenue, Mill Valley, California 94941

MR. SCOTT: Q. And why do you do that?
A. **To find out what we've learned from it. Again, the things we did positive, and the things that we could have done better.**
Q. All right. And based on your experience with the SWAT team, are these debriefings usually led by a Sergeant or a Lieutenant somewhere in a command position?
A. **Usually yeah, just a sergeant does, but that's essentially just to get the ball rolling.**
Q. And where do the -- For purposes of the SWAT team, where do the debriefings usually occur?
A. **Anywhere: Whether that's a training site, sitting at lunch, before the training starts, over coffee, it could be in a meeting room. All over the place.**
Q. Now, the debriefing that occurred after the February 2007 shooting, do you recall where that occurred?
A. **No.**
Q. And do you recall anything about it?
A. **I really don't.**
Q. Okay. But you do recall there was a debriefing that did not involve lawyers of the 2007 shooting?

Page 172

A. **Of the --**
Q. The February.
A. **Yes.**
Q. Okay. But you don't remember anything about it.
A. **No. I think it was essentially just how we got there, and what we did, what the team did, as a whole, throughout the entire deployment.**
Q. Okay. Do you recall any positives or negatives that came up?
A. **We talked about the need, why we have a need for a React Team;**
**We talked about the deployment of the additional officers, some of the tactics that we used after the shooting to secure the rest of the building.**
**That's about it.**
Q. Okay. Now, the suspect who was shot in that incident, was his leg on or partly over the fence when he was shot?
A. **Yes.**
Q. All right. And was it kind of partly over the fence, or can you describe where his leg was at the time he was shot?
A. **When I shot at him, his leg was partially over the fence.**

Page 173

Q. And that was the right leg, I think you said? I could be mistaken. Do you recall --
A. **Left leg.**
Q. Left leg --
A. **Yes.**
Q. Left leg, okay. Okay, fair enough.
And what direction was he facing at the time you shot?
A. **West.**
Q. In your direction?
A. **Yeah. His face and upper body was facing me.**
Q. Okay. And where were his hands when you fired?
A. **In his waistband.**
Q. Okay. Both hands?
A. **Yes.**
Q. And after he was shot, did he fall to the ground, or was he kind of hung up on the fence?
A. **No, he fell to the ground.**
Q. All right. And did you approach him?
A. **Yes.**
Q. And did you search him?
A. **I did not.**
Q. Was he -- Did someone search him in your

Page 174

presence?
A. **No.**
Q. To your knowledge, did anyone ever search him for a weapon?
A. **Somebody probably did. I did not.**
Q. You don't know if he was searched for a weapon?
A. **I wasn't there to witness that.**
Q. Okay. But at some point you -- after he was shot you approached him?
A. **Yes.**
Q. How close did you get to him?
A. **5 yards.**
Q. Okay. And how long did he stay approximately 5 yards from you?
A. **Briefly. Momentarily.**
Q. And what did you observe?
A. **He was on his stomach. One of the officers, I don't know who, asked him to put his arms out. He put his arms out, and stopped moving.**
**At that point, one of the perimeter officers was approaching from the right and going up to him, and that's when I turned and went back towards the hotel.**
Q. Okay. Did you try to find out if he was

Page 175

armed at the time he was shot?
A. **No.**
MS. FOWLER: After the fact, you mean?
MR. SCOTT: Q. Yeah, after the fact.
A. **After the fact I learned that he was not.**
Q. All right. And when did you learn that?
A. **I want to say, the next day.**
Q. All right. Do you recall how you learned that?
A. **I don't.**
Q. Now, I'd like to mark as Exhibit -- and I forget what number this is, but we'll make it next consecutively, I'll confirm with the Court Reporter.
THE VIDEOGRAPHER: Going off the record, the time on the monitor is 10:43 a.m.
(Brief discussion held off the record.)
(Training Log, Santa Rosa Police Department marked Plaintiffs' Exhibit 1 for identification.)
THE VIDEOGRAPHER: Coming back on the record, the time on the monitor is 10:44 a.m.
Please begin.
MR. SCOTT: Okay. The record should reflect I've marked as Exhibit No. 1 to today's deposition a several-page document, appears to be seven

pages. And the first page says, "Training Log for Richard T. Celli, ID No. S19". It says "Date of Hire, 11/5/1990".
Q. And this appears to be at least a summary of some, if not all, of your training records with the Santa Rosa Police Department.
Do you recognize what we've marked as Exhibit No. 1, Sergeant Celli?
A. **I don't recognize it, but I understand it.**
Q. Okay. And what do you mean by that?
A. **It looks like a list of my individual training activity.**
Q. Okay. And to your knowledge, is this a document that would be maintained in the normal course of business by the Police Department, or do you know one way or the other?
MS. FOWLER: Just for the record, I'd object that there is lack of foundation. But if you know, go ahead.
THE WITNESS: Yeah, it's maintained by, I believe, our Training Department.
MR. SCOTT: Q. All right.
MS. FOWLER: And just for the record, I'd point out that this was dated as of 10/10/07, which is when this particular record was run and --

