EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICIA DESANTIS,
individually and as Successor
in Interest for RICHARD
DESANTIS, deceased, and as
Guardian Ad Litem for DANI
DESANTIS, a minor and TIMOTHY
FARRELL, a minor,

          Plaintiffs,

vs.

CITY OF SANTA ROSA, JERRY
SOARES, RICH CELLI, TRAVIS
MENKE, PATRICIA MANN and DOES
1 through 25, inclusive,

          Defendants.

_____/

CASE NO. C 07 3386 JSW

CERTIFIED COPY

DEPOSITION OF PATRICIA MANN

November 15, 2007

Reported by:
JUDY A. MANFRED
CSR No. 4748

HANNAH KAUFMAN & ASSOCIATES, INC.
Certified Shorthand Reporters
472 Pacheco Street
San Francisco, California 94116
(415) 664-4269

1    A.   Yes.

2    Q.   Where?

3    A.   Exchange Bank in Santa Rosa.

4    Q.   What was your position with the Exchange Bank?

5    A.   I held a variety of positions.

6    Q.   Can you tell me what they were?

7    A.   I started as a teller, moved to the data center,

8  where I was a telephone customer service rep, and

9  eventually became the trainer for that department.

10    Q.   How long did you work for the Exchange Bank?

11    A.   Just under five years.

12    Q.   From when to when?

13    A.   I believe 1999 to the end of 2004.

14    Q.   When were you hired by the Santa Rosa Police

15  Department?

16    A.   2006, April.

17    Q.   Did you apply to any other law enforcement

18  agencies?

19    A.   No, I did not.

20    Q.   Why did you apply to the Santa Rosa Police

21  Department?

22    A.   After all the research I did, that was the

23  department that I wanted to work for the most.

24    Q.   And did you know people there?

25    A.   Yes.

1    Q.    What did you do during that period of time?

2    A.    What do you mean?  During the entire period of

3    time or prior to seeing Sergeant Celli?

4    Q.    You're there and there's a minute plus or minus.

5    What did you do during that approximate minute while you

6    were waiting for Sergeant Celli to arrive?

7    A.    Well, I --

8    MS. FOWLER:  I object.  That misstates her

9    testimony.  She didn't say she was waiting for him to

10   arrive.  She said she saw him one minute after she

11   arrived.

12   MR. SCOTT:  Q.  Thank you.  What were you doing

13   during this minute, plus or minus, before you first saw

14   Sergeant Celli?

15   A.    That time included my parking my vehicle half a

16   block away, getting out of my vehicle, unholstering my

17   weapon, running up to the area where I saw two other

18   officers, and getting into position.  What I mean by

19   position is I ran up to the scene and I stood in between

20   Officer Jerry Ellsworth and Officer Travis Menke.

21   Q.    Where were they positioned when you arrived?

22   A.    Officer Menke was taking a position of cover on

23   the southeast corner of one of the residences.  I don't

24   recall the exact address.

25   MR. SCOTT:  I'm going to mark as Exhibit 1 -- can

1   we have a stipulation that this diagram, number 1, is not

2   to scale and, number 2, we can use it outside the

3   protective order.

4           MS. FOWLER:  Yes, so stipulated.

5           MR. SCOTT:  Thank you.  I'm going to mark this as

6   Exhibit number 1.  I have extra copies.

7           (Plaintiffs' Exhibit 1 marked for

8             identification.)

9           MR. SCOTT:  Q.  Now, at some point I may want you

10  to maybe mark certain thing right now, but we aren't there

11  yet.  I'm just going to try to use this to help acclimate

12  ourselves and hopefully better understand your testimony.

13  Now I've agreed with your lawyer that this diagram is not

14  to scale.  All right?

15      A.  Correct.

16      Q.  And I don't want -- so don't -- I don't want you

17  to think that I'm making any assumptions about anything in

18  terms of that this diagram necessarily accurately depicts,

19  you know, approximate positions, distances, what have you.

20  This is just to try to help us get a general idea of where

21  people were and what was happening.

