# EXHIBIT D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

PATRICIA DESANTIS,
individually and as Successor
in Interest for RICHARD
DESANTIS, deceased, and as
Guardian Ad Litem for DANI
DESANTIS, a minor and TIMOTHY
FARRELL, a minor,

    Plaintiffs,

vs.      CASE NO. C 07 3386 JSW

CITY OF SANTA ROSA, JERRY
SOARES, RICH CELLI, TRAVIS
MENKE, PATRICIA MANN and DOES
through 25, inclusive,

    Defendants.
_____/

CERTIFIED COPY

DEPOSITION OF TRAVIS MENKE
November 15, 2007
Pages 1 through 117

Reported by:    HANNAH KAUFMAN & ASSOCIATES, INC.
JUDY A. MANFRED    Certified Shorthand Reporters
CSR No. 4748    472 Pacheco Street
San Francisco, California 94116
(415) 664-4269

```
 1  estimate simply say so.  And if you would be just totally
 2  guessing just say, I'd be guessing, and that will be your
 3  answer.  Because I don't want you to guess and -- but I
 4  want you to give me your best estimate, if you can.  Do
 5  you understand the difference between giving an estimate
 6  and guessing?
 7       A.  Yes.
 8       Q.  Also, if you'd like to take a break at any time,
 9  please say so and we can take a break.  This is not an
10  endurance contest.  And anytime anyone wants to take a
11  break we can take a break in these proceedings.
12           What was your date of hire, Officer?
13       A.  I believe it was sometime at the end of March
14  with the Santa Rosa Police Department.
15       Q.  In what year?
16       A.  I've been on for roughly two years, so I estimate
17  2005.
18       Q.  So it will be three years in the coming March?
19       A.  I'm sorry, no.  It will be 24 months in March.
20       Q.  So it was --
21       A.  2006, yes.
22       Q.  -- March '06?
23       A.  Yes.
24       Q.  Were you in the same academy with Patricia Mann?
25       A.  No, I was not.
```

```
 1        A.   10 to 15 feet.
 2             MS. FOWLER:  The closest point of him?
 3             MR. SCOTT:  Q.  Yes, the closest point.
 4        A.   10 to 15 feet.
 5        Q.   Okay.  And did he fall anywhere near a vehicle?
 6        A.   Yes.
 7        Q.   What type of vehicle?
 8        A.   I believe it was a small truck, I think.
 9        Q.   How far was that vehicle from you at the time you
10   fired?
11        A.   Approximately 10 to 15 feet.
12        Q.   Did -- when you fired were you in a position of
13   cover?
14        A.   Yes.
15        Q.   And why were you in a position of cover?
16        A.   Because I didn't want to get shot.
17        Q.   And did you ever see a gun in Mr. Desantis's
18   hand?
19        A.   No.
20        Q.   Did you ever see a gun on his person?
21        A.   No.
22        Q.   And when he was sprinting towards you was it a
23   full sprint?
24        A.   Yes.
25        Q.   And you could see his arms?
```

```
 1        A.    M-hm, yes.
 2        Q.    And his arms were moving like a sprinter?
 3        A.    Yes.
 4        Q.    And you could see his hands?
 5        A.    Yes.
 6        Q.    Did you see anything in his hands?
 7        A.    No.
 8        Q.    And what were you afraid he was going to do if
 9   you hadn't shot him?
10        A.    Kill me.
11        Q.    And how did you think he was going to kill you?
12        A.    With a gun.
13        Q.    With what gun?
14        A.    The gun I assumed he had.
15        Q.    And did you shoot him because you assumed he had
16   a gun?
17        A.    Under the circumstances I think it was within
18   reason to assume he had a gun, yes, he was armed.
19        Q.    So it would be fair to say that you shot because
20   you assumed he had a gun?
21        A.    I shot because I thought he was coming to kill
22   me.
23        Q.    Did you think he was going to kill you with a gun
24   you assumed he had?
25        A.    I felt it was reasonable.
```

1         identification.)

2         MR. SCOTT: Q. Now, you've been handed what
3    we've marked as Exhibit number 2, and just for the record,
4    I will say again and repeat, we understand this is not to
5    scale. This is probably not a very accurate diagram so we
6    are just using it for illustrative purposes so we can have
7    a general idea to better understand your testimony, but --

8         MS. FOWLER: And also it was not prepared by this
9    witness.

10        MR. SCOTT: And it was not prepared by you. And
11   just so it makes it easy for you, I think we can stipulate
12   or at least if not yet, I think soon, I can probably
13   stipulate that one of the vehicles in this diagram was not
14   there at the time of the shooting. At least that's all
15   the information I have and I think the testimony seems to
16   be consistent with that.

17        MS. FOWLER: Is that correct?

18        THE WITNESS: Yeah.

19        MR. SCOTT: Q. But in looking at Exhibit 2 is
20   that a general, although not entirely accurate
21   description, of the scene?

