# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

| | |
|---|---|
| PATRICIA DeSANTIS, individually and as Successor in Interest for RICHARD DeSANTIS, deceased, and as Guardian Ad Litem for DANI DeSANTIS, a minor,<br><br>  Plaintiffs,<br><br>  vs.<br><br>CITY OF SANTA ROSA, JERRY SOARES, RICH CELLI, TRAVIS MENKE, PATRICIA MANN, and DOES 1 through 25, inclusive,<br><br>  Defendants. | No. C-07-3386 JSW |

DEPOSITION OF JERRY SOARES

December 20, 2007

REPORTED BY:  A. MAGGI SAUNDERS,

C.S.R. No. 2755



A. Maggi Saunders & Associates
Certified Shorthand Reporters

57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

```
 1        A.    Yes, as far as the diameter, yes, it's
 2  37-millimeter, and -- kind of in diameter.
 3        Q.    All right.  Do you know what it's made out
 4  of, the Sage round that you fired?
 5        A.    It's a polyurethane-type of plastic
 6  rubber.  There is two movable rings that are around the
 7  grommet itself, I guess, is the best way to call it;
 8  and then there is a small, like -- I'm trying to think
 9  of what would be the correct terminology for . . .
10  (thinking ) like a tail, or something, I guess it would
11  be on it, as far as directional --
12        Q.    All right.
13        A.    -- for it.
14              MS. FOWLER:  Do you need to answer that?
15              MR. SCOTT:  I don't know.  Let's go off
16  the record for a second.
17              THE VIDEOGRAPHER:  Going off the record,
18  the time is 2:11.
19        (Brief recess taken.)
20              THE VIDEOGRAPHER:  Back on the record.
21  The time is 2:13.
22              MR. SCOTT:  Q.  Okay.  You were describing
23  the Sage round.
24        A.    Yes.
25        Q.    Is that considered to be a non-lethal
```

```
 1  force?
 2       A.    Less lethal.
 3       Q.    Less lethal.
 4             And are you trained to use less lethal
 5  force in situations, and lethal force in others?
 6       A.    [No audible response]
 7             MS. FOWLER:    [Inaudible]
 8             MR. SCOTT:    Q.  Are you trained that there
 9  is a difference between using lethal and
10  less-than-lethal force?
11             MS. FOWLER:  I am going to object.  It's
12  vague and ambiguous as to what -- I don't think your
13  question is intelligible, but if he can answer the
14  question --
15             MR. SCOTT:  I'll ask it a different way.
16       Q.    Based on your training, do you understand
17  that there is a difference in what could justify using
18  less-than-lethal force, compared to lethal force?
19       A.    Yes.
20       Q.    Okay.  What do you understand the
21  difference to be?
22       A.    And, again, the difference goes into the
23  dynamics of the situation, and how -- how it evolves,
24  makes that determination, based on, you know, the
25  threat level and threat assessment that are -- that
```

```
 1  take place, you know, to the officer.
 2           I mean, a situation can change
 3  dramatically, whether it can be a lethal or a less
 4  lethal force.
 5       Q.   All right.  Now, in this situation, you
 6  fired your Sage round.  Did you aim at center mass of
 7  Richard DeSantis?
 8       A.   Yes, I aimed at, you know, and a little
 9  below, I would say below, a little below center mass.
10       Q.   And more towards his waist?
11       A.   Yes.
12       Q.   All right.  And why did you aim for his
13  waist area?
14       A.   In the training that we received in using
15  the -- using the Sage, that's -- you know, ideally,
16  that's, you know, the ideal target that you would want
17  to -- and to use the Sage to hit.
18       Q.   And how many rounds were in the Sage when
19  you fired it at Mr. DeSantis?
20       A.   There were six.
21       Q.   Six rounds?
22       A.   Yes.
23       Q.   Okay.  And when you were doing your
24  assessment after you fired the first round, how many
25  steps did Mr. DeSantis take when you were doing this
```

