EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

PATRICIA DeSANTIS,                    )
individually, and as Successor )
in Interest for RICHARD        )
DeSANTIS, deceased, and as     )
Guardian Ad Litem for DANI     )
DeSANTIS, a mino ,             )
                               )
            Plaintiffs,        )
                               )
      vs.                      )
                               )  No. C-07 3386 JSW
                               )
CITY OF SANTA ROSA, JERRY      )
SOARES, RICH CELLI, TRAVIS     )
MENKE, PATRICIA MANN, and DOES )
1 through 25, inclusive,       )
                               )
            Defendants.        )
                               )
_____)


DEPOSITION OF DANIEL JONES

June 10, 2008


REPORTED BY:  A. MAGGI SAUNDERS,

          C.S.R. No. 2755



**A. Maggi Saunders & Associates**
**Certified Shorthand Reporters**
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

1      Q.    And there was no reason that any of these

2   items that were on your belt were unavailable to you

3   during the course of these -- during the course of this

4   evening, right?

5      A.    Correct.

6      Q.    They were all working, to your knowledge,

7   and available?

8      A.    Yes.

9      Q.    Do you remember precisely what the nature

10  of the call was when you first heard it?

11     A.    It was either a -- Well, it was "Shots

12  fired inside the house," either regarding a "5150," or

13  some kind of "domestic violence dispute".

14     Q.    When did you become aware that it was a

15  call regarding mental illness?

16     A.    When Officer Menke was giving commands to

17  Mr. DeSantis, we all had our guns pointed toward him,

18  because we didn't know if he was armed or not, and his

19  wife was standing behind him, in the line of fire.

20          So, I had yelled at her to get back in

21  the house.

22          And she said that he was -- something to

23  the effect of he had a mental illness and was "in

24  crisis".

25     Q.    From what you observed of Mr. DeSantis'

36

```
 1          A.    Yes.

 2          Q.    Is that part of your training?

 3          A.    I've heard it used during training.

 4          Q.    Okay.  And what does that mean to you?

 5          A.    That means exactly what it means:  If you

 6    don't see the hands, there could be something in those

 7    hands that can be used to hurt you, or the hands

 8    themselves can be used to hurt you.

 9          Q.    Okay.  So, I take it, you were focused on

10    his hands.

11          A.    Well, I checked his hands, yes --

12          Q.    Okay.

13          A.    -- I was focused about everything around

14    him, including him.

15          Q.    Okay.  When you first saw Mr. DeSantis,

16    could you describe his hands?

17          A.    To the best of my knowledge, they were

18    down at his side.

19          Q.    Was there anything in his hands?

20          A.    I didn't see anything, no.

21          Q.    Okay.  How long after you arrived and saw

22    Mr. DeSantis did you hear the first command?

23          A.    That I don't know what the time frame was

24    from -- It was relatively close to when I first got to

25    the corner of the house.
```

1      A.     I don't remember hearing her say that.

2      Q.     And I have forgotten what you said -- I

3  already asked you and you said -- but did she tell you

4  first that he was -- that it was a mental-illness

5  situation, and then you told her to go in the house?

6      A.     No.   When I told her to go into the house,

7  she yelled, "He has mental illness; he's in-crisis,"

8  something to that effect.

9      Q.     Okay.   And did you hear her say anything

10  prior to that?

11      A.     No, I did not.

12      Q.     Okay.   And when she went back into the

13  house, did you hear her yelling anything out of the --

14  from inside of the house?

15      A.     I didn't hear Mrs. DeSantis after I had

16  told her to go back in the house.

17      Q.     Okay.   Did Mr. DeSantis ever say anything?

18      A.     No, I did not hear him say anything.

19      Q.     By the time Menke gave his first command,

20  had all officers positioned themselves?

