CAROLINE L. FOWLER, City Attorney (SBN 110313)
JOHN J. FRITSCH, Assistant City Attorney (SBN 172182)
City of Santa Rosa
100 Santa Rosa Avenue, Room 8
Santa Rosa, California 95404

Telephone: (707) 543-3040
Facsimile: (707) 543-3055

Attorneys for Defendants
CITY OF SANTA ROSA; EDWIN FLINT, in his capacity
as Chief of Police for the CITY OF SANTA ROSA;
RICH CELLI, an individual and Officer of the
SANTA ROSA POLICE DEPARTMENT; TRAVIS MENKE,
an individual and Officer of the SANTA ROSA POLICE DEPARTMENT;
and PATRICIA MANN, an individual and Officer of the
SANTA ROSA POLICE DEPARTMENT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA DESANTIS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF SANTA ROSA, et al., <br><br> Defendants. | Case No. C 07-3386 JSW (consolidated with C 07-4474) <br><br> **DECLARATION OF JOSEPH J. CALLANAN, Jr. IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT** <br><br> Date: October 17, 2008 <br> Time: 9:00 a.m. <br> Ctrm: 2 <br><br> **Trial Date: January 20, 2009** |

I, JOSEPH J. CALLANAN, JR., HEREBY DECLARE AS FOLLOWS:

1. I have been retained by the City of Santa Rosa as an expert witness in this matter regarding police procedures and tactics and police training. Attached hereto as Exhibit A is a true and correct copy of my professional resume setting forth my law enforcement background and credentials. I have consulted, qualified and testified as an expert witnesses in numerous police litigations primarily involving the use of force. A list of those cases is attached hereto as

Exhibit B. I also provide training and assistance in reviewing law enforcement training materials both for individual police agencies and also through the California Police Officers Standards and Training Commission. I have also written and published numerous articles in the law enforcement field as detailed in my resume.

2. The facts set forth herein are known to me of my own personal knowledge and if called as a witness, I could and would competently testify as set forth herein.

3. In preparation for testifying in this matter, I have been provided with and reviewed the following information:

A. Two Binder Case File reflecting the investigation by the Sonoma County Sheriff's Department of the DeSantis shooting containing statements of the involved officers, witnesses, Patricia DeSantis, the 911 transcript and CAD report of the incident.

B. Depositions of Patricia DeSantis; Rich Celli (2 volumes); Travis Menke; Patricia Mann; Dan Jones; Jerry Ellsworth; and Joseph Silny.

C. Training records for Rich Celli, Travis Menke and Patricia Mann.

D. Training materials used by the City of Santa Rosa Police Department produced in Response to Documents Requests by Plaintiffs.

E. Policy Statements of the City of Santa Rosa including Use of Force Policy

F. Assorted CD's containing crime scene and evidence photographs

G. Examination of a SRPD issued .37 mm SAGE tactical weapon system

4. I also traveled to the location of the incident and conducted a site survey the concerning the 600 block of South Ave and particularly the residence located at 631 South Street and the adjoining common driveway serving the three separate residences.

5. After reviewing all of this material and based on my knowledge and experience as a law enforcement officer, trainer and consultant, it is my opinion that the escalation of force used by the officers named as defendants in this case, specifically Sgt. Rich Celli, Officer Patricia Mann and Travis Menke, as well as the other involved officers, was OBJECTIVELY REASONABLE AND NECESSARY based upon the prevailing conditions and CONSISTENT WITH RECOGNIZED POLICE PROCEDURES. I have concluded that the escalation of force

applied by the responding police officers was objectively reasonable and necessary to the prevailing conditions for the reasons set forth below. The observed escalation of force included LOW FORCE followed by INTERMEDIATE FORCE and ultimately culminating in the skillful application of DEADLY FORCE. While the loss of life is a tragic and undesirable outcome, the attending police officers were forced to act in a life-threatening dynamic that was *tense, uncertain, and rapidly evolving.* Upon careful expert analysis, I have concluded that the responding police officers had no viable alternative other than the described use of DEADLY FORCE by Sgt Celli, Officer Mann and Officer Menke.

