1  CAROLINE L. FOWLER, City Attorney (SBN 110313)
   JOHN J. FRITSCH, Assistant City Attorney (SBN 172182)
2  City of Santa Rosa
   100 Santa Rosa Avenue, Room 8
3  Santa Rosa, California 95404

4  Telephone:  (707) 543-3040
   Facsimile:   (707) 543-3055
5
6  Attorneys for Defendants
   CITY OF SANTA ROSA; EDWIN FLINT, in his capacity
   as Chief of Police for the CITY OF SANTA ROSA;
7  RICH CELLI, an individual and Officer of the
   SANTA ROSA POLICE DEPARTMENT; TRAVIS MENKE,
8  an individual and Officer of the SANTA ROSA POLICE DEPARTMENT;
   and PATRICIA MANN, an individual and Officer of the
9  SANTA ROSA POLICE DEPARTMENT

10

11                 UNITED STATES DISTRICT COURT

12               NORTHERN DISTRICT OF CALIFORNIA

13
   PATRICIA DESANTIS, et al.,              Case No.C 07-3386 JSW (consolidated with
14                                          C 07-4474)
                 Plaintiffs,
15                                          MEMORANDUM OF POINTS AND
        v.                                  AUTHORITIES IN SUPPORT OF
16                                          OPPOSITION TO PLAINTIFF'S
   CITY OF SANTA ROSA, et al.,              MOTION FOR SUMMARY
17                                          ADJUDICATION AND IN SUPPORT
                 Defendants.                OF DEFENDANT'S CROSS MOTION
18  _____/       FOR SUMMARY JUDGMENT

19                                          Date:   October 17, 2008
                                            Time:  9:00 a.m.
20                                          Ctrm:  2

21                                          **Trial Date: January 20, 2009**

22

23

24

25

26

27

28
   _____
   Memo of Points & Authorities in Support of Opposition to Motion for
   Summary Adjudication and in Support of MSJ, C 07-3386 (consolidated)

# TABLE OF CONTENTS

Page

I.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  LEGAL ANALYSIS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      A.    STANDARD FOR SUMMARY JUDGMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      B.    CLAIM AGAINST SGT. RICH CELLI  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            1.    Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
                  a.    Constitutional Violation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
                  b.    No Constitutional Duty to Use Nondeadly Alternatives . . . . . . . . 12
                  c.    Application of Qualified Immunity  . . . . . . . . . . . . . . . . . . . . . . 15

      C.    CLAIM AGAINST OFFICER TRAVIS MENKE . . . . . . . . . . . . . . . . . . . . . . . 16

      D.    CLAIM AGAINST OFFICER PATRICIA MANN . . . . . . . . . . . . . . . . . . . . . . . 17

      E.    CLAIM AGAINST CHIEF EDWIN FLINT  . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      F.    MUNICIPAL LIABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
            1.    Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
                  a.    Use of Force Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
            2.    Inadequate Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.   CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

Federal Cases

4

*Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 10

5

6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505;
     91 L.Ed. 2d 202 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7

*Billington v. Smith* 292 F.3d 1177 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

8

*Board of the County Commissioners of Bryan County v. Brown,* 520 U.S. 397;
     117 S.Ct. 1382; 137 L.Ed 2d 626 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

9

*Boyd v. Benton County,* 374 F.3d 773 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

10

*Celotex Corp. v. Catratt,* 477 U.S. 317, 322; 106 S.Ct. 2548; 91 L.Ed.2d 265 (1986) . . . . . . . . . 9

11

*City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed 2d 412 (1989) . . 19, 21, 22, 23

12

*Davis v. City of Ellensburg,* 869 F.2d 1230 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

13

*Elder v. Holloway,* 510 U.S. 510; 114 S.Ct. 1019; 127 L.Ed.2d 344 (1994) . . . . . . . . . . . . . . . 15

14

*Forrester v. City of San Diego,* 25 F.3d 804 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

15

*Forrett v. Richardson* (9th Cir. 1997) 112 F.3d 416 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 19

16

*Foster v. City of Fresno,* 392 F.Supp.2d 1140 (E.D. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

17

*Goomar v. Centennial Life Ins. Co.,* 855 F.Supp. 319 (S.D. Cal. 1994) . . . . . . . . . . . . . . . . . . . 9

18

*Graham v. Conner,* 490 U.S. 386; 109 S.Ct. 1865;
     104 L.Ed.2d 443 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 20, 21

19

*Harlow v. Fitzgerald,* 457 U.S. 800, 818; 102 S.Ct. 2727, 2738;
     73 L.Ed.2d 396 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15

20

21

*Haynie v. County of Los Angeles,* 339 F.3d 1071 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 15

22

*Hunter v. Bryant,* 502 U.S. 224; 112 S.Ct. 534, 536-37; 116 L.Ed.2d 589 (1991) . . . . . 10, 13, 15

23

*Matsushita Electric Industrial Co. v. Zenith Corp.,* 475 U.S. 574; 106 S.Ct. 1348;
     89 L.Ed.2d 538 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

24

25

*McLenagan v. Karnes* 27 F.3d 1002 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

26

*Meredith v. Erath,* 182 F. Supp.2d 964 (C.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

27

*Merritt v. County of Los Angeles,* 875 F.2d. 765 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . 22, 23

28

*Monell v. New York City Dept. of Soc. Serv.,* 436 U.S. 658; 56 L.Ed.2d 611;
        98 S.Ct. 2018 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Nadell v. Las Vegas Metropolitan Police Department,* 286 F.3d 924 (9th Cir. 2001) . . . . . . 20, 23

*Oklahoma City v. Tuttle,* 471 U.S. 808, 823; 85 L.Ed.2d 791;
        105 S. Ct. 2427 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

*Polk County v. Dodson,* 454 U.S. 312, 326; 70 L.Ed.2d 509;
        102 S.Ct. 445 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Quintanilla v. City of Downey* (9th Cir. 1996) 84 F.3d 353 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Reynolds v. County of San Diego,* 84 F.3d 1162 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rise v. Oregon,* 59 F.3d 1556 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Saucier v. Katz,* 533 U.S. 194, 200; 121 S.Ct. 2151; 150 L.Ed.2d 272 (2001) . . . . . . . . 10, 15, 18

*Scott v. Henrich* 39 F.3d 912 (9th Circuit 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 21

*Tachiquin v. Stowell,* 789 F. Supp. 1512 (E.D. Cal 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Tennessee v. Garner* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed. 2d 1 (1985) . . . . . . . . . . 11

*United States ex. rel. Anderson v. N. Telecom, Inc.,* 52 F.3d 810 (9th Cir. 1995) . . . . . . . . . . . . 9

<u>Federal Statutes, Rules and Regulations</u>

Federal Rule of Civil Procedure 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1    Defendants City of Santa Rosa ; Edwin Flint; Rich Celli; Travis Menke and Patricia

2    Mann submit the following memorandum of points and authorities in support of their opposition

3    to Plaintiff's Motion for Summary Adjudication and in support of their cross-motion for

4    summary judgment.

5                                          **I.**

6                                **INTRODUCTION**

7        This consolidated action arises out of a police response to a 911 call that a man was firing

8    shots through the ceiling of his residence which was occupied at the time by his wife and two

9    children.  The incident ended when the suspect charged at the officers and was shot by three of

10   the officers–Sgt. Celli, Officer Mann and Officer Menke.  Mr. DeSantis dies at the scene.

