**EXHIBIT B**

# EMPLOYEE-INVOLVED FATAL INCIDENT REPORT



Employer Agency: Santa Rosa Police Department
Lead Agency: Sonoma County Sheriff's Department
Decedent: Timothy DeSantis
Date of Incident: April 9, 2007

Report Prepared by:
SONOMA COUNTY DISTRICT ATTORNEY

# TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.   SCOPE OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

III.   STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . .   2

IV.   SUMMARY OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

V.   STATEMENT OF THE LAW . . . . . . . . . . . . . . . . . . . . . . .   11

VI.   LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

VII.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

APPENDIX A:   SCENE DIAGRAM

APPENDIX B:   AUTOPSY REPORT

# I. INTRODUCTION

On April 9, 2007, Richard Timothy DeSantis died of two gunshot wounds fired by three on-duty police officers employed by the Santa Rosa Police Department[1]. The Chief of Police of the Santa Rosa Police Department invoked the Sonoma County Law Enforcement Employee-Involved Fatal Incident Protocol. The Sonoma County Sheriff's Department became the lead investigative law enforcement agency for this incident. The Petaluma Police Department also assisted the Sonoma County Sheriff's Department with this investigation. Members of the Sonoma County District Attorney's Office were also assigned to participate in this investigation.

The role of the Sonoma County District Attorney's Office in a Law Enforcement Employee-Involved Fatal Incident is to review the investigation to determine if there is any criminal liability on the part of any involved party, including law enforcement employees; to provide assistance to the investigating agency regarding legal issues; to supplement the investigation when necessary; and, when appropriate, to prosecute those persons believed to have violated the law.

Once the investigation is complete, the District Attorney is required to conduct and complete a thorough review of the investigation and prepare a report summarizing the investigation and documenting his conclusions.

A copy of this report is to be submitted to the Foreperson of the Sonoma County Grand Jury.

The following report has been prepared by the Sonoma County District Attorney. It includes a summary of facts surrounding the death of Richard Timothy DeSantis, legal analysis, conclusions, a diagram of the scene and the autopsy report. In excess of 100 hours of District Attorney staff time has been devoted to the investigation and review of this case.

---

[1]Sergeant Richard Celli; Officer Travis Menke; Officer Patricia Mann.

1

## II. SCOPE OF REVIEW

The purpose of this criminal investigation and review is to establish the presence or absence of any criminal liability on the part of any involved people, including law enforcement employees.

## III. STANDARD OF REVIEW

As chief law enforcement officer for Sonoma County, the District Attorney is responsible for reviewing, approving and filing of all criminal cases. The District Attorney's discretion to charge a person with a crime is limited by well established legal and ethical standards.

The correct standard to be applied by the District Attorney in filing criminal charges is expressed in a publication of the California District Attorney's Association entitled, *Uniform Crime Charging Standards*.[2]  It provides:

> "The prosecutor should consider the probability of conviction by an objective fact-finder hearing the admissible evidence. The admissible evidence should be of such convincing force that it would warrant conviction of the crime charged by a reasonable and objective fact-finder after hearing all the evidence available to the prosecutor at the time of charging and after hearing the most plausible, reasonably foreseeable defense that could be raised under the evidence presented to the prosecutor."

---

[2]Cal. District Attorney's Association, Uniform Crime Charging Committee 1996-99, *Uniform Crime Charging Standards* (1990), p. 6.

2

Additional restraint on the charging authority is found in *The California Rules of Professional Conduct, Rule 5-110*, which provides that an attorney in government service (this definition includes prosecutors) shall not institute or cause to be instituted criminal charges when the member knows or should know that the charges are not supported by probable cause. The standard for charging a crime is high because the burden of proof required to convict, i.e., proof beyond a reasonable doubt, is the highest burden of proof within the American legal system.

## VI. SUMMARY OF FACTS

The following is a summary of facts intended to assist the reader in understanding this report and its conclusions. It is not a substitute for the volumes of reports, interviews, and other evidence from which it is derived. It is an accurate summary of what the District Attorney has determined the material facts in this case to be.

On April 9, 2007, at approximately 1:16 a.m., uniformed patrol officers from the Santa Rosa Police Department were dispatched to a reported domestic disturbance at 631 South Avenue in the City of Santa Rosa. Numerous officers responded, and ultimately, two officers fatally shot a male resident. The Sonoma County Law Enforcement Employee-Involved Fatal Incident Protocol was invoked. The Sonoma County Sheriff's Department became the lead investigative law enforcement agency. The Petaluma Police Department assisted with the investigation.

Richard Timothy DeSantis and his wife, Patricia, lived together at 631 South Avenue in Santa Rosa. They had been married eight years. They lived on South Avenue with their two year old daughter and Patricia's eight year old son from a previous relationship. Throughout decedent's life, he had experienced bouts of manic depression and had been delusional at times.

3

On March 4, 2004, decedent was admitted into Kaiser Hospital in Vallejo for a voluntary psychiatric consultation. During this incident, decedent had become delusional in regards to a car parked on the side of the road near his residence in American Canyon. Decedent told Patricia that the car had been parked on the roadway to spy on him. Patricia transported decedent to Kaiser in Vallejo for a psychiatric consultation.

On March 31, 2006, decedent was admitted into Kaiser Hospital on a Welfare and Institutions Code section 5150 hold. After having been transported to Kaiser Hospital by his mother and his wife, Patricia reported that decedent had been becoming increasingly suspicious and paranoid. Patricia reported she saw decedent sitting at the door of their residence in American Canyon with a loaded gun just in case someone tried to break into their house. While being transported to Kaiser Hospital, decedent removed all of his clothes and entered the emergency room naked.

