**EXHIBIT D**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICIA DESANTIS,
individually and as Successor
in Interest for RICHARD
DESANTIS, deceased, and as
Guardian Ad Litem for DANI
DESANTIS, a minor and TIMOTHY
FARRELL, a minor,

        Plaintiffs,

vs.

CITY OF SANTA ROSA, JERRY
SOARES, RICH CELLI, TRAVIS
MENKE, PATRICIA MANN and DOES
1 through 25, inclusive,

        Defendants.
_____/

CERTIFIED COPY

CASE NO. C 07 3386 JSW

DEPOSITION OF

RICHARD CELLI - VOLUME I

November 14, 2007

Reported by:
JUDY A. MANFRED
CSR No. 4748

HANNAH KAUFMAN & ASSOCIATES, INC.
Certified Shorthand Reporters
472 Pacheco Street
San Francisco, California 94116
(415) 664-4269

1    A.   Oceanside, California.

2    Q.   When was that?

3    A.   That would be an approximate date and I would say

4  sometime in the year 1989.

5    Q.   Did you know someone in the Oceanside Police

6  Department?

7    A.   No.

8    Q.   How long did you do ride-alongs with the

9  Oceanside Police Department?

10   A.   Just one.

11   Q.   What is the first law enforcement agency you

12  worked for?

13   A.   Santa Rosa Police Department.

14   Q.   And what was your date of hire?

15   A.   November 5th, 1990.

16   Q.   Who was the police chief at that time?

17   A.   Salvatore Rosano.

18   Q.   Have you worked continuously for the Santa Rosa

19  Police Department since November of 1990?

20   A.   Yes.

21   Q.   When were you promoted to sergeant?

22   A.   September 10th, 2006.

23   Q.   Have you ever served in the military?

24   A.   No.

25   Q.   Did you ever receive any training in the use of

HANNAH KAUFMAN & ASSOCIATES, INC.

1     A.    Yes.

2     Q.    How many?

3     A.    One was parking in front of me and one pulled in

4   behind me.

5     Q.    What information did you have when you arrived

6   and before you got out of your car?

7     A.    Regarding?

8     Q.    What you were approaching.

9     A.    That a subject was shooting inside the residence,

10  that his wife had called, that there were two children in

11  the house with him, and that the subject was still

12  shooting while I was responding.  I mean, there's a lot.

13    Q.    Well, keep going.

14    A.    That officers were on scene when the subject was

15  still shooting, that the caller was either unable or

16  unwilling to leave the residence.

17    Q.    Anything else?

18    A.    No.

19    Q.    And did you pick this up by listening to radio

20  traffic or from some other source?

21    A.    Radio traffic.

22    Q.    Did you understand that there was someone in the

23  house who was giving information to someone outside the

24  house, in other words, that whatever radio traffic you

25  were getting was from a dispatcher or somebody who was

1    night before Desantis?

2        A.   No.

3        Q.   Now, you get to the scene you get out of your

4    car.  You go to the trunk, you get your rifle, and then

5    you meet with Sergeant Soares and Officer Jones, correct?

6        A.   Yes.

7        Q.   And where did that meeting take place?

8        A.   To the right or in the middle of the street from

9    my patrol car.

10       Q.   How long did that meeting last?

11       A.   Approximately ten seconds.

12       Q.   And what was said?

13       A.   Sergeant Soares advised me that he had the Sage

14   less lethal and I described where I wanted to approach the

15   residence.

16       Q.   What did you say?

17       A.   I pointed out the southeast corner of the

18   driveway.

19       Q.   Was this your attempt to establish a plan, a

20   tactical plan?

21       A.   The start of one, yes.

22       Q.   Okay.  And so at this point your plan was to do

23   what exactly?

24       A.   Get on scene, locate where the residence and the

25   subjects involved were, and resolve the situation.

1    Q.   What do you mean by resolve?

2    A.   To stop the shooting, protect the family, protect

3    the citizens, protect the neighborhood.

4    Q.   When you say protect the family, what do you mean

5    by that?  Did that include Mr. Desantis or not?

6    A.   Yes.

7    Q.   Okay.  Did you understand if there were any

8    children in the house?

