**EXHIBIT E**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

| | |
|---|---|
| PATRICIA DeSANTIS, individually, and as Successor in Interest for RICHARD DeSANTIS, deceased, and as Guardian Ad Litem for DANI DeSANTIS, a minor, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) No. C-07 3386 JSW |
| CITY OF SANTA ROSA, JERRY SOARES, RICH CELLI, TRAVIS MENKE, PATRICIA MANN, and DOES 1 through 25, inclusive, | ) ) ) ) ) |
| Defendants. | ) ) ) |

DEPOSITION OF RICHARD CELLI

VOLUME II - PAGES 140 - 261

June 11, 2008

REPORTED BY:  A. MAGGI SAUNDERS,

C.S.R. No. 2755

A. Maggi Saunders & Associates
Certified Shorthand Reporters
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

1  session of your deposition, you mentioned that in, I

2  believe February of 2007, you were involved in another

3  shooting, correct?

4        A.    Yes.

5        Q.    Okay.  And we were going to delay until a

6  later time, and that is right now, asking questions

7  about that other shooting.

8              Now, my understanding is that the District

9  Attorney has also announced that it's not prosecuting

10 you or anyone else relating to that the shooting,

11 correct?

12       A.    Correct.

13       Q.    And, to your knowledge, did the Santa Rosa

14 Police Department do an independent review of that

15 shooting --

16       A.    Correct.

17       Q.    -- other than relying on the District

18 Attorney and the Sheriff's Department?

19       A.    I don't know.

20       Q.    Okay.  And in that shooting incident do

21 you know how many Officers fired weapons?

22       A.    Four.

23       Q.    And you were one of those four?

24       A.    Yes.

25       Q.    Okay.  And who were the other three

                                                    152

1 Santa Rosa Police Department, have you received any

2 training in conducting 5150 Detentions?

3     A.    I learned about them in Field Training,

4 obviously.

5        And aside from -- I would say, constant

6 contacts with 5150-related incidents, or suspected

7 related incidents, which are a daily occurrence.

8        I would call that essentially on-the-job

9 training, but it looks like you've got listed here on

10 page four of seven, EDP Training.

11     Q.    Yeah, the Emotionally Disturbed Persons,

12 does that training relate to 5150 situations, or

13 something else?

14     A.    Emotionally Disturbed Person, it could be

15 5150; it could be persons who are Under the Influence.

16 A multitude of things.

17     Q.    Okay. So, it could be someone who,

18 because of a mental disorder such as psychosis, or they

19 are delusional because of, they are just born that way;

20 or it could be someone -- people who are acting

21 psychotically or delusionally, because of alcohol or

22 drugs.

23     A.    A multitude of things, correct.

24     Q.    And so, you've had training dealing with

25 "Emotionally Disturbed Persons"?

184

1     A.   Yes.

2     Q.   And is that from a point of view of

3 defensive tactics, and things of that nature, or just

4 in terms of doing some kind of assessment, and placing

5 them under a 5150, or a little of both?

6     A.   Defensive tactics, I don't believe were

7 involved in any of that training.  It was on persons.

8     But since we're speaking of "defensive

9 tactics," routinely, during defensive tactics

10 training, or a lot of trainings, even firearms

11 training, we bring up situations where people are not

12 responding, acting appropriately, emotionally

13 disturbed.  That's routine.

14     Q.   Okay.  And do you recall anything about

15 this training for "Emotionally Disturbed Persons" you

16 received in May of 2002?

17     MS. FOWLER:  Other than what he's already

18 told you.

19     MR. SCOTT:  Q.  Yes.

20     A.   I just remember one part of the training

21 was, you know, dealing with a – a subject arming

22 themselves with a knife, threatening to stab

23 themselves, and you had to speak to them to try to

24 diffuse the situation, both as individuals and as in

25 pairs.

185

1       Q.    Okay.  And how about his wife Patricia

2  DeSantis, had you heard of her?

3       A.    Not that I'm aware of.

4       Q.    Okay.  Do you recall the call you first

5  received regarding Mr. DeSantis?

6       A.    Generally.

7       Q.    Okay.  Do you remember if that call

8  relayed an address?

