**EXHIBIT F**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICIA DESANTIS,

individually and as Successor

in Interest for RICHARD

DESANTIS, deceased, and as

Guardian Ad Litem for DANI

DESANTIS, a minor and TIMOTHY

FARRELL, a minor,

        Plaintiffs,

vs.               CASE NO. C 07 3386 JSW

CITY OF SANTA ROSA, JERRY

SOARES, RICH CELLI, TRAVIS

MENKE, PATRICIA MANN and DOES

through 25, inclusive,

        Defendants.

_____/

**CERTIFIED COPY**

DEPOSITION OF TRAVIS MENKE

November 15, 2007

Pages 1 through 117

Reported by:

JUDY A. MANFRED

CSR No. 4748

HANNAH KAUFMAN & ASSOCIATES, INC.

Certified Shorthand Reporters

472 Pacheco Street

San Francisco, California 94116

(415) 664-4269

1    Q.   Oh, I'm sorry.  And the Desantis residence is

2  part of beat 7?

3    A.   Yes.

4    Q.   And what information did you have at the time you

5  arrived at the scene?  And when I say scene, I'm talking

6  about the area where the shooting occurred.

7    A.   What information did I have from?

8    Q.   Any source, dispatch or otherwise, about what to

9  expect or -- what had happened or what to expect when you

10  got there.

11    A.   Dispatch dispatched me to the scene, reported man

12  firing a gun in his residence.

13    Q.   Did you have any other information?

14    A.   There was mention made of a Glock gun.  There was

15  a wife and two children in the house.

16    Q.   Anything else?

17    A.   Not that I recall.

18    Q.   Do you recall hearing anything about mental

19  illness or bipolar?

20    A.   I don't recall.

21    Q.   What's a Glock?

22    A.   A Glock is a manufacturing of a firearm.  It's a

23  firearm company.  It manufactures primarily handguns.

24    Q.   So the information you had was that there was a

25  man firing a handgun.  By Glock you assumed it was a

1  handgun?

2      A.   Yes.

3      Q.   Inside a residence and there was a wife and two

4  kids, correct?

5      A.   Yes.

6      Q.   And did you have information whether anyone had

7  been injured or shot?

8      A.   No.

9      Q.   Okay.  Was that something you wanted to know?

10     A.   Yes.

11     Q.   And did you try to find out?

12     A.   Yes.

13     Q.   And what did you do to find out if anybody had

14  been shot?

15     A.   I drove to the scene to investigate.

16     Q.   Did the dispatcher have any information on that?

17         MS. FOWLER:  I'll object on the ground it calls

18  for speculation.

19         MR. SCOTT:  Q.  Okay.  If you don't know, say you

20  don't know.

21     A.   I don't recall.

22     Q.   Do you recall if the dispatcher said anything

23  about whether anyone had been shot?

24     A.   I don't recall.

25     Q.   On occasion do you talk to the dispatcher to try

HANNAH KAUFMAN & ASSOCIATES, INC.

1      Q.   So your plan was to kind of sneak up on the house

2    and not let the man with a gun know you were there?

3      A.   Yes.

4      Q.   Because you're hoping to, what, get some element

5    of surprise?

6      A.   Officer safety.

7      Q.   Okay.  And what weapons did you have in your

8    patrol car that night when you arrived at the scene?

9           MS. FOWLER:  In the car as opposed to on his

10   belt?

11          MR. SCOTT:  Q.  Yes, in the car.

12     A.   The shotgun is in the car.

13     Q.   Anything else?

14     A.   I keep my Taser in the car.

15     Q.   In the trunk or in the -- up front?

16     A.   I keep it in a bag.  Usually I keep it in the

17   front seat.

18     Q.   Did you have it with you that night?

19     A.   No.

20     Q.   Why not?

21     A.   Because I don't carry it on my belt.

22     Q.   You left it in the car?

23     A.   Yes.

24     Q.   Why did you leave the Taser in the car?

25     A.   Because I was in a hurry to get to the scene and

1    Q.   And did you walk, run or go in some other

2   fashion?

3    A.   Walked.

4    Q.   Why did you walk?

5    A.   It was a brisk walk.  I didn't know specifically

6   where the house was and I was trying to move tactically

7   quietly staying out of the light.

