**EXHIBIT G**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


PATRICIA DESANTIS,
individually and as Successor
in Interest for RICHARD
DESANTIS, deceased, and as
Guardian Ad Litem for DANI
DESANTIS, a minor and TIMOTHY
FARRELL, a minor,

        Plaintiffs,

vs.                                    CASE NO. C 07 3386 JSW

CITY OF SANTA ROSA, JERRY
SOARES, RICH CELLI, TRAVIS
MENKE, PATRICIA MANN and DOES
1 through 25, inclusive,

        Defendants.
_____/

**CERTIFIED COPY**


DEPOSITION OF PATRICIA MANN

November 15, 2007


Reported by:                HANNAH KAUFMAN & ASSOCIATES, INC.
JUDY A. MANFRED             Certified Shorthand Reporters
CSR No. 4748                     472 Pacheco Street
                        San Francisco, California 94116
                             (415) 664-4269

```
 1      Q.   And were there gunshot residue tests done on you,
 2   do you know?
 3      A.   No.
 4           MS. FOWLER:  No, you don't know or, no, there
 5   wasn't.
 6           THE WITNESS:  No, there wasn't -- it was not done
 7   on me.
 8           MR. SCOTT:  Q.  And how many shots did you fire?
 9      A.   One.
10      Q.   And when you fired your shot how far was
11   Mr. Desantis from you?
12      A.   Approximately 15 feet.
13      Q.   And was he sprinting in your direction?
14      A.   Yes, he was charging at me.
15      Q.   But would it be fair to say he was sprinting?
16      A.   Yes.
17      Q.   And where did you aim when you fired?
18      A.   Center mass, the center of his body.
19      Q.   Did you hit him?
20      A.   I do not know.
21      Q.   All right.  Have you learned that one of the
22   shots fired that night missed Mr. Desantis and hit his
23   house?
24      A.   Yes.
25      Q.   How did you learn that?
```

1    else present?

2        A.   Initially, no.  I just saw one other patrol car.

3    It was not until I parked and exited my patrol car that I

4    saw other officers.

5        Q.   And when you arrived at the house was it your

6    understanding that shots had been fired inside the house?

7        A.   Yes.

8        Q.   When you arrived at the scene was it your

9    intention to use your car for cover?

10       A.   No.

11       Q.   Why not?

12       A.   I needed to make a tactical approach to the

13   residence so I parked my car further away from the scene.

14       Q.   How far away from the scene?

15       A.   Approximately half a block.

16       Q.   And when you arrived was someone in charge,

17   someone in command of the scene?

18       A.   Yes.

19       Q.   Who was in command?

20       A.   I heard over the radio while I was driving to the

21   scene that Sergeant Rich Celli stated he would be in

22   charge of the tactical operations on the scene and that

23   Sergeant Jerry Soares would be in charge of radio

24   communication.

25       Q.   And when you arrived at the scene was Sergeant

1    A.   No, I did not.

2    Q.   All right.  So you had information that shots had

3  been fired shortly before you arrived, correct?

4    A.   Yes.

5    Q.   But when you arrived you did not hear any shots

6  fired, correct?

7    A.   Correct.

8    Q.   Did you have information that anyone had been

9  shot?

10   A.   No.

11   Q.   And was the information that -- at least as far

12  as you knew, that no one had been shot?

13   A.   Just the information that was provided to me

14  through dispatch, no.

15   Q.   And I guess if we looked at the transcript of

16  what was on the air that night, whatever you heard would

17  be what you knew?

18   A.   Correct.

19   Q.   Did you have any information other -- about what

20  was going on in the house, other than what you heard on

21  the dispatch?

22   A.   No.

23   Q.   How long were you at the scene before you saw --

24  first saw Sergeant Celli?

25   A.   Less than a minute.

SAWNAH KAUFMAN & ASSOCIATES, INC.

1   the bean bag gun in the trunk of his car?

2        A.   Not to my knowledge.

3        Q.   And did Officer Ellsworth have the bean bag

4   shotgun in his vehicle?

