**EXHIBIT J**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

PATRICIA DeSANTIS,                      )
individually and as Successor           )
in Interest for RICHARD                 )
DeSANTIS, deceased, and as              )
Guardian Ad Litem for DANI              )
DeSANTIS, a minor,                      )
                                        )
            Plaintiffs,                 )
                                        )
    vs.                                 )
                                        )  No. C-07-3386 JSW
                                        )
CITY OF SANTA ROSA, JERRY               )
SOARES, RICH CELLI, TRAVIS              )
MENKE, PATRICIA MANN, and DOES          )
1 through 25, inclusive,                )
                                        )
            Defendants.                 )
                                        )
_____ )

DEPOSITION OF JERRY SOARES

December 20, 2007

REPORTED BY:  A. MAGGI SAUNDERS,

C.S.R. No. 2755

```
 1   records, I really -- I mean, I can't answer, you know,

 2   to be specific as to the number of times.

 3          Q.    How many do you recall?

 4          A.    [No audible response].

 5          Q.    You mentioned one within the last five

 6   years.  Do you recall any others?

 7          A.    Probably about three, I would think, in my

 8   time at Santa Rosa.

 9          Q.    Now, do you recall the shooting incident

10   out of which this lawsuit arises?  Do you have a

11   present recollection of the event and circumstances

12   leading up to the shooting?

13          A.    Yes.

14          Q.    Okay.  And did you shoot Richard DeSantis

15   with a Sage?

16          A.    Yes.

17          Q.    Why?

18          A.    At the time he posed an immediate threat

19   to the officers that he was charging.

20          Q.    Okay.  And how many rounds did you fire?

21          A.    One.

22          Q.    And why didn't you fire a second shot?

23          A.    I was assessing, and. . .

24          Q.    When you say "assessing," what do you mean

25   by that?
```

```
 1          A.    After I fired the first round and it
 2   struck him, I was reassessing if I needed to deploy,
 3   you know, other rounds.
 4          Q.    Is that what you were trained to do?
 5          A.    Yes.
 6          Q.    And what -- When you were assessing, does
 7   that mean you were waiting to see what impact the first
 8   shot had on him, if it was going to cause him to drop
 9   or stop, or. . .
10          A.    Yes.
11          Q.    And the desired effect was to get him to
12   stop running towards the other officers, is that it?
13          A.    Yes, to start -- you know, charge towards
14   the other officers, yes.
15          Q.    Right.  And you shot to stop him from
16   charging.
17          A.    Yes.
18          Q.    Okay.  And after you shot, you were
19   waiting to assess to see if that shot was going to stop
20   him.
21          A.    Yes.
22          Q.    Okay.  And so, you were looking to see the
23   impact.
24          A.    Yes.
25          Q.    And what impact did that shot have on him?
```

```
 1          A.    After it struck him, he -- he turned to
 2    his -- he turned to his left, just his upper body,
 3    and...
 4          Q.    Towards you?
 5          A.    I wouldn't necessarily --
 6                I mean, yes, towards -- towards me, but
 7    just his upper body, but he was still moving in the,
 8    you know, in that same diagonal direction towards the
 9    other officers that were on the other side of the
10    driveway to my -- it would be to my left.
11                And then, he looked -- looked down towards
12    his left, and both his hands went to his left side;
13                And then he was -- like, he was
14    recovering after the impact, and continuing to move
15    forward.
16          Q.    All right.  Now, when -- when he put his
17    hands to his left side, were you able to see both
18    hands?
19          A.    Yes.
20          Q.    All right.  Was there anything in his
21    hands?
22          A.    No.
23          Q.    Did you ever see a weapon in his hands?
24          A.    No.
25          Q.    Did you ever see a weapon on his person?
```

```
 1   take place, you know, to the officer.
 2              I mean, a situation can change
 3   dramatically, whether it can be a lethal or a less
 4   lethal force.
 5         Q.    All right.  Now, in this situation, you
 6   fired your Sage round.  Did you aim at center mass of
 7   Richard DeSantis?
 8         A.    Yes, I aimed at, you know, and a little
 9   below, I would say below, a little below center mass.
10         Q.    And more towards his waist?
11         A.    Yes.
12         Q.    All right.  And why did you aim for his
13   waist area?
14         A.    In the training that we received in using
15   the -- using the Sage, that's -- you know, ideally,
16   that's, you know, the ideal target that you would want
17   to -- and to use the Sage to hit.
18         Q.    And how many rounds were in the Sage when
19   you fired it at Mr. DeSantis?
20         A.    There were six.
21         Q.    Six rounds?
22         A.    Yes.
23         Q.    Okay.  And when you were doing your
24   assessment after you fired the first round, how many
25   steps did Mr. DeSantis take when you were doing this
```

