**EXHIBIT K**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

PATRICIA DeSANTIS,                          )
individually and as Successor               )
in Interest for RICHARD                     )
DeSANTIS, deceased, and as                  )
Guardian Ad Litem for DANI                  )
DeSANTIS, a minor and TIMOTHY               )
FARRELL, a minor,                           )
                                            )
              Plaintiffs,                   )
                                            )
      vs.                                   )
                                            )   No. C-07 3386 JSW &
                                            )   C-07-4474
                                            )
CITY OF SANTA ROSA, JERRY                   )
SOARES, RICH CELL, TRAVIS                   )
MENKE, PATRICIA MANN, and DOES              )
1 through 25, inclusive,                    )
                                            )
              Defendants.                   )
                                            )
_____)


DEPOSITION OF PMK OF SANTA ROSA POLICE DEPARTMENT

SERGEANT CLAY VAN ARTSDALEN

July 24, 2008



REPORTED BY:  A. MAGGI SAUNDERS,

          C.S.R. No. 2755

A. Maggi Saunders & Associates
Certified Shorthand Reporters
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

```
 1            Q.    Okay.  And you believed that, at Santa
 2    Rosa, you would be able to work as a police officer,
 3    and not be as bored?
 4            A.    Well, it was a much larger city.
 5            Q.    All right.
 6                  Have you worked continuously for Santa
 7    Rosa PD since 1988?
 8            A.    Yes.
 9            Q.    Okay.  Can you summarize for me briefly
10    the assignments you have had with Santa Rosa PD since
11    you were hired?
12            A.    Yes.  When I was hired, I was assigned to
13    Patrol;
14                  I then, after about three years, I went to
15    the Neighborhood Enforcement Team.
16                  After that, I went back to Patrol.
17                  I then became a detective in the Child
18    Abuse Sexual Assault Unit, and spent five years there.
19                  I then became a Field Training Officer.
20            Q.    For Patrol?
21            A.    Yes.  I was a Field Training Officer for
22    four years.
23                  I was then promoted to Sergeant, and
24    worked Patrol for a year as a Sergeant.
25                  I then became the Training Manager, was
```

                                                              20

1  the Training Manager for three years, and rotated back

2  to Patrol.

3           And I'm currently in that position now, as

4  a Sergeant.

5           Q.    Who is the Training Manager now?

6           A.    Jerry Soares, Sergeant Jerry Soares.

7           Q.    And how long has Sergeant Soares been the

8  Training Manager, to your knowledge?

9           A.    One year.

10          Q.    Okay.  So it would be fair to say you were

11  Training Manager from approximately sometime in 2004 to

12  2007?

13          A.    Correct.  July of 2004 to July of 2007.

14          Q.    And was your position ever referred to as

15  "Training Coordinator"?  Are you familiar with that

16  term?

17          A.    I am; and, no, it was not.

18          Q.    What's the difference in your mind between

19  a Training Manager and a Training Coordinator?

20          A.    When I was in the unit, the Training

21  Coordinator was a person who basically made sure

22  everybody attended the training.  She scheduled all of

23  the training.  She scheduled hotels, contacted vendors

24  who put on training, and she was the Training

25  Coordinator.

                                                    21

1        A.     -- if something did occur, sure, that

2   would be something that we would -- could take a look

3   at.

4        Q.     Okay.  As part of the training plan, would

5   it be fair to say there were some areas that were

6   P.O.S.T.-mandated and other areas that were not

7   necessarily P.O.S.T.-mandated, but just recommended by

8   P.O.S.T.?

9        A.     Yes.

10       Q.     All right.  And would it be fair to say,

11  what was P.O.S.T-mandated, you had no choice but to put

12  it in the plan, it had to be in the plan.

13       A.     That is correct.

14       Q.     And things that were not P.O.S.T-mandated,

15  but were merely recommendations, it could be your

16  choice whether you would have included it -- I guess

17  you and others could decide whether to put it in the

18  plan, correct?

19       A.     Correct.  Just to clarify:  It was not

20  ultimately my choice.

21       Q.     And whose choice was it?

22       A.     Well, that would be the command staff.

23       Q.     All right.  And, then, ultimately, the

24  Chief, as far as you know?

25       A.     Yes.

                                                        36

DEPOSITION OF PMK SGT. CLAY VAN ARTSDALEN

1              A.      The only thing would be maybe an e-mail,

2     or maybe just a verbal discussion with my direct

3     supervisor.

