1   JOHN HOUSTON SCOTT (SBN 72578)
    LIZABETH N. de VRIES   (SBN 227215)
2   **SCOTT LAW FIRM**
    1375 Sutter Street, Suite 222
3   San Francisco, California 94109
    Telephone: (415) 561-9600
4   Facsimile: (415) 561-9609
    john@scottlawfirm.net
5   liza@scottlawfirm.net

6   Eric Safire (SBN  98706)
    **LAW OFFICES OF ERIC SAFIRE**
7   2431 Fillmore Street
    San Francisco, CA 94115
8   Telephone: (415) 292-1940
9   Facsimile:   (415) 292-1946
    eric@safirelaw.com
10
    Attorneys for Plaintiffs
11

12
                    **UNITED STATES DISTRICT COURT**
13
                   **NORTHERN DISTRICT OF CALIFORNIA**
14

15
    PATRICIA DESANTIS, individually and as    Case No.:  C 07 3386 JSW
16  Successor in Interest for RICHARD
    DESANTIS, deceased, and as Guardian Ad    **PLAINTIFFS' REPLY TO**
17  Litem for DANI DESANTIS, a minor and      **DEFENDANTS' OPPOSITION TO**
    TIMOTHY FARRELL, a minor,                 **PLAINTIFFS' MOTION FOR PARTIAL**
18                                            **SUMMARY ADJUDICATION AND**
                                              **OPPOSITION TO DEFENDANTS'**
19          Plaintiffs,                       **CROSS MOTION FOR SUMMARY**
    v.                                        **JUDGMENT**
20
    CITY OF SANTA ROSA, et al.,               Date:    October 17, 2008
21                                            Time:    9:00 a.m.
                                              Place:   Courtroom 2, 17th floor
22          Defendants.                       Judge:   Hon. Jeffrey S. White
23                                            Trial:    January 20, 2009
24

25

26

27

28

1
2

# INTRODUCTION

3
4
        Law enforcement officers are permitted to use force in performing their job. They are

given firearms and the discretion to make decisions regarding the amount of force necessary to

5
keep the peace and enforce the law. *Policeman's Benev. Ass'n of N.J. v. Washington Tp.*, 850

6
F.2d 133, 141 (3d Cir. 1988) (police officers [exercise] the most awesome and dangerous

7
power that a democratic state possesses with respect to its residents — the power to use lawful

8
force to arrest and detain them). Ever mindful of how such power can be abused, the framers

9
of our Constitution embedded into our law a citizen's right to be free from unreasonable

10
searches and seizure. *Brinegar v. United States*, 338 U.S. 160, 180 (1949) (the framers

11
understood that search and seizure is one of the first and most effective weapons in the arsenal

12
of every arbitrary government, and that [among] deprivations of rights, none is so effective in

13
cowing a population, crushing the spirit of the individual and putting terror in every heart);

14
15
*Graham v. Connor*, 490 U.S. 386, 394 (1989)(the Fourth Amendment's prohibition against

16
unreasonable seizures of the person is a primary source of constitutional protection against

17
physically abusive governmental conduct).

18
        The death of an individual at the hands of law enforcement is the epitome of a seizure.

19
20
*Tennessee* v. *Garner*, 471 U.S. 1 (1985)[1] The reasonableness of the deadly force must be

21
judged from the perspective of the facts as they existed to law enforcement at the scene of the

22
death. *Graham,* 490 U.S. at 396.

23
---

24
        [1] An excessive force claim is governed by the Fourth Amendment because "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Garner,* 471 U.S. at 7. *See also Graham,* 490 U.S. at 395 (holding that a claim that a law enforcement official used excessive force in making an arrest, investigatory stop, or other "seizure" is judged under the Fourth Amendment's objective "reasonableness" standard); *Scott v. Harris,* 127 S. Ct. 1769, 1777 (2007) (declining to establish a special rule for deadly force and explaining that "*Garner* was simply an application of the Fourth Amendment's 'reasonableness' test" articulated in *Graham*).

25
26
27
28

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

As will be discussed below, both common sense and legal precedent have recognized certain exceptions to the "rule" that it is not reasonable to shoot an unarmed suspect simply because a police officer reasonably believes that he might be armed.  Ninth Circuit decisions have recognized that deadly force may be appropriate in certain cases that involve concealed hands, a furtive gesture and/or verbal threats.  However, none of these circumstances are presented in this case.  Plaintiffs' police practices expert Ron Martinelli put it eloquently in the summary conclusion (page 23) of his declaration and report filed in opposition to defendants' motion for summary judgment.

> A police officer simply cannot shoot someone because they reasonably believe that the subject they have encountered is armed; or that the subject may attack, disarm, shoot and kill them. A police officer cannot shoot someone absent verbal threats coupled with furtive movements suggesting the subject is arming themselves, or an obvious manifestation of a deadly weapon capable of seriously injuring or killing the officer or another person. If police officers were permitted to engage subjects they encountered with deadly force under the former circumstances, police officers would be shooting citizens on a regular basis during high-risk detentions, vehicle enforcement stops and foot pursuits.

