# EXHIBIT A

Ron Martinelli, Ph.D.
Criminologist/Expert Witness
Martinelli & Associates: Justice & Forensic Consultants, Inc.
42143 Avenida Alvarado, Suite B-2
Temecula, California 92590
Phone: (951) 719-1450

Expert Witness for the Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PATRICIA DeSANTIS, individually and as Successor in Interest for RICHARD DeSANTIS, deceased, and as Guardian Ad Litem for DANI DeSANTIS, a minor and TIMOTHY FARRELL, a minor<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF SANTA ROSA, JERRY SOARES, RICH CELLI, TRAVIS MENKE, PATRICIA MANN, and Does 1 through 25, inclusive,<br><br>Defendants. | Case No. C-07-3386 JSW & C-07-4474<br><br>**REBUTTAL REPORT OF DEFENDANTS' POLICE PRACTICES EXPERTS FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B) REPORTS BY PLAINTIFF'S POLICE PRACTICES EXPERT RON MARTINELLI, Ph.D.** |

I have been retained by *The Scott Law Firm, Attorney John Scott, Esq. and the Law Offices of Attorney Eric Safire, Esq.,* as "expert witness" in the above civil action. I have reviewed the FRPP Rule 26(a) expert witness declarations and reports submitted by the defendants' police practice experts Joseph Callahan and Marvin Gangloff and am submitting the following report in rebuttal.

My rebuttal report is based upon of my review of the evidence received to date from the defendants and plaintiffs; my inspections of the shooting scene; as well as my review of other information and case laws relating to the various aspects of police practices and training involved in this case.

As is my custom and practice, I reserve the right to amend, alter, enhance or delete findings and opinions based upon my receipt and review of any subsequent new information pertaining to this case.

## POINTS OF REBUTTAL

The defendants' police practices experts have relied upon speculation, outdated officer safety and mental health training information, and other incorrect information in forming several of their most critical findings and opinions in this case. A review of these errors and improper speculation re-clarify the actual fact pattern and circumstances that existed at the time of this incident, and allow for a more considered analysis and opinion as to whether the defendant officers' actions, including the ultimate decision to use deadly force upon the decedent in this case, were objectively reasonable. The trier of fact will ultimately decide whether the defendants' police practices expert's stated "observed fact pattern" is in fact accurate.

Opinion of Expert Callanan:  The actions of Richard DeSantis (deceased) caused his wife to fear for the safety of herself and her children. [1]

---

[1] Expert's Report, "Observed Fact Pattern," §§6.00, 6.01

*Expert's Rebuttal Report, Dr. Ron Martinelli, Ph.D.*          2

_Rebuttal:_ There is no basis in fact that Mrs. DeSantis ever expressed any fear towards her husband, or felt that he might hurt the couple's children.

At no time during this incident did the Plaintiff Patricia DeSantis ever advise anyone involved in the events that she was afraid that her husband Richard DeSantis was going to harm her or the couple's two children. In point of fact, on the early morning hours of April 9, 2007 at approximately 0116 hours, Plaintiff Patricia DeSantis telephoned the Santa Rosa Police Department's Emergency 9-1-1 line operated by Sonoma County Sheriff's Department Communications, to report that her husband (deceased) Richard DeSantis was bi-polar, going through a manic phase crisis, exhibiting paranoid delusions and was shooting a Glock semi-automatic pistol into the bedroom ceiling. [2] Mrs. DeSantis informed the police dispatchers that her husband had recently resumed his lithium psychotropic medication regimen, was not trying to hurt anyone, and was trying to protect her and their two small children from imaginary people whom he thought were in the attic. [3], [4]

_Opinion of Expert Callanan: Richard DeSantis "orchestrated" a very serious, life threatening and high-risk situation._ [5]

_Rebuttal:_ While there is no doubt that the actions of Richard DeSantis placed the responding officers and himself in extreme danger; DeSantis' actions both prior to and

---

[2] Transcript, Sonoma County Communications 9-1-1 phone call from Plaintiff DeSantis, dated: 04-08-07, pp. 1-6

[3] Ibid., pp. 1-6

[4] Officer-Involved Shooting (OIS) Interview, Patricia DeSantis, pp. 19-20

[5] Expert's Report, "Observed Fact Pattern," §6.04

_Expert's Rebuttal Report, Dr. Ron Martinelli, Ph.D._        3

upon the arrival of the involved police officers was far from "orchestrated". The very term "orchestrated" infers that decedent DeSantis composed, arranged and choreographed his actions to achieve a desired effect that Mr. Callanan would have us believe was a dynamic known as Officer Assisted Suicide or "Suicide by Cop (SBC)".

