EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICIA DESANTIS,
individually and as Successor
in Interest for RICHARD
DESANTIS, deceased, and as
Guardian Ad Litem for DANI
DESANTIS, a minor and TIMOTHY
FARRELL, a minor,

        Plaintiffs,

vs.                      CASE NO. C 07 3386 JSW

CITY OF SANTA ROSA, JERRY
SOARES, RICH CELLI, TRAVIS
MENKE, PATRICIA MANN and DOES
1 through 25, inclusive,

        Defendants.
_____/

CERTIFIED COPY

DEPOSITION OF PATRICIA MANN

November 15, 2007

Reported by:
JUDY A. MANFRED
CSR No. 4748

HANNAH KAUFMAN & ASSOCIATES, INC.
Certified Shorthand Reporters
472 Pacheco Street
San Francisco, California 94116
(415) 664-4269

```
                    I N D E X
                                        PAGE
DEPOSITION OF PATRICIA MANN
EXAMINATION BY MR. SCOTT                  5


                    E X H I B I T S
PLAINTIFFS'                              PAGE
  1    A drawing, not to scale             61
```

                                                    2

```
 1       BE IT REMEMBERED that pursuant to Notice of
 2  Taking Deposition, and on Thursday, the 15th day of
 3  November, 2007, commencing at the hour of 9:39 a.m.
 4  thereof, at the offices of The Scott Law Firm, 1375 Sutter
 5  Street, Suite 222, San Francisco, California, before me
 6  JUDY A. MANFRED, a Certified Shorthand Reporter in the
 7  State of California, personally appeared,
 8                 PATRICIA MANN,
 9  called as a witness herein; and the said witness, being by
10  me first duly sworn, was thereupon examined and testified
11  as is hereinafter set forth.
12
13                    APPEARANCES
14       THE SCOTT LAW FIRM, 1375 Sutter Street, Suite
15  222, San Francisco, California 94109, represented by JOHN
16  H. SCOTT, Attorney at Law, appeared on behalf of the
17  Plaintiffs.
18       LAW OFFICES OF ERIC SAFIRE, 2431 Fillmore
19  Street, San Francisco, California 94115, represented by
20  ERIC SAFIRE, Attorney at Law, appeared on behalf of the
21  Plaintiffs.
22       OFFICE OF THE CITY ATTORNEY, 100 Santa Rosa
23  Avenue, Santa Rosa, California 95402-1678, represented by
24  CAROLINE L. FOWLER, Assistant City Attorney, appeared on
25  behalf of the Defendants.
```

                                                    3

```
 1                 PATRICIA MANN,
 2           sworn as a witness by the Certified
 3           Shorthand Reporter, testified as follows:
 4                        -oOo-
 5       THE VIDEOGRAPHER:  Good morning.  This marks the
 6  beginning of volume 1, videotape 1 in the deposition of
 7  Patricia Mann in the matter of Patricia Desantis, et al.
 8  versus City of Santa Rosa, et al. in the United States
 9  District Court, Northern District of California, case
10  number C 07 3386 JSW.  Today's date is November 15th,
11  2007, and the time is now 9:39.  The location of this
12  deposition is 1375 Sutter Street, Suite 222, San
13  Francisco, California.  The deposition was noticed by John
14  Scott of Scott Law Firm and the videotape is being
15  produced on behalf of the plaintiff.  The video operator
16  is James Taylor, a California Notary Public for the County
17  of San Francisco, employed by Dan Mottaz Video
18  Productions, LLC, 182 Second Street, Suite 202, San
19  Francisco, California 94105.  415-624-1300.  The Court
20  Reporter is Judy Manfred.
21       Would counsel please identify themselves and
22  state whom they represent.
23       MR. SCOTT:  John Scott appearing for the
24  plaintiffs.
25       MS. FOWLER:  Caroline Fowler, Assistant City
```

