EXHIBIT E

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICIA DESANTIS,
individually and as Successor
in Interest for RICHARD
DESANTIS, deceased, and as
Guardian Ad Litem for DANI
DESANTIS, a minor and TIMOTHY
FARRELL, a minor,
            Plaintiffs,

CERTIFIED COPY

vs.                          CASE NO. C 07 3386 JSW
CITY OF SANTA ROSA, JERRY
SOARES, RICH CELLI, TRAVIS
MENKE, PATRICIA MANN and DOES
 through 25, inclusive,

            Defendants.
_____/


DEPOSITION OF TRAVIS MENKE
November 15, 2007
Pages 1 through 117


Reported by:         HANNAH KAUFMAN & ASSOCIATES, INC.
JUDY A. MANFRED         Certified Shorthand Reporters
CSR No. 4748               472 Pacheco Street
                    San Francisco, California 94116
                         (415) 664-4269

**Page 2**

```
1              I N D E X
                              PAGE
2    DEPOSITION OF TRAVIS MENKE
3    EXAMINATION BY MR. SCOTT           5
4
5
6            E X H I B I T S
7    PLAINTIFFS'                    PAGE
8    2    A diagram, not to scale      72
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        2
```

**Page 3**

```
1         BE IT REMEMBERED that pursuant to Notice of
2    Taking Deposition, and on Thursday, the 15th day of
3    November, 2007, commencing at the hour of 2:03 p.m.
4    thereof, at the offices of The Scott Law Firm, 1375 Sutter
5    Street, Suite 222, San Francisco, California, before me
6    JUDY A. MANFRED, a Certified Shorthand Reporter in the
7    State of California, personally appeared,
8              TRAVIS MENKE,
9    called as a witness herein; and the said witness, being by
10   me first duly sworn, was thereupon examined and testified
11   as is hereinafter set forth.
12
13              APPEARANCES
14        THE SCOTT LAW FIRM, 1375 Sutter Street, Suite
15   222, San Francisco, California 94109, represented by JOHN
16   H. SCOTT, Attorney at Law, appeared on behalf of the
17   Plaintiffs.
18        The Law Offices of ERIC SAFIRE, 2431 Fillmore
19   Street, San Francisco, California 94115, represented by
20   ERIC SAFIRE, Attorney at Law, appeared on behalf of the
21   Plaintiffs.
22        OFFICE OF THE CITY ATTORNEY, 100 Santa Rosa
23   Avenue, Santa Rosa, California 95402-1678, represented by
24   CAROLINE L. FOWLER, Assistant City Attorney, appeared on
25   behalf of the Defendants.
                                        3
```

**Page 4**

```
1              TRAVIS MENKE,
2         sworn as a witness by the Certified
3      Shorthand Reporter, testified as follows:
4                -oOo-
5         THE VIDEOGRAPHER:  Good afternoon.  This marks
6    the beginning of volume 1, videotape 1 in the deposition
7    of Travis Menke in the matter of Patricia Desantis, et
8    al., versus City of Santa Rosa, et al., in United States
9    District Court, Northern District of California, case
10   number C 07 3386 JSW.  Today's date is November 15th, 2007
11   and the time is 2:03.  The location of this deposition is
12   1375 Sutter Street, Suite 222, San Francisco, California.
13   The deposition was noticed by John Scott of Scott Law Firm
14   and the videotape is being produced on behalf of the
15   plaintiff.  The video operator is James Taylor, a
16   California Notary Public for the County of San Francisco,
17   employed by Dan Mottaz Video Productions, LLC, 182 Second
18   Street, Suite 202, San Francisco, California 94105,
19   415-624-1300.  The Court Reporter is Judy Manfred.
20        Would counsel like to re-introduce themselves and
21   state whom they represent.
22        MR. SCOTT:  John Scott appearing for the
23   plaintiffs.
24        MR. SAFIRE:  Eric Safire appearing for
25   plaintiffs.
                                        4
```

