# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

| | |
|---|---|
| PATRICIA DeSANTIS, individually and as Successor in Interest for RICHARD DeSANTIS, deceased, and as Guardian Ad Litem for DANI DeSANTIS, a minor and TIMOTHY FARRELL, a minor,<br><br>          Plaintiffs,<br><br>     vs.<br><br>CITY OF SANTA ROSA, JERRY SOARES, RICH CELLI, TRAVIS MENKE, PATRICIA MANN, and DOES 1 through 25, inclusive,<br><br>          Defendants. | No. C-07 3386 JSW |

DEPOSITION OF OFFICER JERRY ELLSWORTH

July 24, 2008

REPORTED BY:  A. MAGGI SAUNDERS,

          C.S.R. No. 2755



A. Maggi Saunders & Associates
Certified Shorthand Reporters

57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

**Page 1**

```
 1    IN THE UNITED STATES DISTRICT COURT
 2    FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3              ---oOo---
 4  PATRICIA DeSANTIS,            )
    individually and as Successor )
 5  in Interest for RICHARD       )
    DeSANTIS, deceased, and as    )
 6  Guardian Ad Litem for DANI    )
    DeSANTIS, a minor and TIMOTHY )
 7  FARRELL, a minor,             )
                                  )
 8             Plaintiffs,        )
                                  )
 9       vs.                      )
                                  ) No. C-07 3386 JSW
10  CITY OF SANTA ROSA, JERRY     )
    SOARES, RICH CELLI, TRAVIS    )
11  MENKE, PATRICIA MANN, and DOES)
12  1 through 25, inclusive,      )
                                  )
13             Defendants.        )
                                  )
14                                )
15
16
17
18
19      DEPOSITION OF OFFICER JERRY ELLSWORTH
20              July 24, 2008
21
22
23  REPORTED BY: A. MAGGI SAUNDERS,
24            C.S.R. No. 2755
25
```

**Page 2**

```
 1              I N D E X
 2
 3                          Page
 4  Examination by MR. SCOTT      6
 5
 6            E X H I B I T S
 7
 8  FOR PLAINTIFFS              Page
 9   1   Interview With Ofc. Jerry Ellsworth   43
```

**Page 3**

 1    BE IT REMEMBERED that, pursuant to Notice
 2 of Taking Deposition, and continued by Stipulation,
 3 and on Thursday, the 24th day of July, 2008,
 4 commencing at the hour of 2:41 o'clock p.m. thereof,
 5 at the SCOTT LAW FIRM, 1375 Sutter Street, Suite 222,
 6 San Francisco, California 94109, (415) 561-9600,
 7 before me, A. MAGGI SAUNDERS, a Certified Shorthand
 8 Reporter in and for the State of California, there
 9 personally appeared
10
11    OFFICER JERRY ELLSWORTH,
12
13 called as a witness by the Plaintiffs, who, being by
14 me first duly sworn, was thereupon examined and
15 interrogated as hereinafter set forth.
16
17            ---oOo---
18
19    SCOTT LAW FIRM, 1375 Sutter Street, Suite
20 222, San Francisco, California 94109, (415) 561-9600,
21 represented by JOHN HOUSTON SCOTT, ESQ., and ALY
22 BECK, ESQ., appeared as counsel on behalf of
23 Plaintiffs.

**Page 4**

 1    CITY OF SANTA ROSA, OFFICE OF THE CITY
 2 ATTORNEY, 100 Santa Rosa Avenue, Santa Rosa,
 3 California (707) 543-3040, represented by CAROLINE L.
 4 FOWLER, CITY ATTORNEY, and JOHN FRITSCH, ASSISTANT
 5 CITY ATTORNEY, appeared as counsel on behalf of
 6 Defendants.
 7
 8    EUREKA STREET LEGAL VIDEO, 511 Eureka
 9 Street, San Francisco, California 94114, (415)
10 643-9190, represented by STEPHEN STATLER, PRINICPAL
11 VIDEOGRAPHER, appeared to videotape the proceedings
12 on behalf of the Plaintiffs.

