# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

PATRICIA DeSANTIS, individually and as Successor in Interest for RICHARD DeSANTIS, deceased, and as Guardian Ad Litem for DANI DeSANTIS, a minor and TIMOTHY FARRELL, a minor,

        Plaintiffs,

  vs.

CITY OF SANTA ROSA, JERRY SOARES, RICH CELLI, TRAVIS MENKE, PATRICIA MANN, and DOES 1 through 25, inclusive,

        Defendants.

No. C 07 3386 JSW

DEPOSITION OF CHIEF ED FLINT

July 31, 2008

REPORTED BY:  A. MAGGI SAUNDERS,

C.S.R. No. 2755



A. Maggi Saunders & Associates
Certified Shorthand Reporters
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755
(415) 383-6281

### Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                       ---oOo---
 4   PATRICIA DeSANTIS,                    )
     individually and as Successor         )
 5   in Interest for RICHARD               )
     DeSANTIS, deceased, and as            )
 6   Guardian Ad Litem for DANI            )
     DeSANTIS, a minor and TIMOTHY         )
 7   FARRELL, a minor,                     )
                                           )
 8            Plaintiffs,                  )
                                           )
 9   vs.                                   )
                                           )  No. C 07 3386 JSW
10                                         )
     CITY OF SANTA ROSA, JERRY             )
11   SOARES, RICH CELLI, TRAVIS            )
     MENKE, PATRICIA MANN, and DOES        )
12   1 through 25, inclusive,              )
                                           )
13            Defendants.                  )
                                           )
14                                         )
15
16
17
18
19          DEPOSITION OF CHIEF ED FLINT
20                  July 31, 2008
21
22
23
24   REPORTED BY: A. MAGGI SAUNDERS,
25   C.S.R. No. 2755
                                                    Page 1
```

### Page 2

```
 1                    I N D E X
 2
 3                         Page
 4   Examination by MR. SCOTT          6
 5   Examination by MR. BURRIS       110
 6
 7              E X H I B I T S
 8
 9   FOR PLAINTIFFS                  Page
10   1   Officer Involved Critical    53
11       Incidents, (2002 thru 2008)
12   2   Defendants' Response To Plaintiffs'  55
13       Special Interrogatories, Set Two
14   3   Multi-page "Marin County Crisis     119
15       Intervention Team [CIT] by Dep.
16       Carl McCosker, Marin County
17       Sheriff's Dept., and Officer Joel
18       Fay, San Rafael Police Department
                                                    Page 2
```

### Page 3

 1  BE IT REMEMBERED that, pursuant to Notice
 2  of Taking Deposition, and continued by Stipulation,
 3  and on Thursday, the 31st day of July, 2008,
 4  commencing at the hour of 2:00 o'clock p.m. thereof,
 5  at the CITY OF SANTA ROSA, OFFICE OF THE CITY
 6  ATTORNEY, 100 Santa Rosa Avenue, Room 8, Santa Rosa,
 7  California 95402, before me, A. MAGGI SAUNDERS, a
 8  Certified Shorthand Reporter in and for the State of
 9  California, there personally appeared

 11             CHIEF ED FLINT,

 13  called as a witness by the Plaintiffs, who, being by
 14  me first duly sworn, was thereupon examined and
 15  interrogated as hereinafter set forth.

 17                   ---oOo---

 19      SCOTT LAW FIRM, 1375 Sutter Street, Suite
 20  222, San Francisco, California 94109, (415) 561-9600,
 21  represented by JOHN HOUSTON SCOTT, ESQ., appeared as
 22  counsel on behalf of Plaintiffs.

                                                    Page 3

### Page 4

 1      LAW OFFICES OF JOHN L. BURRIS, Airport
 2  Corporate Center, 7677 Oakport Street, Suite 1120,
 3  Oakland, California 94621, (510) 839-5200,
 4  represented by JOHN L. BURRIS, ESQ., appeared as
 5  counsel on behalf of Plaintiff ADRIENNE DeSANTIS.

 7      CITY OF SANTA ROSA, OFFICE OF THE CITY
 8  ATTORNEY, 100 Santa Rosa Avenue, Room 8, Santa Rosa,
 9  California 95402, (707) 543-3040, represented by
10  CAROLINE L. FOWLER, CITY ATTORNEY, and JOHN FRITSCH,
11  ASSISTANT CITY ATTORNEY, appeared as counsel on
12  behalf of Defendants CITY OF SANTA ROSA, ET AL..

14      EUREKA STREET LEGAL VIDEO, 511 Eureka
15  Street, San Francisco, California 94114, (415)
16  643-9190, represented by MIKE TUNICK, Certified Legal
17  Videographer, appeared to Videotape the proceedings
18  on behalf of Plaintiffs.

                                                    Page 4

## Page 5

1    ---oOo---
2        THE VIDEOGRAPHER: Okay. This begins
3    Videotape No. 1, Volume I, of the Deposition of Chief
4    Ed Flint, In The Matter of DeSantis, versus the City of
5    Santa Rosa, In The U.S. District Court, For The
6    Northern District of California. Case No. C-07 3386
7    JSW.
8        Today is -- I'm sorry, I need to go off
9    the record for one moment.
