# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

PATRICIA DeSANTIS, )
individually and as Successor )
in Interest for RICHARD )
DeSANTIS, deceased, and as )
Guardian Ad Litem for DANI )
DeSANTIS, a minor and TIMOTHY )
FARRELL, a minor, )
)
        Plaintiffs, )
)
vs. )
  ) No. C-07 3386 JSW &
  )     C-07-4474
)
CITY OF SANTA ROSA, JERRY )
SOARES, RICH CELL, TRAVIS )
MENKE, PATRICIA MANN, and DOES )
1 through 25, inclusive, )
)
        Defendants. )
)
_____)

DEPOSITION OF PMK OF SANTA ROSA POLICE DEPARTMENT

SERGEANT CLAY VAN ARTSDALEN

July 24, 2008

REPORTED BY: A. MAGGI SAUNDERS,

C.S.R. No. 2755



A. Maggi Saunders & Associates
Certified Shorthand Reporters
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                      ---oOo---
 4   PATRICIA DeSANTIS,                )
     individually and as Successor     )
 5   in Interest for RICHARD           )
     DeSANTIS, deceased, and as        )
 6   Guardian Ad Litem for DANI        )
     DeSANTIS, a minor and TIMOTHY     )
 7   FARRELL, a minor,                 )
                                       )
 8              Plaintiffs,            )
                                       )
 9        vs.                          )
                                       )  No. C-07 3386 JSW &
10                                     )  C-07-4474
     CITY OF SANTA ROSA, JERRY         )
11   SOARES, RICH CELL, TRAVIS         )
     MENKE, PATRICIA MANN, and DOES    )
12   1 through 25, inclusive,          )
                                       )
13              Defendants.            )
                                       )
14                                     )
                                       )
15
16
17
18
19   DEPOSITION OF PMK OF SANTA ROSA POLICE DEPARTMENT
20            SERGEANT CLAY VAN ARTSDALEN
21                  July 24, 2008
22
23
24   REPORTED BY: A. MAGGI SAUNDERS,
25                C.S.R. No. 2755
                                                   Page 1
```

```
 1                   I N D E X
 2
 3                                       Page
 4   Examination by MR. SCOTT             8
 5
 6              E X H I B I T S
 7
 8   FOR PLAINTIFFS                      Page
 9   1    Defendants' Response to Plaintiffs'   5
10        Special Interrogatories, Set Two
11   2    Defendant City of Santa Rosa's        5
12        Response To Plaintiff's Request For
13        Production of Documents (Set One)
14   3    Defendant City of Santa Rosa's        5
15        Response To Plaintiff's Request For
16        Production of Documents, Set Two
17   4    Notice of Deposition of City of       5
18        Santa Rosa's Person(s) Most
19        Knowledgeable
20   5    Letter dated July 15, 2008 to Mr.     5
21        Scott from Ms. Fowler, Esq., RE:
22        List of documents response to
23        request
24
25
                                                 Page 2
```

```
 1        BE IT REMEMBERED that, pursuant to Notice
 2   of Taking Deposition, and on Thursday, the 24th day
 3   of July, 2008, commencing at the hour of 10:22
 4   o'clock a.m. thereof, at the SCOTT LAW FIRM, 1375
 5   Sutter Street, Suite 222, San Francisco, California
 6   94109, (415) 561-9600, before me, A. MAGGI SAUNDERS,
 7   a Certified Shorthand Reporter in and for the State
 8   of California, there personally appeared,
 9
10   PERSON MOST KNOWLEDGEABLE FROM SANTA ROSA POLICE
11                    DEPARTMENT,
12
13   called as a witness by the Plaintiffs, who, being by
14   me first duly sworn, was thereupon examined and
15   interrogated as hereinafter set forth.
16
17                    ---oOo---
18
19        SCOTT LAW FIRM, 1375 Sutter Street, Suite
20   222, San Francisco, California 94109, (415) 561-9600,
21   represented by JOHN HOUSTON SCOTT, ESQ., appeared as
22   counsel on behalf of Plaintiffs.
23
24        CITY OF SANTA ROSA, OFFICE OF THE CITY
25   ATTORNEY, 100 Santa Rosa Avenue, Santa Rosa,
                                                   Page 3
```

