JOHN L. BURRIS, Esq./ State Bar #69888
BENJAMIN NISENBAUM, Esq./ State Bar #222173
LAW OFFICES OF JOHN L. BURRIS
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ADRIANNE DESANTIS,

              Plaintiffs,

     vs.

CITY OF SANTA ROSA, a municipal
corporation; EDWIN FLINT, in his capacity as
Chief of Police for the CITY OF SANTA
ROSA; PATRICIA MANN, individually, and in
her capacity as an officer for the CITY OF
SANTA ROSA; RICH CELLI, individually and
in his capacity as an officer for the CITY OF
SANTA ROSA; TRAVIS MENKE, individually
and in his capacity as an officer; and DOES 1-
25, inclusive, individually and in their capacities
as officers for the CITY OF SANTA ROSA,

              Defendants.
                          /

Case No. C 07 4474 JSW

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

**[Fed. R. Civ. P. 56©, 56(d)]**

Time: 9:00 a.m.
Date: October 17, 2008
Location: Courtroom 2, 17th Floor
Judge: Hon. Jeffrey S. White
.

## III.     INTRODUCTION

      Plaintiff Adrianne DeSantis, the mother of the decedent RICHARD DESANTIS, opposes

Defendants' motion for summary judgment or alternatively summary adjudication on her claims for

violation of her Fourteenth Amendment U.S. Constitutional right to a familial relationship with her

son RICHARD DESANTIS. Plaintiff's U.S. Constitutional claims are based on Fourteenth

Amendment violations, since Mr. DeSantis's estate which suffered the Fourth Amendment violation

is represented by the related case (*Patricia DeSantis, et al. v. City of Santa Rosa, et al. C 07 3386*

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*DeSantis v. City of Santa Rosa, et al.*, Case no. C 07 4474 JSW
     1

`

*JSW)*.  This Opposition to Summary Judgment focuses on the contested issues of the basis of the use of force against decedent RICHARD DESANTIS.  On these issues, since there are material questions of fact as to whether there was a legitimate law enforcement purpose to use *lethal* force against Mr. DESANTIS, Defendants' Motion for Summary Judgment must be denied.

 In conjunction with this Memorandum, Plaintiff has also filed the Declaration of Ben Nisenbaum ("Nisenbaum Declaration"), which includes a report prepared by police practice expert Lou Reiter and includes the Deposition testimony of Plaintiff Patricia DeSantis, the Defendant Officers who witnessed the incident, and Santa Rosa Chief of Police Edwin Flint.

## II. TABLE OF CONTENTS

I.  Introduction……………………………………………………………………………… 1

II. Table of Contents……………………………………….…………………………….. 2

III. Table of Authorities……………………………………………………………….…….. 3

 Memorandum of Points and Authorities………………………………………….. 4

IV. Statement of Issues………………………………………………………………… 4

V.  Statement of Facts…………………………………………………………………........ 4

VI. Argument………………………………………………………………………...... 9

 A. Standard for Summary Judgment………………………………………… 9

 B.  Defendants' use of Lethal Force to detain and/or arrest Mr. DeSantis was
  unreasonable…………………………………………………………………… 9

 C. The Defendant Officers violated Plaintiff's Fourteenth Amendment rights
 because their use of deadly force was not objectively reasonable under the facts and
 circumstances presented…....………………………………………………… 14

 D. Defendants are not entitled to qualified immunity..………….....…………………….. 18

 E. Defendants CITY'S and Chief FLINT'S Motions for Summary Judgment should be
 Denied…………………………………………………………………………… 20

 VII. Conclusion…………………………………………………………………… 22

`

# III.    TABLE OF AUTHORITIES

Statutes:

California Welfare and Institutions Code section 5150...…………………….................. 4

Cases:

*Bell v. Cameron Meadows Land Co.* 669 F.2d 1278 (9th Cir. 1982)………………………….9

*Ruffin v. County of Los Angeles* 607 F.2d 1276, 1279 (9th Cir. 1979)…………………….9

*United States v. Diebold*  369 U.S. 654, 655, 82 S. Ct. 993  (1962)……………………….9

*Sankovich v. Life Ins. Co. of N. Am.* 638 F.2d 136 (9th Cir. 1981)……………………….9

*Southwest Marine, Inc. v. Gizoni* 112 S. Ct. 486 (1991)………………………………….9

*Graham v. Conner* 490 U.S. 386, 397 (1989)…………………………………………......9

*Ting v. U.S.*, 927 F.2d 1504, 1510 (9th Cir. 1991)…………………………………………9

*Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc)………………….…..10

*County of Sacramento v. Lewis* 523 U.S. 833 (1998)…………………………………….14,15

*Daniels v. Williams* 474 U.S. 327 (1986)……………………………………….15

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)……………………………………….............19

*Saucier v. Katz*, 533 U.S. 194  (2001)…………………………………………….19,20

*Doe v. Petaluma City Sch. Dist.*, 54 F.3d 1447, 1450 (9th Cir. 1995)…………………………19

*Alford v. Haner*, 333 F.3d 972 (9th Cir. 2003)……………………………………….. 19

*Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095 (9th Cir. 1995)………………… 19

*Tennessee v. Garner*, 471 U.S. 1 (1985)……………………………………………….20

*Monell v. Department of Social Services,* 436 U.S. 658 (1978)…………………………….20,21

*Anderson v. Warner,* 451 F.3d 1063 (9th Cir.2006)……………………………………….20

*Oviatt v. Pearce*, 954 F.2d 1470 (9th Cir.1992)………………………………………….20

*City of Canton v. Harris,* 489 U.S. 378 (1989)………………………………………….20-21

*McDade v. West,* 223 F.3d 1135 (9th Cir.2000)………………………………………….21

*Jackson v. City of Bremerton,* 268 F.3d 646 (9th Cir.2001)………………………………...21

`

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## IV.    STATEMENT OF ISSUES

