United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PATRICIA DESANTIS, et al.

Plaintiffs,

v.

CITY OF SANTA ROSA, et al.,

Defendants.
_____________________________________/

No. C 07-03386 JSW
(consolidated with C 07-04474)

**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Now before the Court is the motion for summary judgment filed plaintiffs Patricia DeSantis ("Mrs. DeSantis") and Dani DeSantis (collectively, "Moving Plaintiffs") and the cross-motion for summary judgment filed by defendants City of Santa Rosa ("the City"), Chief of Police Edwin Flint, Sergeant Richard Celli, Officer Travis Menke and Officer Patricia Mann (collectively, "Defendants"). Plaintiff Adrianne DeSantis did not file a motion for summary judgment but did file an opposition to Defendants' motion.[1] The Court finds that this matter is appropriate for disposition without oral argument and it is hereby deemed submitted. *See* Civ. L.R. 7-1(b). Accordingly, the hearing set for October 31, 2008 is HEREBY VACATED. Having considered the parties' papers, relevant legal authority, and the record in this case, the Court hereby denies Moving Plaintiffs' motion for summary judgment and grants in part and denies in part Defendants' cross-motion for summary judgment.[2]

---

[1] The Court will refer to Dani and Adrianne DeSantis by their first names out of convenience, rather than disrespect.

[2] The Court sustains Defendants' evidentiary objections with respect to Moving Plaintiffs' reference to a prior shooting incident by Sergeant Celli.

**BACKGROUND**

Mr. DeSantis' wife, Mrs. DeSantis, filed an action as a successor in interest and on her own behalf and of her minor daughter, Dani, arising out of Mr. DeSantis' death. Mr. DeSantis' mother, Adrienne DeSantis, also filed an action arising out of his death. These two cases have been consolidated.

On April 9, 2007, Mrs. DeSantis called 911 and advised the dispatcher that her husband, Mr. DeSantis, was firing shots into the ceiling of their home. (Declaration of John Houston Scott ("Scott Decl."), Ex. A at 1.) She further advised the dispatcher that Mr. DeSantis was in a manic phase of a bipolar episode and that he was having paranoid delusions that there were people in the attic. (*Id*.) Mrs. DeSantis told the dispatcher that she was in the home with her two minor children, ages 2 and 10. (*Id*. at 4.)

Mrs. DeSantis instructed her son, Timothy Farrell, to inform the dispatcher that she had disarmed Mr. DeSantis, but she does not know if Farrell actually conveyed this information. (Declaration of Benjamin Nisenbaum ("Nisenbaum Decl."), Ex. B (Deposition of Patricia DeSantis) at 160:13-21.) Mrs. DeSantis led Mr. DeSantis outside. Mr. DeSantis was wearing only jeans and socks. He did not have on a shirt or shoes. (*Id*. at 167:25-168:3.) Mrs. DeSantis yelled to the police officers outside her home that Mr. DeSantis was having mental health issues and told them that the gun was in the house. (*Id*. at 167:4-10.)

Sergeant Richard Celli, Sergeant Jerry Soares and Santa Rosa Police Officers Travis Menke, Patricia Mann, Daniel Jones, and Jerry Ellsworth responded to the scene. The officers were advised that a man was firing a gun in a residence and that his wife and children were in the house. (Declaration of Caroline L. Fowler ("Fowler Decl."), Ex. F (Deposition of Travis Menke) at 36:4-37:5, Ex. H (Deposition of Jerry Ellsworth) at 50:13-23, Ex. G (Deposition of Patricia Mann) at 57:5-7.) Shots were fired inside the house when some of the officers were on the scene. (*Id*. at Ex. D (Deposition of Richard Celli) at 70:14-16, Ex. H (Ellsworth Depo.) at 59:24-60:4.)

Officer Mann testified that the dispatcher informed them that Mr. DeSantis had a mental disorder. (Scott Decl., Ex. C (Deposition of Patricia Mann) at 102:13-19.) Officer Jones

remembers Mrs. DeSantis yelling out that Mr. DeSantis had a mental illness and was in crisis. (Scott Decl., Ex. F (Deposition of Daniel Jones) at 36:14-24.) Although Sergeant Celli discovered by listening to the radio before arriving at the scene that Mr. DeSantis was shooting inside the residence, he did not remember whether he heard, before he fired his weapon at Mr. DeSantis, that Mr. DeSantis had a mental disorder. (Nisenbaum Decl., Ex. C (Deposition of Sergeant Celli) at 70:5-21, 106:10-108:2.) Sergeant Celli remembers discovering that Mr. DeSantis was still shooting when he was responding to the call. (*Id*. at 70:5-12.)

