1  CAROLINE L. FOWLER, City Attorney (SBN 110313)
   JOHN J. FRITSCH, Assistant City Attorney (SBN 172182)
2  City of Santa Rosa
   100 Santa Rosa Avenue, Room 8
3  Santa Rosa, California 95404

4  Telephone:  (707) 543-3040
   Facsimile:   (707) 543-3055
5
   Attorneys for Defendants
6  CITY OF SANTA ROSA; RICH CELLI, an individual and Officer of the
   SANTA ROSA POLICE DEPARTMENT; TRAVIS MENKE,
7  an individual and Officer of the SANTA ROSA POLICE DEPARTMENT;
   and PATRICIA SEFFENS f/k/a PATRICIA MANN, an individual
8  and Officer of the SANTA ROSA POLICE DEPARTMENT

9

10

                        UNITED STATES DISTRICT COURT
11
                       NORTHERN DISTRICT OF CALIFORNIA
12

13  PATRICIA DESANTIS, et al.,                    Case No. C 07-3386 JSW

14           Plaintiffs,
                                                  **DEFENDANTS' TRIAL BRIEF**
15      v.
                                                  Pretrial Conference: July 2, 2012
16  CITY OF SANTA ROSA, et al.,                   Trial Date: September 4, 2012
                                                  Ctrm:  11, 19th Fl.
17           Defendants.                               450 Golden Gate Ave., S.F.
    _____/
18

19       Defendants City of Santa Rosa, Rich Celli; Travis Menke and Patricia Seffens fka Patricia

20  Mann submit the following trial brief regarding the issues in this consolidated action:

21                                        **I.**

22                             **STATEMENT OF FACTS**

23       On April 9, 2007 shortly after 1:16:39 a.m., Santa Rosa Police Officers Travis Menke,

24  Patricia Mann, Daniel Jones, and Jerry Ellsworth were dispatched to the DeSantis residence in

25  response to a 911 call placed by Patricia DeSantis.  She told the dispatcher that her husband was

26  firing shots into the ceiling of their residence with a Glock handgun.  Sergeants Rich Celli and

27  Jerry Soares also responded to the scene.

28       Within minutes after arriving at the scene, Richard DeSantis suddenly and unexpectedly

1   charged at the officers who had positioned themselves in the driveway outside his residence and

2   had instructed him to get down on the ground so they could safely approach and detain him. The

3   officers, who had not had an opportunity to search Mr. DeSantis, reasonably believed that he was

4   armed based on the information they received from dispatch.  In fear for their own safety and the

5   safety of their fellow officers the three officers and the public (Sgt. Celli, Officer Menke and

6   Office Mann) each fired one shot after Mr. DeSantis continued to advance on them after being

7   struck by a less lethal round from a SAGE rifle fired by Sgt. Soares.  The officers did not engage

8   in any conduct prior to this time that provoked Mr. DeSantis to charge at them.

9          When the officers arrived at the residence, Mr. DeSantis was outside with Patricia

10  DeSantis who was holding her 2 year old daughter on her hip.  The DeSantis residence was part

11  of a duplex located at the end of a driveway.  The officers positioned themselves on opposite

12  sides of the driveway with three officers on each side.

13         Mrs. DeSantis was ordered to go into the residence, she failed to comply with the officers

14  instructions to do so.  Patricia DeSantis contends that she advised the officers when they arrived

15  that Mr. DeSantis was in "mental crisis," and that she had taken the gun away from him. The

16  officers and the independent eye witness testified that they did not hear her make any statement

17  that she had disarmed Mr. DeSantis.  There is also no indication on the 911 tape that such a

18  statement was made.

19         Prior to Mr. DeSantis charging at the officers, Officer Menke gave Mr. DeSantis

20  commands to come forward and raise his hands.  After the commands were given several times,

21  Mr. DeSantis reluctantly complied.  Officer Menke then gave commands to Mr. DeSantis to get

22  down on the ground in a prone position so that the officers could safely approach him, search

23  him for any weapons and then take him into custody.  Again the orders had to be repeated several

24  times, but he eventually started to comply.  After he initially got down on the ground, he started

25  to raise up and he was ordered to get down on the ground.  He complied but then started to raise

26  up again.  He was told a third time to get down on the ground.  Mr. DeSantis then suddenly and

27  without any provocation jumped up and charged at the officers in what several of the witnesses

28  describe as a "sprinter leaving the blocks".

