CAROLINE L. FOWLER, City Attorney (SBN 110313)
JOHN J. FRITSCH, Assistant City Attorney (SBN 172182)
City of Santa Rosa
100 Santa Rosa Avenue, Room 8
Santa Rosa, California 95404

Telephone: (707) 543-3040
Facsimile: (707) 543-3055

Attorneys for Defendants
CITY OF SANTA ROSA; RICH CELLI, an individual and Officer of the
SANTA ROSA POLICE DEPARTMENT; TRAVIS MENKE,
an individual and Officer of the SANTA ROSA POLICE DEPARTMENT;
and PATRICIA SEFFENS f/k/a PATRICIA MANN, an individual
and Officer of the SANTA ROSA POLICE DEPARTMENT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA DESANTIS, et al., | Case No. C 07-3386 JSW |
| Plaintiffs, | **MOTION *IN LIMINE* NO. 3: EXCLUDE INAPPROPRIATE EXPERT TESTIMONY BY PLAINTIFFS' USE OF FORCE EXPERTS RON MARTINELLI AND/OR LOU REITER** |
| v. | |
| CITY OF SANTA ROSA, et al., | |
| Defendants. | Hon. Jeffrey S. White |
| _____/ | Pretrial Conference: July 2, 2012<br>Time: 2:00 p.m.<br>Ctrm: 11, 19th Floor |
| | Trial Date: September 4, 2012 |

Defendants anticipate that plaintiffs will seek to introduce inappropriate testimony

through their expert police procedures or "use of force" experts Ron Martinelli and/or Lou Reiter

regarding the following issues which defendants request be excluded:

## A. LEGAL CONCLUSIONS

Defendants anticipate that plaintiff's expert witnesses may attempt to offer opinions in the

form of legal conclusions of whether the use of force in this matter was "unrelated to a legitimate

law enforcement purpose" (*Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008)), and whether the use

1    of force in this matter was "objectively unreasonable". (Graham v. Connor, 490 U.S. 394.).

2    Additionally, both experts have expressed opinions or conclusions that the City of Santa Rosa

3    was "deliberately indifferent" to the rights of Mr. DeSantis.

4        Expert witnesses are prohibited from drawing legal conclusions because such conclusions

5    are the province of the trier of fact or court.  Weinstein's Federal Evidence § 702.02[3] (2d ed.

6    1997).  *Graham v Conner* 490 U.S. 386, 397; See also *Aguilar v. Int'l Longshoremen's Union*

7    966 F.2d, 443,447 (9th Cir 1992) ( rejecting expert opinion as to the reasonableness of plaintiff's

8    reliance on defendant's promise) and *Berry v. City of Detroit* 25 F.3d 1342, 1353 (6th Cir. 1994)

9    (improper for expert witness in 14th Amendment case to testify to the legal conclusion that

10    defendant City was "deliberately indifferent" because "deliberate indifference" is a legal term

11    that is the court's responsibility to define).

12        In this instance, permitting expert opinions from paid experts regarding legal conclusions

13    would invade the province of the trier of fact or court on the ultimate issues in this case.  Such

14    testimony would be highly prejudicial to defendants.  Reference to the existence of such evidence

15    when the jury is not permitted to receive it creates a substantial danger of prejudice to defendants

16    because the jury may infer that the opinions are adverse to defendants

17      **B.**     **TESTIMONY REGARDING K-9 HANDLING PRACTICES OR THE USE**

18             **OF A K-9 UNDER THE CIRCUMSTANCES OF THIS CASE.**

19        Mr. Reiter did not set forth in his Rule 26 report any opinions regarding the use or

20    possible use of the K-9 at the scene.  At this deposition, Mr. Reiter indicated that he did not have

21    any opinions regarding the use of the K-9 (Deposition Testimony of Lou Reiter Page 65, lines 4-

22    7 attached as Exhibit A).  He further testified that he had no training or experience as a K-9

23    handler (Deposition Testimony page 28, lines 10-23  attached as Exhibit A) and did not consider

24    himself to be an expert in that area ( Deposition page 65, line 8-10 attached hereto as Exhibit A).

25        A party may not use evidence at trial that it failed to supply under Rule 26(e) unless the

26    failure was substantially justified or harmless.  F.R.C.P. 37(c).  Additionally Federal Rule of

27    Evidence 702 requires that an expert must establish sufficient expertise to offer such an opinion

28    and that it must be based upon sufficient facts or data.

1    As a threshold matter, in accordance with rule governing admissibility of expert

2  testimony, court must determine whether proffered witness is qualified as an expert by

3  knowledge, skill, experience, training or education.  Fed. Rules Evid. Rules 104(a) 702.   If

4  foundational facts demonstrating relevancy or qualification are not sufficiently established,

5  exclusion of expert testimony is justified.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

6  U.S. 579 (1993) ; *Kumho Tire Company v. Carmichael*, 119 S.Ct. 1167 (1999); *LuMetta v. U.S.*

7  *Robotics, Inc.* 824 F.2d 768, 771 (9th Cir. 1987)

8    Although Dr. Martinelli offered opinions regarding the deployment or use of the K-9 in

9  the underlying incident and opinions regarding Officer Ellsworth's abilities as a K-9 handler in

10  his deposition and in his "Rebuttal Report", he is not qualified to testify as an expert on such

11  subject matter.  Plaintiffs will seek to elicit the opinion testimony of expert police practices

12  witnesses Ron Martinelli to the effect that "it would have been appropriate given the safety

13  margin to have deployed Officer Ellsworth's K-9 partner "Duke" to engage and distract

14  DeSantis; [sic] while officers moved forward under the cover of the K-9 and engaged the

15  unarmed subject with less lethal weaponry." (Martinelli Rule 26 Report, pg. 29:7-1; pertinent

16  portion attached as Exhibit C).  Mr. Martinelli's detailed criticisms of Officer Ellsworth and Sgt.

17  Celli are set out at Martinelli's Report at page 41, line 8-42, line 17.  (Exhibit C)

18    Dr. Martinelli testified in his deposition that he was never trained as a K-9 officer, never

19  supervised a K-9 officer and does not provide K-9 training.  He further testified that he does not

20  consider himself an expert in that area.  (Deposition of Ronald Martinelli, page 23, lines 8-20-

21  page 24, line 12).  As established at his deposition and via *curriculum vitae* (Exhibit D),

22  Martinelli has insufficient knowledge, skill, experience, training and education in police

23  procedure and policy regarding police canine tactics and use to offer such an opinion.

24    His opinions with respect to police procedure and policy regarding police canines and

25  their use are unfounded and should not be admitted in the absence of a sufficient foundation.  Dr.

26  Martinelli's opinions regarding Officer Ellsworth who is not a defendant in this case are not

27  relevant and should also be excluded on that basis. Defendants request that the court exercise its

28  duty under the *Daubert* principles and Federal Rule 702 to review the reliability of the testimony

1   which Dr. Swartz will offer on this issue.

2          Federal Rule of Evidence 702 provides:

3          "If scientific, technical, or other specialized knowledge will assist the trier of fact to
           understand the evidence or to determine a fact in issues, a witness qualified as an expert
4          by knowledge, skill, experience, training or education, may testify thereto in the form of
           an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the
5          testimony is the product of reliable principles and methods, and (3) the witness has
           applied the principles and methods, reliably to the facts of the case."

6

7          In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150; 143 L.Ed.2d 238; 119 S.Ct. 1167

8   (1999), the U.S. Supreme Court noted that the factors set forth in *Daubert* are neither definitive

9   nor exhaustive.  The court emphasized that the gatekeeping requirement is to "make sure that an

10  expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the

11  practice of an expert in the relevant field."

12      **C.      CONCLUSIONS AT TO THE MENTAL STATE OF RICHARD DESANTIS**

13         Neither Mr. Reiter or Dr Martinelli (a PhD.–not medical physician) have any medical or

14  psychological training are not qualified to offer any expert opinions as to Mr. DeSantis's mental

15  state at the time of the incident.  Defendant has filed a separate motion in limine regarding

16  evidence of Richard DeSantis's prior medical treatment.