MR. SCOTT: Understood.
MS. FOWLER: -- produced in response to you, so obviously since that time there has been additional training.
MR. SCOTT: Q. Yeah, I'm assuming there has been additional training. I'm most interested in the training you had before the shooting in April of 2007. I'm not as interested in training you've received since April of 2007.
But, to your knowledge, does this appear to accurately reflect your training with the Santa Rosa Police Department since you were hired in November of 1990?
MS. FOWLER: And take your time to look at it. It's a multi-page document.
MR. SCOTT: Q. Please, take your time.
A. **(Reviewing the document.)**
**It appears to be what I would believe to be a close, if not all, but I can't recall all of my training.**
Q. Okay. Would it be fair to say that you haven't independently gone and checked your records, or whatever records the Department has, with this document, to see if this is complete and accurate.
A. **Correct.**

Q. Okay. But it appears to be generally accurate, although you can't testify that it's entirely accurate; would that be fair to say?
A. **Yes.**
Q. Now, does the term "mandatory training" mean anything to you?
A. **That means that we're required to go to training.**
Q. And are there certain things in this document, Exhibit No. 1, that would be mandatory training?
A. **Um --**
MS. FOWLER: And you are talking mandatory by the Santa Rosa Police Department --
MR. SCOTT: Yes --
MS. FOWLER: -- or mandatory by P.O.S.T?
MR. SCOTT: Q. By the Santa Rosa Police Department or P.O.S.T, just whether -- just whether it's mandatory one way or the other: That you didn't have of choice taking it, you had to take it.
A. **Well, if you are scheduled for the training, it's mandatory.**
Q. Okay. And can you tell me from looking at this document which of the training that's reflected here was mandatory?

A. MAGGI SAUNDERS & ASSOCIATES (415) 383-6281
57 Plymouth Avenue, Mill Valley, California 94941

A. (Looking through the document).
Well, essentially, all of it.
Q. Okay.
A. I mean, as far as, if you are assigned to a training, you go to the training. There is no --
I mean, if you request to go to it at a different time, yes; or if you can put off the training because of scheduling conflicts, and then get trained at a different date.
Q. Okay.
And so, if I understand you correctly, the training you've received was mandated, you had to train, it wasn't something that was optional, or something that you could elect to do in addition to the mandatory training?
A. Well, I don't think there is anything here that I elected to go to. If I did elect to go to anything, it was at my request, and then they assigned to it me, which became mandatory, you know.
Q. Well, I'm not sure.
Okay, can you explain how that works: If you request it, and then it becomes mandatory?
A. Well, let's just go for -- if you look at page three of seven?
Q. Mm-hmm.

A. Down at the last page, or the bottom where it says "Assertive Supervision".
Q. Yes.
A. I asked to go to that class.
Q. Okay. And why did you ask to go to that?
A. It was a class that I wanted to have as part of my resume for future promotion.
Q. Okay. Is there anything else in Exhibit No. 1 that you asked for?
A. Well, I'd have to go through the whole thing.
Q. Sure. Go ahead.
A. [Looking through the document]
Q. Take your time. Once we finish this, I'm done, and then I'll pass the ball to my co-counsel. So, this is the end.
A. Okay. I asked to be a Field Training Officer, so any time -- so, my initial Field Training was there. Let me see if I can find it.
MS. FOWLER: And I guess, again, I will object that it's somewhat ambiguous as to "mandatory"; because, obviously, if you are in a special assignment, then, you are required to go to more trainings than the average police officer --
MR. SCOTT: I understand.

MS. FOWLER: -- if you are a SWAT -- if you are a SWAT person, it's mandatory; if you are not a SWAT person, it wouldn't be mandatory.
MR. SCOTT: Q. I understand that.
A. So, if you look at page 4 of 7, down at 11 -- or, sorry -- 1/11/02.
Q. Yes?
A. I had requested, and had tested for, becoming a Field Training Officer.
Q. Okay.
A. And then, if you look up, all the way up at the, I would guess it would be pages prior to that, anything where it says "PTO Training," that is "Police Training Officer Training".
So, anything related to that would be because I had originally wanted to become a Field Training Officer.
Q. Okay. And were you ever a Field Training Officer?
A. Yes.
Q. And for how long?
A. Approximately five years.
Q. Okay. And from when to when?
A. Six years, actually.
From -- Five years, sorry. From, looks like January of '02 up until September of '06.

Q. Okay. Anything else in here that you believe was something that you requested that wasn't required by your assignment?
A. Page four of seven, with a third of the way down, it's called Hazwoper Training.
Q. What is that?
A. It's HazMat training. And I was currently on the SWAT team, but I wanted to be part of a Weapons of Mass Destruction/Chemical Agents type of a Response Team.
Q. Okay.
A. So I had to learn about hazardous materials.
Q. Okay. Anything else --
Yeah, and I recognize that there may be some things in here that you just miss, but as best you can, tell me right now, what other training in this document is something you requested that was not something mandatory based on your assignment?
A. I think that's it. If there is anything after the Hazwoper thing, then, I was on that team;
And then anything that said "WMD Training," that's just part of my assignment.
Q. All right. Since you've been with the

Santa Rosa Police Department, have you received any training in conducting 5150 Detentions?
A. **I learned about them in Field Training, obviously.**
**And aside from -- I would say, constant contacts with 5150-related incidents, or suspected related incidents, which are a daily occurrence.**
**I would call that essentially on-the-job training, but it looks like you've got listed here on page four of seven, EDP Training.**
Q. Yeah, the Emotionally Disturbed Persons, does that training relate to 5150 situations, or something else?
A. **Emotionally Disturbed Person, it could be 5150; it could be persons who are Under the Influence. A multitude of things.**
Q. Okay. So, it could be someone who, because of a mental disorder such as psychosis, or they are delusional because of, they are just born that way; or it could be someone -- people who are acting psychotically or delusionally, because of alcohol or drugs.
A. **A multitude of things, correct.**
Q. And so, you've had training dealing with "Emotionally Disturbed Persons"?