22      A.  Okay.

23      Q.  So having said all that, number one, does this

24  diagram at least help you in some way or does it appear

25  to, in a general sense, depict the scene of where the

DEPOSITION OF PATRICIA MANN                              61

1  shooting occurred?

2      A.   Generally.

3      Q.   Okay.  Now, I notice in this diagram near what

4  appear to be a couple vehicles that are in the L -- see

5  the L there?

6      A.   I do.

7      Q.   And what appears to be a body there?

8      A.   Yes.

9      Q.   Is that the approximate location Mr. Desantis was

10  in when he was shot?

11     A.   Approximately, yes.  The vehicle parked parallel

12  to South Avenue was not there --

13     Q.   Okay.

14     A.   -- at the time of the shooting.

15     Q.   And was the other vehicle that's facing more

16  north than south, was that there?

17     A.   Yes.

18          MS. FOWLER:  At the time of the shooting.

19          THE WITNESS:  At the time of the shooting, yes.

20          MR. SCOTT:  At the time of the shooting, okay.

21  That's what I thought, too, so I'm not surprised to hear

22  that.  That was my understanding.

23          MS. FOWLER:  So now we have a clear record.

24          MR. SCOTT:  Q.  And were you standing in the

25  general area where it says R2 next to 633 South Avenue?

1      A.   Yes.

2      Q.   And was Officer -- I say Menkee, but I guess it's

3  Menk (phonetic).

4      A.   Menk (phonetic).

5      Q.   But it's M-e-n-k-e?

6      A.   Yes.

7      Q.   And forgive me if I say Menkee, but it's Menk.

8  Now, Officer Menke would have been kind of in an area next

9  to R2, but getting cover behind the corner of the

10 building?

11     A.   Correct.

12     Q.   And to his right or to what I guess would be the

13 east, at the top of this is -- north is at the top, and

14 then the bottom of this would be south and the left would

15 be west and the east would -- I mean, sorry, and the right

16 would be east, correct?

17     A.   Yes.

18     Q.   All right.  So if I say north, south, east, west,

19 I'm referring to it in relation to this diagram.

20     A.   Okay.

21     Q.   And South Avenue would be south part of the

22 scene?

23     A.   Yes.

24     Q.   So that's convenient.  Now, if I understand you

25 correctly, when you arrived Officer Ellsworth would have

```
 1   been to the east or to the right of Officer Menke?

 2       A.   Slightly, yes.

 3       Q.   About how far apart were they?

 4       A.   He was actually more to the southeast.  They were

 5   not standing side by side.  He was approximately ten feet

 6   or less, anywhere between seven to ten feet to the

 7   southeast of where Officer Menke was standing.

 8       Q.   So a little behind him and to his right?

 9       A.   Correct.

10       Q.   And was Officer Ellsworth in a position of cover?

11       A.   No, he was not.

12       Q.   Did you say anything to him about taking a

13   position of cover?

14       A.   There was none available.

15       Q.   What about the vehicle that is next to the body,

16   was that available for cover?

17       A.   No, it was not.  This, again -- as you've already

18   stated, this is not drawn to scale.  The vehicle was much

19   closer to the building.

20       Q.   And you didn't think it was safe to approach the

21   vehicle for cover?

22       A.   No.

23       Q.   Why didn't you not think it was safe?

24       A.   One, there was no room for me to retreat if I

25   needed to; the vehicle was parked too close to the
```

1    building.  That would have required me to walk directly in

2    front of Officer Menke which would have possibly put me in

3    the line of fire.

4        Q.   Okay.

5        A.   And, also, time did not allow for it.

6        Q.   Okay.  And when you arrived and parked your car,

7    would that have been kind of -- you said it was, I think,

8    a half block or something --

9        A.   Yes.

10       Q.   -- west?  That would have been west on this

11   diagram up the street?

12       A.   Yes.

13       Q.   Approximately how many car lengths or feet from

14   the R2 position?