22        A. Yes.

23        Q. And in Exhibit number 2 you see 633 South Avenue.
24   That would be where you spoke to a man in that house?

25        A. M-hm. Yes.

```
 1      Q.   That's a yes?
 2      A.   Yes.
 3      Q.   And your car was parked to the west down South
 4  Avenue?
 5      A.   Yes.
 6      Q.   So west would be to the left and north would be
 7  top and south would be bottom and east would be to the
 8  right?
 9      A.   Yes.
10      Q.   Where it says R2, would that be the general area
11  where you took a cover position?
12      A.   Yes.
13      Q.   And is that the area you were located when you
14  fired your weapon?
15      A.   Yes.
16      Q.   And when you first arrived at this general area,
17  where did you see the man and the woman standing in
18  relation to 631 South Avenue?
19      A.   They were up here by -- in front of the
20  residence.  You want me to mark it or --
21      Q.   Yeah, could you mark it and maybe put an X.
22  Where were they in relation to the front door?
23      A.   They were just outside the front door.
24      Q.   Okay.  And I have no idea what -- looks like
25  steps, a door, something, next to 631 South.  If that was
```

1  the front door would be -- they were in that general
2  vicinity?
3      A.  Yeah, in this general area right here.
4      Q.  Okay.  And if you could circle that X.  And I
5  understand this is just a general approximation.
6      A.  (Nods head.)
7      Q.  And for how long did you observe the man and the
8  woman in that general vicinity?
9          MS. FOWLER:  Before he took some action?
10         MR. SCOTT:  Q.  Before somebody moved.  You saw a
11 man and a woman and they appeared to be talking to each
12 other?
13     A.  M-hm.  (Nods head.)
14     Q.  And how long did you see them in that general
15 vicinity, either standing there talking, or whatever they
16 were doing?
17     A.  Not very long.
18     Q.  What would be your best estimate?
19     A.  Within a minute or two.
20     Q.  Okay.  And during that minute or two did -- was
21 there any movement between them, were either one of them
22 walking back and forth or any kind of movement that you
23 observed or did they seem to be stationary for that period
24 of time?
25         MS. FOWLER:  Just for the record, you're talking

DEPOSITION OF TRAVIS MENKE                                75

```
 1  about moving their positions as opposed to moving arms?
 2          MR. SCOTT:  Q.  Yes, I'm not talking about moving
 3  arms, hand gestures.  I'm talking about moving their
 4  general location.  Did they stay in the same general area?
 5      A.  As I recall, they stayed in the same general
 6  area.
 7      Q.  Did it appear that they were face to face, in
 8  other words -- or was one's back to the other, could you
 9  tell?
10      A.  As I recall, they were talking to one another.
11      Q.  Was the woman holding anything?
12      A.  I don't recall.
13      Q.  What was the man wearing?
14      A.  He was wearing jeans, no T shirt.
15      Q.  Was he wearing glasses?
16      A.  I don't recall.
17      Q.  A hat?
18      A.  No.
19      Q.  And could you see what was on his feet?
20      A.  I don't recall.
21      Q.  Had you ever been to that residence before?
22      A.  No.
23      Q.  Did you know who Richard Desantis was?
24      A.  No.
25      Q.  Had you ever heard about him?
```

1   A.   No.

2   Q.   Had you ever heard about his wife?

3   A.   Hm-m.  No, I hadn't.

4   Q.   Did you have any information at all about the
5   family before you arrived there that night?

6   A.   No.

7   Q.   So the only thing you knew about this situation
8   when you got there was the information you got over the
9   radio or whatever you observed, correct?

10   A.   Yes.

11   Q.   And that included shots being fired, correct?

12   A.   Yes.

13   Q.   After you observed the man and the woman near the
14   front door of the house for some period of time that
15   you've described, what was the next thing that you recall
16   happening?

17   A.   Mr. Desantis turned to go back inside the house,
18   at which time I began to call him out.

19   Q.   What did you say?

20   A.   I don't recall specifically.

21   Q.   Okay.  Any particular words or commands that
22   you're trained to use or that you would use in the normal
23   course of business?