36

1   assessment?
2       A.   He took several.
3       Q.   Okay.  And did it appear to you that
4   the -- being shot with the Sage in any way slowed him
5   down?
6       A.   Momentarily.
7       Q.   All right.  And when you say
8   "momentarily," you mean for like a second?
9       A.   That would probably be correct; about a
10  second, two at the most.
11      Q.   Okay.  And when it was slowing -- when he
12  put both his hand, both hands towards his left side,
13  was this after he had slowed down or before or during?
14      A.   Almost simultaneously.
15      Q.   All right.  And what did he do after he
16  put his two hands down his left side?
17      A.   He looked in that direction.
18      Q.   In the direction -- Did it appear to you
19  he was looking in the direction of where the shot was
20  fired from?
21      A.   No.
22      Q.   Okay.  Which -- In relation to you, was he
23  turning or looking slightly in your direction?
24      A.   No.  He was looking down towards his hands
25  and the left side of his body.

```
 1  hesitated for a moment, and then he fired.
 2       Q.   So that's why -- You didn't shoot because
 3  you waited for Sergeant Celli to shoot?
 4       A.   No.
 5            MS. FOWLER:  I'm going to object.  That
 6  misstates his testimony.
 7            MR. SCOTT:  Q.  Okay.  Well, I'm just
 8  trying to understand.
 9            Did -- You saw Sergeant Celli move
10  forward?
11       A.   Yes.
12       Q.   All right.  And was he to your right or to
13  your left?
14       A.   To my right.
15       Q.   He was to your right.
16       A.   Yes.
17       Q.   And when -- Were you able to tell how much
18  he moved at that point?  Can you give me an estimate,
19  in terms of feet, how many feet he moved forward before
20  he shot?
21       A.   No.  I mean, I could not estimate.
22            All I know is that he came into my field
23  of view, which for me, I recall that it -- you know,
24  I hesitated the moment as I was pulling the trigger.
25       Q.   I'm sorry, you hesitated. . .
```

```
 1         A.    Yes.
 2         Q.    You mean after the first shot, or before
 3   the first shot?
 4         A.    After the first shot.
 5         Q.    Okay.  And did you hesitate because you
 6   saw him come into view?
 7         A.    Yes.
 8         Q.    All right.  And if he hadn't come into
 9   your view, you would have fired the second shot?
10         A.    Yes.
11         Q.    All right.
12               When he came into your view, did you
13   turn to your right to look at him?
14         A.    No.
15         Q.    You didn't move your head to the side or
16   look to the side?
17         A.    No.
18         Q.    Approximately how far was he from you at
19   the time he came into your view and just before he
20   fired?
21         A.    Maybe 5 feet.
22         Q.    Okay.  How long had it been since you had
23   last seen him in your view prior to the time you saw
24   him when he shot?
25               MS. FOWLER:  Well, I'm going to object
```

40

```
1        Q.    And because he seemed to have regained his
2   balance and was now accelerating, that's when you were
3   going to take the second shot.
4        A.    Yes.
5        Q.    And before you could take the second shot,
6   you heard Sergeant Celli's shot?
7        A.    Yes.
8        Q.    Okay. And how soon after Sergeant Celli's
9   shot did you hear the other two shots, approximately
10  how much time passed?
11       A.    Maybe half a second.
12       Q.    Are you familiar with the term
13  "sympathetic gunfire"?
14       A.    I've heard the term used, yes.
15       Q.    In training?
16       A.    Yes.
17       Q.    And what does that term mean to you?
18       A.    The term usually means that sympathetic
19  fire from other officers will fire because they either
20  hear or see another officer fire a weapon, or hear
21  gunfire.
22       Q.    Okay. Have you received any training in
23  relation to this phenomenon known as "sympathetic
24  gunfire"?
25       A.    You mean, as a topic of -- you know, that
```

1  is discussed, but not training specific.
2      Q.   And how is it discussed?
3      A.   It's talked about as, you know, a
4  phenomenon that -- you know, in regards to the
5  possibility that it -- you know, that it's happened, or
6  could -- you know, could happen.
7      Q.   Are you trained not to shoot just because
8  somebody else -- you hear somebody else shoot?
9      A.   Yes.
10     Q.   All right.  And as part of the training,
11 are you told why you shouldn't shoot just because you
12 hear someone else shoot?
13     A.   Yes.
14     Q.   And what are you trained in that regard?
15     A.   We are trained to that each officer has to
16 make their own assessment and judgement when drawing or
17 firing their -- you know, their weapon.
18     Q.   Are you trained why you do that?
19     A.   Again, each officer has to make their own
20 determination based on the facts and the circumstances
21 surrounding the event to justify their own use of
22 whatever level of force they decide, you know, to
23 choose.
24     Q.   Okay.  So, in other words, the training
25 is, just because one officer may believe there is a