21      A.     As far as Sergeant Soares, I'm not sure if

22  he had arrived on-scene prior to Officer Menke telling

23  him to put his hands up; but, by the time he was

24  ordering him to the ground, Sergeant Soares had showed

25  up.

```
 1    there time for you to assess the effect of the

 2    non-lethal shot?

 3          A.     Yes, sir, there was.

 4          Q.     Was Mr. DeSantis -- Strike that.

 5                 Let me ask you another question:

 6                 Do you know what sympath- -- Have you ever

 7    heard the term "sympathetic fire"?

 8          A.     Yes, I have.

 9          Q.     What is that?

10          A.     From my understanding, what "sympathetic

11    fire" is is when one -- someone shoots, and then

12    another person, as like a knee-jerk reaction, I guess,

13    the best I can explain it, shoots, pulls their trigger,

14    and shoots their gun.

15          Q.     And what are you trained to do relative to

16    "sympathetic fire"?   That's a bad question.

17                 As a result of this, of your training

18    about sympathetic fire, are you trained in how to deal

19    with that?

20          A.     I'm not --

21                 MR. SAFIRE:   Bad question again.  You're

22    right.

23                 MS. FOWLER:   That's vague and ambiguous.

24                 MR. SAFIRE:   Q.   Okay.  Let me try again.

25                 As part of your training, do you learn
```

1    about sympathetic fire?

2         A.    Yes.

3         Q.    Okay.  And what are you trained to do

4    relative to it?

5         A.    It's -- I -- From my understanding, it's

6    kind of an individual thing, as far as reaction by an

7    individual.

8              During our range training, you know, you

9    hear lots of gunshots go off, and you just have to

10   have self-control to try to keep from pulling the

11   trigger, when you don't intend to.

12        Q.    I'm not getting through here.  Let me try

13   again.

14             As part of your training, are you told to

15   be aware of sympathetic fire, and try not to do it?

16        A.    Yes.

17        Q.    Okay.  That's what I was trying to get at.

18   Okay.

19             And it's kind of a natural reaction; and,

20   I take it, you are trained to be aware of it, and not

21   immediately fire just because you hear another gunshot.

22        A.    Yes, from my understanding.

23        Q.    Okay.  Was Mr. DeSantis able to advance

24   towards Officers Menke and Mann after being hit by the

25   non-lethal projectile?

73

```
 1            Q.    And I think I've asked you this, but
 2    please bear with me:
 3                  When he -- When the non-lethal shot was
 4    fired, I think you said he was about 30 to 40 feet
 5    away, is that correct, from Officers Menke and Mann?
 6                  MS. FOWLER:   I'm going to object that it
 7    misstates his testimony.
 8                  MR. SAFIRE:   Q.   Yeah, maybe so.
 9                  How far away was he when the non-lethal
10    shot was fired?
11            A.    Maybe 20 to 30.
12            Q.    Okay.
13            A.    I think it originally -- I think the 30 to
14    40 came from where he was at the sprinter's stance.
15            Q.    I see.  Okay.
16                  And how about, after the non-lethal shot
17    was fired, and the lethal shot was fired, was he
18    still about 20 feet away?
19            A.    He had taken a couple steps, so that could
20    be accurate.
21            Q.    Okay.  And you never saw him reach into
22    his waistband or into his pockets, correct?
23            A.    Yes.
24            Q.    We discussed your rifle that you got out
25    of your car.  What kind of rifle is that?
```

84

```
 1          A.    The lighting was good.
 2          Q.    Okay.  Do you know what the lighting
 3   source was?
 4          A.    I believe they were all the typical
 5   outside-lights type floodlights.
 6          Q.    Okay.  Do you know if any headlights were
 7   on from any vehicles?
 8          A.    I don't remember there being any.
 9          Q.    And how about any spotlights coming from
10   vehicles?
11          A.    Again, I don't remember there being any.
12          Q.    Okay.  When you say you could see his rear
13   waistline, was that when he was in the push-up
14   position?
15          A.    I could see it most clearly when he was
16   actually laying flat on the ground.
17          Q.    Okay.  When he was on the bottom part --
18          A.    Yes.
19          Q.    -- of the push-up position?
20          A.    Yes.
21          Q.    Okay.  And about how many different
22   occasions do you recall seeing his rear waistline?
23          A.    That, I don't know.  It was more than
24   twice, I know, but I don't know the exact number.
25          Q.    Okay.  And you saw no object protruding
```

```
                          )
STATE OF CALIFORNIA )     ss.
                          )
```

<u>CERTIFICATE OF REPORTER</u>

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 24th day of June, 2008.

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California