6. Based upon the information in the 911 call that Mr. DeSantis was shooting into the ceiling and the fact that there were advised and heard additional shots being fired while responding to the scene, it was reasonable and appropriate that the officers believed that Mr. DeSantis was armed with a deadly weapon. Regardless of the agency or jurisdiction, such a call describing an ACTIVE SHOOTER and the immediate potential for ASSAULT WITH A DEADLY WEAPON or a HOSTAGE TAKING would be responded to as a HIGH PRIORITY and in HIGH RISK tactical manner. Based upon the materials that I have reviewed, it is clear that the officers properly and expeditiously responded to the plaintiff's 911 Emergency Call. It is also clear that the Santa Rosa Police Department and the involved officers responded to the emergency in a manner consistent with recognized police policy, training and procedures.

7. The essential RISK FACTORS apparent in the incident that the officers were required to respond to are 1) a mentally unstable subject, 2) armed with a GUN, 3) actively firing the GUN within an inhabited structure with children present, 4) all occurring in a populated residential environment. The underlying reason or motivation for Mr. DeSantis's dangerous conduct is less of a police priority than is STOPPING the obvious threat to the family members, immediate neighbors, nearby community, and the responding public safety employees. Prior to any police intervention, Mr. DeSantis created a serious, life threatening and HIGH RISK situation.

8. Plaintiff Patricia DeSantis revealed that her husband, subject Richard Timothy DeSantis, was diagnosed as a BIPOLAR person and that he had suspended his prescribed

regimen of psychotropic medications prior to the 04/09/07 shooting incident. Reportedly, subject DeSantis was paranoid and delusional and this lead him to act out and repeatedly fire a GUN into the ceiling of the family home in a mistaken belief that unseen persons were "hiding up in the attic." Law enforcement training and practical experience clearly establishes that such mentally imbalanced persons are inherently DANGEROUS and unpredictable. That subject DeSantis had access to a GUN significantly increased the situational dangers and the fact that subject DeSantis had already initiated GUNFIRE presented the responding police officers with an EXTREMELY HIGH RISK tactical situation.

9. Mr. DeSantis selected the field conditions, not the responding police officers. There is no dispute that Mr. DeSantis initiated his shooting spree inside his small residence at 631 South Avenue. That location was to the rear of another residence (629) and across from yet another residence (633). A relatively wide, hard surfaced driveway and parking apron occupies the open space separating the three structures. The property is rather deep on a north-south axis and wide on an east-west axis. The initial shooting site (631) was to the extreme rear and east quadrant of the property. The open hard surfaced area common to all three structures was void of cover or concealment, meaning that SAFE ingress and egress was not available to the responding police officers. The reported position of the MAN WITH A GUN indicated that Mr. DeSantis had a clear field of fire over the common areas, approaches and even out onto the public roadway. As presented to the responding police officers, the field conditions were extraordinarily difficult, meaning that containment, evacuation, maneuver and communication tasks were limited. Nonetheless, the responding police officers adjusted to the field conditions and advanced to forward positions, bringing with them certain specialized lethal and less-lethal weapons.

10. After arriving at the scene, the responding police officers established a distant visual and verbal contact with Mr. DeSantis. By all accounts, Mr. DeSantis was contacted immediately OUTSIDE of his residence (631) in the area of his front door, meaning that he had full and immediate access to retreating back into the structure and possible do harm to his family or barricade himself with hostages. This tactical point was of concern to the responding police

officers.

11. By all accounts, the responding police officers correctly established a preliminary containment exercise and went about eliminating potential targets of opportunity (victims/hostages) while attempted to engage, distract, calm and control subject Richard Timothy DeSantis. Such police responses are well recognized as being generally effective and representing sound RISK MANAGEMENT.