11       Actions were filed by his wife, Patricia DeSantis, as successor in interest and on her own

12   behalf and her minor daughter.  Her son Timothy was originally named as a defendant but his

13   claims were previously dismissed by the court since he was not the natural or adopted child of

14   Mr. DeSantis.  The other action was filed by his mother, Adrianne DeSantis.

15       Plaintiff Patricia DeSantis previously stipulated to dismiss the action against Sgt. Soares,

16   another officer that was present at the scene and who fired a less lethal SAGE rifle shot as

17   discussed further below.  Sgt. Soares was not named as a defendant in the action filed by

18   Adrianne DeSantis.

19       Plaintiff Adrianne DeSantis has also named as a defendant the City's former police chief

20   Edwin Flint.[1]  Chief Flint was not at the scene at the time of the incident and had no direct

21   involvement in the incident.  He is named in his capacity as the Chief of Police.

22       Plaintiff Patricia DeSantis has filed a motion for summary adjudication addressed only to

23   the claim against Sgt. Rich Celli.  The motion is not supported by any expert declarations.  The

24   motion relies on second guessing, 20/20 hindsight and pure speculation by plaintiffs attorney as

25   to other potential courses of action by the officers which is precisely what the courts have held

26   should not be done.  The moving papers fail to establish that in fact there was any constitutional

27   _____

28       [1] Chief Flint retired from the City on August 8, 2008.

Memo of Points & Authorities in Support of Opposition to Motion for
Summary Adjudication and in Support of MSJ, C 07-3386 (consolidated)                    Page 1

1     violation by Sgt. Celli. The motion does not address the liability of the other officers or the

2     City.[2]

3         In addition to opposing the motion for summary adjudication, the City is filing a cross-

4     motion for summary judgment on all issues in both actions. As discussed below and as detailed

5     in the Declaration of Joseph Callanan, a police expert, the officers decision to use lethal force

6     was objectively reasonable under the circumstances presented in this case. There was no

7     constitutional violation.

8         Even assuming, arguendo, that the court should determine there was a violation the

9     officers are entitled to qualified immunity. Under the circumstances that were presented to them

10    which required split second decisions to be made in a tense rapidly evolving situation, it would

11    not have been clear to them that they were violating the constitutional rights of Mr. DeSantis.

12    All of the officers had a real and reasonable belief that either their own lives were in jeopardy or

13    those of their fellow officers.

14        Since there was no constitutional violation, there is no municipal liability or supervisory

15    liability. Moreover, even assuming any alleged constitutional violation , it cannot be tied to a

16    policy or lack of training.

17                                      **II.**

18                         **STATEMENT OF FACTS**

19      On April 9, 2007, Plaintiff Patricia DeSantis called 911 and advised that her husband,

20    Richard DeSantis,  was firing shots through the ceiling of their home. She advised the dispatcher

21    that he was bipolar and thought that there were people in the attic. She also advised the

22    dispatcher that she was in the home with her two minor children aged 2 and 10. (A copy of the

23    911 transcript is attached hereto as Exhibit A to the Declaration of Caroline L. Fowler)  While

24    she is on the phone with the 911 operator, Mr. DeSantis came into the kitchen and attempted to

25    hang up the phone and pulled a plug off the wall. (Deposition of Patricia DeSantis, Page 157,

26    line25-page 158, lines 1-14 attached as Exhibit C to the Declaration of Caroline L. Fowler)

27

28         [2] Plaintiff's Memorandum of Points and Authorities indicates an intent to file a motion regarding liability of the City.

1   Santa Rosa Police Officers Travis Menke. Patricia Mann, Daniel Jones, and Jerry

2   Ellsworth were dispatched to the residence.  Sergeants Rich Celli and Jerry Soares also

3   responded to the scene. Officers were advised that a man was firing a gun in a residence and that

4   his wife and children were in the house.  (Deposition of Travis Menke, page 36, line 4-page 37,

5   line 5; Deposition of Jerry Ellsworth, page 50, lines13-23,  attached as Exhibit H to the

6   Declaration of Caroline L. Fowler; Deposition of Patricia Mann, page 57, lines 5-7, attached as

7   Exhibit G to the Declaration of Caroline L. Fowler.)  In route, the officers were advised that

8   additional shots were fired. (Deposition of Rich Celli, page 70, lines 5-18, attached as Exhibit C

9   to the Declaration of Caroline l. Fowler; Deposition of Rich Celli, page 207, lines 6-page 208,

10  line 1; Deposition of Patricia Mann, page 59, lines 2-4, attached as Exhibit G to the Declaration

11  of Caroline L. Fowler)  Officer Ellsworth heard the additional shots as he arrived on scene.

12  (Deposition of Jerry Ellsworth, page 59, line 24-page 60. line 4,attached as Exhibit H to the

13  Declaration of Caroline L. Fowler)

14   On the instructions of Sgt. Celli, the dispatcher advised Mrs. DeSantis to get out of the

15  residence with her children and leave the phone line open so the dispatcher would know that they

16  had safely left the residence.  (Transcript, line 164-194, attached as Exhibit A to the Declaration

17  of Caroline L. Fowler; Deposition of Rich Celli, page 208, line 5-16, attached as Exhibit D to the

18  Declaration of Caroline L. Fowler.)  Instead, she went outside the house with her husband with

19  her two year old daughter on her hip and left her ten year old son[3] to talk with the dispatcher.

20  (Transcript, line 241-299; Deposition testimony of Patricia DeSantis, page 156, line 25-page 157,

21  lines 1-18)

22   By the time the officers arrived, Mr. DeSantis was outside the residence with Mrs.

23  DeSantis who was holding her 2 year old daughter on her hip.  (Deposition testimony of Travis

24  Menke, page 65, line 21-page 66, line 18; Deposition Testimony of Jerry Ellsworth, page 54, line

25  10-16, attached as Exhibit H to the Declaration of Caroline L. Fowler; Deposition testimony of

26

27   [3] Patricia's son ,Timothy Farrell, is not the biological son of Richard DeSantis although Mr. DeSantis had
    raised him since birth.  The court previously granted the defendants motion to dismiss claims filed on behalf of
28  Timothy Farrell.

1    Rich Celli, page 82, lines 4-25, attached as Exhibit D to the Declaration of Caroline L. Fowler).

2    He was wearing baggy jeans and had no shirt on.  The DeSantis residence was part of a duplex

3    located at the end of a driveway.  The officers positioned themselves on each side of the

4    driveway with three officers on each side.  Officers Menke, Mann were on the west side of the

5    driveway and had their handguns drawn. (See Exhibit B to the District Attorney's Report,

6    attached as Exhibit B to the Declaration of Caroline L. Fowler which depicts the scene and the

7    position of the officers.)  Officer Ellsworth had his K-9 dog with him and was also on the West

8    side of the driveway behind Officers Menke and Mann.  Sgt Celli was on the east side of the

9    driveway  along with Sgt Soares and Officer Jones.  Sgt. Celli was armed with a rifle, Sgt Soares

10   had a less lethal impact weapon known as a Sage which fired plastic projectiles and Officer Jones

11   had a rifle.

12        Mrs. DeSantis was instructed to go into the residence.  She stood in the doorway looking

13   out at times and looking back into the house to check on her son.  She kept her daughter on her

14   hip.