On April 13, 2006, decedent was again admitted to Kaiser Hospital on a Welfare and Institutions Code section 5150 hold.

During decedent's psychiatric episodes, Patricia described that decedent would go into "major manic episodes, paranoid delusions." He would patrol inside their house with a gun. In one particular episode, Patricia said "he had it in his head that Armageddon was coming and he was going to start breeding his own army."

Decedent had a history of methamphetamine use. During the first week of April, 2007, Patricia felt decedent was using methamphetamine again because his mood was "different". Decedent told her that he had been using methamphetamine earlier in the week. He gave her what drugs he had left and she threw them away.

On April 8, 2007, decedent, Patricia and the two children went to decedent's mother's house in Vallejo. During that visit, decedent accused his mother of being a "terrorist." He started taking down all of the pictures from her walls. The family came back to Santa Rosa around 6:00 p.m.

4

When they got home, decedent's mood got progressively worse. Decedent talked about wanting to go fight in Iraq. He said that when he is in the infantry, during his first year he will have so many "kills." Patricia also noticed that decedent kept looking at the ceiling in their house. Decedent kept insisting that there were people in the attic who were going to attack his family.

On April 9, 2007, at approximately 12:00 a.m., decedent and Patricia were folding laundry and they decided to go to bed. Patricia was in her bedroom with her two year old daughter when decedent asked her, "Did you hear that?" Patricia responded by saying, "There is no one up there. I hate to tell you this. I know it's real to you. It's in your head though. There is no one up there." Decedent then left the room and came back with a handgun. He did not say a word, but started shooting holes in the ceiling. Patricia grabbed her two year old daughter and turned away, then she left the room and went to the kitchen. Once in the kitchen, she called 9-1-1 to report the incident. Decedent was now moving things around the apartment and attempted to knock the phone out of the wall, but was unsuccessful.

Patricia told the 9-1-1 operator, "My husband is bipolar. He is having a manic episode. My husband just shot into the ceiling with a firearm." The dispatcher asked where the gun was. Patricia replied, "It's in the bedroom, and I'm gonna go. He's not going to hurt anything but he thinks he hears people in the attic but there is no one there. He is having these paranoid delusions. He is manic, and he is bipolar." As Patricia continued to talk with the dispatcher, more gunshots went off. Patricia told the dispatcher that her two year old and eight year old children were in the house.

At 1:15 a.m., Sgt. Celli and Sgt. Soares were in their office at the Santa Rosa Police Department when they were dispatched with other officers to a call for service. Sgt. Celli thought it was a high priority call because he and another sergeant along with officers were asked to respond to the call. He learned from dispatch that the reporting female caller was stating that her husband was shooting inside the house. Sgt. Celli got into his patrol vehicle

and responded to the call Code 3 (emergency lights and sirens activated). As he was responding to the call, he received an update from dispatch that the male subject was armed with a Glock pistol. He considered the information to be significant as "these type of handguns are accurate and reliable." Officers Patricia Mann, Travis Menke, Daniel Jones, Jerry Ellsworth, Tanya Potter and Sgt. Jerry Soares received this information and also responded in separate patrol vehicles. The officers were aware from dispatch that there were children present in the residence.

When Sgt. Celli got on the freeway, he asked dispatch if they were still on the line with the female caller, and if so, to instruct her to evacuate the house with the children. Dispatch advised him that the female was hesitant to leave the residence with the children. Sgt. Celli thought that the female either could not leave, or was in fear of something happening if she did leave, and he immediately began to think of a possible hostage scenario. Sgt. Celli advised Sgt. Soares that he would take care of the tactical aspects of the call while Sgt. Soares handled the communications. (Sgt. Celli was the SWAT Sergeant and has been a member of his department's SWAT team since 2000.)

Officer Menke advised dispatch that he was on scene. As Sgt. Celli drove closer to South Avenue, he heard dispatch advise that there had been more shots fired inside the residence. At this point, Sgt. Celli became concerned that this incident could be an active shooter situation. When he approached South Avenue, he blacked out the emergency equipment on his patrol unit. As he got out of his vehicle, he saw that Sgt. Soares was armed with the Sage-6 Less Lethal Launcher. The Sage-6 is a less-lethal impact weapon that fires a 37 millimeter polyurethane type of projectile like a baton round. He also saw that Officer Jones was on scene and armed with a Bushmaster AR-15 rifle. As Sgt. Celli approached the residence he could see Officer Menke, Officer Mann, and Officer Ellsworth approach the residence from the west. (See "Appendix A" showing the position of the Officers.) All of the officers dispatched to the scene were wearing standard Santa Rosa Police Department uniforms.

Patricia told Decedent to walk out of the house and follow what the officers told him. Decedent wasn't listening. He was still in a "fight or flight stage and totally delusional," according to Patricia. The lighting conditions were poor. As Sgt. Celli surveyed the scene, he realized that the back of the tri-plex was not accessible due to a fence and terrain. He knew he did not have enough officers available to assign one to go to the rear of the residence. As Sgt. Celli approached the south-east corner of the driveway, he heard Officer Menke advise him that he (Officer Menke) could see the decedent in front of the residence. Sgt. Celli positioned himself on the south-east corner of the tri-plex behind a garbage can. From there Sgt. Celli could see the decedent standing in front of the residence by the steps next to Patricia, who was holding their two year old child in her arms. Officer Menke and Officer Mann were positioned across the driveway on the south-west side.