9    A.   Two.

10   Q.   Do you know how old they were?

11   A.   I believe 10 and 2.

12   Q.   When you talked initially to Sergeant Soares and

13   Officer Jones did they provide you any new information

14   that you did not already have?

15   A.   No.

16   Q.   And did you tell them what the plan was?

17   A.   The basic plan of approach, where the approach

18   should come from, yes.

19   Q.   Was the idea that the three of you would approach

20   together from the same general direction?

21   A.   Yes.

22   Q.   And what's the next thing you did after this

23   conversation with Sergeant Soares and Officer Jones?

24        MS. FOWLER:  Soares.

25        MR. SCOTT:  Q.  Soares.

1    Q.  Approximately how far were you from the front

2  door of his house where you saw the light emanating from?

3    A.  Approximately 18 to 20 yards.

4    Q.  And did you see anyone else in the vicinity of

5  the house?

6    A.  Yes.

7    Q.  Who did you see?

8    A.  A female holding, approximately, a two-year-old.

9    Q.  Where was she in relation to the house?

10    A.  Standing on the steps.

11    Q.  Did you hear her say anything?

12    A.  No.

13    Q.  Did you ever hear her say anything before the

14  shots were fired?

15    A.  Not that I recall.

16    Q.  Now, when you first saw Mr. Desantis, where was

17  he in relation to his wife and child?

18    A.  Off the steps a couple of yards south towards my

19  direction.

20    Q.  And was he walking toward you?

21    A.  No.

22    Q.  Was he walking?

23    A.  No.

24    Q.  What was he doing?

25    A.  Standing.

1          MS. FOWLER:  A deposition is not

2   cross-examination.  It's argumentative.  Don't answer

3   that.

4          MR. SCOTT:  Q.  Is it true that you made the

5   decision to have the other five officers at the scene stay

6   in positions without cover so they could have a better

7   view of Mr. Desantis?

8      A.   No.

9      Q.   Do you know if they had positions of cover?

10         MS. FOWLER:  It's been asked and answered.

11         MR. SCOTT:  Q.  So you don't know?

12     A.   No.

13     Q.   You do or you don't know?

14     A.   Don't know what?

15     Q.   Whether they had positions of cover, other than

16  Officer Menke?

17     A.   I don't know.

18     Q.   At some point did you try to find him?

19     A.   No.

20     Q.   Why not?

21     A.   My attention was drawn towards Mr. Desantis.

22     Q.   At that point did you think he was a threat to

23  you and the other officers?

24     A.   Yes.

25     Q.   Did you think he had a gun?

1  A. I didn't know.

2  Q. Were you acting under the assumption that he had

3 a gun?

4  A. Yes.

5  Q. And you understood that if he had a gun he could

6 have shot you and the other five officers there?

7  A. Yes.

8  Q. And you understood that if you or the other

9 officers had a position of cover, that would lessen the

10 risk of being shot?

11  A. I don't know.

12  Q. Why don't you know?

13  A. Because it's based upon Mr. Desantis's actions.

14  Q. So you don't think it would make a difference if

15 there was cover?

16    MS. FOWLER: Object. It's argumentative. Don't

17 answer that.

18    MR. SCOTT: Q. Now, what did Officer Menke say

19 to Mr. Desantis?

20  A. I don't know specific words.

21  Q. Did you understand that he was giving him

22 commands?

23  A. Yes.

24  Q. Did you understand that one of the options was to

25 negotiate?

HANNAH KAUFMAN & ASSOCIATES, INC.

1 shoot them.

2  Q. How are you trained to respond to those

3 situations?

4  A. To deal with it based upon the situation at the

5 time, based upon the dynamics around you.

6  Q. Have you ever heard the term sympathetic gunfire?

7  A. Yes.

8  Q. Have you heard that in training?

9  A. Yes.

10  Q. What do you understand that term means?

11  A. When gunfire is fired after an initial shot based

12 upon the initial shot.

13  Q. And what do you mean by that?  You mean somebody

14 hears a shot fired and they just react by shooting?

15  A. Yes.

16  Q. And did you have training in -- to avoid doing

17 that?

18  A. Yes.

19  Q. And how are you trained to avoid doing that?

20  A. We are trained to individually assess danger or

21 threats based upon our individual thoughts.