9       A.    I'm sure it did, but I couldn't even tell

10  you the name of the address at this time.

11       Q.    Okay.  The information that you first

12  received regarding this incident involving Mr.

13  DeSantis, can you summarize for me what you understood

14  that information to be?

15       A.    That the wife of Mr. DeSantis was

16  reporting that he was shooting a weapon inside the

17  residence, and that there were two children inside the

18  residence, ten years old and two.

19       I was dispatched, along with two other

20  Officers, I was dispatched from the Station.

21       Q.    At the time did you have any information

22  that Mr. DeSantis had been shooting his weapon at any

23  person in the residence?

24       A.    Not that I was aware of.

25       Q.    Okay.  To your knowledge, did you have an

1          A.    I have no idea of the number.

2          Q.    Do you have a sense of whether it was more

3    than five?

4          A.    Back and forth, it was probably around

5    there, somewhere around five.

6          Q.    Okay.  And at the time, by the time that

7    you arrived at the DeSantis residence, do you recall

8    whether you had had any updates pertaining to gunshots

9    in the residence?

10         A.    Yes.

11         Q.    And what -- can you describe what those

12   updates relayed?

13         A.    The first one, before the report of

14   gunshots, was the identification of a Glock pistol that

15   he was shooting.

16               Shortly thereafter, I learned that the

17   first officers had arrived on-scene.

18               And then, immediately after, I was advised

19   that there were more shots from the residence.

20         Q.    Okay.  Who advised you that there were

21   "more shots from the residence"?

22         A.    Dispatch.

23         Q.    And did Dispatch advise you on what basis

24   they had that information?

25         A.    No; just the fact there were more shots

                                                    207

1  from the residence.

2      Q.    Okay. Did Dispatch advise you that the

3  caller was still on the line?

4      A.    Yes.

5      Q.    Did you request any information from

6  Dispatch?

7      A.    I requested that they tell the wife to

8  attempt to flee with the children.

9      Q.    Did you inquire as to the status of --

10  Well, strike that.

11      About how long before you arrived at the

12  DeSantis residence, did you make that request to

13  Dispatch, about having the wife and kids attempt to

14  flee?

15      A.    About a minute, I would say, estimate a

16  minute.

17      Q.    Now, before you arrived at the scene, you

18  had come to an impression in your mind that this could

19  be a potential murder/suicide; is that right?

20      MS. FOWLER:   I'm going to object.  There

21  is lack of foundation.  He hasn't testified to that.

22      THE WITNESS:   There were numerous things

23  crossing my mind about what was going on.

24      MR. NISENBAUM:   Q.   Okay.  Was that one of

25  those?

                                                    208

1      A.    I believe my first thoughts were that this

2   may be a hostage scenario, based upon the fact that

3   Mrs. DeSantis, who was either unwilling, or unable, to

4   leave the residence prior to my arrival.

5      Q.    How did you know that she was unable to

6   leave -- Well, strike that.

7            What made you think that she was either

8   unwilling or unable to leave the residence?

9      A.    I had asked for an update from my original

10  request, to have her flee the residence.

11           And I don't know the terms that were

12  used, but essentially she advised that she either

13  wasn't or couldn't leave the residence.

14     Q.    And did you make any further inquiries

15  about why she wasn't leaving the residence?

16     A.    No.  I didn't have time.

17     Q.    Okay.  Would it make a difference to you

18  as to whether she was unwilling to leave the residence,

19  as opposed to unable to leave the residence?

20     A.    It could have a bearing, but not

21  necessarily.  My interest was protection of everyone

22  involved.

23     Q.    When you arrived at the DeSantis

24  residence, where did you park?

25     A.    Southeast of the residence.

1    Q.   You never -- Did you ever hear any officer

2 ask her any questions about the circumstance?  And I

3 mean the circumstances that brought you to the scene.

4    A.   There was no time there to do that.

5    Q.   Well, from the time that you arrived, from

6 the time that you first saw Mr. DeSantis to the time

7 the shooting occurred, about how much time passed?