8    Q.   Had you drawn your handgun at that point?

9    A.   At getting out of my car?

10    Q.   Yes.

11    A.   Yes, I did.

12    Q.   Why?

13    A.   Because there was a subject shooting a gun and I

14   wanted to be prepared.  And at that point I was not sure

15   what I was walking into so for my safety I drew my

16   handgun.

17    Q.   What kind of handgun did you have with you that

18   night?

19    A.   It's the H&K 40-caliber semi-automatic pistol.

20    Q.   Do you have it with you here today?

21    A.   No.

22    Q.   Why not?

23    A.   It's my duty firearm.

24    Q.   Do you have another weapon that you carry off

25   duty?

HANNAH KAUFMAN & ASSOCIATES, INC.

1   goes back to -- let me see -- 15 or 17 back to 20 -- 20 or

2   25, something like that.

3        Q.   So the closest is ten yards or 30 feet?

4        A.   I think.  I don't recall specifically.

5        Q.   Something in that ball park?

6        A.   Yeah.

7        Q.   How far was Mr. Desantis from you when you fired

8   at him?

9        A.   When I fired at him he was approximately 10 to

10  15 feet.

11       Q.   And was he coming right at you?

12       A.   Yes.

13       Q.   And where did you aim?

14       A.   Center mass.

15       Q.   Could you tell whether you hit him?

16       A.   No.

17       Q.   And when you fired at him was he standing?

18       A.   Yes.

19       Q.   And how far -- did he take some steps after that

20  before he fell, or did he just drop after you shot him?

21       A.   He just dropped.

22       Q.   Okay.  Was he running toward you when you shot

23  him?

24       A.   Yes.

25       Q.   And did it appear to you that the shot that you

HANNAH KAUFMAN & ASSOCIATES, INC.

1  fired caused him to just kind of stop in mid air and his

2  momentum just stopped and he dropped?

3      A.   I pulled the trigger and he kind of turned to his

4  left and fell.

5      Q.   How fast was he running towards you when you

6  fired?

7      A.   He was in a dead sprint.  I don't know how fast

8  he was going, but it was human sprinting speed.

9      Q.   And how many steps would he have had to taken to

10 reach you?

11          MS. FOWLER:  At the point in time when he shot

12 him?

13          MR. SCOTT:  Q.   Yes.

14     A.   I don't know how long his stride was.  He was

15 within 10 to 15 feet so estimate maybe four strides,

16 maybe.

17     Q.   Okay.  And did you see him take any strides after

18 you shot?

19     A.   No.

20     Q.   Which way did he fall?

21     A.   He kind of spun to his left and fell back onto

22 his back.  So it would be he spun his left to my left,

23 turned to my right, fell to his -- kind of fell back to

24 his left -- excuse me, my left.

25     Q.   When he fell how far away was he from you?

HANNAH KAUFMAN & ASSOCIATES, INC.

1     A.   M-hm, yes.

2     Q.   And his arms were moving like a sprinter?

3     A.   Yes.

4     Q.   And you could see his hands?

5     A.   Yes.

6     Q.   Did you see anything in his hands?

7     A.   No.

8     Q.   And what were you afraid he was going to do if

9  you hadn't shot him?

10    A.   Kill me.

11    Q.   And how did you think he was going to kill you?

12    A.   With a gun.

13    Q.   With what gun?

14    A.   The gun I assumed he had.

15    Q.   And did you shoot him because you assumed he had

16  a gun?

17    A.   Under the circumstances I think it was within

18  reason to assume he had a gun, yes, he was armed.

19    Q.   So it would be fair to say that you shot because

20  you assumed he had a gun?

21    A.   I shot because I thought he was coming to kill

22  me.

23    Q.   Did you think he was going to kill you with a gun

24  you assumed he had?

25    A.   I felt it was reasonable.

HANNAH KAUFMAN & ASSOCIATES, INC.

1      Q.   Then if he was going to shoot you with a gun, why

2   would he run at you?  Why not just stop, pull out the gun

3   and fire?

4      A.   I don't know.

5      Q.   Okay.  Are you right or lefthanded?

6      A.   Righthanded.

7      Q.   When you initially got to the scene, you walked

8   from your patrol car and you had your weapon drawn.

9   What's the first thing you did when you got to the -- in

10  the vicinity of the residence and the parking lot or the

11  driveway?

12     A.   The first thing I did when I got to the driveway?

13     Q.   Yes.

14     A.   I took cover and concealment around the corner of

15  the house.