5        A.   Not to my knowledge.

6        Q.   You don't know or --

7        A.   I don't know.

8        Q.   To your knowledge, did any of -- I guess there

9   were at least six officers at the scene.  At least I'm

10  aware of Officer Menke, Officer Ellsworth, you, Officer

11  Jones, Sergeant Celli and Sergeant Soares.

12       A.   Correct.

13       Q.   Does that sound right?

14       A.   Yes.

15       Q.   And when the shooting occurred was it just the

16  six of you or was there anyone else present, to your

17  knowledge?

18            MS. FOWLER:  Police officers?

19            MR. SCOTT:  Q.  Police officers.

20       A.   To my knowledge, we were the only officers on

21  scene.

22       Q.   And did you understand that other officers were

23  coming to the scene, that other officers had been called?

24       A.   I -- prior to shots being fired?

25       Q.   Yes, prior to shots being fired.

DEPOSITION OF PATRICIA MANN                                    67

1    MS. FOWLER:  Other than what she's already

2  testified to --

3    THE WITNESS:  Right.

4    MS. FOWLER:  -- about the person?

5    MR. SCOTT:  Q.  Right, other than what you

6  testified to?

7    A.  Yeah, other than that, no.

8    Q.  Approximately how long was it -- your best

9  estimate -- in terms of seconds or minutes, from the time

10  you arrived and took a position, till the time shots were

11  fired?

12    A.  Approximately two minutes.

13    Q.  During those approximate two minutes -- and I

14  understand this is just an approximation, an estimate, but

15  during that period of time, did you talk to Sergeant Celli

16  or did he talk to you?

17    A.  No.

18    Q.  And during that approximate two minutes, did you

19  talk to Sergeant Soares or did he talk to you?

20    A.  No.

21    Q.  And during that approximate two minutes, did you

22  talk to Officer Jones or did he talk to you?

23    A.  No.

24    Q.  Okay.  And when you took that position did you

25  understand that there was a tactical plan that was being

1  initiated?

2       A.   I understood that Sergeant Celli would be in

3  command of tactical operations.  As far as what level he

4  had a plan, no, I don't.

5       Q.   What does it mean to be in command of tactical

6  operations?

7       A.   It just means that he would be the one

8  instructing us on what to do.  I mean, I'm trying to

9  explain it somewhat simply.

10      Q.   Well, the simpler the better for me.

11      A.   Yeah.  Just as far as if our positioning needed

12  to be changed, if we were going to make any kind of

13  movements, that those instructions would come from the

14  tactical commander on scene, which would have been

15  Sergeant Celli.

16      Q.   Okay.  After you took the position that you've

17  described in Exhibit number 1, did you communicate with

18  Mr. Desantis or his wife or anyone else at the scene,

19  other than briefly with the neighbor at 633 South Avenue?

20      A.   I'm sorry.  Can you repeat that for me?

21      Q.   Yes.  From the time you arrived at the position

22  you've identified in Exhibit 1, from that point till the

23  time that shots were fired, did you talk to anyone else at

24  the scene or did anyone else at the scene -- this would

25  include Mr. and Mrs. Desantis or anyone else -- at the

```
 1   was at the scene?
 2          MS. FOWLER:  When she first saw him?
 3          MR. SCOTT:  Q.  Yes, when you first saw
 4   Mr. Desantis.
 5      A.  When I first saw him, no.
 6      Q.  Okay.  Now, when you heard Officer Menke start
 7   making commands, how long had you been at the location
 8   before you heard Officer Menke start making those
 9   commands?
10      A.  I had been in that position for less than ten
11   seconds.
12      Q.  Okay.  And you heard Officer Celli tell Officer
13   Menke to make the commands?
14      A.  Yes.
15          MS. FOWLER:  Sergeant Celli.
16          MR. SCOTT:  Q.  I'm sorry.  Thank you.  Sergeant
17   Celli.  So when you saw Mr. Desantis near the front steps,
18   he was there when Officer Menke first started making
19   commands in response to Sergeant Celli's commands?
20      A.  From what I can recall, yes.
21      Q.  Fair enough.  This is only what you can recall.
22      A.  Right.
23      Q.  And after about ten seconds did Mr. Desantis
24   finally move in what might have been in response to
25   Officer Menke's commands?
```

DEPOSITION OF PATRICIA MANN                          82

1    A.   Very reluctantly.

2    Q.   Okay.  And at some point did he go on his hands

3  and knees?