                                                    36

```
 1   assessment?
 2        A.    He took several.
 3        Q.    Okay.  And did it appear to you that
 4   the -- being shot with the Sage in any way slowed him
 5   down?
 6        A.    Momentarily.
 7        Q.    All right.  And when you say
 8   "momentarily," you mean for like a second?
 9        A.    That would probably be correct; about a
10   second, two at the most.
11        Q.    Okay.  And when it was slowing -- when he
12   put both his hand, both hands towards his left side,
13   was this after he had slowed down or before or during?
14        A.    Almost simultaneously.
15        Q.    All right.  And what did he do after he
16   put his two hands down his left side?
17        A.    He looked in that direction.
18        Q.    In the direction -- Did it appear to you
19   he was looking in the direction of where the shot was
20   fired from?
21        A.    No.
22        Q.    Okay.  Which -- In relation to you, was he
23   turning or looking slightly in your direction?
24        A.    No.  He was looking down towards his hands
25   and the left side of his body.
```

1      Q.   Okay.  And did it appear to you he was

2  looking in an area where you thought you had hit him?

3      A.   It appeared to be that's what he was, you

4  know, looking in that, you know, direction, yes.

5      Q.   Okay.  And so it appeared that he was

6  putting his left two -- his two hands towards his left

7  side, and looking at that area that he was putting his

8  hands towards?

9      A.   Yes.

10     Q.   All right.  So he looked down at his body.

11     A.   Yes.

12     Q.   Okay.  And what's the next thing he did

13  after he looked down at his body and put his -- both

14  his hands towards his left side?

15     A.   After a moment of looking at, he then

16  began turning back towards the officers that were,

17  again, on the -- on the west side of the driveway area,

18  you know, which was to my left.

19     Q.   Okay.  And at that point, were you getting

20  ready to fire a second round?

21     A.   Yes.

22     Q.   Okay.  And why didn't you fire a second

23  round?

24     A.   It was that moment then is when I saw

25  Sergeant Celli step up, and then -- and then I

```
 1   And then you were assessing, correct?

 2        A.    Yes.

 3        Q.    And you were about to fire a second shot,

 4   correct?

 5        A.    Yes.

 6        Q.    And then, as you were getting ready to

 7   fire a second shot, you saw Sergeant Celli to your

 8   right move into your field of vision?

 9        A.    Yes.

10        Q.    And he fired.

11        A.    Yes.

12        Q.    And that's why you didn't fire a second

13   shot.

14        A.    Well, let's say, not necessarily just

15   because of him.  There were two other shots that were

16   fired that I heard.

17        Q.    Before or after you heard Sergeant Celli's

18   shot did you hear the other two shots?

19        A.    Yes, after.

20        Q.    After.  All right.

21              Now, how soon -- Approximately how much

22   time passed from when you fired your Sage and did your

23   assessment and observed Mr. DeSantis put his hands down

24   to his side, and look down to his side, and then to

25   continue to proceed, how much time passed during this
```

45

```
 1   assessment from the time you fired to the time you
 2   heard Sergeant Celli's shot?
 3        A.    [No audible response]
 4             MS. FOWLER:  I think your question is a
 5   little ambiguous, so let me just make sure it's clear:
 6   You are asking from the time he fired until the time
 7   Celli fired.
 8             MR. SCOTT:  Yes, how much time.
 9             THE WITNESS:  Maybe two seconds.
10             MR. SCOTT:  Q.  Okay.  And how much
11   distance did Mr. DeSantis travel in those two seconds,
12   approximately how many feet, or how many steps?
13        A.    I mean, he had taken several steps.
14   [pause] About maybe five, six.
15        Q.    Steps in about two seconds?
16        A.    (Pause)  Yeah, I believe so.
17        Q.    Okay.  Now, do you recall being
18   interviewed by investigators within a couple days of
19   this shooting?
20        A.    Yes.
21        Q.    And were you aware that that interview was
22   tape-recorded?
23        A.    Yes.
24        Q.    And were you represented by an attorney at
25   that time?
```