4              Q.      Did you ever have any meetings or

5     conversations with the Risk Manager to discuss what

6     should or should not be in the training plan?

7              A.      No.

8              Q.      Did you do any evaluation of, whether it

9     was City demographics, or incident reports, or

10    activities, a statistical analysis of any activities of

11    the Police Department, in terms of identifying training

12    needs?

13             A.      No, nothing formal.

14             Q.      Anything informal?

15             A.      Well, other than, I would review --

16    reports would come to me for review to determine if

17    there were any training needs required, or should we

18    look at doing training a different way.

19             Q.      Okay.  To your knowledge, how were reports

20    routed to you in that regard:  Were all reports routed

21    to you, or just, was there a screening process, so only

22    some reports were routed to you?

23             A.      All Use-of-Force reports were sent to me.

24             And any report that the approving

25    Sergeant would put my name on the bottom of the

38

```
 1                    received by the Santa Rosa Police
 2                    Officers from 2002 to 2007, relating:
 3                    "One: to the use of force, both lethal
 4                     and non-lethal;
 5                    "And, two, 5150 situations."
 6                    Do you see that?
 7          A.    Yes.
 8          Q.    And to your knowledge, are you the Person
 9   Most Knowledgeable regarding training during that
10   period of time relating to both lethal and nonlethal
11   force?
12          A.    Yes.
13          Q.    Okay.  And, to your knowledge, are you the
14   Person Most Knowledgeable regarding training received
15   by Santa Rosa Police Officers between 2002 and 2007
16   relating to 5150 situations?
17          A.    Yes.
18          Q.    All right.  When you were the Training
19   Manager, was any training given to Santa Rosa Police
20   Officers regarding 5150, or 5150-type situations?
21          A.    Yes, but not using the term "5150".
22                We did the Tactical Communication
23   Training, which is required by P.O.S.T., and we also
24   had training with -- dealing with emotionally-disturbed
25   people, or EDP training.
```

48

1      Q.     Was that given annually, to your

2  knowledge?

3      A.     It was in conjunction with the Tactical

4  Communications that was held every other year.

5      Q.     And the Tactical Communication training,

6  that would be different from the EDT, or the

7  Emotionally-Disturbed Training, or was it part of the

8  same class?

9            MS. FOWLER:  EDP.

10           MR. SCOTT:  Q.  I'm sorry, EDP.  And the

11  "P" stands for?

12     A.     Persons.

13     Q.     Okay, thank you.

14           And was that in part of the same class,

15  or two different classes?

16     A.     They were essentially two different

17  classes, but taught back-to-back.

18     Q.     And, to your knowledge, who taught them?

19     A.     They were mostly our hostage negotiators,

20  so I was one of the instructors over the years;

21           Officer Mark Azzouni, A-z-z-o-u-n-i;

22           Officer Wade Alred, A-l-r-e-d;

23           Officer Brad Conners, C-o-n-n-e-r-s;

24           And I believe that's it.

25     Q.     All right.  Was there a -- any written

49

 1   me a little better understanding.

 2        Q.    And maybe I should use the word "less than

 3   lethal". Would that be better?

 4        A.    Okay. But, again, I would still need some

 5   clarification on what you are thinking, because there

 6   are some --

 7        Q.    Okay. Well, actually, I'm not really

 8   thinking anything --

 9        A.    Okay.

10        Q.    -- I'm just trying to find out how it's

11   broken up in the Department --

12        A.    Okay.

13        Q.    -- and how it's given.

14              And why don't you explain to me if there

15   is a distinction between the lethal-force training

16   and nonlethal, or less-than-lethal, what it is, how

17   the Department makes that distinction, if it does.

18        A.    Okay. We do have specific instructors

19   assigned to training, so we have Firearms instructors.

20        Q.    Okay.

21        A.    And we have Defensive Tactics instructors,

22   which is basically what P.O.S.T. refers to as "Arrest

23   and Control".

24        Q.    So, there is Firearms, and then there is

25   Defensive Tactics, which P.O.S.T. refers to as "Arrest

                                                    57

1  and Control"?

2         A.    Yes.

3               And we also have driver instructors.

4         Q.    Okay.

5         A.    And I believe that's it for the pool of

6  instructors.