In their moving papers and again in their reply and opposition, plaintiffs assert that there exists no genuine issue as to any material fact with respect to what Sgt. Celli knew at the scene before he pulled the trigger to his rifle.[2] If the Court disagrees with plaintiffs' interpretation of what constitutes "material facts" and perceives certain disputed facts as material, then defendants' motion must be denied. The declaration of plaintiffs' police practices expert, Ron Martinelli, shows a dispute as to the interpretation of the evidence and the application of the law to the facts presented herein.

---

[2] On summary judgment, a court is required to determine whether the evidence presents a sufficient disagreement to require submission to a jury. *Anderson v. Liberty Lobby,* 477 U.S. 242, 251-252 (1986). If not, and no genuine issue of material fact exists, then the moving party is entitled to summary judgment as a matter of law. *Id.* Plaintiffs submit that they satisfy the above conditions and therefore are entitled to partial summary judgment.

PLAINTIFFS' REPLY AND OPPOSITION TO DEFS MOTION FOR SUMMARY JUDGMENT

**FACTS AS EXISTING DURING DESANTIS'S SEIZURE[3]**

On or about April 9, 2007, at approximately 1:00 a.m., a police dispatcher informed Sergeants Celli and Soares, as well as Police Officers Menke, Mann, Jones, and Ellsworth that Richard DeSantis was firing gunshots into the ceiling of his home. The dispatcher also disclosed that DeSantis had a mental disorder. (Mann Depo, 102:13-20). During the communications back and forth between dispatch, Celli learned that DeSantis had a wife and two young children who were also in the house and that while Celli was responding, DeSantis was still shooting inside his house. (Celli Depo, 70:3-70:12; 206:1-13).

When Celli arrived at DeSantis's residence, DeSantis was "standing just off of the steps of his porch." (Celli Depo, 213:18-25). DeSantis's wife, plaintiff Patricia DeSantis, was standing on the steps with their two-year old child in her arms. (Celli Depo, 214:13-16). Although April in the North Bay, DeSantis was wearing only a pair of jeans without a shirt or shoes. (Celli Depo, 83:1-22). **Celli observed that there was no firearm protruding from DeSantis's jean waistband.** (Celli Depo, 217: 10-13). The lighting at DeSantis's residence was good as light emanated from both the streetlight and from above the porch. (Jones Depo, 102:1; Celli Depo, 81:18-21).

The officers lined up on either side of the driveway with Menke, Mann and Ellsworth on one side, and Celli, Soares and Jones on the other. (Celli Depo, 85:18; 86:1-25; 217:10-13); *See also*, Mann Depo, 60:25-76:25, Exh. 1 Diagram; Menke Depo, 73:23-82:25, Exh. 2 Diagram). The officers had their firearms drawn, including Celli with a rifle, Soares with a Sage[4] and Ellsworth with a canine unit. (Celli Depo, 73:6-10; 77:13-15; 102:23-103:9). **DeSantis's hands**

---

[3] Plaintiffs have set forth the operative facts in their motion. Here plaintiffs simply restate certain facts which they believe are significant.

[4] A Sage is a "less lethal" weapon system that fires a 37-millimeter projectile polyurethane grommet. (Soares Depo, 34:3-35:2). Soares is trained to aim "below center mass," at the waistline, which is the "ideal target." (Soares Depo, 36:12-17).

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

**were visible at all times.** (Celli Depo, 128:8-12; Menke Depo, 63:17-23; Mann Depo, 87:8-9; Jones Depo, 38:19-20; Soares Depo, 123:15-17).

Although Celli was in command of the scene, (Celli Depo, 226:14-22) he ordered the more junior Officer Menke to communicate with DeSantis.  DeSantis was "told to keep his hands in the air and to then put his hands out on the ground in front of him." DeSantis complied with this order but only did so "after repeated commands." (Celli Depo, 119:25-120:3-6). DeSantis didn't say anything during the encounter. (Celli Depo. 109: 2-16; Soares Depo.125: 12-24; Jones Depo. 52:17-18). Mrs. DeSantis, who was still on the porch, yelled out that Mr. DeSantis had a mental illness and that he was in crisis. (Jones Depo, 36:16-24; 52:6-8).

 After placing his hands on the ground in front of him, Mr. DeSantis rose up and was told by the officers to remain on the ground. Mr. DeSantis complied but again rose up and was told to stay down. (Menke Depo. 84:3, 94:1). Mr. DeSantis then "bent forward, rolled his hips towards the ground, [and] and immediately came back up to his kneeling position." (Celli Depo, 124:2-5).

DeSantis then "looked at [Sgt. Celli] . . . looked towards his wife's direction, and looked at [Officer Menke] and ran." (Celli Depo, 125:24-126:20).  He ran in the direction of Officer Menke and Officer Mann.  (Celli Depo, 127:23-25).  At the time DeSantis ran, both Mann and Menke had their guns drawn. (Ellsworth Depo, 72: 17-24; 103:6; 104:11; Celli Depo, 117:5-24).

**DeSantis's hands were visible at all times both prior to and when he ran towards Menke and Mann.** (Celli Depo, 128:8-12; 134:22-135:14; Menke Depo, 63:17-23; Mann Depo, 87:8-9; Jones Depo, 38:19-20; Soares Depo, 123:15-17).