There is absolutely no evidence in this case to suggest that Richard DeSantis displayed any psychological symptoms which could have been recognized or interpreted by reasonably trained officers as being suicidal. Nor have the defendant officers and their police practices expert presented any credible evidence of any physical manifestations of choreographed SBC actions on the part of the decedent which were so obvious in their nature as to cause the officers to believe that Richard DeSantis wanted to commit suicide by having police kill him.

Rather, all of the information provided to the involved officers either by police dispatchers, Mrs. DeSantis; or manifested by the decedent himself, should have allowed a reasonably trained officer to observe that Richard DeSantis was a mentally unstable individual with a bi-polar disorder who was in crisis. Further, the involved officers had already been informed that Mr. DeSantis' actions prior to their arrival - albeit dangerous - were paranoid, delusional and not intended to harm anyone but the unseen, imaginary people that he had hallucinated were in his attic. [6], [7], [8] Any suggestions by the defendant's police practices expert that DeSantis was suicidal is nothing less than pure speculation.

---

[6] Ibid., Transcript, Sonoma County Communications 9-1-1 phone call from Plaintiff DeSantis, pp. 1-6

[7] Ibid., Officer-Involved Shooting (OIS) Interview, Patricia DeSantis, pp. 19-20

[8] Ibid., p. 22

*Expert's Rebuttal Report, Dr. Ron Martinelli, Ph.D.*          4

While the mental health information the defendant officers had knowledge of prior to shooting and killing Mr. DeSantis does not mitigate the obvious risks he posed at the time; the information nevertheless should have provided a foundation for a more competent tactical response to Mr. DeSantis' actions in "real time" during this incident.

Opinion of Expert Callanan: The field conditions were "extraordinarily difficult" and containment, evacuation, cover, maneuver and communications tasks were limited. [9]

Rebuttal: Contrary to the defendants' police expert's opinion that the grounds upon which this incident took place presented the involved officers with "extraordinary difficulty"; the immediate area provided all of the officers with sufficient cover, concealment, overt and ambient lighting and mechanisms of subject containment. The area also provided an entire rearward area for officer disengagement and extraction to the south, east and west of South Avenue.  Excellent cover sufficient to stop a bullet was available to Officers Menke and Mann who state that they were concealed behind the southwest wall of the residence at 633 South Avenue, and for Sergeants

---

[9] Ibid., Expert's Report, "Observed Fact Pattern," §6.03

*Expert's Rebuttal Report, Dr. Ron Martinelli, Ph.D.*          5

Celli, Soares and Officer Jones who were concealed behind the southeast wall of the residence at 629 South Avenue. [10], [11], [12], [13], [14], [15], [16], [17], [18], [19], [20], [21]

The involved officers could or may have also used a commonly trained tactic referred to as "wedging" or "slicing the pie" to maintain both cover and concealment from Mr. DeSantis without ever revealing or compromising their positions to fire.

Once outside of his residence, Mr. DeSantis was physically contained on the eastside by his physical residence, walled carport and adjacent duplex unit at 629 South Avenue. Sergeants Celli and Soares and Officer Jones blocked any escape to the south and southeast. To the north and immediately adjacent to the DeSantis unit, escape was blocked by a five foot and another seven foot solid wooden fence. To the west, escape was blocked by a solid wooden five foot fence, followed by another six

---

[10] OIS Crime Scene Diagram & Crime Scene Photos

[11] Ibid., OIS Interview of Ofc. Menke, pp. 6-9

[12] OIS Interview of Ofc. Ellsworth, dated: 04-09-07, p. 13

[13] OIS Interview of Ofc. Mann, dated: 04-09-07, pp. 16, 18

[14] OIS Interview of Ofc. Jones, dated: 04-09-07, p. 3

[15] Ibid. OIS Interview, Ofc. Jones, pp. 2-3

[16] OIS Interview of Sgt. Celli, dated: 04-23-08, p. 9

[17] OIS Interview of Sgt. Soares, dated: 04-10-07, p. 10

[18] OIS Interview of Sgt. Soares, dated: 04-10-07, pp. 3, 17

[19] Ibid., OIS Interview, Ofc. Jones, p. 3

[20] Ibid., OIS Interview, Sgt. Celli, p. 3

[21] Measurements from SCOSO crime scene diagram and expert's site inspection of
05-12-08

1   foot fence, and the walled in carport and residence of 633 South Avenue. Officers

2   Menke, Mann, Ellsworth and K-9 Duke blocked any escape to the south and northwest.

3   In addition, two vehicles obstructed DeSantis from quickly reaching the southwest

4   corner of the parking area.

5        The involved officers also had the benefit of having a working area with unique

6   "protective distance" and a "reactionary gap" between themselves and Mr. DeSantis.