                                                    4

```
 1  Attorney, on behalf of the defendants.
 2       THE VIDEOGRAPHER:  If there are no stipulations
 3  the Court Reporter may administer the oath.
 4       (The oath was administered by the Court
 5        Reporter.)
 6           EXAMINATION BY MR. SCOTT
 7       MR. SCOTT:  Q.  Would you state your full name
 8  for the record, please.
 9       A.  Patricia Marie Mann.
10       Q.  May I call you Ms. Mann or would you prefer
11  Officer?
12       A.  Ms. Mann is fine.
13       Q.  Ms. Mann, my name is John Scott and I'm one of
14  the attorneys who represents the family, the widow and
15  child of Richard Desantis, in the lawsuit that's been
16  brought.  We're here to take your depositions today.  You
17  are represented by an attorney.  Have you ever had your
18  deposition taken before?
19       A.  No.
20       Q.  In that case, let me make a few comments and
21  observations.  Have you testified in court?
22       A.  Yes.
23       Q.  And have you had training in courtroom demeanor
24  and things of that nature?
25       A.  Yes.
```

                                                    5

| | |
|---|---|
| 1  Q. And were there gunshot residue tests done on you, | 1  before you got to the home that night, the night of the |
| 2  do you know? | 2  shooting? |
| 3  A. No. | 3  MS. FOWLER: And are you also excluding whatever |
| 4  MS. FOWLER: No, you don't know or, no, there | 4  she might have been told by dispatch? |
| 5  wasn't. | 5  MR. SCOTT: No. |
| 6  THE WITNESS: No, there wasn't -- it was not done | 6  MS. FOWLER: Prior to the incident starting? |
| 7  on me. | 7  MR. SCOTT: Q. Yeah, other than what you heard |
| 8  MR. SCOTT: Q. And how many shots did you fire? | 8  from dispatch, did you know anything about Richard |
| 9  A. One. | 9  Desantis before you got to his home the night of the |
| 10  Q. And when you fired your shot how far was | 10  shooting? |
| 11  Mr. Desantis from you? | 11  A. No. |
| 12  A. Approximately 15 feet. | 12  Q. Okay. Why did you go to the scene where the |
| 13  Q. And was he sprinting in your direction? | 13  shooting occurred that night? |
| 14  A. Yes, he was charging at me. | 14  A. I was dispatched to the scene. |
| 15  Q. But would it be fair to say he was sprinting? | 15  Q. Were you riding with a partner or were you alone |
| 16  A. Yes. | 16  that night? |
| 17  Q. And where did you aim when you fired? | 17  A. I was alone. |
| 18  A. Center mass, the center of his body. | 18  Q. And when you arrived -- when I say the scene, I'm |
| 19  Q. Did you hit him? | 19  talking about the area of the house and the driveway, the |
| 20  A. I do not know. | 20  area where the shooting occurred. |
| 21  Q. All right. Have you learned that one of the | 21  A. Okay. |
| 22  shots fired that night missed Mr. Desantis and hit his | 22  Q. Fair enough? So if I say the scene, I'm |
| 23  house? | 23  referring to that general area. |
| 24  A. Yes. | 24  A. Okay. |
| 25  Q. How did you learn that? | 25  Q. When you arrived at the scene, did you see anyone |
| 54 | 56 |
| 1  A. I was told. | 1  else present? |
| 2  Q. Do you recall when you first learned it? | 2  A. Initially, no. I just saw one other patrol car. |
| 3  A. No, I don't recall. | 3  It was not until I parked and exited my patrol car that I |
| 4  Q. Was it before or after you were interviewed the | 4  saw other officers. |
| 5  next day? | 5  Q. And when you arrived at the house was it your |
| 6  A. I believe it was before. | 6  understanding that shots had been fired inside the house? |
| 7  Q. To your knowledge, has there been an | 7  A. Yes. |
| 8  investigation to determine whether you hit him or not, | 8  Q. When you arrived at the scene was it your |
| 9  whether you hit Desantis or not? | 9  intention to use your car for cover? |
| 10  A. To my knowledge, no. | 10  A. No. |
| 11  Q. Is that something you'd like to know? | 11  Q. Why not? |
| 12  A. It doesn't make a difference to me if the | 12  A. I needed to make a tactical approach to the |
| 13  information is found, then sure. | 13  residence so I parked my car further away from the scene. |
| 14  Q. So it doesn't make a difference to you if you, in | 14  Q. How far away from the scene? |
| 15  fact, hit him or didn't hit him? | 15  A. Approximately half a block. |
| 16  A. No. | 16  Q. And when you arrived was someone in charge, |
| 17  (Mr. Safire enters deposition room.) | 17  someone in command of the scene? |
| 18  MR. SCOTT: Q. Did you know who Richard Desantis | 18  A. Yes. |
| 19  was before that night? | 19  Q. Who was in command? |
| 20  A. Meaning had I had any prior contacts with him? | 20  A. I heard over the radio while I was driving to the |
| 21  Q. Or heard about him? | 21  scene that Sergeant Rich Celli stated he would be in |
| 22  A. No, I did not. | 22  charge of the tactical operations on the scene and that |
| 23  Q. So no prior contacts, correct? | 23  Sergeant Jerry Soares would be in charge of radio |
| 24  A. With me, no. | 24  communication. |
| 25  Q. Well, did you know anything about him from others | 25  Q. And when you arrived at the scene was Sergeant |
| 55 | 57 |