**Page 5**

```
1         MS. FOWLER:  Caroline Fowler, Assistant City
2    Attorney, appearing for the defendants.
3         THE VIDEOGRAPHER:  If there are no stipulations
4    the Court Reporter may administer the oath.
5         (The oath was administered by the Court
6         Reporter.)
7         (Confidential portion (bound separately) on
8         page 118.)
9         EXAMINATION BY MR. SCOTT
10        MR. SCOTT:  Q.  Good afternoon.  Would you state
11   your full name for the record, please.
12        A.  Yeah.  Travis Menke, M-e-n-k-e.
13        Q.  Are you an officer with the Santa Rosa Police
14   Department?
15        A.  Yes, I am.
16        Q.  Were you present when Richard Desantis was shot
17   and killed in April of this year?
18        A.  Yes, I was.
19        Q.  And were you on duty at the time?
20        A.  Yes, I was.
21        Q.  Do you prefer being called Officer Menke or
22   Mr. Menke?
23        A.  Officer Menke is fine.  Officer.
24        Q.  Officer Menke, my name is John Scott and I'm one
25   of the lawyers who represents the widow and the child of
                                        5
```

2 (Pages 2 to 5)

| | |
|---|---|
| 1    Q. And did you walk, run or go in some other | 1    A. I don't know. |
| 2   fashion? | 2    Q. Have you ever shot anyone else? |
| 3    A. Walked. | 3    A. No. |
| 4    Q. Why did you walk? | 4    Q. Have you ever gone hunting? |
| 5    A. It was a brisk walk. I didn't know specifically | 5    A. No. |
| 6   where the house was and I was trying to move tactically | 6    Q. When you received your training at Santa Rosa in |
| 7   quietly staying out of the light. | 7   firearms did you shoot at moving targets? |
| 8    Q. Had you drawn your handgun at that point? | 8    A. In Santa Rosa? |
| 9    A. At getting out of my car? | 9    Q. Yes. |
| 10   Q. Yes. | 10   A. No. |
| 11   A. Yes, I did. | 11   Q. So your training at Santa Rosa has been to shoot |
| 12   Q. Why? | 12   at stationary targets? |
| 13   A. Because there was a subject shooting a gun and I | 13   A. Yes. |
| 14   wanted to be prepared. And at that point I was not sure | 14   Q. Just at the range? |
| 15   what I was walking into so for my safety I drew my | 15   A. Yes. |
| 16   handgun. | 16   Q. And is that a silhouette or some other target? |
| 17   Q. What kind of handgun did you have with you that | 17   A. It's the -- you know, has the rings and it's in |
| 18   night? | 18   the shape of an upper torso. |
| 19   A. It's the H&K 40-caliber semi-automatic pistol. | 19   Q. And you get the most points by hitting center |
| 20   Q. Do you have it with you here today? | 20   mass? |
| 21   A. No. | 21   A. Yes. |
| 22   Q. Why not? | 22   Q. And at how many feet do you shoot at that target |
| 23   A. It's my duty firearm. | 23   to qualify? |
| 24   Q. Do you have another weapon that you carry off | 24   A. You do several stages at -- initially it's ten |
| 25   duty? | 25   yards -- roughly, approximately, ten yards and then it |
|                                        58 |                                        60 |
| 1    A. Yes. | 1   goes back to -- let me see -- 15 or 17 back to 20 -- 20 or |
| 2    Q. And what's that? | 2   25, something like that. |
| 3    A. It's the Smith & Wesson 340 PD. | 3    Q. So the closest is ten yards or 30 feet? |
| 4    Q. Do you have that with you today? | 4    A. I think. I don't recall specifically. |
| 5    A. Yes. | 5    Q. Something in that ball park? |
| 6    Q. Why? | 6    A. Yeah. |
| 7    A. I'm an off duty officer. | 7    Q. How far was Mr. Desantis from you when you fired |
| 8    Q. Do you always carry a weapon when you're off | 8   at him? |
| 9   duty? | 9    A. When I fired at him he was approximately 10 to |
| 10   A. Not always. | 10   15 feet. |
| 11   Q. Just at depositions? | 11   Q. And was he coming right at you? |
| 12   A. You know, coming to the City, it's a long trip. | 12   A. Yes. |
| 13   Q. Do you sleep with it? | 13   Q. And where did you aim? |
| 14   A. No. | 14   A. Center mass. |
| 15   Q. How many guns do you own? | 15   Q. Could you tell whether you hit him? |
| 16   A. I own just one. | 16   A. No. |
| 17   Q. Just that one other handgun that you mentioned? | 17   Q. And when you fired at him was he standing? |
| 18   A. Yes, my off duty. | 18   A. Yes. |
| 19   Q. Oh. | 19   Q. And how far -- did he take some steps after that |
| 20   A. No, I'm sorry. I own two. I also have a gun | 20   before he fell, or did he just drop after you shot him? |
| 21   that was given to me by my great uncle. | 21   A. He just dropped. |
| 22   Q. And what kind of gun is that? | 22   Q. Okay. Was he running toward you when you shot |
| 23   A. That's a Colt 1911. It's a World War II pistol. | 23   him? |
| 24   Q. Is Mr. -- well, did you shoot Mr. Desantis, do | 24   A. Yes. |
| 25   you know, if your bullet hit him? | 25   Q. And did it appear to you that the shot that you |
|                                        59 |                                        61 |