**Page 69**

1  same.
2  A. But he was not running toward the
3  Officers? That's the only --
4  Q. Right. Yes.
5  A. Yes, I would have released him.
6  Q. Thank you.
7     Why?
8  A. Why would I have released him?
9  Q. Yes.
10 A. Because he was running away from us, and
11 it was somebody that we had to catch.
12    I don't know if he's armed, he was being
13 violent. I don't know if he's got a gun.
14    He wasn't running towards us. We
15 weren't up against a time wall.
16    And, again, the other factors that I
17 have to -- You know, as clean as you are talking, if
18 that's the only thing that changed, and I had my dog
19 focused on him, there were no other threats, nothing
20 else changed, but there is --
21 Q. Right.
22 A. You know, part of my job as a handler is
23 to focus my dog. If the dog is not in focus, is it the
24 person that I want them to seize.
25    You know, if I want them to seize you,

**Page 70**

1  and he's looking left, you know, part of my job is to
2  send him to the correct person, and be trained to do
3  that.
4     So, assuming that I would have had that
5  opportunity --
6  Q. Right.
7  A. -- without anybody else moving, and no
8  other factors changing, yeah, it's a possibility that I
9  would have sent him.
10 Q. Did you have Duke focused on Richard
11 DeSantis from the time you got there?
12 A. He was focused in that direction, yes.
13 Q. Okay. And was there ever a period of time
14 when he wasn't focused in the direction of Richard
15 DeSantis?
16 A. Possibly.
17 Q. You don't remember, or you don't know?
18 A. No.
19 Q. You just don't remember?
20 A. I don't recall. I mean, if he were there
21 for a minute, if he looked left or looked right, I
22 don't remember if he moved his head once or twice.
23 Q. Was it your intention to have Duke focused
24 on Richard DeSantis --
25 A. Yes.

**Page 71**

1  Q. Why?
2  A. Because he's the person that we were
3  dealing with.
4  Q. Did you ever see Richard DeSantis down on
5  the ground on his knees?
6  A. Yes.
7  Q. For how long did you see him on his knees?
8  A. Couple of seconds.
9  Q. Okay. And how long did you see him on the
10 ground?
11 A. A couple of seconds.
12 Q. Okay. And when he got up from the ground,
13 what did you see him do?
14 A. Which time?
15 Q. The first time.
16 A. I believe he came back -- If I remember
17 correctly, he came back to his knees, and then went
18 back down again.
19 Q. How long was he on his knees?
20 A. A couple seconds.
21 Q. And then what did he do?
22 A. Went almost -- almost back to like what
23 I'm going to call a prone position, which would be
24 laying down.
25 Q. Okay. Did you consider releasing Duke at

**Page 72**

1  that point?
2  A. No.
3  Q. Why not?
4  A. He was complying.
5  Q. Okay. When did he stop complying?
6  A. When he immediately charged after us;
7  charged at us, I should say.
8  Q. Okay. And how far away from you was he
9  when he did that?
10 A. Approximately 30 feet.
11 Q. And at that time did you consider
12 releasing Duke?
13 A. No.
14 Q. Why not?
15 A. It was too close.
16 Q. What do you mean, "too close"?
17 A. Well, he was coming right at the three of
18 us, Officer Mann, Officer Menke and myself.
19    Both Officer Mann and Menke were in my
20 peripheral vision to the left --
21 Q. Huh-huh.
22 A. -- and they had their firearms fully
23 extended --
24 Q. Right?
25 A. -- and he was going right at them.