10       (Brief pause off the record.)
11       THE VIDEOGRAPHER: Today's date is
12   July 31st, 2008, and the time is 2:03 p.m.
13       And my name is Mike Tunick, contracted
14   by Eureka Street Legal Video, at 511 Eureka Street in
15   San Francisco. The telephone number is 415,
16   643-9190.
17       This videotaped deposition is taking place
18   at the Santa Rosa City Attorney's Office, at 100 Santa
19   Rosa Avenue, and it's been noticed by the Scott Law
20   Firm.
21       And if we could now have our attorneys
22   present please introduce yourselves.
23       MR. SCOTT: John Scott, appearing for
24   Patricia DeSantis individually, and her other
25   capacities.

## Page 6

1        MR. BURRIS: John Burris, appearing on
2    behalf of Plaintiff Adrienne DeSantis.
3        MS. FOWLER: Caroline Fowler, appearing on
4    behalf of the Defendants.
5        MR. FRITSCH: And John Fritsch for the
6    Defendants.
7        THE VIDEOGRAPHER: And now our Reporter
8    can administer the oath.
9        THE REPORTER: The Reporter today is Maggi
10   Saunders, of A. Maggi Saunders & Associates.
11
12
13       ---oOo---
14       CHIEF ED FLINT,
15   called as a witness herein, being first duly sworn by
16   the Certified Shorthand Reporter to tell the truth,
17   the whole truth, and nothing but the truth, testified
18   as follows:
19   EXAMINATION BY MR. SCOTT:
20   Q.   Good afternoon, Chief Flint. Would you
21   state your full name for the record, please.
22   A.   Good afternoon. Edwin F. Flint,
23   F-l-i-n-t.
24   Q.   Chief Flint, when were you first hired as
25   Chief of Police for the City of Santa Rosa?

## Page 7

1    A.   January 2004.
2    Q.   Okay. And do you have a retirement date,
3    that you are aware of?
4    A.   August 2nd.
5    Q.   Of this year?
6    A.   2008.
7    Q.   Okay. Chief, have you ever had your
8    deposition taken before?
9    A.   Yes.
10   Q.   On how many occasions?
11   A.   Probably at least approximately a
12   half-dozen. I can't remember exactly when. Earlier in
13   my law enforcement career.
14   Q.   When did you first become a Police
15   Officer?
16   A.   August 1973.
17   Q.   And of the approximate six depositions
18   that you mentioned, were all of those depositions
19   related to police work?
20   A.   Yes.
21   Q.   Have you been deposed as the Chief of
22   Police, or in your capacity as Chief of Police for
23   Santa Rosa?
24   A.   No, I have not.
25   Q.   Okay. Do you recall the last time you

## Page 8

1    were deposed?
2    A.   No, I do not.
3    Q.   Do you recall approximately how long ago
4    it was?
5    A.   Twenty-plus years ago.
6    Q.   So, it would be fair to say that, of the
7    approximate six times you've been deposed, they were
8    all 20 or more years ago?
9    A.   Yes.
10   Q.   Okay. And in any of those cases, were you
11   a defendant, to your knowledge?
12   A.   No.
13   Q.   How many times have you testified as a
14   Police Officer in a court?
15       MS. FOWLER: In any capacity?
16       MR. SCOTT: Q. In any capacity.
17   A.   Well, I have had a very lengthy career,
18   and have testified as an expert witness in both
19   Superior and Municipal Court on a variety of topics. I
20   have been qualified many, many times. I don't have a
21   number for you.
22   Q.   Are we talking hundreds?
23   A.   Yes.
24   Q.   And approximately how many times have you
25   testified as an expert?

**Page 33**

A. Yes.

Q. During the course of your career in law enforcement before you came to Santa Rosa, were you ever involved in reviewing shootings by police officers?

A. Oh, yes.

Q. How many times, or how many shootings have you reviewed?

A. Well, as a Sergeant of a SWAT team, we reviewed the shootings that we were involved, both in terms of critique, and reviewing the reports, to understand what happened, and to make recommendations to our Bureau Commander.

Q. Why did you do that?

A. It's part of our job, as first-line supervisor, to take a look at operations, and make those recommendations.

And then, of course, the -- you know, my Commander would look at, you know, the reports and the investigations and our comments, and would review that as well.

The Commanders above me generally look at a broader perspective of policy, training, management, those kinds of things.

Q. Why?

**Page 34**

A. To make sure that operations are consistent with policies and procedures in the law, to have those routine checks of what we do.

And every tactical operation is different. No two -- No two operations that we went out on as SWAT Officers were the same.

There was always -- Even if they were two, back-to-back entries on narcotics places, they were all different. There was different twists and different things that would occur.

Q. Like life.

A. Yes, very much so.

The sense of -- you know, the purpose of those reviews is to identify issues, identify ways to improve, identify whether our conduct in training -- operations is consistent with our training, policies and procedures and the law.