```
 1   California 95402-1678, (707) 543-3040, represented by
 2   CAROLINE L. FOWLER, SANTA ROSA CITY ATTORNEY, and
 3   JOHN FRITSCH, ASSISTANT CITY ATTORNEY, appeared as
 4   counsel on behalf of Defendants.
 5
 6        EUREKA STREET LEGAL VIDEO, 511 Eureka
 7   Street, San Francisco, California 94114, (415)
 8   643-9190, represented by STEPHEN STATLER, PRINICPAL
 9   VIDEOGRAPHER, appeared to videotape the proceedings
10   on behalf of Plaintiffs.
11
                                                 Page 4
```

**Page 45**

1  Q. Okay. And as best you can recall -- and I
2  just want an estimate -- on average, of those three
3  years you were the Training Manager, what was the
4  budget, approximately?
5  A. Well, because they change every --
6  MS. FOWLER: For training?
7  MR. SCOTT: Yes.
8  THE WITNESS: For training, it was
9  approximately 260,000 per year.
10  MR. SCOTT: Q. That would be plus or
11  minus, but approximately 260,000?
12  A. Yes.
13  Q. And do you recall, of that 260,000,
14  approximately what percentage, or how much of that went
15  to the S.W.A.T. training?
16  A. I don't know.
17  Q. No idea?
18  A. No.
19  Q. Would that be documented, as far as you
20  know?
21  A. Yes.
22  Q. All right. And the budget, this budget
23  process, to your knowledge, is this a document that
24  would be submitted annually to the City officials, or
25  whoever the decision-makers were for the City, in

**Page 46**

1  deciding what the Department's budget would be for a
2  particular year?
3    Is that the City Council, do you know,
4  who ultimately made those decisions?
5  A. Do I know?
6  Q. Yes.
7  A. No, I don't know.
8  Q. All right. Did you ever go to any
9  meetings where the budget was discussed for training,
10  in terms of the budget being reviewed or approved by
11  City officials or the City Council?
12  A. So, are you asking, was I invited to a
13  meeting with City Council regarding the budget?
14  Q. Right.
15  A. No.
16  Q. But have you ever seen the document that
17  would be submitted to the City Council?
18  A. The final document, no.
19  Q. Okay. Did you ever see drafts of the
20  document --
21  A. No.
22  Q. -- before it was submitted?
23  A. No.
24  Q. Do you recall ever recommending any
25  training that was not approved, either by the Chief, or

**Page 47**

1  someone else in the City?
2  MS. FOWLER: It's already been asked and
3  answered several times.
4  MR. SCOTT: Q. Oh, I'm sorry. You don't
5  know?
6  A. Well, ask me the question again.
7  Q. I'm just trying to determine if you recall
8  an occasion where you recommended particular training
9  that did not -- was not ultimately approved, for
10  whatever reason?
11  A. Again, without -- I don't have the
12  specifics but, you know, training is recommended all
13  the time, and not always approved, so --
14  Q. You don't --
15  A. -- to answer your question --
16  Q. -- recall?
17  A. Yes, but I don't know specifics.
18  Q. All right.
19    Now, if you would look at Exhibit No. 4,
20  please, and it's in this pile here, it's the Notice
21  of your Deposition.
22  A. Yes.
23  Q. And this is for:
24    "The Person or Persons Most
25    Knowledgeable regarding training

**Page 48**

1    received by the Santa Rosa Police
2    Officers from 2002 to 2007, relating:
3    "One: to the use of force, both lethal
4    and non-lethal;
5    "And, two, 5150 situations."
6    Do you see that?
7  A. Yes.
8  Q. And to your knowledge, are you the Person
9  Most Knowledgeable regarding training during that
10  period of time relating to both lethal and nonlethal
11  force?
12  A. Yes.
13  Q. Okay. And, to your knowledge, are you the
14  Person Most Knowledgeable regarding training received
15  by Santa Rosa Police Officers between 2002 and 2007
16  relating to 5150 situations?
17  A. Yes.
18  Q. All right. When you were the Training
19  Manager, was any training given to Santa Rosa Police
20  Officers regarding 5150, or 5150-type situations?
21  A. Yes, but not using the term "5150".
22    We did the Tactical Communication
23  Training, which is required by P.O.S.T., and we also
24  had training with -- dealing with emotionally-disturbed
25  people, or EDP training.

**Page 49**

1  Q. Was that given annually, to your
2  knowledge?
3  A. It was in conjunction with the Tactical
4  Communications that was held every other year.
5  Q. And the Tactical Communication training,
6  that would be different from the EDT, or the
7  Emotionally-Disturbed Training, or was it part of the
8  same class?
9      MS. FOWLER: EDP.
10     MR. SCOTT: Q. I'm sorry, EDP. And the
11 "P" stands for?
12 A. Persons.
13 Q. Okay, thank you.
14    And was that in part of the same class,
15 or two different classes?
16 A. They were essentially two different
17 classes, but taught back-to-back.
18 Q. And, to your knowledge, who taught them?
19 A. They were mostly our hostage negotiators,
20 so I was one of the instructors over the years;
21    Officer Mark Azzouni, A-z-z-o-u-n-i;
22    Officer Wade Alred, A-l-r-e-d;
23    Officer Brad Conners, C-o-n-n-e-r-s;
24    And I believe that's it.
25 Q. All right. Was there a -- any written

**Page 50**

1  materials for that training class?
2  A. Yes.
3  Q. Okay. And was that P.O.S.T. materials, or
4  something else?
5  A. Not P.O.S.T. materials. So there was. . .
6     MR. SCOTT: I'm sorry, are you okay?
7     MS. FOWLER: I squished my finger.
8     MR. SCOTT: Let's go back to square one.
9  What was the middle of the question?
10    (The record was read by
11    the Reporter as requested.)