**Plaintiff contests Defendants' motion for summary judgment on the following issues:**

a. <u>The police officers' decision to use lethal force against Mr. DeSantis was patently unreasonable and shocks the conscience</u>:   The Defendant Officers' used excessive force in fatally shooting Mr. DeSantis.  It is undisputed that at the time of the fatal shooting, Mr. DeSantis was unarmed, shirtless, barefoot, incommunicative, and suffering from a mental disorder.  Under these circumstances, it was patently unreasonable for the officers to resort to lethal force, shooting Mr. DeSantis multiple times.

b. <u>Qualified Immunity</u>: The law is clearly established that the basis fatally shooting an unarmed man in the throes of a mental crisis constitutes Fourth and Fourteenth Amendment violations.  As such, the Defendants are not entitled to qualified immunity.

c. <u>Defendant Officers' actions, including the decision to use lethal force against Mr. DeSantis, were approved, ratified and condoned by Defendants City and Flint by their failure to conduct any meaningful internal post-shooting investigation</u>:

Defendant Chief of Police FLINT testified that if an officer's actions are not found criminal by the District Attorney, they are not in violation of any Police Department policies, that there was no formal internal review of Mr. DeSantis's shooting or of any similar police incidents for that matter, thereby tacitly ratifying this unreasonable use of force.

Furthermore, Defendant CITY did not provide adequate training to the Defendant Officers pertaining to the use of force against a person suffering from a mental crisis who presents as a probable California Welfare and Institutions Code section 5150 (posing a risk of harm to oneself or others). Such section 5150 circumstances often involve a person who is psychiatrically impaired, under the influence, and/or incommunicative.

## V.    STATEMENT OF FACTS

On Monday, April 9, 2007, at approximately 1:00 a.m., Mr. Richard DeSantis, who has had a long history of struggling with a mental disorder, experienced an emotional disturbance and, convinced there was someone in his attic, discharged a firearm into the ceiling of his home.  (See

`

Deposition Testimony of Patricia DeSantis 52:13, 147:24-148:9 attached as Exhibit B to the Nisenbaum Declaration, hereinafter cited as "DeSantis Depo".)  Seeking police assistance, Plaintiff Patricia DeSantis called 911.  (DeSantis Depo, 154:14.)  Plaintiff DeSantis informed the dispatcher that: she needed assistance; her husband is bipolar; he was having paranoid delusions; he fired a gun into the ceiling; and she was home with her 10-year-old son Timothy and 2-year-old daughter Dani. (DeSantis Depo, 156:17-22.)  Mr. DeSantis did not fire the gun any more beyond the initial rounds that he shot into the ceiling.  (DeSantis Depo, 158:15-17.)  Plaintiff DeSantis then awakened her son Timothy and instructed him to remain on the phone with the dispatcher.  (DeSantis Depo, 158:18-159:2.)  Timothy remained on the phone with the dispatcher for the duration of the incident. (DeSantis Depo, 169:23-24.)  Once Timothy took the phone, Plaintiff DeSantis successfully and without incident, took the gun away from Mr. DeSantis.  (DeSantis Depo, 159:15-17.)  Plaintiff DeSantis immediately yelled for Timothy to inform the dispatcher that she had disarmed Mr. DeSantis and that he was no longer holding a gun.  (DeSantis Depo, 160:13-19.)

Aware of the police officers' arrival, Plaintiff DeSantis informed Mr. DeSantis that the police were outside and that he needed to go with them so he could get help.  (DeSantis Depo, 165:6, 177:3-5.)  Mr. DeSantis did not respond and only looked at her with a "blank stare."  (DeSantis Depo, 177:7)  While still carrying Dani, Plaintiff DeSantis escorted Mr. DeSantis—who was only wearing jeans and socks, no shirt or shoes, and was now unarmed—outside.  (DeSantis Depo, 160:5, 161:6, 168:1-2.)  Once outside, Plaintiff DeSantis immediately observed three or four police officers on both sides of the driveway with their weapons drawn.  (DeSantis Depo, 165:19, 166:21, 167:1-3.)  She yelled twice to the officers that the gun was inside the house and that Mr. DeSantis was experiencing a mental health crisis.  (DeSantis Depo, 167:6-10; See Deposition Testimony of Daniel Jones 36:22-24 attached to the Nisenbaum Declaration as Exhibit H, hereinafter cited as "Jones Depo.")

Several Santa Rosa police officers responded to the radio call: Sergeants Richard Celli and Jerry Soares, Officers Travis Menke, Patricia Mann, Daniel Jones, and Jerry Ellsworth a K-9 police officer.  Officer Jones and Sgts. Celli and Soares arrived in succession and parked adjacent to each other southeast of the DeSantis' driveway.  (See Deposition Testimony of Richard Celli 69:21-70:4, 73:9-12 attached as Exhibit C to Nisenbaum Declaration, hereinafter cited as "Celli Depo,.")