When Sergeant Celli arrived at the scene, he parked right behind Officer Jones. Sergeant Soares pulled in and parked right behind Sergeant Celli. (Scott Decl., Ex. B at 69:21-70:4, 73:8-14.) Sergeant Celli had a rifle and a Taser in the trunk of his car. (*Id*. at 72:9-73:3.) He chose to take his rifle out, and not the Taser, because he was aware that Mr. DeSantis was shooting in the residence. (*Id*.) Sergeant Celli met briefly with Sergeant Soares and Officer Jones by their cars. (*Id*. at 73:4-7.) Sergeant Celli estimated that the meeting lasted approximately ten seconds. (*Id*. at 77:3-11.) Sergeant Soares informed them that he had a Sage, a "less lethal" weapon that fires a 37-millimeter projectile polyurethane grommet. (*Id*. at 77:12-15, Ex. E (Deposition of Jerry Soares) at 34:3-35:2.)

When he came to the southeast corner of the driveway to the DeSantis' home, Sergeant Celli observed Mr. DeSantis standing outside, just off the steps to his the residence, and observed Mrs. DeSantis holding a two-year old child in her arms on the steps. (Scott Decl., Ex. B at 213:18-24, 214:11-16.) Sergeant Celli then observed Officers Menke, Mann and Elsworth walking towards the southwest corner of the driveway. (*Id*. at 79:1-5.) Although it was dark, Sergeant Celli "could see the scene, and Mr. DeSantis could see [him]." (*Id*. at 81:4-8.) Officer Jones testified that the lighting at the scene "was good." (Scott Decl., Ex. F (Deposition of Daniel Jones) at 102:1.) There was a streetlight near the driveway and there was light emanating from the DeSantis' home. (Nisenbaum Decl., Ex. C at 81:15-20.) Sergeant Celli was approximately eighteen to twenty yards from the front of the DeSantis' home. (*Id*. at 82:1-3.) Sergeant Celli, Sergeant Soares and Officer Jones were standing on the right side of the driveway and Officers Menke, Mann and Ellsworth were standing on the left side of the

United States District Court
For the Northern District of California

driveway. The two groups were standing approximately fifteen to twenty feet apart. (*Id*. at 86:1-25.) Officer Ellsworth had his K-9 dog with him. (*Id*. at 226:7-8.)

Sergeant Celli was in command of the scene. (Scott Decl., Ex. B at 87:11-15, 226:14-17.) Sergeant Celli advised Sergeant Soares that he would take care of tactics while Sergeant Soares would take care of communication. (*Id*. at 226:23-227:1.) Sergeant Celli ordered Officer Menke to start speaking to with Mr. DeSantis because Officer Menke had a better view of Mr. DeSantis and the scene. (*Id*. at 87:21-88:13.)

Mr. DeSantis was wearing loose fitting jeans, but he was not wearing any shirt or shoes. (*Id*. at 83:1-22.) Sergeant Celli could see Mr. DeSantis' hands and observed that he was not holding anything. (*Id*. at 83:23-84:2.) There were no weapons sticking out of the top of Mr. DeSantis' waistband. (*Id*. at 217:10-13.) Mr. DeSantis took three or four steps away from the front of the house and toward Officer Menke. Officer Menke ordered Mr. DeSantis to put his knees to the ground. (*Id*. at 118:4-16.) Mr. DeSantis complied and eventually placed both of his knees on the ground. (*Id*. at 119:2-9.) This took "several seconds." (*Id*. at 119:8-11.) When Officer Menke was giving commands to Mr. DeSantis, the other officers had their guns pointed towards Mr. DeSantis. (*Id*., Ex. F (Jones Depo.) at 36:16-18.) Officer Menke told Mr. DeSantis to keep his hands in the air and then to put his hands on the ground in front of him. Mr. DeSantis complied after repeated commands. (*Id*., Ex. B at 119:23-120:3.)

Sergeant Celli had authority to order Officer Ellsworth to release the canine upon Mr. DeSantis, but he did not do so at this point because Mr. DeSantis had been complying, albeit reluctantly. (*Id*. at 102:23-103:9, 122:4-9.) Sergeant Celli did not consider the Taser to be a viable option at that point either because Mr. DeSantis was too far away at approximately 16 to 18 yards. (*Id*. at 123:4-15.) In response to an order to lay down on the ground, Mr. DeSantis then bent forward, rolled his hips to the ground, but then immediately came back up to a kneeling position. (*Id*. at 124:2-5.) Sergeant Celli still did not believe it would have been appropriate to use the canine on Mr. DeSantis at this point. (*Id*. at 125:18-20.)