1    Sergeant Soares fired the SAGE one time.  He believed that Officers Menke and Mann

2  were in danger.  All of the officers stated that they saw the SAGE shot strike Mr. DeSantis but he

3  appeared to recover and continued to run towards the officers.  Joseph Silny also testified that

4  Mr. DeSantis continued to run after he was initially struck.  Sergeant Celli then fired his rifle

5  when Mr. DeSantis was approximately 10-15 feet from Officers Menke and Mann.  He also

6  believed that Officer Menke and Mann's lives were in danger.  He fired once and struck Mr.

7  DeSantis.  Officers Menke and Mann also fired their handguns at or about the same time

8  believing that their lives were in danger.  One of the two shots struck Mr. DeSantis.  It was not

9  determined which officer fired the second shot that struck him.  Mr. DeSantis was pronounced

10  dead at the scene.  After the fact, it was discovered that Mr. DeSantis did not have a gun on him

11  but had left it in the house.

12    The incident was witnessed by Joseph Silny, a neighbor whose duplex shared the

13  driveway with the DeSantis residence.  Mr. Silny corroborates the statements of the officers as to

14  how the incident occurred.  In his statement after the incident, he stated that in essence he would

15  have done the same thing as the police and that he thought that when Mr. DeSantis bolted

16  forward "one could only expect to get shot."   He further stated that "It seemed to me he was

17  committing suicide almost like what it seemed."

18    Pursuant to the Sonoma County Critical Incident Protocol involving officer involved

19  shootings, the shooting was investigated by the Sonoma County Sheriff's Department with

20  assistance from the Petaluma Police Department.  The investigation was submitted to the District

21  Attorney for review.  The District Attorney's office concluded that the shooting was lawful and

22  also that the officers had reason to believe that Mr. DeSantis would cause serious bodily harm or

23  death.

24    Mrs. DeSantis testified that on the Friday prior to the incident, Mr. DeSantis advised her

25  that he had been using methamphetamine again and that he was not taking his medication for

26  bipolar disorder.  At the time of the incident, Mr. DeSantis had a prescription for medical

27  marijuana and smoked on almost a daily basis which was renewed days before the incident.  She

28  further testified that he had previously gone through a chemical dependency recovery program.

1   The tests performed as part of the autopsy disclosed that Mr. DeSantis had marijuana and ecstacy

2   in his system.

3                                                      **II.**

4                                **NATURE OF PLAINTIFF'S CLAIMS**

5           Patricia is the wife of Richard DeSantis and asserts. as his representative, a Fourth

6   Amendment claim for excessive force under 42 U.S.C. 1983.  She asserts on her own behalf a

7   Fourteenth Amendment claim for loss of familial relationship under 42 U.S.C. 1983.

8           Dani DeSantis is the minor daughter of Richard and Patricia DeSantis.  She is asserting a

9   Fourteenth Amendment claim under 42 U.S.C. 1983.  Adrianne DeSantis is the mother of

10  Richard DeSantis. There is no evidence that Richard provided any support to her.  She asserts a

11  Fourteenth Amendment Claim under 42 U.S.C. 1983 for loss of familial relationship.

12          Patricia and Dani DeSantis assert a Monell claim against the City of Santa Rosa based on

13  an alleged "defacto policy" of failing to discipline officers for excessive use of force.

14                                                     **III.**

15          **THERE WAS NO FOURTH AMENDMENT VIOLATION OF MR. DESANTIS'S
                                    CONSTITUTIONAL RIGHTS**

16

17  **A.      USE OF DEADLY FORCE IS REASONABLE WHEN THE SUSPECT POSES A
            SIGNIFICANT THREAT OF DEATH OR SERIOUS INJURY TO THE
            OFFICERS**

18

19          In the seminal case of *Graham v. Conner*, 490 U.S. 386, 396 (1989), the United States

20  Supreme Court set forth the standard for reviewing police officer conduct in determining whether

21  a police officer has violated the constitutional rights of a suspect:

22          "Reasonableness of a particular use of force must be judged from the perspective
            of a reasonable officer on the scene, rather than with the 20/20 vision of
23          hindsight.....Not every push or shove, even if it may later seem unnecessary in the
            peace of a judge=s chambers violates the Fourth Amendment. The calculus of
24          reasonableness must embody allowance for the fact that police officers are often
            forced to make split second judgments–in circumstances that are tense, uncertain
25          and rapidly evolving–about the amount of force that is necessary in a particular
            situation."