17         Defendants anticipate plaintiffs will seek to elicit the opinion testimony of expert police

18  practices witnesses Ron Martinelli to the effect that "It is my opinion that during this incident,

19  Richard DeSantis was gravely disabled, a danger to himself and others."  Martinelli Report pg.

20  50:25-51:2  As established at his deposition and via *curriculum vitae* (Exhibit D), Martinelli has

21  no knowledge, skill, experience, training and education in mental health assessment and

22  diagnosis to offer such an opinion.  Accordingly, such testimony should be excluded under

23  Federal Rule of Evidence 702, and *Daubert, supra.*

24         Defendants anticipate plaintiffs will seek to elicit the opinion testimony of expert police

25  practices witnesses Ron Martinelli to the effect that "If the trier of fact were to determine that

26  Richard DeSantis was mentally ill to the point of being gravely disabled, then I would opine that

27  he was not responsible for his actions during this incident."  Martinelli Report pg. 51:2-4

28  (Exhibit C).  This opinion sets out a legal conclusion about the legal responsibility of decedent

1   and is inadmissible.

2       Both experts have testified as to techniques that they believe should have been utilized to

3   communicate with Mr. DeSantis although they both acknowledge that whether such techniques

4   would have been successful in this case are speculation on their part. (See Deposition Testimony

5   of Lou Reiter, page 51, lines 10- page 52 line 14, attached as Exhibit A). Dr. Martinelli testified

6   that no one could testify as to what was in Mr. DeSantis's mind at that point in time. (Deposition

7   Testimony of Ronald Martinelli, page 118, line 19-119, line 11 (Exhibit B)).

8       Any statements by Mr. Reiter or Dr. Martinelli as to Mr. DeSantis's mental state at the

9   time of the incident are lacking in foundation, speculative and not based on any expert opinion

10  that they are qualified to express. Mr. DeSantis's state of mind is also not relevant to

11  determining whether the officers violated his constitutional rights. The only testimony in this

12  regard which has any relevance is the information that was provided to the officers regarding Mr.

13  DeSantis via the 911 dispatch operator.

14  **D.    CONCLUSIONS AS TO THE MENTAL STATE OF THE OFFICERS**

15      In the seminal decision of *Graham v. Conner* 490 U.S. 386, 396-387, the court set forth

16  the standard for analyzing the reasonableness of a fourth amendment violation and stated that the

17  intentions of the officer are not relevant to that determination:

18          "An officer's evil intentions will not make a fourth amendment violation our of an
            objectively reasonable use of force; nor will an officer's good intentions make an
19          objectively unreasonable use of force constitutional"

20          "The Fourth Amendment inquiry is one of 'objective reasonableness ' under the
            circumstances, and subjective concepts like 'malice' and 'sadism; have no proper
21          place in that inquiry"

22      Additionally, testimony by the experts as to the state of mind of the individual officers is

23  speculative. Lou Reiter attempts to characterize the existence of "malice" by Sgt. Celli based on

24  post incident statements made by Celli that "he was mad at DeSantis" for leaving him no choice

25  but to shoot. Such testimony is speculative and lacking in foundation and Mr. Reiter

26  acknowledged in his deposition testimony that he did not know what was in Sgt. Celli's mind at

27  the point in time at which he fired. (Deposition Testimony of Lou Reiter, page 71, line 13- page

28  73, line 1, attached as Exhibit A)

1   Plaintiff's may attempt to argue that said evidence of state of mind is relevant to the

2   fourteenth amendment claim and standard of "purpose to harm" although appropriate the

3   standard is "purpose to harm without legitimate law enforcement purpose".   Again the subjective

4   state of any of the officer's mind is not relevant to that issue and is lacking in foundation.

5   **E.     TESTIMONY REGARDING "SYMPATHETIC FIRE"**

6   Defendants believe that plaintiff's experts or plaintiff's counsel may refer to or offer

7   opinions that the actions of Officers Menke and/or Mann were "sympathetic fire"–meaning they

8   fired in response to the shot fired by Sgt. Celli.

9   Lou Reiter did not express any opinions in his Rule 26 report on this subject and testified

10  in his deposition that he had not been asked to express an opinion on this issue and did not

11  believe there was any factual basis for such a conclusion. (Deposition of Lou Reiter, page 61,

12  lines 11-25).   Accordingly, any such opinions by Lou Reiter on this subject matter should be

13  excluded.  Federal Rule of Procedure 37 (c); Federal Rules of Evidence 702.

14  Dr. Martinelli has offered an opinion in his Rule 26 report at page 45 that Sgt. Celli's

15  firing of the rifle may have led to "sympathetic fire" by Officers Menke and Mann.  (A true and

16  correct copy of said portion of the report is attached hereto as Exhibit C).   During his deposition,

17  Dr. Martinelli clarified the statement by indicating "Who Knows" and that the opinion was "just

18  speculation on his part" (Deposition of Ronald Martinelli, page 148, line 8-page 149, lines 23,

19  attached as Exhibit B).  Dr. Martinelli further testified that he had not listened to the 911 tape to

20  determine the timing of the shots and did not recall testimony of Officer Menke that did not hear

21  Sergeant Celli fire.  (Deposition of Ronald Martinelli, page 148, line 24-149, line 11, attached as

22  Exhibit B)  Accordingly, Dr. Martinelli's testimony on this issue should be excluded under

23  Federal Rule of Evidence 702.

24  Dated: June 12, 2012                                    OFFICE OF THE CITY ATTORNEY

25

26                                                          Caroline L. Fowler, City Attorney
                                                            John J. Fritsch, Assistant City Attorney
27                                                          Attorney for Defendants

28  //

1

**ORDER**

2   Satisfactory proof having been made, it is hereby ordered as follows:

3       1.    Plaintiff's experts are precluded from expressing opinions in the form of legal

4           conclusions of whether the use of force in this matter was "unrelated to a

5           legitimate law enforcement purpose" (*County of Sacramento v. Lewis*, 523 U.S.

6           833 (1998)); whether the use of force in this matter was "objectively

7           unreasonable" (*Graham v. Connor*, 490 U.S. 394 (1989)), and whether there was

8           "deliberate indifference" on the part of the City or any individual officers.

9       2.    Plaintiff's experts are precluded from expressing any opinions regarding K-9

10          practices or the possible use of a K-9 in this incident or comments regarding the

11          handling of the K-9 by Officer Ellsworth.

12      3.    Plaintiff's experts are precluded from offering any opinions regarding the mental

13          condition or status of Richard DeSantis at the time of the incident other

14          than testimony as to information that was provided to the officers.

15      4.    Plaintiff's experts are precluded from offering any opinions or statements as to

16          the mental state of mind of any of the defendant officers;

17      5.    Plaintiff's experts are precluded from offering any testimony or opinions regarding

18          "Sympathetic Fire";

19      6.    All parties' counsel shall caution, warn and instruct their clients and their

20          witnesses from attempting to introduce such evidence during the trial of this

21          matter, and counsel are precluded from making any statements or arguments

22          referring to the existence of such evidence to the jury during the trial of this

23          matter.

24  Dated: July ___, 2012

                       _____

25                         Hon. Jeffrey White, Judge
                       United States District Court

26

27

28

1

**ORDER**

2    Satisfactory proof having been made, it is hereby ordered as follows:

3    1.    Plaintiff's experts are precluded from expressing opinions in the form of legal

4          conclusions of whether the use of force in this matter was "unrelated to a

5          legitimate law enforcement purpose" (*County of Sacramento v. Lewis*, 523 U.S.

6          833 (1998)); whether the use of force in this matter was "objectively

7          unreasonable" (*Graham v. Connor*, 490 U.S. 394 (1989)), and whether there was

8          "deliberate indifference" on the part of the City or any individual officers.

9    2.    Plaintiff's experts are precluded from expressing any opinions regarding K-9

10         practices or the possible use of a K-9 in this incident or comments regarding the

11         handling of the K-9 by Officer Ellsworth.

12   3.    Plaintiff's experts are precluded from offering any opinions regarding the mental

13         condition or status of Richard DeSantis at the time of the incident other

14         than testimony as to information that was provided to the officers.

15   4.    Plaintiff's experts are precluded from offering any opinions or statements as to

16         the mental state of mind of any of the defendant officers;

17   5.    Plaintiff's experts are precluded from offering any testimony or opinions regarding

18         "Sympathetic Fire";

19   6.    All parties' counsel shall caution, warn and instruct their clients and their

20         witnesses from attempting to introduce such evidence during the trial of this

21         matter, and counsel are precluded from making any statements or arguments

22         referring to the existence of such evidence to the jury during the trial of this

23         matter.