Page 184

A. **Yes.**
Q. And is that from a point of view of defensive tactics, and things of that nature, or just in terms of doing some kind of assessment, and placing them under a 5150, or a little of both?
A. **Defensive tactics, I don't believe were involved in any of that training. It was on persons.**
**But since we're speaking of "defensive tactics," routinely, during defensive tactics training, or a lot of trainings, even firearms training, we bring up situations where people are not responding, acting appropriately, emotionally disturbed. That's routine.**
Q. Okay. And do you recall anything about this training for "Emotionally Disturbed Persons" you received in May of 2002?
MS. FOWLER: Other than what he's already told you.
MR. SCOTT: Q. Yes.
A. **I just remember one part of the training was, you know, dealing with a - a subject arming themselves with a knife, threatening to stab themselves, and you had to speak to them to try to diffuse the situation, both as individuals and as in pairs.**

Page 185

Q. Okay. And what were you trained to do in that situation?
A. **Attempt to get the person to disarm themselves, which I remember happened pretty quickly in my scenario.**
Q. And how do you do that?
A. **We were able to establish a rapport, or get them to respond to me.**
Q. And how do you do that?
A. **By series of commands and/or questions.**
Q. Okay. And how do you --
Now, is there some guidelines you have in terms of how to do the commands, or what questions to ask?
A. **No.**
Q. Did you ever receive a training, or was there ever a class you took at the Santa Rosa Police Department, on doing 5150s?
MS. FOWLER: It's already been asked and answered.
THE WITNESS: I don't recall.
MR. SCOTT: Q. Okay. And I notice in -- on page six of seven, you had a class in December 1999 called "Suicide By Cops," do you see that?
A. **Yes.**

Page 186

Q. Okay. And what was that all about?
A. **I don't recall.**
Q. Okay. Are you familiar with the term "Suicide By Cop"?
A. **Yes.**
Q. And what does that term mean to you?
A. **When a subject utilizes police or law enforcement to have them act to kill them by their actions --**
Q. And do you --
A. **-- not by the law enforcement actions, but by their own actions.**
Q. And do you believe that the shooting incident of February 2007 was a "Suicide By Cop"?
MS. FOWLER: Again, it calls for speculation. I'd object, but if you know, you can tell him.
THE WITNESS: I don't know.
MR. SCOTT: Q. All right.
And what about the shooting of Mr. DeSantis, do you believe that was a "Suicide By Cop"?
MS. FOWLER: Again, the same objections.
THE WITNESS: I don't know.
MR. SCOTT: Q. How many 5150s have you done in the last year?

Page 187

A. MAGGI SAUNDERS & ASSOCIATES (415) 383-6281
57 Plymouth Avenue, Mill Valley, California 94941

**A. Me personally? None.**
Q. How many have you done in your career?
MS. FOWLER: And by that, you mean where he's actually detained someone under that statute?
MR. SCOTT: Yes.
Q. Where you have detained someone, and placed them on a "5150," and taken them to an appropriate medical facility.
**A. You know, I can't give you an exact number, but I've probably done that dozens of times, and been involved in it in hundreds of times.**
Q. Okay. In the last year, how many have you been involved in?
MS. FOWLER: You just asked him that.
MR. SCOTT: No. I asked him how many did he do, versus how many was he involved in.
THE WITNESS: Oh, probably about a dozen.
MR. SCOTT: Q. Okay. And what was it about those situations that made them fall within the category of a 5150, what kind of behavior was observed?
**A. Oh, I think it's all. . .**
MS. FOWLER: Well, I think it's vague and ambiguous. Are you talking about the dozen that he just identified?
MR. SCOTT: Q. Right. Yeah, of those

Page 188

dozens, can you give me examples of types of behavior that you observed that resulted in someone being 5150'd?
**A. They run the gamut, from all types of things. It's all over.**
**If the persons are unable to care for themselves or others; for instance, elderly, who just can't remember who they are, or where they came from, or whatever, they fall under 5150.**
Q. Okay.
**A. Because we have no way to make sure that they can take care of themselves;**
**To the persons who want, or are talking about committing suicide, have attempted to do so, but are now responsive, or, as a matter of fact, unresponsive, because of a medical condition, or whatever, and they are placed under 5150s.**
Q. Okay. Any other types of situations you can recall over the past year or so where you were involved in a 5150?
**A. A subject tried to hang himself. He had -- he was alive, but unresponsive, but we -- I had the officers go ahead and place him on a 5150, based upon conversations he had with his roommate just prior to that.**

Page 189

Q. Okay. What about --
Have you ever 5150'd or been involved with 5150'ing someone who was delusional, or hallucinating?
**A. I'm sure I have; I just don't have an exact when and where.**
Q. Okay. And have you received any training in terms of psychosis, or people who are psychotic, in relation to 5150?
**A. Probably, the EDP training that we had;**
**But I've seen numerous times where that's been the case, of people acting-out, through my years.**
Q. When you say "acting-out," can you give me examples of what you mean by that?
**A. Subjects who are -- Well, a lot of the times people are under the influence of narcotics, alcohol, rambling statements, displaying violent behavior, hallucinating, and so forth.**
Q. And have you ever 5150'd any of those individuals?
**A. I'm sure I have.**
Q. All right. And did you receive any training on people with bipolar condition and people who had mania, or things like that?