15       A.   Approximately 300 feet.  I parked at the

16   intersection of west and south, West Avenue and South

17   Avenue.

18       Q.   And when you got out of your patrol car were

19   there any shotguns or rifles in the vehicle?

20       A.   A shotgun.

21       Q.   Okay.  And with buckshot?

22       A.   Yes.

23       Q.   And did you bring that?

24       A.   No.

25       Q.   Why not?

1    A.    I didn't think time allowed for it.  Again, I was

2  responding to an active shooter.  That would have required

3  me to unlock the shotgun from its position in the car,

4  load a round into the chamber, load another round into the

5  magazine if I had time to do so.  Then it's also not -- in

6  that kind of situation, not a very tactical weapon.  It's

7  a long gun.  It's not -- in my opinion, for that

8  situation, for me it was not a tactical weapon to bring.

9    Q.    Why do you say you didn't think it was tactical?

10    A.    For the size and just for the fact that it would

11  have taken too long for me to get it out of the car, sling

12  it over my shoulder, if I needed to.

13    Q.    What was it about the size that led you to

14  believe it wasn't tactical?

15    A.    Just the fact that it's long.  It's not a

16  sawed-off shotgun, it's a full-size shotgun.  I didn't

17  know if at some point I'd be going into the residence in a

18  tight, confined area.  It was just more tactically sound,

19  in my opinion, to use my handgun.

20    Q.    Was the bean bag shotgun in the trunk of your car

21  at that time?

22    A.    No.

23    Q.    Why not?

24    A.    I had not been trained to use it yet.

25    Q.    I see.  To your knowledge, did Officer Menke have

1    the bean bag gun in the trunk of his car?

2        A.   Not to my knowledge.

3        Q.   And did Officer Ellsworth have the bean bag

4    shotgun in his vehicle?

5        A.   Not to my knowledge.

6        Q.   You don't know or --

7        A.   I don't know.

8        Q.   To your knowledge, did any of -- I guess there

9    were at least six officers at the scene.  At least I'm

10   aware of Officer Menke, Officer Ellsworth, you, Officer

11   Jones, Sergeant Celli and Sergeant Soares.

12       A.   Correct.

13       Q.   Does that sound right?

14       A.   Yes.

15       Q.   And when the shooting occurred was it just the

16   six of you or was there anyone else present, to your

17   knowledge?

18           MS. FOWLER:  Police officers?

19           MR. SCOTT:  Q.  Police officers.

20       A.   To my knowledge, we were the only officers on

21   scene.

22       Q.   And did you understand that other officers were

23   coming to the scene, that other officers had been called?

24       A.   I -- prior to shots being fired?

25       Q.   Yes, prior to shots being fired.

1    A.   I don't recall if anyone else was in route beside

2  the six officers that were ultimately on scene at the

3  time.

4    Q.   Okay.  So when you parked your car at the corner

5  and came to the scene, you approached the area in the

6  vicinity of Officer Menke and Officer Ellsworth, correct?

7    A.   Yes.

8    Q.   And did Officer Ellsworth have his canine with

9  him?

10    A.   Yes.

11    Q.   Do you know the name of the dog?

12    A.   Uh, duke.

13    Q.   Duke.  Okay.  Have you ever worked with Duke

14  before?

15    A.   Yes, I have.

16    Q.   On how many occasions prior to this incident?

17    A.   Officer Ellsworth and I at the time were on the

18  same patrol team so every shift that Officer Ellsworth was

19  working, I would work with him and Duke.

20    Q.   And you had seen Duke work in the field before

21  this incident?

22    A.   Yes.

23    Q.   And you had seen Duke locate suspects?

24    A.   I don't remember specifically when I've seen the

25  dog -- when I've seen Duke utilized, if it was before or

1   after, I don't remember specific incidents.

2       Q.   So the timing is vague in terms of whether you

3   had seen Duke do certain things before the shooting or

4   after?

5       A.   Right.

6       Q.   But working with the department you have seen

7   Duke apprehend suspects and locate suspects?

8       A.   I have seen Duke apprehend one suspect.   I

9   personally have seen it, yes.