24   A.   Typically it's stop, police, show me your hands.

25   Q.   And so you believe you said words close to that

```
 1  or to that effect?
 2       A.   Yes.
 3       Q.   And you wanted him to stop?
 4       A.   Yes.
 5       Q.   And you wanted to see his hands?
 6       A.   Yes.
 7       Q.   Why did you want to see his hands?
 8       A.   So that I could see he was not armed or see that
 9  there was not a gun in his hand.
10       Q.   When you saw him for that minute or so talking
11  with a woman, did you see anything in his hands?
12       A.   Did I see anything -- I couldn't really see them
13  that well.  It was rather dark out; I couldn't tell.
14       Q.   Was it too dark to see if he had a gun in his
15  hand?
16       A.   Too dark to see?
17       Q.   If he had a gun in his hand?
18            MS. FOWLER:  At that point in time?
19            MR. SCOTT:  Q.  Yes.
20       A.   I believe it's possible he could have had a gun
21  in his hand at that time.
22       Q.   And you would have not seen it?
23       A.   And I would have not seen it, no.
24       Q.   Do you think he could see you?
25       A.   At what point?
```

```
 1     Q.  At any time.
 2     A.  Yes.
 3     Q.  Why do you believe that?
 4     A.  Because I was not totally behind the building.  I
 5  still had, obviously, a large -- a portion of my body
 6  exposed off the building.
 7     Q.  And you were wearing your uniform?
 8     A.  Yes.
 9     Q.  A hat?
10     A.  No.
11     Q.  And describe the uniform you were wearing.
12     A.  It's a -- I believe it's called an LAPD blue
13  colored uniform that has the Santa Rosa PD patches on the
14  sides.  They're outlined in a bright yellow with a white
15  writing.
16     Q.  Were all the officers that you saw at the scene
17  there dressed similarly?
18     A.  Yes.
19     Q.  So you didn't see any officers in jump suits or
20  anything like that or any of the sergeants in other kinds
21  of dress?
22     A.  Officer Ellsworth, he wears a department BDU,
23  basic duty utility uniform, for his canine assignment.
24     Q.  Is that like a jump suit or what is that?
25     A.  I don't recall.  They have jump suits that they
```

HANNAH KAUFMAN & ASSOCIATES, INC.

1  are authorized to wear, but I don't recall specifically.
2  They typically wear the jump suit which is like a full
3  zip-up uniform, but they also generally wear the BDU
4  uniform.
5      Q.   What is a BDU --
6      A.   Basic duty utility uniform.  It's -- essentially
7  it's a similar kind, but it doesn't have the metal badges.
8  They have pockets on the pants.  Obviously, leashes, and
9  the equipment they have to carry, it's more useful for
10 them than your basic patrol officer.
11     Q.   Do you recall what Sergeant Celli was wearing
12 that night?
13     A.   I believe it was just a standard police uniform
14 with the sergeant stripes and...
15     Q.   Do you recall what Sergeant Soares was wearing
16 that night?
17     A.   I believe it was the same.
18     Q.   What about Officer Jones, do you recall what he
19 was wearing?
20     A.   I don't recall.
21     Q.   Now, when you first called out to Mr. Desantis
22 with the commands you've described, where was Officer
23 Mann, do you know?
24     A.   She was to my right.
25     Q.   Was she in a position of cover?

1    A.  She was to my right so I'm sure she was a little
2 more exposed, but I'm sure she was seeking the same type
3 of thing that I had on the corner of the house, covering
4 or concealed as much as possible, but she was to my right,
5 so I don't know if she -- that would have made her farther
6 off the building.
7    Q.  Approximately how far was she from you?
8    A.  A couple of feet, maybe.  Within a couple feet.
9    Q.  And was it your impression that she was trying to
10 either use the building or use you and the building as
11 cover?
12    A.  Was it my impression she was trying to use me as
13 cover?
14    Q.  Yes.
15    A.  I think she was trying to get a vantage point as
16 well.
17    Q.  Could you tell if she had her weapon drawn?
18    A.  I didn't look back, no.
19    Q.  So you don't know if she had her weapon drawn?
20    A.  No, I don't know.
21    Q.  And do you know if Officer Ellsworth was there at
22 the time you made the initial command?
23    A.  Yes.
24    MS. FOWLER:  You mean Ellsworth?
25    MR. SCOTT:  Q.  Yes, that's what I meant,

DEPOSITION OF TRAVIS MENKE                               81

```
 1  Ellsworth.  Did you see him at some point?
 2      A.  Yes.
 3      Q.  When did you first see him?
 4      A.  He arrived just after I did at the scene.
 5      Q.  And do you know what position he was in at the
 6  time you made the initial command?
 7      A.  He was to my right.  I don't know where, though.
 8  He was back to my right.
 9      Q.  And did you understand that he was concealed in
10  some fashion or --
11      A.  I don't know.
12      Q.  -- that he had cover?
13      A.  I don't know.
14      Q.  Do you know if he had the dog with him, Duke?
15      A.  Yes, he did.
16      Q.  You saw Duke?
17      A.  Yes.
18      Q.  Okay.  Did someone ask you to make the initial
19  command or did you do that on your own?
20      A.  I don't recall.
21      Q.  You don't recall someone asking you to do it?
22      A.  I don't recall.
23      Q.  You just recall seeing the man who we now know as
24  Mr. Desantis to kind of turn and walk towards you going
25  inside the house?
```

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the 28th day of November, 2007.

_Judy L. Manfred_
Certified Shorthand Reporter
CSR No. 4748

# EXHIBIT 2