54

```
 1  reason to shoot, doesn't mean you should, if you don't
 2  see a reason?
 3       A.   Correct.
 4       Q.   Now, Officer Jones at the time you fired
 5  your Sage was just to your left --
 6       A.   Yes.
 7       Q.   -- correct?
 8            And he was holding a rifle, correct?
 9       A.   Yes.
10       Q.   Did he fire his rifle?
11       A.   No.
12       Q.   Did you ask him why he didn't?
13       A.   No.
14       Q.   You never asked him?
15       A.   I haven't.
16       Q.   Okay.  Have you ever asked anybody other
17  than your lawyer why Officer Jones didn't fire?
18            MS. FOWLER:  I'm going to object, to the
19  extent that that may call for a privileged
20  attorney-client, or attorney psychotherapist/patient
21  communications.
22            To the extent that any such
23  communication might have occurred in the presence of
24  an attorney or a therapist, you are not to answer
25  that question;
```

```
 1  west side, giving the instructions.
 2        Q.    And the dog was still barking?
 3        A.    Yes.
 4        Q.    Did you have authority to order Officer
 5  Ellsworth to release his dog?
 6        A.    As a Sergeant, I mean, I do have that
 7  authority, yes.
 8        Q.    Okay.  And did Sergeant Celli also have
 9  that authority?
10        A.    As a Sergeant, yes, he -- I mean, he has
11  that authority, yes.
12        Q.    Okay.  So you could have ordered Officer
13  Ellsworth to release the dog to go to Mr. DeSantis,
14  correct?
15        A.    Yes, we could have ordered -- make that
16  order, yes.
17        Q.    Okay.  So, Mr. DeSantis props himself up
18  the second time, correct?
19        A.    Yes.
20        Q.    And then what happened?
21        A.    Again, he was then instructed to get back
22  down on the ground.
23              And, again, that's when I heard other
24  officers give the instructions.  I'm not sure which
25  officers, I just knew that there were the voices of
```

```
 1  toward, you know, south of where the officers were
 2  standing, the last I saw him, as I was running up to
 3  the scene.
 4       Q.   So, if the dog hadn't moved, Mr. DeSantis
 5  would have to get past the officers to get to the dog?
 6       A.   If the dog had moved, yeah, that would be.
 7       Q.   So, he was running in the direction of the
 8  officers and the dog.
 9       A.   Yes.
10       Q.   Thank you.
11            And he was sprinting.
12       A.   I would say it was more -- I mean, it was
13  more charging than sprinting.
14       Q.   What's the difference?
15       A.   Well, I mean, there was a sense of
16  (pause) -- that he was running towards -- I mean, he
17  was running directly towards the officers.
18       Q.   Right.  But he wasn't sprinting.
19       A.   He was running -- I mean, if you want --
20            He was running very fast in the
21  direction, right towards, you know, the other -- the
22  officers.
23       Q.   But not sprinting.
24       A.   If you want to call it sprinting?  I mean,
25  it was --
```

```
 1        Q.    I don't care.  You saw it, I didn't.  I'm
 2  asking you.
 3        A.    Well, you keep asking me, sprinting, and
 4  I'm saying he is -- I describe it more as a charging,
 5  that he is running directly at the officers, and it
 6  appeared to be with a purpose.  I mean, just -- just
 7  mannerisms of --
 8        Q.    Okay.
 9        A.    -- that he is focused on -- in the
10  officers, in then -- that direction.
11        Q.    Okay.  And you could see his hands.
12        A.    Yes.
13        Q.    And you could see that he was unarmed,
14  correct?
15        A.    I mean, I didn't -- I didn't see anything
16  in his hands.  I don't know if he was unarmed.
17        Q.    Okay.  Well, you never saw a weapon.
18        A.    Correct.
19        Q.    Okay.  And as he was charging, were his
20  hands kind of going back-and-forth, like a sprinter or
21  was his --
22        A.    Yeah; I mean, his hands were in that
23  running-type position, yes.
24        Q.    All right.
25        A.    They were pumping.
```

```
                    )
STATE OF CALIFORNIA )   ss.
                    )
```

CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 29th day of January, 2008.

*A. Maggi Saunders CSR*

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California

---

A. Maggi Saunders & Associates
Certified Shorthand Reporters

57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281