12. The responding police officers were eventually successful in their repeated efforts to gain COMPLIANT BEHAVIOR and direct Mr. DeSantis to "prone out" on the ground. To this critical point in the dynamic, the police officers were uncertain if Mr. DeSantis was or was not ARMED. Various witnesses, including an independent eye witness, Joseph Silny, testified, subject Richard Timothy DeSantis was slow and/or reluctant to comply with the VERBAL COMMANDS issued by the on scene police officers. Repeated and persistent police VERBAL COMMANDS continued until the subject complied and lowered himself to the ground. The police accounts indicate that the subject remained non-communicative up to the point that he appeared compliant. It is significant to note that the subject had yet to be searched for weapons and the on scene officers were unable to determine if the subject was concealing a GUN on his person. It is commonly known to police officers and they are trained that suspects may hide guns in their waistbands or their pockets. Hence, the pre-positioned DEADLY FORCE and LESS LETHAL FORCE options were maintained in place and at the ready. It is also significant to note that the on scene officers had yet to secure the SAFETY of the subject's wife and family.

13. Time, distance and maneuver are critical elements in evaluating the police tactics carried out by the responding officers. It is apparent that any approach to the front door of the subject's residence (631) would have been imprudent, particularly in consideration of the street lighting and lack of cover. Essentially, the ARMED subject commanded a "kill zone" that extended out into the open common areas and beyond to the public street. That the responding police officers sought to move the subject through the "kill zone" demonstrates proper field tactics built upon proper training. As the subject moved southbound from the front door of the family home and towards the established police positions he was effectively increasing the

distance from and SAFETY of the family members still inside the location. Conversely, his southbound movement decreased the distance to and SAFETY of the police officers. Hence, proper police procedures were obviously followed when the police officers instructed subject Richard Timothy DeSantis to "prone out" on the ground. Such a tactic is the recommended protocol offering the subject and the police officers the best opportunity to complete the arrest in a controlled manner with the least amount of danger to any of the participants or onlookers.

14. The applied police procedures that eventually caused the subject to present himself in an open field setting and place himself in a controlled tactical position on the ground were exactly consistent with modern police practices that are known to be generally effective in resolving such confrontations without further violence. Unfortunately, subject Richard Timothy DeSantis presented as an unusual set of circumstances and escalated risks.

15. It is apparent that the responding police officers relied on LOW FORCE options such as their police presence and verbal commands. It is apparent that the responding police officers carried regular equipment and weapons including chemical agents, impact weapons, handcuffs, duty firearms, etc. It is also apparent that the responding police officers prepared to deliver INTERMEDIATE and DEADLY FORCE options should the need arise. The assembled police officers carried and positioned specialized equipment and weapons including a trained canine, a long-range rifle, a munitions-fired impact weapon (SAGE), an electronic immobilizer (TASER), etc.

16. Given the totality of the circumstances, it was appropriate for SRPD Sergeant Celli to draw and pre-position a tactical rifle. Given the totality of the circumstances, it was appropriate for SRPD Sergeant Soares to draw and pre-position a munitions-fired impact weapon (SAGE). Given the totality of the circumstances, it was appropriate for SRPD Sergeant Ellsworth to pre-position a trained police service dog (K-9). Given the totality of the circumstances, it was appropriate for SRPD Officer Menke, Officer Mann and other first responders to draw and display their .40 caliber handguns.

17. The subject's sudden lunge at the police officers appears to have been swift and sudden based on the statements of the involved and witnessing officers, the independent eye

witness and also based on the short distance made good. The sequence of FIRE appears to have been rapid and possibly simultaneous based on the same factors and the forensic findings. Sergeant Soares was the first to FIRE and that his intended application of the SAGE weapons systems failed to stop the subject's forward assault. Prior to firing their weapons, Sgt. Celli, Officer Menke and Officer Mann testified that they had observed that the round from the SAGE had failed to stop Mr. DeSantis from advancing.