15        Although Plaintiff relies upon testimony of Mrs. DeSantis that she advised the officers

16   when they arrived that Mr. DeSantis was in "mental crisis".  Several of the officers and the

17   independent eye witness have all testified that they did not hear her make any statements prior to

18   the shooting.  (See Deposition Testimony of Rich Celli, page 82, line 11-1; Deposition

19   Testimony of Joseph Silny, page 31, lines 15-22 attached as Exhibit P to the Declaration of

20   Caroline L. Fowler.)

21        The incident was witnessed by Joseph Silny a neighbor whose house shared the driveway

22   with the DeSantis residence.  Mr. Silny resided at the residence identified as 633 South Avenue

23   in the diagram attached as Exhibit R to the Declaration of Caroline L. Fowler.)  As the cited

24   portions of the deposition testimony below show, Mr. Silny corroborates the statements of the

25   officers as to how the incident occurred.  He stated at the time that he was interviewed by the

26   Sheriff's department after the incident that in essence he would have done the same thing as the

27   police and that he thought that when Mr. DeSantis bolted forward "one could only expect to get

28   shot" (Deposition Testimony of Joseph Silny, page 84, line 18-page 85, line 9 attached as Exhibit

1  P to the Declaration of Caroline L. Fowler).  He further stated that "It seemed to me he was

2  committing suicide almost like what it seemed."

3      Officer Menke gave Mr. DeSantis commands to come forward and raise his hands.  Mr.

4  DeSantis reluctantly complied after the commands were given several times.  Officer Menke then

5  gave commands for Mr. DeSantis to get down on the ground in a prone position so that the

6  officers could safely approach him and take him into custody.  Again the instructions had to be

7  repeated severally times but he again started to comply.  At this point, he was approximately 15-

8  20 feet away from the officers.  After he was initially down on the ground he started to raise up

9  and several of the officers told him to get down on the ground.  He again complied and then

10 started to raise up again.  He was again told to get down. (Deposition of Travis Menke, page 84,

11 line 3-page 94, line 1.  All of the witnesses indicate that Mr. DeSantis was reluctantly complying

12 with the commands and that the commands had to be given several times. Deposition testimony

13 of Joseph Silny page 32, lines 11-25, page 33, line 6- 11 attached as Exhibit P to the Declaration

14 of Caroline L. Fowler; Deposition testimony of Patricia DeSantis, page 169, line 7-12 attached as

15 Exhibit C to the Declaration of Caroline L. Fowler; Deposition Testimony of Daniel Jones, page

16 39, line 25-page 40, line 4 attached as Exhibit I to the Declaration of Caroline L. Fowler;

17 Deposition testimony of Travis Menke, page 84-page 86, line 15 attached as Exhibit F to the

18 Declaration of Caroline L. Fowler.)

19      There is no dispute that throughout this time, Mr. DeSantis did not say anything to the

20 officers. (Deposition testimony of Joseph Silny, page 34, lines 12-22 attached as Exhibit P to the

21 Declaration of Caroline L. Fowler; Deposition testimony of Patricia DeSantis, page 169, lines 13-

22 15; page 176, lines20-25 attached as Exhibit C to the Declaration of Caroline L. Fowler;

23 Deposition Testimony of Rich Celli, page 109, lines 2-16  attached as Exhibit C  to the

24 Declaration of Caroline L. Fowler ; Deposition Testimony of Jerry Soares, page 125, lines 12-24

25 attached as Exhibit J  to the Declaration of Caroline L. Fowler; Deposition Testimony of Daniel

26 Jones, page 52, line 17-18 attached as Exhibit I to the Declaration of Caroline L. Fowler.)  There

27 is also no dispute that  Mr. DeSantis then got up and charged at Officers Menke and Mann in

28 what the officers  have described as a sprinter taking off from the blocks. Deposition Testimony

1   of Joseph Silny, page 48, line 8-15; page 35, lines 7-12; page 37, line 4-25 attached as Exhibit P

2   to the Declaration of Caroline L. Fowler; Deposition testimony of Patricia DeSantis, page 171,

3   line13-page 172, line 12; page 175, line 2-15attached as Exhibit C to the Declaration of Caroline

4   L. Fowler; Deposition Testimony of Rich Celli, page 125, line 24- page 127, line 25 attached as

5   Exhibit D to the Declaration of Caroline L. Fowler; Deposition Testimony of Jerry Ellsworth,

6   page 72, line 5-25 attached as Exhibit H to the Declaration of Caroline L. Fowler; Deposition

7   Testimony of Daniel Jones, page 61, line 5-23 attached as Exhibit I to the Declaration of

8   Caroline L. Fowler.)  Officers Menke and Mann had their guns pointed at Mr. DeSantis at the

9   time he charged at them.  (Deposition Testimony of Jerry Ellsworth page 72, lines 17-24, page

10  103, lines 6-page 104, line 11 attached as Exhibit H to the Declaration of Caroline L. Fowler;

11  Deposition of Rich Celli, page 117, lines 5-24 attached as Exhibit D to the Declaration of

12  Caroline L. Fowler.)

13      Sergeant Soares fired the Sage one time based on his belief that Officers Menke and

14  Mann were in danger.(Deposition testimony of Jerry Soares, page 29, line 14-21 , attached as

15  Exhibit J to the Declaration of Caroline L. Fowler)    All of the officers indicated that they

16  observed the shot strike Mr. DeSantis but he appeared to recover and continued to move towards

17  the officers. (Deposition of Travis Menke, page 94, line 4-line 25; Deposition of Rich Celli, page

18  133, lines 15-25, page 134, line 22-page 135, line 12; Deposition of Jerry Ellsworth, page 75,

19  lines11-25, attached as Exhibit H to the Declaration of Caroline L. Fowler; Deposition of Daniel

20  Jones, page 67, line 11-page 70, line 5; Deposition of Jerry Soares, page 30, line22-page 31, line

21  15.) Joseph Silny also testified that Mr. DeSantis continued to move forward after he was

22  initially struck  (Deposition of Joseph Silny, page 96, line 2-9  attached as Exhibit P to the

23  Declaration of Caroline L. Fowler.)  Sergeant Celli then fired his rifle when Mr. DeSantis was

24  approximately 10-15 feet from Officers Menke and Mann, also believing that Officer Menke and

25  Mann's lives were in danger.  He fired once and struck Mr. DeSantis. (Deposition of Rich Celli,

26  page 135, line 5-p136, line 12; page 137, line 1-17 attached as Exhibit D  to the Declaration of

27  Caroline L. Fowler)  Officers Menke and Mann also fired their handguns at or about the same

28  time believing that their lives were in danger.  (Deposition of Patricia Mann, 54, line10-20; page

1   93, line 20-page 96, line 6; page 114, lines 11-25; page 122, line 18-page 123, line 12; page 123,

2   line 23-page 124, line 9 attached as Exhibit G  to the Declaration of Caroline L. Fowler;

3   Deposition of Travis Menke page 93, line 16-page 94, line 1; page 61, line 7-page 62, line 16

4   attached as Exhibit F to the Declaration of Caroline L. Fowler).  One of their shots struck Mr.

5   DeSantis but it has not yet been determined which of the two shots struck him. (Deposition of

6   Patricia Mann, page 54, line 21-24, attached as Exhibit G to the Declaration of Caroline L.

7   Fowler.)  The other officers at the scene also testified that they believed that Mr. DeSantis posed

8   a threat of harm to Officers Menke and Mann.  (Deposition Testimony of Jerry Ellsworth, page

9   82, line 1-line 19, attached as Exhibit H to the Declaration of Caroline L. Fowler; Deposition

10  testimony of Daniel Jones, page 61, line 5-62, line 8 attached as Exhibit I to the Declaration of

11  Caroline L. Fowler.)

12          Mr. DeSantis then fell to the ground.  The officers approached and handcuffed him and

13  medical aid was immediately provided by paramedics who had staged on scene.  Mr. DeSantis

14  was pronounced dead at the scene.  He did not have a gun on him.