Sgt. Celli told Officer Menke to start talking with the decedent. Officer Menke was carrying a .40 caliber semi-automatic handgun. Officer Menke looked around the corner, down the driveway, and saw the decedent. He noticed the decedent had a shaved head, was heavy set, approximately 200 pounds, and was wearing baggy jeans with no shirt. He also saw Patricia standing in front of the doorway. There was a parked vehicle in the area, so Officer Menke could only see the decedent from the waist up. He could not see the decedent's hands or waist area. The decedent had his back toward Officer Menke at that time. Decedent then proceeded to go back inside the house. As he was starting to go back inside the house, Officer Menke shouted to him, "Stop! Let me see your hands." Decedent put his hands up and Officer Menke instructed him to walk toward him, which he did. Sgt. Celli stepped out from behind the garbage can into the open so that decedent could see him. Sgt. Celli yelled "Police!" and he saw decedent turn and look at him. Decedent began to walk out with his hands in the air. When the decedent got within fifty feet of Officer Menke, Officer Menke ordered the decedent to stop. Officer Mann was located on Officer Menke's right side.

Officer Menke ordered the decedent to stop and drop down to his knees. As the decedent dropped down to his knees, he dropped his hands. Officer Menke then told the decedent to put his hands on the ground in front

7

of him, which he did. Officer Menke then told the decedent to slide away from his hands until he was on his stomach and look to his right, which he did. Officer Menke's concern at this time was he and the other officers' approach. He did not want the decedent looking at his position when he or other officers were going to move toward decedent to secure him and make him less of a threat. However, decedent quickly moved his head to the right, and then back to the left. Officer Menke told the decedent, "Look to your right. Turn your head to the right!" Decedent ignored Officer Menke's commands, and looked around two more times. He then pulled his arms back toward his body. Officer Menke ordered the decedent to, "Get his arms out." Instead, the decedent lifted up and got onto his knees. Officer Menke commanded the decedent to get on the ground yelling, "Get on your stomach! Get on your stomach!" The decedent then lay back down and put his arms out to his side. Officer Menke again directed the decedent to look to his right, but the decedent did not comply. Instead, he looked back at Officer Menke. Officer Menke ordered decedent, "Don't get up! Don't get up!" Despite repeating these commands several times, the decedent pulled his arms in very quickly. Decedent then got into a push-up position and took off from the ground in a dead sprint directly at Officer Menke. He was approximately ten feet from Officer Menke and about fifteen feet from Officer Mann. Although the officers saw no weapons in decedent's hands, they believed that he may still have firearms or other weapons concealed in his pants or in the small of his back. Sgt. Celli and Officers Menke and Mann believed that decedent was going to attack Officers Menke and Mann. They believed that there was a "high threat level."

Sgt. Soares fired one round from the Sage-6 Less Lethal impact weapon. The round hit the decedent in the right arm, breaking it, but he did not stop. Decedent slowed down and looked at his arm, but then kept running directly toward Officers Menke and Mann. Sgt. Celli believed that the decedent was going to attack the officers. He then fired one round of his .223 caliber AR-15 rile at the decedent, striking him in the left side of his chest. Officer Menke thought that the decedent was "not stopping. The only reason he was coming toward me right now was to kill me; kill my partner." Officer Menke fired one round at the decedent with his Heckler and Koch .40

caliber handgun. Officer Mann also fired one round at the decedent with her Sig Sauer P226 .40 caliber handgun. Officer Mann described that when the decedent was running at her, she was "scared for her life."

Sgt. Celli fired one round from his Bushmaster semi-automatic XM-15 .223 caliber rifle. Officer Mann fired one round from her Sig Sauer P226 .40 caliber handgun. Decedent was struck with one .223 caliber bullet and one .40 caliber bullet. One of the two shots fired from the .40 caliber handguns fired by the involved officers missed decedent. The bullet struck the driveway pavement, ricocheted and came to rest inside the kitchen of 631 South Avenue. When decedent was struck, he stopped running and went down on his back side. He stopped moving at this point. Officer Mann, Officer Menke, Sgt. Celli and Sgt. Soares all approached the decedent. Officer Mann kept her firearm pointed at the decedent until Office Menke handcuffed the decedent. The decedent received emergency medical treatment from EMS personnel, from the Santa Rosa Fire Department, and American Medical Response. Decedent was later pronounced dead at the scene.

Officer Mann ran inside decedent's residence to check on the welfare of Patricia and her two children. When Officer Mann went inside the residence, Patricia was holding her two year old daughter. The eight year old was on the phone with the 9-1-1 dispatcher. Patricia picked up a small handgun which was located on the coffee table and Officer Mann took possession of the gun. Patricia also pointed to a rifle that was near a couch.

The Santa Rosa Police Department invoked the Sonoma County Law Enforcement Employee-Involved Fatal Incident Protocol for this incident. The Santa Rosa Police Department contacted the Sonoma County Sheriff's Department and requested the Sheriff's Department conduct the criminal investigation into this incident.

The Sonoma County Sheriff's Department contacted the Petaluma Police Department and requested assistance with conducting this investigation.

9

Shortly after this shooting, on April 9, 2007, Sonoma County Sheriff's Detectives entered the decedent's house and found a .22 caliber Glenfield Model 60 rifle, serial number 2239185, previously identified by Patricia, in the living room. They found a single .357 caliber brass casing lying on the living room floor. When they entered the master bedroom, they saw what appeared to be multiple bullet holes in the ceiling. They also found a Glock model 33 .357 semi-automatic handgun, serial number CSE457, lying on the bed. They further found approximately nine spent .357 caliber brass cartridge casings inside the master bedroom.