22  Q. And have you --

23  A. And observations.

24  Q. And have you heard the term shoot and assess?

25  A. Yes.

1    A.   I wanted Mr. -- Officer Menke to give orders that

2  Mr. Desantis would understand and follow.

3    Q.   Towards what end?

4    A.   A safe resolution to the situation.

5    Q.   And what was that going to be?

6    A.   Taking him into custody.

7    Q.   Oh.  At some point did you see this as a 5150

8  situation?

9    A.   I don't know what I had at the time.

10    Q.   At some point did you learn that Mr. Desantis was

11  bipolar?

12        MS. FOWLER:  Object.  Assumes facts not in

13  evidence.  You can answer that if you have an

14  understanding.

15        THE WITNESS:  I don't know if Mr. Desantis was

16  bipolar or not.

17        MR. SCOTT:  Q.  Did -- at some point that night

18  did you hear anyone say that?

19    A.   Yes.

20    Q.   Who said it?

21    A.   Patricia.

22    Q.   When did she first say that to you?

23    A.   After he had already been stopped.

24    Q.   When you say stopped, what do you mean by that?

25  You mean killed?

HANNAH KAUFMAN & ASSOCIATES, INC.

1  dynamics of the situation.

2      Q.   What was it about his reactions and dynamics of

3  the situation that led you to believe that commands were

4  necessary instead of negotiations to get control of the

5  situation?

6      A.   It was my belief that Mr. Desantis still posed a

7  threat to his family, the community, and the officers and

8  that he had to be detained to make sure that there weren't

9  any injuries to anyone there.

10     Q.   I agree.  This guy needed to be detained and put

11 in handcuffs and locked up.  Nobody is disputing that.  My

12 question is, why did you think the best way to accomplish

13 that was through commands instead of negotiation?

14     A.   Mr. Desantis never spoke a word.

15     Q.   In response to commands?

16     A.   Correct.

17     Q.   Was there any attempt to negotiate with him?

18     A.   No.

19     Q.   Okay.  And based on your training, are you

20 trained in certain situations where people do not respond

21 to commands, it might be appropriate to try to negotiate

22 with them?

23     A.   Repeat the question.

24     Q.   Are you trained in situations where suspects do

25 not respond to commands that it might be appropriate to

HANNAH KAUFMAN & ASSOCIATES, INC.

1  intoxicated or psychotic people are doing is to -- maybe

2  for the purpose of being shot or harmed?

3      A.   I don't know.

4      Q.   Okay.  And you don't -- haven't had any training

5  in that regard?  In other words, why would an unarmed

6  person act out to cause him or herself to get seriously

7  injured or killed; you don't have any training about that?

8      A.   We train on all types of scenarios.

9      Q.   Including this?

10      A.   Yes.

11      Q.   Okay.  Now, I think we were at this situation

12  where Mr. Desantis was going in the direction of Officer

13  Menke; is that correct?

14      A.   Away.

15      Q.   When you started giving the commands, at some

16  point, reluctantly, Mr. Desantis started going in his

17  direction?

18      A.   Yes.

19      Q.   And at that point were the officers that you

20  mentioned still in the same positions or had people moved

21  or changed their positions?

22      A.   The same position.

23      Q.   Was everybody standing?

24      A.   Yes.

25      Q.   And were you aiming your rifle in the direction

1    of Mr. Desantis?

2        A.   Yes.

3        Q.   Why?

4        A.   He was a threat.

5        Q.   Okay.  And to your knowledge, was Sergeant Soares

6    aiming his -- what's it called, Sage?  Was he aiming his

7    Sage in the direction of Mr. Desantis?

8        A.   Yes.

9        Q.   And did you observe the other officers at the

10   scene -- did they have their weapons drawn?

11       A.   Officer Mann and Officer Menke did.

12       Q.   What about Officer Ellsworth?

13       A.   I don't know.

14       Q.   What about Officer Jones?

15       A.   I don't know.

16       Q.   And you believe Mr. Desantis could have seen you?

17       A.   Yes.

18       Q.   So at this point Mr. Desantis should have been

19   able to see at least four officers pointing rifles or

20   handguns at him and two other officers, including a police

21   dog, all standing kind of in front of him, right?