8    A.   A minute, a minute and a half, total.

9    Q.   Did you give any consideration to, during

10 that minute to a minute and a half time period, did you

11 give any consideration to bringing the police car

12 around to illuminate the driveway?

13    A.   No.

14    Q.   Why not?

15    A.   I could see the scene at that point.

16    Q.   So, at that point, was the scene fairly

17 well-lit?

18    A.   It was not well-lit; however, I could see

19 Mr. DeSantis.

20    Q.   And as I understand it, Mr. DeSantis was

21 topless?

22    A.   No shirt, correct.

23    Q.   And he was wearing jeans?

24    A.   Yes.

25    Q.   Did you feel that you could -- that the

1          Did you give any consideration at that

2   point to attempt to get greater visibilty through the

3   use of better lighting upon Mr. DeSantis?

4          A.    No.   We were directed at trying, or more

5   focused at trying to get compliance from Mr. DeSantis

6   at that point.

7          Q.    Now, it was important to you to know

8   whether or not Mr. DeSantis was still armed, correct?

9          A.    Yes.

10         Q.    Did you ask him whether he was still

11  armed?

12         A.    We didn't get that far.

13         Q.    All right.   So you did not ask him that

14  question?

15         A.    Correct.

16         Q.    And you never asked Mrs. DeSantis whether

17  he was still armed, correct?

18         A.    Correct.

19         Q.    Okay.   Is there a reason you did not ask

20  Mrs. DeSantis whether her husband was still armed?

21         A.    I was focused on Mr. DeSantis at the time.

22         Q.    What was Mr. DeSantis doing at that time?

23         A.    At which time?

24         Q.    During the time period when you did not

25  ask Mrs. DeSantis whether or not her husband was still

                                                        218

1  correct?

2       A.   I just couldn't tell.

3       Q.   Okay.  If -- Did you see something in his

4  pants that you thought might be a bulge, but you

5  couldn't tell?

6       A.   Not that I was aware of.

7       Q.   Okay.  Now, at some point Mr. DeSantis

8  kind of was more prone on the ground; is that correct?

9       A.   Yes.

10      Q.   Okay.  And it's been described, I think as

11  being in a push-up position; is that correct?

12      A.   Yes.

13      Q.   Okay.  And what you mean by that is his

14  hands were kind of by his chest, and his body was

15  extended?

16      A.   Briefly.

17      Q.   Okay.  At that time, were you able to see

18  Mr. DeSantis' back at all?

19      A.   No.

20      Q.   Okay.  And was there an obstruction in

21  your vision?

22      A.   It was just the way that he went down, and

23  then he immediately bowed up.

24      Q.   Were you able to see his back pockets at

25  all?

231

```
 1          A.    No.

 2          Q.    Okay.  So when he was down in a push-up

 3   position, you were never able to see his rear

 4   waistband?

 5          A.    No.

 6          Q.    What direction was his head relative to

 7   you?

 8          A.    Facing towards Officer Menke; so, it would

 9   have been facing away from me, and about, maybe a

10   30-degree angle away from me.

11          Q.    Okay.  Officer Menke was to what side of

12   you?

13          A.    The left.

14          Q.    Okay.  And Mr. DeSantis was -- his head

15   was -- was more aligned in Officer Menke's direction?

16          A.    And body.

17          Q.    Correct, his head and body were more

18   aligned in Officer Menke's direction?

19          A.    Yes.

20          Q.    Is it fair to say that you had a better

21   view of Mr. DeSantis', the right side of Mr. DeSantis'

22   body when he was in that somewhat prone push-up

23   position than the left side?

24          A.    No, the left more than the right.

25          Q.    I see.  I see.

                                                    232
```

1   Bushmaster?

2         A.    A second or two.

3         Q.    Now, Mr. DeSantis reacted to the Sage,

4   correct?

5         A.    Yes.

6         Q.    And it slowed him down?

7         A.    It tilted him right; I guess, slowed him

8   down momentarily.

9         Q.    Okay.  Now, at the time that the Sage hit

10  Mr. DeSantis, how far was he from the officers he was

11  running at?