16     Q.   And what was the lighting like?

17     A.   Dim.

18     Q.   Were you able to see the Desantis -- what you

19  discovered was the Desantis house?

20     A.   Yes.

21     Q.   And did you see anyone in the vicinity of the

22  house?

23     A.   Yes.

24     Q.   Who did you see?

25     A.   I saw a man and a woman.

1    Q.    What were they doing?

2    A.    They were talking or looking -- they were

3    possibly talking in front of the -- front of the

4    residence -- or the front door of the residence.

5    Q.    Okay.  And was the woman talking on the phone?

6    A.    I don't recall.

7    Q.    You don't recall if you saw --

8    A.    I don't believe so.

9    Q.    -- a phone in her hand?

10   A.    Hm-m.

11   Q.    But you saw a man and a woman near the front of

12   the house --

13   A.    M-hm.

14   Q.    -- near the front door talking?

15   MS. FOWLER:  You need to say yes or no.

16   THE WITNESS:  Oh.  Yes.

17   MR. SCOTT:  Q.  Did they appear to be arguing?

18   A.    I couldn't hear anything.

19   Q.    So they weren't yelling, at least it didn't seem

20   like they were yelling?

21   A.    They were not -- I don't recall them yelling, no.

22   Q.    And did you see anyone else other than the man

23   and the woman?

24   A.    No.

25   Q.    And at this point did you believe that this was

1   weapons?

2       A.   I saw them when they were walking up, and then as

3   soon as I saw Mr. Desantis I kind of focused on him so I

4   didn't look back to check.

5       Q.   Did you ever look back to check before you fired?

6       A.   No.

7       Q.   Okay.  So from that moment when you observed

8   Sergeant Celli and Sergeant Soares arrive, to the time you

9   pulled the trigger, you just kept your eyes on

10  Mr. Desantis and never looked back at Sergeant Celli or

11  Sergeant Soares and never talked to them; is that correct?

12      A.   Yes.

13      Q.   And they never talked to you; is that right?

14      A.   I don't think so.

15      Q.   Was it your understanding that someone was in

16  command of the scene for tactical purposes?

17      A.   No.

18      Q.   Did you get any information from any source that

19  there was someone at the scene there, one of the

20  sergeants, who was in command for tactical purposes?

21      A.   I knew the sergeants were there, but I -- due to

22  this was all happening very rapidly, there was really no

23  time for anybody to sort of develop any plan or, you know,

24  tactical response, as you put it.

25      Q.   From the time you arrived how much time passed to

HANNAH KAUFMAN & ASSOCIATES, INC.

1   the time you fired your weapon?

2       A.   I would estimate just within a couple minutes;

3   quickly.

4       Q.   Did you make a split second decision at the

5   scene?

6            MS. FOWLER:  Object.  Vague and ambiguous as to

7   split second decision.  About what?

8            MR. SCOTT:  About anything.

9       Q.   Did you make any split second decisions in those

10  two minutes?

11           MS. FOWLER:  Object.  Vague and ambiguous.

12           THE WITNESS:  I can't answer that.

13           MR. SCOTT:  Q.  Okay.  Now, you took the position

14  of cover.  And I'd like to mark as an exhibit -- I've got

15  a blank one, and at some point if you want to look at the

16  one that was used before, you can, but I'd like you to --

17  and just so you know I'm not trying to play any games here

18  or trick you, but I'd like to get your testimony on this

19  and so I'm going to mark this as Exhibit number 1.

20  There's a copy for you counsel.  Do you want to make this

21  2?

22           MR. FOWLER:  Yeah.

23           MR. SCOTT:  Let's make this Exhibit 2.  So we'll

24  just go kind of chronologically with numbers.

25           (Plaintiffs' Exhibit 2 marked for

```
 1   or to that effect?

 2       A.   Yes.

 3       Q.   And you wanted him to stop?

 4       A.   Yes.

 5       Q.   And you wanted to see his hands?

 6       A.   Yes.

 7       Q.   Why did you want to see his hands?

 8       A.   So that I could see he was not armed or see that

 9   there was not a gun in his hand.

10       Q.   When you saw him for that minute or so talking

11   with a woman, did you see anything in his hands?

12       A.   Did I see anything -- I couldn't really see them

13   that well.  It was rather dark out; I couldn't tell.

14       Q.   Was it too dark to see if he had a gun in his

15   hand?

16       A.   Too dark to see?

17       Q.   If he had a gun in his hand?

18            MS. FOWLER:  At that point in time?

19            MR. SCOTT:  Q.  Yes.

20       A.   I believe it's possible he could have had a gun

21   in his hand at that time.

22       Q.   And you would have not seen it?

23       A.   And I would have not seen it, no.

24       Q.   Do you think he could see you?

25       A.   At what point?
```

1    are authorized to wear, but I don't recall specifically.