4    A.   At some point, yes.

5    Q.   Okay.  Approximately how much time passed from

6  when Officer Menke started making the commands to the time

7  Mr. Desantis was on his hands and knees?

8         MS. FOWLER:  For the first time?

9         MR. SCOTT:  Q.  For the first time.

10   A.   For the first time, approximately a minute and a

11  half.

12   Q.   Okay.  And can you put a number 2 in the

13  approximate location Mr. Desantis was in the first time he

14  went on his hands and knees.  And we'll call that number

15  2.  Okay.  If you could circle that.

16        And how many times did you see -- or how many

17  positions geographically was Mr. Desantis in when he went

18  on his hands and knees before he was shot?

19   A.   What do you mean, how many different positions?

20   Q.   Well, did he go on his hands and knees someplace

21  other than approximately where number 2 is, or was that

22  whenever he went on his hands and knees it was that

23  approximate location?

24   A.   It was that approximate location.

25   Q.   Fair enough.  And once he got to what we're

1  ground when Officer Menke instructed him multiple times to

2  do so.

3        Then Mr. Desantis pushed himself -- his upper

4  body off of the ground -- before he was completely in the

5  prone position, pushed his upper body off the ground, back

6  up on to where he was standing up on his knees.  At that

7  point Officer Menke was yelling at him to get back down on

8  the ground, as was I.  I was yelling at him, you know, to

9  stop, get gown, stay down, numerous times.

10        Mr. Desantis then stood fully upright.  I recall

11  seeing Mr. Desantis look over his shoulder and I believe

12  it was -- I believe it was his left shoulder, as if he was

13  looking back towards the house or towards a back fence --

14  the fence at the end of the driveway, and then immediately

15  turned, looked straight at myself and Officer Menke, and

16  charged at us.

17    Q.   Was Mrs. Desantis still in the area of the front

18  door of the house at that time?

19    A.   I did not see her.  I believe she had gone back

20  inside the house.  I don't know how close to the door she

21  was standing.  I no longer had a visual on her.

22    Q.   When Mr. Desantis was on his hands and knees,

23  were you able to see his hands?

24    A.   Yes.

25    Q.   And what was he wearing?

1   light was coming from inside the residence.

2       Q.   Did you ever see a gun in his hand?

3       A.   No.

4       Q.   Did you ever see a gun on his person?

5       A.   No.

6       Q.   Okay.  Did -- now, when he got up from that

7   location -- at approximately number 2 on the diagram --

8   when he got up from that position, did he charge straight

9   in your direction?

10      A.   Yes.

11          MS. FOWLER:  Just for the record, that's

12  ambiguous because she said he got up several times.  So

13  you're talking about the time he got up right before he

14  charged?

15          MR. SCOTT:  Q.  Right, the time he got up before

16  he charged.  And how long was he standing when he got

17  up -- the last time he got up to the time he charged?  Did

18  he stand up, delay and charge, or was it kind of one

19  motion, he stood up and charged?

20      A.   I've already stated that when he stood up I saw

21  him look over his shoulder back towards the house or the

22  back fence, the driveway, then turn and immediately charge

23  in my direction.

24      Q.   Okay.  Thank you.  I forgot that.  And

25  approximately how long was he standing and looking back

1   over his shoulder before -- how long did that last, from

2   that looking backward to turning around and then charging?

3       A.   Approximately three seconds.

4       Q.   Oh.  And, now, when -- did you have your Taser

5   with you on your duty belt that night?

6       A.   Yes, I did.

7       Q.   And when he was on the ground and you could see

8   that he had nothing in his hands, did you consider taking

9   -- holstering your weapon and taking out your Taser?

10      A.   No, I did not.

11      Q.   Okay.  Any reason why you didn't?

12      A.   He was out of range for the Taser.

13      Q.   Okay.  That would have been about 40 feet?

14      A.   His distance -- approximately his distance from

15  where I was, yes, 40 feet, approximately.