46

```
 1  but he was spinning and turning to his left.
 2         Q.    Okay.  All right.
 3               So, when you fired your Sage, you
 4  believe he took approximately five or six steps after
 5  he was hit by the Sage?
 6         A.    Yes, they were staggered steps, but . . .
 7         Q.    All right.  And what do you mean by
 8  "staggered steps"?
 9         A.    That the -- reduced in speed, kind of
10  like -- I wouldn't say necessarily a stumble, but a
11  reduce in -- a notable reduce in speed, and kind of
12  like a stumble, a little bit --
13         Q.    Okay.
14         A.    -- in the step.
15         Q.    Okay.  So he was staggering or stumbling,
16  but still on his feet.
17         A.    Yes.
18         Q.    And were you going to fire another shot
19  because he hadn't fallen down, or were you going to
20  fire a second shot for some other reason?
21         A.    For another reason.
22         Q.    And what was the other reason?
23         A.    Because he was still going to continue his
24  charge towards the other officers.
25         Q.    With the staggered, stumbled steps.
```

```
 1          A.    At that point, no.

 2          Q.    Okay.  So he took several staggered,

 3  stumbled steps, and then he was -- then started moving

 4  where he wasn't staggered or stumbling?

 5          A.    Correct.

 6          Q.    Okay.  Approximately how many steps did he

 7  take that were staggered or stumbled?

 8          A.    (Pause)  I would say approximately, you

 9  know, four.

10          Q.    Okay.  And was this before or after he put

11  his hands down to his side and looked down at his side?

12          A.    When he took -- I'm sorry, the step --

13          Q.    The staggered, stumbled steps.

14          A.    That was about the same time, around --

15  about the same time as those steps is when he -- his

16  hands came to his left side, and he looked down to his

17  left.

18          Q.    Okay.  When he was doing the staggered

19  steps.

20          A.    Mm-hmm.

21          Q.    Slowing down.

22          A.    Yes.

23          Q.    And then after that, he seemed to

24  accelerate again?

25          A.    Yes.
```

52

```
 1          Q.    And because he seemed to have regained his
 2   balance and was now accelerating, that's when you were
 3   going to take the second shot.
 4          A.    Yes.
 5          Q.    And before you could take the second shot,
 6   you heard Sergeant Celli's shot?
 7          A.    Yes.
 8          Q.    Okay.  And how soon after Sergeant Celli's
 9   shot did you hear the other two shots, approximately
10   how much time passed?
11          A.    Maybe half a second.
12          Q.    Are you familiar with the term
13   "sympathetic gunfire"?
14          A.    I've heard the term used, yes.
15          Q.    In training?
16          A.    Yes.
17          Q.    And what does that term mean to you?
18          A.    The term usually means that sympathetic
19   fire from other officers will fire because they either
20   hear or see another officer fire a weapon, or hear
21   gunfire.
22          Q.    Okay.  Have you received any training in
23   relation to this phenomenon known as "sympathetic
24   gunfire"?
25          A.    You mean, as a topic of -- you know, that
```

                                                          53

```
 1          A.    Paperwork; you know, possibly on the

 2    computer; you know, looking at -- you know, staffing

 3    levels for the next day, and. . .

 4          Q.    All right.  Some of your supervisory

 5    functions.

 6          A.    Yes.

 7          Q.    Fair enough.

 8                And do you know what Sergeant Celli was

 9    doing at that time?

10          A.    No.  I know he was in the office, but I

11    don't know what he was involved in.

12          Q.    And do you know what Sergeant Sensley was

13    doing at the time?

14          A.    No; probably similar duties.

15          Q.    And when you -- Well, how did you hear

16    about the 911 call?

17          A.    It was -- In the office there is a radio,

18    you know, that we can hear calls that are being

19    dispatched out to the officers, and that's how we heard

20    it.

21          Q.    And do you recall what you heard, anything

22    specific about the dispatch?

23                MS. FOWLER:  When he initially heard it?

24                MR. SCOTT:  Q.  Yes.

25          A.    I heard officers were being dispatched to
```

1   the, you know, South Avenue address regarding gunshots

2   being fired inside -- inside the home, and that -- and

3   that -- and that there was a family inside the

4   residence.