7         Q.    Okay.  Now, under the pool of Firearms

8  instructors, who were they when you were the Training

9  Manager?

10        A.    Okay.  We had Keith Covington,

11 C-o-v-i-n-g-t-o-n;

12              Brian Boettger, B-o-e-t-t-g-e-r.

13              Mike Numaineville,

14 N-u-m-a-i-n-e-v-i-l-l-e.

15              We also had Phil Brazis, B-r-a-z-i-s.

16              Dave Phillips, P-h-i-l-l-i-p-s.

17              For some of the time, not the entire time

18 I was there, Mike Lazzarini, L-a-z-z-a-r-i-n-i.

19              I'm going back some time, so (thinking)...

20              Oh, we Armando Jauregui, J-a-u-r-e-g-u-i.

21              Tim Hughes, H-u-g-h-e-s.

22              Rob Leftwich, L-e-f-t-w-i-c-h.

23              And, I'm sorry, without looking at the

24 roster, I believe that's it.

25        Q.    Okay.  To your knowledge, was there --

                                                      58

DEPOSITION OF PMK SGT. CLAY VAN ARTSDALEN

1  Critical Incidents, or being involved in Police

2  Officers calls?

3        A.    Not that I'm aware of.

4        Q.    To your knowledge, was there anyone at the

5  Santa Rosa Police Department responsible for trying to

6  coordinate Defensive Tactics training with the use of a

7  K-9?

8        A.    No.

9        Q.    To your knowledge, when you were Training

10  Manager, was there weapon-retention training?

11        A.    Yes.

12        Q.    And what does that term mean to you?

13        A.    Weapon retention is training that we

14  provide Officers, basically to have the tools to retain

15  their own weapon, if for some reason a suspect grabs,

16  either a weapon that is in the Officer's hand, or

17  attempts to pull it from the holster.

18        Q.    And that would include what weapons?

19        A.    That would include a long rifle, as well

20  as pistols.

21        Q.    Okay.  And what about batons or OC?

22        A.    Weapon --

23              MS. FOWLER:  I think your question was

24  vague and ambiguous, and he may have misunderstood.

25              Are you talking about what tools they

                                                    67

1   teach them to use to retain their weapons, or what

2   types of weapons that are being retained that they

3   are being trained how not to get them taken away.

4               I think that was the confusion in the --

5               MR. SCOTT:  You are correct.  It was a

6   confusing question, and I apologize for that.  Let me

7   ask a follow-up question that's hopefully less

8   confusing.

9        Q.    In terms of weapon-retention training, if

10  I understand you correctly, it certainly applied to

11  rifles and handguns or pistols, correct?

12       A.    Correct.  And that is for the Officer

13  protecting themselves from the weapon being taken from

14  them.

15       Q.    All right.  And was there weapon-retention

16  training, to your knowledge, regarding having a baton

17  taken from an Officer?

18       A.    Yes, it is -- Yes, it's the same as the

19  long rifle.

20       Q.    Okay.  Would the same thing go for, say, a

21  Taser?

22       A.    You could use the same techniques, yes.

23       Q.    And would it also go for OC?

24       A.    I don't think so.

25       Q.    And why do you say that?

                                                      68

1   Officers, at least when you were the Training Manager,

2   receive any training in making decisions regarding the

3   Use-of-Force?

4          A.     What we do talk about is the force

5   options, of what options we have available to us; so, I

6   don't know if that helps.

7          Q.     Okay.  And to your knowledge, do Officers

8   receive training in, not only what the options are, but

9   also training on when or when not to implement a

10  certain option?

11         A.     There is no clear guideline or scenario of

12  when you will use a certain technique.  And that's why

13  we have so many options, so. . .

14                So, the Officers are taught how to use

15  those options; and then each situation will dictate

16  what is used.  And that's up to the Officer as well.

17         Q.     Okay.  And is it your understanding that,

18  whatever option an Officer uses, will be considered to

19  be within policy?

20                MS. FOWLER:  Well, I'm going to object, to

21  the extent that calls for a legal conclusion.