After DeSantis began to run, Soares stepped out and fired the "less lethal Sage" at DeSantis.  (Celli Depo, 128:14-17). As Soares fired the Sage, Sgt. Celli had his rifle pointed in the direction of Mr. DeSantis's upper body.  (Celli Depo, 130: 11-17).  The Sage round hit Mr. DeSantis whose body tilted right and whose impact propelled him three or four yards in Mann

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

- 4 -

and Menke's direction. (Celli Depo, 133:19-21; 136:6-8). Soares was poised to shoot another

Sage round but ceased after seeing Celli come into his view. (Soares Depo, 39:17-40:7; 40:5-10).

Celli fired his rifle at DeSantis who was struck. Almost immediately thereafter, Mann and Menke

fired upon DeSantis. DeSantis was pronounced dead at the scene. (Celli Depo, 135:5-136:12;

Mann Depo, 54:10-20, 93:20, 96:6, 114:11-25; Menke Depo, 93:16-94:1, 61:7-62:16).

The above facts are undisputed and derive principally from Celli's testimony. The

plaintiffs' burden of proof in this case is by a preponderance of the evidence. For purposes of the

cross-motions, reasonable inferences should be drawn in favor of the non-moving party. Because

the undisputed facts i*nfra* that Celli's use of deadly force was objectively unreasonable, this Court

should enter partial summary judgment in plaintiffs' favor.

# ARGUMENT

### A. Based on the Facts and Circumstances that Defendant Officers Confronted on April 9, 2007, the Use of Deadly Force was Unreasonable.

#### 1. Assumptions, Asides, and 20/20 Hindsight are Superfluous When Evaluating the Reasonableness of Deadly Force

In order for the court to clearly evaluate the reasonableness of defendants' use of deadly

force on April 9, 2007, the court must first parse out defendants' assumptions, asides and "20/20

hindsight" which have been put forth in their opposition to plaintiff's summary judgment.

Thereafter, plaintiff will show how in light of the on-the-scene circumstances of April 9, 2007,

the assumptions and beliefs used to justify Celli's use of deadly force were unreasonable.

Primarily, it is paramount that the 'reasonableness' of deadly force must be judged from

the perspective of a reasonable officer on the scene, and not with 20/20 hindsight. *Graham,* 490

U.S., at 396. Additionally, an officer cannot justify his unwarranted conduct on unfounded

assumptions or on a simple statement that he fears for his safety or the safety of others. There

must be objective factors to justify such a concern. *Deorle v. Rutherford,* 272 F.3d 1272, 1281

(9th Cir. 2001). The Ninth Circuit has admonished that "a court may not simply accept what may

be a self-serving account by the police officer. It must also look at the circumstantial evidence

PLAINTIFFS' REPLY AND OPPOSITION TO DEFS MOTION FOR SUMMARY JUDGMENT

that, if believed, would tend to discredit the police officer's story." *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir. 1994); *see also, Ting v. United States,* 927 F.2d 1504, 1510 (9th Cir. 1991) (court need not decide whether plaintiff's shooting was objectively reasonable under officer's version of the facts but rather must look at the circumstances that existed at the shooting); *Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992) (officer killed an unarmed civilian purportedly to save his own life).

In evaluating the reasonableness of the defendants' use of deadly force, the following facts put forth by defendants are superfluous and should have no bearing on the Court's determination. Testimony by neighbor witness Joseph Silny should be disregarded because it is irrelevant and has no bearing on what the defendants knew or observed at the scene. See, Defendant's Opposition/Cross Motion at 8:21-9:2. Additionally, the Sonoma County District Attorney's Office determination that defendants' shooting was not criminal and has no bearing on the determination of this motion. In that investigation the issue was whether the DA could prove "beyond a reasonable doubt" that DeSantis was murdered. See, Defendants' Opposition/Cross Motion at 12:2-8. Similarly irrelevant is the assertion that DeSantis had guns and knives in his house and that purportedly he was using drugs and not taking his medication for his bipolar condition. All of this should be disregarded as an attempt to insert irrelevant and inadmissible evidence into the record to excuse or salvage the defendants' lack of reasonableness. See, Defendants' Opposition/Cross Motion at 12:9-21. The same holds true for defendants' expert, Joseph Callanan's opinion that deadly force was objectively reasonable.[5] See, Defendants' Opposition/Cross Motion at 21:19-22. All of these "facts" are either inadmissible hearsay or otherwise irrelevant to what Celli knew and observed on the early morning of April 9, 2007.

A party opposing summary judgment cannot establish a triable issue of fact by relying on inadmissible evidence. See, e.g., *Orr v. Bank of America*, 286 F.3d 764, 773 (9th Cir. 2002). Additionally, it is well established that reasonableness must be judged solely from the officers' point of view at the time and place of the seizure. *Garner*, 490 U.S. at 396; see also, *Scott v.*

---

[5] The plaintiffs have submitted a declaration and report from a police practice expert, Ron Martinelli, which directly rebuts Joseph Callanan's assumptions and opinions.

PLAINTIFFS' REPLY AND OPPOSITION TO DEFS MOTION FOR SUMMARY JUDGMENT

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

*Henrich*, 39 F.3d 912 (9th Cir 1994) (the question is was the conduct reasonable at the moment of seizure?); *Gardner v. Buerger*, 82 F.3d 248, 254 (8th Cir. 1996)(for  reasonableness under the Fourth Amendment, only the seizure itself, and not events leading up to the seizure itself are determinative); *Moyle v. County of Contra Costa*, U.S. Dist Lexis 89509(9th Cir. 2007)(evidence obtained after seizure occurred could not be considered in determining whether seizure was reasonable).