7   [22] The parking area in which the officers had contained DeSantis was relatively large at

8   approximately 120 feet by 50 feet. The distance from the front steps of the DeSantis

9   residence to the southwest corner of the residence at 633 South Avenue (SW corner)

10  where Officers Menke and Mann took cover was approximately seventy-eight (78') feet

11  and to the tree where Officer Ellsworth and his K-9 were concealed was approximately

12  114 feet. [23] Sergeant Soares has estimated that DeSantis was approximately eighty –

13  eight-five feet (80-85') from his position after Officer Menke had directed him to the

14  ground and DeSantis suddenly rose up to come towards the officers. [24]

15    In no way were communication options limited for the involved officers. The

16  officers had the benefit of immediate voice, radio and silent hand communication.

17  However, the officers created their own communication problems by failing to use any

18  communication options because of their over-excitement and lack of situational

19  awareness. During this entire incident, the involved officers including Sergeant Celli

20

21  _____

22  [22] "Reactionary gap," def. officer safety tactical concept that compares distance with reaction

23      time. The greater the distance, the more time officers have to react to something a subject

24      does.

    [23] Diagram and measurements from crime scene inspection, dated: 05-12-08

25  [24] OIS Interview, Sgt. Soares, dated: 04-10-07, p. 22

have stated that other than Sergeant Celli providing one direction to Officer Menke and Sergeant Soares advising the officers that he had a "SAGE" less lethal rifle; it is acknowledged by the involved officers that no other communication between them took place during this critical incident. [25], [26], [27]

Even after Officer Menke had managed to direct Mr. DeSantis to a position of relative control, no one exploited the opportunity to communicate tactical directions to the assembled officers, or assume dialog to calm the mentally unstable and paranoid DeSantis. Sergeant Celli as incident commander also failed to take advantage of time created by DeSantis' compliance to develop and direct his officers towards a tactical plan that addressed the changing circumstances that had occurred between the time they first encountered DeSantis and the time they had him in a relative position of compliance and verbal control.

Opinion Expert Callanan: The involved officers had "good reason to believe" that DeSantis was still armed and dangerous. No information or observations suggested otherwise. [28]

Opinion Expert Callanan: It was reasonable to consider that DeSantis' conduct was already at a "gun violence level" and there was no indication that he had de-escalated. [29]

---

[25] Ibid., OIS Interview, Sgt. Soares, pp. 5, 14

[26] Ibid., OIS Interview, Ofc. Mann, p. 14

[27] Ibid., OIS Interview, Ofc. Jones, pp. 13, 26

[28] Ibid., Expert's Report, "Observed Fact Pattern," §6.09

[29] Ibid., Expert's Report, "Observed Fact Pattern," §7.23

*Expert's Rebuttal Report, Dr. Ron Martinelli, Ph.D.*        8

Rebuttal: Mr. Callanan's finding that the involved officers had good reason to believe that Richard DeSantis was armed and that "no information or observations suggested otherwise", and that he was at a "gun violence level" and had not de-escalated is unsupported by the facts of this case and the testimony of Plaintiff Patricia DeSantis and all of the involved officers.

Mrs. DeSantis had advised the involved officers that she had taken her husband's gun away from his and that he was unarmed. [30] At the time that the officers encountered Richard DeSantis, he was attired only in a pair of pants.   The involved officers have repeatedly stated that they never observed anything resembling any weapons in his waistband, nor any suspicious bulges in his pants pockets that they could identify as being a possible weapon.  Officer Jones has explained that during this incident he was continually assessing DeSantis' pants for bulges in his clothing that might indicate the presence of a weapon and observed nothing suspicious. Officer Jones also states that he could see his back at the waistline and didn't see any bulges in the back of DeSantis' pants. [31], [32], [33]

[30] OIS Interview of Patricia DeSantis, dated: 04-09-07, p. 71

[31] Ibid., Deposition, Sgt. Celli, Vol. II, p. 260

[32] Ibid., OIS Reports, Ofc. Jones, Tab 2, pp. 4-5

[33] Ibid., Deposition, Ofc. Jones, p. 101

*Expert's Rebuttal Report, Dr. Ron Martinelli, Ph.D.*          9

The involved officers have repeatedly stated that during the process of following Officer Menke's directions, DeSantis had his hands either up or outstretched as directed and that his hands at all times were open and empty of weapons. [34, 35, 36, 37, 38, 39, 40] The involved officers have unanimously and repeatedly stated that from the time they first encountered DeSantis, until the time just before he was fatally shot, his hands were empty, he made <u>no furtive movements</u> indicating that he might be armed and <u>no one</u> ever saw him in possession of any type of weapon. [41, 42, 43, 44, 45, 46, 47]

The officers who fatally shot DeSantis and their police practices expert only offer non-factually based conjecture as to the <u>potential</u> of the decedent arming himself while running towards them.