**Page 90**

1  over his shoulder before -- how long did that last, from
2  that looking backward to turning around and then charging?
3     A. Approximately three seconds.
4     Q. Oh. And, now, when -- did you have your Taser
5  with you on your duty belt that night?
6     A. Yes, I did.
7     Q. And when he was on the ground and you could see
8  that he had nothing in his hands, did you consider taking
9  -- holstering your weapon and taking out your Taser?
10    A. No, I did not.
11    Q. Okay. Any reason why you didn't?
12    A. He was out of range for the Taser.
13    Q. Okay. That would have been about 40 feet?
14    A. His distance -- approximately his distance from
15 where I was, yes, 40 feet, approximately.
16    Q. All right. And would you characterize his
17 movement toward you as a sprint?
18    A. Yes, he was charging at us; he was sprinting at
19 us, yes.
20    Q. Have you ever been to a track meet?
21    A. Yes.
22    Q. Did you run track?
23    A. A long time ago, yes.
24    Q. In high school?
25    A. Junior high.

**Page 91**

1     Q. Okay. Were you a sprinter?
2     A. Yes.
3     Q. Okay. You run the hundred?
4     A. Yes, and the four-by-four.
5     Q. All right. Me too in high school. And did you
6  -- would you say that he was -- based on your experience
7  in junior high school, track and being a sprinter, would
8  you characterize what he was doing as sprinting toward
9  you?
10    A. Yes.
11    Q. All right. And his legs were churning?
12    A. Yes.
13    Q. And his hands and arms were moving like a
14 sprinter?
15    A. His hands and arms were moving very rapidly.
16    Q. Consistent with sprinting?
17    A. Not exactly, no.
18    Q. What was it about his arms that was not
19 consistent with sprinting?
20    A. I do not recall seeing his fists closed or in a
21 sprinter's position where they might have their hands {}
22 bladed like this. His hands were open and loose; they
23 weren't straight in a -- along his sides. He was waving
24 them around and his right hand kept dropping out of my
25 sight because when he was charging at us he kept bringing

**Page 92**

1  his hand down and I would lose sight of it behind his
2  back.
3     Q. Okay. And did he bring his left hand down while
4  he was sprinting also or just his right hand?
5     A. He brought his left hand down as well, but I was
6  able to maintain a visual on the left hand.
7     Q. So because of the angle as he was sprinting you
8  would lose sight of his right hand as he was sprinting
9  because just the way his arms were moving?
10    A. No. He was running straight at me. The reason
11 why I lost sight of his right hand is because as I saw it
12 it kept going behind his back.
13    Q. For how long?
14    A. With each stride. Every time he would bring his
15 arm up and bring it back in more like a running stride, it
16 would go back behind his waist.
17    Q. And how many strides did he take in your
18 direction from location number 2 to the time you heard the
19 first shot fired?
20    A. I don't know how many strides. I can estimate
21 distance of how long.
22    Q. Okay. Approximately how far had he gone while he
23 was sprinting to the time you heard the first shot?
24    A. I believe -- I estimate that Mr. Desantis, when
25 he started charging us, ran or sprinted approximately ten

**Page 93**

1  feet and then the Sage weapon was fired.
2     Q. And approximately how many strides did he take to
3  cover that ten feet?
4     A. I --
5     MS. FOWLER: It's already been asked and
6  answered. She said she couldn't answer.
7     THE WITNESS: I don't know.
8     MR. SCOTT: Q. And did you know -- well, when
9  you heard the first shot fired, did you know it was from
10 the Sage?
11    A. Yes, I did.
12    Q. And how did you know that?
13    A. It has a completely different sound than a
14 firearm.
15    Q. All right. And so from your training,
16 experience, you knew from the sound that it was a Sage?
17    A. I knew from the sound that it was not a firearm.
18 I honestly cannot remember if I knew it was specifically
19 the Sage.
20    Q. And after you heard what you believed was the
21 Sage being fired, what's the next thing you observed?
22    A. I remember hearing some sort of, like, thud and
23 then seeing Mr. Desantis slow his pace just for one second
24 and then he didn't collapse, but he kind of, like, leaned
25 his shoulder down.