16 (Pages 58 to 61)

DEPOSITION OF TRAVIS MENKE

**Page 62**

1  fired caused him to just kind of stop in mid air and his
2  momentum just stopped and he dropped?
3      **A. I pulled the trigger and he kind of turned to his**
4  **left and fell.**
5      Q. How fast was he running towards you when you
6  fired?
7      **A. He was in a dead sprint. I don't know how fast**
8  **he was going, but it was human sprinting speed.**
9      Q. And how many steps would he have had to taken to
10  reach you?
11      MS. FOWLER: At the point in time when he shot
12  him?
13      MR. SCOTT: Q. Yes.
14      **A. I don't know how long his stride was. He was**
15  **within 10 to 15 feet so estimate maybe four strides,**
16  **maybe.**
17      Q. Okay. And did you see him take any strides after
18  you shot?
19      **A. No.**
20      Q. Which way did he fall?
21      **A. He kind of spun to his left and fell back onto**
22  **his back. So it would be he spun his left to my left,**
23  **turned to my right, fell to his -- kind of fell back to**
24  **his left -- excuse me, my left.**
25      Q. When he fell how far away was he from you?

**Page 63**

1      **A. 10 to 15 feet.**
2      MS. FOWLER: The closest point of him?
3      MR. SCOTT: Q. Yes, the closest point.
4      **A. 10 to 15 feet.**
5      Q. Okay. And did he fall anywhere near a vehicle?
6      **A. Yes.**
7      Q. What type of vehicle?
8      **A. I believe it was a small truck, I think.**
9      Q. How far was that vehicle from you at the time you
10  fired?
11      **A. Approximately 10 to 15 feet.**
12      Q. Did -- when you fired were you in a position of
13  cover?
14      **A. Yes.**
15      Q. And why were you in a position of cover?
16      **A. Because I didn't want to get shot.**
17      Q. And did you ever see a gun in Mr. Desantis's
18  hand?
19      **A. No.**
20      Q. Did you ever see a gun on his person?
21      **A. No.**
22      Q. And when he was sprinting towards you was it a
23  full sprint?
24      **A. Yes.**
25      Q. And you could see his arms?

**Page 64**

1      **A. M-hm, yes.**
2      Q. And his arms were moving like a sprinter?
3      **A. Yes.**
4      Q. And you could see his hands?
5      **A. Yes.**
6      Q. Did you see anything in his hands?
7      **A. No.**
8      Q. And what were you afraid he was going to do if
9  you hadn't shot him?
10      **A. Kill me.**
11      Q. And how did you think he was going to kill you?
12      **A. With a gun.**
13      Q. With what gun?
14      **A. The gun I assumed he had.**
15      Q. And did you shoot him because you assumed he had
16  a gun?
17      **A. Under the circumstances I think it was within**
18  **reason to assume he had a gun, yes, he was armed.**
19      Q. So it would be fair to say that you shot because
20  you assumed he had a gun?
21      **A. I shot because I thought he was coming to kill**
22  **me.**
23      Q. Did you think he was going to kill you with a gun
24  you assumed he had?
25      **A. I felt it was reasonable.**

**Page 65**

1      Q. Then if he was going to shoot you with a gun, why
2  would he run at you? Why not just stop, pull out the gun
3  and fire?
4      **A. I don't know.**
5      Q. Okay. Are you right or lefthanded?
6      **A. Righthanded.**
7      Q. When you initially got to the scene, you walked
8  from your patrol car and you had your weapon drawn.
9  What's the first thing you did when you got to the -- in
10  the vicinity of the residence and the parking lot or the
11  driveway?
12      **A. The first thing I did when I got to the driveway?**
13      Q. Yes.
14      **A. I took cover and concealment around the corner of**
15  **the house.**
16      Q. And what was the lighting like?
17      **A. Dim.**
18      Q. Were you able to see the Desantis -- what you
19  discovered was the Desantis house?
20      **A. Yes.**
21      Q. And did you see anyone in the vicinity of the
22  house?
23      **A. Yes.**
24      Q. Who did you see?
25      **A. I saw a man and a woman.**

17 (Pages 62 to 65)

DEPOSITION OF TRAVIS MENKE

HANNAH KAUFMAN & ASSOCIATES, INC.