**Page 101**

1  A. Legal Defense Fund.
2  Q. And did you ask for him to be your lawyer?
3     MS. FOWLER: I'm going to object. To the
4  extent that calls for privileged attorney-client
5  communication, I'd instruct you not to answer.
6     MR. SCOTT: Q. Well, I'm not asking --
7  I'm not asking what you said to Paul Brennan.
8     Did you ask someone who wasn't a lawyer,
9  "Hey, I want a lawyer"?
10 A. Yeah.
11 Q. Who?
12 A. I don't remember who it was. Somebody
13 from the POA.
14 Q. Okay. So you contacted an Officer with
15 the POA, or the organization --
16 A. Well, a Board member.
17 Q. Okay. So you asked an Officer to provide
18 you with an attorney.
19 A. Right.
20 Q. All right. Do you know if Mr. Brennan was
21 representing any of the other Officers?
22 A. I don't know --
23    MS. FOWLER: To the extent that may call
24 for privileged communications, I would instruct you not
25 to answer; but if you know through any other source,

**Page 102**

1  you can answer the question.
2     THE WITNESS: I don't know.
3     MR. SCOTT: Q. Okay. Anybody ever talk
4  to you about possible conflict of interest?
5     MS. FOWLER: And, again, to the extent
6  that involves confidential attorney-client
7  communications, do not reveal any discussions you had
8  with an attorney about that.
9     If anyone else discussed that with you,
10 you can answer the question.
11    THE WITNESS: No.
12    MR. SCOTT: Q. Now, in your -- if you
13 would look at page 30 of Exhibit No. 1, there is a
14 couple places where you used the term "funneling," and
15 it's near the bottom of page.
16    What did you mean by that, the word,
17 "funneling"?
18 A. (Reading the document)
19    MS. FOWLER: (Indicating)
20    THE WITNESS: Meaning, looking at it, you
21 know, just like a funnel-type pattern.
22    MR. SCOTT: Q. Like, tunnel vision?
23 A. Well, not necessarily.
24 Q. Okay. Then, what do you mean by
25 "funneling"? I'm having a hard time understanding.

**Page 103**

1  A. He was -- He was basically focusing in one
2  particular area --
3  Q. Okay.
4  A. -- not, you know, over here and over
5  there, it was a focus on a particular area.
6  Q. And you said, "He was in a dazed or
7  confused state" at the of bottom of page 30.
8     What did you mean by that?
9  A. Well, he just looked like he was --
10    I mean, he just had like kind of a blank
11 look on his face a lot of the times, looking at --
12 almost like, you know, if you were to speak to
13 somebody in a foreign language, they don't -- you
14 know, they kind of just have this blank stare at you,
15 like. . .
16 Q. Now, did you refer to him as "Raging
17 Bull"?
18 A. Yes.
19 Q. What did you mean by that?
20 A. I just was -- He was -- When he was in his
21 prone position, if you will, laying down on the
22 ground --
23 Q. Mm-hmm?
24 A. -- he was up and running and coming
25 straight at us before he was anywhere near vertical.

**Page 104**

1     It was like he was in a sprinter's box,
2  and he just had this -- like his face was red, his
3  teeth were gritted, and he was just like a raging
4  bull, just coming right at us.
5  Q. Okay. You weren't referring to the movie
6  "Raging Bull" the boxer, you are talking about the --
7  A. I've never seen the movie, no.
8  Q. Okay. So you weren't trying to suggest
9  that he was acting like a boxer, he was more like an
10 animal who was kind of head down, running.
11 A. Correct.
12 Q. Okay. Have you ever been to a bullfight?
13 A. Have I ever been to one?
14 Q. Yeah.
15 A. No.
16 Q. Okay. The second shot that you heard
17 after the Sage, did it sound to you like it came from a
18 rifle?
19 A. Well, I can't say. I don't know.
20 Q. Could you tell where the second shot came
21 from?
22 A. No.
23 Q. Did it appear to you that the second shot
24 hit Mr. DeSantis?
25 A. I don't know. They were all pretty quick,

```
                    )
STATE OF CALIFORNIA )  ss.
                    )
```

### CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 30th day of July, 2008.

*A. Maggi Saunders CSR*

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California