Q. Approximately how many shootings did you review relating to the SWAT Team?

A. I would say at least a dozen.

Q. And did you determine or believe that any of those shootings were not within the policy?

MS. FOWLER: Well, I'm going to object, to the extent that that may invade the right to privacy of other individual Officers of that Department.

**Page 35**

MR. SCOTT: I didn't ask him for names.

MS. FOWLER: You can answer, but don't provide any names or specifics.

THE WITNESS: I don't believe that I personally reviewed one that was not within policy.

MR. SCOTT: Q. Did you become aware of any shootings that, upon review, were determined not to be within the policy?

MS. FOWLER: That's a "yes" or "no" question.

THE WITNESS: No.

MR. SCOTT: Q. Okay. Did you ever see any shooting you didn't like?

MS. FOWLER: Well, I'm going to object. That's vague and ambiguous --

MR. SCOTT: I'll phrase it another way.

Q. Have you ever reviewed a shooting anywhere that you thought was outside of policy?

A. Within the Department that I worked?

Q. Yes.

A. No.

Q. Okay. And that would be out of approximately how many shootings?

A. Well, I already testified that I probably reviewed a dozen. It may be more.

**Page 36**

But I also reviewed shootings as a Division Commander, some of those.

Q. Approximately how many as a Division Commander?

A. I don't recall. It was several.

Q. How many --

A. -- approximately it was several.

Q. How many of those shootings involved an unarmed person who was shot?

MS. FOWLER: The ones he reviewed as a Division Commander?

MR. SCOTT: Q. Yes.

A. I don't recall the particulars. That would be quite a few years ago.

Q. Okay. And if I understand you correctly, you determined that all of those shootings were within policy?

A. I don't recall any being outside of policy or, you know. . .

Q. Could a police shooting be outside of policy, but not be criminal?

MS. FOWLER: Well, I'm going to object. That's an incomplete hypothetical, overly broad, vague and ambiguous.

MR. SCOTT: Q. Go ahead.

**Page 49**

1  Q. How many do you have?
2  A. I think right now we're down 12 officers,
3 approximately. It could be more or less. It's a
4 moving target.
5  Q. So, approximately 176 right now?
6  A. Approximately.
7  Q. Okay. I guess at any given time someone
8 could retire or go out on Disability?
9  A. Exactly; or we could hire a lateral, or
10 somebody from the Academy could come out.
11  Q. And how many Captains are there?
12  A. We're authorized two Captains and a
13 Civilian Manager.
14  Q. Do they report directly to you?
15  A. Yes, they do.
16  Q. Okay. And does anyone else report
17 directly to you as Chief?
18       MS. FOWLER: Sworn personnel, or anyone?
19       MR. SCOTT: Q. Anyone.
20  A. The -- Obviously, my administrative
21 assistant; the budget coordinator.
22  Q. Anyone else?
23  A. That's it.
24  Q. Is there an Internal Affairs Department?
25  A. Not a "department".

**Page 50**

1       The agency is not large enough for an
2 Internal Affairs Department, but what we do have is a
3 Support Bureau Lieutenant and a Training Sergeant
4 work on Internal Affairs issues with me and with the
5 Division Commanders.
6  Q. All right. And does that Lieutenant
7 report directly to you?
8  A. No. He reports to the Special Services
9 Division Commander or Captain.
10  Q. Do you review Internal Affairs
11 Investigations?
12  A. Yes, I do.
13  Q. Okay. And do you also review reports of
14 "Critical Incidents"?
15  A. Yes, I do.
16  Q. And why do you do that?
17  A. It's my responsibility:
18       First of all, with respects to all
19 discipline matters, per the City Charter, it's my
20 responsibility to impose discipline, up to and
21 including termination.
22       I also review the District Attorney's
23 reports when they come back on "Officer-Involved
24 Shootings," and I review and get briefings on the
25 investigations of those shootings.

**Page 51**

1  Q. Regarding the shooting of Richard
2 DeSantis, the case we're here about today, did you look
3 at any, or read any of the interviews done of the
4 Officers involved in that incident?
5  A. I read the entire -- I believe I read the
6 entire report when it was complete, which was sometime
7 ago; and I've read the [synops] and the District
8 Attorney's report as well.
9  Q. Do you recall reading any of the
10 interviews of the Officers?
11  A. I do, but not -- I don't recall specifics
12 of their interviews and statements.
13  Q. But you did read them?
14  A. Yes, mm-hmm.
15  Q. That's a "yes"?
16  A. Yes.
17  Q. And why did you do that?
18  A. I'm interested in the report, interested
19 in how the investigation was conducted, what the
20 Officers had to say, and . . .
21  Q. Did you have any problems or concerns with
22 the way the interview process was conducted?
23  A. No.
24  Q. How many shooting incidents have you
25 reviewed here in Santa Rosa as the Chief of Police?

**Page 52**

1  A. I believe the number was six.
2  Q. Okay. You have a document there. What is
3 that document?
4  A. It's Officer-Involved Shootings, or
5 Critical Incidences at the Department, that members of
6 the Department have been involved in since I've been
7 here.