12    MR. SCOTT: Thank you. We'll come back to
13 it:
14 Q. If you could complete that answer, in
15 terms of what written materials there were for the
16 Tactical Communication training class?
17 A. Sure. The materials were designed after
18 some training received several years ago, so we -- we
19 have Power Point presentation that we use.
20 Q. In addition to Power Point, were there
21 written materials handed out to students?
22 A. No. Oh, I take that back. There. . .
23    I'm trying to think. . . .
24    I believe a -- there was a P.O.S.T.
25 booklet that was handed out. Other than that, there

**Page 51**

1  were no other materials.
2  Q. Okay. So there would have been an
3  in-house Power Point presentation that was not a
4  P.O.S.T.-certified document --
5  A. Correct.
6  Q. -- material.
7     And then, in addition, you believe there
8  was a P.O.S.T. booklet handed out.
9  A. Correct.
10 Q. And do you recall what the title was of
11 this P.O.S.T. booklet?
12 A. I don't know the exact title, but I
13 believe it was dealing with the mentally-ill.
14 Q. Based on your experience with the Santa
15 Rosa Police Department and as the Training Manager, was
16 that a common phenomenon, for Santa Rosa Police
17 Officers to have to deal with the mentally-ill, with a
18 mentally-ill person?
19     MS. FOWLER: I'm going to object to the
20 phrase "common [occurrence]" as vague and ambiguous.
21     MR. SCOTT: Q. By that I mean daily, or
22 almost daily.
23 A. No, not daily; and not even almost daily.
24    I couldn't give you a time frame but,
25 again, not on a daily.

**Page 52**

1  Q. Was it documented how often it occurred?
2  A. The only time it would be documented is if
3  someone was taken into protective custody.
4     But if there was a call that did not
5  require somebody being taken into protective custody,
6  and no report was generated, there would not be
7  documentation. The only other documentation would be
8  call for service.
9  Q. Okay. And were statistics kept of this
10 information, other than who would have been detained
11 under a 5150?
12 A. No.
13 Q. And, to your knowledge, were there other
14 incidents where an arrest occurred and, where it wasn't
15 a 5150, but an arrest occurred where the person
16 arrested was believed to have been, or ultimately
17 identified, as being mentally-ill?
18 A. I'm sure there have been.
19    And -- I'm sorry, could you ask that
20 question one more time?
21 Q. Fine. To your knowledge, were there
22 police reports, incident reports where a person was
23 arrested who was either -- at some point identified as
24 being mentally-ill?
25     MS. FOWLER: Well, I'm going to object.

## Page 109

1  this, when I was a Training Manager, but it looks like
2  some things may have changed.
3      Q.   All right. And would it be fair to say
4  that when you were the Training Manager, there was a
5  number of types of training that was given that are not
6  identified on this one page?
7      A.   Yes.
8      Q.   All right. And is it your understanding
9  that this simply attempts to describe at least
10 someone's opinion of what P.O.S.T. training is
11 mandated, versus what P.O.S.T. training is recommended
12 by P.O.S.T., but not mandated?
13     A.   It appears that this is the Mandated
14 Training for Peace Officers and Dispatchers.
15     Q.   Okay, at the top.
16          But then, where you see it says,
17 "Recommended training, per legislative mandate, but
18 not mandated"; do you see that?
19     A.   Oh, okay, yes.
20     Q.   Okay. Is it your understanding the
21 training below that line is training that is simply
22 recommended, but not mandated?
23     A.   I'm assuming, based on the line you just
24 read.
25     Q.   All right. And was one of your

## Page 110

1  responsibilities to see that the mandated training,
2  which would be near the upper portion of this document,
3  that Santa Rosa Police Officers received the mandated
4  training? Is that one of your responsibilities?
5      A.   Yes.
6      Q.   Okay. And did you keep any records of
7  what training was given on an annual basis, in addition
8  to mandated training when you were the Training
9  Manager?
10         MS. FOWLER: Him, personally?
11         MR. SCOTT: Q. Yes.
12     A.   No.
13     Q.   To your knowledge, does such a document
14 exist?
15     A.   Yes.
16     Q.   Where is it?
17     A.   That, I don't know, since there has been a
18 change, with -- It was kept by the Training
19 Coordinator, Shelley Walker.
20     Q.   Okay. And what did you understand to be
21 the purpose of keeping that document?
22     A.   Just having a history of the training that
23 we conducted; and then, if we wanted to do training
24 again, we wouldn't then have to reinvent the wheel, we
25 could just use the same basis of training, or training

## Page 111

1  blocks.
2      Q.   All right.
3          Now, if you would look at the second page
4  of Exhibit No. 1, and I understand you did not prepare
5  this document, and I understand you did not sign the
6  verification, and I understand you just recently saw it
7  for the first time;
8          So, just so it's understood between you
9  and me, I'm not -- I'm not assuming that you
10 necessarily know from personal belief what's in
11 here --
12     A.   Correct --
13     Q.   -- but you may.
14     A.   -- I've not read this.
15     Q.   Right, but I'm just trying to find out to
16 what extent there is information here that may be your
17 personal knowledge, versus because, if it is your
18 personal knowledge, I'm entitled to know that; and if