`

Officers Mann and Jones testified that the dispatcher informed them that Mr. DeSantis suffered from a mental disorder.  (See Deposition Testimony of Patricia Mann 102:13-19 attached as Exhibit E to the Nisenbaum Declaration, hereinafter cited as "Mann Depo;" Jones Depo, 36:9-13.")  The Sergeants met in the middle of the street for approximately "ten seconds," Sgt. Soares informed Sgt. Celli that he had "the Sage," a less-lethal projectile weapon,[1] and Sgt. Celli described where he wanted to approach the residence by pointing to the southeast corner of the driveway.  (Celli Depo, 77:3-18.)  Officer Jones did not participate in and was not aware of this conversation or any tactical planning discussion.  (Jones Depo, 33:3-6, 28:5-13.)  Similarly, the other three officers did not participate in any type of "briefing" where they discussed a tactical plan of approach.  (Mann Depo, 58:8-16; See Deposition Testimony of Travis Menke 71:21-24 attached as Exhibit D, hereinafter cited as "Menke Depo.")  Officer Ellsworth testified that no one seemed to be in command.  (See Deposition Testimony of Jerry Ellsworth 62:6 attached as Exhibit G, hereinafter cited as "Ellsworth Depo.")  Sgt. Celli decided against retrieving his Taser and instead retrieved his rifle both of which he stored in the trunk of his patrol car.  (Celli Depo, 72:9-17.)  The officers observed that the driveway was lit by a nearby streetlight, and light emanated from inside the residence and the porch light that Plaintiff DeSantis had turned on.  (Celli Depo, 81:18-20; DeSantis Depo, 161:10, 166:10.)  Sgt. Celli observed Plaintiff DeSantis holding Dani standing on the steps leading to the front door and Mr. DeSantis standing a couple of yards away from them towards the officers.  (Celli Depo, 82:7-19.)  The scene was sufficiently illuminated for the officers to observe that Mr. DeSantis was wearing jeans, no shirt or shoes, that he had no weapons "sticking out the top" of his waistband, and his hands were empty.  (Celli Depo, 83:2-6, 83:22-25, 217:7-12; Mann 87:9; Menke 85:18.)  Sgt. Celli did not recognize Mr. DeSantis and had no prior contact with him.  (Celli Depo, 13:9; Mann Depo, 55:22.)

Sgt. Celli took command of the scene.  (Celli Depo, 87:15.)  Sgts. Celli and Soares and Officer Jones were shoulder-to-shoulder and approached from the southeast corner of the driveway.  (Celli Depo, 84:15-23.)  Officers Menke, Mann and Ellsworth, who were approximately 15 feet away, approached from the southwest corner of the driveway.  (Celli Depo, 79:1-2, 84:14; Mann

---

[1] A Sage is less lethal weapon system that fires a 37-millimeter projectile polyurethane grommet shot from a large bore cylinder that is rifled and has chambers resembling a revolver.  (Deposition Testimony of Jerry Soares 32:24-33:3

`

Depo, 60:18-20.)  All six officers approached the scene in a straight line in two groups of three with 15 feet between the groups.  (Celli Depo, 86:10-25.)  All of the officers had their weapons drawn. (Celli Depo, 116:2-11; Menke Depo, 58:15.)  Although Sgt. Celli ordered Officer Menke to speak with Mr. DeSantis, Officer Menke did not recall this order and started communicating with Mr. DeSantis because he was the first officer to arrive.  (Celli Depo, 87:21; Menke Depo, 85:21-86:1.) Plaintiff DeSantis heard several of the officers shouted commands.  (DeSantis Depo, 167:19; Jones Depo, 36:20-21.)  Additionally, Officers Jones testified that the canine was barking at this time. (Jones Depo, 35:21.)  Officer Menke repeatedly ordered Mr. DeSantis to get on his knees, and after several seconds, Mr. DeSantis got down on both knees.  (Celli Depo, 119:2-11; Menke Depo, 89:20-25.)  While Mr. DeSantis kneeled on the ground, Officer Menke ordered him to keep his hands in the air and then instructed him to place his hands on the ground in front of him.  (Celli Depo, 119:23-120:3.)  Meanwhile, Plaintiff DeSantis, who was standing just inside doorway watching what was happening, yelled to the officers that Mr. DeSantis "had a mental illness and was 'in crisis.'"  (Jones Depo, 36:16-24; 52:6-8; DeSantis Depo, 169:2-3.)

While his hands were in the air, the officers again observed that Mr. DeSantis's hands were empty and did not observe any weapons on or near his person.  (Celli 120:7-16; Mann Depo, 89:2-5.) After initially placing his hands on the ground in front of him, Mr. DeSantis then quickly raised his hands back in the air and then placed them back on the ground.  (Celli Depo, 121:24-25; Mann Depo, 79:9-17.)  Mr. DeSantis never said anything response to the police commands.  (DeSantis Depo, 169:13-15; Celli Depo, 109:15-16; Mann Depo, 169:2-3.)  Plaintiff DeSantis testified that although Mr. DeSantis complied with the officers' commands, she did not feel that any of it registered with him.  (DeSantis Depo, 170:21-171:1.)  Indeed, Sgt. Celli testified at this point he did not order Officer Ellsworth to release the canine because Mr. DeSantis was complying with Officer Menke's commands.  (Celli Depo, 122:4-9.)

Officer Menke then ordered Mr. DeSantis to lay prone on the ground.  (Celli Depo, 124:2.) Mr. DeSantis bent forward, rolled his hips to the ground like he was going to lay on his stomach and came back up to a kneeling position.  (Celli Depo, 124:2-12; Mann Depo, 86:3-6.)  Mr. DeSantis then

attached as Exhibit F to the Nisenbaum Declaration, hereinafter cited as "Soares Depo,.")

`

momentarily looked towards Sgt. Celli, back towards Plaintiff DeSantis, and then towards Officers Menke and Mann.  (Celli Depo, 125:24-25, 126:6-7; Mann Depo, 86:10-16.)  Mr. DeSantis then stood up and ran towards Officers Menke, Mann, and Ellsworth.  (Celli Depo, 125:24-126:5; Mann Depo, 78:3-5.)  Sgt. Celli testified that Mr. DeSantis took off like a sprinter out of the blocks, though there was still clearly nothing in his hands.  (Celli Depo, 126:19, 127:20-21, 128:8-12.)  Plaintiff DeSantis testified that Mr. DeSantis got up and initially started walking towards the officers slowly, although she admitted that she had difficulty gauging speed.  (DeSantis Depo, 171:17, 172:8, 172:11-22.)