Mr. DeSantis then looked towards Sergeant Celli, looked towards his wife, looked at Officer Menke, and then ran. (*Id*. at 125:24-126:3.) Officer Celli testified that Mr. DeSantis

United States District Court
For the Northern District of California

"took off like he left the sprinter blocks." (*Id*. at 126:18-20.) However, Mrs. DeSantis testified that when Mr. DeSantis initially got up, he starting walking towards the officers. (Nisenbaum Decl., Ex. B (DeSantis Depo.) at 171:12-21, 172:5-11.) None of the officers at the scene reported seeing anything in Mr. DeSantis' hands. (Scott Decl., Ex. B (Celli Depo.) at 128:3-12, Ex. C (Mann Depo.) at 87:8-9, Ex. D (Menke Depo.) at 63:17-64:6, Ex. E (Soares Depo.) at 123:11-18, Ex. F (Jones Depo.) at 38:19-20.) Sergeant Soares fired the less lethal Sage weapon at Mr. DeSantis after he ran approximately seven to ten yards. (*Id*., Ex. B at 128:14-16, 130:6-8.) When Sergeant Soares shot Mr. DeSantis with the Sage, Mr. DeSantis was approximately ten to twelve yards from Sergeant Soares and ten to fifteen yards from Officer Menke. (*Id*. at 129:14-23.) Mr. DeSantis was a little closer to Sergeant Soares than to Officer Menke. (*Id*. at 130:1-5.)

Mr. DeSantis tilted his body to the right briefly when he was hit with the Sage weapon, and then continued running towards Officers Menke and Mann. (*Id*. at 133:17-23.) Mr. DeSantis took another two to four steps, moving three to four yards. When Sergeant Celli estimated that Mr. DeSantis was now six to eight yards away from Officer Menke, he shot Mr. DeSantis. (*Id*. at 135:24-136:11.) Sergeant Celli could still see that Mr. DeSantis had nothing in his hands. (*Id*. at 135:13-14.) Sergeant Celli was concerned that Mr. DeSantis would kill Officers Menke and Mann by either pulling out a weapon or taking one of theirs. (*Id*. at 135:18-21.) After he was shot, Mr. DeSantis took another step or two. Two more shots were fired at Mr. DeSantis, one by Officer Menke and one by Officer Mann. (*Id*. at 137:1-17; Nisenbaum Decl., Ex. D (Menke Depo.) at 61:7-10, Ex. E (Mann Depo.) at 98:9-16.) About one and a half minutes passed between when Sergeant Celli first saw Mr. DeSantis and when he shot him. (Scott Decl., Ex. B (Celli Depo.) at 216:5-8.) Mr. DeSantis died on the scene.

During the incident, Sergeant Celli had a batton on him. There were at least two other officers with a Taser and Officer Ellsworth had a police canine with him. (*Id*. at 225:23-226:8.)

Under the critical incident protocol adopted by the police chiefs in Sonoma County, whenever there is an officer involved shooting, an investigation is conducted by an outside police agency. Here, the investigation of the shooting of Mr. DeSantis was conducted by the

United States District Court
For the Northern District of California

Sonoma County Sheriff's Office, with assistance by officers from the Petaluma Police Department. (Fowler Decl., ¶ 2, Ex. B at 1.) The completed investigation was forwarded to the Sonoma County District Attorney for review. The District Attorney concluded that the officers were not criminally liable. (*Id.*, ¶ 4, Ex. B at 18.)

Mrs. DeSantis is bringing claims under 42 U.S.C. § 1983 ("Section 1983") on behalf of herself and her daughter, Dani, against the City and against Sergeant Celli, Officer Menke, and Officer Mann (collectively "Defendant Officers") for excessive force, deliberate indifference to the need to summon or provide emergency medical care for Mr. DeSantis, and deprivation of familial relationship. Moving Plaintiffs also bring a wrongful death claim under California Code of Civil Procedure section 377.60. Adrienne brings a loss of familial relationship claim under Section 1983 against the Defendant Officers and brings a Section 1983 claim against the City and Chief Flint in his official capacity.

Moving Plaintiffs move for summary judgment on their claims against Sergeant Celli. Defendants cross move for summary judgment on all of the claims filed by Moving Plaintiffs and Adrienne.

**ANALYSIS**

**A. Legal Standard on Summary Judgment.**

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A party moving for summary judgment who does not have the ultimate burden of persuasion at trial, must produce evidence which either negates an essential element of the non-moving party's claims or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A party who moves for summary

United States District Court
For the Northern District of California

judgment who does bear the burden of proof at trial, must produce evidence that would entitle him or her to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Transp. Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000).

Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). It is not the Court's task to "scour the record in search of a genuine issue of triable fact." *Id.* (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 723, 735 (9th Cir. 1997).

**B. Legal Standards Applicable to Qualified Immunity.**

In support of their motion, Defendants argue that they are entitled to qualified immunity on Moving Plaintiff's and Adrienne's claims. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The privilege is an immunity from suit rather than a mere defense to liability. *Id.* As a result, the Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

In *Saucier*, the Supreme Court stated that a court called upon to rule on the issue of qualified immunity must ask the following threshold question: "Taken in the light most

United States District Court
For the Northern District of California

favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *See id.* (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* However, if the Court finds that the facts would show the violation of a constitutional right, the next inquiry is to determine "whether the right was clearly established." *Id.*

A constitutional right is clearly established for qualified immunity purposes if "[t]he contours of the right [are] sufficiently clear that [at the time the alleged unlawful action is taken] a reasonable official would understand that what he is doing violates that right." *Id.* at 202 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ...; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640. "In other words, an officer who makes a reasonable mistake as to what the law requires under a given set of circumstances is entitled to the immunity defense." *Boyd v. Benton Co.*, 374 F.3d 773, 781 (9th Cir. 2004) (citing *Saucier*, 533 U.S. at 205). Thus, a court "must determine whether the law governing the official's conduct was clearly established at the time the challenged conduct occurred." *Mendoza v. Block*, 27 F.3d 1357, 1360 (9th Cir. 1994) (citing *Hallstrom v. Garden City*, 991 F.2d 1473, 1482 (9th Cir. 1993)). A court should then address the question "whether, under that clearly established law, a reasonable officer could have believed the conduct was lawful." *Id.*

**C. Mrs. DeSantis' Claims Against the Defendant Police Officers.**

Mrs. DeSantis, as Mr. DeSantis' successor in interest, brings a claim for excessive force under the Forth Amendment against the Defendant Officers. Mrs. DeSantis moves for summary judgment on her claim against Sergeant Celli and Defendants cross move for summary judgment against her claims against all Defendant Officers.

The Fourth Amendment proscribes "unreasonable searches and seizures." U.S. Const. amend IV.; *see also Allen v. City of Portland*, 73 F.3d 232, 235 (9th Cir. 1995); *Franklin v. Foxworth*, 31 F.3d 873, 875 (9th Cir. 1994). The ultimate test of reasonableness requires the

court to balance the governmental interest that justifies the intrusion and the level of intrusion into the privacy of the individual. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1496 (9th Cir. 1996).

Mrs. DeSantis must show that the Defendant Officers' use of force was unreasonable. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). The reasonableness of the particular use of force must be judged from the perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396. The reasonableness inquiry is objective, however, asking "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. When determining whether the amount of force used was reasonable, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Johnson v. County of Los Angeles*, 340 F.3d 787, 792 (9th Cir. 2003) (citing *Graham*, 490 U.S. at 396). The Court must consider whether the "'totality of the circumstances' justifies the force used, examining particularly severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). Further, "where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining ... the reasonableness of the force employed." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).[3] Although officers "are not required to use

---

[3] As the Court in *Deorle* explained:

The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. ... Even when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

the least intrusive degree of force possible," *see Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), in some cases, "the availability of alternative methods of capturing or subduing a suspect may be a factor to consider." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Finally, the reasonableness of the particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. at 20-22).

Upon reviewing the record in this case, the Court concludes that it cannot grant summary judgment for either party on this issue. On Moving Plaintiff's motion regarding their claim against Sergeant Celli, considering the evidence and all reasonable inferences in the light most favorable to Defendants, the officers were aware that just before and up to their arrival, Mr. DeSantis was shooting a gun in the home in which his wife and two young children were inside. Although the could not see a gun in his hands, they did not know whether he had a gun in his pants. Sergeant Celli does not remember hearing that Mr. DeSantis was bipolar or mentally unstable before he shot him. Sergeant Celli observed Mr. DeSantis sprinting towards officers who had their weapons drawn. The Sage weapon did not successfully stop Mr. DeSantis from running at the officers. These facts were developing quickly. Less than two minutes passed from when Sergeant Celli first saw Mr. DeSantis and when he shot him. Based on these facts, a reasonable juror could find that Mr. DeSantis posed an immediate threat to the safety of the officers, and thus, the amount of force used was reasonable.