26

27          This is to allow "for the fact that police officers are often forced to make split-second

28  judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of

1   force necessary in a particular situation." *Id.*, at p. 396.

2   The courts have held that the use of deadly force is objectively reasonable where the

3   officer has probable cause to believe that a suspect poses a significant threat of death or serious

4   physical injury to the officer or others.  *Tennessee v. Garner*, 471 U.S. 1, 11  (1985).  Here, the

5   undisputed evidence shows that the incident at issue unfolded in a matter of minutes from the

6   time that the officers arrived until shots were fired; the officers were faced with a split second

7   decision when Mr. DeSantis suddenly charged at them. Given the information provided to the

8   officers that Mr. DeSantis had been shooting a weapon inside his residence, it was reasonable for

9   the officers to believe that Mr. DeSantis was armed and they had no opportunity to search him.

10   The officers reasonably believed he posed a significant threat to them when he suddenly and

11   without provocation charged at them while they had their weapons drawn.

12   Although plaintiffs emphasize the testimony of the officers that up to the point when they

13   fired their weapons they had not in fact observed a weapon on Mr. DeSantis, the officers had

14   only a brief opportunity to observe him in less than ideal circumstances.

15   The Ninth Circuit has also held that it is not necessary for the suspect to be armed or to

16   have threatened an officer in order for an officer to have probable cause to believe that the

17   suspect poses a threat of serious harm either to the officers or others.  *Forrett v. Richardson*, 112

18   F.3d 416, 420 (9th Cir. 1997).

19   Patricia DeSantis claims that she told the officers she had "the gun" when they arrived.

20   However, the evidence will show that not one of the officers or the eye witness heard such a

21   statement.  Even assuming, arguendo, that such a statement was made, it is not unreasonable for

22   an officer who believes his/her life could be on the line not to take the word of a related witness

23   who the officers have had no opportunity to question and who they have no idea is credible or

24   not.

25   It was therefore objectively reasonable for the officers to believe that Mr. DeSantis

26   created a threat of serious or deadly harm to the officers and/or the public at large.

27   //

28   //

1   **B.   THE OFFICERS ARE NOT REQUIRED TO USE THE LEAST AMOUNT OF
         FORCE AVAILABLE**

2

3          The courts have held that there is no requirement that officers use the least amount of

4   force available in a given situation-only that the use of the force be objectively reasonable under

5   the circumstances know to the officer at the time of the incident.  *Scott v. Henrich*, 39 F.3d 912

6   (9th Cir. 1994).  *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir 2010); *MacEhern v. City of*

7   *Manhattan Beach*, 623 F.Supp.2d 1092, 1103 (C.D. Cal 2009).  To hold officers to such a

8   standard is clearly inappropriate.

9          Such judgments would require reviewing the situation from the perspective of 20/20

10  hindsight and is contrary to this circuit's prior holding on the appropriate standard to review an

11  officer's conduct and specific authority that an officer has no constitutional duty to use less

12  intrusive alternatives where deadly force can be justifiably used.  As stated in *Scott v. Henrich*,

13  39 F.3d 912 (9th Circuit 1994):

14          "Plaintiff argues that the officers should have used alternative measures before
            approaching and knocking on the door where Scott was located.  But the text of
15          the Fourth Amendment indicates, the appropriate inquiry is whether the officers
            acted reasonably, not whether they had less intrusive alternatives available to them
16          [citations omitted] Requiring officers to find and choose the least intrusive
            alternative would require them to exercise superhuman judgment.  In the heat of
17          battle with lives potentially in the balance, an officer would not be able to rely on
            training and common sense to decide what would best accomplish his mission.
18          Instead, he would need to ascertain the least intrusive alternative (an inherently
            subjective determination) and choose that option and that option only. Imposing
19          such a requirement would inevitably induce tentativeness by officers, and thus
            deter police from protecting the public and themselves.  It would also entangle the
20          courts in endless second-guessing of police decisions made under stress and
            subject to the exigencies of the moment." (*Id*., at p. 915, emphasis added)

21

22         Thus, the correct inquiry is not "whether another reasonable or more reasonable

23  interpretation of the events can be constructed......after the fact." (*Hunter v. Bryant*, 502 U.S.