24   Dated: July ____, 2012

                                    _____
25                                  Hon. Jeffrey White, Judge
                                    United States District Court

26

27

28

# EXHIBIT A

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                          ---oOo---

4    PATRICIA DESANTIS, individually)
     and as Success in Interest for )
5    RICHARD DESANTIS, deceased, and)
     as Guardian ad Litem for DANI  )
6    DESANTIS, a minor,             )
                                    )
7                    Plaintiffs,    )
                                    )
8    vs.                            )    Case No. C 07-3386 JSW
                                    )
9    CITY OF SANTA ROSA, JERRY      )
     SOARES, RICH CELLI, TRAVIS     )
10   MENKE, PATRICIA MANN and DOES 1)
     through 25, inclusive,         )
11                                  )
                     Defendants.    )
12   _____)

13

14

15

16              DEPOSITION OF LOU REITER

17         REPORTED BY THOMAS DAVID BONFIGLI,

18              C.S.R. LIC. NO. 5498

19                OCTOBER 8, 2008

20                  10:25 A.M.

21                  ---oOo---

22

23

24

25

1      A.    No.  I don't train first-level officers.

2      Q.    Have you ever?

3      A.    No.

4      Q.    And have you ever provided any training in

5  defensive tactics, or do you consider that to be the

6  same as use of force?

7      A.    Well, it depends on -- you know, in some

8  agencies, it's combined.  But I'm not a defensive-

9  tactics trainer.

10      Q.    Have you ever been a canine trainer?

11      A.    No.

12      Q.    Were you ever a canine officer?

13      A.    No.  I've got a couple poodles, and that's as

14  close as I can get to dogs.

15      Q.    And have you ever done any training on that

16  subject in your consulting business?

17          MR. BURRIS:   On?

18          MS. FOWLER:   On the use of canines.

19          MR. BURRIS:   Canines.

20          THE WITNESS:   Only from a policy development

21  and the recommendation that you have a -- a dog-use

22  report rather than simply a dog-bite report that some

23  agencies used to have.

24          MS. FOWLER:   Q.  And in terms of the training

25  that you have done regarding investigation of critical

1  on him to control him using defensive tactics.  But the

2  problem is, they had their weapons out, and that's one

3  of the -- a problem you run into because a lot of the

4  holsters that we provide to officers aren't easy, and

5  you can't quickly get your weapon back in a control

6  situation.

7          They made the choice to bring weapons into

8  that encounter.  They should have had a couple of

9  officers designated to be the subject-control officers.

10     Q.   And in your opinion, did the officers do

11  something that provoked Mr. Desantis into attacking

12  them?

13     A.   I don't know what was in his mind at all.  I

14  know that the officers conducted themselves in a way

15  that the training that we provide officers, that you

16  don't -- where you have multiple people shouting

17  authoritative commands to the person, training and

18  experience has told us that agitates many emotionally

19  disturbed persons.  That's why they say you ought to

20  have one command voice; you ought to use measured

21  response; you ought to use open-ended questions; you

22  ought to attempt to develop a dialogue with the person.

23     Q.   Well, it's my understanding throughout this

24  that Mr. Desantis never spoke to anyone.  Is that

25  correct?

1        Q.    Okay.  Can you tell me what that means to you.

2        A.    It really means that the subject instigates a

3    police encounter where the police allows him to commit

4    suicide by the police using deadly force on the subject.

5        Q.    And have you been asked to express any

6    opinions as to whether or not this was a suicide-by-cop

7    situation?

8        A.    No.  But there's no -- in my opinion, it's

9    been no indication that this was a suicide-by-cop

10   situation.

11       Q.    Have you been asked to express any opinions

12   regarding sympathetic fire?

13       A.    No.

14       Q.    And you have not formed any opinions on that

15   subject?

16       A.    Well, in the first place, I should back up and

17   say:  Nobody's asked me to develop any opinions; they

18   simply gave me the materials.  And they know how I work;

19   I either have an opinion, or I don't.

20             In this case, the reason I don't have an

21   opinion is because there's nothing in the record that

22   would support that this was a contageous or

23   sympathetic-fire situation.  Each officer has indicated

24   that he or she made an independent decision to use

25   deadly force.

1          Is it your opinion he should have fired it

2     sooner?

3          A.   No.

4          Q.   Do you have any opinions as to whether or not

5     the canine should have been deployed at some point in

6     time during this incident?

7          A.   No.

8          Q.   I take it you'd agree you're not a canine

9     expert?

10         A.   I'm not.

11         Q.   Starting on the bottom of page 11, the last

12    sentence there, you indicate that "Sergeant Soares gave

13    none of the officers at the scene any indication he was

14    going to deploy the Sage and was then later hindered

15    from following through with a second round as

16    Sergeant Celli entered his field of fire stating that he

17    was not expecting the Sage to be deployed."

18         A.   Yes.

19         Q.   Is it your opinion that Sergeant Celli should

20    have known that Sergeant Soares would fire the Sage

21    again?

22         A.   I -- I don't know what Sergeant Celli -- no, I

23    don't think -- Sergeant Celli testified that he didn't

24    even know the Sage was going to be deployed in the first

25    place and that within a second or two after it was

1  with emotionally disturbed persons every city every day,

2  and it's rare to have officer-involved shootings because

3  the officers deal with those persons in a reasonable

4  manner responsive to those generally accepted police

5  practices, and the situation is resolved.

6       Now, many of those we have to use force, but

7  not deadly force.

8       Q.   But you don't know, as you've previously

9  testified, that had that tactic been deployed that the

10 outcome would have been any different?

11      A.   I don't.

12      Q.   You don't.

13      Then you indicate on Page 14 under the "Use of

14 deadly force" that "Sergeant Celli has continued to

15 demonstrate and testify that he was motivated by animus

16 against Mr. Desantis."

17      What do you base that on?

18      A.   His own testimony.  I mean, it's the first

19 time I've ever seen an officer who was involved in a

20 fatal shooting express himself both in his dep- -- in

21 his statement to the shooting-team investigators and

22 then continue to support it during his deposition that

23 he experienced an ill will or an animus toward

24 Mr. Desantis.  Mr. Desantis was an emotionally disturbed

25 person.

1      Q.    But that was after the incident was concluded

2  that he expressed --

3      A.    That he expressed --

4      Q.    -- that he expressed that he was angry because

5  he felt that Mr. Desantis left him no choice but to

6  shoot him.

7      A.    That's what he expressed after the incident,

8  correct.

9      Q.    That's correct.

10     Okay. Did he express any animus during the

11 incident itself?

12     A.    I don't know that.

13     Q.    So you're speculating that this animus that

14 he's expressed after the fact motivated him during the

15 incident.

16     A.    I don't know what motivated him during the

17 incident.  I'm saying that his expression afterwards in

18 my opinion exhibited an animus toward Mr. Desantis, who

19 was a person of diminished capacity.

20     Q.    But that doesn't mean that he had that?

21     MR. BURRIS:  Objection.  That's argumentative.

22     MS. FOWLER:  Well, I'm asking for his opinion.

23     Q.    Is it your opinion that during the incident,

24 Mr. -- Sergeant Celli had animus towards Mr. Desantis?

25     A.    I don't know what was in his mind at that

1    point.

2         Q.    And in evaluating the officer's conduct, isn't

3    it correct that the intent of the officer is

4    irrelevant --

5         A.    Right.

6         Q.    -- in terms of determining whether the use of

7    force was reasonable or not?

8         A.    Right.  It has to be -- that's exactly what

9    Graham decided.

10        Q.    Are there any other opinions that you intend

11   to testify about that are not contained in your report

12   and that we haven't already discussed in your

13   deposition?

14        A.    No.  This is the final report, unless I were

15   to be given additional materials that would cause me to

16   change these opinions or develop new opinions.  I've not

17   been told whether I'm going to get any additional

18   materials.

19        Q.    And so I take it unless you're specifically

20   asked, you don't have any plans to do any additional

21   work in this case.

22        A.    That's correct.

23        Q.    And you charge your client a flat fee?

24        A.    I do.

25        Q.    So no matter how many hours you put in, it's a

# EXHIBIT B

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                  ---oOo---

4   PATRICIA DESANTIS, individually)
    and as Success in Interest for )
5   RICHARD DESANTIS, deceased, and)
    as Guardian ad Litem for DANI  )
6   DESANTIS, a minor,             )
                                   )
7             Plaintiffs,          )
                                   )
8   vs.                            )   Case No. C 07-3386 JSW
                                   )
9   CITY OF SANTA ROSA, JERRY      )
    SOARES, RICH CELLI, TRAVIS     )
10  MENKE, PATRICIA MANN and DOES 1)
    through 25, inclusive,         )
11                                 )
              Defendants.          )
12  _____)

13

14

15

16        DEPOSITION OF RON MARTINELLI

17     REPORTED BY THOMAS DAVID BONFIGLI,

18          C.S.R. LIC. NO. 5498

19           OCTOBER 1, 2008

20             10:14 A.M.