Page 190

**A. Probably just mentioned in the EDP training, that type of thing.**
**And then, basic -- I mean, like a defensive tactics, or firearms training, just regarding people with emotional difficulties.**
Q. Do you know what a bipolar -- what bipolar condition is?
MS. FOWLER: To the extent that calls for expert medical opinion, I will object, but you can tell him what your understanding is, if you have one.
THE WITNESS: My understanding is their behavior is affected based upon not what they want to do, but is a condition in their brain that makes them act-out.
MR. SCOTT: Q. And have you ever --
Did you receive any training on people who are in "manic" phase of a bipolar condition?
**A. Not that I'm aware of.**
MR. SCOTT: Okay. That's all the questions I have.
It might be a good time to take a break, and then I'll let my colleague Mr. Nisenbaum carry on.
THE VIDEOGRAPHER: Going off the record, the time on the monitor is 11:04 a.m.

Page 191

Case 3:07-cv-03386-JSW Document 47-3 Filed 08/08/2008 Page 35 of 42

continuum of kind of a lesser force, up to greater force?
A. **I wouldn't necessarily describe it as going -- it's a medium -- I would say, a medium level of force. But there is no ladder of force, necessarily, than that we have to increase. We can move all over the continuum, I should say.**
Q. I understand that you can move over the continuum.
Just, when we refer to a "continuum of force," the "continuum" is something that goes -- that begins kind of with lesser force, and ends at lethal force; is that fair to say?
A. **Um. . .**
Q. I'm talking -- I'm not talking about your options within it, but as much as I am what the continuum itself represents?
MS. FOWLER: Well, I think your question is somewhat vague and ambiguous.
If you are saying that that's how it's described, I think there are some people who believe that the "continuum of force" means that you have to go through each level of force progressively before you can get to the next level of force.
And if that's what you are trying to

Page 200

imply in your question, I think it's argumentative, and I think that's what his concern is, so. . .
MR. NISENBAUM: I was trying to make that clear. That's not my implication.
MS. FOWLER: Okay.
THE WITNESS: So, that's part of the continuum. It's somewhere in the middle. There is a lesser amount of force, and then there is, obviously, a lethal force above that.
MR. SCOTT: Q. Okay. And lethal force includes a force that is likely to kill a person; is that correct?
A. **Correct.**
Q. Okay. Do you know where the Taser falls in this continuum?
A. **Somewhere in the middle, in the medium level of force.**
Q. Now, since 2004, have you been trained in the Taser sinc then?
A. **Just updated training regarding, in defensive tactics on where it sits in the continuum, the likely reactions or the outcomes of Taser use, updating on how to utilize it better. Standard training.**
Q. Okay. And have you had any training with

Page 201

respect to the use of the Taser that tells you that the Taser may be used to incapacitate individuals who are not responsive to police commands?
MS. FOWLER: Well, I'm going to object, since that may call for an expert opinion. It's also vague, ambiguous and an incomplete hypothetical.
But if you can answer the question as he's phrased it, go ahead.
THE WITNESS: Um, yes, it has been.
We have been trained on, when we have noncompliant, or unresponsive persons, on occasion to use it. But, again, it is based upon individual assessments of individual scenarios.
MR. NISENBAUM: Q. Okay. Now, directing your attention again to April 9th, 2007, at some point you received a call regarding a person who you ultimately learned was Richard DeSantis; is that correct?
A. **Correct.**
Q. And I know you didn't know his name at the time, right?
A. **Correct.**
Q. You had never heard of Mr. DeSantis prior to the incident?
A. **Not that I'm aware of.**

Page 202

Q. Okay. And how about his wife Patricia DeSantis, had you heard of her?
A. **Not that I'm aware of.**
Q. Okay. Do you recall the call you first received regarding Mr. DeSantis?
A. **Generally.**
Q. Okay. Do you remember if that call relayed an address?
A. **I'm sure it did, but I couldn't even tell you the name of the address at this time.**
Q. Okay. The information that you first received regarding this incident involving Mr. DeSantis, can you summarize for me what you understood that information to be?
A. **That the wife of Mr. DeSantis was reporting that he was shooting a weapon inside the residence, and that there were two children inside the residence, ten years old and two.**
**I was dispatched, along with two other Officers, I was dispatched from the Station.**
Q. At the time did you have any information that Mr. DeSantis had been shooting his weapon at any person in the residence?
A. **Not that I was aware of.**
Q. Okay. To your knowledge, did you have an

Page 203

A. MAGGI SAUNDERS & ASSOCIATES (415) 383-6281
57 Plymouth Avenue, Mill Valley, California 94941

understanding -- Strike that.
Did you have an understanding from -- from the information you received, that Mr. DeSantis was -- Strike that question.
Did you have an understanding that the caller was related to Mr. DeSantis?
A. **Yes, his wife.**
Q. And did you have an understanding that the caller was actually present in the same residence as Mr. DeSantis?
A. **Yes.**
Q. Did you have an understanding that the --
Well, did you have any information that the caller had been prevented from using the telephone to make the call?
A. **I don't know.**
Q. You don't recall any specific information to that effect?
A. **Correct.**
Q. All right. Did you have any information that Mr. DeSantis had threatened anyone in particular inside the residence specifically?
MS. FOWLER: You mean, other than by firing a gun in the residence? Are you talking about verbal threats, or. . .