10      Q.   What's the first thing you did when you got to

11  the scene and took a position in the vicinity of Officer

12  Menke and Officer Ellsworth?

13      A.   Well, I put myself into that position on the

14  instruction of Officer Ellsworth.

15      Q.   What did he say?

16      A.   He had his flashlight, which he used to get my

17  attention.   He basically flashed it on and off very

18  quickly to establish where he was.   I ran up to his

19  location and he pointed to a spot in between him and

20  Officer Menke.

21      Q.   Is that the spot you were in when you fired your

22  weapon?

23      A.   Yes.

24      Q.   And from the time you arrived and took that spot,

25  you stayed in that location until you fired your weapon?

1     A.   Yes.

2     Q.   And did Officer Ellsworth stay in the position he

3  was, which I guess would have been to your right and maybe

4  slightly behind you, from the time that you arrived to the

5  time shots were fired?

6     A.   My focus wasn't on Officer Ellsworth, so I don't

7  know if he moved.   To my knowledge, he stayed within that

8  area.

9     Q.   Okay.   So at least that's the location you saw

10  him in before shots were fired and after shots were fired,

11  where was he when you first saw him?

12     A.   I believe he stayed in that area.   I don't recall

13  what his movements were.

14     Q.   Do you have any reason to believe he was not in

15  that general area when shots were fired?

16     A.   No.

17     Q.   And when Officer -- when shots were fired was

18  Officer Menke to your left and in a position of cover?

19     A.   Yes.

20     Q.   Now, could -- and as far as you know, he stayed

21  in that position from the time you arrived until the time

22  shots were fired?

23     A.   Yes.

24     Q.   If you could do me a favor, please, and just put

25  maybe M for Menke, and -- let's see.   Oh, you're Mann, so

1    let's put --

2        A.   First initials?

3        Q.   Yeah, why don't we put initials.  If you could

4    put the initials for Officer Menke, for you, and for

5    Officer Ellsworth in that diagram, recognizing this is

6    approximations, it's not to scale, and this is just giving

7    us an approximate location of where you were at the time

8    of this incident.

9            MS. FOWLER:  With those understandings, you can

10   go ahead and do that.

11           MR. SCOTT:  Q.  Just so it's clear, you got

12   plenty of wiggle room if this case goes to trial and

13   you're not going to be -- you know, nobody is going to be

14   nailed to these as being an exact or precise --

15       A.   Okay.

16       Q.   -- it's just approximate locations.

17           MS. FOWLER:  And just for the record, I would

18   note this diagram was not prepared by this witness and has

19   not been authenticated.

20           MR. SCOTT:  Correct.  Correct.

21       Q.   You did not prepare this diagram, it is not to

22   scale, and this is just to give us a general idea of

23   locations.  Now, it looks like a TM; that would be Officer

24   Menke?

25       A.   Yes.

1     Q.   And then a PM, that would be you?

2     A.   Yes.

3     Q.   And it looks like -- is that a YE?

4     A.   No, that would be my J.

5     Q.   Oh, that's your J.  Fair enough.

6     A.   JE.  Jerry Ellsworth.

7     Q.   Jerry Ellsworth.  And that would be the

8  approximate location that you were in and they were in

9  when you arrived and also at the time the shots were

10  fired?

11     A.   Yes.

12     Q.   Approximately how many feet was Officer Menke

13  from you at the time you took a position?

14     A.   I was approximately three feet to -- three feet

15  behind him and one foot to the right.  So I guess three

16  feet south of where he was standing and one foot east,

17  approximately.

18     Q.   Was he providing you any cover, his body?

19     A.   No.

20     Q.   Okay.  And what was the approximate distance from

21  you to Officer Ellsworth when you took a position?

22     A.   Approximately -- approximately three to

23  five feet.  He was approximately three to five feet,

24  again, south of me, so...