18. In response to the apparent and sudden threat of the subject's aggressive act, Sergeant Soares fired ONE ROUND from the six-shot .37 mm SAGE weapon directly at the advancing subject. In response to the apparent and sudden threat of the subject's aggressive act, Sergeant Celli fired ONE ROUND from a thirty-round capacity small-bore patrol rifle directly at the advancing subject.   In response to the apparent and sudden threat of the subject's aggressive act, Officer Menke fired ONE ROUND from a thirteen-round capacity .40-caliber handgun at the advancing subject. In response to the apparent and sudden threat of the subject's aggressive act, Officer Mann fired ONE ROUND from a thirteen-round capacity .40-caliber handgun at the advancing subject.

19. FIRE DISCIPLINE is apparent in the case at hand. Only four of the on scene officers FIRED at the charging subject, one of which actually FIRED a less-lethal (blunt force) impact weapon. The three officers who actually deployed DEADLY FORCE maintained individual FIRE DISCIPLINE as evidenced by a SINGLE SHOT application. It is apparent that as the subject fell, the involved officers recognized that the threat had abated and that no additional FIRE was necessary or appropriate.

20. Trained PERCEPTION and REACTION times are apparent in the case at hand. Essentially, professional law enforcement officers are trained to focus their attention on known indicators of threat and measure the seriousness of the perceived threat against the need to deploy DEADLY FORCE. This process involves an intellectual "threat assessment" followed by a trained physical REACTION, such as the four separate decisions to SHOOT observed in the case at hand. Human factors dictate that this process consumes a measurable amount of time, often expressed in fractions of a second. The PERCEPTION and REACTION times are equally

apparent in the subsequent decisions by each of the involved officers to STOP shooting once the threat had abated. Again, such a serious intellectual process consumes some measurable amount of time.

None of the other police officers on scene discharged firearms, again demonstrating FIRE DISCIPLINE. The subject was struck by the gunfire and fell to the ground just short of reaching the involved officers. Subject Richard Timothy DeSantis succumbed to the gunshot wounds (GSW) and was pronounced dead at the scene.

21. Careful review of the shooting dynamic clearly establishes that the involved police officers were forced to defend themselves and others in the face of an AGGRESSING VIOLENT OFFENDER WHO WAS REASONABLY BELIEVED TO BE ARMED. The fact that the subject was not armed was a fact not known to the officers at the time of the shooting incident. The initial 911 Emergency Call describing an ACTIVE SHOOTER coupled with the sounds of continued GUNFIRE prior to the police arrival and compounded by the responding officers' inability to either search or render safe the indicated SHOOTER are certainly factors that would cause any reasonable, well-trained and experienced law enforcement officer to consider subject Richard Timothy DeSantis an ARMED and DANGEROUS person. Any other conclusion would represent substandard and imprudent police reasoning.

22. The intent or motivation of subject Richard Timothy DeSantis when he launched his final assault remains unknown. However, what is known is that he was paranoid and delusional and off his medications. He expressed an unfounded belief that persons in the attic of his home were threatening harm. He reacted to that ideation by repeatedly FIRING A GUN. Within the practical knowledge and experience of law enforcement professionals, it is reasonable to consider that such a subject might confuse the first responders (police, fire, medical, etc.) as being the same as the imaginary attic persons and consequently direct his violence against the first responders. It is reasonable to consider that the subject's conduct was already at a GUN VIOLENCE level and there was no indication that he had de-escalated. Lastly, it is well within the international law enforcement experience that such mentally disturbed persons may present as a classic "suicide by cop" scenario in which their deliberate and intentional behavior is calculated

to bring about and force a fatal confrontation with police authorities.