15          The officers have all testified that they believed based upon the information provided to

16  them by dispatch that it was likely that Mr. DeSantis was armed.  Although none of the officers

17  saw a gun in his hand, they did not have complete view of his hands at all times and he could

18  have had a gun in his pocket or the back of his pants.  Prior to the shooting, the officers had not

19  had an opportunity to search Mr. DeSantis. The officers were further concerned when he charged

20  at the officers that even if he was unarmed he could try to wrestle one of the officers guns from

21  them or otherwise cause them injury.  (Deposition of Travis Menke, page 93, line 16-page 94,

22  line 1, attached as Exhibit F to the Declaration of Caroline L. Fowler; Deposition of Patricia

23  Mann, page 122, line 18-page 123, line 7, attached as Exhibit G to the Declaration of Caroline L.

24  Fowler.)

25          Mrs. DeSantis also has testified that the officers had to repeat the commands several times

26  before her husband responded.  She also acknowledges that he got up off the ground and started

27  heading towards the officers.  She indicated she is unable to estimate the speed at which he was

28  moving since it is all in slow motion in her mind.  (Deposition of Patricia DeSantis, page 172,

1   line 20–25)

2       Pursuant to the Sonoma County Critical Incident Protocol involving officer involved

3   shootings, the shooting was investigated by the Sonoma County Sheriff's office with assistance

4   from the Petaluma Police Department.   The investigation was turned over to the District

5   Attorney for review.  The District Attorney's office determined that the shooting was lawful and

6   also that the officers had reason to believe that Mr. DeSantis could cause serious bodily harm or

7   death.  (District Attorney Report, page 18, attached as Exhibit B to the Declaration of Caroline L.

8   Fowler.)

9       At the time of the incident, Mr. DeSantis had two guns and a rifle in the house.  His wife

10  was unaware of the existence of one of the guns.  (Deposition of Patricia DeSantis, page 148,

11  lines 10-25.)  He also had several knives in the house.  Mrs. DeSantis has testified that on the

12  Friday prior to the incident, Mr. DeSantis advised her that he had been using methamphetamine

13  again and that he was not taking his medication for bipolar disorder.(Deposition Testimony of

14  Patricia DeSantis, page 83, line 7-21; page 84, line 15-22; page 86, lines 1-page 87, line 10; page

15  92, line20-page 93, line 2 attached as Exhibit C to the Declaration of Caroline L. Fowler). At the

16  time of the incident, Mr. DeSantis had a prescription for medical marijuana and smoked on

17  almost a daily basis (Deposition Testimony of Patricia DeSantis, page 38, line 25-page 39, line

18  25)  She further testified that he had previously gone through a chemical dependency recovery

19  program (Deposition of Patricia DeSantis, page 111, lines 2-24.)   The tests performed as part of

20  the autopsy also disclosed that Mr. DeSantis had Ecstacy in his system and well as marijuana.

21  (See Autopsy report, lab tests attached as Exhibit Q  to the Declaration of Caroline L. Fowler )

22      Mrs. DeSantis also testified that she and her husband discussed that he had discussed that

23  he should go to the hospital prior to the incident but that because of the holiday they decided to

24  wait to take him to Kaiser until that Monday.  (Deposition of Patricia DeSantis, page 89, line 23-

25  page 92, line 11.)

26  //

27  //

28

1

## III.

2

## LEGAL ANALYSIS

3

**A.     STANDARD FOR SUMMARY JUDGMENT**

4      Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if

5  there is no genuine issue as to any material fact and the moving party is entitled to judgment as a

6  matter of law. One of the principal purposes of summary judgment is to dispose of factually

7  unsupported claims. *Goomar v. Centennial Life Ins. Co.,* 855 F.Supp. 319 (S.D. Cal. 1994).

8      When a motion for summary judgment is made and supported, an adverse party may not

9  merely rely upon the allegations in their pleading but set forth specific facts showing there is a

10 genuine issue for trial.   "Genuine issue of fact exists when the non-moving party produces

11 evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole

12 in light of the evidentiary burden the law places on that party." *Celotex Corp. v. Catratt,* 477

13 U.S. 317, 322; 106 S.Ct. 2548; 91 L.Ed.2d 265 (1986); *Tachiquin v. Stowell,* 789 F. Supp. 1512

14 (E.D. Cal 1992).  This requires more than a "mere existence of a scintilla of evidence in support

15 of plaintiff's position." *United States ex. rel. Anderson v. N. Telecom, Inc.,* 52 F.3d 810, 815;

16 (9th Cir. 1995);  *Foster v. City of Fresno,* 392 F.Supp.2d 1140 (E.D. 2005).

17      In *Matsushita Electric Industrial Co. v. Zenith Corp.,* 475 U.S. 574; 106 S.Ct. 1348; 89

18 L.Ed.2d 538 (1986), the U.S. Supreme Court elaborated on the requirement that the party

19 opposing a motion for summary judgment must establish the existence of a genuine issue of fact.

20 The court stated:

21      "Second, the issue of fact must be 'genuine.' Fed.Rules Civ. Proc. 56(c),(e).  When the
       moving party has carried its burden under Rule 56 (c), its opponent must do more than
22     simply show that there is some metaphysical doubt as to the material facts.  See *Deluca v.
       Atlantic Refining Co.*, 176 F.2d 421,423 (CA2 1949) (L. Hand, J.), cert denied, 338 U.S.
23     943 (1950); 10A C.Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727
       (1983); Clark, Special Problems in Drafting and Interpreting Procedural Codes and Rules,
24     3 V and L.Rev. 493, 504-505 (1950). Cf. *Sartor v Arkansas Natural Gas Corp., 321 U.S.
       620, 627 (1944).*  In the language of the Rule, the nonmoving party must come forward
25     'specific facts showing that there is a genuine issue for trial.'  Fed. Rule Civil Proc.56(e)
       (emphasis added).  See also Advisory Committee Note to 1963 Amendment of Fed. Rule
26     Civ. Proc. 56(e), 28 U.S.C. App., p 626 (purpose of summary judgment is to 'pierce the
       pleadings and to assess the proof in order to see whether there is a genuine need for trial').
27     Where the record taken as a whole could not lead a rational trier of fact to find for the
       nonmoving party, there is no 'genuine issue for trial.' *Cities Service, supra,* at 289."

28

1    _____Moreover, only disputes over facts that might affect the outcome of the suit under

2    governing law preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477

3    U.S. 242, 106 S.Ct. 2505; 91 L.Ed. 2d 202 (1986).

4    **B.    CLAIM AGAINST SGT. RICH CELLI**

5        **1.    Qualified Immunity**

6        Qualified Immunity shields government officials performing discretionary functions from

7    liability for civil damages "insofar as their conduct does not violate clearly established statutory

8    or Constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

9    457 U.S. 800, 818; 102 S.Ct. 2727, 2738; 73 L.Ed.2d 396 (1982). It is an immunity from suit

10   rather than a mere defense to liability. *Hunter v. Bryant*, 502 U.S. 224; 112 S.Ct. 534, 536-37;

11   116 L.Ed.2d 589 (1991). Qualified immunity presents a question of law to be determined by the

12   court. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993). As set forth in *Meredith*

13   *v. Erath*, 182 F. Supp.2d 964 (C.D. Cal. 2001), "Qualified immunity protects all but the plainly

14   incompetent or those who knowingly violate the law. If Officers of reasonable competence could

15   disagree on the issue whether a chosen course of action is constitutional, immunity should be

16   recognized."