On April 10, 2007, an autopsy was performed on the decedent. The attending forensic pathologist was Dr. Kelly Arthur, M.D. She determined the cause of death to be from two gunshot wounds to decedent's upper torso. Both gunshot wounds were of the penetrating type. One bullet entered the left side of decedents chest, and perforated both lungs, liver, aorta and diaphragm. The second bullet entered the decedent's upper left chest, traversing downward, where it was located in the abdomen. Decedents injuries were consistent with bullets being fired from a rifle and a handgun. The ballistics results have not been delivered, so it is not yet known whose handgun round struck the decedent.

Dr. Arthur also reported that decedent had an abrasion/contusion to the right forearm with a broken radius bone. (See "Appendix B".) Samples of decedent's blood and urine were taken at the autopsy. The results show his blood contained cannibinods/THC metabolite and his urine contained MDA (methylenedioxyamphetamine).

10

# V. STATEMENT OF THE LAW

STATUTE

California Penal Code §196 states:

"Homicide is justifiable when committed by public officers and those acting by their command in their aid and assistance, either –

1.  In obedience to any judgment of a competent court; or

2.  When necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty; or

3.  When necessarily committed in retaking felons who have been rescued or have escaped, or when necessarily committed in arresting persons charged with a felony, and who are fleeing from justice or resisting such arrest."

JURY INSTRUCTION

CALCRIM 507 is an instruction to be given to the jury by the trial court in any criminal homicide prosecution involving a law enforcement officer. It states, in pertinent part:

"The defendant is not guilty of murder or manslaughter if he killed someone while in acting as a public officer. Such a killing is justifiable, and therefore not unlawful, if:

1.  The defendant was a public officer;

11

2.    The killing was committed while arresting a person charged with a felony who was resisting arrest or fleeing from justice;

3.    The killing was necessary to accomplish one of those lawful purposes;

AND

4.    The defendant had probable cause to believe that the decedent posed a threat of serious physical harm either to the defendant, i.e., peace officer, or to others, or that decedent had committed a forcible and atrocious crime."

"A person has probable cause to believe that someone poses a threat of serious physical harm when facts known to the person would persuade someone of reasonable caution that the other person is going to cause serious physical harm to another."

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter."

Accordingly, use of deadly force while in the line of duty is justified, and therefore not unlawful, provided all of the following exist: the person is a peace officer; the killing was committed while performing any legal duty; the killing was necessary to accomplish that lawful purpose; and the peace officer had probable cause to believe that the person killed posed a threat of serious physical harm, either to the peace officer or to others, or that the decedent was being apprehended for the commission of a forcible and atrocious crime. In either situation, there is a presumption that the killing

was justified. The burden falls to the prosecution to prove that the killing was *not* justified.[3]

# VI. LEGAL ANALYSIS

The sole issue to be resolved by this report is whether the shooting of decedent was unlawful because the force used by the officers was not justifiable under the circumstances, or whether the shooting was lawful because the force used by the officers was justifiable under the circumstances. This question must be resolved as to each officer individually. Deciding this issue centers around several key principles of law.

A peace officer who has reasonable cause to believe that a person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape, or to overcome resistance.[4]

Likewise, a peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; not shall such officer be deemed an aggressor of lose the right to self-defense by the use of reasonable force to effect the arrest, to prevent escape, or to overcome resistance.[5]

Any person, including a peace officer, has a right to use reasonable force in self-defense or for the defense-of-others.[6] A person can be said to have acted in lawful, self-defense or for the defense-of-others if all of the

---

[3]See CALCRIM 507; Penal Code §§ 196, 199.

[4]See Penal Code §835a.

[5]See Penal Code §835a.

[6]CALCRIM 505; Penal Code §§ 692-694.

13

following exist: the person reasonably believed that person, or someone else, was in imminent danger or being killed or suffering great bodily injury; the person reasonably believed that the immediate use of deadly force was necessary to defendant against that danger; the person used no more force than was reasonably necessary to defend against that danger.[7]

When deciding whether the person's beliefs were reasonable, one must consider all the circumstances as they were known to and appeared to the person at the time and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the person's beliefs were reasonable, the danger does not need to have actually existed.[8]

Both self-defense and defense-of-others are complete defenses to a homicide and render the homicide justifiable.[9] Alternatively, if officers reasonably believe that the suspect they are apprehending has committed a "forcible and atrocious" crime involving the infliction of serious harm, the officer's use of deadly force may also be justified.[10]

There are no bright-line tests to evaluate when an officer reasonably believed the suspect posed a threat of harm to himself or to others. Instead, courts apply a case by case, fact intensive inquiry. This analysis requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. The reasonableness of a particular use of force must be judged from the

---

[7]CALCRIM 505.

[8]CALCRIM 505.

[9]CALCRIM 505; Penal Code §199.

[10]CALCRIM 505; See People v. Ceballos (1974) 12 Cal.3d 470 defining "forcible and atrocious crime."

14

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and must allow for the fact that police officers are often forced to make split-second judgments about the amount of force that is necessary in a particular situation in circumstances that are tense, uncertain, and rapidly evolving. The prosecution has the burden of proving beyond a reasonable doubt that the killing was not justified.