22       A.   I know Mr. Desantis could see myself, or looking

23   at me, as well as looking in the direction of Officer

24   Menke, Officer Mann and Officer Ellsworth.

25       Q.   Okay.  I mean, you don't know what he saw, but he

HANNAH KAUFMAN & ASSOCIATES, INC.

1  certainly had an opportunity to see all the officers there

2  and see what you saw?

3      A.  Yes.

4      Q.  Can you describe how Mr. Desantis moved in the

5  direction of Officer Menke?

6      A.  He stepped from the area of the porch and walked

7  southwest approximately three to four steps towards

8  Officer Menke's direction.

9      Q.  You say he walked.  Was it a slow pace, a normal

10 pace, how would you describe it?

11     A.  I can't.  I don't know.

12     Q.  So he took about three or four steps?

13     A.  Yes.

14     Q.  And then what did he do?

15     A.  Officer Menke ordered him to put his knees on the

16 ground.

17     Q.  Is this something you wanted Officer Menke to

18 order him to do?

19     A.  Yes.

20     Q.  Did you tell Officer Menke to order him to do

21 that?

22     A.  No.

23     Q.  Did Officer Menke order him to stop after he took

24 three or four steps and to get on the ground, or did he do

25 it without being ordered to do it?

1        A.    I don't know.

2        Q.    So Mr. Desantis, after he took three or four

3    steps in the direction of Officer Menke, stopped and put

4    one or more knees on the ground?

5        A.    Eventually both knees.

6        Q.    And how long was he standing there before both

7    knees were on the ground?

8        A.    There were several commands to do so.  It took a

9    while for him to get on his knees.

10       Q.    Several seconds?

11       A.    Yes.

12       Q.    During this period of time was his wife still in

13   the vicinity of the front door of the house?

14       A.    Yes.

15       Q.    You could see her?

16       A.    No.

17       Q.    Did you -- before the shots were fired, did you

18   hear her say anything about a leg injury that he had?

19       A.    No.

20       Q.    And did you hear over the radio traffic any

21   information about a leg injury?

22       A.    No.

23       Q.    Now, what happened after Mr. Desantis put two

24   knees on the ground?

25       A.    He was told to keep his hands in the air and then

```
 1            MS. FOWLER:  Other than what he's already
 2   testified to?
 3            MR. SCOTT:  Yes.
 4            THE WITNESS:  No.
 5            MR. SCOTT:  Q.  And how would you describe
 6   Officer Menke's tone of voice?
 7       A.   Assertive.
 8       Q.   Loud?
 9       A.   Yes.
10       Q.   Was he screaming?
11       A.   No.
12       Q.   Did Mr. Desantis ever say anything to Officer
13   Menke?
14       A.   No.
15       Q.   When Mr. Desantis put his hands on the ground was
16   he in a prone position?
17       A.   No.
18       Q.   What position was he in?
19       A.   Kneeling.
20       Q.   He was kneeling and he had his hands facing down
21   on the ground?
22       A.   Briefly.
23       Q.   For how long?
24       A.   He would pick them up, take them off the ground,
25   and then put them back down.
```

HANNAH KAUFMAN & ASSOCIATES, INC.

1      Q.   How many times did he do that?

2      A.   I would es- -- excuse me.  I would estimate one

3  or two times.

4      Q.   At that time would it have been appropriate to

5  have the dog go after Mr. Desantis?

6      A.   No.

7      Q.   Why not?

8      A.   Because, although he was hesitantly complying, he

9  was complying.

10     Q.   Okay.  Now, at that point were you going to go

11 over or have someone go over to Mr. Desantis and handcuff

12 him?

13     A.   Once he was proned out.

14     Q.   What does that mean, proned out?

15     A.   Once we gained his compliance and he was on the

16 ground.

17     Q.   When you say on the ground, what do you mean by

18 that?  Fully on the ground, not just on his hands and

19 knees?

20     A.   Correct.

21     Q.   So the idea was once he got fully on the ground,

22 not just on his hands and knees, someone would -- one or

23 more persons would approach him to handcuff him?