12        A.    Maybe 12 yards.

13        Q.    Okay.  Now, you've been trained that --

14  you've had training that a person can, of course,

15  approach officers, correct, that that's possible?

16              MS. FOWLER:  Well, I'm going to object.

17  That's a vague, ambiguous and overly-broad question.

18              MR. NISENBAUM:  Q.  Well, let me put it

19  this way:

20              It's within your understanding that a

21  person may start out further than, let's say, 45 feet

22  from an Officer, but can, of course, come closer to the

23  Officer, correct?

24        A.    In what circumstances?

25        Q.    A circumstance where there is not an

                                                    240

```
 1              MR. NISENBAUM:  Q.  I'll ask, from you
 2   first.
 3         A.    No, I think he was too far away.
 4         Q.    Okay.  How far -- He was about 12 yards
 5   away when you shot him --
 6         A.    Yes.
 7         Q.    -- he was 12 yards from you, or from
 8   Officer Menke?
 9         A.    From Officer Menke; so, probably about the
10   same distance from me.
11         Q.    Okay.  And the Taser, the Taser that you
12   have in your trunk would be effective as a range of
13   further than 12 yards, correct?
14              MS. FOWLER:  Well, is your question,
15   effective, or have a range?  I mean, that's two
16   different questions.
17              MR. NISENBAUM:  Q.  Have a range.
18         A.    It has a range of about 21 feet.
19         Q.    So that's 7 yards?
20         A.    Yes.  Effective range of 21 feet.
21         Q.    Does it have a further range than that?
22         A.    Not effectively.  So, it doesn't have --
23              The probes on the Taser, they are
24   designed to separate, so the further separation is
25   created by further distance.
```

243

1    it, you had no information from Mr. DeSantis' wife

2    until after the shots were fired as to why she had

3    called -- and I mean directly from Mr. DeSantis' wife,

4    as to why she had called the police, correct?

5          A.    Correct.

6          Q.    Your only information had come through

7    Dispatch?

8          A.    Correct.

9          Q.    Okay.  Did you have any conversation with

10   Officers at the scene about any information -- and I

11   mean prior to the firing -- from the time you arrive at

12   the scene, up to the point when shots are fired, about

13   any information they had learned while they were at the

14   scene?

15         A.    No.

16         Q.    And is the reason for that, the same, that

17   there was not time?

18         MS. FOWLER:  Well, I was going to object:

19   It assumes facts not in evidence, that any other

20   Officer spoke to her before he got there.

21         THE WITNESS:  It's my belief at the time

22   we were approaching the residence, that this was

23   possibly an active shooter situation, with ongoing

24   firing.

25         MR. NISENBAUM:  Q.  And the "active

                                              246

1 shooter" was obviously in your vision when -- once you

2 observed Mr. DeSantis, correct?

3      A.    Once we got to the location, I saw Mr.

4 DeSantis, yes.

5      Q.    Now, you fired your weapon one time,

6 correct?

7      A.    Yes.

8      Q.    Do you know who fired the first round?

9      A.    From a firearm?

10      Q.    From any firearm at the scene, aside from

11 the earlier shots fired by Mr. DeSantis allegedly?

12           MS. FOWLER: And not counting the Sage, or

13 are you including the Sage, and --

14           MR. NISENBAUM: Q. Not counting the Sage.

15      A.    I was the first Officer to fire a firearm.

16      Q.    Okay. How do you know that?

17      A.    I shot -- heard my shot.

18      Q.    At the time you fired, Mr. DeSantis had

19 never reached behind his back, that you could observe;

20 is that correct?