2    They typically wear the jump suit which is like a full

3    zip-up uniform, but they also generally wear the BDU

4    uniform.

5        Q.   What is a BDU --

6        A.   Basic duty utility uniform.  It's -- essentially

7    it's a similar kind, but it doesn't have the metal badges.

8    They have pockets on the pants.  Obviously, leashes, and

9    the equipment they have to carry, it's more useful for

10   them than your basic patrol officer.

11       Q.   Do you recall what Sergeant Celli was wearing

12   that night?

13       A.   I believe it was just a standard police uniform

14   with the sergeant stripes and...

15       Q.   Do you recall what Sergeant Soares was wearing

16   that night?

17       A.   I believe it was the same.

18       Q.   What about Officer Jones, do you recall what he

19   was wearing?

20       A.   I don't recall.

21       Q.   Now, when you first called out to Mr. Desantis

22   with the commands you've described, where was Officer

23   Mann, do you know?

24       A.   She was to my right.

25       Q.   Was she in a position of cover?

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.    Yes.

2    Q.    And your response was to verbalize a command to

3    tell him words to the effect, stop, put your hands where I

4    can see them?

5    A.    Yes.

6    Q.    And what did Mr. Desantis do in response to that

7    command?

8    A.    After several commands he turned -- okay?

9    Q.    Yeah, we have to stop this tape, but you can

10   finish this answer?

11   A.    After several commands he stopped, turned around,

12   put his hands up.

13        MR. SCOTT:  We need to take a break to change

14   tapes, so let's take a short break.

15        THE VIDEOGRAPHER:  This marks the end of volume

16   1, videotape 1, in the deposition of Travis Menke on

17   November 15th, 2007.  The time now is 4:05 and we're off

18   the record.

19        (Brief recess taken from 4:05 p.m. to 4:26 p.m.)

20        THE VIDEOGRAPHER:  This marks the beginning of

21   volume 1, videotape number 2 in the deposition of Travis

22   Menke on November 15th, 2007 in the matter of Patricia

23   Desantis, et al., versus City of Santa Rosa, et al., in

24   the United States District Court, Northern District of

25   California, case number C 07 3386 JSW.  Today's date is

1    November 15th, 2007 and the time is 4:26.  Back on the

2    record.

3              MR. SCOTT:  Q.  If we could get back to the

4    diagram and kind of where we were in our time line, now

5    you have just made some commands and -- towards

6    Mr. Desantis.  The first time you made a command did he

7    react at all?  Did he stop walking or just keep walking?

8         A.   I believe at that point he stopped and turned.

9         Q.   With your initial command?

10        A.   Yes.

11        Q.   And approximately how far was he from the front

12   door of the residence when he stopped and turned?

13        A.   I believe he was at the base of the steps.

14        Q.   And could you still see his wife?

15        A.   She was out front also.

16        Q.   So she was still in plain view?

17        A.   Yes.

18        Q.   And after he stopped and turned, what did you do

19   next?

20        A.   I told him to get his hands in the air, get his

21   hands high, something of that line.

22        Q.   What did he do?

23        A.   As I recall, he didn't do it initially.  I had to

24   keep yelling at him to get his hands up.

25        Q.   Approximately how many times?

1      A.   I believe two to three.

2      Q.   And after those two to three commands to put his

3   hands up, did he?

4      A.   Yes.

5      Q.   So he put his hands in the air?

6      A.   Yes.

7      Q.   With palms open?

8      A.   I don't recall.

9      Q.   And you wanted to see his hands because you

10  wanted to see if he had a weapon in his hands, right?

11     A.   Yes.

12     Q.   And you were expecting to see a gun or possibly

13  see a gun?

14     A.   It was reasonable to assume that, yes.

15     Q.   And did you see a gun in his hands?

16     A.   Not that I could see at that point.

17     Q.   Did you ever see a gun in his hands?

18     A.   No.

19     Q.   So he put his hands in the air, and for how long

20  was he standing there with his hands in the air?