16      Q.   All right.  And would you characterize his

17  movement toward you as a sprint?

18      A.   Yes, he was charging at us; he was sprinting at

19  us, yes.

20      Q.   Have you ever been to a track meet?

21      A.   Yes.

22      Q.   Did you run track?

23      A.   A long time ago, yes.

24      Q.   In high school?

25      A.   Junior high.

1    Q.   Okay.  Were you a sprinter?

2    A.   Yes.

3    Q.   Okay.  You run the hundred?

4    A.   Yes, and the four-by-four.

5    Q.   All right.  Me too in high school.  And did you

6  -- would you say that he was -- based on your experience

7  in junior high school, track and being a sprinter, would

8  you characterize what he was doing as sprinting toward

9  you?

10   A.   Yes.

11   Q.   All right.  And his legs were churning?

12   A.   Yes.

13   Q.   And his hands and arms were moving like a

14  sprinter?

15   A.   His hands and arms were moving very rapidly.

16   Q.   Consistent with sprinting?

17   A.   Not exactly, no.

18   Q.   What was it about his arms that was not

19  consistent with sprinting?

20   A.   I do not recall seeing his fists closed or in a

21  sprinter's position where they might have their hands {}

22  bladed like this.  His hands were open and loose; they

23  weren't straight in a -- along his sides.  He was waving

24  them around and his right hand kept dropping out of my

25  sight because when he was charging at us he kept bringing

1  his hand down and I would lose sight of it behind his

2  back.

3      Q.  Okay.  And did he bring his left hand down while

4  he was sprinting also or just his right hand?

5      A.  He brought his left hand down as well, but I was

6  able to maintain a visual on the left hand.

7      Q.  So because of the angle as he was sprinting you

8  would lose sight of his right hand as he was sprinting

9  because just the way his arms were moving?

10     A.  No.  He was running straight at me.  The reason

11 why I lost sight of his right hand is because as I saw it

12 it kept going behind his back.

13     Q.  For how long?

14     A.  With each stride.  Every time he would bring his

15 arm up and bring it back in more like a running stride, it

16 would go back behind his waist.

17     Q.  And how many strides did he take in your

18 direction from location number 2 to the time you heard the

19 first shot fired?

20     A.  I don't know how many strides.  I can estimate

21 distance of how long.

22     Q.  Okay.  Approximately how far had he gone while he

23 was sprinting to the time you heard the first shot?

24     A.  I believe -- I estimate that Mr. Desantis, when

25 he started charging us, ran or sprinted approximately ten

1    feet and then the Sage weapon was fired.

2        Q.   And approximately how many strides did he take to

3    cover that ten feet?

4        A.   I --

5            MS. FOWLER:   It's already been asked and

6    answered.  She said she couldn't answer.

7            THE WITNESS:   I don't know.

8            MR. SCOTT:   Q.   And did you know -- well, when

9    you heard the first shot fired, did you know it was from

10   the Sage?

11       A.   Yes, I did.

12       Q.   And how did you know that?

13       A.   It has a completely different sound than a

14   firearm.

15       Q.   All right.  And so from your training,

16   experience, you knew from the sound that it was a Sage?

17       A.   I knew from the sound that it was not a firearm.

18   I honestly cannot remember if I knew it was specifically

19   the Sage.

20       Q.   And after you heard what you believed was the

21   Sage being fired, what's the next thing you observed?

22       A.   I remember hearing some sort of, like, thud and

23   then seeing Mr. Desantis slow his pace just for one second

24   and then he didn't collapse, but he kind of, like, leaned

25   his shoulder down.

1    Q.   And after you heard the thud, were you attempting

2    to determine where it may have struck Mr. Desantis?

3    A.   No, there was no time.

4    Q.   Okay.

5    A.   Like I said, he maybe stalled for less than a

6    second before continuing to charge at me.

7    Q.   And when you say he stalled, what do you mean by

8    that?

9    A.   That's when he broke his stride and leaned his

10   shoulder down and that was for less than a second and...

11   Q.   When you say broke his stride, do you mean he

12   went from more of a sprint to a jog or did he actually

13   stop?