5            I mean, I can't state verbatim what I

6   heard, but generally that's --

7        Q.   All right.  Just your best recollection.

8        A.   (Nodding head.)

9        Q.   I wouldn't expect you to remember exactly

10  what was said, I just want your best recollection of

11  the substance of what you recall.

12       A.   Mm-hmm.

13       Q.   And could you tell if it was officers

14  under your supervision who were being dispatched, or

15  not?

16       A.   There was a combination between the two --

17  between the two teams that were basically responsible

18  for that area of the city.

19       Q.   So did you understand that there were some

20  officers under your supervision that night who were

21  responding to the scene?

22       A.   Yes.

23       Q.   Okay.  And were you dispatched to the

24  scene by the Dispatcher?

25       A.   No.

66

1  are trained, in part, to protect officers from possible
2  assaults?

3          A.      The handlers.

4          Q.      Okay.  And do you understand the handler

5  can -- has the ability to have the dog attack someone

6  who is a perceived threat to the handler?

7          A.      (No audible response)

8          Q.      You don't know.

9          A.      I don't know.

10         Q.      Okay.  Were you afraid the dog was going

11  to get hurt that night?

12         A.      I don't know.  I mean, I wasn't thinking

13  about -- That was not on my mind.

14         Q.      Okay.  Was it on your mind that

15  Mr. DeSantis might go over and hurt the dog?

16         A.      [Pause]  No.

17         Q.      Okay.  Was it on your mind that

18  Mr. DeSantis might hurt one of the other officers?

19         A.      Yes.

20         Q.      And how did you think he was going to hurt

21  them?

22         A.      I don't know.

23         Q.      All right.  And were you afraid that the

24  officers at the scene wouldn't be able to protect

25  themselves from Mr. DeSantis?

                                                        77

```
 1           A.    Again, I don't know.

 2           Q.    All right.  Were you afraid that

 3    Mr. DeSantis might take one of the other officer's gun

 4    and use it against him or her?

 5           A.    That's one possibility.

 6           Q.    Is that why you shot?

 7           A.    Not solely for that reason, no.

 8           Q.    All right.

 9                 Were you afraid that the officers

10    there -- there were six of you, right, that you were

11    aware of?

12           A.    That I am -- was aware of, yes.

13           Q.    Okay.  Were you afraid that the six of you

14    wouldn't be able to subdue him in hand-to-hand combat?

15                 MS. FOWLER:  Well, I'm going to object

16    that that's an incomplete hypothetical.  It's also

17    vague and ambiguous, but if you can answer the

18    question, go ahead.

19                 THE WITNESS:  I mean, I don't know.  I'm

20    not familiar with the skill level of the other officers

21    in regards to hand-to-hand.

22                 MR. SCOTT:  Q.  Were you afraid that the

23    six officers and a canine, together with batons and OC

24    spray and their abilities in hand-to-hand combat, would

25    not be able to restrain Mr. DeSantis?
```

1          Q.    Okay.  And would a reason to be on the

2     ground to give an opportunity for an officer or

3     officers to approach and to put him in cuffs?

4          A.    That would be one, yes, in order to, you

5     know, control, you know, an individual in the

6     situation, to isolate that person and their movement,

7     for officer-safety reasons, to make, you know, a safe

8     approach.

9          Q.    Okay.  And so, once he was on the ground,

10    there would be an opportunity to make a safe approach?

11         A.    Once the -- you know, the situation was --

12    the officers felt that it was safe to do so -- I

13    wouldn't say stabilized, but the officers felt that it

14    was, you know, to make a safe approach.

15         Q.    Who?  Who would have to make that

16    decision, Sergeant Celli?

17         A.    Either Sergeant Celli, or myself, or one

18    of the other officers could make that, depending on,

19    you know, their vantage point and their view and what

20    they -- you know, what they seen.

21         Q.    Okay.  Did you think it would have been

22    unsafe for an officer to approach Mr. DeSantis when he

23    was prone on the ground?