22                MR. SCOTT:  Q.  Go ahead.

23         A.     The -- We do Use-of-Force training, and we

24  talk about case law, *Graham vs. Connor*, and as far as

25  when it's reasonable to use force, and properly

                                                          75

DEPOSITION OF PMK SGT. CLAY VAN ARTSDALEN

```
 1  documenting the force.
 2            So, the -- any item used, obviously, there
 3  needs to be justification for that, for any tool used.
 4       Q.    And why do you say that?
 5       A.    Well, there needs to be -- There needs to
 6  be a reason for that option to be utilized.
 7       Q.    And to your knowledge, when you were the
 8  Training Manager, did anyone in the Santa Rosa Police
 9  Department review, do some type of review of
10  Use-of-Force to determine whether it was reasonable?
11       A.    Well, that comes from the supervisor who
12  is approving the initial report will have that
13  opportunity to read the report.  And the Officer using
14  force in the Santa Rosa Police Department is required
15  to notify a supervisor immediately, or as soon as
16  practical.
17            So the Officer -- So, the Sergeant, the
18  on-line, or first-line supervisor would have an
19  opportunity to get the information, and determine what
20  type of force was used.
21       Q.    And if a supervisor determined that the
22  force used was not necessary or reasonable, would that
23  be referred to you?
24       A.    No.  That would be referred to -- through
25  the chain-of-command, it would be referred to a
```

76

1    Lieutenant.

2         Q.    Okay.  To your knowledge, have such

3    reports ever been referred to you for training

4    purposes?

5         A.    Well, I think those are two different

6    questions.

7         Q.    Well, if --

8         A.    Or --

9         Q.    Let me ask it a different way.

10        A.    Okay.

11        Q.    If a Sergeant or a Lieutenant has reviewed

12   an incident, and made a determination that the force

13   used was either unnecessary or excessive or not

14   reasonable, to your knowledge, would that report be

15   referred to you for training, or remedial training

16   needs?

17             MS. FOWLER:  You mean, the actual report

18   itself?

19             MR. SCOTT:  Yes.

20             THE WITNESS:  If there was a determination

21   that remedial training needed to be done on any

22   situation, that report would be forwarded to me, and a

23   request for remedial training.

24             MR. SCOTT:  Q.  And did that ever occur in

25   the three years you were the Training Manager?

                                                        77

1          MR. SCOTT:  Q.  All right.  This training

2    that you have described in relation to engaging

3    suspects who may be armed --

4          A.    Mm-hmm.

5          Q.    -- to your knowledge, are there written

6    materials for that training?

7          A.    Yes, I believe so.

8          Q.    And do you know what they'd be called, or

9    if it's P.O.S.T.-related, or if it's something that was

10   created independent of P.O.S.T.?

11         A.    It was not P.O.S.T.-certified.  It was

12   created in-house, and I don't know what the title is.

13         Q.    Okay.  And if you wanted to get a copy of

14   it, how would you find it, or locate it?

15         A.    I would look -- I would check with

16   Sergeant Jerry Soares, who is now in charge of the

17   Training Unit, or at least a Training Manager, and to

18   see where it currently is.

19         Q.    And have you attended any of the -- this

20   training in relation to engaging suspects who may be

21   armed?

22         A.    Yes.

23         Q.    And how many times have you received that

24   training in 20 years?

25         A.    Oh, this training was not developed 20

93

1    A.    Just, you know, keeping the Officers kind

2    of thinking about different types of scenarios and, you

3    know, keeping that thought in the back of their mind,

4    that it could be -- you could be going to a very

5    routine call, which could turn dangerous very quickly.

6    Q.    Okay.  Do you recall any other scenarios

7    that were used during that training?

8    A.    Yes.  There was one:

9    Two or three males, drinking in their

10   car, and one male in the car.  And the officers then

11   would respond to a call of people drinking in a

12   parking lot.

13   And another scenario was a person who had

14   made suicidal threats.

15   Q.    Okay.  Did you receive training or, to

16   your knowledge, did officers receive training in

17   Suicide By Cop?

18   MS. FOWLER:  Well, you asked two different

19   questions:  Him, personally, or Officers in general?

20   Which question do you want him to

21   answer?

22   MR. SCOTT:  Q.  Let's start with Officers

23   in general.

24   A.    We have had training in the area of

25   Suicide By Cop.  However, I don't believe that all

96

1  Officers, due to, you know, when we had the training

2  and hiring of new Officers, that they've had that

3  training.

4        Q.    Did you receive that training?

5        A.    Yes, I did.

6        Q.    And what do you recall about it?

7        A.    Again, it was several years ago.

8              It was two days of, you know, talking

9  about the -- I guess the term "Suicide By Cop," and

10 what people may do and different actions, saying,

11 again, just communicating with people.

12       Q.    Do you know who gave that training?

13       A.    It was it was Dr. Barry Perrou.   I'm

14 guessing on the spelling as P-e-r-o-u.   There may be

15 two r's, I'm not sure.

16       Q.    And was this training that you --

17             Well, that happened on your watch while

18 you were Training Manager?

19       A.    No.   It happened several years before

20 that.