Additionally, the individual officers' subjective statements that they feared for their own and each other's safety must also be scrutinized in light of the undisputed facts. See Defendants' Opposition/Cross Motion at 20:23-21:8; 22:7-24. As plaintiffs will illustrate, *infra*, these are self-serving conclusions that are not supported by the circumstances that were presented on April 9, 2007.

### 2. Defendants' Belief that They Were Imminently Threatened with Death or Serious Physical Harm By DeSantis is Not Supported by the Totality of the Circumstances.

An officer may use deadly force only when the circumstances support an objectively reasonable belief that the suspect poses an imminent threat of death or serious physical harm. *Garner,* 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1. The reasonableness of an officer's use of deadly force is judged in light of the nature of the threat posed *and* whether the threat is objectively supported by sufficiently reliable evidence. *Price v. Sery*, 513 F.3d 962, 980 (9th Cir. 2008).

Here, defendants rely solely on the fact that DeSantis had been shooting a weapon inside his residence as grounds for arguing that it was objectively reasonable for them to believe that DeSantis was still armed when he was shot outside of the house. However, an important distinction exists between (1) knowledge that DeSantis was armed and (2) a reasonable belief that he might be armed.[6] For example, Officer Menke testified in the following manner:

---

[6] Should the Court accept the defendants reasoning, it would be reasonable to shoot the driver in almost any traffic stop because he might be armed.

PLAINTIFFS' REPLY AND OPPOSITION TO DEFS MOTION FOR SUMMARY JUDGMENT

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

1    Q. And did you shoot him because you assumed he had a gun?

2    A. Under the circumstances I think it was within reason to assume he had
     a gun, yes, he was armed.

3

4    Q. So it would be fair to say that you shot because you assumed he had a
     gun?

5    A. I shot because I thought he was coming to kill me.

6    Q. Did you think he was going to kill you with a gun you assumed he had?

7    A. I felt it was reasonable.

8    Defendants' Opposition/Reply at p. 20:23-21:9.

9        Officer Mann testified that she also believed that DeSantis was armed and that her fear for

10   herself extended to her fellow officers, as well as the safety of others in the neighborhood.

11
     Q. Okay. Now when Mr. DeSantis was running toward you, when he got
12   up from position number 2 and was running in your direction, did you
     believe he was going to kill you?
13
     A. Yes, either myself, Officer Menke, Officer Ellsworth.
14
     Q. And how did you think he was going to kill you?
15
     A. There was a variety of ways he could have, all of which went through
16   my mind; that he was still armed and would present that weapon that he
     could use it against me or another officer.
17
     Q. Okay.
18
     A. That he could physically take my gun away from me or Officer
19   Menke's gun away from him or start wrestling with Officer Ellsworth in
     an attempt to disarm him.
20
     Q. What else were you worried about?
21
     A. Well, just him physically fighting with me and resulting in serious
22   injury or death. Again, also fighting with any of the other officers on
     scene.
23
     Q. Okay, so you thought that because shots had been fired earlier and
24   because he was running at you, that he was an imminent threat to your
     life?
25
     A. As well as the other officers on scene and anyone else who may have
26   been in the area.

27   Defendants' Opposition/Reply at 22:8-24.

28

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

- 8 -

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

As to defendants Menke and Mann the same reasoning applies to them as to Sgt. Celli. They saw essentially the same things regarding DeSantis behavior and appearance. His hands were visible at all times, no weapon was visible, there was no furtive gesture(s), and DeSantis made no verbal threats. However, there are two important distinctions. First, they were rookies with nowhere near Sgt. Celli's experience and training. Second, Celli fired first and their shots were a classic example of "sympathetic gunfire".

It also bears mentioning that Sgt. Celli had been involved in a shooting incident approximately two months earlier and had hundreds of hours of training as a member of the SWAT team. His experience and background are symbolic of the phrase - "If you only teach someone to use a hammer, every problem is perceived as a nail."

Again, a court "may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir. 1994). The following facts show that there is an incongruity between defendants' subjective beliefs and the undisputed factual circumstances they encountered at the scene.

Based upon information relayed by dispatch, it was reasonable that Celli and the other defendants believed that DeSantis was armed *prior* to their arrival at his residence. However, this belief became increasingly less reasonable **after** the defendants arrived and continued to be so throughout the encounter.

When defendant Celli arrived at DeSantis' residence, DeSantis was outside on the porch. (Celli Depo, 214:13-16). He did not run inside his house nor disappear for any period of time while defendants were present. The area was well lit. (Jones Depo, 102:1; Celli Depo, 81:18-21). He was shirtless. (Celli Depo, 83:1-22). Sgt. Celli observed that there was no bulge or object in DeSantis's waistband. (Celli Depo, 217: 10-13).

- 9 -

DeSantis's hands were visible at all times, including when he was running towards Menke and Mann. (Celli Depo, 128:8-12; 134:22-135:14; Menke Depo, 63:17-23; Mann Depo, 87:8-9; Jones Depo, 38:19-20; Soares Depo, 123:15-17); see, *Cf. Dague v. Dumesic*, 2008 U.S. App. 15511 (9th Cir. 2008)(plaintiff kept his left hand concealed during standoff and made a threatening movement with that hand).