---

[34] Ibid., OIS Interview, Patricia DeSantis, p. 7

[35] Ibid., OIS Interview, Ofc. Mann, pp. 16-17

[36] Ibid., OIS Interview, Sgt. Celli, p. 11

[37] Ibid., OIS Interview, Ofc. Ellsworth, p. 25

[38] Ibid., OIS Interview, Ofc. Menke, p. 7

[39] Ibid., OIS Interview, Ofc. Jones, pp. 9, 18

[40] Ibid., Deposition, Ofc. Jones, p. 57

[41] Ibid., OIS Reports, Ofc. Jones, Tab 2, pp. 4-5

[42] Ibid., Deposition, Sgt. Celli, Vol. II, p. 260

[43] Ibid., OIS Reports, Ofc. Jones, Tab 2, pp. 4-5

[44] Ibid., Deposition, Ofc. Jones, p. 101

[45] Ibid., Deposition, Sgt. Celli, Vol. II, p. 260

[46] Ibid., OIS Reports, Ofc. Jones, Tab 2, pp. 4-5

[47] Ibid., Deposition, Ofc. Jones, p. 101

<u>Opinion Expert Callanan</u>: Richard DeSantis was "generally non-compliant" with the involved officers' verbal commands. [48]

<u>Rebuttal</u>: The involved officers unanimously state that upon their initial contact with DeSantis, he complied with their directions and commands. While it is acknowledged that in several instances DeSantis appeared to be reluctant to obey Officer Menke's commands to the point where some commands had to be repeated several times; this reluctance could have been just as readily attributed to his confusion during a mental health crisis, then as to his deliberate non-compliance.

The involved officers had information and reason to believe prior to their arrival on-scene that they would be dealing with a subject who was bipolar, suffering from paranoid delusions and who was in mental health crisis. Police officers receive training in the academy and during periodic update training on persons with disabilities that bipolar disorder is characterized as a significant mood disorder and that in periods of crisis, bipolar subjects will characteristically exhibit symptoms to a significant degree that include: distractibility, diminished ability to think, indecisiveness, and temporary cognitive disorientation. They are also trained to understand that a significant symptom of this mood disturbance is reduced executive function characterized by loss of tasks involving reasoning, problem solving and an inability to self-monitor to correct their behavior.

As evidenced by the statements of all of the involved officers, Mr. DeSantis was apparently able to respond in some capacity to the directions of his wife to be disarmed by her and to exit the residence to meet with the officers. Additionally, Mr. DeSantis was also able to cooperate with many of Officer Menke's commands to move

---

[48] Expert's Report, "Observed Fact Pattern," §7.03

1  with his hands open and exposed to a position of control away from his residence and

2  into the parking area where he momentarily laid down in a prone position. [49], [50], [51]

3      From the officers' own statements, it is quite clear that up until the point where

4  DeSantis suddenly arose to confront the officers, that he was cooperative and

5  compliant with their directions. The defendant's police practices expert merely

6  speculates and then assumes that the reason for DeSantis' reluctant compliance and

7  eventual refusal to remain on the ground was attributed solely to the decedents'

8  intentional and premeditated resistance when in fact, we will never know why Mr.

9  DeSantis suddenly refused to remain prone and subsequently arose to move towards

10  the officers in a threatening manner. Mrs. DeSantis states that the initial orders issued by

11  Officer Menke to Richards DeSantis to "get down on the ground" and then "put your

12  hands up" were confusing. [52] Officer Jones states that he did not know whether Mr.

13  DeSantis was even able to understand what commands were being given. [53]

14      It should be acknowledged that there is a significant difference between

15  deliberate, intentional resistance to police control, and an inability to comprehend and

16  rationally process situational awareness due to confusion created by mental health

17  crisis.

18      Regardless as to what "fact pattern" is believed in this case with respect to Mr.

19  DeSantis' compliance with orders, three facts are clear: (1) he ultimately complied with

20

21  _____

22  [49] Ibid., OIS Interview, Sgt. Soares, pp. 5, 14

    [50] Ibid., OIS Interview, Ofc. Mann, p. 14

23  [51] Ibid., OIS Interview, Ofc. Jones, pp. 13, 26

24  [52] Ibid., OIS interview, Mrs. DeSantis, p. 73

25  [53] Ibid., Deposition, Ofc. Jones. P. 54

all of Officer Menke's orders to move forward to a prone position of control on the ground with his hands open, fully exposed and unarmed; (2) DeSantis was a bipolar person who was very confused, paranoid, delusional and in crisis to the point where his cognitive processing skills and ability for rational thought were significantly diminished; and (3) prior to arising and moving towards the officers, DeSantis had never verbally or physically threatened the officers with harm; nor had he ever postured or made any deliberate furtive movements to suggest that he was armed and intended to kill the officers.