HANNAH KAUFMAN & ASSOCIATES, INC.

**Page 94**

1  Q. His left shoulder?
2  A. At the same -- I believe so.
3  Q. Okay.
4  A. I honestly can't remember. I just remember
5  seeing him lean his shoulder down very slightly right when
6  I heard a thud noise.
7  Q. When you say thud, can you be more specific? I
8  guess thud is kind of specific but, you know, I'm --
9  A. Yeah. Something like hitting him.
10 Q. All right.
11 A. Yeah, the sound of something coming into contact
12 with his skin, basically.
13 Q. And at the time did you associate the thud with
14 the shot that was fired?
15 A. At that time, yes, I did.
16 Q. And so you thought he'd been hit by the Sage?
17 A. Yes.
18 Q. And based on your -- had you had any training yet
19 with the Sage at the time of this incident?
20 A. No. I just knew of it, but I had not been
21 trained with it yet.
22 Q. Did you have any information at that time as to
23 what a Sage round would or could do to someone it hit?
24 MS. FOWLER: I'm going to object. Incomplete
25 hypothetical, but if you can answer as phrased, go ahead.

**Page 95**

1  THE WITNESS: I had not received any formal
2  training, no.
3  MR. SCOTT: Q. Okay. But through -- I don't
4  know, just word or talk around the department, did you
5  have any information, informal information about what a
6  Sage round could or might possibly do if it hit a person?
7  MS. FOWLER: Object to the extent it calls for
8  speculation.
9  MR. SCOTT: Q. Go ahead.
10 A. Well, I would have to make an assumption --
11 Q. No, I'm --
12 A. -- for that.
13 Q. Just what you heard, if anything.
14 A. I don't recall specifically what I've heard. I
15 knew that it shot a large plastic projectile and I can
16 only assume when one gets shot at you that -- what it
17 might do at that point, based on my training at that time.
18 Q. And you later -- through your training, you got
19 more information after this incident?
20 A. Yes.
21 Q. And what did you later learn that it does?
22 A. That it really depends on the situation. You
23 know, it can cause very traumatic injury if it's shot at a
24 close range. The further away you are, the less of an
25 impact it has. It's... yeah.

**Page 96**

1  Q. And after you heard the thud, were you attempting
2  to determine where it may have struck Mr. Desantis?
3  A. No, there was no time.
4  Q. Okay.
5  A. Like I said, he maybe stalled for less than a
6  second before continuing to charge at me.
7  Q. And when you say he stalled, what do you mean by
8  that?
9  A. That's when he broke his stride and leaned his
10 shoulder down and that was for less than a second and...
11 Q. When you say broke his stride, do you mean he
12 went from more of a sprint to a jog or did he actually
13 stop?
14 A. He -- no, he did not stop. He just slightly
15 slowed down.
16 Q. So more -- it became more of a jog than a sprint?
17 A. He was running.
18 Q. All right.
19 A. And that's faster than a jog, in my
20 interpretation.
21 Q. Fair enough. Oh, it is. Running is faster than
22 a jog. So he was still sprinting, he just was slowed down
23 a little bit?
24 A. Again, for less than a second, so it was maybe
25 one stride.