1  Ellsworth. Did you see him at some point?
2     A. Yes.
3     Q. When did you first see him?
4     A. He arrived just after I did at the scene.
5     Q. And do you know what position he was in at the
6  time you made the initial command?
7     A. He was to my right. I don't know where, though.
8  He was back to my right.
9     Q. And did you understand that he was concealed in
10 some fashion or --
11    A. I don't know.
12    Q. -- that he had cover?
13    A. I don't know.
14    Q. Do you know if he had the dog with him, Duke?
15    A. Yes, he did.
16    Q. You saw Duke?
17    A. Yes.
18    Q. Okay. Did someone ask you to make the initial
19 command or did you do that on your own?
20    A. I don't recall.
21    Q. You don't recall someone asking you to do it?
22    A. I don't recall.
23    Q. You just recall seeing the man who we now know as
24 Mr. Desantis to kind of turn and walk towards you going
25 inside the house?

82

1     A. Yes.
2     Q. And your response was to verbalize a command to
3  tell him words to the effect, stop, put your hands where I
4  can see them?
5     A. Yes.
6     Q. And what did Mr. Desantis do in response to that
7  command?
8     A. After several commands he turned -- okay?
9     Q. Yeah, we have to stop this tape, but you can
10 finish this answer?
11    A. After several commands he stopped, turned around,
12 put his hands up.
13    MR. SCOTT: We need to take a break to change
14 tapes, so let's take a short break.
15    THE VIDEOGRAPHER: This marks the end of volume
16 1, videotape 1, in the deposition of Travis Menke on
17 November 15th, 2007. The time now is 4:05 and we're off
18 the record.
19    (Brief recess taken from 4:05 p.m. to 4:26 p.m.)
20    THE VIDEOGRAPHER: This marks the beginning of
21 volume 1, videotape number 2 in the deposition of Travis
22 Menke on November 15th, 2007 in the matter of Patricia
23 Desantis, et al., versus City of Santa Rosa, et al., in
24 the United States District Court, Northern District of
25 California, case number C 07 3386 JSW. Today's date is

83

1  November 15th, 2007 and the time is 4:26. Back on the
2  record.
3     MR. SCOTT: Q. If we could get back to the
4  diagram and kind of where we were in our time line, now
5  you have just made some commands and -- towards
6  Mr. Desantis. The first time you made a command did he
7  react at all? Did he stop walking or just keep walking?
8     A. I believe at that point he stopped and turned.
9     Q. With your initial command?
10    A. Yes.
11    Q. And approximately how far was he from the front
12 door of the residence when he stopped and turned?
13    A. I believe he was at the base of the steps.
14    Q. And could you still see his wife?
15    A. She was out front also.
16    Q. So she was still in plain view?
17    A. Yes.
18    Q. And after he stopped and turned, what did you do
19 next?
20    A. I told him to get his hands in the air, get his
21 hands high, something of that line.
22    Q. What did he do?
23    A. As I recall, he didn't do it initially. I had to
24 keep yelling at him to get his hands up.
25    Q. Approximately how many times?

84

1     A. I believe two to three.
2     Q. And after those two to three commands to put his
3  hands up, did he?
4     A. Yes.
5     Q. So he put his hands in the air?
6     A. Yes.
7     Q. With palms open?
8     A. I don't recall.
9     Q. And you wanted to see his hands because you
10 wanted to see if he had a weapon in his hands, right?
11    A. Yes.
12    Q. And you were expecting to see a gun or possibly
13 see a gun?
14    A. It was reasonable to assume that, yes.
15    Q. And did you see a gun in his hands?
16    A. Not that I could see at that point.
17    Q. Did you ever see a gun in his hands?
18    A. No.
19    Q. So he put his hands in the air, and for how long
20 was he standing there with his hands in the air?
21    A. Mr. Desantis dropped his hands several times, so
22 he put them up for maybe a couple seconds. I told him to
23 walk towards the sound of my voice. He then proceeded --
24 obviously, there were several commands. He would drop his
25 hands, so for the first time I told him to put his hands