8  Q. Okay. May I see that, please?
9  A. Sure.
10       MS. FOWLER: No. This was a privileged
11 attorney-client communication. I wasn't aware the
12 Chief was bringing it.
13       It does have confidential, privileged
14 information. I would be willing to give you a
15 redacted copy of this, that removes the names of the
16 involved Officers.
17       MR. SCOTT: Okay. Could we do that now?
18       MS. FOWLER: Yeah. Sure.
19       MR. SCOTT: Let's go off the record.
20       THE VIDEOGRAPHER: Off the record at 3:15.
21       (Brief pause off the record.)
22       THE VIDEOGRAPHER: Back on the record at
23 3:19.
24       MR. SCOTT: Okay. Counsel, have you
25 managed to redact the document?

DeSANTIS vs. CITY OF SANTA ROSA, ET AL Multi-Page™ Deposition of CHIEF ED FLINT
USDC, NORTHERN DIST OF CA No. C-07-3386 JSW    July 31, 2008
Case 3:07-cv-03386-JSW    Document 58-8    Filed 09/19/2008    Page 7 of 13

### Page 81

1 incident was debriefed in order to identify training
2 needs?
3    A. I do not.
4    Q. As Chief of Police, did you have to submit
5 a budget annually?
6    A. Yes.
7    Q. And did that include, as part of the
8 budget, training?
9    A. Yes.
10   Q. And did someone make recommendations to
11 you regarding what training should be provided, and how
12 much it would cost?
13   A. Yes.
14      The staff, the Training Sergeant and the
15 Budget Coordinator will look at the entire budget,
16 and look at the mandated training and the essential
17 training that we would like to accomplish, and try to
18 put a figure on that, so we have some idea on what
19 the training budget might have to be for the
20 Department.
21   Q. And did you understand that --
22      Well, is it -- Yes, was it your
23 understanding that, if you asked for more than a
24 certain amount for training, that it would not be
25 approved?

### Page 82

1       MS. FOWLER: Well, I'm going to object
2 that there is a lack of foundation, but go ahead and
3 answer it, if you know.
4       MR. SCOTT: Q. I'm just asking what you
5 understood.
6    A. Yeah, that's kind of a difficult question.
7       You know, the budget's $50 million, and
8 how we want to package the "Training" piece of that,
9 and if I felt that there was something significant in
10 the way of training need, and we needed additional
11 funds, I would go to the City Manager, and we'd
12 figure out a way to get additional funds to make that
13 training happen.
14   Q. Did you ever ask for money for training
15 that wasn't approved by the City Manager or the City
16 Council?
17   A. No.
18   Q. Well, what was the training budget for the
19 last year here?
20   A. Approximately, give or take, about
21 250,000.
22   Q. And is that consistent with the four years
23 that you were Chief, around 250,000?
24   A. Approximately.
25   Q. Okay. And do you know, of that amount,

### Page 83

1 how much was towards Mandatory P.O.S.T. training?
2    A. No, I do not.
3    Q. Now, if you would look at Exhibit No. 2
4 again, if you can find it here, and if you would look
5 at page No. 5, please.
6    A. (Complies).
7    Q. And near the bottom of the page, in
8 response to Interrogatory No. 13, it indicates that:
9       "From 2002 to 2007, there were over
10      58,000 incidents that resulted in
11      reports involving arrest";
12      And then it also indicates that:
13      "In that period there were approximately
14      3,186 incidents identified as possibly
15      involving a 5150 issue."
16      MS. FOWLER: That misstates what the
17 response states.
18      It says:
19      "58,000 would have to be reviewed to
20      determine whether in fact there was a
21      detention under Welfare and
22      Institutions."
23      That's the total Incident Report.
24      MR. SCOTT: Understood. Understood.
25   Q. I don't intend to be misleading here, and

### Page 84

1 this document says what it says, and I'm not trying to
2 misrepresent it. I'm just trying to skim along here to
3 some numbers.
4       And it indicates that there were
5 approximately 1,746 cases during that period where
6 persons were reported detained under 5150.
7       Do you see that?
8    A. Yes.
9    Q. Okay. And can you tell me, when you were
10 Chief how much training your Officers received
11 regarding the use of deadly force, in comparison to
12 training and doing 5150s, or responding to 5150s?
13   A. I don't have, you know, those figures off
14 the top of my head.
15   Q. Do you know if your Officers received any
16 training when you were Chief in doing 5150s, or
17 performing 5150s?
18   A. Yes.
19   Q. Why do you believe that?
20   A. Well, as part of the Field Training
21 Officer Program, as well as I believe there is probably
22 a block of training in the Police Academy as well
23 dealing with "disabled" persons, dealing with the
24 "mentally-ill".
25   Q. And how much training do Officers get,

1 once they get past beyond the Field Training?
2    A.   Well, I don't have specifics on that, but
3 I know that we've had Tactical Communications, the CIT
4 Crisis Intervention training, off the top of my head;
5 but, again, I don't have all the training plans, and I
6 have somebody that manages that for me.
7    Q.   Now, I will represent to you that last
8 week Sergeant Van Artsdalen testified that, when he was
9 in charge of training, there was no 5150 training?