19 you don't know, you don't know, all right?
20         If you'll note, in the response to
21 Interrogatory No. 6, it seems to say that:
22             "In this period from 2002 to 2007, there
23         were four shooting incidents: Two
24         resulted in death of the suspect, and
25         two resulted in non-fatal injuries."

## Page 112

1          That's at line 18 and 19. Do you see
2  that?
3      A.   Yes.
4      Q.   Okay. Based on just your personal
5  knowledge, having worked in the Department during that
6  period of time and being the Training Manager during
7  some of that time, do those numbers sound correct to
8  you?
9      A.   Yes.
10     Q.   All right. And the two shooting incidents
11 that resulted in death, both in 2007, are you familiar
12 at all with those two incidents?
13     A.   Yes.
14     Q.   And how did you become aware of them?
15     A.   The first one, I forget the name of the
16 case, but I was actually on-duty, and I was on a -- as
17 a supervisor, I was on the very far perimeter during
18 the shooting.
19     Q.   Okay. And who were the Officers involved
20 in shooting that suspect?
21         MS. FOWLER: Well, I'm going to object, to
22 the extent that that invades the right to privacy of
23 the Officers in that there may be pending disciplinary,
24 criminal and/or civil matters.
25         And I would instruct you not to answer

**Page 113**

1 that question.
2     MR. SCOTT: Well, you know if there are or
3 there aren't. Are you telling me there are pending
4 disciplinary or criminal matters?
5     MS. FOWLER: I don't know necessarily
6 about disciplinary actions, as I don't get involved in
7 the Department's disciplinary --
8     MR. SCOTT: Okay.
9     MS. FOWLER: -- proceedings, so I don't
10 know that, and he's not answering those questions.
11     MR. SCOTT: All right. So -- And you know
12 that there is no criminal pending, right; you know
13 that?
14     MS. FOWLER: On this particular shooting,
15 the DA has released a report, which I've already
16 provided to you --
17     MR. SCOTT: Right.
18     MS. FOWLER: -- indicating that they have
19 found no criminal activity.
20     MR. SCOTT: Right.
21   Q. To your knowledge, Sergeant, can a Santa
22 Rosa Police Officer violate the Department's Shooting
23 Policy, without committing a crime?
24     MS. FOWLER: I'm going to object, to the
25 extent that that calls for a legal conclusion.

**Page 114**

1     MR. SCOTT: Q. I just want to know what
2 you know about the policies of the Department in
3 relation to the Use-of-Force.
4   A. Yes.
5   Q. Okay. And, to your knowledge, have
6 Officers ever been disciplined for the excessive
7 Use-of-Force -- Don't give me names --
8   A. Mm-hmm.
9   Q. -- where they were not criminally
10 prosecuted for that use-of-force?
11   A. Not that I'm aware of.
12   Q. Okay. So, at least based on your
13 knowledge, which obviously may be limited, but based on
14 your knowledge and experience, where Officers have been
15 disciplined for excessive Use-of-Force, have been
16 situations where Officers have also been prosecuted for
17 that.
18     MS. FOWLER: Well, I'm going to object.
19 That assumes facts not in evidence. He hasn't
20 testified that there were such situations.
21   Q. I'm just asking you, is that what you
22 said?
23   A. No, I'm not aware --
24     Well, why don't you ask the question
25 again.

**Page 115**

1   Q. Well, let's start with:
2     To your knowledge, have any Officers
3 ever been disciplined for the excessive Use-of-Force?
4   A. And I think I answered that, but I'm not
5 aware of that.
6   Q. Oh, I see. Okay.
7     So, if it happened, it happened without
8 your knowledge.
9   A. Correct.
10   Q. All right. And if I understand you
11 correctly, when you were the Training Manager, you were
12 never asked to give remedial training for any
13 situations involving Use-of-Force; is that correct?
14   A. Correct.
15   Q. Now, the two shooting incidents between
16 2002 and 2007 that did not result in death, do you know
17 anything about those two incidents?
18   A. No. Not with just the dates.
19   Q. Okay. Have you ever been involved as a
20 Santa Rosa Police Officer in a shooting incident?
21   A. No.
22   Q. Okay. Have you ever fired your weapon in
23 the line of --
24     MS. FOWLER: Well, other than to the
25 extent he already testified he was present at --

**Page 116**

1     MR. SCOTT: Right.
2     MS. FOWLER: -- the one shooting.
3     MR. SCOTT: Q. Correct.
4     And have you ever fired your weapon
5 on-duty, other than for training purposes?
6   A. No.
7   Q. Now, if you look at the Answer to
8 Interrogatory No. 7, it starts at the bottom of page
9 two and goes up to the bottom of page three. And it
10 states that:
11     "There are 58,758 incident reports
12     involving arrest between 2002 and 2007."
13     Do you know how that number was
14 determined?
15   A. No.
16   Q. Now, Interrogatory No. 8 here is asking
17 for "Number of times a Police Officer used a Taser
18 on-duty between 2002 and 2007".
19     To your knowledge, did the Department keep
20 any logs of use of a Taser by an Officer on-duty
21 between 2002 and 2007?
22   A. Well, what do you mean by "log"?
23   Q. Any kind of record, by anybody,
24 supervisor, Lieutenant, anybody who kept track of --
25     MS. FOWLER: Statistics.

Depo of PMK SGT. CLAY VAN ARTSDALE
July 24, 2008
Multi-Page
DeSANTIS VS. CITY OF SANTA ROSA, ET AL.
USDC, NORTHERN DIST. OF CA, No. C-07 3386 JSW
Case 3:07-cv-03386-JSW    Document 58-9    Filed 09/19/2008    Page 8 of 9

**Page 125**