After several steps, Sgt Soares fired the less-lethal Sage at Mr. DeSantis who was 10 to 15 yards away from Officers Menke and Mann.  (Celli Depo, 128:14-16, 129:21.)  The Sage round hit Mr. DeSantis, and he tilted his body to the right; he then continued running towards Officers Menke and Mann. (Celli Depo, 133:19-25.)  Plaintiff DeSantis testified that after the initial shot, Mr. DeSantis crouched or leaned over, stopped for a second, and continued to either run but that he could have easily been falling.  (DeSantis Depo, 171:24-172:4, 173:12-13, 175:6-8.)  Officer Mann also testified that Mr. DeSantis slowed his pace for a second after being hit by the Sage round.  (Mann Depo, 93:23, 96:5-6.)

After being hit with Sgt. Soares's Sage round, Sgt Celli then observed Mr. DeSantis for a second or two, observed him advance four more steps, aimed at his upper body, and then shot Mr. DeSantis.  (Celli Depo, 135:1-9, 135:22-136:5.)  Sgt. Soares testified that Sgt. Celli stepping into his field of view caused him to hesitate firing a second Sage round and had Sgt Celli not come into view he would have fired a second Sage round at Mr. DeSantis.  (Soares Depo, 39:22-40:10.)  Sgt. Celli testified that he thought that Mr. DeSantis would kill Officers Menke and Mann by either pulling out a weapon or taking one of their weapons from them, so he shot him.  (Celli Depo, 130:17, 135:15-21.)  Mr. DeSantis's body started to turn, he took one or two more steps and then two more shots were fired and Mr. DeSantis dropped.  (Celli Depo, 137:1-17; Menke Depo, 61:21.)  Officers Menke and Mann shot the other two rounds.  (Menke Depo, 61:9; Mann Depo, 98:14-16.)  The entire encounter took a minute to a minute and a half.  (Celli Depo, 21:5-8.)

`

# VI.    ARGUMENT

## A.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment, which is sought by Defendants against Plaintiffs' Causes of Action alleging violation of their Fourth Amendment and Fourteenth Amendment rights, requires that the moving party show there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. *Bell v. Cameron Meadows Land Co.* 669 F.2d 1278 (9th Cir. 1982). The relevant disputed facts must be considered in the light most favorable to the non-moving party and all relevant disputed matters resolved in the non-moving party's favor. *Ruffin v. County of Los Angeles* 607 F.2d 1276, 1279 (9th Cir. 1979); *United States v. Diebold* 369 U.S. 654, 655, 82 S.Ct. 993, (1962) wherein the Court held "on summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion."

The Court should not grant summary judgment where there are undisputed facts which reasonably lend themselves to different inferences. *Sankovich v. Life Ins. Co. of N. Am.* 638 F.2d 136 (9th Cir. 1981).

Further, it is not the trial court's function to resolve any genuine factual issue at the summary judgment hearing. *Southwest Marine, Inc. v. Gizoni* 112 S.Ct. 486 (1991).

## B.    DEFENDANTS' USE OF LETHAL FORCE TO DETAIN AND/OR ARREST MR. DESANTIS WAS UNREASONABLE

Plaintiff agrees the use of force to affect an arrest is properly examined under the Fourth Amendment's prohibition on unreasonable searches and seizures. *Graham v. Connor*, 490 U.S. 386 (1989). Police may only use force that is objectively reasonable under the circumstances. The reasonableness of the use of force is to be judged from the perspective of a reasonable officer on the scene. *Graham* at 397. Factors to consider in assessing the reasonableness of the use of force include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by

flight." *Ting v. U.S.*, 927 F.2d 1504, 1510 (9th Cir. 1991), citing *Graham v. Connor*, *supra*.  The most important of these elements is the threat posed to officer safety or the safety of others. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc). Contrary to Defendants' rejection of the argument, the totality of the circumstances analysis includes the availability of less intrusive alternatives.  *Smith* at 701.

       As Plaintiff's police practice expert Lou Reiter explains, the police officers response to Plaintiff Patrcia DeSantis's 911 call seeking assistance with a mentally and emotionally disturbed man was contrary to generally accepted police practices.  (See Exhibit A, p. 6 para. 10, attached to the Nisenbaum Declaration, hereinafter cited as "Exhibit A.")  Instead, their actions were callous and deliberately indifferent to the special needs of a person with diminished mental capacity and ultimately recklessly exacerbated this citizen encounter into a deadly force incident.  As Reiter details in his declaration, the courts, particularly the 9th Circuit, as well as the police community have spent years examining the use of force involving persons of diminished capacity and have determined that police are to treat such afflicted persons differently than the force used when dealing with other criminals.   (Exh. A, p. 7 para. 11.)  Reiter cites four tactical police concepts that are critical to a successful encounter with diminished capacity suspects: 1) Coordination: the concept of devising a plan, 2) Containment: devising a plan that will contain the subject, 3) Communication: where one person should be designated as the command voice, and 4) Time: the longer the encounter is allowed to occur, the better the chance of a successful and safe resolution.  (Exh. A, pp. 8-10 paras. 12-13.) Even a cursory analysis of these factors and the Defendant Officers actions in this case reveals that the state action in this case was unreasonable and inconsistent with generally accepted police practices when dealing with an emotionally disturbed person of diminished capacity.