On the other hand, viewing the evidence and all reasonable inferences in the light most favorable to Moving Plaintiffs, a reasonable juror could find that the amount of force used was unreasonable. Mrs. DeSantis informed the dispatcher and the officers on the scene that Mr. DeSantis did not have the gun anymore. By shooting up into the empty attic, Mr. DeSantis did not inflict, or threaten to inflict, serious physical harm. Mr. DeSantis never threatened his family members or any of the officers with the gun. Mr. DeSantis was bipolar and was in mental crisis. Mr. DeSantis was outnumbered by the officers on the scene by six to one. The

---

> officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.

*Id*. at 1282-83 (internal citations omitted)

United States District Court
For the Northern District of California

officers were all armed, at least two officers had Tasers, one officer had a Sage, and another officer had his K-9 dog with him. Although Sergeant Celli initially did not order the dog or the Tasers to be used because Mr. DeSantis had been compliant and was too far away for the Taser, those circumstances changed when Mr. DeSantis started running towards the officers. When Sergeant Celli shot Mr. DeSantis, he was still six to nine yards away from Officers Menke and Mann. Mr. DeSantis' hands were visible and he did not have a weapon in them. There is no evidence that any of the officers warned Mr. DeSantis that he would be shot if he kept running towards the officers. Based on the totality of the circumstances, the Court finds that a reasonable juror could easily find that the use of deadly force against Mr. DeSantis was not reasonable.

*Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002), a case Defendants argue is analagous, is easily distinguished. At the time of the shooting in that case, the defendant detective was the only officer on the scene. The suspect started to hit the detective and then grabbed the detective by his throat. The detective tried to back away, but the suspect came after him, yelling "Shoot me, motherfucker." The detective tried to fight the suspect off by hitting him with a flashlight. The suspect started kicking the detective in the stomach and groin. Although the detective tried to back away and fend off the blows and kicks, the suspect charged him, held him in a bear hug and grabbed the detective's gun by the barrel. As he was warding off blows to his head, the detective fought for control of his gun. During the struggle for the gun, the detective fired and killed the suspect. *Id.* at 1181. This case does not stand for the proposition that a man with no gun in his hand when he is almost twenty feet away from six armed officers poses an immediate threat to the officers' safety.

Nor can the Court determine as a matter of law that the officers are or are not entitled to qualified immunity. As the Court explained in *Deorle* in denying qualified immunity:

> Every police officer should know that it is objectively unreasonable to shoot-even with lead shot wrapped in a cloth case-an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals.

United States District Court
For the Northern District of California

*Id*. at 1285. Again, viewing the facts in the light most favorable to Moving Plaintiffs, Mr. DeSantis had not threatened any of his family members or any of the officers with the gun, he was mentally disturbed, he was not given any warning of the imminent use of force, let alone deadly force, and he did not present an objectively reasonable immediate threat of death or of serious injury to the officers at the time of the shooting. Moreover, the Court finds it significant that several alternative methods of capturing or subduing Mr. DeSantis were available. As Mr. DeSantis came closer, the Tasers could have been used. Moreover, the canine could have been used to stop him. With no weapon, Mr. DeSantis did not pose a serious threat of killing one of the officers until he reached them and was able to wrestle a gun away. Yet, Mr. DeSantis was shot when he was still almost twenty feet away from the closest officer. In light of such circumstances, under clearly established law, a reasonable officer could not have believed that using deadly force against Mr. DeSantis was lawful.

On the other hand, viewing the facts in the light most favorable to Defendants, the Court cannot find as a matter of law that, under clearly established law, a reasonable officer could not have believed that using deadly force against Mr. DeSantis was lawful. Accordingly, the Court denies Moving Plaintiffs' and Defendants' motion for summary judgment as to Mrs. DeSantis' claims against the Defendant Officers.

**D. Plaintiffs' Claims Against Defendant Officers under Fourteenth Amendment.**

Dani and Adrienne cannot bring the Fourth Amendment claim that Mr. DeSantis could have brought had he survived. Instead, as the daughter and mother of the deceased, their claims are limited to ones for loss of familial relationship with Mr. DeSantis under the Fourteenth Amendment. *See Moreland v. Las Vegas Metropolitan Police Dept.*, 159 F.3d 365, 371 (9th Cir. 1998). Parents and children of a person killed by law enforcement officers may bring this substantive due process claim. *Id*. To prevail on such a claim, Plaintiffs must demonstrate that the officers' use of force "can properly be characterized as arbitrary, or conscious shocking, in a constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1988). To meet this standard, Plaintiffs must show that the officers were motivated by a *purpose to cause harm* that was unrelated to the legitimate object of their use of force. *Id*. at 372 (emphasis added); *see*

United States District Court
For the Northern District of California

*also Porter v. Osborn*, -- F.3d --, 2008 WL 4614334, *5 (9th Cir. 2008). Neither Moving Plaintiffs nor Defendants addressed whether the claims by Dani and/or Adrienne meet this stricter standard in their motions. Accordingly, the Court denies both motions to the extent they seek summary judgment on the claims by Dani and/or Adrienne against the Defendant Officers.