24  224, 228 (1991).  "The court must allow for the fact that officers are forced to make split second

25  decisions in tense situations.  An officer cannot be expected to accurately anticipate all of the

26  possible responses a subject may have to his commands and then tailor his actions accordingly in

27  order for his conduct to fall into the category of reasonableness." *Reynolds v. County of San*

28  *Diego*, 84 F.3d 1162,  1169 (9th Cir 1996)

1    The alleged tactical errors that the plaintiff's experts contend were made by the officers

2    did not constitute a violation of Mr. DeSantis's constitution rights or recklessness on their part.

3    A plaintiff cannot establish a fourth amendment violation based merely on bad tactics that result

4    in a deadly confrontation that could have been avoided. *Billington v. Smith*, 292 F.3d 1177,

5    1190.

6    In *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002), the court held in an analogous

7    situation that the district court erred in denying the officers' motion for summary judgment when

8    the officers shot a motorist who was attempting to wrest control of the officer's gun from him.

9    While the district court agreed that the officer's shooting was reasonable at the time that he shot

10   the plaintiff given the imminent threat to his safety, the court denied the motion.  The plaintiff

11   had argued that the officer had failed to wait for back up, failed to use his baton or spray on the

12   motorist or release the magazine on his gun to make it unusable prior to the shooting and that

13   these acts created the situation in which the reasonable force was required to be used and that

14   therefore the reasonable use of force became unreasonable.  The court pointed out that the

15   plaintiff's criticisms of the officer's tactics fit the "20/20 vision of hindsight" that *Graham v.*

16   *Conner* holds must be disregarded.

17   Moreover, the evidence establishes that, in fact, the officers  used less lethal force such as

18   verbal commands, uniformed presence and the SAGE prior to the use of deadly force.  The

19   officers attempted to gain Mr. DeSantis's cooperation in gaining control over him and

20   eliminating any potential threat by low level uses of force.  It was not until Mr. DeSantis charged

21   at the officers that they were required to use deadly force.

22   Even though, as stated above, there was no legal duty or requirement to use less lethal

23   measures, Defendants' Police Practices Expert Joseph Callanan will testify that the other options

24   which the plaintiffs speculate could have been used were not a prudent course of action for the

25   officers.

26   **C.    THERE IS NO DIFFERENT STANDARD APPLIED IN THE CASE OF A
          SUSPECT WHO HAS A MENTAL ILLNESS**

27

28   Plaintiff's emphasize that Mr. DeSantis allegedly had a mental illness.  There is no

1  recognized different standard for a police response applied to persons with mental illness or

2  emotional distress; it is only one factor to be considered.  *Deorle v. Rutherford*, 272 F.3d 1272,

3  1283 (9th Cir. 2001)  ("We do not adopt a per se rule establishing two different classifications of

4  suspects:  mentally disabled persons and serious criminals"); *Blandford v. Sacramento County,*

5  406 F.3d 1110 (9th Cir. 2005).

6  **D.      DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY**

7       Qualified Immunity shields government officials performing discretionary functions from

8  liability for civil damages "insofar as their conduct does not violate clearly established statutory

9  or Constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*,

10  457 U.S. 800, 818  (1982).  It is an immunity from suit rather than a mere defense to liability.

11  *Hunter v. Bryant*, 502 U.S. 224 (1991).  Qualified immunity presents a question of law to be

12  determined by the court.  *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993).  As set

13  forth in *Meredith v. Erath*, 182 F. Supp.2d 964 (C.D. Cal. 2001), "Qualified immunity protects

14  all but the plainly incompetent or those who knowingly violate the law.  If Officers of reasonable

15  competence could disagree on the issue whether a chosen course of action is constitutional,

16  immunity should be recognized."

17       As the U.S. Supreme court recently reiterated in *Pearson v. Callahan*, 555 U.S. 223

18  (2009):

19       "The protection of qualified immunity applies regardless of whether the
         government officials error is 'a mistake of law, a mistake of fact, or a mistake
20       based on mixed questions of law and fact'" [citations omitted] (*Id*., at p. 231).

21       As stated by the court in *Saucier v. Katz*, 533 U.S. 194 (2001), at page 205:

22       "The concern of qualified immunity is to acknowledge that reasonable mistakes
         can be made as to the legal constraints on particular police conduct.  It is
23       sometimes difficult for an officer to determine how relevant legal doctrine . . . will
         apply to the factual situation the officer confronts."

24

25       The issue of whether a right is clearly established is a question of law to be determined by

26  the court.  *Elder v. Holloway*, 510 U.S. 510 (1994).  An officer is entitled to qualified immunity

27  even if he makes a reasonable mistake regarding the legality of his actions.  *Haynie v. County of*

28  *Los Angeles*, 339 F.3d 1071 (9th Cir. 2003).