21             ---oOo---

22

23

24

25

1    decent passing score, and wasn't -- and had the

2    seniority points, but not enough to get the promotion.

3    I needed to be way up in the 90's for that.

4         Q.    So other people scored higher than you on the

5    test --

6         A.    Yes.

7         Q.    -- essentially.

8              During the time that you were with the

9    San Jose Police Department, were you ever trained as a

10   canine officer?

11        A.    No.

12        Q.    Did you ever supervise any Canine officers?

13        A.    No.

14        Q.    How about at Redwood City?

15        A.    No.

16        Q.    And Moro Bay?

17        A.    No.

18        Q.    And in your training practice now, have you

19   ever taught any type of canine training?

20        A.    No.  I am many familiarized -- I'm familiar

21   with canine practices because in the patrol division, we

22   worked on numerous occasions with canine officers.  I've

23   had a number of conversations with canine officers.

24   Part of the training process for field-training officers

25   and recruits was to be familiar with canine practices,

1   so I have attended several lectures delivered by canine

2   officers on updated training as to how canines work and

3   canine handlers work with their dogs.

4           My father's a retired veterinarian and

5   has been a veterinarian on past occasions to the

6   San Francisco Police Department and, also, I believe the

7   Palo Alto Police Department at one time when he was

8   filling in for another veterinarian who's now deceased.

9   So I was familiar with -- with canines, police canines.

10          Q.   Do you consider yourself to be an expert in

11  that area?

12          A.   I do not.

13          Q.   How about during your law-enforcement career?

14  Were you ever a member of the SWAT team?

15          A.   No.

16          Q.   And did you act as an FTO either at

17  Redwood City or Moro Bay?

18          A.   No.

19          Q.   Okay.

20          A.   I have written a manual and a Power Point

21  presentation on the field-training-officer course for

22  both field-training officers and field-training

23  supervisors, and I recently produced a 40-hour FTO

24  program for field officers and field supervisors for the

25  United States Virgin Islands Police Department.

1    seemed to be quite a bit of distance.

2         Q.   But you're suggesting they should have closed

3    that distance to advance and use other means of force?

4         A.   Depends on what tactic they decide to use.

5         Q.   And then after we have this behavior of

6    getting up and down, pumping himself up and down on the

7    ground, Mr. Desantis takes off, on page 18, what you

8    described in the depositions as a "sprinter's start" and

9    begins to run towards Officers Menke, Mann and

10   Ellsworth, correct?

11        A.   Yes.

12        Q.   Is it your opinion that at this point in time

13   he represented a threat to the officers?

14        A.   Yes.

15        Q.   And is it your opinion that the officers

16   did anything up to this point in time to provoke

17   Mr. Desantis to charge at them?

18        A.   No.

19        Q.   Do you have any opinions or thoughts as to why

20   you believe Mr. Desantis charged at the officers?

21        A.   I do not know.

22        Q.   But you don't believe it was an effort at

23   suicide.

24        A.   Based on everything that I've looked at, I see

25   no evidence of suicidal behavior.

1    Q.   And Sergeant Celli it's your understanding did

2    not have a Taser on his person?

3    A.   Right.  I think Sergeant Celli did not have a

4    Taser, and I think Officer Menke may not have had a

5    Taser.  But I have all of the weaponry that the officers

6    stated that they had in their possession listed in my

7    report.

8    Q.   One of your other opinions that you talk about

9    in your report, on page 45, you say:  "Sergeant Celli's

10   shooting Desantis prematurely may have led to

11   Officers Menke and Mann's hypervigilance, resulting in

12   'sympathetic gunfire' in also shooting the decedent."

13   A.   I think that's a -- I think that's a

14   possibility.  The thing that brings me to opine on

15   that -- and first of all, let me preface it by saying:

16   Who knows?

17   Q.   Okay.  That's all I want to hear.

18   A.   Is that the answer you want?

19   Q.   Yes.

20   A.   Who knows?  The officers state they fired in

21   defense of their life and that it was not sympathetic

22   gunfire, so I'm going with what the officers have to

23   say.

24   Q.   And Officer Menke testified, did he not, that

25   he didn't hear Sergeant Celli's rifle fire.

1        A.   No, I don't recall that happening.   But that

2   would not alter my opinion.

3        Q.   Have you timed the time between the shots?

4        A.   No.   I can only go with what the officers are

5   saying, and the officers seemed to be saying that the

6   shots were fairly simultaneous, Officer Celli firing

7   first, closely followed by Officers Menke and Mann.

8        Q.   Have you listened to the 911 tape?

9        A.   I do not have a copy of the 911 tape.   If you

10  would provide that for me -- do you hear gunfire in the

11  background at all?

12       Q.   Talk to your lawyer about that.

13       A.   Okay.

14       Q.   He's the one who needs to provide you with

15  what he wants you to consider.

16       A.   Okay.

17       Q.   So in this section of the report, you list

18  reasons why you believe it's a possibility that there

19  was sympathetic gunfire, but at this point, it's just

20  speculation on your part that that could be what was

21  happening?

22       A.   Yes.   The officers have indicated that they

23  were firing in defense of their life.

24       Q.   Then we've already talked briefly about the

25  section of your report regarding the inadequate

**EXHIBIT C**

1 | Ron Martinelli, Ph.D.
Criminologist/Expert Witness
2 | Martinelli & Associates: Justice & Forensic Consultants, Inc.
42143 Avenida Alvarado, Suite B-2
3 | Temecula, California 92590
Phone: (951) 719-1450

4

5 | Expert Witness for the Plaintiffs

6 | UNITED STATES DISTRICT COURT

7 | NORTHERN DISTRICT OF CALIFORNIA

8

9 | PATRICIA DeSANTIS, individually and as

10 | Successor in Interest for RICHARD DeSANTIS,

11 | deceased, and as Guardian Ad Litem for

12 | DANI DeSANTIS, a minor and TIMOTHY

13 | FARRELL, a minor

14 |    Plaintiffs,

15 |    vs.

16 | CITY OF SANTA ROSA, JERRY SOARES, RICH

17 | CELLI, TRAVIS MENKE, PATRICIA MANN, and

18 | Does 1 through 25, inclusive,

19 |    Defendants.

20

Case No. C-07-3386 JSW & C-07-4474

FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B) REPORT OF PLAINTIFF'S POLICE PRACTICES EXPERT RON MARTINELLI, Ph.D.



21 |      I have been retained by *The Scott Law Firm, Attorney John Scott, Esq. and the*

22 | *Law Offices of Attorney Eric Safire, Esq.*, as "expert witness" in the above civil action. I

23 | am therefore submitting the following information and accompanying documents in

24 | support of my application to be designated by the Court as "expert witness" in police

25 | practices and the Use of Force.

1   assuage his paranoid fears towards the officers and the invisible people he

2   thought were in his attic.

3       At least one officer has estimated that there was a twenty-five second

4   time window from the time that DeSantis was proned on the ground, to the

5   time he rose up and ran towards the officers. [124]  Given the seriousness of this

6   situation and the inherent risks to all involved, if dialog would have failed and

7   DeSantis would have postured (as he eventually did), it would have been

8   appropriate given the safety margin to have deployed Officer Ellsworth's K-9

9   partner "Duke" to engage and distract DeSantis; while officers moved

10  forward under the cover of the K-9 and engaged the unarmed subject with

11  less lethal weaponry.

12      Sergeant Celli and Officers Menke and Mann should have reasonably

13  recognized that all of the circumstances that existed before Richard DeSantis

14  rose up from the ground and charged towards Officers Menke and Mann

15  had changed to such an extent that the _actual_ jeopardy all were exposed

16  to, albeit still serious, had diminished from "imminent" to "potential." This level

17  of threat reduction reasonably allowed the officers to take advantage of an

18  opportunity to engage alternate non-forceful to less lethal force resolution

19  strategies. It would definitely appear that the experienced Sergeant Soares

20  and Officer Jones _did_ recognize that the threat potential had been reduced

21  due to the changing circumstances.

22      Police Officers are instructed in officer safety tactics and Use of Force

23  classes to constantly assess and recognize the circumstances of jeopardy

24

25

---

[124] Ibid., Deposition, Sgt. Celli, Vol. II, p. 250

As previously discussed, this incident was unique in that the involved officers possessed a variety of tactical, less-lethal force options that although deployed, were not used to stop, control and overcome DeSantis' resistance.