Page 204

MR. NISENBAUM: Q. Well, what I mean is whether verbal or physical.
A. **I knew he was firing a weapon inside the residence. That would appear to be threatening, but I didn't know of any verbal threats.**
Q. Did you know if the caller --
Did you have any information that the caller had said that Mr. DeSantis thought he was actually protecting the people inside the residence?
A. **No, not at that time.**
Q. You didn't have any information that Mr. DeSantis was making verbal threats to people inside the residence, did you?
A. **No.**
Q. Do you know if the caller expressed fear that Mr. DeSantis was going to shoot her?
A. **I don't know.**
Q. Meaning, you don't recall having that information?
A. **I don't know if she expressed fear or not.**
Q. You don't have -- As we sit here today, you don't have a specific recollection of having any information that Mr. DeSantis -- Strike that.
As we sit here today, you don't recall having any specific recollec- -- You don't have a

Page 205

specific recollection of having any information that the caller stated that Mr. DeSantis had -- had said that he was going to shoot them, or shoot her?
A. **No.**
Q. Okay. Did you have an understanding of how many people were inside the residence, what the call was about?
A. **Four people, including Mr. DeSantis.**
Q. And did you have an understanding of who those people were in relation to Mr. DeSantis?
A. **Only that there was a wife and two children.**
Q. Now, did you receive updates on --
Well, I take it, once you respond -- once you heard the call, you responded to the DeSantis residence?
A. **Yes.**
Q. Okay. And by the time you responded to the DeSantis residence, did you have any updates pertaining to the DeSantis incident?
A. **Some.**
Q. Okay. And do you recall how many separate communications you received from Dispatch on your way up to the point when you arrived at the DeSantis residence?

Page 206

A. **I have no idea of the number.**
Q. Do you have a sense of whether it was more than five?
A. **Back and forth, it was probably around there, somewhere around five.**
Q. Okay. And at the time, by the time that you arrived at the DeSantis residence, do you recall whether you had had any updates pertaining to gunshots in the residence?
A. **Yes.**
Q. And what -- can you describe what those updates relayed?
A. **The first one, before the report of gunshots, was the identification of a Glock pistol that he was shooting.**
**Shortly thereafter, I learned that the first officers had arrived on-scene.**
**And then, immediately after, I was advised that there were more shots from the residence.**
Q. Okay. Who advised you that there were "more shots from the residence"?
A. **Dispatch.**
Q. And did Dispatch advise you on what basis they had that information?
A. **No; just the fact there were more shots**

Page 207

**from the residence.**

Q. Okay. Did Dispatch advise you that the caller was still on the line?

A. **Yes.**

Q. Did you request any information from Dispatch?

A. **I requested that they tell the wife to attempt to flee with the children.**

Q. Did you inquire as to the status of -- Well, strike that.

About how long before you arrived at the DeSantis residence, did you make that request to Dispatch, about having the wife and kids attempt to flee?

A. **About a minute, I would say, estimate a minute.**

Q. Now, before you arrived at the scene, you had come to an impression in your mind that this could be a potential murder/suicide; is that right?

MS. FOWLER: I'm going to object. There is lack of foundation. He hasn't testified to that.

THE WITNESS: There were numerous things crossing my mind about what was going on.

MR. NISENBAUM: Q. Okay. Was that one of those?

Page 208

A. **I believe my first thoughts were that this may be a hostage scenario, based upon the fact that Mrs. DeSantis, who was either unwilling, or unable, to leave the residence prior to my arrival.**

Q. How did you know that she was unable to leave -- Well, strike that.

What made you think that she was either unwilling or unable to leave the residence?

A. **I had asked for an update from my original request, to have her flee the residence.**

**And I don't know the terms that were used, but essentially she advised that she either wasn't or couldn't leave the residence.**

Q. And did you make any further inquiries about why she wasn't leaving the residence?

A. **No. I didn't have time.**

Q. Okay. Would it make a difference to you as to whether she was unwilling to leave the residence, as opposed to unable to leave the residence?

A. **It could have a bearing, but not necessarily. My interest was protection of everyone involved.**

Q. When you arrived at the DeSantis residence, where did you park?

A. **Southeast of the residence.**

Page 209

Q. And is there a driveway that leads to the residence?

A. **It's a common driveway. I didn't park there.**

Q. Okay. How far from the driveway did you park?

A. **50 yards, approximately.**

Q. Okay. And was your car -- in what direction relative to the driveway was your car facing?

A. **It was facing towards the driveway. It was facing west on the south side of the street.**

Q. And do you know if there were any --

Did you park in the street?