25     Q.   So somewhat behind you and to your right?

1    A.    I think he was more directly behind me.

2    Q.    And where was the dog, do you know?

3    A.    On Officer Ellsworth's left side.  He was holding

4  Duke.

5    Q.    With his left hand?

6    A.    With his left hand.

7    Q.    Do you know what he had in his right hand?

8    A.    His flashlight, I believe.

9    Q.    To your knowledge, did Officer Ellsworth ever

10  take out a weapon prior to the time shots were fired?

11    A.    Not to my knowledge.  In fact, that's why I was

12  standing where I was.  I was providing Officer Ellsworth

13  with lethal cover to protect him.

14    Q.    Okay.  And the dog?

15    A.    And the dog.

16    Q.    Did you say anything to Officer Menke after you

17  took the position there?

18    A.    As I was getting myself into position someone

19  from inside 633 South Avenue -- or at least according to

20  that diagram -- opened the front door.  I alerted Officer

21  Menke -- as he opened the front door from this residence,

22  I alerted Officer Menke and Officer Ellsworth that someone

23  was opening the door.  And I know at least I told the

24  person -- I didn't even get a good look at that person --

25  to stay inside the house.

1     Q.   Do you recall if it was a man or a woman?

2     A.   I don't.  It was extremely dark.

3     Q.   Okay.  How well lit was the area where the

4  shooting occurred?

5     A.   It was poorly lit.

6     Q.   Was it so dark that Mr. Desantis could not have

7  seen you?

8     A.   No.  No, he definitely could have seen us.  I was

9  able to see him.

10    Q.   So you think he saw you?

11    A.   Yes.

12    Q.   So it was light enough for him to see you?

13    A.   I believe so.

14    Q.   And so it was light enough for you to see him?

15    A.   Yes.

16    Q.   Did you talk to Officer Menke after the comments

17  about the residence at 633 South Avenue?  Did you say

18  anything else to him or did he say anything else to you

19  from that point up until the time shots were fired?

20    A.   Not that I recall, no.

21    Q.   Okay.  Now, did you say anything to Officer

22  Ellsworth or did he say anything to you from the time you

23  arrived and took your position to the time shots were

24  fired?

25    A.   Not that I recall.

1          MS. FOWLER:  Other than what she's already

2    testified to --

3          THE WITNESS:  Right.

4          MS. FOWLER:  -- about the person?

5          MR. SCOTT:  Q.  Right, other than what you

6    testified to?

7      A.    Yeah, other than that, no.

8      Q.    Approximately how long was it -- your best

9    estimate -- in terms of seconds or minutes, from the time

10   you arrived and took a position, till the time shots were

11   fired?

12     A.    Approximately two minutes.

13     Q.    During those approximate two minutes -- and I

14   understand this is just an approximation, an estimate, but

15   during that period of time, did you talk to Sergeant Celli

16   or did he talk to you?

17     A.    No.

18     Q.    And during that approximate two minutes, did you

19   talk to Sergeant Soares or did he talk to you?

20     A.    No.

21     Q.    And during that approximate two minutes, did you

22   talk to Officer Jones or did he talk to you?

23     A.    No.

24     Q.    Okay.  And when you took that position did you

25   understand that there was a tactical plan that was being

1    initiated?

2        A.    I understood that Sergeant Celli would be in

3    command of tactical operations.  As far as what level he

4    had a plan, no, I don't.

5        Q.    What does it mean to be in command of tactical

6    operations?

7        A.    It just means that he would be the one

8    instructing us on what to do.  I mean, I'm trying to

9    explain it somewhat simply.

10       Q.    Well, the simpler the better for me.

11       A.    Yeah.  Just as far as if our positioning needed

12   to be changed, if we were going to make any kind of

13   movements, that those instructions would come from the

14   tactical commander on scene, which would have been

15   Sergeant Celli.

16       Q.    Okay.  After you took the position that you've

17   described in Exhibit number 1, did you communicate with

18   Mr. Desantis or his wife or anyone else at the scene,

19   other than briefly with the neighbor at 633 South Avenue?