23. The professional training of Peace Officers includes responding to and handling persons who are "emotionally disturbed" and/or "mentally imbalanced." The CA Commission on Peace Officer Standards and Training (POST) published a field guide for first responders concerning such persons and situations. The practical response strategies presented in this publication, and other recognized educational sources, rely heavily on a cognitive, compliant, isolated and non-threatening subject. Even so, such persons are typically unpredictable and often demonstrate wide mood and behavior swings ranging from passive to extremely violent behavior. Unfortunately, subject DeSantis did not present in such a controlled scenario. Most important, subject DeSantis was armed with a GUN and was an ACTIVE SHOOTER at the time of the 911 Emergency Call and prior to any police intervention.

ref: *"Law enforcement must be prepared to respond to the potential violence. The ability of an officer to engage in any on-scene activities will often be dictated by the behavior of the subject, the circumstances and the environment. Officer safety is of the utmost importance in dealing with an unpredictable population who are sometimes volatile or violent, and whose behaviors defy common experiences and common sense." (Chapter Six "Responding to Violent Subjects")*

24. Absolutely nothing reported in the case at hand indicates that any further "crisis intervention" technique was either possible or promising. There is no indication that a lesser FORCE option was either reasonable or practical. In fact, some of the pre-staged FORCE options apparent in the case at hand were exactly unreasonable, impractical and would probably proven ineffective if attempted during the confrontation. Consider the use of physical force, impact weapons (batons), and chemical agents (O/C). Each of these more commonly used FORCE options is known to be surprisingly ineffective when used against a highly intoxicated combatant and/or a violently enraged mental case. The practical application of any of these three FORCE options requires CLOSE and DIRECT contact with an UNARMED subject, factors not applicable in the case at hand.

25. For a third example, Sergeant Ellsworth had pre-staged a trained police service dog

(K-9). This INTERMEDIATE FORCE option was correctly held in reserve. Typically, police service dogs are not deployed senselessly against an ARMED subject. Such a cruel deployment predicts that the animal would be destroyed by gunfire that, in turn, would precipitate a police shooting response. In the case at hand, the use of the police service dog prior to the subject's ultimate forward charge would have been unreasonable and impractical. Obviously, Sergeant Ellsworth came to that conclusion as the situation progressed. The true potential use of the police service dog would have occurred if subject DeSantis had chosen to FLEE rather than CHARGE. Any potential use of the police service dog in the case at hand was seriously restricted by the knowledge that the subject's wife and children were essentially unsecured in the immediate operational area. On balance, Sergeant Ellsworth's decision to maintain the canine "on-leash" and "ready" was exactly appropriate to the prevailing conditions.

26. It is clear in the case readings that subject Richard Timothy DeSantis was paranoid, delusional, non-communicative, and generally non-compliant with VERBAL COMMANDS. Accepting these facts, there is little expectation that some form of intellectual banter or crafted dialog might have produced a non-violent outcome. Typically, trained police negotiations rely on a static situation and a communicative, ultimately compliant subject. Such police techniques typically consume time and are dependent on the absence of hostilities or assaultive behavior. Again, these recognized factors are not applicable to the case at hand. More importantly, the subject's manifest GUN violence and his ultimate forward charge at the police officers compelled a DEFENSIVE response, not a passive "wait and see what happens" posture.

27. Careful review of the case at hand reveals that the City of Santa Rosa Police Department and the responding police officers were educated, trained, prepared and fully capable in responding to the plaintiff's 911 Emergency Call in a proper and disciplined manner. Factually, the Department and the officers correctly assessed the reported situation and effectively deployed regular and specialized police resources in a manner calculated to SAFELY address the EXTREMELY HIGH RISK tactical situation

28. FIRE DISCIPLINE is apparent in the case at hand. Only four of the on scene officers FIRED at the charging subject, one of which actually FIRED a less-lethal (blunt force) impact

weapon. The three officers who actually deployed DEADLY FORCE maintained individual FIRE DISCIPLINE as evidenced by a SINGLE SHOT application. It is apparent that as the subject fell, the involved officers recognized that the threat had abated and that no additional FIRE was necessary or appropriate. Trained PERCEPTION and REACTION times are apparent in the case at hand. Essentially, professional law enforcement officers are trained to focus their attention on known indicators of threat and measure the seriousness of the perceived threat against the need to deploy DEADLY FORCE. This process involves an intellectual "threat assessment" followed by a trained physical REACTION, such as the four separate decisions to SHOOT in the case at hand. Human factors dictate that this process consumes a measurable amount of time, often expressed in fractions of a second. The PERCEPTION and REACTION times are equally apparent in the subsequent decisions by each of the involved officers to STOP shooting once the threat had abated. Again, such a serious intellectual process consumes some measurable amount of time.