17       As stated by the court in *Saucier v. Katz,* 533 U.S. 194, 200; 121 S.Ct. 2151; 150 L.Ed.2d

18   272 (2001), at page 205:

19       "The concern of qualified immunity is to acknowledge that reasonable mistakes
         can be made as to the legal constraints on particular police conduct. It is
20       sometimes difficult for an officer to determine how relevant legal doctrine . . . will
         apply to the factual situation the officer confronts."
21

22       In *Saucier, supra*, the court set forth a two step sequential inquiry to be followed in

23   determining whether qualified immunity shields a defendant from liability.

24       First, the court must determine after taking the facts in the light most favorable to the

25   injured party, whether the officer's conduct violated a constitutional right. If the court

26   determines that a plaintiff's constitutional rights have been violated, then the court must

27   determine whether the right was "clearly established" at the time of the violation. If the right was

28   not clearly established, then qualified immunity shields the officer from liability.

a.    **Constitutional Violation**

Here, there was no constitutional violation by Sgt. Celli.  As discussed below, the use of deadly force by Sgt. Celli was objectively reasonable under the circumstances of this situation. (See Declaration of Joseph J. Callanan, page 7, lines 18-page 8, line 17; page 11, line 17-27; page 13, lines 3-7)

As stated in the seminal case of *Graham v. Conner,* 490 U.S. 386; 109 S.Ct. 1865; 104 L.Ed.2d 443 (1989):

> "Reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.....Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments–in circumstances that are tense, uncertain and rapidly evolving–about the amount of force that is necessary in a particular situation."

The courts have held that the use of deadly force is reasonable where the officer has probable cause to believe that a suspect poses a significant threat of death or serious physical injury to the officer or others.  *Tennessee v. Garner* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed. 2d 1 (1985).  The U.S. Supreme Court had further held that the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight.   *Graham v. Conner* (1989) 490 U.S. 386; 109 S.Ct. 1865; 104 L.Ed 2d 443.  This is to allow "for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force necessary in a particular situation." *Id*.  Here, the undisputed evidence shows that the incident at issue unfolded in a matter of minutes from the time that the officers arrived until shots were fired. ( See Deposition Testimony of Rich Celli, page135, lines 134, line 22-page 135, line 4, attached as Exhibit D to the Declaration of Caroline L. Fowler; Deposition Testimony of Travis Menke, page 71, line 25-page 72, line 3, attached as Exhibit F to the Declaration of Caroline L. Fowler.)

Here, given the information provided to the officers that Mr. DeSantis had been shooting a weapon inside his residence, it was reasonable for them to believe that Mr. DeSantis could be armed or that he could physically injure one of the officers or disarm him or her when he charged

at them. In *McLenagan v. Karnes* 27 F.3d 1002, 1007 (4th Cir. 1994), the court held that there was no requirement that a police officer actually observe an object in the suspect's hand before firing on him where reasonable officer possessing the same particularized information could have believed that the suspect was armed and where the officer could not confirm that the suspect was unarmed.

The Ninth Circuit has also held that it is not necessary for the suspect to be armed or to have threatened an officer in order for an officer to have probable cause to believe that the suspect poses a threat of serious harm either to the officers or others. *Forrett v. Richardson* (9th Cir. 1997) 112 F.3d 416, 420.

Officer Soares initially fired a less lethal weapon which did not stop Mr. DeSantis and the three other officers then each fired one shot. Mr. DeSantis was clearly not acting rationally by charging at armed police officers and it was reasonable for the officers that he was charging to fear for their life and for the other officers to fear for the safety of their fellow officers. The officers were also concerned for the safety of Mrs. DeSantis and the minor children and the public at large.

As set forth in the Declaration of Joseph J. Callanan, 1 out of every 11 officers killed in the line of duty is killed with their own gun. (Declaration of Joseph J. Callanan, page 11, lines 25-27.) It was therefore objectively reasonable for the officers to be concerned that DeSantis would try to injure them by taking their weapons.

**b.    No Constitutional Duty to Use Nondeadly Alternatives**

Contrary to plaintiffs' contentions, an officer has no constitutional duty to use nondeadly alternatives where deadly force can be justifiably used. As stated in *Scott v. Henrich* 39 F.3d 912 (9th Circuit 1994):

> "Plaintiff argues that the officers should have used alternative measures before approaching and knocking on the door where Scott was located. But **the text of the Fourth Amendment indicates, the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them [citations omitted] Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment.** In the heat of battle with lives potentially in the balance, an officer would not be able to rely on training and common sense to decide what would best accomplish his mission. Instead, he would need to ascertain the least intrusive alternative (an inherently subjective determination)

1  and choose that option and that option only. **Imposing such a requirement would**
2  **inevitably induce tentativeness by officers, and thus deter police from protecting the**
   **public and themselves.  It would also entangle the courts in endless second-guessing**
   **of police decisions made under stress and subject to the exigencies of the moment.**"
3  (*Id.,* at page 915, *emphasis added*)

4  In *Reynolds v. County of San Diego,* 84 F.3d, 1162, 1170, the court held that declarations

5  by the plaintiff's experts that the officers should have used different tactics did not create a

6  genuine issue of material fact regarding the reasonableness of the officer's use of deadly force.

7  The court therefore affirmed the trial court's granting of summary judgment in favor of the

8  officers.  Here, plaintiffs have not even submitted any expert declarations in support of their

9  motion and even if they submit such declarations in opposition to Defendants' Motion for

10  Summary Judgment it is insufficient as held in *Reynolds., Id.,* to create a genuine issue of

11  material fact on the reasonableness of the force used by Sgt. Celli or the other officers.  Such

12  speculation is particularly the type of analysis that the courts have stated should not be made.

13  Given the rapid manner in which this incident unfolded and the threat perceived by the officers,

14  they acted reasonable under the circumstances. Even assuming, arguendo, there were any tactical

15  errors prior to the time that Mr. DeSantis charged at the officers such conduct did not involve the

16  use of any excessive force or reckless conduct and therefore would not make their use of deadly

17  force when Mr. DeSantis charged at them unreasonable.

18  Thus, the correct inquiry is not "whether another reasonable or more reasonable

19  interpretation of the events can be constructed......after the fact." *Hunter v. Bryant,* 502 U.S. 224,

20  228 (1991).  Rather, the issue is whether a reasonable officer could have believed that his

21  conduct was justified. *Reynolds, supra* at page 1170.

22  In *Billington v. Smith* 292 F.3d 1177 (9th Cir. 2002), the court held in an analogous

23  situation that the district court erred in denying the officers motion for summary judgment when

24  the officers shot a motorist who was attempting to wrest control of the officer's gun from him.

25  While the district court agreed that the officer's shooting was reasonable at the time that he shot

26  the plaintiff given the imminent threat to his safety, the court denied the motion.  The plaintiff

27  had argued that the officer had failed to wait for back up, failed to use his baton or spray on the

28  motorist or release the magazine on his gun to make if unusable prior to the shooting and that

1   these acts created the situation in which the reasonable force was required to be used and that

2   therefore the reasonable use of force became unreasonable.  The court held that where an officer

3   negligently gets himself into a dangerous situation, it will not make it unreasonable for him to

4   use force to defend himself.  The court pointed out that the plaintiff's criticism's of the officer's

5   tactics fit the "20/20 vision of hindsight" that *Graham v. O'Conner* holds must be disregarded.