All the officers that were dispatched to 631 South Avenue received information that the decedent had discharged a firearm several times into the ceiling of his residence and that his wife and children were inside the residence. They heard that the decedent discharged the firearm into the ceiling because he was shooting at "the people who were hiding up in the attic." The decedent's conduct violated Penal Code section 246 (discharging a firearm at an inhabited dwelling) and Penal Code section 273a (placing children in danger of serious bodily harm).

Upon arrival at the residence at 631 South Avenue, uniformed Santa Rosa Police Officers and Sergeants tactically deployed on the east and west sides of the residence. While deployed, the officers saw the decedent exit the residence and could also see Patricia holding a very young child. Although the decedent had no visible weapons in his hands, and because he was wearing baggy jeans, they believed that he still may be carrying a firearm or other weapon. Sgt. Celli announced "Police!". More than one officer ordered the decedent to lie on the ground in a prone position. Decedent initially complied with the uniformed officers' verbal commands, and he lay on the ground in a prone position.

However, while lying in a prone position, decedent ignored the officers' repeated verbal commands to remain in a prone position and, instead ran in a sprint aggressively toward Officers Menke and Mann. Decedent's wife, Patricia, had described him as being in a "delusional" state and said that he felt "threatened" and would "fight."

15

Each officer described that they believed this was a very dangerous and life threatening situation. They knew that the decedent had possessed a gun, was shooting inside the residence while children were present, and that he may still have a gun concealed on his person.

Sgt. Soares fired the Sage-6 Less Lethal Launcher. Sgt. Soares believed that the decedent was going to attack the officers that were on the south-east side of the building. Although a Sage-6 round hit the decedent, breaking his arm, it had little effect and did not stop him from advancing on the officers.

Officer Menke saw that the decedent was advancing on him to within ten feet. Officer Menke believed that the decedent was "not stopping" and was running right at Officer Menke to "kill me or my partner." Officer Menke feared for his own life. At the time, Officer Menke fired one round from his duty weapon. He believed that decedent posed a life threatening risk of physical harm to Officer Menke and his fellow officers. Based on the totality of the circumstances, Officer Menke was legally justified in firing his weapon.

Officer Mann was approximately five feet behind Officer Menke. Officer Mann described the circumstances of the call as "very volatile." She was very concerned because the decedent had been shooting inside the residence with his wife and young children there. She stated that when decedent disobeyed officers' orders and charged her and Officer Menke, she was "scared for her life and the lives of every other officer on the scene."

When Officer Mann fired one round from her duty handgun, she reasonably believed that the decedent posed a life threatening risk to herself and fellow officers. As such, when she fired her weapon, she was legally justified in doing so.

16

Sgt. Celli believed that when he received the service call it was serious, as it was "very rare" that he and another sergeant are called directly from department headquarters to respond to a call along with other officers. As he drove to the scene, he received information from dispatch that a female caller was reporting that her husband was shooting inside the house, was armed with a Glock pistol, and that young children were present. He began to think there may be a possible hostage situation. As he continued toward the scene, dispatch advised him that more shots had been fired inside the residence, increasing his concern for his own safety and the safety of others.

When Sgt. Celli arrived at the scene, he identified himself by yelling, "Police". Decedent turned and looked at Sgt. Celli when he identified himself. Decedent disobeyed Officer Menke's orders and concealed his hands. At that point, Sgt. Celli became more concerned for the safety of the children and his fellow officers.

He saw that as the decedent bolted towards Officers Menke and Mann, decedent was not trying to run away from them but to run directly at them. At that moment, Sgt. Celli recognized that the decedent was going to attack them. He believed that the decedent was going to attack them with a gun or fight them for their guns.

He also saw that a less lethal projectile fired by Sgt. Soares did not stop the decedent in his rush toward the officers. At that point, Sgt. Celli fired one round at the decedent to prevent him from attacking Officers Menke and Mann. At the time he fired his rifle, Sgt. Celli had reason to believe that the decedent posed a great risk of death or serious bodily injury to his fellow officers. Sgt. Celli's belief was reasonable considering all of the circumstances as they were known to and appeared to him at that time.

Applying these facts to the elements stated in CALCRIM 507, it is clear that the elements are met as to each officer: 1) Sgt. Celli and Officers Menke and Mann were peace officers on duty for the Santa Rosa Police

Department. They were dispatched to decedent's house because of a 9-1-1 call from decedent's wife; 2) When decedent was shot and killed, the officers were attempting to investigate and arrest him for felonies (Penal Code sections 246 and 273(a); 3) The shooting was necessary to overcome decedent's resisting arrest and to respond to the serious threat he posed to Officers Menke and Mann; and 4) Sgt. Celli and Officers Menke and Mann had probable cause to believe decedent posed a threat of serious physical harm because of the nature of the original call that he was shooting inside the house while his wife and children were present, and also because he refused to comply with Officer Menke's lawful commands and then rushed at Officers Menke and Mann. These facts would persuade someone of reasonable caution to believe that decedent was going to cause serious bodily harm or death. Their concern that decedent was still armed was reasonable due to their background knowledge and his actions in their presence.

## VII.  CONCLUSION

It is our opinion that based on all of the circumstances known to and appearing to Santa Rosa Police Officers Menke and Mann, and Sgt. Celli, that the shootings were justified and as such, no criminal liability is found.