24     A.   Yes.

25     Q.   And if he didn't do that was putting the dog on

HANNAH KAUFMAN & ASSOCIATES, INC.

1    him ever an option?

2           MS. FOWLER:  I object.  Incomplete hypothetical.

3           THE WITNESS:  No.

4           MR. SCOTT:  Q.  Okay.  Was using a Taser ever an

5    option?

6           MS. FOWLER:  Again, I'm going to object.

7    Incomplete hypothetical.  Also, vague and ambiguous as to

8    time.

9           MR. SCOTT:  Q.  At this point.  He's on the

10   ground.  Hands and knees are on the ground.

11      A.   No.

12      Q.   Okay.  And why not?

13      A.   It's too far away.

14      Q.   How far away was he?

15      A.   16 to 18 yards, approximately.

16      Q.   Okay.  Was that for tactical reasons to have him

17   go on the ground that far away?

18      A.   Yes.

19      Q.   Was there tactical reasons you wanted to stay

20   that far away from him before you -- that you were going

21   to stay 16 or 18 yards from him before he was fully prone?

22      A.   Yes.

23      Q.   Okay.  Is that part of your training?

24      A.   Yes.

25      Q.   So at this point what's the next thing

HANNAH KAUFMAN & ASSOCIATES, INC.

1   Mr. Desantis did?

2       A.   Mr. Desantis was ordered to lay down prone.   He

3   bent forward, rolled his hips towards the ground,

4   immediately came back up to his kneeling position.

5       Q.   When you say rolled his hips to the ground, what

6   do you mean by that?

7       A.   He went from having his hands and knees on the

8   ground to moving forward, placing his hips on the ground.

9       Q.   The side of his hips or...

10      A.   No, like he was going to lie down.

11      Q.   Okay.   On his back or on his stomach?

12      A.   On his stomach.

13      Q.   So did he do that by kind of going forward or

14  sideways on his hands -- he's on his hands and knees.   And

15  what did he do to make it appear like he was going to go

16  on the ground on his stomach?

17      A.   He pushed his hips forward.

18      Q.   And what were his hands doing at that point?

19      A.   Staying in the same spot.

20      Q.   Did his face hit the ground?

21      A.   I don't think so.

22      Q.   Did any of his upper body touch the ground?

23      A.   No.

24      Q.   Okay.   And then what happened?   How long was he

25  in that position where he was kind of leaned forward but

1    hadn't touched the ground yet?

2        A.    Approximately a second.

3        Q.    And then what happened?

4        A.    He was back at the kneeling position.

5        Q.    For how long?

6        A.    A couple seconds.

7        Q.    And were commands still being made?

8        A.    Yes.

9        Q.    Did it appear that the commands were not being

10   followed?

11       A.    Yes.

12       Q.    Did -- what were your options at that point if he

13   wasn't going to follow commands?

14       A.    To continue to try to gain his compliance.

15       Q.    And was negotiating with him an option at that

16   time?

17       A.    Had he been responsive.

18       Q.    And was putting a dog on him an option at that

19   time?

20       A.    No.

21       Q.    Okay.  And what's the next thing you saw him do

22   after he was on his hands and knees again for about a

23   second?

24       A.    He looked at me, looked towards me, looked

25   towards his wife's direction, and looked at Travis and

1   ran.

2        Q.   And did what?

3        A.   Ran.

4        Q.   Ran.  On his hands and knees or did he get up?

5        A.   He got up.

6        Q.   And did he look at you and his wife and Officer

7   Menke before he got up or after he got up?

8        A.   Before he got up.

9        Q.   And how long did he look in your direction?

10       A.   Momentarily.

11       Q.   And then how long did he look at his wife?

12       A.   Momentarily.

13       Q.   And did he look at you first?

14       A.   I don't know.

15       Q.   Did he look at his wife before or after he looked

16  at you?

17       A.   I don't know.

18       Q.   And describe how he got up.

19       A.   He took off like he left the sprinter blocks, if

20  you know what sprinter blocks are.

21       Q.   I ran track, so I know what they are very well.

22  So he came -- got up and like he was coming out of

23  sprinter blocks?

24       A.   Yes.

25       Q.   Without track shoes?  All right.  And was he

HANNAH KAUFMAN & ASSOCIATES, INC.