21      A.    Correct.

22      Q.    Your only information that Mr. DeSantis

23 presented a lethal threat at the time you fired was the

24 information you had received from Dispatch, that he had

25 been shooting into the residence; is that correct?

```
 1              MS. FOWLER:  I'm going to object.  That's
 2   argumentative.
 3              Go ahead, you can answer the question.
 4              THE WITNESS:  Could you repeat the
 5   question?
 6              MR. NISENBAUM:  Q.  Your only information
 7   at the time that you fired your firearm at Mr.
 8   DeSantis, your only information that Mr. DeSantis
 9   presented a lethal threat was information you received
10   from Dispatch about regarding Mr. DeSantis' alleged
11   behavior while in the house, correct?
12        A.    And then the actions that he was
13   displaying.
14        Q.    Well, the actions that he was displaying,
15   he never displayed a weapon, correct?
16        A.    Correct.
17        Q.    Okay.  So, what other lethal threat did
18   you understand him to be at the time that you fired?
19        A.    He's attacking the Officer.
20        Q.    Attacking them physically?
21        A.    Yes.
22        Q.    Okay.  Now, Officers are trained in how to
23   protect themselves; is that correct?
24        A.    Yes.
25        Q.    And they are trained that -- to your
```

248

```
 1   knowledge, you've been trained that force is -- that

 2   the use of force is to be based upon the threat

 3   presented, correct?

 4       A.   Correct.

 5       Q.   Okay.  And do you have any training --

 6            Have you had any training that it's

 7   appropriate to use lethal force on an unarmed person?

 8            MS. FOWLER:  Well, I'm going to object.

 9   That's vague and ambiguous and an incomplete

10   hypothetical.

11            And if you can answer the question as

12   phrased, go ahead.

13            THE WITNESS:  If the Officer is being

14   attacked, and they are in fear for their life, yes, or

15   the life of others.

16            MR. NISENBAUM:  Q.  The attack that's

17   presented, what kind of -- To your understanding, what

18   kind of attack is -- justifies lethal -- a lethal

19   force?

20       A.   If I'm in fear for the Officers or my own

21   life or the lives of others, then, I am fearful that

22   that person, if I allow to continue that attack, will

23   harm or kill them, it's justified.

24       Q.   Now, to your knowledge, with the officers

25   that Mr. DeSantis had ran towards, to your knowledge,
```

1   are they trained in the use of pepper spray?

2        A.    Yes.

3        Q.    And they are also trained in the use of

4   defensive tactics, correct?

5        A.    Correct.

6        Q.    The same training you've had?

7        A.    Correct.

8        Q.    Okay.  And to your knowledge, an Officer

9   could have used pepper spray on Mr. DeSantis, correct?

10       A.    If he or she had had the time or ability

11  to transition from a firearm to that other option.

12       Q.    Okay.  Do you know whether or not -- Let

13  me ask you this:

14            During the time period when Mr. DeSantis

15  got down on the ground initially, up to the -- and then

16  later went into this push-up position type of thing, so

17  from the point when he initially complied and got on

18  his knees, up to the point after the push-up position

19  of when you say that he started to charge at the

20  Officers, how much time did that encompass?

21       A.    From the time he went from his knees to

22  the push-up position?

23       Q.    From the time he went to his knees to the

24  point when he charged at the Officers.

25       A.    Fifteen, 20 seconds.

                                            250

1    could have ordered that the dog be sent, correct?

2         A.    When he started to charge the Officer?

3         Q.    When he stopped complying.

4         A.    There was no time to give that order.

5         Q.    Okay.  At the point when the Sage was

6    used, a Taser could have been used, correct?

7              MS. FOWLER:  I'm going to object.  Calls

8    for speculation.  Don't answer that.

9              MR. NISENBAUM:  Q.  I'm not asking --

10             I'm asking you, as a commander at the

11   scene:  You could have given an order for a Taser to

12   be used, correct?

13             MS. FOWLER:  You mean, did he have the

14   ability to order an Officer to do that?

15             MR. NISENBAUM:  Q.  Yes.

16        A.    At the time I did not have the ability to

17   do that, based upon the time and distance of Mr.

18   DeSantis.

19        Q.    Okay.  It's fair to say that you never saw

20   any object consistent with a weapon on Mr. DeSantis'

21   person, correct?

22             MS. FOWLER:  It's already been asked and

23   answered several times.

24             THE WITNESS:  Correct.

25             MR. NISENBAUM:  Q.  No one ever re- -- No

                                                    253

```
                          )
STATE OF CALIFORNIA  )     ss.
                          )
```

### CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 22nd day of June, 2008.

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California

A. Maggi Saunders & Associates
Certified Shorthand Reporters

57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281