21     A.   Mr. Desantis dropped his hands several times, so

22  he put them up for maybe a couple seconds.  I told him to

23  walk towards the sound of my voice.  He then proceeded --

24  obviously, there were several commands.  He would drop his

25  hands, so for the first time I told him to put his hands

1   up, he held them up for a couple seconds.

2       Q.   When he dropped his hands did he at any time put

3   his hands in his pockets?

4       A.   Not that I could tell.

5       Q.   Did it appear that he put his hands behind his

6   back?

7       A.   Not that I could tell.  I don't recall.

8       Q.   Do you recall that you were -- when he dropped

9   his hands you could still see his hands?

10      A.   I didn't have a very good view of his left hand

11  at that point.  Obviously, he wasn't -- he was positioned

12  somewhat facing me, but I was able to see much more of his

13  right side.  I couldn't see his back or anything.  He

14  dropped his hands and I immediately began yelling to, get

15  your hands back in the air, and repeating the commands.

16      Q.   How many times did he drop his hands and then

17  raise them again?

18      A.   Approximately two, maybe more.

19      Q.   And when he dropped his hands, for how long were

20  they dropped before he raised them again?

21      A.   Maybe just a couple seconds.

22      Q.   And did this happen before he started walking

23  towards you?

24      A.   Yes.

25      Q.   Why did you want him to walk toward you?

1    A.   I wanted him to get in a position away from the

2    front door, away from any barriers that he could hide

3    behind position of cover.  In my training, basically, you

4    want a person that is out of the middle of -- in the open.

5    I wanted him to come to the middle of the driveway.  That

6    was a safer place for him to be.

7    Q.   Okay.  Safer for you?

8    A.   Safer for him me and him.

9    Q.   Why was it safer for him?

10   A.   If he were, to say -- I wouldn't want to, you

11   know, put him down behind a truck or something like that

12   to where, you know, if we could see any movements we could

13   give commands.  We wanted to be able to see his whole

14   body.

15   Q.   And you didn't want to put him in a position

16   where he could have cover, right?

17   A.   Yes.

18   Q.   Was anyone else giving commands at the time you

19   were giving commands that you could hear?

20   A.   Not that I could hear, no.

21   Q.   And approximately how many steps did he take in

22   your direction before he stopped?

23   A.   I don't know how many steps he took.  I was not

24   looking really at his feet.  I was looking at his arms,

25   his hands, his upper body.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.    And did you have -- in your mind was there a

2    place where you wanted him to stop and get down on the

3    ground?

4    A.    Yes.

5    Q.    When he got near that location did you tell him

6    to stop?

7    A.    Yes.

8    Q.    And approximately how far away from you was he

9    when you told him to stop?

10    A.    Approximately 40 to 50 feet.

11    Q.    And was that a distance you felt that was safe?

12    A.    Yes.

13    Q.    Was he walking toward you when you told him to

14    walk?

15    A.    He was walking towards my general area, yes.

16    Q.    And do you believe he could see you?

17    A.    I believe so.

18    Q.    And you were able to see him?

19    A.    Yes.

20    Q.    Do you believe he could see Officer Mann?

21    A.    I'd say probably, yes.

22    Q.    Do you believe he could see Officer Ellsworth?

23    A.    I don't know.

24    Q.    And do you believe he could see Officer Jones?

25    A.    I don't know.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.   Do you believe he could see Sergeant Soares?

2    A.   I don't know.

3    Q.   You just didn't look over there?

4    A.   No, I was focused on him.

5    Q.   So at some point you told him to stop; is that

6  right?

7    A.   Yes.

8    Q.   Do you recall what you said?

9    A.   I said, stop.

10   Q.   And did he stop?

11   A.   Yes.  I don't recall how many times I had to yell

12  stop.

13   Q.   Was there a period of time when you yelled stop

14  and he kept walking toward you?

15   A.   Not that I recall.

16   Q.   And after he stopped, what is the next thing you

17  did?

18   A.   Told him to drop down to his knees.

19   Q.   And did he do that?

20   A.   I had to tell him several times.  I believe at

21  that point, too, he dropped his hands again.  I told him

22  to get his hands back up.  I was having to give the vast

23  majority of my commands several times.  He seemed

24  reluctant to follow my commands but, eventually, after

25  several commands, he did drop down to his knees.