14   A.   He -- no, he did not stop.  He just slightly

15   slowed down.

16   Q.   So more -- it became more of a jog than a sprint?

17   A.   He was running.

18   Q.   All right.

19   A.   And that's faster than a jog, in my

20   interpretation.

21   Q.   Fair enough.  Oh, it is.  Running is faster than

22   a jog.  So he was still sprinting, he just was slowed down

23   a little bit?

24   A.   Again, for less than a second, so it was maybe

25   one stride.

1 did you consider taking a position of cover?

2     MS. FOWLER:  Beyond the ones she initially

3 described?

4     MR. SCOTT:  Q.  Yes.

5     A.  There was none available to me.

6     Q.  Well, if you had gotten behind Officer Menke,

7 would you have had cover?

8     A.  I would have.  However, I would have taken lethal

9 cover away from Officer Ellsworth because I would have no

10 longer been able to hold my firearm on target with

11 Mr. Desantis.

12     Q.  Right.  Do you know how many people at the scene

13 were pointing lethal weapons at Mr. Desantis when he was

14 in the kneeling position?

15     A.  I knew for a certainty that it was myself,

16 Officer Menke, Officer Jones and Sergeant Celli, just

17 because I had seen them.

18     Q.  Did you think for your safety and the safety of

19 the other officers you needed to have four guns pointed at

20 Mr. Desantis?

21     A.  Yes.

22     Q.  Oh.  And why did you think that?

23     A.  We still did not know if he had a weapon hidden

24 on his person somewhere.  And at any point in time had he

25 had a weapon he could have gone for it and started firing

1    A.    Yes.

2    Q.    When were you first trained in that?

3    A.    In the military police.

4    Q.    And were you also trained at the Santa Rosa

5  Police Department?

6    A.    Yes, during the academy.

7    Q.    Was it similar or different, the training you got

8  from the military police, compared to the police

9  department?

10   A.    Similar.

11   Q.    And what training did you receive in terms of to

12  shoot and assess?

13        MS. FOWLER:  At the military or the Santa Rosa

14  Police Department?

15        MR. SCOTT:  Q.  Santa Rosa Police Department.

16   A.    Pretty much exactly how it sounds:  If you have

17  to shoot at a suspect, that you shoot and assess the

18  situation to determine whether continued lethal force is

19  necessary.

20   Q.    Okay.  Now, we haven't talked yet about Sergeant

21  Celli's shot.  After you heard the thud from what was the

22  Sage, did you hear -- what was the next shot you heard

23  fired?

24   A.    A rifle round.

25   Q.    And you could tell it was a rifle round?

1      Q.   Are these targets, are these silhouettes of
2    persons or something else?
3      A.   They are silhouettes of people or persons.
4      Q.   So since you saw him hit a target, a silhouette
5    at a hundred yards, you felt that the night of this
6    shooting that when you heard his rifle being fired, would
7    it be fair to say you assumed that he shot -- that he hit
8    Desantis?
9      A.   I did not make any assumptions of whether or not
10   he hit Mr. Desantis.
11     Q.   Now, after he fired did you hear a thud or
12   anything like that?
13     A.   No, I just heard the round being fired.
14     Q.   And after he fired the rifle, did you see it have
15   any effect on Mr. Desantis?
16     A.   No.
17     Q.   And how much time passed from when Sergeant Celli
18   fired his rifle to when you fired your weapon?
19     A.   Less than a second, or approximately a second,
20   right around there.
21     Q.   And during that second were you attempting to
22   assess what impact the thud and the rifle shot had on
23   Mr. Desantis?
24     A.   I believe I already did assess the situation at
25   that point.

1    Q.   And did you think that he was running towards you

2  with a bullet and a projectile in him or did you think

3  that he had not been hit?

4    A.   I believed that he had been hit with a

5  projectile.  I did not know whether or not he had been hit

6  with a rifle round.

7    Q.   And so it would have been about a second or less

8  to when you heard the rifle fired to when you fired?