24              MS. FOWLER:  Well, to the extent that's an

25    incomplete hypothetical and calls for speculation --

                                                      103

```
 1                    THE WITNESS:  I'm not --

 2                    MS. FOWLER:  -- but if you can answer, go

 3   ahead.

 4                    THE WITNESS:  Yeah, I mean, it's hard to

 5   say at that moment, because the situation wasn't

 6   stabilized; we didn't -- there wasn't control over Mr.

 7   DeSantis.  He was still moving.  He -- he wasn't, you

 8   know, adhering to the instructions that were given to

 9   him.

10                    MR. SCOTT:  Q.  Okay.  And did he appear

11   to you to be dazed or psychotic?

12                    MS. FOWLER:  Well, I'm going to object, to

13   the extent that that calls for an expert opinion as to

14   whether or not somebody is psychotic; and also assumes

15   facts not in evidence, that he had a viewpoint that he

16   could make that determination.

17                    But, if you can answer the question, go

18   ahead.

19                    THE WITNESS:  You know, I don't know.

20                    MR. SCOTT:  Q.  Did he appear to be

21   normal?

22                    MS. FOWLER:  Well, object as vague and

23   ambiguous as to what's "normal".

24                    MR. SCOTT:  Q.  Rational?  Coherent?

25                    MS. FOWLER:  Again, assumes facts not in
```

1   evidence, that he had any basis upon which to make that

2   determination.

3           MR. SCOTT:  That's not a proper objection,

4   Caroline, you know better than that.  If you want to

5   testify for him, I'll swear you in.

6           THE WITNESS:  I don't know.  I mean, all I

7   know is that he was not following the instructions that

8   were given to him.

9           MR. SCOTT:  Q.  Okay.  And is that because

10  he got up from the prone position?

11          A.    Yes.

12          Q.    All right.  And how long were you there

13  from the time that he -- you saw him on the prone

14  position to the time he got up?

15          A.    Got up?  I mean . . .

16          Q.    Did he get up at once, or did he slowly

17  get up from the prone position?

18          A.    Well he propped himself up on two

19  different occasions.

20          Q.    Okay.  Let's talk about the first

21  occasion:  Describe for me the first occasion he

22  propped himself up?

23          A.    As he was -- When I first got there, like

24  I said, he was in the prone position; and then, when

25  the instructions were given for him not to move, he

                                                    105

```
 1   then propped himself up, his upper torso, his hips

 2   seemed to be still on the ground as he propped himself

 3   up that way, and he was looking -- like, looking

 4   around, looking back towards the person that was

 5   standing in the doorway, looking to, you know, to the

 6   north.  I mean, he was like looking around.

 7        Q.   And did he also look in your direction?

 8        A.   He may have, I think, as he was, you know,

 9   just looking around the area.

10        Q.   And did he look in the direction of the

11   barking dog?

12        A.   Yes.

13        Q.   And for how long did he prop himself up

14   the first time?

15        A.   A couple seconds.

16        Q.   And then what did he do?

17        A.   Well, at that time that -- he was then

18   ordered -- given instructions again by the officers to

19   get back down on the ground, and not to move.

20             And so he then went back into that prone

21   position on the ground.

22        Q.   At that time, who was in charge of the

23   scene, or in-command?

24        A.   (Pause)  I mean, if you look at protocol,

25   I guess it would fall back to myself or Sergeant Celli.
```

 1 | other officers that were giving instructions to Mr.
 2 | DeSantis to get back down onto the ground.
 3 |      Q.    And then what happened?
 4 |      A.    He then went back --
 5 |      Well, prior to him going back down on
 6 | the ground, he was continually looking about, again,
 7 | looking back at the doorway, looking around,
 8 | presumably, at his -- you know, at the surroundings
 9 | and stuff, but his head was pivoting around, just
10 | looking at -- he was looking around him, and then
11 | went back into that prone position.
12 |      Q.    Now, at that time, if someone had told you
13 | that Mr. DeSantis was bipolar and that he was, you
14 | know, acting paranoid and delusional or acting-out
15 | because he was bipolar, if you had been told that,
16 | would you have acted differently?
17 |      MS. FOWLER:  I'm going to object.  That
18 | calls for speculation.  Don't answer that.
19 |      MR. SCOTT:  Q.  To your knowledge, did any
20 | of the other officers at the scene have information
21 | that Mr. DeSantis was bipolar?
22 |      A.    I don't know.
23 |      Q.    If other officers had that information,
24 | would you have expected them to share it with you?
25 |      MS. FOWLER:  Again, I'm going to object.