21       Q.    Okay.   And that was two days of training?

22       A.    Yes.

23       Q.    And I think you indicated you were on --

24 this training that you received more recently in

25 relation to scenario-based situations, where a person

                                              97

1   Incidents, as you have defined the term?

2          A.    No.

3          Q.    Now I'm going to ask you questions about

4   your knowledge of training received when you were

5   Training Manager regarding 5150 situations.

6                And have you ever received training as a

7   Police Officer in -- at any time in 5150-type

8   situations, for dealing with those?

9                MS. FOWLER:  He's already testified at

10  length about that.  You are asking him, in addition to

11  what he's already told you --

12               MR. SCOTT:  Yes.

13               MS. FOWLER:  -- about Tactical

14  Communications and --

15               MR. SCOTT:  Yes.

16               MS. FOWLER:  -- Emotionally-Disturbed

17  Persons.

18               MR. SCOTT:  Q.  Right.

19          A.    Okay.  We do not do --

20                Just to clarify, we don't do training on

21  5150s.  We do training on Tactical Communication and

22  training on Emotionally-Disturbed Persons, which

23  would encompass 5150s.

24                And so, I've gone through that training.

25                Also, I personally have extensive

                                                    101

DEPOSITION OF PMK SGT. CLAY VAN ARTSDALEN

```
 1   trained, or how they work in the Department?
 2          A.    No.
 3          Q.    Okay.  If you would turn, please, to let's
 4   say, the top of page seven.
 5          A.    (Complies)
 6          Q.    If you look at lines 7 and 8, it says:
 7                "There is no specific mandated
 8                training -- mandated amount of training
 9                for batons."
10                Do you see that, lines 7 and 8, top of
11   page 7?
12          A.    Yes.
13          Q.    And at least between 2002 and 2007, is
14   that, based on your knowledge as the Training Manager,
15   is that correct?
16          A.    I'm sorry, I'm still looking for the baton
17   piece.  Oh, there we go.
18                MS. FOWLER:  (Indicating).
19                THE WITNESS:  Yes, that's correct.
20                MR. SCOTT:  Q.  Okay.  And if you look at
21   that same page, on line 18 and 19, it says:
22                "There is no specific mandated amount of
23                training for OC pepper spray."
24          A.    That is correct.
25          Q.    Now, if you look at the bottom of page 20.
```

                                                          124

1          MS. FOWLER:  Page 20.

2          MR. SCOTT:  Q.  I'm sorry, No. 20, page 7,

3    it says:

4               "There is not any mandated training on

5               Section 5150 of the Welfare and

6               Institutions Code under P.O.S.T.

7               requirements, and Santa Rosa does not

8               have any specific mandated training

9               limited to Section 5150."

10              Do you see that?

11        A.    Yes.

12        Q.    And to your knowledge, was that true when

13   you were the Training Manager?

14        A.    Yes.

15              MS. FOWLER:  And just for the record, the

16   rest of that stated that:

17              "This subject matter is covered as parts

18              of other mandated or recommended

19              training that's provided."

20              MR. SCOTT:  That is correct, it does say

21   that.

22        Q.    Now, if you will go to page five of this

23   document, please, and if you would look at

24   Interrogatory 13 and the Answer to No. 13, if you would

25   just read the Answer to No. 13 to yourself, and then I

                                                      125

1   effect when you were the Training Manager?

2        A.   Yes.

3        Q.   Okay.  And what did understand to be the

4   purpose of this policy?

5             MS. FOWLER:  I would object that the

6   document speaks for itself.  It specifically states

7   what the purpose of the document is.

8             MR. SCOTT:  I'm asking him what he

9   understood to be the purpose of it.

10            THE WITNESS:  It's how to -- the procedure

11  and policy of how to process weapons that are taken

12  from people who are 5150 -- deemed 5150, or suspects in

13  Domestic Violence cases.

14            MR. SCOTT:  Q.  Okay.

15            Now, if you would turn to page 53, it's

16  entitled "Use-of-Force, General Order 01-02."  Do you

17  see that?

18       A.   Yes.

19       Q.   When you were the Training Manager, was

20  this policy in effect?

21       A.   Yes.

22       Q.   And to your knowledge, were Officers

23  trained in relation to this policy when you were the

24  Training Manager?

25       A.   Yes.

```
                                  )
STATE OF CALIFORNIA )     ss.
                                  )
```

### CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 28th day of July, 2008.

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California

A. Maggi Saunders & Associates
Certified Shorthand Reporters
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281