DeSantis did not make any furtive movement indicative of reaching for a weapon. See, *Cf. Cunningham v. Gates*, 229 F.3d 1271, 1289(9th Cir. 2000)(movement of hand towards waistband as if reaching for a gun as grounds for deadly force).

DeSantis did not say anything during the encounter. (Celli Depo. 109: 2-16; Soares Depo.125: 12-24; Jones Depo. 52:17-18); see, *Cf. Long v. City and County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007)(verbal threats to shoot the police); Price *v. Sery*, 513 F.3d at 969 (sincerely held but unreasonable belief does not justify the use of force under *Garner and Graham*).

### 3. *DEADLY FORCE WAS UNREASONABLE IN LIGHT OF THE FACTORS IN GRAHAM V. CONNOR*

The reasonableness of defendants' belief is based, in part, upon the three factors stated in *Graham v. Connor*, i.e., "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he . . . actively resist[ed] arrest or attempt[ed] to evade arrest by flight."[7] *Graham*, 490 U.S. at 396. Defendants were called to DeSantis's residence for his shooting at the ceiling of his house. There was no evidence that

---

[7] The factors set out in Graham are reflected in the Ninth Circuit Court of Appeals Jury Instructions for Fourth Amendment-Excessive/Deadly Force Claims. (9th Circuit Model Civil Jury Instruction No. 9.22) They are the first three factors. Other factors include (4.) The amount of time and any changing circumstances during which the officer had to determine the type and amount of force that appeared to be necessary; (5.) The type and amount of force used; (6.) The availability of alternative methods [to take the plaintiff into custody] [to subdue the plaintiff]; [(7.) *Other factors particular to the case, including a person who is emotionally disturbed]* Plaintiff will address both the availability of alternative methods to subdue plaintiff as well as the reasonableness of the force employed on an emotionally disturbed plaintiff, *infra*.

PLAINTIFFS' REPLY AND OPPOSITION TO DEFS MOTION FOR SUMMARY JUDGMENT

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

DeSantis was threatening his wife, children, or any other person. According to the dispatch, DeSantis was having a mental break that involved paranoid delusions that there were people in the attic of his house. This is in stark contrast to *Forrett v. Richardson*, 112 F.3d 416 (9th Cir. 1997)(plaintiff committed a violent residential burglary involving the shooting and tying up of several victims).[8]

*Graham*'s second factor, "whether suspect posed an immediate threat to the safety of the officers or others"[9] must be answered in the negative. Upon arriving at DeSantis's house, the six officers drew their guns and positioned themselves on either side of the driveway. They observed that DeSantis was unarmed, with no bulge in his waistband, he made no furtive gestures, was mentally unstable, and initially complied with their commands. DeSantis was clearly outnumbered and surrounded by six armed police officers and one attack dog. All were trained to protect themselves and each other. DeSantis did not pose an imminent threat of death or serious physical harm.[10] Additionally, DeSantis's threat to the safety of innocent bystanders[11] was also

---

[8] Defendants rely upon *Forrett v. Richardson,* (9th Cir. 1997) 112 F.3d 416, 420 for the proposition that it is not necessary for the suspect to be armed or to have threatened an officer in order for an officer to have probable cause to believe that the suspect poses a threat of serious harm either to the officers or others. The facts in *Forrett* however are inapposite to the facts at bar as the plaintiff in *Forrett* committed a violent residential burglary, subdued, and tied up three victims, shot one of the victims in the neck at point blank range and shot at another using a .38 caliber revolver he found in the house. Thus, although unarmed at the time of his encounter with law enforcement, it was reasonable for law enforcement to use deadly force because they had "probable cause to believe that he committed a crime involving the infliction or threatened infliction of serious physical harm." *Garner*, 471 U.S. at 11-12.

[9] In *Price v Sery,* 513 F3d 962, 969 (9th Cir 2008), the Ninth Circuit makes a distinction between deadly and excessive force. The court states, "when there is objective reason to fear for one's safety but not one's life, then force short of deadly force might be justified; **to justify deadly force, an objective belief that an imminent threat of death or serious physical harm is required**". *Id.* at 969.

[10] Although plaintiff recognizes that "police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving . . .." *Billington v. Smith*, 292 F.3d 1177, 1184 (9th Cir. 2002), this case is unlike those in which the lone officer is confronted with a violent fleeing felon and is forced to make an exigent split second judgment call. For example, in *Billington*, unlike here, the officer shot the subject when the officer was "locked in hand-to-hand combat and losing . . . . [The subject] actively, violently, and

PLAINTIFFS' REPLY AND OPPOSITION TO DEFS MOTION FOR SUMMARY JUDGMENT

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

1   clearly minimal.  Defendants' statements that they were afraid for their lives and the lives of

2   others does not comport with the facts and circumstances they confronted on April 9, 2007.