What is factually known is that initially, Richard DeSantis was cooperative and complaint with the officers' orders to verbally and physically control his actions. The defendants' police practices expert incorrectly speculates without experience or evidence to the contrary that "crafted dialog" would not have produced a less-lethal outcome, when there is no clear evidence in this case to suggest that a change in tone and dialog speaking to Mr. DeSantis' obvious crisis could have ultimately allowed officers to control him and would not have resulted in his unnecessary death.

Opinion Expert Callanan: The event culminated in the "skillful" application of deadly force. There are no indications that a lesser force option was either reasonable or practical. In fact, some of the pre-staged force options in this case were exactly unreasonable, impractical and would prove to be ineffective if attempted during the confrontation. [54], [55]

---

[54] Ibid., Expert's Report, "Observed Fact Pattern," §7.05

[55] Ibid., §7.11

Expert's Rebuttal Report, Dr. Ron Martinelli, Ph.D.          13

1    Rebuttal: As a retired police officer and detective who spent over twenty years

2    primarily in the patrol division with numerous high-risk assignments, and a current multi-

3    certified Use of Force and officer safety tactics instructor with thirty years of diverse

4    experience, I am at a loss to understand how a police practices expert with no Use of

5    Force instructor or tactical training experience for the past twenty years and no patrol

6    experience for the past thirty years can form the opinion that the involved officers' initial

7    uses of less lethal force were "unreasonable, impractical and ineffective", and that the

8    defendant officers' ultimate use of deadly force upon Richard DeSantis was objectively

9    reasonable and "skillful" given the circumstances in this case.

10    As an experienced less-lethal instructor who is experienced with using chemical

11    agents, Taser, SAGE and other similar impact munitions; one who is familiar with K-9

12    deployment; and as a hand-to-hand combat and firearms instructor, my opinions are

13    quite the opposite of the defendants' police practices and K-9 experts.

14    Not only did the involved officers have the benefit of a number of tactical and

15    less-lethal force options that have historically proven to be successful in situations similar

16    to this one, the use of verbal orders, dialog, and the SAGE 37 mm less-lethal impact

17    round rifle were in fact effective. Further, other combinations of SAGE, Taser and/or K-9

18    could have likely produced a non-lethal conclusion to this confrontation without

19    resorting to deadly force.

20    Based upon the totality of the actual real time circumstances and the officers'

21    experience and training; Sergeant Celli's and Officers Menke and Mann's belief that

22    DeSantis was armed or would attack, disarm and kill them was not objectively

23    reasonable.

24    The officers had no reason to believe that DeSantis was armed when he rose up

25    and ran towards them. None of the involved officers, including Sergeant Celli, Officer

1  Menke and Officer Mann, have ever stated that they saw DeSantis in possession of any

2  type of deadly weapon.

3       None of the involved officers, including Sergeant Celli, Officer Menke and Officer

4  Mann, have ever stated that they observed DeSantis make any furtive or suspicious

5  movements towards his waistband or pants pockets indicating that he was arming

6  himself. In fact, Sergeant Soares and Officer Jones, who were standing next to Sergeant

7  Celli, have both stated that they were able to see DeSantis' hands and waistband at all

8  times and never saw a weapon, nor saw him reach towards his front or rear waistband.

9  [56], [57]

10       The most reasonable assumption that Sergeant Celli and Officers Menke and

11  Mann should have made was that Richard DeSantis intended to engage and physically

12  assault them. Santa Rosa Police Department's Use of Force General Order No. 01-02,

13  requires officers to assess the incident to determine which force option will best de-

14  escalate the incident to bring it under control in a safe manner.

15       Given the observation and knowledge that DeSantis was unarmed as he ran

16  towards the officers, the most objectively reasonable assumption the shooting officers

17  should have made was that DeSantis intended to physically assault them. The

18  reasonable, tactical defensive force response to physical assault in this situation would

19  have been: SAGE 37 mm less-lethal rifle, Taser, impact weapon, K-9, or hand-to-hand

20  combat.

21       By the time that Richard DeSantis had assumed a prone position on his stomach

22  in the driveway, the involved officers variously estimate that he was anywhere between

23

24

[56] Ibid., OIS Interview, Sgt. Soares, Tab 2, p. 7

25
[57] Ibid., Deposition, Ofc. Jones, pp. 59-60

80' – 85' feet from Sergeants Soares, Celli and Officer Jones; [58] and approximately 40'

feet from Officers Menke and Mann. [59] Measurement comparison estimates from the

crime scene indicate that when decedent DeSantis was initially proned on the ground,

he was between 68' – 80' feet from Officers Menke and Mann; and over 100' feet from

Officer Ellsworth and his K-9 partner. [60] The involved officers report that they could see

DeSantis' hands and palms and it is clear that he remained unarmed. [61,62,63,64,65]

At the point where DeSantis pushed completely off of the ground and began

running towards Officers Menke and Mann, it was tactically appropriate and

objectively reasonable for Sergeant Soares to fire one or more rounds from his 37 mm

SAGE less-lethal rifle at DeSantis. Sergeant Soares and Officer Jones confirm that the

SAGE round was initially effective on DeSantis, causing him to stop, crumple over like he

got punched in the stomach, grab one arm with the other hand and drag his feet.