**Page 97**

1  Q. Were you waiting to see if that -- being hit, the
2  thud, was going to drop him?
3  A. I was assessing the situation to see, you know,
4  what he was going to do next, yes.
5  Q. Okay. And in your mind were you wondering if
6  that thud was going to drop him?
7  A. Well, not if it was, because it didn't. I don't
8  know if I'm not answering the question you're trying to
9  ask, but there was no time for me to wonder if it was
10 going to drop him because it did not. He remained
11 upright.
12 Q. For how long?
13 A. He never went back down to the ground until after
14 he was struck with lethal rounds.
15 Q. And how much time passed from when you heard the
16 thud to when lethal rounds were fired?
17 A. Approximately two seconds. Again, it would
18 probably be easier for me to give a distance estimation.
19 Q. Okay. So you heard the thud. And can you put a
20 number 3 on exhibit number 1 approximately where he was
21 when you heard the thud?
22 A. Sure.
23 Q. And then after you heard the thud, he kept
24 running in your direction?
25 A. Yes.

**Page 114**

Q. Are these targets, are these silhouettes of persons or something else?
A. They are silhouettes of people or persons.
Q. So since you saw him hit a target, a silhouette at a hundred yards, you felt that the night of this shooting that when you heard his rifle being fired, would it be fair to say you assumed that he shot -- that he hit Desantis?
A. I did not make any assumptions of whether or not he hit Mr. Desantis.
Q. Now, after he fired did you hear a thud or anything like that?
A. No, I just heard the round being fired.
Q. And after he fired the rifle, did you see it have any effect on Mr. Desantis?
A. No.
Q. And how much time passed from when Sergeant Celli fired his rifle to when you fired your weapon?
A. Less than a second, or approximately a second, right around there.
Q. And during that second were you attempting to assess what impact the thud and the rifle shot had on Mr. Desantis?
A. I believe I already did assess the situation at that point.

**Page 115**

Q. And did you think that he was running towards you with a bullet and a projectile in him or did you think that he had not been hit?
A. I believed that he had been hit with a projectile. I did not know whether or not he had been hit with a rifle round.
Q. And so it would have been about a second or less to when you heard the rifle fired to when you fired?
A. Correct.
Q. Did you fire before or after Mr. Officer Menke?
A. After.
Q. About how much time after?
A. Less than half a second. His -- I heard his shot. I was already almost completely done with my trigger pull at that time, so I heard his shot and then immediately mine.
Q. Are you familiar with the term sympathetic gunfire?
A. Yes.
Q. Have you been trained about that?
A. Yes.
Q. When were you first trained about it?
A. In the military police.
Q. And what did you learn in that training from the military police about sympathetic gunfire?

**Page 116**

A. I was told that sympathetic gunfire is, again, pretty much just like how it sounds, when one person fires other people fire in response, not to the threat but to hearing the gunshots.
Q. And so that's something you had training with from the Army?
A. The Army, yes, as well as in the police academy.
Q. And in the police academy was the training essentially the same as in the Army or was it different?
A. It was similar.
Q. Did you ever ask Officer Jones why he did not fire?
A. No, I did not.
Q. Do you believe Officer Jones should have fired?
MS. FOWLER: Object. Calls for speculation, lack of foundation.
MR. SCOTT: Q. Go ahead.
A. No, I'm not going to answer that.
MR. SCOTT: Because?
MS. FOWLER: Because I objected. She doesn't know what Officer Jones knew or what was in his mind or his sight or vision. It's --
MR. SCOTT: Then she can say she doesn't know.
MS. FOWLER: She is not going to answer that question.

**Page 117**

MR. SCOTT: Q. Okay. At the time of this incident what weapons were on your duty belt?
MS. FOWLER: Asked and answered, but you can tell him again.
THE WITNESS: Okay. My duty weapon, the weapon that I had fired that night, pepper spray, my ASP, baton, my M26 Taser and two pocket knives.
MR. SCOTT: Q. And what type of handgun did you fire that night?
A. A Sig P226, 40 caliber semi-automatic pistol.
Q. I'm sorry. A Sig what?
A. P226, 40 caliber.
Q. And is that the weapon that you chose or was this just department issued?
A. It is department issued, however, it is the one I chose. I was given a choice.
Q. Do you recall what your choices were?
A. Yes, an H&K 40 caliber or a Beretta 40 caliber.
Q. And why did you choose the Sig?
A. A variety of reasons. I was more accurate with it while I was shooting at the range, it fit my hand better. I did not have to adjust my grip at all to use the weapon. I just felt more comfortable with it.
Q. Okay. Do you know what kind of round you had in your Sig at the time you fired it at Mr. Desantis?

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _28th_ day of _November_, _2007_.

_____
Certified Shorthand Reporter
CSR No. _4748_