85

22 (Pages 82 to 85)

1    Q. Approximately how many commands did you have to
2  make before he dropped to his knees?
3    A. I estimate two to three.
4    Q. At that point were you yelling?
5    A. Yes.
6    Q. Did he say anything in response?
7    A. Not that I heard.
8    Q. Did you ever hear him say anything in response to
9  any of your commands?
10    A. No, not that I heard.
11    Q. When he initially dropped to his knees, was he
12  kneeling and facing toward you?
13    A. Yes.
14    Q. On both knees?
15    A. I don't recall. At that point I simply tell a
16  person to drop down to their right next and then their
17  left knee. I would assume it was in some sort of that
18  fashion and he eventually got down on both knees, as I
19  recall.
20    Q. And where was his hands at this point?
21    A. As I said, he had dropped his hands. I had
22  called him to get back up. There was a point at
23  which when I was telling him to do this he was on both his
24  knees and his hands were in the air.
25    Q. And then what happened next?

90

1    A. I told him to put his hands on the ground in
2  front of him.
3    Q. Did he do that?
4    A. Yes.
5    Q. Did he put his hands with open palm on the ground
6  in front of him?
7    A. I couldn't tell. It was rather dark out. He put
8  his hands out on the ground in front of him.
9    Q. Could you see his hands?
10    A. I couldn't see if there was really anything in
11  his hands. I could just see that they were on the ground
12  and I couldn't tell if he had, you know, splayed fingers
13  or he had it on the side of his hands or what, but his
14  hands were on the ground in front of him. I couldn't see
15  anything with real definition.
16    Q. And you couldn't tell if he was with open palms
17  or his fists?
18    A. I couldn't tell, no.
19    Q. And then what happened?
20    A. I told him to slide away from his hands until he
21  was flat on his stomach.
22    Q. And what did he do?
23    A. He didn't comply initially, but after a few times
24  he eventually did that.
25    Q. And how many times did you have to make that

91

1  command before he complied?
2    A. I'd say two to three again.
3    Q. And then what happened after he complied with
4  that command?
5    A. He went down to his stomach, he dropped to his
6  stomach and he was down there for approximately a second.
7    Q. And then what happened?
8    A. He pushed himself back up, got back up on to his
9  knees.
10    Q. Were his hands still on the ground?
11    A. No, I believe at that point they were at his
12  side, although I don't recall specifically, but he pushed
13  up and raised up off the ground.
14    Q. And was he facing you?
15    A. Yes.
16    Q. And what happened next?
17    A. I told him to get back on the ground -- oh,
18  excuse me. Take a step back there. I began yelling, do
19  not get up, do not get up, get on your stomach, that sort
20  of thing. He rose up. I again told him get on his
21  stomach again.
22    Q. And what's the next thing he did?
23    A. After several commands, as I recall, he went back
24  down to his stomach. And at that point I began telling
25  him to get his arms out and get his arms out. At that

92

1  point he essentially pushed up and sprinted directly at
2  me.
3    Q. Can you describe how he stood up at that point?
4    A. He didn't stand up. Essentially, what happened
5  is he kind of brought his arms in to kind of a pushup
6  position. He did essentially a pushup and his body got
7  into somewhat of a mod-- -- I want to describe it like a
8  modified sprinter stance with, you know, kind of the back
9  arched. I remember seeing like his shoulders and his
10  head, and then he went from pushup to that sprinter stance
11  and then directly at me.
12    Q. Sprint?
13    A. Sprinting, yes.
14    Q. And leaning forward?
15    A. Yes.
16    Q. And what's the next thing that happened?
17    A. It was all happening extremely rapidly. I felt
18  like I was yelling, but it seemed like my vision went
19  directly on to him. I heard something reminiscent like a
20  bang, clack or a bang, clack, clack. It was a bang and a
21  clack. It was just two distinct sounds. And what seemed
22  like an instant after that, I remember thinking to myself,
23  oh, my God, he's still coming, he's not stopping. And
24  once he had gotten to within about 10 to 15 feet of me, I
25  felt that he was coming to kill me, kill my partner, take

93

24 (Pages 90 to 93)