10       MS. FOWLER:  That misstates his testimony.
11       He said that the subjects of 5150 are
12 covered in other trainings -- regarding
13 emotionally-disturbed person, but there is not a
14 separate, specific training on 5150.  So, you are
15 mischaracterizing his testimony.
16       MR. SCOTT:  I wouldn't intend to.  I agree
17 with what you said, that's what he said.
18    Q.   And, to your knowledge, is there any
19 specific training on 5150?
20       MS. FOWLER:  Where that is the sole
21 subject of the course.
22       MR. SCOTT:  Q.  Yes.
23    A.   Well, we have Officers and supervisors
24 involved in the CIT curriculum that were working with
25 Sonoma County Officers.

Page 85

1       We have the belief that last year we had
2 Tactical Communications, which is:  How to deal with,
3 you know, distraught people, or people who may be
4 suffering from mental illness or, under -- you know, a
5 combination of maybe under the influence of mental
6 illness.
7    Q.   How are Officers trained to deal with
8 those persons?
9    A.   Pardon?
10    Q.   How are Officers trained to deal with
11 emotionally-distraught persons?
12    A.   Well, there is --
13       MS. FOWLER:  Well, I'm going to object.
14 There is a lack of foundation.  He's already testified
15 he didn't participate in those trainings, and he
16 doesn't have personal knowledge.
17       MR. SCOTT:  He can say he doesn't know.
18       MS. FOWLER:  Don't guess or speculate.  If
19 you have personal knowledge, tell him what you know.
20       MR. BURRIS:  He is the Chief, though.
21       MS. FOWLER:  But he doesn't sit in on
22 every single training; he doesn't conduct the training;
23 he doesn't review the lesson plans.  That's delegated
24 to other people.
25       MR. BURRIS:  I would think he knows what

Page 86

1 they are doing --
2       MS. FOWLER:  If he knows, then, he knows.
3 [Inaudible].
4       THE VIDEOGRAPHER:  He's the Chief.  He's
5 supposed to know.
6       THE WITNESS:  Well, I can't outline it,
7 you know, block-by-block for the training, but learning
8 how to recognize symptoms of people who are mentally
9 disturbed, when they are acting out, how to give them
10 room, how to talk to them in a softer tone;
11       And just -- just a variety of techniques
12 that Officers can employ to help them deal more
13 effectively with people who are mentally ill.
14       MR. SCOTT:  Q.  To your knowledge, do
15 these techniques work?
16       MS. FOWLER:  Well, I'm going to object.
17 That calls for an expert opinion.
18       MR. SCOTT:  Q.  As a Police Officer, as
19 somebody who has been in law enforcement for over 30
20 years, to your knowledge, do these techniques work?
21    A.   I would like to think that they do,
22 because we deal with literally hundreds and hundreds of
23 people annually, as the numbers reflect; and, in the
24 County, we know that, you know, the mental health
25 system, a lot of this is falling upon law-enforcement

Page 87

1 shoulders to deal with.
2       So, we are coming into contact with
3 people with mental-illness issues on a fairly regular
4 basis.
5       And I think that, when the numbers bear
6 out, that we do a very, very good job many, many
7 times.
8    Q.   Would it be fair to say it's a more
9 frequent occurrence for a Police Officer in Santa Rosa
10 than, say, having to use deadly force?
11    A.   Could you say that again?
12    Q.   Yes.  Would having to deal with an
13 emotionally-disturbed person be a more frequent
14 occurrence for a Santa Rosa Police Officer than having
15 to use deadly force?
16    A.   Well, again, I think the vast majority of
17 the contacts that Santa Rosa Police Department has with
18 the community, whether mentally-ill or not, do not
19 involve force at all.
20    Q.   I would hope so.
21    A.   Okay.
22    Q.   And would it be --
23       Is it your understanding that Officers
24 have to deal with emotionally-disturbed or
25 mentally-ill people on a frequent basis, if not

Page 88

**Page 89**

1 daily, almost daily?
2    A.   Yes.
3    Q.   And it's been your experience that many
4 Officers can go through their entire career without
5 ever having to use deadly force?
6    A.   That's correct.
7    Q.   Do you know who does the Firearm
8 instruction for the Police Department?
9    A.   We have a number of range masters in the
10 Department have specialized training in providing
11 weapons-training, weapons-retention,
12 weapons-qualification in the Department, and I don't
13 have the specific names.
14   Q.   Okay. Does the term "Active Shooter
15 Training" mean anything to you?
16   A.   Yes.
17   Q.   What does that term mean to you?
18   A.   Well, it's a -- it is training -- the
19 "Active Shooter Training" has evolved out of a variety
20 of high-profile incidences in the state and around the
21 country, where Officers are encouraged and trained to,
22 you know, respond directly to the incident and try to
23 isolate or control a person that may be armed and
24 shooting people, say, on a school grounds, or the
25 McDonald's San Ysidro incident where, you know,

**Page 90**

1 Officers surrounded the place, staged, and were waiting
2 for a SWAT team, but had identified a suspect inside
3 who was shooting people.
4    Q.   Okay. I didn't ask you why you have it;
5        But Active Shooter Training is training
6 for situations where you have an active shooter?