```
 1      MS. FOWLER:  Page 20.
 2      MR. SCOTT:  Q.  I'm sorry, No. 20, page 7,
 3  it says:
 4          "There is not any mandated training on
 5          Section 5150 of the Welfare and
 6          Institutions Code under P.O.S.T.
 7          requirements, and Santa Rosa does not
 8          have any specific mandated training
 9          limited to Section 5150."
10          Do you see that?
11      A.  Yes.
12      Q.  And to your knowledge, was that true when
13  you were the Training Manager?
14      A.  Yes.
15      MS. FOWLER:  And just for the record, the
16  rest of that stated that:
17          "This subject matter is covered as parts
18          of other mandated or recommended
19          training that's provided."
20      MR. SCOTT:  That is correct, it does say
21  that.
22      Q.  Now, if you will go to page five of this
23  document, please, and if you would look at
24  Interrogatory 13 and the Answer to No. 13, if you would
25  just read the Answer to No. 13 to yourself, and then I
```

**Page 126**

```
 1  will ask you some questions about it.
 2      A.  (Complies).
 3      MS. FOWLER:  Just for the record, I will
 4  give you a little bit of latitude, but this is beyond
 5  the scope of what he's been designated to testify
 6  about.  And he's already told you that he was not the
 7  person who participated in preparing these responses to
 8  interrogatories.
 9      MR. SCOTT:  I understand that, and I'm
10  just -- I'm going to -- This is foundational to ask
11  questions that could be related to training, and I'm
12  asking the questions for that purpose.
13      Q.  Now, have you had a chance to read the
14  response to Interrogatory No. 13?
15      A.  Yes.
16      Q.  Okay.  And do you see there are some
17  numbers in here, where it says:
18          "From December of 2002, to
19          December 2007, the Department received
20          reports of approximately 3,186 incidents
21          identified as possibly involving a
22          '5150' issue."
23          Do you see that?
24      A.  Yes.
25      Q.  All right.  Do you know how this
```

**Page 127**