`

Initially, the Defendant Officers' response to the scene was reasonable in that they responded with full emergency equipment; however, beyond that, the officers failed to conduct themselves consistent with the aforementioned generally accepted police practices.  First, the coordination factor calls for allocating available resources and ensuring that sufficient units and equipment are brought to the scene, determining who will be doing what aspects of the operation, establishing a lead person to communicate with the subject, and developing a perimeter.  (Exh A, p. 10 para. 15.) The purpose of this factor is to ensure that the officers conduct themselves in a manner that does not unnecessarily agitate or excite the subject.  (Exh. A, p. 8. para. 12.)  The Defendant Officers, particularly the Sergeants, failed to coordinate their tactical response to the incident.  Although Sgts. Celli and Soares testified they were either "in command" of the scene or were there to provide supervisory oversight of the operation, they both reverted to becoming active members of the operation.  Officers Menke and Ellsworth did not realize anyone was in command, and Officer Menke did not realize that he had been ordered to be lead communicator.  (Menke Depo, 71:21-24, 86:1.)  Beyond establishing that Sgt. Soares "had the Sage" and Sgt. Celli had a rifle, they failed to devise a plan of who would do what, who would be assigned to conduct subject control in case of Mr. DeSantis's compliance, what response should be taken following attempts to deploy the less lethal weapon, and only the Sergeants were included in the attempt at a "briefing."  The testimony of the other officers belies Sgt. Celli's testimony that Officer Menke was the sole communicator with Mr. DeSantis.  In fact, multiple officers simultaneously yelled commands at Mr. DeSantis.

Furthermore, none of the officers were really in a position to provide subject control and diffusing techniques Officer Ellsworth had the burden of controlling his barking dog and the other officers all had their handguns or rifles fixed on Mr. DeSantis all of which resulted in a disorganized operation with elements of agitation.  The officers approached "shoulder-to-shoulder" rather than

take tactical positions to lessen the appearance of aggression.  (Celli Depo, 84:15-23.)  In addition, the Defendant Officers did not attempt to gain any intelligence from Plaintiff DeSantis, which would have confirmed what she repeatedly attempted to inform them, that Mr. DeSantis was mentally impaired and unarmed, and that he had not threatened or hurt anyone in the home and fired shots at the ceiling in his belief, albeit delusional, that he was protecting his family.

Secondly, the officers reasonably executed the element of containment by having Plaintiff DeSantis and her two year old child retreat inside the home.  The resulting scene was the officers and Mr. DeSantis in full view of each other in well-lit conditions with no other bystanders nearby.  (Exh. A, p. 12, para. 16.)

Thirdly, the Defendant Officers unreasonably failed to adhere to the element of communication.  As Reiter explains, communication is critical when dealing with subjects of diminished capacity.  (Exh. A, pp. 8-10, paras. 12-13.)  In these instances one person should be in charge of communication; that person should verbally communicate in a non-threatening manner; they should ask open-ended questions to facilitate participation; and, they should employ various methods of communication in the case of a non-responsive subject.  (Exh A, p. 8, para 12.)  Officers should avoid authoritative commands and must constantly analyze what affect, if any, their efforts are having on the situation.  Although Sgt. Celli testified that he ordered Officer Menke to communicate with Mr. DeSantis, this decision was not based on a plan that considered Officer Menke's training in contacting diminished capacity subjects and experience with diffusing similar situations.[2]  In fact, Sgt. Celli with his years of training and significant experience with Section 5150 subjects may have

---

[2] Officer Menke is a rookie, hired by the Santa Rosa Police Department in March 2006.  (Menke Depo, 9:12-23.)

`

been the more prudent choice as lead communicator.[3]  Instead, the decision to make Officer Menke in

charge of communication came because he had an unobstructed view of Mr. DeSantis whereas Sgt.

Celli's view was obstructed by a garbage can.  (Celli Depo, 88:1-16.)  Furthermore, despite Sgt.

Celli's testimony to the contrary, Officer Menke was not the sole voice communication with Mr.

DeSantis.  Other officers testified that they also shouted commands at Mr. DeSantis or that the noise

factor was complicated with the combination of multiple commands and the barking dog.  (Mann

Depo, 77:11-12.)  Indeed, it is undisputed that the officers did not attempt any semblance of

negotiation or open-ended discussion with Mr. DeSantis and only utilized sharp authoritative

commands that they shouted at him from several sources and from different directions.  The

communication effected only served to heighten the intensity of the situation by likely agitating and

confusing Mr. DeSantis, and frustrating the officers' purpose to safely control the scene

      Finally, the element of time was not effectively implemented by the Defendant Officers.

Elongating the time of an encounter allows the subject to reflect on their predicament and the police

to deploy additional resources.  (Exh. A, p. 13, para. 18.)  It also encourages communication and the

creation of a relationship between the lead officer and the subject.  (Exh. A, p. 8, para. 12.)  The

Defendant Officers made no attempt to slow down the encounter with Mr. DeSantis, a subject in the

throes of a mental crisis; instead, they needlessly hastened the encounter.  Sgt. Celli testified that

there was no indication that this was a hostage situation and when they approached the scene Plaintiff

Patricia DeSantis and Mr. DeSantis were both outside of the house standing a few feet apart.  (Celli

Depo, 71:24-25.)  Plaintiff DeSantis did not appear to be in distress and was able to easily to comply

with the officers' directive to go inside the house.  Each of the officers testified that they did not

---

[3] Sgt. Celli testified that he had both police academy, SWAT, and on-the-job training in handling suicidal situations most of which were Section 5150 situations.  (Celli Depo, 112:3-114:8.)  He also testified that he had been involved with

`

observe Mr. DeSantis with a weapon and he did not ever attempt to flee.  Sgt. Celli testified that Mr. DeSantis complied with the police commands only after they were repeatedly iterated.  Slowing down the pace of the encounter would have afforded the officers the opportunity to realize that Mr. DeSantis was in mental distress.  With more time, the officers could have calmed themselves and truly designated one officer to be the command voice.  They could have determined that Mr. DeSantis was non-responsive due to his mental state, not animus or defiance.