**D. Claims Against Chief Flint and the City.**

Defendants move for summary judgment on the claims against Chief Flint and the City. "Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability." *Hanson v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). "A supervisor may be liable if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Id.* (citing *Thompkins v. Belt*, 828 F.2d 298, 303-04 (5th Cir. 1987). Where there is no overt participation in the allegedly wrongful act, supervisory liability can be established when the supervising officials implement "a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Id.* (quoting *Thompkins*, 828 F.2d at 304); *cf. Munger v. City of Glasgow*, 227 F.3d 1082, 1087 (9th Cir. 2000) ("The 'inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'") (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

With respect to the City, "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978). Thus, to establish that the City is liable, Plaintiffs must show that: (1) they had a constitutional right of which they were deprived; (2) the City had a custom created by those who may be fairly said to determine official policy, which amounted to, at a minimum, deliberate indifference to Plaintiffs' constitutional rights; and (3) the custom was the moving force behind the constitutional

United States District Court
For the Northern District of California

violation. *See Blair v. City of Pomona*, 223 F.3d 1074, 1079 (9th Cir. 2000); *see also Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).

Moving Plaintiffs argue that they are pursuing the following three alternative theories of municipal liability: (1) that the use of deadly force against Mr. DeSantis was ratified by the City's final decision maker, Chief Flint; (2) that the City failed to adequately train officers in responding to 5150 situations; and (3) that the City maintains a *defacto* policy of failing to discipline officers for use of excessive force that authorized, encouraged and condoned the use of excessive force by police officers. Adrienne argues that liability against the City under *Monell* is warranted based on the City's failures in its post-shooting investigative procedures.

**1. Claim of Chief Flint's Ratification.**

Ratification may form the basis for holding a municipality liable under *Monell* "[i]f the authorized policymakers approve a subordinate's decision and the basis for it...." *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003) (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). However, a plaintiff must still "prove [] the existence of an unconstitutional policy." *Id*. (quoting *Praprotnik*, 485 U.S. at 128). While a single decision *may* be sufficient to trigger Section 1983 liability, "the plaintiff must show that the triggering decision was the product of a 'conscious, affirmative choice' to ratify the conduct in question." *Id*. (citing *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1993)). While a single, post-event ratification may provide the basis to hold a city liable under *Monell*, generally, the Ninth Circuit has done so only when there were very clear instances of abuse and gross recklessness. *See Siwiec v. Thompson L*, 2004 WL 2480516, *22 (D. Or. Nov. 3, 2004) (summarizing Ninth Circuit law on this point); *see also Estate of Escobedo v. City of Redwood City*, 2005 WL 226158, *11 (N.D. Cal. Jan. 28, 2005) ("the Ninth Circuit ... appears to require more than a failure to reprimand to establish a municipal policy or ratification of unconstitutional conduct."); *Kane v. Hodson*, 294 F. Supp. 2d 1179, 1189 (D. Haw. 2003) (same).

The Ninth Circuit's analysis in *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991), and *Haugen* illustrate the considerations courts must take into account to find a municipal liable for a failure to reprimand after an investigation. In *Larez*, an expert testified as

United States District Court
For the Northern District of California

to the multiple deficiencies and improprieties regarding the police department's procedures and investigation. For example, the unit being investigated, as opposed to a separate internal affairs unit, was given responsibility for passing upon the citizen's complaint. *Larez*, 946 F.2d at 647. In addition, the expert concluded that the investigation contained holes and inconsistencies "that should have been visible to any reasonable police administrator," including improperly relying on testimony from a sergeant who was not even present during some of the relevant incidents to corroborate the defendant officers' claims. *Id*. Moreover, the expert testified that based on his review of the incidents, he would have disciplined the officers involved and taken steps to prevent such violations in the future. *Id*. at 636. The conclusion that the department had a policy of not reprimanding officers for use of excessive force was further corroborated by a two-year study conducted by the expert which demonstrated that it was "almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen" and that it was as if "something had to be done on film for the department to buy the citizen's story." *Id*. at 647. In addition, a defendant officer told the plaintiff "I could blow your fucking head off right here and nobody can prove you did not try to do something," while he was pointing a gun in the plaintiff's face. In this context, the court held the city was liable under Section 1983 for failing to discipline the defendant officers. *Id*. at 647-48.