1    In the context of excessive force, the mere general proposition that use of excessive force

2  violates the Fourth Amendment is not enough to establish whether the right is clearly established.

3  The right must be established with sufficient specificity that a reasonable officer would

4  understand that what he is doing violates that right. (*Saucier v. Katz*, 533 U.S. 194 (2001).) The

5  issue of whether a right is clearly established is a question of law to be determined by the court.

6  *Elder v. Holloway*, 510 U.S. 510 (1994), "Qualified immunity protects all but the plainly

7  incompetent or those who knowingly violate the law. If Officers of reasonable competence could

8  disagree on the issue whether a chosen course of action is constitutional, immunity should be

9  recognized." *Meredith v. Erath*, 182 F.Supp.2d 964 (C.D. Cal. 2001)

10    Here, the officers are entitled to qualified immunity if they mistakenly believed their lives

11  were in danger. The law has clearly established that an officer may resort to the use of deadly

12  force when a suspect poses a significant threat of death or serious physical injury. This is

13  precisely the type of circumstance that the courts created the doctrine of qualified immunity to

14  apply to.

15                                           **IV.**

16  **THE CONDUCT OF THE OFFICERS CANNOT BE SHOWN TO HAVE VIOLATED
    THE FOURTEENTH AMENDMENT**

17

18    The claims of Dani DeSantis and Adrianne DeSantis are limited to claims under the

19  Fourteenth Amendment which required that the "plaintiffs demonstrate that the officers' use of

20  force 'can properly be characterized as arbitrary, or conscious shocking, in a constitutional

21  sense'" *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1988).

22    This standard was further defined in situations, like the instant case, where officers are

23  required to make split-second decisions to act. In *Porter v. Osborn*, 545 F.3d 1131, 1133, 1139

24  (9th Cir. 2008), the court held that where the undisputed evidence showed that the encounter

25  "took very little time-probably no more that five minutes" and that there was not time for the

26  officer to deliberate since the officer was required to make "split-second decisions", the

27  appropriate inquiry is whether the officers acted with a purpose to harm unrelated to a legitimate

28  law enforcement purpose rather than a standard of "deliberate indifference". Here, the entire

---

1   incident at issue transpired in approximately two minutes, and the decision to fire took place in

2   significantly less time.

**V.**

**THERE IS NO BASIS TO ASSERT A MONELL CLAIM AGAINST THE CITY**

5   As a result of the court's prior rulings on summary judgment, the only remaining claim

6   against the City of Santa Rosa by Patricia and Dani DeSantis is based on an alleged "defacto

7   policy of failing to discipline officers for excessive use of force." There is no evidence to

8   support the existence of such a claim or to establish as required that any such alleged policy was

9   the "moving force" of the plaintiffs injury. *Board of the County Commissioners of Bryan County*

10  *v. Brown* 520 U.S. 397, 404 (1997). Establishing an official custom or practice requires proof of

11  more than a single instance. *City of Oklahoma v. Tuttle*, 471 U.S, 808, 823-24*; Trevino v. Gates*,

12  99 F. 3d 911, 918 (9th Cir. 1996).

13  Plaintiff relies solely on isolated deposition testimony of the former Police Chief after a

14  confusing line of questions stating that the appropriate standard for reviewing incidents was

15  beyond a reasonable doubt. This testimony is contrary to his testimony in other portions of his

16  deposition. More importantly, there is no evidence that any officer ever engaged in the use of

17  excessive force and was not appropriately disciplined or that the officers in question knew of or

18  acted in this case because of such alleged policy.

19  Additionally, a municipality cannot be held under a *Monell* theory if there is no

20  underlying constitutional violation by the officers. *City of Los Angeles v. Heller*, 475 U.S. 796,

21  799; *Long v. City and County of Honolulu*, 511 F. 3d 901 (9th Cir. 2007).

**VI**.

**CONCLUSION**

24  For the foregoing reasons, the evidence and the law in this case will establish that the only

25  appropriate judgment in this case is a judgment in favor of all defendants.

26  Dated: June 18, 2012                    _____/s/_____

Caroline L. Fowler
27                                          City Attorney
Attorney for Defendants
28                                          City of Santa Rosa, Santa Rosa Police Officers
Rich Celli, Travis Menke, and Patricia Seffens