- The officers missed a tactical opportunity to move forward towards the prone DeSantis with Tasers under the cover of Sergeant Soares' SAGE less-lethal rifle, OC pepper spray chemical agents and handguns to attempt to secure him.

- Officer Ellsworth missed a tactical opportunity to use his K-9 to engage, bite, hold and distract DeSantis long enough for a team of officers to advance and engage DeSantis under the cover of the K-9, when DeSantis became non-compliant with remaining prone. Officer Ellsworth missed a critical second opportunity to use his K-9 to engage, distract and control DeSantis after he rose up and ran towards Officers Menke and Mann both before and after DeSantis had been shot with the SAGE less-lethal round.

Sergeant Celli as incident commander, failed to plan for the potential tactical use of the K-9 as a less-lethal contingency in the event that verbal negotiation or other less-lethal options were unavailable or unsuccessful.

One important factor to be considered is that Officer Ellsworth's K-9 "Duke" had been specifically trained to be used as a tactical tool deployed to mitigate risk to officers attempting to affect the arrest of a threatening or fleeing subject in high-risk situations.

Officer Ellsworth states that while he understands that his K-9 is a tool and concedes that his K-9 had received at least twenty trainings on engaging a person who was attacking him; he did not release his K-9 to

(1989); Saucier v. Katz, 533 U.S. 194, 201 (2001); Forrester v. City of San Diego, 25 F.3d 804 (9th Cir. 1994); Tennessee v. Garner, 471 U.S. 1 (1985); Blanford v. Sacramento County, 406 F.3d 1110, 1115 (9th Cir. 2005); Jackson v. City of Bremerton, 268 F. 3d 646 (9th Cir. 2001); Drummond v. City of Anaheim, 343 F. 3d 1052, 1058 (9th Cir. 2003); Santa Rosa Police Department Policies "Use of Force/Deadly Force No. 01-02.")

e. <u>Sergeant Celli shooting DeSantis prematurely may have led to Officers Menke and Mann's hypervigilance, resulting in "sympathetic gunfire" in also shooting the decedent.</u>

"Sympathetic gunfire," is loosely defined in firearms training as the premature firing of a weapon absent of any threat assessment, situational awareness, or force option control.

Sergeant Celli and Officers Menke and Mann have all provided reasons why the opted for a deadly force response against DeSantis' aggressive actions. None of these reasons relate in any way to sympathetic gunfire.

Sergeant Celli states that he shot DeSantis because he felt that the SAGE less-lethal option had no been effective and "wasn't going to let (DeSantis) attack Menke and Mann, or get behind him." [161]

Officer Menke states that he fired at DeSantis because he felt "forced to defend himself and his fellow officers." He states that as DeSantis was running towards him, he felt that the only reason DeSantis would be doing so would be "to kill (him)." Officer Menke states that at the time he fired at DeSantis, he thought that DeSantis could still be armed, could not see DeSantis' back

---

[161] Ibid., OIS Interview, Sgt. Celli, p. 12

waistband area, and the SAGE round wasn't stopping DeSantis." [162] Officer
Menke also states that at the time he shot DeSantis, he "couldn't see
(DeSantis) very well, so (I) wasn't sure of anything." [163]

Officer Mann states that she fired at DeSantis when DeSantis ran towards
her because she was in fear of her life. She states that she did not know
whether DeSantis still had a weapon in his pants and "kept losing sight of his
right hand." Officer Mann states that she was not sure if DeSantis was
grabbing a weapon out of his rear waistband area." [164]

While Officers Menke and Mann have represented that they fired upon
Richard DeSantis in self-defense because they were in fear of their lives, I
believe that there is sufficient evidence present to suggest that both officers
actually fired at DeSantis sympathetically after Sergeant Celli shot DeSantis.
I further believe that this sympathetic gunfire occurred as a direct result of
their mutual inexperience and their psychological state of hypervigilance.
There are several reasons for this opinion:

- Both Officer Menke and Officer Mann were new and inexperienced
  police officers. Officer Menke had been on the street approximately one
  year and Officer Mann had been on the street barely six months, having
  recently been released from the Field Training Program only a few months
  before this incident.

---

[162] Ibid., OIS Interview, Ofc. Menke, pp. 7, 12-14

[163] Ibid., pp. 4, 12,

[164] Ibid., OIS Interview, Ofc. Mann, pp. 18, 21

1       •   According to Santa Rosa Police Department training records, outside of

2   attending a police academy, neither officer had received any officer

3   safety tactics training. It is believed that the only periodic department

4   training each officer had received was defensive tactics, weapon

5   retention and firearms qualification training. If the officers' defensive

6   tactics training and their confidence with using lower level force options

7   would have been minimal; when threatened, both officers may have

8   resorted to a "comfort zone" of deadly force.

9       •   Sergeant Soares, Officer Jones and Officer Ellsworth report that Officers

10   Menke and Mann fired their weapons immediately after Sergeant Celli

11   fired his weapon.

12       •   As previously discussed, both Officers Menke and Mann have repeatedly

13   stated that at no time did they ever see DeSantis with any type of

14   weapon prior to and while running towards them. They also concede that

15   they never saw any suspicious bulges in his pants indicating that he

16   possessed a concealed weapon. Both officers acknowledge that they

17   never saw DeSantis make any furtive or suspicious movements towards his

18   waistband or pockets indicating that he might have a concealed

19   weapon.

20       •   Neither Officer Menke nor Officer Mann took note that they were firing

21   their handguns towards the DeSantis residence where Mrs. DeSantis and

22   her two small children were sequestered at the time. In fact, one of the

23   officers' .40 caliber rounds missed the decedent and struck the home

24   and certainly could have injured or killed one of its occupants. Officers

25   are continuously taught in firearms training to always be sure of the

*Expert's Report, Dr. Ron Martinelli, Ph.D.*

backstop for any rounds they fire down range. Both officers obviously forgot their firearms safety training when they fired at DeSantis.

○ Officers Menke and Mann have described the ambient lighting in the immediate area during the shooting as "very dark," "poor," or "dim". [165], [166] Yet, Officer Menke also states that there was better lighting once DeSantis had moved closer to him. [167] Officer Mann also states that during the incident, she had been illuminating DeSantis with her flashlight. [168] In comparison, other involved officers within the immediate area and observing DeSantis and the scene from positions directly across from the officers have described the ambient lighting at the time of the shooting as "well lit" and "good." Perceptions of poor lighting in an area that is relatively well lit are indications of perceptual narrowing, or "tunnel vision." This dynamic can also account for officers claiming that they did not see a subject's hands, when their hands were clearly visible to others.

○ Both officers had special "threat level – 3" weapon retention holsters and had been trained in weapon retention defensive tactics. Yet, when DeSantis charged towards them empty-handed, each failed to re-holster their weapons and transition to alternate defensive weapons for protection such as a Taser, or an impact weapon (baton). Both kept their handguns pointed at DeSantis because their constant mindset was that

---

[165] Ibid., OIS Interview, Ofc. Mann, pp. 15-16

[166] Ibid., OIS Interview, Ofc. Menke, p. 10

[167] Ibid., p. 10

[168] Ibid., OIS Interview, Ofc. Mann, pp. 15-16

they would be killed, rather than physically attacked by the unarmed DeSantis. In inability to properly assess actual threats present, rather than preparing for and responding to what is actually happening, is a clear symptom of panic, confusion and hypervigilance.

It is quite possible that when threatened by the running, yet unarmed DeSantis; rather than relying on their own threat assessment, their inexperience psychologically allowed each other to instead rely upon Sergeant Celli's judgment. Therefore, when Sergeant Celli fired at DeSantis, Officers Menke and Mann felt that it was appropriate to shoot as well, despite the actual diminished threat level that existed at the time. (Police officer, detective, Field Training Officer 22 years; Police Academy Instructor & Professor Criminal Justice 30 years; Division Dean Criminal Justice & Police Academy Director 2 years; Professor Forensic Psychology & Forensic Science 4 years; criminal investigations and crime scene investigations instructor 25 years; state-approved police practices, law enforcement training, risk management and liability instructor 29 years; Federal/State Courts Certified Expert in Police Practices 18 years; Use of Force Instructor 28 years, Combat Psychology & Physiology 8 years, firearms instructor 17 years, Simunitions & Use of Deadly Force scenario instructor 4 years, officer safety & high-risk environments instructor 28 years; law enforcement consultant in police practices, Use of Force, and officer safety 30 years; CA-POST LD 35 "Firearms;" Santa Rosa Police Department Policies "Use of Force/Deadly Force No. 01-02; SRPD Expanded Course Outline "Tactical Firearms.")