A. **Yes.**

Q. Do you know if there were any vehicles that -- Well, let me ask you this:

When you stopped your vehicle, and you were still in the car -- I take it, you got out at some point, right?

A. **Correct.**

Q. Okay. When you stopped the vehicle and you were still in the car, could you see the DeSantis residence from the vehicle?

A. **I probably could have, but at that point I didn't know which residence it was.**

Page 210

Q. Okay. How did you come to find out which residence it was?

A. **I started walking towards the residence and Officer Menke used his flashlight to identify where he was in relationship to the residence.**

Q. Did you see an Officer at the residence?

A. **I saw three Officers approaching from the west.**

MS. FOWLER: And, Ben, at some point I'm going to start objecting. I mean, he's gone over all of this in his prior deposition testimony, which you've been provided. And I appreciate, if you want to have some context for your questions, but we're not going over every single detail again.

MR. NISENBAUM: I hear you. I hear you. Obviously.

Q. Now, what was the first communication you had with the Officers at the scene?

A. **My first communications -- my first contacts was with Officer Jones and Officer Soares at our patrol cars.**

Q. Now, other -- do you know whether or not Officer Jones had a Taser that night?

A. **I don't know.**

Q. Do you know whether or not Officer Soares

Page 211

A. MAGGI SAUNDERS & ASSOCIATES (415) 383-6281
57 Plymouth Avenue, Mill Valley, California 94941

had a Taser that night?
A. **I believe he did, but I'm not sure.**
Q. And is it fair to say that, to your knowledge, officers at Santa Rosa who carry a Taser have been trained in the use of the Taser?
A. **They all have.**
Q. Okay. Now, when you -- at some point you observed the driveway, correct?
A. **Yes.**
Q. Okay. And I'm talking about the driveway to the DeSantis residence.
A. **Yes.**
Q. Okay. And it's my understanding, from -- well, it's my understanding that, in your view, the driveway was relatively dark; is that right?
A. **Yes.**
Q. Okay. Do you know whether there were any police vehicles parked near the driveway closer than yours?
A. **There were not. There was one --**
**Let me rephrase that. Officer Jones was parked in front of my patrol car, but it wasn't close to the driveway.**
Q. All right. Now, you had the ability to illuminate the driveway using your vehicle; is that

correct?
A. **Not tactically.**
Q. And can you tell me why not?
A. **I chose not to.**
Q. Sure. So you made a conscious choice not to use a police vehicle to illuminate the driveway, correct?
A. **Yes.**
Q. And the reason for that is what?
A. **Tactics.**
Q. And how would that be beneficial, tactically?
A. **I didn't know where Mr. DeSantis was upon arrival. And I knew, just prior to my arrival, that shots were still being fired from the residence.**
**I wasn't going to drive into a -- into the midst of a shooting.**
Q. Okay. When did you first observe Mr. DeSantis?
A. **As I rounded the southeast corner of the common driveway.**
Q. And where was he?
A. **Standing just off of the steps to his residence.**
Q. And in relation to the driveway to the

residence, where are the steps?
A. **The northeast side.**
Q. How far from the driveway was Mr. DeSantis standing on those steps?
MS. FOWLER: Well, I'm going to object. It's vague and ambiguous. The steps are in part of the driveway, if you've seen the site.
MR. NISENBAUM: [Inaudible]
THE WITNESS: He was standing in the driveway.
MR. NISENBAUM: Q. And was anyone around him?
A. **I believe it was his wife, who I determined, later determined to be his wife and a, approximately a two-year-old child in her arms were standing on the steps.**
Q. Now, at this point you had an understanding that there was one other person who could still be in the residence, correct?
A. **Yes.**
Q. Prior to the shooting of Mr. DeSantis, did you ever see that other person?
A. **No.**
Q. From your observation could you get a sense of the demeanor of Mr. DeSantis' wife?

A. **No.**
Q. Okay. Were you able to tell whether or not -- Did you form any opinion in furtherance of the earlier possibility that there could be a hostage situation, that she was a hostage of Mr. DeSantis?
MS. FOWLER: Well, I'm going to object that it's vague and ambiguous. It calls for speculation.
If you can understand the question, answer it, but. . .
THE WITNESS: I don't know whether she was a hostage or not.
MR. NISENBAUM: Q. Okay. Prior to the shooting of Mr. DeSantis, did she say anything to you -- Strike that -- did she say anything that you could hear?
A. **Not that I was aware of.**
Q. Prior to the shooting of Mr. DeSantis, did you ask her any questions?
A. **I did not.**
Q. Okay. Now, to your knowledge, she was ordered to go into the residence before the shooting occurred, correct?
A. **By one of the officers; I don't know who it was.**

Depo of RICHARD CELLI - VOLUME II Multi-Page DeSANTIS VS. CITY OF SANTA ROSA, ET AL.
June 11, 2008 USDC, NORTHERN DIST OF CA, No. C-07 3386 JSW