20       A.    I'm sorry.  Can you repeat that for me?

21       Q.    Yes.  From the time you arrived at the position

22   you've identified in Exhibit 1, from that point till the

23   time that shots were fired, did you talk to anyone else at

24   the scene or did anyone else at the scene -- this would

25   include Mr. and Mrs. Desantis or anyone else -- at the

1     A.   He was not wearing a shirt.  He was wearing light

2   colored blue jeans.

3     Q.   Did he have shoes on or something on his feet?

4     A.   I don't recall.

5     Q.   Did he have -- was he wearing a hat or anything

6   on his head?

7     A.   I -- no, I don't believe he was.

8     Q.   Did you ever see a weapon in either of his hands?

9     A.   No, I did not.

10    Q.   And when his hands were on the ground were his

11  palms open or closed?  In other words, was he open hands,

12  with his hands on the ground?

13    A.   Yes, his --

14         MS. FOWLER:  At what point in time?

15         MR. SCOTT:  When he was on his hands and knees.

16         MS. FOWLER:  At what point in time?

17         MR. SCOTT:  Q.  At any time.

18    A.   From what I can recall, when he first put his

19  hands on the ground, his palms were on the ground.  I

20  don't know -- he did not get fully in the prone position,

21  so I don't know if at any point he turned his hands over.

22  I just don't recall seeing that.

23    Q.   And when he was in that position, getting up and

24  off of his knees and then on his knees and on his hands

25  and knees during those approximately 30 seconds, were you

1    Q.    Okay.  Were you a sprinter?

2    A.    Yes.

3    Q.    Okay.  You run the hundred?

4    A.    Yes, and the four-by-four.

5    Q.    All right.  Me too in high school.  And did you

6  -- would you say that he was -- based on your experience

7  in junior high school, track and being a sprinter, would

8  you characterize what he was doing as sprinting toward

9  you?

10    A.    Yes.

11    Q.    All right.  And his legs were churning?

12    A.    Yes.

13    Q.    And his hands and arms were moving like a

14  sprinter?

15    A.    His hands and arms were moving very rapidly.

16    Q.    Consistent with sprinting?

17    A.    Not exactly, no.

18    Q.    What was it about his arms that was not

19  consistent with sprinting?

20    A.    I do not recall seeing his fists closed or in a

21  sprinter's position where they might have their hands {}

22  bladed like this.  His hands were open and loose; they

23  weren't straight in a -- along his sides.  He was waving

24  them around and his right hand kept dropping out of my

25  sight because when he was charging at us he kept bringing

1   his hand down and I would lose sight of it behind his

2   back.

3       Q.  Okay.  And did he bring his left hand down while

4   he was sprinting also or just his right hand?

5       A.  He brought his left hand down as well, but I was

6   able to maintain a visual on the left hand.

7       Q.  So because of the angle as he was sprinting you

8   would lose sight of his right hand as he was sprinting

9   because just the way his arms were moving?

10      A.  No.  He was running straight at me.  The reason

11  why I lost sight of his right hand is because as I saw it

12  it kept going behind his back.

13      Q.  For how long?

14      A.  With each stride.  Every time he would bring his

15  arm up and bring it back in more like a running stride, it

16  would go back behind his waist.

17      Q.  And how many strides did he take in your

18  direction from location number 2 to the time you heard the

19  first shot fired?

20      A.  I don't know how many strides.  I can estimate

21  distance of how long.

22      Q.  Okay.  Approximately how far had he gone while he

23  was sprinting to the time you heard the first shot?

24      A.  I believe -- I estimate that Mr. Desantis, when

25  he started charging us, ran or sprinted approximately ten

1           MR. SCOTT:  Q.  Did you say anything else to her?

2      A.   Not to my knowledge.  I just remember asking if

3  her and the kids were okay.

4      Q.   And do you recall anything else she said to you,

5  other than that she and the kids were okay?

6      A.   Yes.

7      Q.   What did she say?

8      A.   At first she asked me how Mr. Desantis was.  I

9  told her I did not know, because I did not know his

10  condition at that point.  And then she told me he was

11  bipolar.