29. None of the other police officers on scene discharged firearms, again demonstrating FIRE DISCIPLINE. The subject was struck by the gunfire and fell to the ground just short of reaching the involved officers.

30. At the time that Mr. DeSantis sprung up and charged the officers who were holding weapons pointed at him in violation of the commands that he had been given, it was reasonable for the officers to believe that their lives, the lives of other officers, the lives of Mrs. DeSantis and her children and the public at large were in danger. The fact that the subject was not armed was a fact not known to the officers at the time of the subject's final forward charge. A very important observation is that subject Richard Timothy DeSantis moved <u>towards</u> the police officers as opposed to moving away. (ref: "fight-flight" response) In doing so, he presented the real potential for obtaining and controlling one of the available police firearms and then continue with his previously demonstrated propensity for GUN VIOLENCE. Long-term studies reveal that 1out of every 11 law enforcement officers killed in the line of duty was murdered by a suspect successfully gaining control and use of the officer's service

31. Also available in the pre-staged police resources were one or more TASER devices.

These are modern electronic muscle immobilizers that have been proven to be highly effective when dealing with actively resisting subjects. The use of such devices is limited to short range applications, typically less than 15 feet between the subject and the officer. The success of the TASER relies on several delicate issues; mainly the ability to FIRE two tethered barbs ON TARGET and then initiate an electrical pulse lasting five seconds. In the case at hand, time and distance constraints did not permit such an experiment. More importantly, subject Richard Timothy DeSantis was reasonably considered to be ARMED and DANGEROUS, a consideration that eliminates any rational use of a TASER device.

32. The officers also would not have been able to use O/C spray or a baton until Mr. DeSantis was closer to them and again this would not have been recommended to deal with a possibly armed subject.

33. In preparation of this DECLARATION, I carefully reviewed the policies and training of the Santa Rosa Police Department and the involved police officers. The policy statements concerning the use of force and the use of DEADLY FORCE are thorough, modern and consistent with a properly managed public safety agency. The training programs provided to the involved officers, both mandated and supplemental, are completely consistent with State and national standards. More importantly, the disciplined and well-reasoned performance of the Department and the involved police officers during the encounter with subject Richard Timothy DeSantis on 04/09/07 serves as evidence of a well-manage agency and the careful selection, training and supervision of qualified law enforcement personnel. The City of Santa Rosa' use of force policy and training are consistent with the standards used in the law enforcement community and in conformance with the training requirements mandated by POST which set the standards for police officers within the State of California. POST does not mandate any specific training for dealing with mentally or emotionally disturbed individuals. POST does have recommended training on these subjects which the City of Santa Rosa has provided to its officers. The City also provided additionally training beyond those recommendations such as the "Suicide by Cop" Training and Crisis Intervention Training. Based upon my review, the training provided by the City of Santa Rosa exceeds the required mandates imposed by POST in

1  numerous areas including use of force and dealing with mentally ill or emotionally disturbed persons.

34. My review of this incident does not indicate that any of the actions taken by the officers was due to any lack of training or inappropriate policy of the City of Santa Rosa. In fact, as stated above, it is my opinion that the officers involved acted in an objectively reasonable manner. Their actions were consistent with standard law enforcement procedures and the City's Use of Force Policy.

I declare under penalty of perjury that the foregoing is true and correct, executed this 28th day of August, 2008.

Joseph J. Callanan, Jr.