6   That is precisely what the plaintiffs are attempting to do in this case.

7           Moreover, the evidence establishes that in fact the officers did use less lethal force such

8   verbal commands, uniformed presence and the SAGE prior to the use of deadly force.  The

9   officers attempted to gain Mr. DeSantis's cooperation in gaining control over him and

10  eliminating any potential threat by low level uses of force.  It was not until Mr. DeSantis charged

11  at the officers that they were required to resort to deadly force in order to defend themselves and

12  this was only after the use of a less lethal weapon had not succeeded.  The three officers,

13  including Sgt. Celli,  testified that they saw the SAGE round strike Mr. DeSantis and that he

14  continued to move forward in his attack on the officers and which point the officers fired their

15  weapons believing in the case of Menke and Mann that their own lives were in danger and in the

16  case of Celli and Soares that the lives of Menke, Mann and Ellsworth were in danger.   Each

17  officer only fired one round.

18          Even though as stated above there was no legal duty or requirement to use less lethal

19  measures,  as discussed in the Declaration of Joseph Callanan the other options which Mr. Scott

20  speculates could have been used were not a prudent course of action for the reasons detailed in

21  his declaration (See Declaration of Joseph J. Callanan, page 11, line 28-Page 12, lines 11).

22  Several of the officers testified, which testimony is conveniently omitted by plaintiff that the

23  Taser was not an alternative because of the distance between the officers and Mr. DeSantis (See

24  deposition testimony of Rich Celli, page 243, lines 4-25 , attached as Exhibit E to the Declaration

25  of Caroline L. Fowler; Deposition testimony of Patricia Mann, page 90, line 7-15, attached as

26  Exhibit G to the Declaration of Caroline L. Fowler.  At least two of the officers did not have a

27  taser on them at the time of the incident. (Deposition Testimony of Travis Menke, page 13-28,

28  attached as Exhibit F to the Declaration of Caroline L. Fowler)

1                              **c.    Application of Qualified Immunity**

2          Even assuming arguendo, that any acts of the officers could be construed to constitute a

3   violation of Mr. DeSantis's constitutional rights, the officers would be entitled to qualified

4   immunity. Qualified Immunity shields government officials performing discretionary functions

5   from liability for civil damages "insofar as their conduct does not violate clearly established

6   statutory or Constitutional rights of which a reasonable person would have known." *Harlow v.*

7   *Fitzgerald*, 457 U.S. 800, 818; 102 S.Ct. 2727, 2738; 73 L.Ed.2d 396 (1982).  It is an immunity

8   from suit rather than a mere defense to liability. *Hunter v. Bryant*, 502 U.S. 224; 112 S.Ct. 534,

9   536-37; 116 L.Ed.2d 589 (1991).

10         The issue of whether a right is clearly established is a question of law to be determined by

11  the court. *Elder v. Holloway,* 510 U.S. 510; 114 S.Ct. 1019; 127 L.Ed.2d 344 (1994).  An officer

12  is entitled to qualified immunity even if he makes a reasonable mistake regarding the legality of

13  his actions. *Haynie v. County of Los Angeles*, 339 F.3d 1071 (9th Cir. 2003).

14         In the context of excessive force, the mere general proposition that use of excessive force

15  violates the fourth amendment is not enough to establish whether the right is clearly established.

16  The right must be established with sufficient specificity that a reasonable officer would

17  understand that what he is doing violates that right. *Saucier v. Katz,* 533 U.S. 194, 200; 121 S.Ct.

18  2151; 150 L.Ed.2d 272 (2001)**.**

19         As stated by the court in *Saucier v. Katz,* 533 U.S. 194, 200; 121 S.Ct. 2151; 150 L.Ed.2d

20  272 (2001), at page 205:

21             "The concern of qualified immunity is to acknowledge that reasonable mistakes
               can be made as to the legal constraints on particular police conduct.  It is
22             sometimes difficult for an officer to determine how relevant legal doctrine . . . will
               apply to the factual situation the officer confronts."
23

24         The law at the time clearly established that it was reasonable for an officer to use deadly

25  force when the suspect poses a significant threat of death or serious physical injury. The fact that

26  Mr. DeSantis was not armed is not determinative as indicated above.  Here, given the

27  circumstances and the information provided to the officers and the fact that they had not had an

28  opportunity to search Mr. DeSantis, it was reasonable for them to believe that he could be armed

1   and act accordingly.  Even if he was not armed, he could have caused serious injury to the

2   officers with some other concealed weapon, his fists or by taking one of their guns away.  There

3   is no evidence that would support a finding that any of the officers should have known that they

4   were violating Mr. DeSantis's constitutional rights at the time of the shooting.  Even if they

5   mistakenly determined the threat to their safety, that is precisely the type of conduct that qualified

6   immunity is designed to protect.  Had the officers waited or acted in a different manner one or

7   more of them could have easily been killed.

8   **C.    CLAIM AGAINST OFFICER TRAVIS MENKE**

9         The same analysis set forth above equally applies to Officer Menke.  The testimony

10  indicates that the shots all occurred within seconds of each other. (Deposition of Jerry Soares,

11  page 46, line 4-line 9; page 53, line 8-11, attached as Exhibit J to the Declaration of Caroline L.

12  Fowler ; Deposition of Travis Menke, page 71, line 25-page 72, line 3, attached as Exhibit F to

13  the Declaration of Caroline L. Fowler.)

14        Plaintiffs passing reference to sympathetic fire in its moving papers is again pure

15  speculation and unsupported by any evidence.  In fact, Officer Menke testified that he did not

16  even hear the rifle round fired by Sgt. Celli. (Deposition of Travis Menke, page 96, line 18- page

17  97, line 1) By all accounts, Mr. DeSantis was clearly charging at Officers Menke and Mann and

18  they were the most at risk in this scenario for being injured by Mr. DeSantis.  (Deposition

19  Testimony of Travis Menke, page 61, line 7-24, attached as Exhibit F to the Declaration of

20  Caroline L. Fowler; Deposition Testimony of Jerry Ellsworth, page 82, line 1-line 19, attached as

21  Exhibit H to the Declaration of Caroline L. Fowler; Deposition Testimony of Daniel Jones, page

22  61, line 5-62, line 8 attached as Exhibit I to the Declaration of Caroline L. Fowler)

23        Officer Menke testified in his deposition as follows:

24        "Q.  And what were you afraid he was going to do if you hadn't shot him?

25         A.  Kill me.

26         Q.  And how did you think he was going to kill you?

27         A.  With a gun.

28         Q.  With a gun?

1    A.  The gun I assumed he had.

2    Q.  And did you shoot him because you assumed he had a gun?

3    A.  Under the circumstances I think it was within reason to assume he had a gun, yes, he

4    was armed.