STEPHAN R. PASSALACQUA
District Attorney, County of Sonoma

18



N

631 South Ave
victim's residence

DRIVEWAY

633 South Ave.                R-2

Travis Menke
Patricia Mann
Jerry Ellsworth

R-1    629 South Ave

Daniel Jones
Rich Celli
Jerry Scares

South Ave

1400 West Ave, West Ave Apartments

Appendix 'A'



# Forensic Medical Group, Inc.

www.fmg-inc.com

1860 Pennsylvania Ave. Ste 150
Fairfield, California 94533

Mark A. Super M.D.
Arnold R. Josselson, M.D.
Gregory D. Reiber, M.D.

Kelly A. Arthur, M.D.
Ikechi O. Ogan, M.D.
Thomas H. Gill, M.D.

☒ AUTOPSY                                    ☐ EXTERNAL EXAMINATION

NAME: DESANTIS, RICHARD TIMOTHY          CASE NO. 07-0443
                                              (SON07-121)

POSTMORTEM DATE: 04-10-2007              TIME: 0845

PLACE OF DEATH: Residence                DATE: 04-09-2007
                                         TIME: 0138

AGE: 30              SEX: Male            RACE: White

## AUTOPSY FINDINGS:

1. Gunshot wounds of chest:
   A. Gunshot wound of left upper chest (GSW #1):
      i. Entrance: Left upper chest.
      ii. Injuries: Anterior chest and abdominal wall subcutis and musculature without penetration into body cavities.
      iii. Associated Injuries: Fracture of anterior left 7th rib with overlying cutaneous contusion.
      iv. Recovery: Large caliber moderately-deformed partially jacketed bullet in subcutis of left abdominal wall and one triangular fragment of jacket in wound tract.
      v. Path: Downward, slightly right to left and slightly front to back.
      vi. Range: Indeterminate.
   B. Gunshot wound of left lateral chest (GSW #2):
      i. Entrance: Left lateral chest.
      ii. Injuries: Perforation of left chest wall, left lung, aorta, right lung, diaphragm, liver and right chest wall.
      iii. Associated Injuries: Pulpified wound tract through left lower lobe of lung, left hemidiaphragm and liver partially involving right adrenal gland; gaping transection of descending thoracic aorta; lateral left 7th rib fracture; bilateral hemothoraces (left 1000 ml, right 300 ml); trace upper quadrant hemoperitoneum.
      iv. Recovery: Small caliber mildly-deformed fully jacketed bullet in right lateral chest wall soft tissue and musculature with overlying cutaneous contusion.
      v. Path: Left to right, downward, without significant front/back deviation.
      vi. Range: Indeterminate.
2. Blunt force injuries:
   A. Abraded contusion with underlying non-displaced distal radius fracture, right forearm.
   B. Cutaneous abrasions and contusions, face, right elbow and forearm, right foreleg and left ankle.
   C. Small nicks and scratches, dorsal hands.
3. Cerebral edema.
4. History that the deceased was shot by police officer(s).

# RECEIVED

AUG - 7 2007

Phone: (707) 426-4883          Appendix 'B'          Fax: (707) 426-1690

NAME:  DESANTIS, RICHARD TIMOTHY     CASE NO.  07-044   (SJ/07-121)      2

CAUSE OF DEATH:  Gunshot Wound of Left Lateral Chest (seconds).

OTHER SIGNIFICANT CONDITIONS:  Superficial gunshot wound of left chest; right distal radius fracture.

*Kelly A. Arthur*

KELLY A. ARTHUR, M.D.
Forensic Pathologist

KAA/wg; tn
D: 04-10-2007
T: 04-16-2007
F: 8|7|07

The autopsy is conducted at the Sonoma County Sheriff-Coroner's Morgue Facility in Santa Rosa, CA, beginning at 0845 hours on April 10, 2007. Witnesses include C. Vivian and D. Dougherty (Sonoma County Sheriff's Department), P. Gilman (Petaluma Police Department), F. Foo (Santa Rosa Police Department) and C. Norick (Forensic Assistant).

## EXTERNAL EXAMINATION:

The body is received in a black zipped body pouch with an identification strip of tape affixed to the front. The zippers of the bag are secured with blue plastic lock "19929" flanked by inscribed tape. An identification tag is on the right great toe. Postmortem x-rays of the entire head, body and extremities are taken. By report, GSR samples are collected from the hands at the scene.

When first viewed, the body is nude. Jewelry on the body consists of a yellow-metal ring with several small clear stones on the left ring finger.

The body is that of a normally developed and well-nourished White male whose appearance is compatible with the recorded age of 30 years. His body, nude, weighs 185 pounds (84 kg) and measures 66 ½ inches (168 cm) in length. The body is cold subsequent to refrigeration, rigor mortis is fully developed, and lividity is reduced in amount on the back of the body where it is red-purple and partially fixed. Preservation is fair in the absence of embalming.

Scalp hair has a full distribution; it is brown and shows regrowth to 1/8 inch. The moustache and beard areas are clean shaven. The irides are hazel and the corneas are slightly cloudy. The conjunctival surfaces are pale and without petechiae. The ears, nose, and lips are normally developed. The teeth are natural and in very good condition. A few red blemishes are on the mid and lower face. A few crusted blemishes are on the parieto-occipital scalp, the right more affected than the left. No bony crepitance is palpated over the facial structures or skullcap. The neck is normally developed and symmetrical. The chest is normally developed and symmetrical with gunshot wounds, to be described. The abdomen is soft. The external genitalia are that of a normal adult male. Pubic hair shows moderate regrowth. The anus and perineum are unremarkable. The back and buttocks are normally developed and have no injuries. The extremities are normally developed and roughly symmetrical. During body movement in the autopsy, the fractured right distal radius evident by postmortem x-rays is displaced causing wrist deformity. There is scarred soft tissue defect and deformity with waffle print on the left medial foreleg. The fingernails and toenails are short and fairly groomed. Body and extremity hair is average in amount for an adult male.