1  sprinting?

2      A.  Yes.

3      Q.  Have you ever sprinted?

4      A.  Yes.

5      Q.  Did you run the hundred, 220, 240, or you just

6  sprinted for fun?

7      A.  I've run track.

8      Q.  What events?

9      A.  All types.  Short distance, long distance.

10      Q.  What was your best time in a hundred?

11      A.  I have no idea.

12      Q.  Okay.  So -- but you've run out of blocks?

13      A.  Yes.

14      Q.  On tracks?

15      A.  Yes.

16      Q.  In high school or in college?

17      A.  High school.

18      Q.  And you know what it looks like to sprint, right?

19      A.  Yes.

20      Q.  And was Mr. Desantis sprinting?

21      A.  Yes.

22      Q.  And what direction was he sprinting?

23      A.  Directly at Travis and Officer Mann.

24      Q.  And his legs were pumping?

25      A.  Yes.

1      Q.    His arms were pumping?

2      A.    Yes.

3      Q.    Okay.  And you could see his arms moving like a

4   sprinter?

5      A.    Yes.

6      Q.    And his legs were moving like a sprinter?

7      A.    Yes.

8      Q.    And there was nothing in his hands?

9      A.    No.

10     Q.    Correct?  Correct, there was nothing in his

11  hands?

12     A.    Correct.

13     Q.    And then what happened?

14     A.    After several steps when Mr. Desantis --

15  Officer -- Sergeant Soares stepped forward to my left and

16  fired the less lethal Sage.

17     Q.    When he stepped in front of you -- when you say

18  he stepped, was that kind of in front of you between you

19  and Mr. Desantis?

20     A.    He just stepped to my left.

21     Q.    So he didn't get in your -- what would be your

22  line of fire?

23     A.    Correct.

24     Q.    And how far away was -- well, did you order him

25  to shoot?

```
 1      A.   No.

 2      Q.   Were you surprised that he shot?

 3      A.   No.

 4      Q.   Why didn't you shoot?

 5      A.   Before that?

 6      Q.   Yeah, or at the same time.  What were you waiting

 7 for?

 8      A.   Compliance, which wasn't happening.

 9      Q.   Okay.  So why didn't you shoot before Sergeant

10 Soares shot?

11      A.   I just hadn't.

12      Q.   Were you waiting for him to shoot?

13      A.   No.

14      Q.   And approximately how far was Mr. Desantis from

15 Sergeant Soares when Sergeant Soares shot?

16      A.   I would estimate approximately 10 to 12 yards.

17      Q.   30 to 35 feet?

18      A.   Yes.

19      Q.   And approximately how far was Mr. Desantis from

20 Officer Menke when the first shot was fired?

21      A.   10 to 15 feet -- yards.

22      Q.   Yards?

23      A.   Yards.

24      Q.   So 30 to 45 feet?

25      A.   Yes.
```

1          (Brief recess taken from 5:39 p.m. to 5:48 p.m.)

2          THE VIDEOGRAPHER:  This marks the beginning of

3    volume 1, videotape number 3 in the deposition of Richard

4    Celli in the matter of Patricia Desantis, et al. versus

5    City of Santa Rosa in the United States District Court,

6    Northern District of California, case number

7    C 07-3386 JSW.  Today's date is November 14th, 2007, and

8    the time now is 5:48 on the record.

9          MR. SCOTT:  Back on the record.

10         Q.  Mr. Celli, we left off and I think where we left

11   off Mr. Desantis was sprinting in the direction of Officer

12   Menke and you observed Sergeant Soares take a position,

13   aim his Sage -- and how is that spelled, s-a-g or s-a-g-e?

14         A.  S-a-g-e.

15         Q.  And did you see Sergeant Soares fire the Sage?

16         A.  I heard it.

17         Q.  And did you -- what's the next thing you saw

18   after you heard the Sage being fired?

19         A.  It appeared that the Sage round hit Mr. Desantis,

20   he tilted his body right, briefly, and proceeded towards

21   Officers Menke and Mann.

22         Q.  Was he still sprinting?

23         A.  Yes.

24         Q.  At any time did he stop sprinting?

25         A.  No.

HANNAH KAUFMAN & ASSOCIATES, INC.