1      Q.   Approximately how many commands did you have to

2   make before he dropped to his knees?

3      A.   I estimate two to three.

4      Q.   At that point were you yelling?

5      A.   Yes.

6      Q.   Did he say anything in response?

7      A.   Not that I heard.

8      Q.   Did you ever hear him say anything in response to

9   any of your commands?

10      A.   No, not that I heard.

11      Q.   When he initially dropped to his knees, was he

12   kneeling and facing toward you?

13      A.   Yes.

14      Q.   On both knees?

15      A.   I don't recall.  At that point I simply tell a

16   person to drop down to their right next and then their

17   left knee.  I would assume it was in some sort of that

18   fashion and he eventually got down on both knees, as I

19   recall.

20      Q.   And where was his hands at this point?

21      A.   As I said, he had dropped his hands.  I had

22   called him to get back up.  There was a point at

23   which when I was telling him to do this he was on both his

24   knees and his hands were in the air.

25      Q.   And then what happened next?

1      A.   I told him to put his hands on the ground in

2   front of him.

3      Q.   Did he do that?

4      A.   Yes.

5      Q.   Did he put his hands with open palm on the ground

6   in front of him?

7      A.   I couldn't tell.  It was rather dark out.  He put

8   his hands out on the ground in front of him.

9      Q.   Could you see his hands?

10      A.   I couldn't see if there was really anything in

11   his hands.  I could just see that they were on the ground

12   and I couldn't tell if he had, you know, splayed fingers

13   or he had it on the side of his hands or what, but his

14   hands were on the ground in front of him.  I couldn't see

15   anything with real definition.

16      Q.   And you couldn't tell if he was with open palms

17   or his fists?

18      A.   I couldn't tell, no.

19      Q.   And then what happened?

20      A.   I told him to slide away from his hands until he

21   was flat on his stomach.

22      Q.   And what did he do?

23      A.   He didn't comply initially, but after a few times

24   he eventually did that.

25      Q.   And how many times did you have to make that

1    command before he complied?

2        A.    I'd say two to three again.

3        Q.    And then what happened after he complied with

4    that command?

5        A.    He went down to his stomach, he dropped to his

6    stomach and he was down there for approximately a second.

7        Q.    And then what happened?

8        A.    He pushed himself back up, got back up on to his

9    knees.

10       Q.    Were his hands still on the ground?

11       A.    No, I believe at that point they were at his

12   side, although I don't recall specifically, but he pushed

13   up and raised up off the ground.

14       Q.    And was he facing you?

15       A.    Yes.

16       Q.    And what happened next?

17       A.    I told him to get back on the ground -- oh,

18   excuse me.  Take a step back there.  I began yelling, do

19   not get up, do not get up, get on your stomach, that sort

20   of thing.  He rose up.  I again told him get on his

21   stomach again.

22       Q.    And what's the next thing he did?

23       A.    After several commands, as I recall, he went back

24   down to his stomach.  And at that point I began telling

25   him to get his arms out and get his arms out.  At that

1  point he essentially pushed up and sprinted directly at

2  me.

3      Q.   Can you describe how he stood up at that point?

4      A.   He didn't stand up.  Essentially, what happened

5  is he kind of brought his arms in to kind of a pushup

6  position.  He did essentially a pushup and his body got

7  into somewhat of a mod- -- I want to describe it like a

8  modified sprinter stance with, you know, kind of the back

9  arched.  I remember seeing like his shoulders and his

10  head, and then he went from pushup to that sprinter stance

11  and then directly at me.

12      Q.   Sprint?

13      A.   Sprinting, yes.

14      Q.   And leaning forward?

15      A.   Yes.

16      Q.   And what's the next thing that happened?

17      A.   It was all happening extremely rapidly.  I felt

18  like I was yelling, but it seemed like my vision went

19  directly on to him.  I heard something reminiscent like a

20  bang, clack or a bang, clack, clack.  It was a bang and a

21  clack.  It was just two distinct sounds.  And what seemed

22  like an instant after that, I remember thinking to myself,

23  oh, my God, he's still coming, he's not stopping.  And

24  once he had gotten to within about 10 to 15 feet of me, I

25  felt that he was coming to kill me, kill my partner, take

HANNAH KAUFMAN & ASSOCIATES, INC.

1   my gun, so I pulled the trigger.