9    A.   Correct.

10   Q.   Did you fire before or after Mr. Officer Menke?

11   A.   After.

12   Q.   About how much time after?

13   A.   Less than half a second.  His -- I heard his

14 shot.  I was already almost completely done with my

15 trigger pull at that time, so I heard his shot and then

16 immediately mine.

17   Q.   Are you familiar with the term sympathetic

18 gunfire?

19   A.   Yes.

20   Q.   Have you been trained about that?

21   A.   Yes.

22   Q.   When were you first trained about it?

23   A.   In the military police.

24   Q.   And what did you learn in that training from the

25 military police about sympathetic gunfire?

1   necessary to take a subject into custody, stop resistance,

2   and prevent escape.

3       Q.   Okay.   And what types of resistance would warrant

4   the use of the medium types of force, whether it's impact

5   weapons, batons, Tasers, canines, things like that?

6           MS. FOWLER:   I object.   Incomplete hypothetical,

7   calls for speculation.

8           MR. SCOTT:   Q.   Go ahead.

9       A.   I would need more of a specific example.   It

10  would vary.

11      Q.   Well, based on your training, can you give me

12  examples of the different levels of resistance that would

13  warrant you resorting to this medium amount of force?

14          MS. FOWLER:   Again, speculative, incomplete

15  hypothetical.   There are many factors that go into it.

16          MR. SCOTT:   Q.   Go ahead.

17      A.   That would be my answer.

18      Q.   Okay.   Now, when Mr. Desantis was running toward

19  you, when he got up from position number 2 and was running

20  in your direction, did you believe that he was going to

21  kill you?

22      A.   Yes, either myself, Officer Menke, Officer

23  Ellsworth.

24      Q.   And how did you think he was going to kill you?

25      A.   There was a variety of ways he could have, all of

1   which went through my mind; that he was still armed and
2   would present that weapon and use it against me or another
3   officer.

4       Q.   Okay.

5       A.   That he could physically take my gun away from me
6   or Officer Menke's gun away from him or start wrestling
7   with Officer Ellsworth in an attempt to disarm him.

8       Q.   What else were you worried about?

9       A.   Well, just him physically fighting with me and
10  resulting in serious injury or death.  Again, also,
11  physically fighting with any of the other officers on
12  scene.

13      Q.   Okay.  So you thought that because shots had been
14  fired earlier and because he was running at you, that he
15  was an imminent threat to your life?

16      A.   As well as the other officers on scene, and
17  anyone else who may have been in the area.

18      Q.   Did you believe that he was assaulting you with a
19  deadly weapon?

20      A.   Can you be more specific with that?

21      Q.   No, I don't think I can.

22      A.   Okay.

23      Q.   When he was running toward you, did you believe
24  he was assaulting you with a deadly weapon?

25      A.   I'm trying to think how to explain this.  I

DEPOSITION OF PATRICIA MANN                               123

1  believe that he had the capability and means to severely

2  injure or kill myself, as well as everyone else around me.

3     Q.   Okay.  And when you pulled the trigger, did you

4  believe that he was assaulting you with a deadly weapon?

5     A.   In the explanation I just gave.

6          MS. FOWLER:  Asked and answered.

7          MR. SCOTT:  Q.  And what was he doing to assault

8  you with a deadly weapon?

9     A.   He was charging at myself and Officer Menke.

10    Q.   Okay.  That's all the questions I have.  Thank

11 you for your time.  Thank you for being here.

12    A.   Thank you.

13         MR. SCOTT:  We're adjourned.

14         THE VIDEOGRAPHER:  This marks the end of the

15 deposition of Patricia Mann on November 15th, 2007.  The

16 time now is 1:02.  The original videotapes will be

17 retained by Dan Mottaz Video Productions, LLC, 182 Second

18 Street, Suite 202, San Francisco, California, 94105.

19 415-624-1300.  We are off the record.

20         THE REPORTER:  Counsel, copy?

21         MS. FOWLER:  Yes, please.

22              (Whereupon the deposition was

23               concluded at 1:02 p.m.)

24         _____

25              PATRICIA MANN

DEPOSITION OF PATRICIA MANN                    124

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _____

day of _____November_____ , 2007.

_____
Certified Shorthand Reporter

CSR No. _4748_