111

1  Mr. DeSantis propped himself up, and twice he went back

2  to a prone position, correct?

3       A.    Yes.

4       Q.    And how long was he in a prone position

5  after the second prop?

6       A.    After he was instructed to get down onto

7  the ground?

8       Q.    Yes.

9       A.    It was a few seconds.

10       Q.    And during those -- Can you give me an

11  estimate, when you say "a few seconds"?

12       A.    An estimate, maybe five.

13       Q.    Okay.  And during those five seconds, he

14  was prone down on the ground?

15       A.    Yes.

16       Q.    And during those five seconds, did you

17  think it would have been safe for some officer to

18  approach him?

19       A.    No.

20       Q.    Why not?

21       A.    We were not sure at what point -- you

22  know, what we were dealing with.  We didn't have, you

23  know -- you know, his movements, and stuff.  We weren't

24  sure that he was going to continue to stay in that

25  position.  I could -- you know, I can only speak for

```
 1              MS. FOWLER:  I'm sorry.  I'm going to
 2   object that that calls for speculation.
 3              But if you are able to answer that
 4   question, go ahead.
 5              THE WITNESS:  [Long pause/thinking]  Yeah,
 6   I think it was -- you would have to take a -- with that
 7   situation a -- you know, a collaborative effort, I
 8   mean, for us to make that determination to -- you know,
 9   to go in.
10              MR. SCOTT:  Q.  And that was going to be
11   up to you or Sergeant Celli to decide when it was safe
12   to move in?
13       A.    Yes.
14       Q.    All right.
15              And, now, after he's propped himself up
16   twice and now he's proned-out for about five seconds,
17   what's the next thing that happened?
18       A.    He sprang to his feet, and then began to
19   charge towards the officers on the west side of the
20   driveway.
21       Q.    Okay.  Describe how he "sprang to his
22   feet"?
23       A.    You know, he just very quickly pushed
24   himself up to his feet -- I mean, in -- I guess, the
25   best way to describe it would be kind of in a -- as a
```

1   sprinter in a starter box.

2         Q.   Okay. Like coming out of the box?

3         A.   Yeah, that would be -- yeah, a good way to

4   describe it.

5         Q.   Okay. Like he's running a hundred-meter

6   dash.

7         A.   If you want to say hundred meters, or...

8         Q.   Hundred-yard dash.

9         A.   Or . . . Yes, just that rapidly out of --

10         Q.   All right.

11         A.   -- to his feet.

12         Q.   All right.

13         And did that startle you?

14         A.   Yes.

15         Q.   Were you scared?

16         A.   Yes.

17         Q.   Were you afraid he was going to hurt you?

18         A.   There was that possibility, yes.

19         Q.   Okay. Were you afraid he was going to

20   kill you?

21         A.   There was that possibility.

22         Q.   Okay. Did you think he was going to kill

23   you?

24         A.   [No audible response]

25         Q.   Or were you afraid he was going to run

1          A.     Yes.

2          Q.     Oh.  And the dog was still barking.

3          A.     Yes.

4          Q.     Okay.  Now, he sprung up and started

5     running towards the dog, or in the area of the dog.

6                 And how many steps did he take before you

7     fired the Sage?

8                 MS. FOWLER:  I'm going to object.  That

9     misstates the witness' testimony.  He said that the --

10    Mr. DeSantis was charging towards the officers.

11                MR. SCOTT:  Q.  Right, who were standing

12    in front of the dog, right?

13                MS. FOWLER:  He hasn't said standing

14    directly in front of the dog.  He said the dog was

15    behind the officers.

16                MR. SCOTT:  Q.  Okay.

17         A.     Yeah, the direction of the two officers.

18         Q.     Are you -- Is it your testimony that he

19    was running towards the officers, but not towards the

20    dog; is that what you are telling me?

21         A.     Yes.

22         Q.     Okay.  And how far was the dog from these

23    officers, last time you saw it?