3         The third factor, whether the suspect "actively resisted arrest or attempted to evade arrest

4   by flight" is admitted.  Although initially complying with defendants' command to lie on the

5   ground with hands in front, DeSantis ran in defendants' direction. The Supreme Court has

6   qualified this factor to mean that deadly force may only be used if it is necessary to prevent

7
8   escape when the suspect is known to have committed a crime involving the infliction or

9   threatened infliction of serious physical harm and thus poses a threat to others. *Scott v Harris*, 127

10  S. Ct. at 1777. Here, DeSantis's act of shooting a firearm at nonexistent beings in his attic is not

11  the kind and quality of crime necessitating deadly force to prevent him from evading arrest.[12] The

12  facts at bar epitomize the Supreme Court's cautionary note that "it is not better that all felony

13  suspects die than that they escape." *Garner* at 11-12; See also,  *Haugen v. Brosseau,* 351 F.3d

14  372 (9th Cir. 2003) (as amended), *rev'd*, 543 U.S. 194 (2004)(defendant's belief that escape

15
16  would harm fellow officers was objectively unreasonable); *Harris v. Roderick,* 126 F.3d 1189

17  _____

18  successfully resisted arrest and physically attacked [the officer] and tried to turn [his] gun against
    him. . . . [The subject] was trying to get the detective's gun, and he was getting the upper hand."
19  *Id.* at 1185.

20      [11] Defendants also state that they were concerned for the "safety of Mrs. DeSantis and her
    children." Defendants' Opposition/Reply at p. 16:13-15. Again, this belief was unreasonable
21  when evaluated against the undisputed facts and circumstances defendants' encountered. Mrs.
    DeSantis was standing next to her husband outside their residence when defendants arrived. (Celli
22  Depo, 214:13-16). She stood at the door and yelled to defendants that her husband had a mental
    illness and he was in crisis. (Jones Depo, 36:16-24; 52:6-8). These facts belie defendants' belief
23  that, at the time he was shot, DeSantis posed an immediate threat of death or serious physical
    injury to his wife.

24      [12] As one of the factors a jury can consider in deciding a Fourth Amendment Deadly Force
25  claim (See Ninth Circuit Court of Appeals Pattern Jury Instructions No. 9.22), police awareness
    that an individual is emotionally disturbed is relevant in determining whether police conduct was
26  reasonable. See *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001). In *Deorle*, defendant
    police officers unreasonably shot and killed an emotionally disturbed individual. The court held
27  that "where an emotionally disturbed individual is "acting out" the governmental interest in using
    deadly force is diminished by the fact that the officers are confronted, not with a person who has
28  committed a serious crime against others, but with a mentally ill individual. *Deorle*, 272 F.3d at
    1283.

PLAINTIFFS' REPLY AND OPPOSITION TO DEFS MOTION FOR SUMMARY JUDGMENT

1    (9th Cir. 1997)(plaintiff posed no threat to anyone and thus deadly force upon escape was

2    objectively unreasonable).

3         The Court may consider the availability of alternative methods to subdue DeSantis.

4    Relying on case law, defendants argue in their Opposition/Reply that they had no constitutional

5    duty to use non-deadly alternatives where deadly force can be justifiably used. See Defendants

6    Opposition/Reply at p. 16:21-19. This however is inaccurate.  The Ninth Circuit Court of Appeals

7    Jury Instruction No. 9.22 expressly states that one factor a jury can consider in its determination

8    of objective reasonableness is "the availability of alternative methods [to take the plaintiff into

9    custody] [to subdue the plaintiff]." See also, *Smith v. City of Hemet*, 94 F.3d 689, 701 (9th Cir.

10   2005) (courts may also consider the availability of alternative methods of capturing or subduing a

11   suspect); see also, *Chew v. Gates*, 27 F.3d 1432, 1440 n.5 (9th Cir. 1994)(the availability of

12   alternative methods of capturing or subduing may be a factor in the consideration of

13   reasonableness) Plaintiffs will not reiterate the arguments set out in their opening brief but wish to

14   correct defendants inaccuracy.  The court may consider defendants failure to employ alternative

15   methods of subduing DeSantis in its evaluation of reasonableness.

16

17        **B.  Defendants Are Not Entitled to Qualified Immunity.**

18        With respect to a deadly force claim, the first stage of the qualified immunity

19   analysis inquires "whether it would be objectively reasonable for the officer to believe that the

20   amount of force employed was required by the situation he confronted . . . . That is, the first step

21   in the analysis is an inquiry into the objective reasonableness of the officer's belief in the

22   *necessity* of his actions, and there is no Fourth Amendment violation if the officer can satisfy this

23   standard." *Wilkins v. City of Oakland,* 350 F.3d 949, 954 (9th Cir. 2003). Relying on arguments

24   set out above, defendants' belief in the necessity of resorting to deadly force was objectively

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

- 13 -

unreasonable.  Thus, DeSantis's Fourth Amendment right to be free from excessive force was violated.

The second step in a qualified immunity analysis is to consider whether the Fourth Amendment right prohibiting the use of deadly force, except when the lives and safety of others are seriously imperiled, was clearly established on April 9, 2007. The law governing the use of deadly force has been clearly established since the Supreme Court decided *Garner* in 1985. In addition, as early as 1996, the Ninth Circuit Court of Appeals held, without further comment, that "the law governing when an officer may use deadly force against an unarmed fleeing suspect was clearly established . . .." *Acosta v. City & County of San Francisco*, 83 F.3d 1143, 1147 (9th Cir. 1996)(where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so).