Officer Jones states that it took DeSantis four to six seconds to recover from being struck

---

[58] Ibid., OIS Interview, Sgt. Soares, p. 22

[59] Ibid., OIS Interview, Ofc. Mann, p. 18

[60] Expert's measurement comparisons from crime scene inspection, 05-12-08 and involved officers' statements to OIS investigators.

[61] Ibid., Deposition, Ofc. Jones, p. 57

[62] Ibid., OIS Interview, Sgt. Soares, pp. 19, 22

[63] Ibid., OIS Interview, Ofc. Jones, p. 18

[64] Ibid., OIS Interview, Ofc. Ellsworth, p. 32

[65] Ibid., OIS Interview, Ofc. Mann, pp. 17-18

by the SAGE round. [66], [67], [68]  After a primary assessment as to the effectiveness of the SAGE round and DeSantis taking another step forward, Sergeant Soares states that he was fully prepared to re-engage DeSantis with another or more SAGE rounds, when Sergeant Celli suddenly stepped up in front of him and engaged DeSantis with his .223 caliber rifle, immediately followed by Officers Menke and Mann firing one round each from their .40 caliber pistols. [69] Officer Jones confirms these events. [70] Sergeants Celli and Soares and Officers Jones and Ellsworth place DeSantis at anywhere between 18' – 40' feet from Officers Menke and Jones when he was shot. [71], [72], [73], [74]

Officer Jones states that after DeSantis had been struck by the 37 mm less-lethal round, he did not feel that the use of deadly force was necessary. [75] Apparently, at that point, Sergeant Soares felt similarly because he was in fact about to fire another round(s) at DeSantis when Sergeant Celli interrupted him by shooting and killing DeSantis.

---

[66] Ibid., OIS interview, Sgt. Soares, p. 23

[67] Ibid., OIS interview, Ofc. Jones, pp. 10, 16, 18, 38, 67-68

[68] Ibid., Deposition, Ofc. Jones, p. 46

[69] Ibid., OIS interview, Sgt. Soares, pp. 16, 23, OIS report Tab 2, pp. 3-4

[70] Ibid., OIS interview, Ofc. Jones, p. 16

[71] Ibid., OIS interview, Sgt. Celli, p. 17

[72] Ibid., OIS interview, Ofc. Jones, p. 38

[73] Ibid., deposition, Ofc. Jones, 71

[74] Ibid., OIS interview, Ofc. Ellsworth, p. 38

[75] Ibid., deposition, Ofc. Jones, pp. 68-69

1    There is no evidence in this case to suggest or opine that the continued use of

2  the SAGE 37mm less-lethal rifle would not have ultimately been effective against

3  Richard DeSantis. Evidence that the first round fired by Sergeant Soares not only

4  temporarily stopped DeSantis for several seconds, but actually broke his arm is clear

5  evidence of this weapon's effectiveness. The fact that Sergeant Soares and Officer

6  Jones have both stated or indicated through their actions that there was no need to

7  use deadly force against DeSantis demonstrates their confidence in the SAGE weapon

8  system, as well as their objectively reasonable belief that the use deadly force was

9  unwarranted in this incident.

10    There is no evidence to suggest or opine that engaging, distracting and

11  controlling DeSantis with Officer Ellsworth's K-9 anytime from the point that he failed to

12  fully prone out on the ground, to the point where he was first shot by Sergeant Soares,

13  would have been ineffective.

14    There is no evidence to suggest that the use of any combination of K-9 and less-

15  lethal weaponry would not have been ultimately successful in stopping and controlling

16  DeSantis.

17    Finally, there is certainly no evidence in this case to suggest or opine that the use

18  of less-lethal force options by the involved officers was "impractical" or "unreasonable"

19  and to champion any finding that shooting and killing an unarmed, distraught,

20  confused and delusional man was the only objectively reasonable option available to

21  the defendant officers.