DEPOSITION OF TRAVIS MENKE

**Page 94**

1  my gun, so I pulled the trigger.
2      Q. Okay. Now, you said bang and clack?
3      A. Yes.
4      Q. The bang that you heard, did you associate that
5  with a particular weapon that was at the scene?
6      A. It was very -- very kind of strange to me. The
7  sound was -- it seemed altered. When my gun fired I
8  didn't even hear it. I just heard a sound like a pop. I
9  did not hear Patty's shot, even though she was just to my
10  right. I can only assume that with the two distinct
11  sounds, it may have been, like guessing --
12      MS. FOWLER: Don't guess.
13      THE WITNESS: Oh. In my estimation at that point
14  I assumed it was the Sage round, the fire, and then the
15  coil of the spring-loaded chambers for additional Sage
16  rounds will rotate. So if you fire a shot it rotates to
17  get to the next shot because it makes kind of a distinct
18  sound.
19      MR. SCOTT: Q. And you heard that sound?
20      A. Yes, that's what I believed it was.
21      Q. So you heard -- was that the bang, clack?
22      A. I think.
23      Q. All right. And when you heard the bang, clack,
24  did it appear to you that Mr. Desantis was wounded?
25      A. No, he just kept coming.

**Page 96**

1      Q. Had you ever heard that term used in any
2  training?
3      A. We were trained to shoot to stop, followed by an
4  area assessment.
5      Q. What is area assessment?
6      A. The way I was trained in the Contra Costa academy
7  was to shoot to stop, that is, shoot until the threat has
8  stopped, that the threat is no longer a threat to you, at
9  which time you essentially assess the area for any other
10  threats, other threats to anybody else, you, yourself,
11  that type of thing.
12      Q. Have you ever been trained to try to determine if
13  the person you shot had been hit before you fire another
14  shot?
15      A. To assess if the person had been hit?
16      Q. Yes.
17      A. No.
18      Q. Okay. How many shots did you hear fired, total?
19      A. Shots from what?
20      Q. From anything. When you were there.
21      A. I heard the bang, clack and my -- and my pistol,
22  and that was it.
23      Q. So you did not hear the rifle?
24      A. No.
25      Q. Correct?

**Page 95**

1      Q. So you didn't hear or see anything to -- that
2  would indicate to you that he'd been hit?
3      A. No.
4      Q. Correct?
5      A. Hm-m.
6      Q. Correct?
7      A. Correct. That is correct, yes.
8      Q. You didn't think he'd been hit?
9      A. No.
10      Q. Did you hear a rifle fired?
11      A. Say again.
12      Q. Did you hear a rifle being fired?
13      A. Not with any certainty, no.
14      Q. So the only thing you recall hearing was the
15  bang, clack from what you think was the Sage?
16      A. Yes.
17      Q. And approximately how much time passed from when
18  you heard the bang, clack of the Sage to the time you
19  fired?
20      A. It was really enough for me to think that, oh, my
21  God, he's not stopping. Within a second.
22      Q. Okay. So a second or less?
23      A. Yeah.
24      Q. Are you familiar with the term shoot and assess?
25      A. Not entirely.

**Page 97**

1      A. No, I did not.
2      Q. Well, let me ask it this way. Did you hear a
3  rifle fire?
4      A. Not that I could hear, not that I could
5  distinguish.
6      Q. Did you hear your gun discharge?
7      A. Yes.
8      Q. Did you hear Officer Mann's gun discharge?
9      A. No, I did not.
10      Q. Why did you only fire one shot?
11      A. Because immediately after I fired my shot, he
12  went down.
13      Q. And I think you've described how he fell. After
14  he fell, what's the next thing you did?
15      A. At that point we -- still with guns drawn. He
16  was not moving. We approached to take him into custody.
17      Q. Oh. I'd like to get back to this diagram, and if
18  you could -- have you got a pen handy or -- yeah, you have
19  one there. Next to the X could you put the number 1
20  there. So when you were talking about when you first got
21  there and they were talking -- the man and the woman were
22  talking by the front door, that would be number 1.
23      A. M-hm.
24      Q. Could you give me an approximation -- and write
25  in number 2 there -- where Mr. Desantis was when he went

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _28Th_

day of _____ _November_ , _2007_ .

_Judy L. Manfred_
Certified Shorthand Reporter
CSR No. _4748_