7    A.   Correct.
8    Q.   And do all of your Officers get Active
9 Shooter Training?
10   A.   I don't know if every Officer has, but
11 it's -- it's a consistent training that we have
12 provided.
13   Q.   Does the term "Staging" mean anything to
14 you as a Police Officer?
15   A.   Yes.
16   Q.   And what does that term mean to you?
17   A.   Well, it generally means that Officers, or
18 a group of Officers would meet in a location, and put
19 together a hasty plan before going into an incident.
20       It also could be as simple as: It's a
21 two-Officer call, and one Officer stages down the
22 street, and waits for the backup Officer before they go
23 into the call.
24   Q.   To your knowledge, do Santa Rosa Police
25 Officers receive training in staging?

**Page 91**

1    A.   I don't know. It's a pretty routine
2 function that members of the Department probably do.
3    Q.   So, you don't know?
4    A.   Don't know.
5    Q.   Do you know if the Department has a policy
6 for staging regarding certain incidents?
7    A.   I don't know.
8    Q.   Okay. Does the term "perishable skills"
9 mean anything to you as a Police Officer?
10   A.   Yes.
11   Q.   What does that term mean to you?
12   A.   Well, there is a variety of training that
13 Police Officers engage in, because we realize that, if
14 you don't do it repetitively, or fairly regularly, your
15 skills diminish.
16       And the, for instance, Commission on
17 P.O.S.T., Peace Officers Standards and Training
18 requires that Peace Officers in the State of
19 California qualify every -- once every two years.
20       And we qualify twice a year. So, we're
21 significantly doing more training in firearms than
22 required by the Commission.
23   Q.   Do Officers have to qualify annually in
24 demonstrating they are able to deescalate situations
25 with mentally-ill persons or emotionally-disturbed

**Page 92**

1 people?
2    A.   Well, there is not a qualification course
3 for that.
4    Q.   Well, there not be a P.O.S.T. course.
5        Are you saying that one doesn't exist,
6 or it just isn't P.O.S.T.-certified.
7    A.   Well, courses exist, and we participate in
8 training regarding dealing with the mentally-ill,
9 but -- and we might even run some scenarios, as far as
10 that training, but there is not a -- a "qualification"
11 course or a mandate by the Commission to do that
12 training.
13   Q.   Okay. And, therefore, you don't do it?
14   A.   No, I'm trying to say, we do do training,
15 but there is not a qualification course, like going out
16 to the fire range, and meeting a certain score to
17 qualify with a particular firearm.
18   Q.   Do you know if Officers receive training
19 in using a Sage weapon in your Department?
20   A.   Yes.
21   Q.   Do you know who does that training?
22   A.   That would be our Firearms instructors.
23   Q.   Do you know if Officers receive
24 Weapons-Retention training in the Department?
25   A.   Yes, that's part of our Defensive Tactics

### Page 97

1 neutralize suspects?
2     MS. FOWLER: Well, I'm going to object.
3 That's an incomplete hypothetical. But, if you know
4 the answer, you can go ahead and answer it.
5     THE WITNESS: I don't -- Hold on.
6     Well, I know that that's how -- that's one
7 of the functions that the K-9 is used for, is to, you
8 know, help apprehend suspects.
9     MR. SCOTT: Q. Okay. Have you ever
10 reviewed incidents where K-9s were used to apprehend
11 suspects?
12  A.  I'm sure that I have, but I don't recall
13 any.
14  Q.  Okay. And have you ever witnessed K-9s
15 being used in the field in Santa Rosa?
16  A.  Yes.
17  Q.  And in what type of situation?
18  A.  I was out on a ridealong one night, and
19 there was a Cadillac Escalade stolen from the Santa
20 Rosa Mall.
21     And there was a short pursuit, and the
22 suspect bailed out. And we had a small, one-block
23 area cordoned off.
24     And we used the dog for a search, and he
25 found the suspect hiding under some sheet metal.

### Page 98

1  Q.  And did the suspect quietly come into
2 custody?
3  A.  Yes; he heard the dog barking, and the K-9
4 Officer said, "You know, you need to give up and come
5 out, or we're going to release the dog."
6  Q.  Have you ever seen a police dog attack and
7 take control of a person?
8     MS. FOWLER: While he's in been Santa
9 Rosa?
10    MR. SCOTT: Q. Anywhere.
11  A.  Sacramento, I believe, I probably saw that
12 occur.
13  Q.  And was it successful?
14  A.  Yes.
15  Q.  Does the -- Well, let me ask you this:
16    In 2007, did the Santa Rosa Police
17 Department have a "Use of Force" policy?
18  A.  Yes.
19  Q.  And what was it?
20  A.  What -- Did you want a copy of it, or did
21 you want me to just kind of talk about it.
22  Q.  Just as you understood it, if you could
23 just tell me what you understood it to be.
24  A.  Well, it -- Officers can use that force
25 which is reasonable -- reasonably necessary to effect

### Page 99

1 an arrest, overcome resistance, prevent escape.
2  Q.  Is it your understanding the
3 reasonableness of the force used is by some objective
4 standard or the subjective belief of the Officer?