```
 1  information was obtained?
 2      A.  No.
 3      Q.  Okay.  And then it goes on to say:
 4          "There were approximately 1,746 cases
 5  during this period that were reported as persons
 6  being detained under that section.  Do you see that?
 7      A.  Yes.
 8      Q.  And do you know where that number came
 9  from?
10      A.  No.
11      Q.  All right.  As the Training Manager, was
12  this type of information brought to your attention, in
13  other words, this type of statistics?
14      A.  No.
15      Q.  Now, if a 5150 incident involved
16  Use-of-Force, it would be routed to you, unless it was
17  investigated by an outside agency?
18      A.  No.
19      Q.  Okay.  So, the Use-of-Force incidents that
20  came out of 5150s were not routed to you.
21      A.  Correct.
22      Q.  And do you know why that was?
23      A.  **The reports that were routed to me were
24  codified.  So, if it involved a Section of 148 or 243B,
25  Records knew to forward that to me.**
```

**Page 128**

```
 1      Q.  All right.
 2      A.  The 5150 was not codified with that
 3  specifically.
 4      Q.  Were you aware that some police
 5  departments keep a record of 148s and 243s, to identify
 6  Officers who may be violence-prone?
 7      A.  I'm not aware of that.
 8      Q.  Okay.  Have you ever discussed that with
 9  anyone at the Santa Rosa Police Department?
10      A.  No.
11      Q.  Did you ever attempt to analyze if there
12  was a relatively small group of Officers who were
13  responsible for the majority of the 148 and 243s?
14      A.  No.
15      Q.  To your knowledge, does the Department
16  keep track of the outcome of the 148 and 243 arrests,
17  in other words, whether there was a prosecution and, if
18  so, whether there was a conviction?
19      A.  I'm not aware of anything that -- or
20  anyone that keeps track of that.
21      Q.  To your knowledge, do other departments
22  keep track of that?
23      A.  I don't know.
24      Q.  In your three years as the Training
25  Manager, how many times did you talk to the Chief?
```

```
                        )
STATE OF CALIFORNIA     )  ss.
                        )
```

CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 28th day of July, 2008.

*A. Maggi Saunders CSR*

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California