Defendants' argue that such analyses are bald assertions based on 20/20 hindsight.  Not so. As explained by Mr. Reiter, the police department is the primary public office sought to assist the public with situations involving mentally impaired subjects.  (Exh. A, p. 13, para. 20.)  Over the past decades, police departments have sought to train its officers to understand the complexities involved with dealing with subjects with special needs.  It is a growing trend in the police industry to treat mentally impaired subjects differently than other criminals.  It is thereby patently unreasonable for the Defendant Officer to ignore Mr. DeSantis's known mental diminished capacity and treat him like a suspect possess of fully functioning cognition.

**C.     THE DEFENDANT OFFICERS VIOLATED PLAINTIFF'S FOURTEENTH AMENDMENT RIGHTS BECAUSE THEIR USE OF DEADLY FORCE WAS NOT OBJECTIVELY REASONABLE UNDER THE FACTS AND CIRCUMSTANCES PRESENTED**

In *County of Sacramento v. Lewis* 523 U.S. 833 (1998), the US Supreme Court wrote, regarding the substantive due process "shocks the conscience" standard:

> Thus, in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it many fairly be said to shock the contemporary conscience.  That judgment may be informed by a history of liberty protection, but it necessarily reflects an understanding of traditional

detaining and taking people to medical facilities based on Section 5150 holds hundreds of times throughout his career and personally did it at least of dozen times this past year.  (Celli Depo, 138:2-17.)

`

executive behavior, of contemporary practice, and the standards of blame generally applied to them. **Only if the necessary condition of egregious behavior were satisfied would there by a possibility of recognizing a substantive due process right to be free of such executive action**, and only then might there be a debate about the sufficiency of historical examples of enforcement of the right claimed, or its recognition in other ways." *Lewis, supra,* at 847, emphasis added.

The Defendant Officers, particularly Sgt. Celli's, behavior as the state actor must be examined in order to determine whether a Fourteenth Amendment Substantive Due Process violation occurred. Sgt. Celli's state of mind must also be examined to determine whether his conduct with respect to Mr. DeSantis rises sufficiently to "…[B]ehavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." See *Daniels v. Williams 474 U.S. at 331, 106 S.Ct., at 665.*("Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property" (emphasis in original))." *Lewis, supra,* at 849.

Sgt. Celli's actions and testimony reveal much about his state of mind.  Sgt. Celli's distaste for the situation is evident by the fact that he ignored his training and previous experience with dealing with mentally impaired suspects and took command of the scene without regard for Mr. DeSantis's mental state, as described above in subsection "B."  It is an arguable question of fact appropriate only for jury determination whether Sgt. Celli blatantly ignored information regarding Mr. DeSantis's mental state provided by the dispatch.  Sgt. Celli testified that he did not recall whether he heard information regarding Mr. DeSantis's mental state over the radio; however, he did recall other details about the scene that he received via "radio traffic" prior to exiting his police vehicle.  (Celli Depo, 70:5-21, 107:21.)  Furthermore, other officers testified that dispatch

specifically informed that Mr. DeSantis was suffering from a mental disorder.  In addition, Sgt. Celli

stepped into Sgt. Soares's field of view discouraging him from taking a second non-lethal Sage shot.

And of course the ultimate action, Sgt. Celli fired his rifle at Mr. DeSantis who was shirtless, shoeless

and, by Sgt. Celli's own observation, unarmed.

Sgt. Celli's testimony also reveals much about his state of mind.  Arguably he had some

negative feelings for even being on duty at that time, given his testimony that he did not choose the

graveyard weekend shift but that he lacked the seniority for a desirable shift, and it was the Easter

holiday weekend.  (Celli Depo, 73:22-74-13, 76:19; DeSantis Depo, 91:3-5.)  It had also been a busy

night with lots of calls.  (Celli Depo, 76:16.)  Sgt. Celli also testified that Mr. DeSantis finally

complied with police commands to get on his knees, put his hands in the air and then put on them

ground in front of him, but only after repeated orders.  Sgt. Celli testified when Mr. DeSantis returned

to a kneeling position, after briefly rolling his hips to the ground like he was going to lay on his

stomach, he was instantly no longer in compliance.  (Celli Depo, 125:125:7-11)  Despite  Sgt. Celli's

attempt to characterize Mr. DeSantis's behavior as that of going from complete compliance to

complete defiance, his own testimony reveals that Mr. DeSantis at best was reluctantly complying

with or even comprehending the officers' commands all along.  In addition, Sgt. Celli testified that

Mr. DeSantis looked toward him, his wife, and then toward Officers Mann and Menke before

charging them like a sprinter coming out of the blocks.  (Celli Depo, 127:20-128:12)  Again, this is a

question of fact for a jury to determine, because Plaintiff DeSantis testified that Mr. DeSantis stood

up and walked toward the officers, and that he started toward them slowly.  (DeSantis Depo, 171:17,

172:8.)  She also testified at length about Mr. DeSantis's debilitating motorcycle accident, numerous

painful surgeries on his leg, and the resulting months of recovery thereafter, which seriously calls into

question the decedent's ability to resemble a sprinter exploding out of the blocks, as described by Sgt.

Celli.  (DeSantis Depo, 35:4, 37:14-15, 39:15-16, 43:1-18.)  Sgt. Celli testified that even after Sgt. Soares struck Mr. DeSantis with the Sage round he continued to run at full speed.  (Celli Depo, 133:17-25)  However, Plaintiff Patricia DeSantis testified that the first shot bent Mr. DeSantis over and that he appeared to continue to advance but he also looked like he could have been falling. (DeSantis Depo, 173:12-13, 175:6-8.)