On the other side of the spectrum, the Ninth Circuit granted summary judgment against the plaintiff in *Haugen*, because there were no facts indicating that the single failure to discipline the officer rose to the level of a "ratification." *Haugen*, 339 F.3d at 875 (citing with approval *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989) (holding that a failure to discipline in two instances did not demonstrate a sufficiently widespread municipal policy to hold the city liable under *Monell*)). Thus, the court held that the plaintiff failed to demonstrate the decision not discipline the officer was a conscious, affirmative choice to ratify the alleged use of excessive force. *Id*.

Here, Moving Plaintiffs argue and submit supporting evidence that Chief Flint reviewed the report regarding the shooting of Mr. DeSantis. (Declaration of John Houston Scott in Support of Plaintiffs' Reply ("Reply Scott Decl."), Ex. G (Deposition of Chief Edward

Flint) at 51:1-23.) However, Moving Plaintiffs failed to submit any evidence indicating whether Chief Flint approved of the use of deadly force against Mr. DeSantis. Moreover, in contrast to the expert in *Larez*, who concluded that based on what he reviewed he would have disciplined all the officers involved and taken preventative steps for the future, Moving Plaintiffs have not submitted any expert evidence on how the report on the incident should have been viewed. Accordingly, the Court finds that Moving Plaintiffs failed to establish a question of fact regarding whether Chief Flint made a conscious, affirmative choice to ratify the conduct in question and the basis for it. Therefore, the Court grants Defendants' motion for summary judgment as to Moving Plaintiffs' ratification theory.

**2. Claim that City Failed to Adequately Train Officers on 5150 Situations.**

A policy is a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (quoting *Oviatt*, 954 F.2d at 1477). A policy can be one of action or inaction. *Id.* (citing *City of Canton*, 489 U.S. at 384 (failure to train)). The "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388.

To constitute "deliberate indifference " and enter the realm of a constitutional violation, any failure to supervise must rise to a level higher than that of negligence. *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (holding that "liability for a negligently inflicted harm [by state officials] is categorically beneath the threshold of constitutional due process"). A constitutional violation may be present when the need for additional or different action "is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, . . .[that] the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. Whether a local government entity has manifested a policy of deliberate indifference is generally a question for the jury. *Oviatt*, 954 F.2d at 1478.

United States District Court
For the Northern District of California

Iin support of this claim, Moving Plaintiffs point to the testimony by Chief Flint that he was unfamiliar with any specifics relating to training received by his officers in relation to 5150 situations involving mentally ill suspects. Upon review of his testimony, the Court finds that this evidence does not support Plaintiff's claim. Chief Flint testified that officers received training in performing "5150's" when he was the Chief. (Reply Scott Decl., Ex. G at 84:15-24.) The fact that he did not have specifics on what the training entailed does not mean that the officers were not provided training.

Moving Plaintiffs also cite to the testimony by Sergeant Clay Van Artsdalen, the person most knowledgeable from the City. Moving Plaintiff argue that Sergant Artsdalen testified that when he was in charge of training for the police department, there was no specific training for 5150 situations. What Sergeant Artsdalen actually said was:

> Q: All right. When you were the Training Manager, was any training given to Santa Rosa Police Officers regarding 5150, or 5150-type situations?
> A: Yes, but not using the term "5150."
> We did the Tactical Communication Training, which is required by P.O.S.T., and we also had training with -- dealing with emotionally-disturbed people, or EDP training.
> Q: Was that given annually, to your knowledge?
> A: It was in conjunction with the Tactical Communications that was held every other year.

(Reply Scott Decl., Ex. H (Deposition of Sergeant Clay Van Artsdalen) at 48:18-49:4.)[4] Again, the testimony does not support Moving Plaintiff's claim regarding the alleged lack of training. Finally, Moving Plaintiffs submit the opinion by its expert, Ron Martinelli, Ph.D., that "the City of Santa Rosa and its police department failed to provide update training to their police officers beyond the academy level in several key police practices relating to this incident." (*Id.*, Ex. A (Rebuttal Report by Plaintiff's Police Practices Expert Ron Martinelli, Ph.D.) at p. 24.) Dr. Martinelli does not explain what facts led him to this conclusion, nor does he explain what training he believes the City should have, but failed, to provide. The Court finds that Dr. Martinelli's bare opinion that the City provided some, but not enough, training, would be

[4] Moving Plaintiffs also cite to Sergeant Artsdalen's deposition at pages 135 through 137, but they did not file these pages of his deposition.

United States District Court
For the Northern District of California

insufficient to support of jury finding of "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. Accordingly, the Court grants Defendants' motion for summary judgment as to Moving Plaintiff's theory of inadequate training.