7.  <u>Sergeant Celli failed to properly supervise the officers in his command during this incident</u>.

As previously discussed, Sergeant Celli failed to supervise officers under his command during this critical incident. Sergeant Celli had designated himself as the "Incident Commander" while responding to this incident, yet he failed to properly communicate with his men, develop and implement an appropriate response plan and direct the actions of his officers. Sergeant Celli's lack of supervision led to a lack of communication, cohesion and team work among his officers. Sergeant Celli's lack of supervision ultimately caused officers to respond independently and the inexperienced officers to act without control. Sergeant Celli's lack of supervision was a contributing factor in Richard DeSantis' death. (Former police officer, detective, Field Training Officer 22 years; police academy instructor, law enforcement training consultant & professor of Criminal Justice, Forensic Psychology, and Forensic Science 30 years; former Police Academy Director & Division Dean Criminal Justice; law enforcement instructor: police responses to the mentally disabled, "Suicide by Cop"; Field Training Officer & Supervisor Course, Officer Responses and Supervisors' Responses to Critical Incidents; Use of Force, officer-involved shootings, officer safety tactics, firearms and close quarter battle (CQB), critical decision making, and Simunitions, ; Federal/State Courts Certified Expert in Police Practices 18 years.)

8.  <u>Richard DeSantis' history of mental illness was a contributing factor in this incident</u>. The decedent's actions ultimately contributed to the police response to his residence at their confrontation with him. However, it is believed based upon his behavior that his mental illness, paranoia and delusional behavior significantly affected his cognitive processing and ability for rational thought. It is my opinion

Expert's Report, Dr. Ron Martinelli, Ph.D.

that during this incident Richard DeSantis was gravely disabled, a danger to himself and others. If the trier of fact were to determine that Richard DeSantis was mentally ill to the point of being gravely disabled, then I would opine that he was not responsible for his actions during this incident.

(Former police officer, detective, Field Training Officer 22 years; police academy instructor, law enforcement training consultant & professor of Criminal Justice, Forensic Psychology, and Forensic Science 30 years; former Police Academy Director & Division Dean Criminal Justice; law enforcement instructor: criminal behavior, police responses to the mentally disabled, "Suicide by Cop" and Responses to Critical Incidents, Field Training Officer & Supervisor course; state-approved police practices, risk management and liability instructor 16 years Federal/State Courts Certified Expert in Police Practices 18 years; POST LD-37 "People with Disabilities" Mental Health Section; W&I §5150.)

9. <u>The City of Santa Rosa provided inadequate training to the involved officers</u>

   a. The City of Santa Rosa and its police department failed to provide update training to their police officers beyond the police academy level in several key police practices relating to this incident. The lack of foresight, strategic planning and update training contributed to the decedent's injury. Examples of an inadequate training program are many:

   - Sergeant Clay Van Artsdalen, (Person Most Knowledgeable) "PMK", who was the department "Training Manager" from 2004 – 2007, has testified that during the three years that he was training manager, he <u>never</u> met with Chief Ed Flint to discuss training issues. [169] He states that he never

---

[169] Deposition, Sgt. Van Artsdalen "PMK", dated: 07-24-08, p. 106

read or was aware of a job description for his position of "training manager". [170]

○ The PMK has testified that during the three years that he was the department training manager, he never attended any meetings where the training budget was discussed. He was unable to offer any specifics or recall whether or not he ever recommended any non-mandated Commission on Peace Officer Standards & Training (POST) training. [171]

○ The PMK has testified that ultimately it is the choice of the command staff including the chief to select department training. However, he states that in the three years that he was training manager, he never conducted any Training Needs Assessments based upon incident reports, demographics, or police activities which identified training needs. [172]

○ The PMK has testified that although the department responded to 3,186 calls for services involving mentally disturbed persons and had affected 1,746 detentions and involuntary holds of mentally disturbed persons per W&! §5150 between 2002 and 2007, no officers in the department had received any training in Crisis Intervention or dealing with emotionally disturbed persons (EDPs) since 2002. [173]

---

170 Ibid., p. 18

171 Ibid., p. 38

172 Ibid., pp. 30-31

173 Ibid., PMK Sgt. Van Artsdalen, pp. 83, 104, 113, 118-119

*Expert's Report, Dr. Ron Martinelli, Ph.D.*

**EXHIBIT D**

# Ron Martinelli, Ph.D.
42143 Avenida Alvarado, Suite B-2  Temecula, CA 92590
Phone: (951) 719-1450, E-Fax: (334) 460-6175  Email: Code3Law@martinelliandassoc.com

## Professional Work Experience

❖ **Criminologist & Law Enforcement Training Consultant:** Full-Time:   05/1997- Present
   **Federal/State-Certified Police Practices Expert**                       02/1993 – 07/1994
   Martinelli & Associates Justice Consultants, LLC      Part-Time:  10/1978 – 02/1993

Criminologist and private law enforcement training provider retained to develop and produce professional training and policies for law enforcement, corrections, criminal justice agencies and civilian personnel. **Federal/State Courts Certified Police Practices Expert:** Provide consultation, forensic analysis, investigative reports and expert testimony for agencies, associations, county counsels, state/city attorneys, law firms and plaintiffs involved in use of force and police practices litigation. Significant portfolio of agency, municipal, and plaintiff attorney clients.

❖ **Director, Strategic Training & Consulting, LLC – USVI**                05/2008 – Present
   1009 North Street, Suite B ● Christiansted, U.S. Virgin Islands 00820-5019

Administration of law enforcement and criminal justice training and consulting firm providing training and consulting services to the U.S. Virgin Islands Police Department and offshore Caribbean Island nations. Oversee development and production of police and corrections practices training; network with government and police agencies and administrators; budgeting, staff selection, appointments, supervision of training specialists; supervision and evaluation of training programs.

❖ **Law Enforcement Training Consultant:  U.S. Virgin Islands Police Department** 05/2008 -

Law enforcement training consultant and police practices advisor for the U.S. Virgin Islands Police Department under contract with *Strategic Training & Consulting, LLC – USVI*. Program development and production; course instruction; production logistics. Provide police practices consultation and training to USVI Governor's Office, VIPD Police Commissioner, police administration and department officers. Upon request author specific department policies & procedures; make recommendations on police practices training curriculum; instruction of intermediate and advanced law enforcement courses. Assist agency in its efforts to become a nationally accredited law enforcement agency.

❖ **Special Investigator , Officer-Involved Shootings  & In-Custody Deaths** 04/2008 - Present
   **Office of the City Attorney, City of Riverside**

Contract specialist and investigator working under the Manager of the Community Police Review Commission to independently investigate all officer-involved shootings (OIS) and in-custody death incidents involving the Riverside Police Department. Provide in-depth investigations, forensic analysis and reports, testimony, consultation and training to the City Attorney's Office, the commission, city agencies and administrators as requested.

❖ **Director, Criminal Justice Training Center & Fire Science Training Academy**
   **Division Dean, Criminal Justice; Modesto Junior College:** January 1992 to May 1993
   201 Blue Gum Avenue, Modesto, California 95352

Interim contract administration and coordination of a California POST accredited law enforcement Basic Police Academy, Criminal Justice Training Center and Regional Fire Science Training Center serving eight counties.  Management and supervision of full and part-time faculty.  Program development and certification of basic academy and advanced officer courses; scheduling, budget, networking with law enforcement, fire and community public safety agencies.

## Professional Work Experience, Continued:

❖ **Police Officer/Detective:** July 1994 to May 1997
Morro Bay Police Department
850 Morro Bay Blvd, Morro Bay, California

Investigation of felonies, major crimes and narcotics violations. Collateral responsibilities of providing Spanish translation, officer safety and use of defensive force training to departmental personnel. Reserve Police Officer status from November 1993 to July 1994.

❖ **Police Officer:** January 1977 to January 1992
San Jose Police Department
201 W. Mission Street, San Jose, California 95110

Diverse field enforcement and investigative assignments, including: Field Training Officer and police academy instructor; Administrative Assistant to District Supervisor; felony suppression patrol, Street Crimes Unit (undercover, vice, prostitution, narcotics, robbery suppression); Fraud Unit: Forgery and complex theft investigation; street gang investigations; Juvenile Crimes Against Persons Unit; Sole beat patrol; development and instruction. Certified bilingual (Spanish-fluent) officer/translator.