Q. You never -- Did you ever hear any officer ask her any questions about the circumstance? And I mean the circumstances that brought you to the scene.
**A. There was no time there to do that.**
Q. Well, from the time that you arrived, from the time that you first saw Mr. DeSantis to the time the shooting occurred, about how much time passed?
**A. A minute, a minute and a half, total.**
Q. Did you give any consideration to, during that minute to a minute and a half time period, did you give any consideration to bringing the police car around to illuminate the driveway?
**A. No.**
Q. Why not?
**A. I could see the scene at that point.**
Q. So, at that point, was the scene fairly well-lit?
**A. It was not well-lit; however, I could see Mr. DeSantis.**
Q. And as I understand it, Mr. DeSantis was topless?
**A. No shirt, correct.**
Q. And he was wearing jeans?
**A. Yes.**
Q. Did you feel that you could -- that the

Page 216

lighting was sufficient for you to observe any weapons that he might have held in his hands?
**A. Yes.**
Q. Okay. And you did not observe any weapons, correct?
**A. Correct.**
Q. Was the lighting sufficient for you to observe his waistband?
**A. The front of it, yes.**
Q. Okay. And did there appear to be any weapons in the waistband?
**A. Not sticking out the top.**
Q. Okay. Did you notice any bulges in the waistband?
**A. I couldn't tell.**
Q. Okay. And why couldn't you tell?
**A. I couldn't see that part. I couldn't tell whether there was anything sticking in them, or anything in his pockets.**
Q. And is that because Mr. DeSantis was too far away?
**A. I don't know whether it was too far away, the lighting conditions, the way he was standing.**
Q. Did it occur to you at that point -- strike that.

Page 217

Did you give any consideration at that point to attempt to get greater visibilty through the use of better lighting upon Mr. DeSantis?
**A. No. We were directed at trying, or more focused at trying to get compliance from Mr. DeSantis at that point.**
Q. Now, it was important to you to know whether or not Mr. DeSantis was still armed, correct?
**A. Yes.**
Q. Did you ask him whether he was still armed?
**A. We didn't get that far.**
Q. All right. So you did not ask him that question?
**A. Correct.**
Q. And you never asked Mrs. DeSantis whether he was still armed, correct?
**A. Correct.**
Q. Okay. Is there a reason you did not ask Mrs. DeSantis whether her husband was still armed?
**A. I was focused on Mr. DeSantis at the time.**
Q. What was Mr. DeSantis doing at that time?
**A. At which time?**
Q. During the time period when you did not ask Mrs. DeSantis whether or not her husband was still

Page 218

armed.
MS. FOWLER: Well, that covers the entire period of time. And I think that's vague and ambiguous, because he said he never asked her. So, the whole time he was there was during the time he didn't ask her.
MR. NISENBAUM: Maybe I can make it a little more clear.
Q. It was up to about a minute and a half from the time you saw Mr. DeSantis to the time he was shot. We've described that already, I think.
**A. Correct.**
Q. Okay. During that minute and a half time period, so I understand, is it your testimony that you never had the opportunity to ask Mrs. DeSantis if her husband was still armed?
**A. Correct.**
Q. Okay. Now, an Officer did have the opportunity to ask her to go inside the house, correct?
**A. I think an officer ordered her to go back into the house.**
Q. Now, before she went into the --
At some point she did go into the house, correct?
MS. FOWLER: I'm sorry, I was just

Page 219

Page 216 - Page 219
A. MAGGI SAUNDERS & ASSOCIATES (415) 383-6281
57 Plymouth Avenue, Mill Valley, California 94941

Case 3:07-cv-03386-JSW Document 47-3 Filed 08/08/2008 Page 40 of 42

possible murder/suicide situation?
**A. No.**
Q. You were interviewed shortly after the incident occurred, correct?
**A. Correct.**
Q. And do you recall who interviewed you?
**A. Officer Vivian in the Sheriff's Department and a Detective from the Petaluma Police Department. I don't recall his name.**
Q. Okay. Do you recall. . .
I do have one other question. I asked you about your vision. How is your hearing?
**A. It's good.**
Q. Okay. Do you have tinnitus?
**A. I do.**
Q. Okay. And what is tinnitus?
**A. It's a ringing in the ears.**
Q. And is that a chronic condition?
MS. FOWLER: Well, to the extent that it calls for a medical opinion, I object, but if you can answer it, go ahead.
THE WITNESS: It appears so.
MR. NISENBAUM: Q. Is it a persistent condition?
**A. Yes, but it's sometimes noticeable,**

**sometimes not.**
Q. Okay. And when you say "ringing in the ears," kind of ringing on what level?
**A. Say, when I'm attempting, or when I'm quiet, or I'm trying to sleep, sometimes I can hear ringing in my ears. Not like bells, or anything, just a dull ringing.**
Q. At any point in time during this incident involving Mr. DeSantis from the time you arrived at the DeSantis residence up to the point of when shots were fired, did you experience any symptoms of tinnitus?
**A. No.**
Q. Now, what was your understanding with respect to less lethal that was present at the scene of the DeSantis incident?
And I'm asking you, at the time you were at the DeSantis incident, at the time that this was occurring, right, up to the point when shots were fired, what was your understanding of the less lethal options that you had with respect to Mr. DeSantis that you had available to you?
MS. FOWLER: Him, personally?
MR. NISENBAUM: Q. Well, that would be available, either on your person, or immediately available to you by another officer who is at the

scene.
**A. The other officers, well for me personally, was the OC or baton, or physical hands-on.**
**There was Sergeant Soares, with the Sage;**
**I believe there were at least two other Officers there with a Taser;**
**And then, Officer Ellsworth had a police canine.**
Q. Were you the most senior Officer at the scene?
**A. No.**
Q. Who was?
**A. Sergeant Soares.**
Q. And was there, to your knowledge, an Officer who kind of had the overall command of the scene?
**A. I did.**
Q. And why was that you, as opposed to Sergeant Soares?
**A. From my SWAT background, I've got some trainings in tactics, and I -- command of the scene: I ordered that I was going to be in command of the scene.**
Q. How did you give that order?
**A. I advised Sergeant Soares on the way there that I would take care of tactics, while he took care**