12      Q.   Is that the first time you'd heard that?

13      A.   I remember hearing on -- after I was dispatched

14  to the call, when I received an update on the call, I do

15  remember hearing the dispatcher telling us, informing us

16  that the subject, Mr. Desantis, had a mental disorder.  I

17  honestly can't remember if the words bipolar were used.  I

18  remember knowing going into it that we were told that he

19  had a mental disorder of some kind.

20      Q.   Go ahead.

21      A.   When Mrs. Desantis told me that he was bipolar

22  she immediately followed that by saying that he had been

23  taking lithium for a week, or approximately a week.  I

24  can't remember exactly what she said.

25      Q.   Do you remember anything else she said?

1      A.   Yes.

2      Q.   How could you tell?

3      A.   Based on my training and experience from the

4  military and shooting rifles myself, I can tell the

5  difference in sound between a handgun and a rifle.

6      Q.   Okay.  Was it coming from the direction of

7  Sergeant Celli?

8      A.   Yes.

9      Q.   Did you believe it was Sergeant Celli?

10     A.   Yes.

11     Q.   Did you know him to be a good shot?

12     A.   Based on personal observation, reputation?

13     Q.   Yes.

14     A.   Actually, both, personal observation and his

15  reputation, yes.

16     Q.   And what was it about his reputation that you

17  heard about him being a good shot?

18     A.   Just that he's -- I can't remember specifics, but

19  the fact that he is on the SWAT team and has been for

20  quite a while, there's extensive training involved in that

21  and continuous training.  Just the fact that he's been

22  able to be on the SWAT team for as long as he has been

23  means that, you know, he has, I guess, that skill level,

24  the higher and consistent skill level with shooting his

25  weapon.

1    Q.   And did you think that he was running towards you
2    with a bullet and a projectile in him or did you think
3    that he had not been hit?

4    A.   I believed that he had been hit with a
5    projectile.  I did not know whether or not he had been hit
6    with a rifle round.

7    Q.   And so it would have been about a second or less
8    to when you heard the rifle fired to when you fired?

9    A.   Correct.

10   Q.   Did you fire before or after Mr. Officer Menke?

11   A.   After.

12   Q.   About how much time after?

13   A.   Less than half a second.  His -- I heard his
14   shot.  I was already almost completely done with my
15   trigger pull at that time, so I heard his shot and then
16   immediately mine.

17   Q.   Are you familiar with the term sympathetic
18   gunfire?

19   A.   Yes.

20   Q.   Have you been trained about that?

21   A.   Yes.

22   Q.   When were you first trained about it?

23   A.   In the military police.

24   Q.   And what did you learn in that training from the
25   military police about sympathetic gunfire?

1  A.  I was told that sympathetic gunfire is, again,
2  pretty much just like how it sounds, when one person fires
3  other people fire in response, not to the threat but to
4  hearing the gunshots.
5  Q.  And so that's something you had training with
6  from the Army?
7  A.  The Army, yes, as well as in the police academy.
8  Q.  And in the police academy was the training
9  essentially the same as in the Army or was it different?
10  A.  It was similar.
11  Q.  Did you ever ask Officer Jones why he did not
12  fire?
13  A.  No, I did not.
14  Q.  Do you believe Officer Jones should have fired?
15  MS. FOWLER:  Object.  Calls for speculation, lack
16  of foundation.
17  MR. SCOTT:  Q.  Go ahead.
18  A.  No, I'm not going to answer that.
19  MR. SCOTT:  Because?
20  MS. FOWLER:  Because I objected.  She doesn't
21  know what Officer Jones knew or what was in his mind or
22  his sight or vision.  It's --
23  MR. SCOTT:  Then she can say she doesn't know.
24  MS. FOWLER:  She is not going to answer that
25  question.

DEPOSITION OF PATRICIA MANN                    116

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _28th_

day of _November_ , _2007_.

_____
Certified Shorthand Reporter

CSR No. _4748_

# EXHIBIT 1