5    Q.  So it would be fair to say that you shot because you assumed he had a gun?

6    A.  I shot because I thought he was coming to kill me.

7    Q.  Did you think he was going to kill you with a gun you assumed he had?

8    A.  I felt it was reasonable"

9    (Deposition Testimony of Travis Menke, page 64, lines 8-25, attached as Exhibit F to the

10   Declaration of Caroline L.. Fowler)

11   He further testified:

12   Q.  And what's the next thing that happened?

13   A.  It was all happening extremely rapidly.  I felt I was yelling, but it seemed like my

14   vision went directly to him.  I heard something reminiscent like a bank, clack or a bang, clack,

15   clack, It was a bang and a clack.  It was just two distinct sounds.  And what seemed like an

16   instant after that, **I remember thinking to myself, oh, my God, he's still coming, he's not**

17   **stopping.  And once he had gotten within about 10-15 feet of me, I felt that he was coming**

18   **to kill me, kill my partner, take my gun, so I pulled the trigger."** (Emphasis added)

19   (Deposition testimony of Travis Menke, page 93, line 16-page 94, line 1)

20   Mr. Callanan as discussed above found that the acts of all of the officers that fired shots to

21   have been objectively reasonable.(Declaration of Joseph J. Callanan**,** page 8, lines 8-9, line 1;

22   page 12, lines 17-27; Page 13, lines 3-7)

23   **D.    CLAIM AGAINST OFFICER PATRICIA MANN**

24   The same undisputed facts and law stated above also establish that Officer Mann had an

25   objectively reasonable basis to fear that Mr. DeSantis was going to harm her or her partner. She

26   did not violate Mr. DeSantis's constitutional rights.  Even assuming, arguendo, the court

27   determined a violation did occur, Officer Mann is entitled to Qualified Immunity.  The law

28   clearly provides that an officer may use deadly force to protect their own lives or the lives of

1   others which she clearly believed was the situation she was dealing with.  Even if she was

2   mistaken or did not accurately assess the situation, she would still be entitled to qualified

3   immunity since it would not have been clear to her under that under these circumstances that she

4   was not entitled to defend herself and her fellow officers or that she was violating Mr. DeSantis's

5   constitutional rights.  *Saucier v. Katz,* 533 U.S. 194, 200; 121 S.Ct. 2151; 150 L.Ed.2d 272

6   (2001)**.**

7          She testified as follows:

8          "Q.  Okay. Now when Mr. DeSantis was running toward you, when he got up from

9   position number 2 and was running in your direction, did you believe he was going to kill you?

10         A.  Yes, either myself, Officer Menke, Officer Ellsworth.

11         Q.   And how did you think he was going to kill you?

12         A.   There was a variety of ways he could have, all of which went through my mind; that

13  he was still armed and would present that weapon that he could use it against me or another

14  officer.

15         Q.  Okay.

16         A.  That he could physically take my gun away from me or Officer Menke's gun away

17  from him or start wrestling with Officer Ellsworth in an attempt to disarm him.

18         Q.  What else were you worried about>

19         A.  Well, just him physically fighting with me and resulting in serious injury or death.

20  Again, also fighting with any of the other officers on scene.

21         Q.  Okay, so you thought that because shots had been fired earlier and because he was

22  running at you, that he was an imminent threat to your life?

23         A.  As well as the other officers on scene and anyone else who may have been in the

24  area."

25  (Deposition of Patricia Mann, page 122, line 18-page 123, line 17)

26         As stated above, Defendant's expert also concluded that the acts of Officer Mann were

27  objectively reasonable and that her use of deadly force was reasonable and appropriate under the

28  circumstances. (Declaration of Joseph J. Callanan**,** page 8, lines 8-9, line 1; page 12, lines 17-27;

1  Page 13, lines 3-7)

2  **E.    CLAIM AGAINST CHIEF EDWIN FLINT**

3          There are no allegations tor evidence that Chief Flint was  personally involved in the

4  incident in question.   Plaintiff Adrianne DeSantis seeks to impose liability on Chief Flint merely

5  on the basis that he was the superior of Officer of Sgt Celli, Officer Menke and Officer Mann and

6  his position as Chief of Police.   This is insufficient to impose personal liability on Chief Flint.

7  As an individual, he has no personal liability under Section 1983 for the acts of his subordinate

8  officers   *Rise v. Oregon*, 59 F.3d 1556, 1563 (9th Cir. 1995).

9          Since as discussed above, there was no constitutional violation, there can be no liability

10  imposed upon Chief Flint. *Forrett v. Richardson* (9th Cir. 1997) 112 F.3d 416.

11  **F.    MUNICIPAL LIABILITY**

12          The United States Supreme Court has specifically held that a municipality may not be

13  held liable under Section 1983 on a respondeat superior theory.  *Monell v. New York City Dept.*

14  *of Soc. Serv.,* 436 U.S. 658; 56 L.Ed.2d 611; 98 S.Ct. 2018 (1978).  Thus, even assuming,

15  arguendo, that the plaintiff can establish that any of the officers violated Mr. DeSantis's

16  constitutional rights and are not entitled to qualified immunity, this is insufficient to establish a

17  claim against the City.  *Board of the County Commissioners of Bryan County v. Brown,* 520 U.S.

18  397; 117 S.Ct. 1382; 137 L.Ed 2d 626 (1997); *Quintanilla v. City of Downey* (9th Cir. 1996) 84

19  F3d 353, 355.

20          In order to impose municipal liability under Section 1983, the plaintiff must establish that

21  the municipality adopted an official policy which caused the injury, and that the official policy

22  was a "moving force of the constitutional violation" or that the City made a "deliberate" or

23  "conscious" choice to fail to train its employees adequately.  *Monell, supra*; *City of Canton v.*

24  *Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed 2d 412 (1989); *Boyd v. Benton County,* 374 F.3d

25  773 (9th Cir. 2004). Where a plaintiff claims that his injury was not directly inflicted by a

26  municipality,  "rigorous standards of culpability and causation must be applied to ensure that the

27  municipality is not held liable simply for the actions of its employee." *Board of the County*

28  *Commissioners of Bryan County v. Brown,* 520 U.S. 397; 117 S.Ct. 1382; 137 L.Ed 2d 626

1   (1997). It is not sufficient to establish simple or even heightened negligence on the part of a city.

2   *Id.*, at p. 407

3       Here, plaintiffs allege municipal liability based both upon a municipal policy and

4   inadequate training. Each of these arguments will be addressed separately below.

5       **1.    Policy**

6       In the case of liability asserted based on the existence of a policy, at a minimum, an

7   affirmative link between the alleged policy and the particular constitutional violation alleged

8   must be shown. *Oklahoma City v. Tuttle,* 471 U.S. 808, 823; 85 L.Ed.2d 791; 105 S. Ct. 2427

9   (1985). A plaintiff must establish the existence of such policy by more than a bald allegation that

10  the injury resulted from a policy of the municipality. *Polk County v. Dodson,* 454 U.S. 312, 326;

11  70 L.Ed.2d 509; 102 S.Ct. 445 (1981). Thus, liability may only be imposed on a municipality

12  when a deliberate action attributable to the municipality itself is the "moving force" behind the

13  plaintiff's deprivation of federal rights or was directly caused by a municipal policy. *Board of*

14  *the County Commissioners of Bryan County v. Brown*, 520 U.S. 397; 117 S.Ct. 1382; 137 L.Ed

15  2d 626 (1997); *Oviatt v. Pearce,* 954 F.2d 1470, 1477-78 (9th Cir. 1992).

16      A plaintiff cannot establish the existence of a municipal policy or custom based solely on

17  the occurrence of a single incident or unconstitutional action by a non-policy making employee.

18  *Nadell v. Las Vegas Metropolitan Police Department,* 286 F.3d 924, 929 (9th Cir. 2001); *Davis v.*

19  *City of Ellensburg,* 869 F.2d 1230, 1233 (9th Cir. 1989).