## IDENTIFYING MARKS AND SCARS:

A large multicolored tattoo of a dragon covers the left chest, shoulder and upper back. A monochromatic tattoo of a dog's face is on the right upper back. A 2 inch vertical oblique linear scar is on the right chest above the nipple. A 3 ¼ inch oblique linear scar is on the left anterior hip. A 9 ½ inch vertical linear scar is on the left proximal anterior thigh. A 4 ½ inch vertical linear scar is on the left anterior mid foreleg. The left medial foreleg has a vertical 9 x 3 ½ inch scarred oval area of waffled skin with soft tissue loss.

## EVIDENCE OF THERAPY:

An endotracheal tube emerges from the mouth, terminating in the right mainstem bronchus. A hard cervical collar is around the neck. EKG pads are on the body.

NAME: DESANTIS, RICHARD TIMOTHY    CASE NO. 07-0441  GN07-121)

EVIDENCE OF INJURY:

GUNSHOT WOUNDS OF CHEST:

### Gunshot Wound of Left Chest (GSW #1):

**Entrance:** The left upper chest within the face of the dragon tattoo, medial and superior to the nipple, 2 ½ inches to the left of anterior midline and 14 ½ inches below the top of the head, has a 3/8 inch round gunshot wound of entrance. The wound has a thin rim of circumferential marginal abrasion widest to 3/8 inch from the 1 to 2 o'clock positions. No soot or stippling is on the skin.

**Injuries:** The bullet penetrates soft tissues and musculature of the left anterior chest wall and abdominal wall without entering the body cavities.

**Associated Injuries:** Along the trajectory of the bullet is a fracture of anterior left rib 7 with associated soft tissue hemorrhage and a 3 inch light purple-blue cutaneous contusion.

**Recovery:** A large caliber moderately-deformed partially jacketed bullet is recovered in subcutis of the left abdomen, 5 ¾ inches to the left of anterior midline and 28 inches below the top of the head. The projectile is visible and palpable externally. Skin overlying the bullet has a ¾ inch abraded contusion. A triangular fragment of yellow-metal jacket is recovered in the wound tract through the left anterior abdominal wall.

**Path:** The direction of the bullet is downward, slightly right to left and slightly front to back.

**Range:** The range of fire is indeterminate based on autopsy findings. Refer to separate clothing analysis if applicable.

### Gunshot Wound of Left Lateral Chest (GSW #2):

**Entrance:** The left posterolateral chest, 15 inches below the top of the head in the posterior axillary line, has a 1/8 inch round gunshot wound of entrance with a circumferential red marginal abrasion to 3/32 inch wide superiorly. No soot or stippling is on the skin.

**Injury:** The bullet perforates the left posterolateral chest wall through rib 7, left lower lobe of lung, left hemidiaphragm, descending thoracic aorta which is transected and has gaping separation with partial avulsion from the prevertebral soft tissues, medial right hemidiaphragm, liver, lateral right hemidiaphragm, right lower lobe of lung and the right posterolateral chest wall between ribs 9 and 10.

**Associated Injuries:** The left lower lobe of lung, left hemidiaphragm, liver and part of the right adrenal gland are pulpified along the wound tract. The left hemidiaphragm has a gaping defect through which the intact stomach and spleen are herniated into the left chest cavity. The posterolateral left 7th rib is fractured. There are bilateral hemothoraces with the left chest containing 1 liter of liquid blood, clot and pulpified fat, and the right chest containing 300 ml of liquid blood and clot. Trace hemoperitoneum is in the upper quadrants of the abdomen.

**Recovery:** A small caliber mildly-deformed fully jacketed bullet with a pointed nose and flattened deformity at the base with extrusion of lead is recovered in subcutis and musculature of right lateral lower chest wall. Skin overlying the bullet has a 1 ½ inch blue-purple contusion, 21 inches below the top of the head and roughly in the posterior axillary line.

**Path:** The direction of the bullet is left to right and downward, without significant front/back deviation.

Range: The range of fire is indeterminate based on autopsy findings. Refer to separate clothing analysis if applicable.

BLUNT FORCE INJURIES:

A ½ inch red abrasion is on the right forehead corresponding to a contusion in the scalp. A 3/8 inch red abrasion is on the left superior forehead and a 3/8 inch red abrasion is on the left lower forehead above the eyebrow. A 1/8 inch red abrasion is on the nasal bridge. A ¼ inch red abrasion is on the right nasal ala. Three red-brown abrasions to ½ inch are on the right elbow. A 2 inch red contusion containing a 1 x ¾ inch partially curvilinear red-brown abrasion is on the right radial distal forearm which has an underlying fracture of the radius. On the right dorsal forearm are several light red contusions up to ½ inch. The dorsal hands have a crusted nicks and scratches up to 3/8 inch, the left hand more affected than the right. The right anterior foreleg has a 4 ½ inch curvilinear brown crusted abrasion with several small surrounding abrasions with crust up to ½ inch. The left lateral ankle has a ½ inch red-tan abrasion.

These injuries, having once been described, will not be repeated.

INTERNAL EXAMINATION:

The body is examined using the standard Y-shaped thoraco-abdominal and posterior scalp incisions.