1     Q.   So he kept sprinting, but he just tilted

2  slightly?

3     A.   Yes.

4     Q.   And it appeared that he had been shot?

5     A.   Yes.

6     Q.   And did it appear that he'd been shot in his

7  right arm?

8     A.   I couldn't tell.

9     Q.   But it appeared -- at least there appeared to be

10  an impact in his body that you observed?

11     A.   Yes.

12     Q.   Okay.  And you saw his body tilt, I think you

13  said?

14     A.   Yes.

15     Q.   And you associated that tilt with him being hit?

16     A.   Yes.

17     Q.   And at this point is this a shoot and assess

18  situation?

19     A.   For me?

20     Q.   Yes.

21     A.   Yes.

22     Q.   And how long did you assess Mr. Desantis after it

23  appeared that he was shot by the Sage?

24     A.   Immediately.

25     Q.   What period of time?

HANNAH KAUFMAN & ASSOCIATES, INC.

1      A.   A second.

2      Q.   One second?

3      A.   Maybe -- I would say a second to two,

4   approximately.

5      Q.   And in those one or two seconds what did you

6   observe Mr. Desantis do?

7      A.   Continue towards Officer Menke and Mann.

8      Q.   And was he still continuing as a sprinter?

9      A.   Yes.

10     Q.   And his legs were -- and his arms were moving

11  like a sprinter?

12     A.   Yes.

13     Q.   And there was nothing in his hands, correct?

14     A.   Correct.

15     Q.   What were you afraid he was going to do, tackle

16  them or run by them, what were you thinking?

17     A.   He was attacking them.

18     Q.   And were you afraid he was going to kill them?

19     A.   Yes.

20     Q.   And how did you think he was going to kill them?

21     A.   By either pulling out a weapon or taking theirs.

22     Q.   And what did you do?

23     A.   I shot him.

24     Q.   And where -- how far had he moved from when the

25  Sage round hit him to when you pulled -- squeezed the

HANNAH KAUFMAN & ASSOCIATES, INC.

1    trigger?

2        A.   A couple of steps.

3        Q.   Okay.  Are you sure it was a couple of steps, not

4    more?

5        A.   Two to four steps.

6        Q.   And approximately how many feet had he moved in

7    those two to four steps?

8        A.   Approximately three to four yards.

9        Q.   And how far away was he from Officer Menke when

10   you fired?

11       A.   Approximately six to eight yards.

12       Q.   And how far away was he from you when you fired?

13       A.   A little further, approximately, I'd say, seven

14   to nine yards.

15       Q.   20, 25 feet?

16       A.   Approximately.

17       Q.   It would have been maybe 15 or 20 feet from

18   Officer Menke?

19       A.   Approximately.

20       Q.   And did it appear to you that he was heading

21   directly towards Officer Menke?

22       A.   Yes.

23       Q.   How big is Officer Menke?

24       A.   Approximately five-six to five-nine, 150 to 175

25   pounds, approximately.

1       Q.   Okay.   Well, what happened, what did you observe

2   after you fired your shot?

3       A.   Mr. Desantis's body starting to turn.

4       Q.   Was he still sprinting?

5       A.   Yes.

6       Q.   And why didn't you shoot again if he was still

7   sprinting?

8       A.   I was assessing.

9       Q.   And how many steps did he take while you were

10  assessing?

11      A.   Maybe one to two.

12      Q.   And then what happened?

13      A.   Two more shots were fired.

14      Q.   And why didn't you shoot again?

15      A.   Mr. Desantis stopped.

16      Q.   After the other two shots were fired?

17      A.   Yes.

18      Q.   Do you know who fired the other two shots?

19           MS. FOWLER:   Now, or did he know then?

20           MR. SCOTT:   Q.   Did you know then?

21      A.   I did not know then.

22      Q.   This is a good place to stop, so let's stop here

23  for today.   This deposition will be reconvened at a time

24  that is mutually convenient for the witness and for

25  opposing counsel but, hopefully, sometime before we get to

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _26th_ day of _November_ , _2007_ .

_____
Certified Shorthand Reporter

CSR No. _4748_