2       Q.   Okay.  Now, you said bang and clack?

3       A.   Yes.

4       Q.   The bang that you heard, did you associate that

5   with a particular weapon that was at the scene?

6       A.   It was very -- very kind of strange to me.  The

7   sound was -- it seemed altered.  When my gun fired I

8   didn't even hear it.  I just heard a sound like a pop.  I

9   did not hear Patty's shot, even though she was just to my

10  right.  I can only assume that with the two distinct

11  sounds, it may have been, like guessing --

12          MS. FOWLER:  Don't guess.

13          THE WITNESS:  Oh.  In my estimation at that point

14  I assumed it was the Sage round, the fire, and then the

15  coil of the spring-loaded chambers for additional Sage

16  rounds will rotate.  So if you fire a shot it rotates to

17  get to the next shot because it makes kind of a distinct

18  sound.

19          MR. SCOTT:  Q.  And you heard that sound?

20      A.   Yes, that's I what believed it was.

21      Q.   So you heard -- was that the bang, clack?

22      A.   I think.

23      Q.   All right.  And when you heard the bang, clack,

24  did it appear to you that Mr. Desantis was wounded?

25      A.   No, he just kept coming.

```
 1        Q.    So you didn't hear or see anything to -- that
 2   would indicate to you that he'd been hit?
 3        A.    No.
 4        Q.    Correct?
 5        A.    Hm-m.
 6        Q.    Correct?
 7        A.    Correct.  That is correct, yes.
 8        Q.    You didn't think he'd been hit?
 9        A.    No.
10        Q.    Did you hear a rifle fired?
11        A.    Say again.
12        Q.    Did you hear a rifle being fired?
13        A.    Not with any certainty, no.
14        Q.    So the only thing you recall hearing was the
15   bang, clack from what you think was the Sage?
16        A.    Yes.
17        Q.    And approximately how much time passed from when
18   you heard the bang, clack of the Sage to the time you
19   fired?
20        A.    It was really enough for me to think that, oh, my
21   God, he's not stopping.  Within a second.
22        Q.    Okay.  So a second or less?
23        A.    Yeah.
24        Q.    Are you familiar with the term shoot and assess?
25        A.    Not entirely.
```

1    Q.   Had you ever heard that term used in any

2  training?

3    A.   We were trained to shoot to stop, followed by an

4  area assessment.

5    Q.   What is area assessment?

6    A.   The way I was trained in the Contra Costa academy

7  was to shoot to stop, that is, shoot until the threat has

8  stopped, that the threat is no longer a threat to you, at

9  which time you essentially assess the area for any other

10 threats, other threats to anybody else, you, yourself,

11 that type of thing.

12   Q.   Have you ever been trained to try to determine if

13 the person you shot had been hit before you fire another

14 shot?

15   A.   To assess if the person had been hit?

16   Q.   Yes.

17   A.   No.

18   Q.   Okay.  How many shots did you hear fired, total?

19   A.   Shots from what?

20   Q.   From anything.  When you were there.

21   A.   I heard the bang, clack and my -- and my pistol,

22 and that was it.

23   Q.   So you did not hear the rifle?

24   A.   No.

25   Q.   Correct?

1       A.   No, I did not.

2       Q.   Well, let me ask it this way.  Did you hear a

3  rifle fire?

4       A.   Not that I could hear, not that I could

5  distinguish.

6       Q.   Did you hear your gun discharge?

7       A.   Yes.

8       Q.   Did you hear Officer Mann's gun discharge?

9       A.   No, I did not.

10      Q.   Why did you only fire one shot?

11      A.   Because immediately after I fired my shot, he

12  went down.

13      Q.   And I think you've described how he fell.  After

14  he fell, what's the next thing you did?

15      A.   At that point we -- still with guns drawn.  He

16  was not moving.  We approached to take him into custody.

17      Q.   Oh.  I'd like to get back to this diagram, and if

18  you could -- have you got a pen handy or -- yeah, you have

19  one there.  Next to the X could you put the number 1

20  there.  So when you were talking about when you first got

21  there and they were talking -- the man and the woman were

22  talking by the front door, that would be number 1.

23      A.   M-hm.

24      Q.   Could you give me an approximation -- and write

25  in number 2 there -- where Mr. Desantis was when he went

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _28th_

day of _____ _November_, _2007_.

_Judy L. Manfred_
Certified Shorthand Reporter
CSR No. _4748_