24         A.     The last time I saw it, they were -- he

25    was like a few feet behind the officers, you know, more

                                                      121

```
 1        Q.    I don't care.  You saw it, I didn't.  I'm
 2   asking you.
 3        A.    Well, you keep asking me, sprinting, and
 4   I'm saying he is -- I describe it more as a charging,
 5   that he is running directly at the officers, and it
 6   appeared to be with a purpose.  I mean, just -- just
 7   mannerisms of --
 8        Q.    Okay.
 9        A.    -- that he is focused on -- in the
10   officers, in then -- that direction.
11        Q.    Okay.  And you could see his hands.
12        A.    Yes.
13        Q.    And you could see that he was unarmed,
14   correct?
15        A.    I mean, I didn't -- I didn't see anything
16   in his hands.  I don't know if he was unarmed.
17        Q.    Okay.  Well, you never saw a weapon.
18        A.    Correct.
19        Q.    Okay.  And as he was charging, were his
20   hands kind of going back-and-forth, like a sprinter or
21   was his --
22        A.    Yeah; I mean, his hands were in that
23   running-type position, yes.
24        Q.    All right.
25        A.    They were pumping.
```

1          MR. SCOTT:   Q.   Okay.  So you don't know

2   whether he was going to try to run past them or at

3   them, and whether he was going to kiss them, hug them,

4   tackle them, punch them, you don't know?

5          A.    Well, kiss them or hug them, I could

6   probably rule that out.

7          Q.    Why?

8          A.    Just by his demeanor and his running, he

9   wasn't showing any expression or emotion of joy of

10  seeing our presence there, or welcoming the presence

11  of -- of us being there.

12         Q.    Did he say anything the entire time you

13  were there before you shot him?  Did he call you a

14  "pig" or a "cop," or say anything mean or nasty to you?

15         A.    No.

16         Q.    He didn't swear at you, call you any bad

17  names?

18         A.    No.

19         Q.    Did he threaten you verbally?

20         A.    No.

21         Q.    Did he insult you?

22         A.    No.

23         Q.    Did you hear him say anything?

24         A.    No.

25         Q.    Did you think you were dealing with

                                                        125

```
 1          Q.    All right.  Now, when you got --
 2                Who was at risk when you arrived at this
 3    situation?
 4          A.    (Pause)  The potential was, I mean, there
 5    is a risk to a number of people.
 6          Q.    Okay.  Who?
 7          A.    Well, we did not know, as far as the
 8    people within the -- you know, the residents, you know,
 9    the neighborhood in which we were in, the other
10    officers that were there at the scene, you know, the
11    children that were there, I mean, we didn't have a full
12    grasp of what we were dealing with.
13          Q.    Okay.  Was one option to talk to his wife
14    to get information?
15          A.    No.
16          Q.    Why not?
17          A.    At that point, you know, we weren't
18    getting compliance from Mr. DeSantis to go in that
19    direction.
20          Q.    To go in the direction of talking to her,
21    to see if she could help you gain compliance?
22          A.    Yes.
23          Q.    Okay.  So, that wasn't an option?
24          A.    At that moment in time, no.
25          Q.    All right.
```

```
 1   with that.  I don't know who else would be there that
 2   would do that to him.
 3        Q.    All right.  Are you familiar with the term
 4   "level of resistance"?
 5        A.    No.
 6        Q.    Okay.  Did -- Well, what was your
 7   assessment of the risk Mr. DeSantis posed to the
 8   officers that he was charging?
 9        A.    (Pause/thinking).  The level of risk?
10        Q.    Yes.  What was the potential risk?
11        A.    It could have been fatal on one of the
12   officers.
13        Q.    Okay.  In what way?
14        A.    The fact that, if he would have reached
15   the officers, of disarming one of them.  I mean, I'm
16   thinking, to the -- you know, to that level that, if he
17   had reached to -- you know, the other officers.
18        Q.    Okay.  If he had reached them, and then
19   done what?
20        A.    Disarmed one of them.
21        Q.    Okay.  And what options did you have
22   available to you to stop that from happening?
23        A.    The Sage.
24        Q.    I mean, collectively, the six officers
25   there, what options did you have collectively to stop
```

134

DEPOSITION OF SERGEANT GERRY SOARES

STATE OF CALIFORNIA ) ss.

### CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 29th day of January, 2008.

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California