As the above analysis clearly illustrates, the defendants acted in violation of clearly established law when they shot DeSantis. A reasonable officer would have understood that shooting DeSantis under the circumstances that Celli confronted violated DeSantis's right to be free from unreasonable seizure. *Anderson v. Creighton,* 483 U.S. 635 (1987). Therefore, the shield of qualified immunity is unavailable to him. See *Price v. Sery*, 513 F3d 962 (9th Cir. 2008); *Deorle v. Rutherford* 272 F.3d at 1286 (every police officer should know that it is objectively unreasonable to shoot an unarmed man who is mentally or emotionally disturbed and has been given no warning of the imminent use of such a significant degree of force).

**C.  Triable Issues of Fact Preclude Summary Judgment on the *Monell* Claim**

The plaintiffs are pursuing three alternative theories of municipal liability in this case: (1) that the officers' conduct was ratified by the final decision-maker for the City of Santa Rosa; (2) the City is liable because of a failure to adequately train police officers in responding to 5150 situations; and (3) the City of Santa Rosa maintained a *defacto* of failing to discipline officers for

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

excessive force policy that authorized, encouraged and condoned excessive force by police officers.

Unlike police officers, a public entity may not assert qualified immunity in an action brought under Section 1983. In addition, for purposes of summary judgment, the Court must draw all inferences in favor of the non-moving party. Moreover, the plaintiffs' burden of proof at trial in this case is a mere "preponderance" of the evidence, rather than the "beyond a reasonable doubt" criminal standard.

### 1. The Officers Conduct was Ratified by the Final Decision Maker for the City of Santa Rosa.

Edwin F. Flint was hired as Chief of Police for the City of Santa Rosa in January 2004. He retired in August 2008. He had a lengthy career in law enforcement in the Sacramento area before taking the job in Santa Rosa. (Flint Depo, pp. 6-8)

As Chief of Police he reviewed the entire report regarding the shooting of Richard DeSantis. (Flint Depo, 51:1-23) As Chief of Police for the City of Santa Rosa he had the ultimate authority to review and approve the shooting in terms of whether the deadly use of force was appropriate and/or within policy. He was the final policy maker for the Police Department and the City. (Flint Depo, 130:8-19)

While it is true that there is *respondeat superior* liability in a Section 1983 action, *Monell v. Dept. of Social Srv's*, 436 U.S. 658, 691 (1978), municipal liability may attach when a final policy maker ratifies a subordinate's unconstitutional action and the basis for it. *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir 1999) Ratification requires both knowledge of the alleged constitutional violation, and proof that the policy maker specifically approved of the subordinate's act. *Ulrich v. City and County of San Francisco*, 308 F.3d 168, 985 (9th Cir 2002). For a person to be a final policy maker, he or she must be in a position of authority such that a

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

final decision by that person may appropriately be attributed to the defendant public body. *Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir 2004).

Ninth Circuit Model Jury Instruction 9.6 sets forth the applicable law as it relates to a 1983 claim against a municipal defendant alleging liability based on ratification by a final policy maker.  Based on the testimony of Chief Flint there is unrebutted evidence that he ratified the shooting of Richard DeSantis as a final decision maker for the City of Santa Rosa.

### 2.  The City is Liable Because of a Failure to Train Police Officers in Responding to 5150 Situations.

*Monell* liability may attach based on a policy of inaction that demonstrates deliberate indifference to constitutional rights.  The policy of inaction must be a conscious or deliberate choice among various alternatives. *Berry v. Baca*, 379 F.3d 764, 767 (9th Cir 2004).

A violation of federal rights may be a highly predictable consequence of failure to equip law enforcement officers with training to handle recurring situations.  The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify finding that policy makers' decision not to train the officer reflected "deliberate indifference" to the obvious consequences of the policy maker's choice. *Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004).

Between 2002 and 2007 there were approximately 3,186 incidents identified as possibly involving a 5150 issue out of 58,000 incidents. Of those, approximately 1,746 cases during that period involved persons who were reported to be detained under Section 5150 of the Welfare and Institutions Code. (Van Artsdalen Depo, 125:22 – 127:21)

In contrast, an incident where deadly force may have to be employed by a police officer is a rare event in Santa Rosa.  Between 2002 and 2007 there were four officer involved incidents involving death or the use of deadly force.  Two resulted in death. Defendant Sgt. Celli was

involved in both shootings resulting in death. (Van Artsdalen Depo, 111:22 – 112:13; Celli Depo, 168:5 – 175:20)

Chief Flint testified that police officers in Santa Rosa have to deal with emotionally disturbed or mentally ill people on a frequent basis, if not daily.  (Flint Depo, 83-89) Nevertheless, he was unfamiliar with any specifics relating to training received by his officers in relation to 5150 situations involving mentally ill subjects. The person most knowledgeable for the City, Sgt. Van Artsdalen, testified that when he was in charge of training for the Police Department there was no training specific for 5150 situations. (Van Artsdalen Depo, 47:19 - 49:4; 135:15 - 137:10)  Sgt. Celli received on the job training relating to contacts with 5150 related incidents. (Celli Depo, 183:25 – 185:13)

Plaintiff's police practice expert Ron Martinelli states at page 24 of his report:

> It is critical that reasonably trained and experienced police officers who regularly place themselves in harms way should be able to confidently rely upon their training, experience and legal guidelines when considering the use of any level of force without second guessing themselves. However, it is not only reasonable but, critical that those same police officers be provided with adequate training, supervision, policies and oversight to assist them in making potentially life and death decisions.