22

23

24

25

1      Opinion Expert Callanan: Any potential use of the police K-9 was seriously

2  restricted by the knowledge that DeSantis' wife and children were essentially

3  unsecured in the immediate operational area. [76]

4

5      Opinion Expert Callanan: The use of the police K-9 prior to DeSantis' ultimate

6  forward charge would have been unreasonable and impractical. Typically, K-9s are not

7  deployed senselessly against an armed subject. [77]

8

9      Opinion K-9 Expert Marv Gangloff: Engaging Richard DeSantis with Officer

10  Ellsworth's K-9 would have placed Mrs. DeSantis, her children and the other officers at

11  risk. [78]

12      Opinion K-9 Expert Marv Gangloff: There was a possibility that DeSantis was

13  armed with a gun, so deploying the K-9 would have been useless as the suspect would

14  have just shot the dog. [79]

15

16      Rebuttal: There is no basis in fact that once the involved officers had assumed

17  their tactical positions and Richard DeSantis began moving forward with his arms raised

18  and hands open and exposed towards the center of the open parking area that Mrs.

19  DeSantis and her children remained outside of the residence. In fact, as unanimously

20  attested to by the involved officers, Mrs. DeSantis and her child were directed back

21

22  _____

23  [76] Expert Declaration, Callanan, Opinions, §7.07, p. 10

24  [77] Ibid.

25  [78] Expert Declaration, Marv Gangloff, p. 1

[79] Ibid., p.1

*Expert's Rebuttal Report, Dr. Ron Martinelli, Ph.D.*          19

1  inside of the residence where they remained until after Richard DeSantis had been shot.

2  Therefore, neither Mrs. DeSantis nor her children were exposed to danger from the

3  police K-9.

4      Contrary to the expert's opinions that police K-9s are not deployed against

5  armed subjects, police service dogs that have been trained to seek, locate and

6  control/bite concealed subjects in the open or in buildings are regularly deployed on

7  such missions specifically because it is far less risky to engage and expose an animal to

8  a potentially armed suspect than a police officer. Police officers including K-9 handlers

9  are trained to believe that any felony suspect that flees and/or conceals themselves

10  from apprehension could be armed and dangerous.

11      Police service dogs which are trained for seek out, locate and apprehend; or

12  handler protection missions are considered expendable tactical force projection tools.

13  They are not "pets" and should not be treated as such by their handlers.  Police canine

14  handlers are trained that in order to accomplish certain high-risk apprehension and

15  protection missions, they must occasionally place their K-9s at risk. Such risks are

16  certainly not "senseless" as one expert implies but tactically and strategically

17  considered. It is the responsibility of the well trained K-9 handler to know when and how

18  to best deploy their K-9 to accomplish a variety of missions. Police K-9s such as Officer

19  Ellsworth's service dog "Duke" had been trained for seek, locate, bite/control and

20  handler protection missions. Officer Ellsworth concedes that he and his K-9 had

21  participated in approximately twenty "agitator" trainings. Agitator trainings often

22  involve a subject armed with a variety of weapons including the agitator "suspect"

23  firing a gun.

24      To opine that it would have been "impractical", "useless" or "senseless" to have

25  used Officer Ellsworth's K-9 to engage Richard DeSantis at the point where the officers

*Expert's Rebuttal Report, Dr. Ron Martinelli, Ph.D.*        20

were losing verbal control of him and DeSantis was repeatedly posturing from a prone to a "push-up" position, given the existing "real time" circumstances, preclusion and the seriousness of the confrontation, is both naïve and inconsiderate of Use of Force guidelines. Simply put, one must consider whether if the involved officers truly thought that the non-compliant or threatening Mr. DeSantis was armed, yet observed no weapon; given the "real time" circumstances that existed, would it have been more humane and less injurious to have engaged him with a K-9, or to have shot and killed him.

Officer Ellsworth was an inexperienced K-9 handler with a "pet" rather than "partner" mindset who missed several key opportunities to tactically deploy his K-9 where he could have maximized the safety of himself and the other involved officers. His stated mindset that the call for service he was not responding to "was not a dog call" underscores his inexperience. One immediately questions why he made the decision to take his K-9 into the operational field, rather than leaving the dog locked in his police car if he did not think a police service dog could be beneficial and tactically deployed. The fact that Officer Ellsworth states that his K-9 "Duke" wore a shock collar and was over-agitated to the point where he was experiencing difficulty controlling him, is an indication that the service dog was equally inexperienced. Shock collars are often an indication that a K-9 is immature, inexperienced, and/or under trained. A proper tactical position of obedience for a well trained K-9 would have been in either the prone or seated position awaiting the handler's command to engage the subject. This was clearly not the case in this incident.

Given the immediate operational ground where the incident took place and the manner in which the involved officers sought cover, Officer Ellsworth should have taken advantage of moving his K-9 with Sergeant Soares under cover of the other armed

1    officers to a position behind the southernmost parked vehicle located near the

2    southwest corner of the parking area.  At this position, Officer Ellsworth and his K-9 would

3    have been in the "point" position with excellent tactical advantage of engaging

4    DeSantis without worry of having the excited K-9 attacking any of the officers who

5    would have been behind them. This position would have also afforded Sergeant Soares

6    continued cover and an unobstructed field of fire. Additionally, Sergeant Celli and

7    Officer Jones (the more experienced officers) would have had the benefit of cover and

8    an unobstructed field of fire should DeSantis have actually been armed.