5  A.  It's the objective belief of the Officer.
6  Q.  The objective belief of the Officer?
7  A.  How the Officer feels, he or she feels at
8 the time when the application of deadly force is used.
9  Q.  So, by that, you mean subjective?
10  A.  Well, I think that's opened up to
11 discussion, whether it's subjective or objectively,
12 they felt a particular way, that's the feelings they
13 had, what they saw.
14  Q.  So, if I understand you correctly, if an
15 Officer believes that the force is reasonable, then,
16 it's reasonable.
17  A.  No. The -- Like I said, our "Use of
18 Force" policy with respect to deadly force is
19 consistent with the law. And that policy sets the
20 standard of when and how deadly force can be used --
21  Q.  Okay.
22  A.  -- and it is an objective -- you know, an
23 objective standard of reasonableness in the mind of the
24 Officer, when he or she believes that great-bodily harm
25 is imminent.

### Page 100

1  Q.  Okay. Well, I hadn't gotten to "deadly
2 force" yet, I was just talking about force in general,
3 but. . .
4     And let me ask you this:
5     Is it your understanding that in 2007, the
6 Santa Rosa Police Department had a policy that
7 recognized different levels of force?
8  A.  Yes, there is discussion in the policy
9 about levels of force consistent with the situation.
10  Q.  And what do you understand to be the
11 levels of force that are identified in the policy?
12  A.  Well, there is low level, which could be
13 voice commands; and, you know, taking somebody by the
14 arm and, you know, escorting them to the car;
15     There are less-than-lethal forces that are
16 greater force, where you can use an impact weapon, or a
17 Taser or chemical spray.
18     And then of course there is lethal force,
19 which would be the firearm; or if some other instrument
20 or a vehicle might be used, could be considered deadly
21 force as well.
22  Q.  And this in-between level of force, in
23 between maybe a come-along, or using voice, between
24 that and using a lethal force, such as a firearm, you
25 mentioned a baton --

**Page 113**

1  A. Correct.
2  Q. They are looking to see whether or not
3 that shooting is the kind that they can say they can
4 prove beyond a reasonable doubt, okay, for criminal
5 violations.
6  A. Mm-hmm. Correct.
7  Q. Now, the question is, under your
8 Departmental rules and policy, as it relates to the Use
9 of Force, can a person use deadly force, and be
10 out-of-policy, but, yet, have not met the standard of
11 proof beyond a reasonable doubt for a criminal case?
12  A. I don't believe so.
13  Q. Okay. So, your standard is for a person
14 to have violated out-of-policy, the standard of that
15 is: Is it proof beyond a reasonable doubt, from a
16 criminal law standpoint?
17  A. Yes.
18  Q. Okay. I wanted to be clear about that.
19   Now, you had an opportunity, I take it,
20 to review the police reports that -- and
21 investigative reports that were prepared by your
22 Departmental staff, correct?
23   MS. FOWLER: I'm going to object, that
24 that misstates the evidence --
25   MR. SCOTT: I'm asking a question. I'm

**Page 114**

1 not asking whether -- It's not for you answer, okay.
2 I'm asking what he did, what he did, okay?
3   MS. FOWLER: You are misstating the
4 evidence --
5   MR. BURRIS: I'm not misstating anything.
6 I'm asking a question.
7   MS. FOWLER: Can you let me make my
8 objections? I'm entitled to make my objections.
9   MR. BURRIS: So, don't misstate --
10   Well, don't make objections that
11 mislead, or seek to inform the witness, okay. The
12 question is not --
13   MS. FOWLER: Well, your questions are
14 misleading. There was no report prepared by the Santa
15 Rosa Police Department. [Rest of statement
16 inaudible/multiple voices]
17   MR. BURRIS: There were a lot of reports
18 prepared.
19   MS. FOWLER: Not by the Santa Rosa Police
20 Department. They were prepared by the Sonoma County
21 Sheriff. And if you had attended any of the
22 depositions, you would know what the facts are.
23   MR. BURRIS: You are getting out of line,
24 lady, okay, you are a smart --
25   MS. FOWLER: You are out of line, because

**Page 115**

1 you are misstating the evidence to the witness.
2   MR. BURRIS: Q. Did you, in fact, review
3 the reports that were prepared in connection with the
4 shooting death of Mr. DeSantis?
5  A. I reviewed the DA summary, and there may
6 have been other things that I was able to review, but I
7 don't recall. That was way back when the incident
8 occurred, when the reports were -- [Interrupted]
9  Q. How recently have you rereviewed any of
10 the reports that have been prepared?
11  A. I reviewed the DA summary just to refresh
12 my memory on the incident.
13  Q. Okay. All right.
14   Now, during the course of that, did you
15 make any requests that any additional investigation
16 occur, based upon having read whatever reports you
17 did that described the incident?
18  A. I don't recall making -- you know, giving
19 any direction or additional investigation.
20  Q. If you had done so, would you have done
21 that in writing?
22  A. It depends.
23  Q. Okay. Well, you don't have a recollection
24 of having done so.