According to police practice expert Reiter, the reasonable police practice demands that police officers base their decision to use deadly force on objectively reasonable factors and not those that might be assumed or that are subjective.  (Exh. A, pp. 14-16, paras. 21-26.)  Sgt. Celli testified that Mr. DeSantis appeared to be attacking Officers Menke and Mann; however, Sgt. Celli testified that even when Mr. DeSantis was running at full speed, he clearly did not have any weapons in his hands or visible in the front of his waistband.  (Celli 135:17.)  Mr. DeSantis was shirtless and his pants were loose but not overly baggy.  Based on all of the officers' testimony it is arguable whether any of them got a clear view of the back of Mr. DeSantis's waistband, or if he appreciably reached behind his back; however, it is undisputed that the decedent's hands were empty at all times and never out of the view of the officers.  The factual inference that must be drawn in Plaintiff's favor is that at the time Sgt. Celli first shot Mr. DeSantis, Sgt. Celli had absolutely no reasonable basis to believe that Mr. DeSantis posed a lethal threat to anyone.

As opined by Mr. Reiter, each of the officers' based their decision to use deadly force on "a subjective belief that [Mr.] DeSantis might have retrieved a weapon, rather than upon objective knowledge of this potential threat."  (Exh. A, p. 16, para. 26.)  Sgt. Celli testified that he based his decision to fatally shoot Mr. DeSantis largely on the fact that he feared the decedent might suddenly reveal a weapon or take one of the other officers' weapons from them and not only use it against them but kill them with it.  (Celli Depo, 249:20-25; Mann Depo, 107:23-25.)  Furthermore, in a post-

shooting interview and during his Deposition testimony, Sgt. Celli admitted: that he was "mad" at

Mr. DeSantis for his failure to comply with police commands, that he was not going to allow Mr.

DeSantis to attack "[his] people," and that he was mad because Mr. DeSantis "had other options."

(Celli 254:24-256:9)  As opined by Mr. Reiter, Sgt. Celli demonstrated and testified that he was

motivated by animus against Mr. DeSantis, and that such motivation is unacceptable in law

enforcement and contrary to generally accepted police practices.  (Exh. A, p. 18, para. 32.)  Clearly,

there is no place in responsible policing to allow officers to base their decisions, particularly

decisions to fatally injure suspects, on their anger and this type of behavior shocks the conscience.

Each of the other officers testified similarly that they feared what Mr. DeSantis might do.

Officer Mann testified that she did not observe a weapon in Mr. DeSantis's hands as he advanced

toward her.  (Mann Depo, 87:9, 91:20-25.)  She based her decision to use deadly force on her belief

that he may have been armed and may have physically taken her gun from her or the other officers.

(Mann Depo, 123:1-12.)  Officer Menke testified that he resorted to deadly force because he assumed

Mr. DeSantis was armed, even though he admitted he never saw Mr. DeSantis with a gun or any

other type weapon, and based his decision use lethal force on his feeling that Mr. DeSantis was

coming to kill him, his partner, or to take his gun. (Menke Depo, 64:14-18, 78:20, 93:25.)  Officer

Jones admitted that he never saw Mr. DeSantis with a weapon in his hands or even reach for a

weapon.  (Jones Depo, 38:20.)  Similarly, Officer Ellsworth never observed Mr. DeSantis with a

weapon or reach for a weapon, but thought he might grab one of the other Officer's guns.  (Ellsworth

Depo, 77:6-15, 81:23-82:3.)  Sgt. Soares also testified that he did not observe Mr. DeSantis with

anything in his hands or armed with anything and that he thought Mr. DeSantis might hurt an officer

but did not know with what means.  (Soares Depo, 31:16-33:1, 77:17-19.)  Whether the fact that Mr.

DeSantis is deceased based on these officers' subjective beliefs and if this rises to the level of

conduct that shocks the conscience is a question of fact for a jury and not properly determined in summary adjudication.

Based on Defendant Officer Celli's testimony, a reasonable fact finder could conclude that he shot Mr. Desantis out of his own subjective sense of anger at Mr. DeSantis under circumstances that had confirmed to Officer Celli that Mr. Desantis was unarmed, and that Officer Celli's shooting precipitated the shots subsequently fired by other officers.  Since the facts viewed in the light most favorable to Plaintiff show that Officer Celli's shooting was improperly motivated by animus against Mr. Desantis, and not based on any legitimate law enforcement purpose, Defendants are not entitled to summary judgment on Plaintiff's Fourteenth Amendment loss of familial relationship claim.

### D.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The defense of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The threshold question is whether, taken in the light most favorable to the plaintiff, the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The defendant bears the burden of establishing that his or her actions were reasonable, *Doe v. Petaluma City Sch. Dist.*, 54 F.3d 1447, 1450 (9th Cir. 1995), and the defendant's good faith or subjective belief in the legality of his or her actions is irrelevant. *Alford v. Haner*, 333 F.3d 972, 978-79 (9th Cir. 2003). Where there are genuine issues of fact relating to what the officer knew or did, or if a reasonable juror could find that the officer acted unreasonably, the question is appropriately for the trier of fact. *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1099-1100 (9th Cir. 1995).

`

Plaintiff's police practice expert Mr. Reiter, opines these Santa Rosa police officers did not reasonably employ care and tactics in dealing with Mr. DeSantis, a subject they knew to be mentally disturbed.  The Defendant Officers' failure to: coordinate and devise a plan to assess or address Mr. DeSantis's special needs, effectively contain the subject, calmly communicate by establishing non-threatening repose initiated by a single lead officer, and elongate the time of the encounter only proved to exacerbate the anxiety of the situation rather than calm and diffuse it.  The Defendant Officers effectively created a deleterious situation and then decided to use deadly force as result to extinguish the threat.  In addition, the Defendant Officers' decision to use deadly force was based on a subjective belief that Mr. DeSantis might retrieve a weapon, because he was clearly unarmed, rather than upon objective knowledge of this potential threat.  Moreover, Sgt. Celli clearly based his decision to use deadly also out of his animus for Mr. DeSantis.  These officers' actions rise to the level a clear substantive violation of the Plaintiff's Fourteenth Amendment rights.  As such, the Defendants are not entitled to qualified immunity.