**3. Claim of *Defacto* Policy of Failing to Discipline Officers.**

Finally, Moving Plaintiffs contend that the City maintains a *defacto* policy of failing to discipline officers for use of excessive force that authorized, encouraged and condoned the use of excessive force by police officers. In support of this theory, Moving Plaintiffs submit the testimony of Chief Flint in which he states that under his Department rules and policy, an officer can be found to have violated the policy against use of excessive force only if there is proof beyond a reasonable doubt. (Reply Scott Decl., Ex. G (Chief Flint Depo.) at 113:7-17.) Moving Plaintiffs also submit the following opinion by their expert, Dr. Martinelli:

> It is also my belief that the police department administration used an incorrect standard in determining whether they investigate officers in their department for possible violations of the law and department policies and procedures.
>
> The department's Chief of Police acknowledges that the decision as to whether they should investigate use of force/deadly force incidents and possible violations of law appears to rest upon whether the involved officer(s) use of force were criminal "beyond a reasonable doubt". This policy, standard and/or informal practice appears to be inconsistent with the Internal Affairs investigations training approved by the Commission on Peace Officer Standards & Training (CA-POST).
>
> No law enforcement agency that I am aware of uses the legal/criminal standard of "beyond a reasonable doubt" to determine whether an officer violated department policy. Classically, the law enforcement industry standard for determining out of policy violations and to pursue disciplinary action against an officer suspected of violating department policy is the "preponderance of evidence". The agency's policy or practice in this regard has the effect of encouraging and condoning officers who use excessive force, including deadly force.

(*Id*., Ex. A at pp. 24-25.) The Court finds that this evidence is sufficient to create a question of fact precluding summary judgment on this theory. Accordingly, the Court denies Defendants' motion for summary judgment as to the Moving Plaintiff's theory that the City maintains a *defacto* policy of failing to discipline officers for use of excessive force that authorized, encouraged and condoned the use of excessive force by police officers.

United States District Court
For the Northern District of California

**4. Claim of City's Failures in Its Post-Investigative Procedures.**

Adrienne argues that liability against the City under *Monell* is warranted based on the officers' decision to use deadly force against Mr. DeSantis and the City's failures in its post-shooting investigative procedures. Adrienne focuses on the events that happened in this case, both the initial shooting and whether the shooting was properly investigated. Because, as here, Chief Flint did not overtly participate in the use of deadly force against Mr. DeSantis, liability based on his post-incident conduct can only be established by demonstrating the existence of a policy "so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Hanson*, 885 F.2d at 646. Adrienne submits a report from her expert, Lou Reitter, who states that "it appears as though the Santa Rosa Police Department does not conduct any formal administrative review of critical incidents such as this fatal police shooting" and that no "critical incident review was conducted" of the shooting of Mr. DeSantis. (Nisenbaum Decl., Ex. A (Preliminary Expert Report of Lou Reiter) at ¶¶ 34, 37.) Mr. Reitter opines that this "agency and supervisory failure would indicate to all officers that their conduct was appropriate and if confronted with a similar incident in the future is [*sic*] would be appropriate to perform in the exact same manner." (*Id*. at ¶ 37.) It is not clear whether Adrienne and her expert, Mr. Reitter, are arguing that the City's failure to sufficiently investigate the subject incident here establishes a policy or that the City has a general policy of failing to sufficiently investigate. To the extent Adrienne is arguing there is a policy or custom of failing to sufficiently investigate, beyond the alleged failures relating to the incident with Mr. DeSantis, she fails to submit evidence to establish such a policy exists. With respect to the investigation of the use of deadly force against Mr. DeSantis, it is undisputed that an investigation of the incident was conducted by the Santa Rosa Sheriff's Department. Mr. Reitter fails to address the investigation that was conducted or explain how the investigation was insufficient. Accordingly, the Court finds that Adrienne fails to demonstrate the existence of a material question of fact which would preclude summary judgment against her *Monell* claim. Therefore, the Court grants Defendants' motion for summary judgment as to Adrienne's Section 1983 claims against Chief Flint and the City.

**CONCLUSION**

For the foregoing reasons, the Court DENIES Moving Plaintiff's motion for partial summary judgment and GRANTS IN PART and DENIES IN PART Defendants' cross-motion for summary judgment as follows:

(1) The Court DENIES Defendants' motion as to the claims against the Defendant Officers and Moving Plaintiffs' claim against the City's *defacto* policy of failing to discipline officers; and

(2) The Court GRANTS Defendants' motion as to Moving Plaintiffs' claim against the City based on ratification and the alleged failure to adequately train officers regarding 5150 situations and as to Adrienne's claims against the City and Chief Flint.

**IT IS SO ORDERED.**

Dated: October 28, 2008

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California