❖ **Police Officer:** 1975 to 1977
Redwood City Police Department
1020 Middlefield Road, Redwood City, California 94063
General patrol, enforcement and investigative functions. Department Spanish language translator.

## Education

❖ **Doctor of Philosophy (Ph.D.), Criminology** 1986
Columbia Pacific University, San Rafael, California

❖ **Masters Degrees, Public Administration & Justice Administration** 1980
Golden Gate University, San Francisco, California

❖ **MPA Degree Program, Graduate Studies in Criminal Law and Public Administration**
1978-1979 John F. Kennedy University, Orinda, California

❖ **Bachelor of Science Degree, Physical Education & History** 1973
California Polytechnic State University, San Luis Obispo, California
Recipient of California Secondary Teaching Credential 1974

## Faculty Memberships (Past – Present)

❖ **National University:** 2007 – Present
11255 No. Torrey Pines Road, La Jolla, California 92037-1011
Professor: Forensic Science Masters Degree Program, Mathematics & Technology Department

❖ **Argosy University:** 2004 – 2005
999-A Canal Boulevard, Point Richmond, California 94804
Professor: Forensic Psychology Masters Degree Program, Forensic Psychology Department

Ron Martinelli, Resume (continued)

## Faculty Memberships (Past & Present), Continued:

❖ **California Polytechnic State University** 1998 - 1999
  1 Grand Avenue, San Luis Obispo, California 93407
  Instructor: Criminology, Bachelors Degree Program, Social Science Department

❖ **DeAnza College:** 1983 to 1991
  21250 Stevens Creek Boulevard, Cupertino, California 95014
  Instructor: Advanced criminology/law enforcement Instructor: Social Science Division, Administration of Justice

❖ **Columbia Pacific University:** 1987 to 1990
  1415 Third Street, San Rafael, California 94901
  Adjunct Professor & faculty mentor for graduate & undergraduate studies: Criminal Justice Program

❖ **San Jose City College:** 1977 to 1981
  2100 Moorpark Avenue, San Jose, California
  Instructor: Basic Police Academy, Regional Criminal Justice Training Center. Instructor of advanced law enforcement studies for corrections and probation departments

## Visiting Lectureships

❖ US Naval Special Warfare Command, SEAL Team One, Coronado, California
❖ San Jose State University, Center for Transitional Studies
❖ San Joaquin Delta Community College, Regional Criminal Justice Training Center
❖ Los Medanos College, Criminal Justice Training Center
❖ Butte College, Criminal Justice Training Center
❖ University of Nevada-Reno, Criminal Justice Division
❖ Truckee-Meadows Community College, Law Enforcement Academy
❖ Tampa College, Florida, Criminal Justice Division
❖ Wyoming Law Enforcement Academy, Wyoming Division of Criminal Investigations
❖ Crafton Hills College, Criminal Justice Division
❖ Atlanta Police Department & Police Academy, Atlanta, Georgia

## Professional Certifications (Partial List Only)

❖ Peace Officer Standards & Training Advanced Certificate, 1980  #A9825
❖ Officer-Involved Shootings & In-Custody Death Investigations, AELE, 2008
❖ Sexual Assault Investigator School, San Jose State University, POST, 1996
❖ Homicide Investigator School, California District Attorney's Association, 1995
❖ Child Physical/Sexual Abuse & Sexual Exploitation Investigator School, POST, 1994
❖ Criminal Psychological Profiling Certification, National Law Enforcement Institute, 1988
❖ Computer Crime & Complex Economic Fraud Certification, U.S. Department of Justice, 1981
❖ Bilingual Spanish language Certification, City of San Jose, 1977

## Instructor Certifications (Past-Present)

❖ California Community College Instructor Certificate (Life),
  Police Science/Administration of Justice 1977 #146515
❖ Law Enforcement Training Provider & Instructor, California Board of Corrections #0970, 1980
❖ Law Enforcement Training Provider & Instructor, California POST #9190, 1978
❖ Law Enforcement Firearms (Tactical Pistol) Instructor (CA)

## Instructor Certifications (Past & Present), Continued:

- ❖ Simunitions FX, Officer-Involved Shooting & Scenario Safety Training Instructor, 2006
- ❖ NRA Law Enforcement Firearms Instructor, 2004, 2007 (National)
- ❖ NRA Civilian Firearms Instructor (Pistol/Shotgun), 2005, 2007 (National)
- ❖ NRA Home Defense Instructor, 2005, 2007 (National)
- ❖ Grav Maga Edged Weapons Defense (CA), 2002
- ❖ Advanced TASER Electro Muscular Disruption Weapon Instructor, TASER Intl (USA), 2002, '05, '07
- ❖ *Gunsite* Law Enforcement Firearms Instructor, 1998
- ❖ Chemical Agents, OC Pepper Spray Aerosol & Chemical Munitions Instructor, CA-POST, 1993
- ❖ Less Lethal Weapons & Munitions Instructor (Defense Technology), CA-POST, 1993
- ❖ Less Lethal Weapons & Munitions, 40mm Launcher & Exact Impact Sponge Round, 2004
- ❖ Defensive Force Management Instructor (CA, NV, NE, WY, FL)
- ❖ Defensive Force:  Unarmed Defensive Tactics Instructor (CA, NV, WY, NE)
- ❖ Arrest, Control, and Restraints Tactics Instructor (CA, NV, NE)
- ❖ Officer Survival Tactics for First Responders Instructor (CA, NV)
- ❖ Tactics for Armed Officers Instructor (CA)
- ❖ Tactical Negotiation & Conflict Resolution Instructor (CA)
- ❖ Field Training Officer & Field Training Supervisor Course (CA, USVI)
- ❖ Special Emergency Response Teams (SERT) for Corrections Institutions Instructor (CA)
- ❖ Survival Tactics for Unarmed Field & Institutions Officers Instructor (CA)
- ❖ Officer Safety/Survival in High-Risk Environments Instructor (CA)
- ❖ Integrated Force Instructor (CA)
- ❖ Probation Field & Institution Supervision Instructor (CA)
- ❖ Street Gang Dynamics & Investigations Instructor (CA, NV, WY, NE, FL)
- ❖ White Supremacist Groups, Organizations & Hate Crime Investigations Instructor (CA, NV)
- ❖ Prostitution Dynamics & Investigations Instructor (CA)
- ❖ Field Training Officer Instructor (CA)
- ❖ Probation/Corrections Training Officer Instructor (CA)
- ❖ Report Writing & Testimony for Critical Incidents Instructor (CA)
- ❖ Risk Management, Civil Liability & Training Instructor (CA)
- ❖ Corrections Title 15 Instructor (CA)
- ❖ Officer & Suspect Psychology & Physiology During Critical Incidents Instructor (CA)
- ❖ Supervisor Response to Critical Incidents, In-Custody Deaths & Officer-Involved Shootings Instructor (Corrections & Field Officers) (CA)

## Awards & Special Achievements (Partial List Only)

- ❖ Visiting Instructor:  U.S. Naval Special Warfare Command, SEAL/s *Hand to Hand Combat Instructor/UDT Course, 2000*
- ❖ Key Presenter/Instructor: CA Board of Corrections Law Enforcement Training Manager's Seminar, 2006, *"Risk Management, Training and Law Enforcement Liability"*
- ❖ Instructor/Presenter: CA Probation, Parole & Corrections Officers Assoc. State Conference, 2005 *"Tactical Psychology & Physiology in Officer Involved Shootings;" " Taser Electro Neuromuscular Disruption Weapon Systems"*
- ❖ Instructor/Presenter: CA State Park Rangers Association State Conference, 2007 *"Tactical Psychology: Dealing with Stress Inoculation During Critical Incidents"*
- ❖ Instructor/Presenter: CA State Park Rangers Association State Conference, 2005 *"Training, Standards and Law Enforcement Liability; The Arming of Park Rangers"*
- ❖ Instructor/Presenter: California Probation, Parole, & Correctional Assoc. State Conference, 2002, '04 *"Armed Officer & Legal Training Standards"*
- ❖ Instructor/Presenter: California Probation, Parole, & Correctional Assoc. State Conference, 2002, '04 *"Managing Legal Liability & Law Enforcement Training"*
- ❖ Visiting Instructor: Atlanta Police Department *"Undercover Street Crimes Operations"* 2003