**of communications.**
Q. Now, in "taking care of tactics," did you come to a conclusion, up to the point when the shooting occurred, that the Taser would be inappropriate to use in this incident?
**A. Up to just prior to the shooting, he was at too close of a distance -- or too -- Sorry -- too far away of distance to use the Taser.**
**Nor had he displayed characteristics, or a reason to deploy the Taser up to that point.**
Q. My pen is dying here. I think I only brought one. Does anyone have one?
THE VIDEOGRAPHER: Here.
MR. NISENBAUM: Thank you.
Q. Okay. Now, the X26, right?
**A. Yes.**
Q. That's the Taser model?
**A. Correct.**
Q. And although your Taser X26 was in the trunk, there were at least two other Tasers that were actually with other Officers at the scene of the DeSantis residence?
**A. Yes.**
Q. Okay. And what range does the Taser X26 have?

A. MAGGI SAUNDERS & ASSOCIATES (415) 383-6281
57 Plymouth Avenue, Mill Valley, California 94941

Q. Okay. And is it your testimony that these were not the right circumstances for the dog to be used?

MS. FOWLER: I'm going to object. That calls for an expert opinion. Mr. -- Sergeant Celli has already testified that he's not trained in the use of canines.

MR. NISENBAUM: Okay. But he has testified that he's the commander at the scene.

Q. So, I want to know essentially whether that was an option that you gave the other Officers to use?

A. **The other Officer, Jerry Ellsworth, has the ability to make that decision on his own, without my command, based upon his perception of the abilities of himself and/or his dog.**

Q. Okay. So the use of the dog did not fall within your range of use-of-force options; is that correct?

A. **It was there. It was an option.**

**However, I wasn't, at that time, while Mr. DeSantis was, although hesitantly complying, was complying, there was no reason to send the dog at that point, nor did I order it.**

Q. I see. When he stopped complying, you

Page 252

could have ordered that the dog be sent, correct?

A. **When he started to charge the Officer?**

Q. When he stopped complying.

A. **There was no time to give that order.**

Q. Okay. At the point when the Sage was used, a Taser could have been used, correct?

MS. FOWLER: I'm going to object. Calls for speculation. Don't answer that.

MR. NISENBAUM: Q. I'm not asking --

I'm asking you, as a commander at the scene: You could have given an order for a Taser to be used, correct?

MS. FOWLER: You mean, did he have the ability to order an Officer to do that?

MR. NISENBAUM: Q. Yes.

A. **At the time I did not have the ability to do that, based upon the time and distance of Mr. DeSantis.**

Q. Okay. It's fair to say that you never saw any object consistent with a weapon on Mr. DeSantis' person, correct?

MS. FOWLER: It's already been asked and answered several times.

THE WITNESS: Correct.

MR. NISENBAUM: Q. No one ever re- -- No

Page 253

other Officer at the scene reported to you that they had observed an object consistent with a weapon on Mr. DeSantis, correct?

A. **Correct.**

Q. Now, if I understand your statement -- Strike that.

Following the shooting you gave a statement to the Petaluma Police Department Investigators, correct?

A. **Yes.**

MS. FOWLER: And the Sheriff.

THE WITNESS: And the Sheriff.

MR. NISENBAUM: Q. And the Sheriff, okay.

A. **Yes.**

Q. Now, do you recall the name of the person you gave the statement to?

A. **No, I don't, other than Detective Vivian from the Sheriff's Department.**

Q. Okay. Do you know Mike Pierre?

A. **That's his name, yes.**

Q. Okay. That's from the Petaluma Police Department?

A. **Correct.**

Q. Okay. Now, it sounds like after the shooting you were angry?

Page 254

MS. FOWLER: Well, I'm going to object. That's argumentative, and that isn't reflected.

He hasn't testified to that, so it assumes facts not in evidence.

But you can answer the question.

THE WITNESS: Yes.

MR. NISENBAUM: Q. All right. And I think you actually told Officer Pierre -- Pierre is an Officer, right?

A. **Detective, yes.**

Q. Detective -- Detective Pierre, that -- that right after you shot you were pretty pissed off, you were mad at him, correct?

A. **Mad at Mr. DeSantis, yes.**

Q. Okay. And you were mad because he had other options, right?

A. **Correct.**

Q. Now -- And you told Detective Pierre that you weren't going to let Mr. DeSantis attack and kill your people, correct?

A. **Correct.**

Q. Was that a decision -- When did you make that decision?

A. **When Mr. DeSantis started to attack them.**

Q. And the attack -- When we talk about

Page 255

STATE OF CALIFORNIA ) ss.

CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 22nd day of June, 2008.

A. Maggi Saunders, CSR

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California