20      **a.    Use of Force Policy**

21      With respect to the City's Use of Force Policy (General Order 01-02, attached as

22  Exhibit L to the Declaration of Caroline L. Fowler, the City's policy sets forth both the

23  applicable state and federal standards on the use of force and identifies the factors set forth in the

24  seminal case of *Graham v. Conner.* There is no legal requirement that specific examples be set

25  forth in a policy and, given the wide variety of circumstances that officers face in the field, it

26  would be impossible to identify all such scenarios.

27      In fact, the United States Supreme Court acknowledged in *Graham v. Conner,* 490 U.S.

28  386, 109 S.Ct. 1865;104 L.Ed.2d 443 (1989), that "the test of reasonableness under the Fourth

1   Amendment is not capable of precise definition or mechanical application" *Id*. at p. 396.

2   Therefore, the court held that the "reasonableness of a particular use of force must be judged

3   from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

4   hindsight" and that "The calculus of reasonableness must embody allowance for the fact that

5   police officers are often forced to make split second judgments–in circumstances that are tense,

6   uncertain, and rapidly evolving–about the amount of force that is necessary in a particular

7   situation."

8           Subsequent decisions, including those of the 9th Circuit, have held that the test of

9   reasonableness as stated in *Graham* must be based upon the "totality of the circumstances"

10  known to the officer at the time and is not limited to those factors specifically identified in

11  *Graham.  Forrester v. City of San Diego,* 25 F.3d 804 (9th Cir. 1994).  Moreover, a police officer

12  is not required to use the least intrusive degree of force possible.  The inquiry is whether the use

13  of force was reasonable under the circumstances faced by the officer.  Whether the officer could

14  have used less painful, less injurious or more effective force in making an arrest is not the issue.

15  *Forrester, supra*, at pp. 807-808; *see also Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir. 1994).

16          In fact, the 9th Circuit specifically stated in *Forrester, supra,* at p. 808, "Each officer had

17  the discretion to use force or not, and if deciding to do so, how much force to apply."

18          Moreover, there is no evidence establishing that even assuming, arguendo, that any of the

19  officers used excessive force that it was authorized under the existing use of force policy.  The

20  policy specifically states that "officers shall use only that amount of force that appears reasonable

21  to effectively bring an incident under control while protecting the lives of the officer and others."

22           Defendant's expert has stated in his declaration that it is well recognized in POST

23  training that officers are vested with discretion in the use of force and are specifically instructed

24  on how to use such discretion. (See Declaration of Joseph Callanan, page 12, lines 12- Page 13,

25  line 7.)

26          **2.     Inadequate Training**

27          With respect to liability based on inadequate training, the U.S. Supreme Court in *City of*

28  *Canton v. Harris,* 489 U.S. 378, 103 L.Ed.2d 412, 109 S.Ct. 1197 (1989) indicated that such

1   liability may be found in "limited circumstances" (*Id*. at p. 426). The court held that a

2   municipality may only be held liable under Section 1983 when the failure to train reflects a

3   "deliberate" or "conscious" choice by a municipality.  The fact that a particular officer was

4   unsatisfactorily trained is not sufficient by itself to establish liability against a municipality for

5   failure to train.  Nor is it sufficient to prove that an injury or accident could have been avoided if

6   an officer had received better or more training.  An isolated error by a particular officer does not

7   prove that the officers training was inadequate.  (*Id*. at pp. 390-392.)

8          To establish municipal liability, the plaintiff must show that the failure to train amounts to

9   deliberate indifference.  It is not sufficient merely to establish that the city was negligent or even

10  grossly negligent in its training.  *City of Canton v. Harris,* 489 U.S. 378, 103 L.Ed.2d 412, 109

11  S.Ct. 1197;  *Merritt v. County of Los Angeles*, 875 F.2d. 765 (9th Cir. 1989)

12         The portions of the Deposition of Clay Vanartsdalen( attached as Exhibit K to the

13  Declaration of Caroline L. Fowler) establish that the City provides training that meets the

14  required POST mandates and provides additional training (Deposition of Clay Vanartsdalen,

15  page 36, lines 4-22 attached as Exhibit K to the Declaration of Caroline L. Fowler)   He also

16  testified that the department provides training that trains officers how to deal with Emotionally

17  disturbed individuals (Deposition of Clay Vanartsdalen, page 48, lines 18-page 49, line

18  20,attached as Exhibit K to the Declaration of Caroline L. Fowler)  He further testified that he

19  would receive use of force reports to review and determine whether they identified the need for

20  any additional training. (Deposition of Clay Vanartsdalen, page 38, line 8-23 attached as Exhibit

21  K to the Declaration of Caroline L. Fowler).  Additionally, the department provided training on

22  use of force and its use of force policy. (Deposition of Clay Vanartsdalen, page 57, line 2-page

23  58, line 6; page 75, line 1-page 76, line 6)

24         Thus, the court outlined in *City of Canton* in essence a three-part test to determine

25  whether a municipality could be held liable under 42 U.S.C. § 1983 for inadequate training.

26  First, it must be determined that the training was inadequate.  Second, if the policy is deemed

27  inadequate, it must be determined whether the inadequacy resulted from a deliberate indifference

28  on the part of the municipality.  In order to establish such deliberate indifference, it must be

1  shown that the need for more or different training is so obvious and the inadequacy so likely to

2  result in the violation of constitutional rights that the city can reasonable be said to have been

3  deliberately indifferent to the need.  Third, it must be shown that the inadequate training

4  "actually caused" a deprivation of the plaintiff's constitutional rights.  *Merritt v. County of Los*

5  *Angeles,* 875 F.2d 765 (9th Cir. 1989).  The identified deficiency in the city's training program

6  must be closely related to the ultimate injury. *City of Canton., supra,* at p. 391.

7       The courts have held that mere proof of a single incident of unconstitutional behavior is a

8  clearly insufficient basis for imposing liability on a municipality for inadequate training.

9  *Oklahoma City v. Tuttle,* 471 U.S. 808; 85 L.Ed 2d 791, 105 S.Ct. 2427 (1985); *Merritt v.*

10 *County of Los Angeles,* 875 F.2d 765 (9th Cir 1989).  Similarly, the courts have held that a

11 plaintiff cannot prove the existence of a municipal policy or custom based solely on the

12 occurrence of a single incident or unconstitutional action by a non-policymaking employee.

13 *Davis v. City of Ellensburg,* 869 F.2d 1230 (9th Cir. 1989); *Nadell v. Las Vegas Metropolitan*

14 *Police Dept.,* 268 F.3d. 924 (9th Cir. 2001).

15       As stated above, plaintiff's contentions regarding the lack of adequate training by the City

16 of Santa Rosa fail to meet the burden of proof necessary to support such a claim against the City.

17 The evidence and the facts do not show that any of the alleged deficiencies in the training directly

18 caused any alleged constitutional violation or that there was deliberate indifference by the City to

19 its training obligations.  (See Declaration of Joseph Callanan, page 12, lines 12- Page 13, line 7.)

20                                    **IV.**

21                              **CONCLUSION**

22       For the foregoing reasons, defendants, jointly and severally, respectfully request that the

23 court grant summary judgment in their favor on plaintiffs' complaints civil rights claims and

24 //

25 //

26

27

28

1    deny plaintiff Patricia DeSantis's motion for summary adjudication against defendant Rich Celli.

2                                              Respectfully submitted,

3

4    Dated: September 5, 2008                    _____/S/_____
                                                 Caroline L. Fowler
5                                                City Attorney
                                                 Attorney for Defendants
6                                                City of Santa Rosa; Chief Edwin Flint; Sgt.
                                                 Rich Celli; Officer Travis Menke and Officer
7                                                Patricia Mann

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28