BODY CAVITIES:

See previous description. The thoracic and abdominal organs are normal situs. The pleural cavities have no adhesions. The pericardial cavity has no abnormal collection of fluid and no adhesions. The abdominal cavity has abundant adipose tissue and no adhesions. Subcutaneous fat of the anterior abdominal wall measures approximately 1 ½ inches.

HEAD:

See previous description. The subscalpular area has no hemorrhage. The calvarium and basilar skull are normally developed and have no fractures. The dura and dural sinuses are unremarkable. There are no epidural, subdural, or subarachnoid hemorrhages. The leptomeninges are thin and delicate. The cerebral hemispheres are symmetrical with the usual gyral distribution. The cranial nerves are unremarkable. The blood vessels at the base of the brain show no significant atherosclerosis. The brain weighs 1520 grams; it is firm and edematous. Sections through the cerebral hemispheres, cerebellum, and brainstem reveal normal internal architecture and no focal lesions. There are no hemorrhages in the deep white matter or the basal ganglia. The cerebral ventricles contain no blood.

NECK:

The soft tissues, strap muscles, and prevertebral fascia are unremarkable. The hyoid bone and larynx are intact. The cervical vertebral column is unremarkable.

CARDIOVASCULAR SYSTEM:

See previous description. The intimal surface of the thoracic and abdominal aorta is free of significant atherosclerosis. The aorta and its major branches and the great veins appear normally distributed. The pericardium and epicardium are smooth, glistening, and unremarkable. The heart

NAME: DESANTIS, R. HARD TIMOTHY       CASE NO. 07-04    SC N07-121)         6

weighs 360 grams and has normal external architecture. The coronary arterial system is right dominant and shows no significant atherosclerosis. The endocardium is smooth and unremarkable. There are no thrombi in the cardiac chambers. The foramen ovale is closed. The atrial and ventricular septa are normally formed. The cardiac valves are unremarkable. The myocardium is dark red-brown and firm, and there are no focal abnormalities. The right ventricle extends minimally into the apex of the heart.

## RESPIRATORY SYSTEM:

See previous description. The upper airway is unobstructed. The mucosa of the larynx and trachea is smooth and tan-pink. The lungs show normal lobation, and the pleural surfaces show no evidence of natural disease. The right lung weighs 340 grams and the left lung weighs 300 grams. The pulmonary arteries contain no emboli and show no fatty streaking. The mucosa of the major bronchi is unremarkable and the lumens contain a small amount of mucous. Sectioning the lungs discloses a pink parenchyma with minimal with minimal posterior congestion. There are no masses or areas of consolidations.

## HEPATOBILIARY SYSTEM:

See previous description. The 1710 gram liver is normally shaped and covered by a smooth, glistening capsule. The parenchyma has a uniform consistency; it is tan-brown and has no masses. The porta hepatis is unremarkable. The gallbladder contains approximately 10 ml of orange thin bile and no calculi. The extrahepatic biliary ducts are unremarkable.

## DIGESTIVE SYSTEM:

See previous description. The tongue is unremarkable externally and on sectioning. The esophageal mucosa is gray-white and unremarkable. The intact stomach contains less than 5 ml of tan thin liquid and no food particles. There are no identifiable tablets, capsules, or pill fragments. The gastric mucosa has normal rugal folds and there are no ulcers. The small and large intestines are unremarkable externally and have non-bloody contents. The appendix is present and unremarkable. The pancreas is unremarkable externally and on sectioning.

## GENITOURINARY SYSTEM:

The renal capsules strip with ease, revealing smooth cortical surfaces. The right kidney weighs 160 grams and the left kidney weighs 140 grams. The cortices are of normal thickness and the corticomedullary junctions are distinct. The calyces, pelves, and ureters are unremarkable. The urinary bladder contains approximately 15 ml of clear yellow urine. The mucosa is white-pink and unremarkable. The prostate gland is unremarkable to palpation.

## ENDOCRINE SYSTEM:

See previous description. The pituitary, thyroid, and left adrenal gland are unremarkable externally and on sectioning.

## RETICULOENDOTHELIAL SYSTEM:

See previous description. The 180 gram spleen is covered by a smooth, blue-gray, intact capsule. The parenchyma is dark red. The lymph nodes are unremarkable.

NAME: DESANTIS, R    IARD TIMOTHY    CASE NO: 07-04   0-121

MUSCULOSKELETAL SYSTEM:

See previous description. The clavicles, other ribs, sternum, pelvis, vertebral column, and the remainder of the extremities have no visualized or palpable fractures. Skeletal muscle is dark red and well-developed. The diaphragm shows no evidence of natural disease.

SPECIMENS FOR HISTOLOGY:

Representative sections of the major organs are retained in formalin.

SPECIMENS FOR TOXICOLOGY:

Femoral blood, left chest cavity blood, urine, bile and vitreous humor are retained. A urine drug screen is positive for THC.  Toxicology analysis is requested on an aliquot of femoral blood.

POSTMORTEM RADIOGRAPHY:

Total body x-rays are taken postmortem and are reviewed prior to examination and autopsy. These show a small caliber projectile in the right lateral chest wall, a deformed large caliber bullet overlying shadows of the left hip, and two triangular radio-opaque projectile elements (corresponding to jacket) in shadows of the left chest and abdomen, a non-displaced right distal radius fracture, overlying shadows of jewelry, two screws in the left foot and numerous staples in the left foreleg with deformity and callous of the long bones in the left foreleg.

EVIDENCE COLLECTED:

Fingernail clippings, scalp hair standards, a purple-top vial of blood and the projectiles are released to SCSO.

KAA/wg; tn
D: 04-10-2007
T: 04-16-2007