> It is my belief that the City of Santa Rosa and its police department failed to provide update training to their police officers beyond the academy level in several key police practices relating to this incident. The lack of foresight, strategic planning, and update training contributed to the decedent's and plaintiff's injuries.

Ninth Circuit Model Jury Instruction 9.7 sets forth the elements and burden of proof for a Section 1983 claim against a local governing body based on a policy of failure to train. By applying the evidence presented herein to that jury instruction it is clear that the plaintiffs have submitted sufficient evidence to raise a triable issue of fact as to this issue.

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

- 17 -

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

### 3. The City of Santa Rosa Maintained a De Facto Policy that Authorized, Encouraged and Condoned Excessive Force by Police Officers.

Chief Flint testified that, in performing his function in reviewing and evaluating the use of deadly force by Santa Rosa police officers, his policy was follow the determination by the District Attorneys' Office regarding whether the shooting was a criminal act. (Flint Depo, 35:17-37:16) According to Chief Flint – "if the police shooting is not a criminal act, then, it is within the policy." (See also, Van Artsdalen Depo, 112:10 – 114:11)

The standard Chief Flint employed to determine whether an officer violated the use of force policy was "proof beyond a reasonable doubt, from a criminal law stand point." (Flint Depo, 113:7-17)  This *defacto* policy is compounded by the fact that Chief Flint applied an essentially "subjective" standard in evaluating whether the application of deadly force was reasonable and justified. According to Chief Flint it is "an objective standard of reasonableness in the mind of the officer, whether he or she believes that great bodily harm is imminent." (Flint Depo, 99:2-25)

These *defacto* policies relating to the standard by which the Department's use of force policies were interpreted and implemented had the foreseeable effect of encouraging, condoning and ratifying the use of force, including deadly force, by Santa Rosa police officers who were inclined to abuse their authority.

Plaintiffs' expert Ron Martinelli declared as follows:

It is also my belief that the police department administration used an incorrect standard in determining whether they should investigate officers in their department for possible violations of the law and department policies and procedures.

The department's Chief of Police acknowledges that the decision as to whether they should investigate use of force/deadly force incidents and possible violations of law appears to rest upon whether the involved officer(s)' use of force were criminal "beyond a reasonable doubt".  This policy, standard and/or informal practice appears to be inconsistent with

- 18 -

1
2

the Internal Affairs investigations training approved by the Commission on Peace Officer Standards & Training (CA-POST).

3
4
5
6
7

No law enforcement agency that I am aware of uses the legal/criminal standard of "beyond a reasonable doubt" to determine whether an officer violated department policy. Classically, the law enforcement industry standard for determining out of policy violations and to pursue disciplinary action against an officer suspected of violating department policy is the "preponderance of evidence". The agency's policy or practice in this regard has the effect of encouraging and condoning officers who use excessive force, including deadly force.

8

Martinelli Rebuttal Report, p. 24

9

Municipal liability may occur pursuant to a governmental "custom" even though such a

10

custom has not received formal approval. *Monell v. Dept. of Social Services*, 436 U.S. 658, 690 –

11

91 (1978). Customs have also been referred to as *defacto* policies for purposes of municipal

12

liability. For such a theory of liability to exist the plaintiffs must prove, by a preponderance of

13

the evidence, not only the existence of the *defacto* policy or custom, but also that the alleged

14

policy be the "moving force" behind the violation. There must be an "affirmative link" between

15

the policy and the constitutional violation. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823

16

(1985).

17

18

Many courts have recognized that a policy or custom that tolerates the use of excessive

19

force may be actionable under Section 1983. *Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir

20

1987); *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir 1987); *Grandstaff v. City of Borger*, 767 F.2d

21

161 (5th Cir 1985); *Bielevicz v. Dubinon*, 915 F.2d 845 (3rd Cir 1990). However, what is unique

22

about this case is that the plaintiff has been unable to locate any decision where a Police

23
24

Department's policy regarding discipline for the use of force was whether the officer had

25

committed a crime.

26
27
28

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

PLAINTIFFS' REPLY AND OPPOSITION TO DEFS MOTION FOR SUMMARY JUDGMENT

The plaintiff believes that this custom or unwritten policy is unprecedented – both factually and legally. However, both common sense and logic lead to the conclusion that such a policy will have the inevitable effect of authorizing and encouraging excessive force in a police department. While it is true that many officers may not be predisposed to abuse their authority or engage in excessive force, history tells us that it is inevitable that some officers will abuse their authority and engage in excessive force. Whether such a policy was a "moving force" in the shooting death of Richard DeSantis is a question of fact for a jury to decide.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motion for partial summary judgment should be GRANTED. In the alternative, defendants' motion for summary judgment should be DENIED.

DATED: September 19, 2008                     Respectfully submitted,

                                              **SCOTT LAW FIRM**

                                              By:_____/s/ John H. Scott_____
                                                      JOHN HOUSTON SCOTT

*F:\Cases\Cases - Active\DeSantis\Pleadings\Reply and Opposition to MSJ.09 16 2008.doc*

**SCOTT LAW FIRM**
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

PLAINTIFFS' REPLY AND OPPOSITION TO DEFS MOTION FOR SUMMARY JUDGMENT