9        At least one officer has estimated that there was a twenty-five second time

10    window from the time that DeSantis was proned on the ground, to the time he rose up

11    and ran towards the officers. [80]  This should have afforded Officer Ellsworth more than

12    sufficient time to have announced to DeSantis that had a K-9 deployed and would

13    engage if he did not remain still. In point of fact, no such K-9 advisement was given

14    although a K-9 had been deployed into the operational field.

15        Given the seriousness of this situation and the inherent risks to all involved, if

16    dialog would have failed and DeSantis would have postured (as he eventually did), it

17    would have been appropriate given the safety margin to have deployed Officer

18    Ellsworth's K-9 partner "Duke" to engage and distract DeSantis; while officers moved

19    forward under the cover of the K-9 and engaged the unarmed subject with less lethal

20    weaponry and later (only if safe and appropriate) with physical control methods.

21        Simply put, one must consider whether if the involved officers truly thought that

22    the non-compliant or threatening Mr. DeSantis was armed, yet observed no weapon;

23

24

25

[80] Ibid., Deposition, Sgt. Celli, Vol. II, p. 250

*Expert's Rebuttal Report, Dr. Ron Martinelli, Ph.D.*        22

1    given the "real time" circumstances that existed, would it have been more humane

2    and less injurious to have engaged him with a K-9, or to have shot and killed him.

3

4    <u>Summary Rebuttal Points</u>

5

6    Ultimately, this case boils down to whether or not, given the totality of the actual

7    circumstances determined by the tier of fact, the defendant officers Sergeant Celli,

8    Officer Menke and Officer Mann felt that it was objectively reasonable to use deadly

9    force against Richard DeSantis.

10    A police officer simply cannot shoot someone because they reasonably believe

11    that the subject they have encountered is armed; or that the subject may attack,

12    disarm, shoot and kill them. A police officer cannot shoot someone absent verbal

13    threats coupled with furtive movements suggesting the subject is arming themselves, or

14    an obvious manifestation of a deadly weapon capable of seriously injuring or killing the

15    officer or another person. If police officers were permitted to engage subjects they

16    encountered with deadly force under the former circumstances, police officers would

17    be shooting citizens on a regular basis during high-risk detentions, vehicle enforcement

18    stops and foot pursuits.

19    While it is important for officers who are about to be attacked to be concerned

20    about the assailant's access to concealed weapons and their potential for placing the

21    officer and others at extreme risk; they must respond to threatening behavior according

22    to what they know and can see, rather than what they "think might happen". In the

23    present case, it would appear that the defendant officers did more thinking about

24    what could possibly happen to them, rather than observing what was actually

25    happening to them. This is a dangerous and unreasonably paranoid mindset.

It is critical that reasonably trained and experienced police officers who regularly place themselves in harms way should be able to confidently rely upon their training, experience and legal guidelines when considering the use of any level of force without second guessing themselves. However, it is not only reasonable but, critical that those same police officers be provided with adequate training, supervision, policies and oversight to assist them in making potentially life and death decisions.

It is my belief that the City of Santa Rosa and its police department failed to provide update training to their police officers beyond the academy level in several key police practices relating to this incident. The lack of foresight, strategic planning, and update training contributed to the decedent's and plaintiff's injuries.

It is also my belief that the police department administration used an incorrect standard in determining whether they should investigate officers in their department for possible violations of the law and department policies and procedures.

The department's Chief of Police acknowledges that the decision as to whether they should investigate use of force/deadly force incidents and possible violations of law appears to rest upon whether the involved officer(s)' use of force were criminal "beyond a reasonable doubt". This policy, standard and/or informal practice appears to be inconsistent with the Internal Affairs investigations training approved by the Commission on Peace Officer Standards & Training (CA-POST).

No law enforcement agency that I am aware of uses the legal/criminal standard of "beyond a reasonable doubt" to determine whether an officer violated department policy. Classically, the law enforcement industry standard for determining out of policy violations and to pursue disciplinary action against an officer suspected of violating department policy is the "preponderance of evidence". The agency's policy or

1  practice in this regard has the effect of encouraging and condoning officers who use

2  excessive force, including deadly force.

3

4

5  I would so testify to the aforementioned findings and opinions under penalty of

6  perjury if called upon in any subsequent civil proceedings.

7

8

9

10  _____ Date: September 18, 2008

11  Ron Martinelli, Ph.D.

12  Criminologist

13  Federal/State Courts Certified Police Practices Expert

14

15

16

17

18

19

20

21

22

23

24

25

*Expert's Rebuttal Report, Dr. Ron Martinelli, Ph.D.*                 25