25  A. Correct.

**Page 116**

1  Q. Is there anything that would refresh your
2 recollection, any documents anywhere, that would
3 refresh your recollection that you, in fact, had made a
4 request of the District Attorney, or whoever was
5 conducting the investigation to go back and look at
6 more specifically certain aspects of the reports?
7  A. I probably would have committed that to
8 writing. I don't believe that there were -- was
9 anything that I asked for additionally of the
10 investigation.
11  Q. Okay. All right, fine.
12   So, and I'm not clear about this point,
13 just in terms of how the questions were responded to.
14   Based upon everything that you read in
15 terms of reports that were prepared, did you know, or
16 were able to determine whether any of the Officers had
17 -- the Officers had their batons, had a baton?
18  A. I said I -- it's a standard issue.
19 Whether they had it, I don't know.
20  Q. You don't know that.
21  A. No.
22  Q. Okay. The same question, as it relates to
23 whether any of the officers had their Tasers.
24  A. Again, back then, I can't remember how
25 many Tasers we had for Officers, but it was a

**Page 129**

1 training records that the Officers who were there
2 had, as it relates to dealing with the
3 emotionally-impaired?
4  A. No, I did not.
5  Q. Do you know whether or not --
6  Okay, I want to ask you this question:
7  In terms of what their training was, you
8 are not aware of it, that is, training for the
9 emotionally-impaired at the time you reviewed the
10 records?
11  A. Correct.
12  Q. Okay.
13  Has anything come to your attention
14 since then, since you reviewed the records, that
15 indicate, that reflect whether or not the Officers
16 had received training as it relates to 5150s or
17 dealing with emotionally-impaired persons?
18  A. No.
19  Q. Okay. And you are not aware, I take it,
20 as to whether any of the officers received any training
21 that was consistent with the CIT training.
22  A. Not specifically, no.
23  Q. Okay. And in terms of the report --
24  MS. FOWLER: Can we just go off the record
25 for a moment, and I will see if I can get these people

**Page 130**

1 just outside the room to quiet down, so that it doesn't
2 interfere.
3  MR. BURRIS: Okay.
4  THE VIDEOGRAPHER: Off the record at 5:09.
5  (Brief pause off the record.
6  THE VIDEOGRAPHER: Back on the record at
7 5:09.
8  MR. BURRIS: Q. So, Chief, other than
9 yourself, was there anyone that's in the City that's
10 above you that had to give the stamp-of-approval -- or
11 not a stamp -- that basically you had to report to
12 about the shooting itself?
13  A. No.
14  Q. Okay. So, your sort of approval, that the
15 shooting was, deadly use of force was appropriate and
16 within policy, in essence, was the final word --
17  A. For the Police Department.
18  Q. For the Police Department.
19  A. For the Police Department.
20  MR. BURRIS: We can go off the record for
21 a second.
22  (Brief pause off the record.
23  THE VIDEOGRAPHER: Back on the record at
24 5:11.
25  MR. BURRIS: Q. Looking at Exhibit 3, I

**Page 131**

1 know you said that you just kind of grabbed a bunch of
2 stuff on your way over here, and I don't know if you
3 intended to bring this or not, but do you recall when
4 it was and the relative time period as to when you
5 received this?
6  MR. SCOTT: Exhibit 3.
7  THE WITNESS: No, I do not.
8  MR. BURRIS: Q. Okay.
9  A. I don't have the dates.
10  Q. Do you have any way to help with that,
11 whether it was before the DeSantis case, or afterwards?
12  A. You know, I don't know.
13  I know that we had sent Officers to the
14 training to review it and take a look at it, and that
15 that perhaps was before -- and I'm just, you know,
16 going off of vague memory here, that that perhaps had
17 been going on for a while, the Sheriff and I had had
18 discussions about this, and we both sent staff to the
19 CIT training to evaluate it.
20  Q. Okay. In terms of adoption -- and this
21 may not have occurred --
22  A. Mm-hmm.
23  Q. -- but was the CIT format, for Sonoma
24 County perhaps, was that adopted by your Department at
25 some point?

**Page 132**

1  A. Well, I don't know if "adopted" is the
2 right terminology, but we decided to start attending
3 it, and it was just a matter of getting it scheduled,
4 and the finances around the training, because it is
5 resource-intensive and it's expensive.
6  Q. Okay. So, sending people to it was sort
7 of -- it meant that you thought this is a program that
8 should be used, or were you just looking to see if it
9 looks like a program that you might want to use?
10  A. Well, both.
11  Remember when I said we had sent some
12 personnel to it in different places around the Bay
13 Area, specifically to get some feedback to take a
14 look at it in its entirety, to have some discussion,
15 "Okay, this looks like a worthy program for us to
16 complement the training that we're already doing";
17  And that it was decided that, the Sonoma
18 County Chiefs had a presentation on it, and we
19 decided that we would, you know, start pooling our
20 resources and conducting this training for
21 law-enforcement agencies in the County.
22  Q. For the CIT to work, it is interactive
23 with the Mental Health section of the County; is that
24 correct?
25  A. Correct.

```
                    )
STATE OF CALIFORNIA )    ss.
                    )
```

## CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 4th day of August, 2008.

*A. Maggi Saunders CSR*

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California