*Saucier, supra,* at p. 201 (2001) sets forth the rule on qualified immunity that the alleged constitutional violation must be clearly established and that a reasonable officer would know that his conduct violated the right.  No reasonable officer can believe that the use of deadly force was justified in this circumstance.  It is clearly established that use of deadly force is a seizure.  "[S]uch force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).   Here, Mr. DeSantis was unarmed and any threat he posed to his family clearly ended prior to his encounter with the Defendant Officers.  A reasonable fact-finder could determine that through the Defendant Officers' gross mismanagement of their containment efforts, blatant disregard for the decedent's mental status, and their resulting

`

unfounded decision to use deadly force Mr. DeSantis was subjected to unreasonable under the circumstances.

### E. DEFENDANTS CITY'S AND CHIEF FLINT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED

Defendants assert that there can be no liability against Defendant CITY OF SANTA ROSA (hereinafter "City") and Chief FLINT in part because, according to the Defendants, there was no constitutional violation committed in the subject-incident. To the extent that Defendants have decided for themselves that no constitutional violation occurred in this case, they are wrong.

Defendant City and Chief Flint are liable pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978), which holds that municipalities are only liable for injuries that arise from an official policy or custom. *Id.* at 694. Plaintiffs must show that Mr. DeSantis: "(1) possessed a constitutional right of which he was deprived; (2) that the City had a policy; (3) that the policy 'amounts to deliberate indifference' to the constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Anderson v. Warner,* 451 F.3d 1063, 1070 (9th Cir.2006)(quoting *Oviatt v. Pearce,* 954 F.2d 1470, 1474 (9th Cir.1992) (in turn quoting *City of Canton v. Harris,* 489 U.S. 378, 389-91 (1989)). "There also must be a 'direct causal link' between the policy or custom and the injury," and Plaintiffs "must be able to demonstrate that the injury resulted from a 'permanent and well settled practice.'" (*Ibid.* (quoting *McDade v. West,* 223 F.3d 1135, 1141 (9th Cir.2000)(internal quotations omitted)). A municipality may not be held liable under Section 1983 where no injury or constitutional violation has occurred. *Jackson v. City of Bremerton,* 268 F.3d 646, 653 (9th Cir.2001). The failure to train or supervise may give rise to a "policy or custom" sufficient to impose liability on the City. *City of Canton,* 489 U.S. at 389- 90.

Here, the *Monell* claim is based in part on the allegations relating to the basis of the Defendant Officers' decision to use deadly force against Mr. DeSantis. In addition, the *Monell* claim is based on failures in the post-shooting investigative procedures by Defendant City. In his expert report, Mr. Reiter, explains that law enforcement has become the public agency most relied upon by the public to assist then when dealing with mentally disturbed family members. (Exh. A, p. 14, para. 20.) As discussed above, all of the Defendant Officers based their decision to use deadly force upon

their subjective belief on what Mr. DeSantis might do instead of upon what objective knowledge they had, including: the fact that any harm he posed to his family was long since over, he was compliant with police commands, the Officers were informed that Mr. DeSantis was mentally disturbed, that his erratic behavior implied that he was having cognitive difficulties not displaying defiance or aggression,  he only ever exhibited physical aggression just prior to the shooting, and at all times Mr. DeSantis was unarmed.  Additionally, Sgt. Celli testified that he was angry after the shooting and confirmed that he told post-shooting investigators that he was "pissed off" with and "mad" at Mr. DeSantis as he felt he had other options.  However, a reasonable trier of fact could agree with Plaintiff police practice expert and determine it was the Defendant Officers' actions that limited the options and unnecessarily escalated the encounter into a deadly force situation.  (Exh. A at p. 19, para. 33.)

Chief Flint testified that the Santa Rosa Police Department does not conduct any formal administrative review of critical incidents such as this fatal shooting of Mr. DeSantis.  Mr. Reiter explains that this failure: is contrary to generally accepted police practice, deprives the community with essential critical review to assess policy, training, tactics, and supervisory failings that may have caused the fatal shooting.  (Exh. A, pp. 19-21, paras. 34-36.)  The City's failure to internally review critical incidents only serves to rubber stamp the incorrect behavior of its officers, thereby creating policy based on conduct contrary to accepted police practices and that is ultimately harmful to the community served.  (Exh. A, p. 23, para. 37.)  Here, each of the Defendant Officers testified that their initial goal was to gain Mr. DeSantis's compliance and then negotiation may have been appropriate, leaving no possibility for using negotiation to gain his compliance which clearly was necessary.  Similarly, all of the Defendant Officers testified that they based their decision to use deadly force on their subjective belief that Mr. DeSantis might going injure them, a belief that conveniently ignores several key objective facts they were well aware of.

## VII.    CONCLUSION

Defendants' Motion for Summary Judgment should be denied.  The basis of the Defendant Officers' decision to use deadly force was patently unreasonable, amounted to a violation of Plaintiff's Fourteenth Amendment rights, and is a question of fact for the jury.  As such, the

`

Defendant Officers are not entitled to qualified immunity.  Furthermore, Defendants City and Flint's failure to investigate this behavior and evaluate the department's response to mentally impaired suspects and the implementation of its use of deadly force policy only serves to endorse the Defendant Officers actions and leaves potential similarly challenged suspects vulnerable.

Dated:  September 26, 2008                          **The Law Offices of John L. Burris**


  /s/ Benjamin Nisenbaum_____
Benjamin Nisenbaum
Attorney for Plaintiff ADRIANNE DESANTIS