Ron Martinelli, Resume (continued)

## Special Awards & Achievements, Continued:

- ❖ Instructor/Presenter:  American Society of Law Enforcement Trainers Use of Force National Conference, *"Unarmed Defensive Tactics/Tactical Ground Fighting Instructor's Course"*, 1999
- ❖ Presenter:  CA Probation Chief's Association State Conference, *"Risk Management & Training"*, 1998
- ❖ Appointed Expert Witness, *Caliber Press, Inc.* Law Enforcement Agency Defense Services, 1997
- ❖ Key Presenter:  California Probation, Parole, & Correctional Assoc. Conference, *"Use of Force Training"* 1996
- ❖ Key Presenter:  California Probation Administrator's State Conference, *"Use of Force Liability"* 1995
- ❖ Appointed *"Use of Force Advisor"*, CA Probation Chief's Arming Committee, 1993-94
- ❖ San Jose Police Department Employee Recognition Awards, 1987, 1988, 1989
- ❖ Nominated San Jose Police Department Medal of Valor, 1981
- ❖ San Jose Police Department & Santa Clara County "Top Cop Award" Most Felony Arrests, 1980
- ❖ San Jose Police Department Outstanding Duty Award, 1980
- ❖ Recipient of over **140** departmental, community, and citizen commendations for outstanding performance and community service
- ❖ Peace Officer Research Association of California (PORAC) Graduate Studies Scholarship, 1985
- ❖ Chair, Education & Training Committee, Northern California Gang Investigators Association 1983-84
- ❖ Outstanding Service Award, American Association of Retired Persons, 1981
- ❖ Appointed Child Abuse Task Force, San Mateo County Supervisors, 1980
- ❖ California Youth Gang Task Force, (Governor's Consultant) 1980

## Professional Memberships (Past & Present)

- ❖ California Academy Director's Association (ADA)
- ❖ California District Attorneys Association (CDAA)
- ❖ International Law Enforcement Educators & Trainers Association (ILEETA)
- ❖ International Association of Law Enforcement Firearms Instructors (IALEFI)
- ❖ American Society of Law Enforcement Trainers (ASLET)
- ❖ National Rifle Association Law Enforcement Activities Division (NRA-LEAD)
- ❖ California Probation, Parole, & Correctional Association (CPPCA)
- ❖ California Association of Police Training Officers (CAPTO)
- ❖ California Peace Officers' Association (CPOA)
- ❖ Peace Officers' Research Association of California (PORAC)
- ❖ California Gang Investigators Association
- ❖ Northern California Gang Investigators Association
- ❖ American Society of Criminology
- ❖ Police Marksman Association
- ❖ International Assoc. Crime & Intelligence Analysts
- ❖ The Society for Police and Criminal Psychology
- ❖ Crime Scene Investigator's Association
- ❖ U.S. Navy UDT/SEAL Association

Ron Martinelli, Resume (continued)

## Publications Authored (Texts)

❖ *The Violent Gang*
Shield Criminal Justice Publications; San Carlos, 1991, '92, '93, '94

❖ *The Stroll: Victims and Violators of the World's Oldest Profession – Prostitution*
Shield Criminal Justice Publications; San Carlos, 1986, '87, '90

❖ *Street Gangs: Violent Nations Within A Violent Nation*
Shield Criminal Justice Publications; San Carlos, 1986, '87

❖ *Streetwise Criminology*
Martinelli & Associates Justice Consultants; Los Osos, 1999

## Training Manuals Authored

❖ *Field Training Officer & FTO Supervisor's Course (Manual & PowerPoint), 2008*
*Strategic Training & Consulting, LLC – USVI*

❖ *Police Supervisor's Liability Course (Manual & PowerPoint), 2007*

❖ *Supervisor Responses to Critical Incidents (Manual & PowerPoint), 2007*

❖ *Tactical Psychology & Physiology: How the Body Acts when Stress Inoculated*
Martinelli & Associates Justice Consultants, 2005, '06

❖ *Managing Risk & Civil Liability Through Training (Manual & PowerPoint)*
Martinelli & Associates: Justice Consultants, 1999, '01, '02, '06

❖ *Arrest, Control, & Restraint Tactics*
Martinelli & Associates: Justice Consultants, 1994, '97, '98, '03, '07

❖ *Arrest, Control, & Restraint Tactics Instructor*
Martinelli & Associates: Justice Consultants, 1998, '00, '03, '07

❖ *Probation Training Officer (PTO Manual & PowerPoint)*
Martinelli & Associates: Justice Consultants, 1996, '97, '98, '02, '06

❖ *Chemical Agent OC Pepper Spray Defense (Manual & PowerPoint)*
Martinelli & Associates: Justice Consultants, 1994, '95, '96, '97, '98, '03, '06, '07

❖ *Tactical Use of OC Spray*
Martinelli & Associates: Justice Consultants, 1995, '96, '97, '98, '03, '07

❖ *Report Writing & Testimony for Critical Incidents*
Martinelli & Associates Justice Consultants, 1998, 2000

❖ *Use of Force:  Unarmed Defensive Tactics*
    Shield Criminal Justice: Consultants, 1993, '96, '97, '03

❖ *Weaponless Defense for Corrections Instructor*
    Martinelli & Associates: Justice Consultants, 2003

❖ *Laws of Arrest, Search & Seizure (Manual & PowerPoint)*
    Martinelli & Associates Justice Consultants, 2005, 2006

❖ *Tactical Negotiation & Conflict Resolution (Manual & PowerPoint)*
    Martinelli & Associates: Justice Consultants, 1995, '98, 2002

❖ *High-Risk Environments for Officers (Manual & PowerPoint)*
    Martinelli & Associates: Justice Consultants, 1995, '97, '99, 2002, '07

❖ *Armed Officer Academy: Semi-Auto Pistol Transition*
    Martinelli & Associates: Justice Consultants, 2000, '02, '03
    Co-Author Larry Nichols

❖ *Arrest & Control Tactics (ACT) Instructor*
    Martinelli & Associates: Justice Consultants, 2000, 2003

❖ *Unarmed Defensive Tactics (UDT) Instructor*
    Martinelli & Associates: Justice Consultants, 2003

❖ *The Juvenile Street Gang Phenomenon*
    Martinelli & Associates: Justice Consultants, 1981

❖ *Defensive Force Management for Administrators & Supervisors*
    Martinelli & Associates: Justice Consultants, 1994, '95, 2001

❖ *Probation Supervisor's Manual (& PowerPoint)*
    Martinelli & Associates: Justice Consultants, 1995, 2007
    Co-Author Al Petrides

❖ *Street Gang Dynamics & Investigations*
    Martinelli & Associates: Justice Consultants, 1994, '95

❖ *Outlaw Motorcycle Gangs & Clandestine Labs*
    Martinelli & Associates: Justice Consultants, 1993, '95, '98
    Co-Author Anthony Tait (Compilation of OLMCG & Narcotics Data)

## Documentaries: Film, Television & Radio

❖ *"History's Mysteries" Series, 'Butch Cassidy & The Sundance Kid:
    Did they Survive their Famous Shootout?'*
    The History Channel, August, 2004
    Technical Advisor/Appearance

❖ **"Dangerous Missions" Series, 'Law Enforcement Snipers & Force'**
The History Channel, August, 2002
Technical Advisor/Appearance

❖ **"History's Mysteries: Forensic History" Series, 'Investigating the Shoot-Out At the OK Corral'**
The Discovery Channel, November, 2002
Technical Advisor/Appearance

❖ **"Officer-Directed Violence" : 'Officers Facing Violent Encounters'**
KICU-TV Channel 36 San Jose  1996
Technical Advisor/Appearance

❖ **"Criminal Psychological Profiling of A Serial Killer"**
'Hard Copy' Cable Television Documentary Series 1993
Technical Advisor/Appearance

❖ **"Satanism & The Occult"**
KICU-TV Channel 36 San Jose  1993
Technical Advisor/Appearance

❖ **"Crime & Criminology"**  Radio Talk Show Series Guest
KGO-ABC Radio 810AM San Francisco 1986-1990

❖ **"Shaved & Dangerous: White Supremacy In America"**
'Hard Copy' Cable Television Documentary Series 1990
Technical Advisor/Appearance

❖ **"Street Gangs"**
'Hard Copy' Cable Television Documentary Series 1989
Technical Advisor/Appearance

❖ **"Street Prostitution In America"** (News Feature)
'The Today Show' NBC-TV 1986
Appearance